

Eric H. Gibbs (State Bar No. 178658)
ehg@girardgibbs.com
Dylan Hughes (State Bar No. 209113)
dsh@girardgibbs.com
Phyra M. McCandless (State Bar No. 260021)
pmm@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Plaintiff

FILED

2013 AUG 22 P 2: 38

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNDER SEAL

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

JCS

CV 13 3891

UNITED STATES OF AMERICA *ex rel.* [FILED UNDER SEAL]

Plaintiff,

v.

[FILED UNDER SEAL]

Defendant.

CASE NO.

**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**DEMAND FOR JURY TRIAL**

**NATURE OF THE ACTION**

1.      This is a civil action brought by Relator Ronda Osinek on her own behalf and on behalf of the United States of America against Kaiser Permanente ("Kaiser") under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, to recover damages, civil penalties, and other relief owed to the United States and Relator.

2.      Defendant Kaiser is a private provider of Medicare Advantage insurance under Medicare Part C. Kaiser defrauded the United States through a sophisticated scheme to upcode diagnoses to ensure Medicare payments for reimbursable, high-value conditions. Kaiser effectuated its scheme through data mining and pressuring physicians and staff to retroactively change patient medical records.

3.      Kaiser's upcoding scheme is a direct violation of the Federal requirements for Medicare beneficiary reimbursement, leads to the submission of false and fraudulent claims to the United States, and results in Kaiser receiving excess Medicare payments.

**PARTIES**

4.      Plaintiff is the United States of America by and through Relator, Ronda Osinek. Relator is a resident of the State of California. Plaintiff brings this action on behalf of the United States Department of Health and Human Services and its component, the Centers for Medicare & Medicaid Services.

5.      Relator Ronda Osinek has been employed by The Permanente Medical Group of Kaiser Permanente, as a Data Quality Trainer since June 2006. Internal, non-public information known to Relator serves as the basis for this action. Relator has direct knowledge of methods used by Defendant to submit false or fraudulent data to CMS for reimbursement.

6.      Defendant, Kaiser Permanente is a California corporation with its principal place of business at One Kaiser Plaza, Oakland, California 94612. Kaiser is one of the largest Medicare Advantage organizations in the country and has more enrollees in its Medicare Advantage plans than any other organization in California. At all times relevant, Kaiser conducted business in California, including but not limited to providing healthcare services through Medicare Advantage plans and to the general public in California.

1

## JURISDICTION AND VENUE

2      7.      This Court has subject matter jurisdiction under 28 U.S.C. §1345. This Court has

3   subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (Federal

4   question), 1345 (United States as plaintiff), and 31 U.S.C. § 3732(a) (False Claims Act).

5      8.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a)

6   because Defendant can be found, resides, and transacts business in the Northern District of California

7   and because an act proscribed by 31 U.S.C. § 3729 occurred within this District.

8      9.      This Complaint is not based on the facts underlying any pending action, within the

9   meaning of the False Claims Act's first to file rule, 31 U.S.C. § 3730(b)(5).

10      10.      This action is not precluded by any provisions of the False Claims Act's jurisdiction bar.

11   31 U.S.C. § 3730(e) *et seq.*

12                a.   This Complaint is not based upon allegations or transactions that are the subject of a

13                civil suit or an administrative civil money penalty proceeding in which the United States

14                is already a party. 31 U.S.C. §3730(e)(3).

15                b.   There has been no "public disclosure" of the matters alleged herein and this action is

16                not "based upon" any such disclosure, within the meaning of 31 U.S.C. §3730(e)(4)(A).

17                Notwithstanding the foregoing, Relator is an "original source" of this information as

18                defined by 31 U.S.C. §3730(e)(4)(B) of the False Claims Act, and as such, she is

19                expressly excepted from its public disclosure bar.

20      11.      Venue is proper in the San Francisco or Oakland Divisions of the Northern District of

21   California under 31 U.S.C. § 3732(a), 28 U.S.C. § 1391(b), and Civil Local Rule 3-2(d) because

22   Defendant can be found in and transacts business within this District.

23

## THE FEDERAL FALSE CLAIMS ACT

24      12.      The False Claims Act was originally enacted in 1863, and was substantially amended in

25   1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for

26   recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.

27   The amendments were intended to create incentives for individuals with knowledge of government

28

1   frauds to disclose the information without fear of reprisals or government inaction, and to encourage

2   the private bar to commit resources to prosecuting fraud on the government's behalf.

3     13. The False Claims Act provides that any person who presents, or causes to be presented,

4   false or fraudulent claims for payment or approval to the United States Government, or knowingly

5   makes, uses, or causes to be made or used false records and statements to induce the government to pay

6   or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000

7   for each such claim, plus three times the amount of the damages sustained by the federal government.

8   No proof of specific intent to defraud is required under the Act.

9     14. The Act also allows any person having information about false or fraudulent claims to

10  bring an action for himself or herself and the government, and to share in any recovery. Based on these

11  provisions, Relator seeks through this action to recover all available damages, civil penalties, and other

12  relief for state and federal violations alleged. Although the precise amount of the loss from Kaiser's

13  misconduct alleged in this action cannot presently be determined, it is estimated that the damages and

14  civil penalties amount to millions of dollars.

15              **BACKGROUND**

16    15. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

17  Medicare program. Medicare is a federally-funded health insurance program for people who are over

18  the age of 65, under age 65 with certain disabilities, and for people of all ages with End-Stage Renal

19  Disease. As of 2012, Medicare provided insurance to approximately 50.7 million people.

20    16. The Centers for Medicare & Medication Services ("CMS") is the division of the

21  Department of Health and Human Services that is responsible for the reimbursement, administration,

22  and supervision of the Medicare program. Medicare includes the following categories of benefits:

23  hospital insurance for inpatient hospital care (Part A), medical insurance for doctors' services and

24  outpatient care (Part B), and prescription drug coverage to offset the cost of medications (Part D).

25  Medicare beneficiaries may opt out of the traditional program and receive benefits through Medicare

26  Part C, also known as "Medicare Advantage." Medicare Advantage plans are federally funded

27  privately-run insurance plans. For a monthly fee established by Medicare that is determined per

28

3

1   enrollee, Medicare Advantage organizations, such as Kaiser, provide the services available through

2   Medicare Parts A and B (inpatient and outpatient services).

3        17.    The per-enrollee monthly fee is derived by a formula that is primarily based on two

4   main factors. The first factor, the base rate, is the standard cost of providing Medicare Parts A and B

5   benefits to an average beneficiary. The second factor is a risk score that takes into consideration the

6   enrollee's actual health risks based on disease conditions and his or her demographics, such as age and

7   gender. The risk score is calculated using a complex statistical model called the CMS-HCC Risk

8   Adjustment Model. The result is that enrollees with more severe health risks derive a higher monthly

9   payment because Medicare expects that they will require more expensive care. In other words, the

10  higher the risk score, the more money Medicare pays the Medicare Advantage organization (such as

11  Kaiser) each month.

12       18.    CMS requires Medicare enrollees' disease conditions to be diagnosed and memorialized

13  by a physician as a result of a face-to-face encounter according to the *International Classification of*

14  *Disease, Ninth Revision, Clinical Modification* ("ICD-9"), which is the official system of assigning

15  codes to diagnoses associated with health care in the United States. The ICD-9 codes are mapped to

16  disease groups known as hierarchical condition categories or HCCs. The HCC categories are, in turn,

17  used under the risk adjustment model to reflect the enrollee's health risks, and thus directly correlate to

18  the amount of payments the Government is to pay the Medicare Advantage organization each month.

19      **FEDERAL REQUIREMENTS FOR MEDICARE ADVANTAGE PAYMENTS**

20       19.    Medicare Advantage plans such as Kaiser are legally obligated to accurately and

21  properly submit data to CMS to receive payment for Medicare beneficiaries. The Medicare Advantage

22  plan must have documentation from provider encounters (rather than prescriptions or test results)

23  supporting associated ICD-9 diagnoses. Any causal link between a disease and a resulting

24  complication must be established and supported during the doctor-patient visit. According to the ICD-

25  9 Official Guidelines:

26        The importance of consistent, complete documentation in the medical record cannot be

27        overemphasized. Without such documentation accurate coding cannot be achieved. The
      entire record should be reviewed to determine the specific reason for the encounter and

28        the conditions treated.

1       The term encounter is used for all settings, including hospital admissions.  In the context
of these guidelines, the term provider is used throughout the guidelines to mean physician
2   or any qualified health care practitioner who is legally accountable for establishing the
patient's diagnosis.  Only this set of guidelines, approved by the Cooperating Parties, is
3   official.

4       20.    All relevant documentation is entered into a medical record at the time of service.  CMS

5   recognizes, however, there may be times that a provider will need to amend, correct, or enter

6   documentation related to an encounter.  CMS expects supplemental documentation to be occasional,

7   and that delayed or amended entries will be entered within a reasonable time frame.  *See* Medicare

8   Program Integrity Manual, Pub. 100-08, ¶3.3.2.5 (Rev. 442, Implementation Jan. 8, 2013).  CMS will

9   consider delayed or amended explanations for diagnoses so long as the explanations are for clarification

10   and not for substantiating retroactive diagnoses.  According to the leading organization that trains and

11   certifies individuals on physician-based medical coding, the American Association of Professional

12   Coders or AAPC, Medicare understands a reasonable time frame to be 24 to 48 hours because it is not

13   reasonable for a provider to recall a visit two weeks (or more) after it occurred.  Similarly, according to

14   AAPC, addenda to medical records should not be a normal practice, but an exception to CMS' general

15   rule in which a provider fully documents a visit at the time of the encounter or shortly thereafter.

16       21.    CMS also requires that all documentation in a medical record be specific to a given

17   patient's situation at the time of the documented visit, which means medical records documentation

18   language should not be the same (i.e., cloned or boilerplate) from patient to patient or provider to

19   provider.

20       **KAISER VIOLATED THE FALSE CLAIMS ACT**

21       22.    Prior to 2004, Medicare Advantage organizations such as Kaiser were paid by CMS only

22   based on an enrollee's demographic information.  For instance, prior to 2004, Kaiser was paid the same

23   for all 77-year-old women in a community regardless of their actual disease conditions.  When

24   Congress passed the Medicare Modernization Act of 2003, CMS phased in the CMS-HCC Risk

25   Adjustment Model between 2004 and 2007. Beginning in 2007, Medicare Advantage plans received

26   payments based entirely on the CMS-HCC Risk Adjustment Model, which, as described above,

27   considers an enrollee's actual health risk.

28

5

23.     In response to the phase-in of the Risk Adjustment Model, Kaiser established the Encounter Information Operations department. The department is managed by The Permanente Medical Group, Inc., in Oakland, California, and tasked with overseeing Medicare coding and ensuring document standards are met. The Encounter Information Operations department includes Data Quality Trainers, Data Quality Auditors, CMS project managers, and CMS lead physician(s) who are assigned to, and work out of, each of Kaiser's Northern California facilities. Relator, a trained and certified medical coder, was recruited and hired by The Permanente Medical Group as the Data Quality Trainer and Audit Manager for the San Rafael Kaiser facility in 2006. Relator trained physicians on coding guidelines. If the facility's auditor found discrepancies between coding and documentation in progress or visit notes, Relator was sent to meet with the physicians to remediate the discrepancies and re-train them on proper coding practices.

24.     In or about 2007, there was a shift in the interactions with doctors and the management of the Encounter Information Operations department at Kaiser. Kaiser's Encounter Information Operations department began using a system to capture "missed opportunities," which are brought to the attention of physicians to ensure that all possible Medicare billing opportunities are captured, a process some Kaiser physicians refer to as "diagnosis chasing." By moving away from its focus on data quality and auditing physician coding to what Kaiser terms "refreshing" and "data mining," Kaiser was able to increase its billings for high value hierarchical condition categories or HCCs.

25.     Kaiser focuses its data mining on high value disease conditions for which Kaiser can maximize its reimbursement from Medicare and increase its revenue. Put another way, Kaiser identified the higher value HCCs and then determined the diagnoses its doctors would need to make to support the HCCs Kaiser wanted to submit for Medicare reimbursement. As of 2012, the Encounter Information Operations department used a variety of algorithms to identify the following disease conditions for data mining, which leads to upcoding (changes made over time in the diagnosis codes that make their enrollees appear less healthy than they actually are):

a. Chronic kidney disease

b. Diabetes mellitus with diabetic chronic kidney disease

c. Diabetes mellitus with diabetic nephropathy

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

    d. Congestive heart failure

    e. Depression

    f. Amputations

    g. Ostomy

    h. Tracheostomies

    i. Stable angina

    j. Peripheral vascular disease

    k. Diabetic peripheral vascular disease

    l. Diabetes with diabetic dyslipidemia

    m. Diabetes with diabetic erectile dysfunction

    n. Chronic respiratory failure

    o. Cachexia/Protein Calorie Malnutrition

    p. Severe obesity

    q. Dementia

    r. Seizure

    s. Chronic pancreatitis

26.    The consequence of Kaiser's focus on refreshing and data mining for missed opportunities is that physicians take into consideration HCCs and the Medicare payment system when coding and recording patient encounters. For example, Kaiser told its physicians to diagnose chronic kidney disease instead of the lower value nephritis or nephropathy. From 2010 to 2012, Kaiser shifted diagnoses from the lower risk nephropathy to the higher health risk (and higher-paying) chronic kidney disease. The charts below demonstrate Kaiser's success in bringing up its chronic kidney disease diagnoses while shifting away from the lower-paying nephropathy. HCC 132 (nephropathy) dropped by 200 diagnoses per 10,000 members from 2010 to 2012. HCC 131 (chronic kidney disease), which has a higher risk and is reimbursable at a higher rate than HCC 132, increased by more than 400 diagnoses per 10,000 members during the same time period.

7



**HCC 132: Nephropathy**

Dates of Service YTD 12/31/2012 • Data Extracted 1/5/2013

□ Dec 2012   ▲ Dec 2011   ✕ Dec 2011   ✕ Dec 2011 as of Dec 2012

| | SFO | EBA | SSF | GSAA | SRF | SSC | NSA | FRS | RWC | DSA | CVL | NCAL | NVL | SCL | SRO | SJO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec 2012 | 9 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 21 | 23 | 25 | 25 | 30 | 37 | 41 | 80 |
| Dec 2011 | 88 | 115 | 259 | 101 | 161 | 188 | 274 | 282 | 146 | 90 | 225 | 177 | 178 | 232 | 194 | 263 |
| Dec 2010 | 253 | 215 | 246 | 245 | 171 | 320 | 259 | 268 | 136 | 204 | 217 | 225 | 184 | 253 | 198 | 282 |

19                                                                   🏥 KAISER PERMANENTE.



**HCC 131: Chronic Kidney Disease**

Dates of Service YTD 12/31/2012 • Data Extracted 1/5/2013

Dec 2012  Dec 2012 Threshold  2012 Expected Prevalence   ▲ Dec 2011   ✕ Dec 2011   ✕ Dec 2011 as of Dec 2012

| | SSF | CVL | SSC | GSAA | NSA | FRS | SJO | NCAL | SCL | EBA | SFO | NVL | DSA | RWC | SRO | SRF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec 2012 | 2,944 | 2,768 | 2,767 | 2,668 | 2,655 | 2,652 | 2,535 | 2,412 | 2,369 | 2,339 | 2,332 | 2,331 | 2,271 | 2,269 | 1,887 | 1,816 |
| Dec 2011 | 2,491 | 2,353 | 2,295 | 2,403 | 2,212 | 2,134 | 2,179 | 2,045 | 2,020 | 2,071 | 2,095 | 1,808 | 1,981 | 1,931 | 1,422 | 1,515 |
| Dec 2010 | 2,384 | 2,281 | 2,044 | 2,187 | 2,189 | 2,089 | 2,122 | 1,926 | 1,976 | 1,914 | 1,884 | 1,796 | 1,741 | 1,900 | 1,421 | 1,482 |

18                                                                   🏥 KAISER PERMANENTE.

27. Likewise, when CMS announces that HCCs are eliminated (and no longer reimbursable by Medicare), Kaiser tells its physicians to change coding practices to reflect new reimbursable codes. CMS is "concerned about the high rate of coding of other HCCs by M[edicare] A[dvantage] organizations, [Fee for Service or] FFS providers, given that the coefficients are calibrated on FFS data." Therefore, CMS "made changes to . . . HCCs to address M[edicare] A[dvantage] coding intensity." For example, "[s]ince the clinically-revised model allowed [CMS] to better estimate marginal costs for a wider range of renal disease (specifically, the current HCC131 renal failure is split among a range of acute and chronic kidney conditions), we removed the lower-severity kidney disease HCCs, including Chronic Kidney Disease (CKD) stage 3, CKD stages 1-2, or unspecified; unspecified renal failure; and nephritis." In other words, to address upcoding, CMS notified Medicare Advantage providers that starting in 2014, the HCCs for chronic kidney disease stages 1 through 3 would be eliminated, meaning that Kaiser would no longer receive reimbursement for patients submitted with HCC 131. In response to CMS's notification that HCC 131 will be eliminated, Kaiser promptly sent materials to its staff to begin prompting physicians to code diagnoses for acute kidney injury instead of chronic kidney disease stage 1, 2, or 3, which will be included in the 2014 HCC list and reimbursable by Medicare.

28. To support the HCCs submitted to Medicare, Kaiser needs its physicians to amend patient files. Under CMS guidelines, physicians must verify that they considered a diagnosis or treated a diagnosis during the physician encounter, which means a physician must address what was contemporaneously considered if he or she addends a diagnosis. Kaiser's Medicare enrollee medical records include addenda with supporting statements or documentation that were not addressed at the time of an encounter. Kaiser should be training physicians to follow Medicare best practices and guidelines to contemporaneously document and code disease conditions during or immediately after face-to-face visits. Instead, Kaiser has its physicians systematically addend patient records retroactively—often many months after visits—with cloned or boilerplate language to make the patient record appear to comply with CMS instructions.

29. After an encounter, Kaiser tells physicians to go back to see what a member's previous test results showed to make diagnoses, which is not an appropriate data source for coding a diagnosis

9

1  under CMS guidelines nor does it comply with CMS best practices for contemporaneous

2  documentation and coding. In the specific example below, a patient was seen for a knee and sleep

3  problem. Two months after the visit, the physician addended the progress note to say the patient has

4  diabetes with chronic kidney disease (DM2 W DIABETIC CKD STAGE 1) based on laboratory tests,

5  with no indication that the diabetes or chronic kidney disease was addressed at the visit:

**Reason For Visit History**

| User | Date & Time |
|---|---|
| **Sitchler, Christi A** | 7/6/2012 2:26 PM |

Reason For Visit
**KNEE PROBLEM**
  Comment : RT x 2 days
**SLEEP PROBLEM**

| User | Date & Time |
|---|---|
| **Sitchler, Christi A** | 7/6/2012 2:25 PM |

Reason For Visit
**KNEE PROBLEM**
  Comment : RT x 2 days

| User | Date & Time |
|---|---|
| **Sitchler, Christi A** | 7/6/2012 2:25 PM |

Reason For Visit
**KNEE PROBLEM**

**Diagnoses**

| | |
|---|---|
| **SPRAIN TIBIOFIBULA, SUPERIOR** - Primary | 844.3 |
| **MAJOR DEPRESSION, RECURRENT** | 296.30 |
| **DYSSOMNIA** | 780.56 |
| **DM 2 W DIABETIC CKD STAGE 1 (GFR >= 90)** | 250.40, 585.1 |

**After Visit Summary**
  After Visit Summary

**Progress Notes**
Lewis, Anna Klaertje (M.D.) 9/19/2012 7:50 PM  Signed
After review of my note for this visit encounter, I recall this encounter and am addending this note to state
that this patient has diagnosis of:

DM 2 W DIABETIC CKD STAGE 1 (GFR >= 90)
Note: GLOMERULAR FILTRATION RATE - AFRICAN AMERICAN      >60  07/06/2012
GLOMERULAR FILTRATION RATE - AFRICAN AMERICAN    >60  04/03/2012
GLOMERULAR FILTRATION RATE - AFRICAN AMERICAN    >60  06/21/2011
GLOMERULAR FILTRATION RATE, NONAFRICAN AMERICAN      >60  07/06/2012
GLOMERULAR FILTRATION RATE, NONAFRICAN AMERICAN      >60  04/03/2012
GLOMERULAR FILTRATION RATE - NONAFRICAN AMERICAN     >60  06/21/2011
GLOMERULAR FILTRATION RATE - NONAFRICAN AMERICAN     >60  11/04/2010
GLOMERULAR FILTRATION RATE - NONAFRICAN AMERICAN     >60  03/18/2010
CREATININE   0.78  07/06/2012
ALBUMIN/CREATININE RATIO, UR    54.5  07/06/2012
GFR is stable, but patient has microalbuminuria.  Will follow. Control DM, HTN

30.    In addition, Kaiser tells its doctors to change diagnoses to upcode to higher value and

more complicated forms of diseases. For example, Kaiser prompted physicians to addend diabetes

diagnoses to include hyperlipidemia as a complication where tests or records reflected hyperlipidemia

regardless of whether the hyperlipidemia was actually *due to* diabetes. Likewise, changed diagnoses to

add complications are addended long after patient encounters. Dr. Pont, in the example below,

addended her progress note seven months after the initial patient visit to change a diagnosis from

10

1   diabetes without complications (ICD-9 250.00) to diabetes with mixed hyperlipidemia (250.80, 272.2),

2   which maps to a higher reimbursement HCC:

**Visit and Patient Information**
Encounter Date
2/3/12

**Reason For Visit History**

| User | Date & Time |
|---|---|
| Griffin, Kristine G (M.A.) | 2/3/2012 10:51 AM |

Reason For Visit
PHYSICAL EXAMINATION

**Diagnoses**

| | |
|---|---|
| ACTINIC KERATOSIS - Primary | 702.0 |
| PHASE POPULATION MANAGEMENT PROGRAM. | V49.89 |
| DM, WO RETINOPATHY | 250.00 |
| DM 2 | 250.00 |
| HYPERLIPIDEMIA | 272.4 |
| HTN | 401.9 |
| GOUT | 274.9 |
| SCREENING FOR CA, COLON | V76.51 |
| ELEVATED PROSTATE SPECIFIC ANTIGEN MEASUREMENT | 790.93 |
| HYPERPARATHYROIDISM, PRIMARY | 252.01 |
| DM 2 W DIABETIC HYPERLIPIDEMIA, MIXED | 250.80, 272.2 |

**After Visit Summary**
After Visit Summary

**Progress Notes**
Pont, Joan Turner (M.D.) 9/20/2012 6:57 PM Signed
Addendum to previous chart entry on 2-3-12
After reviewing the notes from the aforementioned visit, I recall the visit. The previous note reflects that I evaluated the patient who has the diagnosis of dm2 with mixed hyperlipidemia as evidence by tg 210 on 11-8-05, ldl 134 on 6-5-01.

Pont, Joan Turner (M.D.) 2/3/2012 11:30 AM Signed
Clinical Progress Note:
Patient presents with a chief complaint of PHYSICAL EXAMINATION

HPI: completed cataract surgery and whiter and brighter visionl Left still needs to be done

I have reviewed
medical history with no changes 2/3/2012, social history with no changes 2/3/2012 and family history with no changes 2/3/2012

31.   Kaiser also addended and submitted diagnostic codes for complex conditions without proper support (i.e., not a true causal connection). In 2009, providers were told to capture diagnoses of Peripheral Vascular Disease ("PVD") and Diabetic Peripheral Vascular Disease ("DPVD") using Carotid Artery Stenosis as evidence.

a.   Dr. Lori Selleck saw a patient on April 10, 2009 at 4:31 PM. There is no mention of PVD, however, four months later, on December 30, 2009, there is an addendum stating, "PVD = carotid a stenosis." Not only is the code assigned long after the patient encounter, but there is no evidence or documentation showing that the condition was present during the physician encounter. Furthermore, PVD and Carotid Artery Stenosis have no causal link:

11

**Office Visit (MRN 110001276550)**

**Visit and Patient Information**

Encounter Date
4/10/09

**Reason For Visit History**

| User | Date & Time |
|---|---|
| Steenburgh, Tyrone N (M.A.) | 4/10/2009 4:31 PM |

Reason For Visit
PHYSICAL EXAMINATION

**Diagnoses**

| HEALTH CHECK UP, ADULT  - Primary | V70.0 |
|---|---|
| HYPERTENSION | 401.9 |
| GIANT CELL ARTERITIS | 446.5 |
| HYPERLIPIDEMIA | 272.4 |
| CAROTID ARTERY STENOSIS, ASYMPTOMATIC | 433.10 |
| PERIPHERAL VASCULAR DISEASE | 443.9 |

**After Visit Summary**
After Visit Summary

**Progress Notes**
Selleck, Lori Z. (M.D.) 12/30/2009 12:28 PM Addendum
PVD = carotid a stenosis

b. Dr. David Conant met with a patient on June 28, 2011. Almost one year later, on

May 28, 2012, at 8:44 AM he addended his progress note to replace nephropathy

with chronic kidney disease, just as Kaiser encouraged to ensure the higher value

HCC would be captured when Medicare paid for this enrollee:

**Visit and Patient Information**

Encounter Date
6/28/11

**Reason For Visit History**

| User | Date & Time |
|---|---|
| Jones, Marlene J. (M.A.) | 6/28/2011 8:58 AM |

Reason For Visit
HEALTH MAINTENANCE

**Diagnoses**

| HEALTH CHECK UP, ADULT  - Primary | V70.0 |
|---|---|
| DM 2 W LOW HDL AND HIGH TRIGLYCERIDE DUE TO DM (DIABETIC DYSLIPIDEMIA) | 250.80, 272.4 |
| HYPERLIPIDEMIA | 272.4 |
| HTN | 401.9 |
| DM 2 W DIABETIC CHRONIC KIDNEY DISEASE, STAGE 1 | 250.40, 585.1 |

**After Visit Summary**
After Visit Summary

**Progress Notes**
Conant, David Loring (M.D.) 5/17/2012 8:44 AM Addendum
Diagnosis of DM2 with diabetic nephropathy microalbuminuria was replaced with DM2 with diabetic chronic kidney disease stage 1 because the latter is more appropriate for his condition.

Conant, David Loring (M.D.) 6/28/2011 9:26 AM Signed
Chief Complaint
Member presents with Patient presents with:
HEALTH MAINTENANCE

HPI: Accompanied by mother and sister. Generally doing well. Attending day program, using stationary bike 45 minutes on most days.

At today's visit I reviewed the patient's problem list, past medical and surgical history, social history and relevant family history.

12

32.     Kaiser also provides boilerplate phrases to help its physicians justify addenda.  Kaiser's boilerplate addendum phrases can be automatically inserted through a combination of key strokes and physicians are expected to use these phrases rather than their own language and discretion based on what they recall from visits.  The language Kaiser physicians use is intended to give CMS the impression that the doctor thought about the addenda and wants to comply with Medicare instructions for amendments and corrections.  Encounter Information Operations staff send emails to physicians recommending the use of macros such as ".DXUPDATE" for addendum phrases, leading the physicians to state exactly what Kaiser needs records to say to amend records for coding.  For example, when a physician enters ".DXUPDATE," the following phrases will populate the medical record: "After review of my note for this encounter, I recall this visit and am addending this note to state that this patient has a more specific diagnosis of: @diag@."

a.   Dr. Rukiye Yoltar met with a patient on September 5, 2012.  At 5:53 PM on October 9, 2012, a month later she writes: "After review of my note for this encounter, I recall this visit and am addending this note to state that this patient has a more specific diagnosis of: DM 2 W DIABETIC MIXED HYPERLIPIDEMIA (primary encounter diagnosis)."

b.   Dr. Charles E. Metzger met with a patient on January 19, 2012 at 11:13 AM.  Nearly nine months later on October 9, 2012, at 6:34 PM he used nearly identical language as Dr. Yoltar on the same day: "After review of my note for this encounter, I recall this visit and am addending this note to state that this patient has a more specific diagnosis of: DM2 W DIABETIC MIXED HYPERLIPIDEMIA."

c.   Another example of boilerplate language was sent through email for use with upcoding to diabetes with diabetic chronic kidney disease:

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FROM EMAIL SENT BY KAREN GRAHAM TO DOC CODING LEADS**

**Karen Graham/CA/KAIPERM**
11/08/2011 11:34 PM

    To Doc Coding Leads-KPNC
    cc
    Subject EBA-SmartPhrase for Addendum to capture DM w/DCKD

As a follow up to the Doc & Coding Leads conf call, East Bay provided the following Smartphrase which Dr. David Law created to use in an Addendum for DM w/DCKD:

**"After reviewing my visit note, I recall this encounter. The visit note reflects that I evaluated the patient, who has the diagnosis of diabetic CKD, stage 1. Plan is to optimize control of blood pressure and diabetes, and recheck urine protein"**

33. Although physicians should be using their own discretion for diagnosing, if doctors disagree with the prompt to review and addend records, they must explain their refusal to the regional Encounter Information Operations auditors. To ensure there are almost no "missed opportunities" to capture data mined and refreshed diagnoses, Kaiser pressures its physicians to addend diagnoses and capture the high value HCCs, with the assistance of staff, including Relator. For example, to ensure capturing of HCCs, Kaiser instituted an escalation process for physicians who do not agree with the data mining prompts. Physicians will have to meet one-on-one with Data Quality Trainers if they refuse to make diagnoses changes that are presented by data mining. The physicians must explain why they disagree, resulting in The Permanente Medical Group's management engaging with these physicians directly until there is resolution. Physicians often give in and use the diagnoses that management asks for rather than using their own, original judgment in coding diagnoses. The following slide from the Encounter Information Operations department describes the escalation process, including meeting with management such as Lead Physician Jill Dunton.

14

## **Internal Medicine Communication/Missed Opportunities**

**Gain a Presence:**
- Present at monthly departmental meetings to discuss CMS goals and expectations
- Create Facility CMS Website
- Create regular reports for physician leaders displaying performance metrics for both department and individual clinicians
- Post articles In Newsletter

**Prevent Missed Opportunities**
- Distribute Missed Opportunity lists to Physicians on a monthly basis
- Implement process for printing MDPs for same day appointments
  - Use the MDRS Jump Button

**Individual Physician Follow-Up**
- Attend Lunch & Learn Sessions/Lunch Lab workshops
- Send KPHC Staff Message when follow-up is required
- Assist with missed opportunities, data mining and remediations
- 1:1 Clinician Training

**Escalation**
- Identify non-compliance
- Schedule 1:1 training time
- Engage CMS Leads, Module Leader and/or Chief as necessary

34.    In addition to the escalation process the physicians face if they refuse to comply with the prompts to refresh or retroactively change diagnoses, physicians have personal report cards based on how they perform in certain areas, which are tied to their compensation. After the Encounter Information Operations shifted to emphasizing the importance of HCC and their matching diagnostic codes, the physician report cards included how they respond to refreshing and data mining prompts. In other words, bonuses for doctors now become, at least in part, tied to diagnosis chasing.

35.    Kaiser also pressures providers into approving retroactive diagnoses, which increase revenue, but does not ensure quality of care. Kaiser has mandatory meetings called "coding parties," where physicians are gathered in a single room with computers and asked to review past progress notes for addenda related to revised medical diagnoses. Coding parties occur on at least a yearly basis. There are new diagnoses to focus on every year and physicians are expected to addend 30 to 40 progress notes over a 3-hour period. Addenda made in September and October of 2012, demonstrate there were "coding parties" where, for example, the following physicians amended medical records, including for diagnoses of diabetes with mixed hyperlipidemia, as described above:

a.    On September 19, 2012:

- Dr. Irina Sophie Cons Defischer addended at 6:15 PM; and

15

1          • Dr. Patrick Flynn Roland addended at 6:38 PM; and

2          • Dr. Anna Klaertje Lewis addended at 7:11, 7:22; 7:25, and 7:50 PM.

3     b. On September 20, 2012:

4          • Dr. Raymund Mafnus Damian addended at 6:14 PM;

5          • Dr. Carolyn Mar addended at 6:37 PM;

6          • Dr. Jill Dunton addended at 6:40 PM and 7:10 PM;

7          • Dr. John David Culbertson addended at 6:42 PM;

8          • Dr. Roberto Gonzalez addended at 6:46 PM;

9          • Dr. Ryan Scott Lum addended at 6:47 PM;

10         • Dr. Joan Turner Pont addended at 6:47 and 6:57 PM;

11         • Dr. John David Culbertson addended at 6:56 PM;

12         • Dr. Alan Kneital addended at 6:56, 6:59, 7:01, 7:06, and 7:10 PM; and.

13         • Dr. Lori Selleck addended at 7:04 PM.

14    c. On October 9, 2012:

15         • Dr. Rukiye Yoltar addended at 5:53 and 6:20 PM;

16         • Dr. Daniel Gerard White addended at 6:16 PM; and

17         • Dr. Charles Metzger addended at 6:33 and 6:34 PM.

18

19

20

21

22

23

24

25

26

27

28

16

36.    Kaiser also pressures physicians to diagnose Medicare patients through incentive programs, such as this doctor's $100 reward:



# Year End 2006 Specialty Refresh Rate Winner

- **Dr. Padmesh saw a total of 129 Medicare Patients with 62 chronic diagnoses. Of these, he refreshed 42, achieving a refresh rate of 68%**

- **CERTIFICATE**

- **REWARD: $100 American Express Gift Certificate**

Hosahalli Padmesh, MD, Surgery

37.    Kaiser tracks and rewards physicians based on the percentage of chronic conditions they are able to capture and refresh. Additionally, Kaiser positioned the Southern California Region against Northern California in competition for the highest risk scores and physician approval rates. The following demonstrates the competition from the CMS Leads Meetings in 2008:

17

| HCC Hierarchy | NCal | | SCal | | | Potential Increase |
|---|---|---|---|---|---|---|
| | Higher HCCs | Low HCCs | High HCCs | Low HCCs | | |
| Diabetes HCC 15-19 | 56% | 44% | 73% | 27% | | $53M |
| Cancer HCC 7-10 | 16% | 84% | 20% | 80% | | $17M |
| Renal Failure HCC 131-132 | 83% | 17% | 99% | 1% | | $10M |
| Depression | 569 / 10k | | 852 / 10k | | | $20M |
| Protein Calorie Malnutrition | 37 / 10k | | 157 / 10k | | | $33M |
| Totals | | | | | | $133M |

## "Highest Specificity" Documentation (It's more than 'See & Capture' now)

**ISSUE:**

In five HCCs categories, SCal appears to document more conditions in higher diagnostic categories of the same hierarchy, which could result in:
- enhanced patient care tracking
- improved disease monitoring
- appropriate reimbursement for illness burden
- significant financial impact, estimated at an estimated $80M variance for capture within the 5 categories

**Regional Focus Audit Verification:**
- 7% of Cancer HCC7 indicated metastatic disease was implicitly or explicitly documented but not captured
- 25% of Diabetes complications – not captured

38.     The competitive pressure is not only exerted between regions, but within the region. An email from Aaron Smith regarding the San Rafael Kaiser facility on May 17, 2013, describes the ranking of facilities on documentation and coding "missed opportunities" for April 2013. Mr. Smith states:

> Refresh: We are at 70.9%, 6th in the Region (down from 5th last month), above where we were in 2012 (69%), above the tracking goal of 64%, as well as the Region average of 67.3 percent.
>
> With the change in payment structure for 2013 (60% for Data Mining, 40% for Refresh), I believe passing the April benchmark brings our performance payment for the year to $143,114.

18

We currently have just under 1600 outstanding missed opportunities out to PCP's. Granted many of those are data mining prompts, which are not in our refresh denominator, but are in the addressed data mining denominator (which is actually worth more locally than standard refresh). So we certainly could and should be doing better than our 70.9% rate if that number could be significantly reduced through one-on-one sit-down with those PCP's who have a large number of dx that we have not hard [sic] back on."

Seeing Pts: We are at 78.1%, 3rd in the Region, above where we were at this point in 2012 (76.7%) and the Region average (75.6%).

The caller and PCP/MA's are currently calling those members who were unable to reach when they were originally on a call list and were due for an appointment in the first half of the year. With such an elevated Seeing Patients percentage, it's a bit disappointing that hasn't translated to a higher overall refresh percentage and data mining addressed rate which are two [of] the benchmarks that **we are financially incentivized on** [emphasis added].

...

Data Mining: We are below the Region average in terms of coding (88.8% vs. 91.9%) and have gone through a lower percentage of overall prompts than the NCAL [Kaiser Northern California] average to date (43.5% vs. 48.2%). This places us 13th in NCAL, which is staggeringly low considering where we are at with Patients Seen and Refresh. The percentage of prompts required to either be stopped or coded for by the end of the year is 90 percent. Doing that will lead to receiving the remaining 60% of the annual allocation not tied in with refresh.

Part of the gap between the 43.5 and 48.2 numbers could be made up by that overwhelming number of PCP missed opportunities mentioned above, which includes a large number of data mining prompts that even if we can't addend for or stop could at least be put on the Problems List to alert the clinician the next time they see the member. That will be of utmost importance as this is a category that the denominator can continue to grow through October 31, which is the deadline for Region in releasing prompts that need to be addressed or stopped by December 31, 2013.

39.     Kaiser ties funding allocations to a facility's refresh and data mining rates such that a facility will lose an allocation if goals are not met. For example, in 2012, Kaiser's goal for refreshing chronic diagnoses was 99%, which was 60% of a facility's total allocation. The 2012 goal for addressing data mining conditions was 90%, which was 40% of the total allocation. In other words, if the providers do not address at least 90% of the data mined conditions, 40% of the allocation was unavailable the next year.

## 2012 REFRESH GOAL

# Maintaining Diagnoses = 99%

## This represents 60% of Performance Allocation

## 2012 'New' Focus: Capture Key Conditions

### Expected Prevalence Rates

- **Protein Calorie Malnutrition – 250 / 10k**
- **Diabetes w/ Neurologic Manifestations – 600 / 10k**
- **Vascular Disease / Aortic Atherosclerosis – 1,200/ 10k**
- **Renal Failure – 2,200 / 10k**

**This represents 40% of Performance Allocation**

40.  In 2013, Kaiser's goal for refreshing chronic diagnoses is 99%, which is 40% of a facility's total allocation. The 2013 goal for addressing data mining conditions is still 90%, but it is now 60% of the total allocation. Data mining is a key factor for Kaiser's facility allocations. The Data Quality Trainers, such as Relator, are managed by the regional office in Oakland, so the pressure is primarily on the physicians to make sure they address all the refreshing and data mining for own their facilities.

41.  The focus since 2007 on data mining and high value HCCs has ensured increased billings from Kaiser to Medicare. For example in 2009 alone, high value HCCs resulted in $51 million dollars in CMS payments to Kaiser's Northern California region:

| Data-Mining Condition | Volume | Reimbursement |
|---|---|---|
| HF | 62 | $ 52,500.00 |
| CKD | 3434 | $ 7,237,327.00 |
| DEP | 4927 | $ 9,470,285.00 |
| DM w/ PN | 7499 | $ 7,762,590.00 |
| Protein Calorie Malnutrition | 435 | $ 1,048,829.00 |
| AMP, OST-STOMA, Trach | 142 | $ 440,911.00 |
| DM w/ PVD | 188 | $ 392,679.00 |
| DM w/ CKD | 1785 | $ 6,018,734.00 |
| MDD | 1318 | $ 3,101,175.00 |
| CAD | 6983 | $ 4,639,435.00 |
| PVD | 439 | $ 755,458.00 |
| DM w/ DYS | 2965 | $ 6,133,814.00 |
| DM w/ ED | 1791 | $ 3,705,113.00 |
| **Totals** | **31968** | **$51M** |

42.  Kaiser failed to, and continues to fail to, comply with CMS guidelines and instructions. With the addition of more data mining prompts each year, despite CMS' efforts to rein in payments to Medicare Advantage organizations, Kaiser's reimbursement continues to grow, violating the False Claims Act.

**COUNT I**

**False Claims Act Violations – Presentation of False Claims**

**(31 U.S.C. § 3729(a)(1)(A))**

43.     Relator re-alleges and incorporates all paragraphs alleged herein.

44.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, to the United States Government false or fraudulent claims for the payment or approval of medical services in violation of 31 U.S.C. § 3729(a)(1)(A).

45.     By reason of these payments, the United States has been damaged, and continues to be damaged, by a substantial amount.

**COUNT II**

**False Claims Act Violations – False Records or Statements**

**(31 U.S.C. § 3729(a)(1)(B))**

46.     Relator re-alleges and incorporates all paragraphs alleged herein.

47.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

48.     By reason of these payments, the United States has been damaged, and continues to be damaged, by a substantial amount.

**PRAYER FOR RELIEF**

WHEREFORE, Relator Ronda Osinek requests that judgment be entered against Defendant, ordering that:

49.     Defendant pays not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729(a) plus three times the amount of damages the United States has sustained because of Defendant's actions;

50.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

51.     Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d); and

21

1    52.    The United States and Relator recover such other relief as the Court deems just and

2  proper.

3                                          **JURY TRIAL**

4         Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury.

5

6  Dated: August 2⍰, 2013                          Respectfully Submitted

7

8                                          **GIRARD GIBBS LLP**

9

10                                 By:
                                   Eric H. Gibbs
11                                 Dylan Hughes
                                   Phyra M. McCandless
12                                 601 California Street, 14th Floor
                                   San Francisco, CA 94108
13                                 Telephone: (415) 981-4800
                                   Facsimile: (415) 981-4846
14

15                                 Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28