1  SARAH E. HARRINGTON
   Deputy Assistant Attorney General
2
   STEPHANIE M. HINDS (CABN 154284)
3  Acting United States Attorney

4  MICHELLE LO (NYBN 4325163)
   Chief, Civil Division
5
   SHIWON CHOE (CABN 320041)
6  BENJAMIN WOLINSKY (CABN 305410)
   Assistant United States Attorneys
7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
9       Facsimile: (415) 436-6748
        shiwon.choe@usdoj.gov
10      benjamin.wolinsky@usdoj.gov

11 JAMIE ANN YAVELBERG
   PATRICIA L. HANOWER
12 ARTHUR S. DI DIO
   GARY R. DYAL
13 LAURIE A. OBEREMBT
   United States Department of Justice
14 Civil Division
   Commercial Litigation Branch
15
   Attorneys for the United States of America
16

17               UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19                  SAN FRANCISCO DIVISION

| 20 | UNITED STATES OF AMERICA ex rel. RONDA OSINEK, | ) ) | Case No. 3:13-cv-03891-EMC |
|---|---|---|---|
| 21 | | ) | |
| 22 | Plaintiff, | ) ) | **UNITED STATES' COMPLAINT-IN-INTERVENTION** |
| 23 | v. | ) ) | |
| 24 | KAISER PERMANENTE, et al., | ) ) | |
| 25 | Defendants. | ) ) ) | |
| 26 | | ) | |

27              (captions continued on next page)

28

UNITED STATES' COMPLAINT-IN-INTERVENTION
No. 3:13-cv-03891-EMC et al.

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. NASER AREFI, AJITH KUMAR, and PRIME HEALTHCARE SERVICES, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| KAISER FOUNDATION HEALTH PLAN, INC., et al., | ) ) ) |
| Defendants. | ) ) |

Case No. 3:16-cv-01558-EMC

**UNITED STATES' COMPLAINT-IN-INTERVENTION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. MARCIA STEIN AND RODOLFO BONE, | ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| KAISER FOUNDATION HEALTH PLAN, INC., et al., | ) ) ) |
| Defendants. | ) ) |

Case No. 3:16-cv-05337-EMC

**UNITED STATES' COMPLAINT-IN-INTERVENTION**

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. GLORYANNE BRYANT and VICTORIA M. HERNANDEZ, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| KAISER PERMANENTE, INC., et al., | ) ) |
| Defendants. | ) ) |

Case No. 3:18-cv-01347-EMC

**UNITED STATES' COMPLAINT-IN-INTERVENTION**

(captions continued on next page)

UNITED STATES' COMPLAINT-IN-INTERVENTION
No. 3:13-cv-03891-EMC et al.

| | | |
|---|---|---|
| 1 | UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. MICHAEL BICOCCA, | ) Case No. 3:21-cv-03124-EMC |
| 2 | | ) |
| 3 | Plaintiff, | ) **UNITED STATES' COMPLAINT-IN-INTERVENTION** |
| 4 | v. | ) |
| 5 | PERMANENTE MEDICAL GROUP, INC., et al., | ) |
| 6 | | ) |
| 7 | Defendants. | ) |

| | | |
|---|---|---|
| 8 | | |
| 9 | UNITED STATES OF AMERICA ex rel. JAMES M. TAYLOR, | ) Case No. 3:21-cv-03894-EMC |
| 10 | Plaintiff, | ) **UNITED STATES' COMPLAINT-IN-INTERVENTION** |
| 11 | v. | ) |
| 12 | KAISER PERMANENTE, INC., et al., | ) |
| 13 | Defendants. | ) |
| 14 | | ) |

UNITED STATES' COMPLAINT-IN-INTERVENTION
No. 3:13-cv-03891-EMC et al.

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................1

II.     PARTIES ............................................................................................................5

        A.      Plaintiff and Relators ...........................................................................5

        B.      Defendants ...........................................................................................6

                1.      Kaiser Health Plans..................................................................7

                2.      Permanente Medical Groups......................................................7

                3.      Kaiser's integrated and collaborative risk-adjustment operations ..........................8

III.    JURISDICTION AND VENUE ...........................................................................11

IV.     THE FALSE CLAIMS ACT ..............................................................................11

V.      THE MEDICARE ADVANTAGE PROGRAM AND ITS RISK-ADJUSTMENT
        PAYMENT SYSTEM ........................................................................................12

        A.      Medicare Part C and risk-adjustment payments to MA Organizations ...........12

        B.      Standards governing risk-adjustment payments ...................................17

VI.     KAISER KNEW THE CMS STANDARD FOR SUBMISSION OF RISK-
        ADJUSTMENT DIAGNOSES............................................................................22

VII.    KAISER KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED
        FRAUDULENT DIAGNOSIS CODES ...............................................................24

        A.      Kaiser recognized the importance of Medicare revenue and implemented
                national initiatives to increase patient risk scores..................................25

        B.      Kaiser mined patient medical records to add lucrative risk-adjustment
                diagnoses via addenda to achieve risk-score targets..............................30

                1.      Data mining generates new risk-adjustment diagnoses. ..................33

                2.      "Refresh" and "missed-opportunities" are more data-mining programs
                        that generate risk-adjustment diagnoses. ......................................37

                3.      Chart review is another program to generate risk-adjustment
                        diagnoses................................................................................41

        C.      Kaiser pressured physicians to add diagnoses via addenda...................45

                1.      Inappropriate queries pressured physicians to create addenda. ..........45

                2.      Kaiser used "SmartPhrases" to make it easy for physicians to create
                        addenda even when the condition did not require or affect patient care,
                        treatment, or management........................................................52

3.      Kaiser pressured physicians by requiring them to justify refusals to add diagnoses. ...........................53

4.      Kaiser used financial incentives and other metrics to pressure Permanente Medical Group physicians to create addenda. ...................54

D.      How Kaiser targeted the diagnosis aortic atherosclerosis to increase risk-adjustment payments: "$40M is no chump change."........................56

E.      Kaiser knew that its practices resulted in the addition of improper diagnoses to patient medical records. ...........................62

1.      Kaiser knew that its use of addenda to add risk-adjustment diagnoses did not comply with CMS rules for submission of diagnoses for risk-adjustment payment. ...........................62

2.      Kaiser pushed for addenda regardless of how much time had passed since the patient visit, especially at the end of the year. ........................64

3.      Kaiser physicians put Kaiser on further notice of fraudulent diagnoses. ............66

4.      Kaiser's internal audits put Kaiser on further notice of fraudulent diagnoses. ...........................68

VIII.   KAISER RECEIVED MONEY FROM MEDICARE BASED ON THE PRESENTATION OF FALSE CLAIMS. ...........................74

A.      Patient #1 ...........................75

B.      Patient #2 ...........................76

C.      Patient #3 ...........................77

D.      Patient #4 ...........................80

E.      Patient #5 ...........................81

F.      Patient #6 ...........................82

G.      Patient #7 ...........................83

H.      Patient #8 ...........................84

I.      Patient #9 ...........................85

J.      Patient #10 ...........................86

IX.     CAUSES OF ACTION ...........................88

X.      PRAYER FOR RELIEF ...........................90

XI.     DEMAND FOR JURY TRIAL ...........................91

The United States of America ("United States" or "Government") brings this action against Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Colorado, The Permanente Medical Group, Inc., Southern California Permanente Medical Group, and Colorado Permanente Medical Group, P.C. (collectively, "Kaiser" or "Defendants"), to recover treble damages and civil penalties for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and conspiracy to violate the FCA, and damages and other relief for common law claims of payment by mistake and unjust enrichment.  Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States alleges for its complaint-in-intervention ("Complaint") as follows:

## I.   PRELIMINARY STATEMENT

1.      Beginning sometime prior to 2009 and continuing through at least 2018, Kaiser engaged in a coordinated scheme to unlawfully obtain payments from the Medicare Part C program, also called Medicare Advantage.  Kaiser obtained these payments by systematically altering patient medical records to add diagnoses that either did not exist or were unrelated to the patient's visit with the Kaiser physician.  Kaiser altered the patients' medical records to add these diagnoses retrospectively—*after* the patient medical visit—using a mechanism called an addendum.  Often, these addenda were added months or even a year or more after the visit.  In many cases, patients were not even told that they supposedly had the diagnoses that Kaiser had added to their medical records.  Kaiser knew that it could not lawfully submit diagnoses that were unrelated to the patient's visit, but it nevertheless routinely used these diagnoses to obtain additional payments from Medicare.  Between 2009 and 2018, Kaiser added roughly half a million diagnoses using addenda.  Kaiser submitted the diagnoses from these addenda to the Centers for Medicare and Medicaid Services ("CMS") and received additional Medicare payments in the range of $1 billion from these diagnoses.

2.      As Medicare Advantage ("MA") Organizations, Kaiser's Health Plans were responsible for covering the costs of medical services for the Medicare patients enrolled in Kaiser's MA plans. Kaiser's Health Plans, in return, received monthly payments from CMS for each patient for whom Kaiser provided such coverage.  CMS adjusts these payments for various "risk" factors that affect expected healthcare expenditures, to ensure that MA Organizations are paid more for sicker enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

1  To make these adjustments, CMS relies on "risk adjustment" data, including medical diagnosis codes,

2  collected from MA Organizations.  This payment model creates powerful incentives for MA

3  Organizations like Kaiser's Health Plans to exaggerate the expected healthcare costs for their enrollees

4  by "over-reporting" diagnosis codes.  *See infra* ¶¶ 20-22, 52-72.

5        3.     Kaiser knew that, pursuant to this risk-adjustment system, the amount of payment that

6  CMS made to Kaiser for a Medicare Advantage patient depended directly on the diagnoses that Kaiser

7  submitted to CMS for that patient.  In fact, internally, executives repeatedly stressed the importance of

8  these risk-adjustment payments to the financial health of Kaiser, emphasizing that "risk adjustment is by

9  far the biggest lever we have to change our revenue from Medicare.  If we don't do this well, our

10  financial health could be seriously impacted."  Kaiser touted that its structure gave it a strategic

11  advantage over other health plans in obtaining risk-adjustment revenue because Kaiser's health plans

12  were integrated with its physician groups "under one roof" and coordinated with each other.  Kaiser's

13  risk-adjustment programs were highly successful at achieving Kaiser's goal of increasing Medicare

14  Advantage risk-adjustment revenue.  *See infra* ¶¶ 28-40, 100-20.

15        4.     The allegations in this complaint concern one of the ways that Kaiser increased its

16  diagnoses and therefore its risk-adjustment revenue—by systematically creating retrospective addenda

17  to medical records of patients' visits with physicians.  Kaiser would mine a Medicare Advantage

18  patient's medical file for potential additional diagnoses, regardless of their relevance to the visit.  Kaiser

19  would then seek to have the physician add the new diagnoses to the medical record retrospectively using

20  an addendum, as if the new diagnoses had been addressed in some way during the patient visit when in

21  fact they had not been.  The driver was money: so that Kaiser could submit these improper diagnoses to

22  CMS for payment.  Indeed, Kaiser employed these initiatives only for diagnoses and patients for whom

23  Kaiser could receive a risk-adjustment payment.  *See infra* ¶¶ 121-32.

24        5.     During all relevant times, CMS has imposed specific standards regarding which

25  diagnoses could be submitted for risk-adjustment payment.  Among other limitations, diagnoses could

26  be submitted only if they conformed to the International Classification of Diseases ("ICD") Official

27  Guidelines for Coding and Reporting (the "ICD Guidelines").  The ICD Guidelines limited reportable

28  diagnoses to those that required or affected patient care treatment or management at the visit.  In other

words, only those conditions that specifically mattered to the patient care, treatment, or management that the physician actually provided at the visit could be submitted to CMS for payment.  *See infra* ¶¶ 73-87.

6.      Kaiser knew and understood these standards, and knew that any diagnoses submitted for payment had to comply with these standards.  Kaiser's own internal compliance materials stated that diagnoses submitted for payment must comply with these specific standards.  Kaiser knew that it could not submit diagnoses for payment that were irrelevant to the visit.  *See infra* ¶¶ 88-96.

7.      Kaiser nevertheless systematically violated these standards as it pursued various risk-adjustment initiatives that routinely resulted in the creation of addenda to retrospectively add diagnoses to patient medical records.  These initiatives included "data mining" and "chart review," where Kaiser would utilize automated algorithms and/or human reviewers to identify new diagnoses for a patient.  Such never-before-diagnosed conditions should rarely, if ever, have resulted in addenda because these diagnoses were, almost by definition, not relevant to the visit.  Yet Kaiser routinely added these diagnoses to medical records using addenda and submitted them for payment, often without even telling patients about these brand-new diagnoses.  Kaiser also employed a related data-mining program called "refresh," where Kaiser would mine patient medical files to find old diagnoses that had not yet been diagnosed in the current service year.  If a physician failed to address any of these old diagnoses at a patient visit, the physician would be provided a list of these "missed opportunities"—i.e., opportunities for risk-adjustment payment—to create an addendum to retrospectively add these diagnoses to the medical record.  Kaiser's efforts focused especially on diagnoses it knew were lucrative, and Kaiser routinely ignored the requirement that every diagnosis must have required or affected patient care, treatment, or management at the visit in order to be submitted for payment. *See infra* ¶¶ 133-83.

8.      Kaiser regularly brought these mined diagnoses to the physician's attention for addition to the patient's medical record using a tool called a "query"—which in the healthcare industry is a communication tool used to clarify documentation in the health record.  Queries present significant risks for improper diagnosis coding, and there are national standards guiding and limiting the use of queries.  The standards include that a query cannot be leading (i.e., cannot direct a provider to a specific diagnosis) and cannot discuss financial impact.  But Kaiser routinely violated the national query standards and used queries not to clarify medical records, but instead for the purpose of pressing

1   physicians to retrospectively add new diagnoses via addenda that had nothing to do with the visit, so that

2   Kaiser could then seek payment from CMS for these diagnoses.  *See infra* ¶¶ 185-216.

3   9.   Kaiser employed numerous tactics to pressure physicians to improperly add these

4   diagnoses.  In addition to improper queries, Kaiser required its physicians to meet certain metrics related

5   to its risk-adjustment program.  Kaiser meticulously tracked and monitored these metrics across

6   physicians, facilities, and regions.  Physicians who scored high were praised and rewarded.  Those who

7   did not would often be required to meet with supervisors about their risk-adjustment performance and

8   could face financial consequences.  As each year drew to a close, some employees referred to Kaiser's

9   rush to capture as many diagnoses as possible as the "dash for cash."  Kaiser employed numerous other

10   tactics, such as "coding parties," where it would gather physicians in a room and expect them to work

11   through lists of diagnoses and add these diagnoses to the records of their patient visits.  *See infra* ¶¶ 217-

12   68.

13   10.   Kaiser knew that its addenda practices were widespread and unlawful.  Kaiser ignored

14   numerous red flags and internal warnings that it was violating Medicare rules, including concerns raised

15   by its own physicians that these were false claims and audits by its own compliance office identifying

16   the issue of inappropriate addenda.  As Relator Randi Osinek (a Kaiser certified medical coder) reported

17   to several Kaiser executives in 2011: "over 50% of the physicians tell me they feel that they are being

18   '<u>forced</u>' to add diagnoses that they did not consider[], evaluate[], and/or treat.  Especially since they feel

19   their bonuses are being impacted."  (Emphasis in original.)  *See infra* ¶¶ 269-331.

20   11.   Through these coordinated and systematic efforts to have physicians create retrospective

21   addenda to patient medical records with diagnoses that did not exist or were unrelated to the medical

22   visit, Kaiser improperly submitted thousands upon thousands of diagnoses to CMS as claims for

23   payment.  Based on these unlawful false claims, Kaiser improperly obtained and retained hundreds of

24   millions of dollars in risk-adjustment payments from CMS, in violation of both the FCA and the

25   common law.  If CMS had known that Kaiser was submitting fraudulent diagnosis codes, CMS would

26   have refused to make risk-adjustment payments based on the improper coding and/or taken other

27   appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to

28   which they were not entitled, including by recouping payments through administrative processes,

payment adjustments, or obtaining repayments in enforcement actions.

## II.     PARTIES

### A.     Plaintiff and Relators

12.     Plaintiff is the United States of America, suing on behalf of the Department of Health and Human Services ("HHS"), which includes its operating division, CMS.  At all times relevant to this Complaint, CMS administered the MA Program and made risk-adjustment payments under the MA Program.  The United States filed its notice of intervention in this consolidated action on July 27, 2021. *See* 31 U.S.C. § 3730(b)(4)(A).

13.     Relator Randi Osinek filed an action alleging violations of the FCA on behalf of herself and the United States Government pursuant to the *qui tam* provisions of the FCA on August 22, 2013. *See* 31 U.S.C. § 3730(b).  Randi Osinek is a citizen of the United States and a resident of the State of Oregon.  Randi Osinek, a certified medical coder, worked for Defendant The Permanente Medical Group as a Data Quality Trainer and Audit Manager at Kaiser's San Rafael, California facility.

14.     Relator James Taylor, M.D. filed an action alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA on October 22, 2014 in the District of Colorado.  His action was transferred to the Northern District of California on May 11, 2021.  Dr. Taylor is a citizen of the United States and a resident of the State of Colorado.  Dr. Taylor worked for Defendant Colorado Permanente Medical Group from 1995 through 2015, most recently as the Medical Director of Revenue Cycle/Claims, where his responsibilities included revenue cycle risk adjustment programs and coding governance and compliance.  Dr. Taylor also previously served as Chair of the Board of Directors of Defendant Colorado Permanente Medical Group.

15.     Relators Naser Arefi, Ajith Kumar, and Prime Healthcare Services, Inc. ("Prime") filed an action alleging violations of the FCA on behalf of themselves and the United States Government pursuant to the *qui tam* provisions of the FCA on September 4, 2015.  Naser Arefi is a citizen of the United States and a resident of the State of California.  Naser Arefi worked for Defendant The Permanente Medical Group, Inc. as a Clinical Documentation Specialist from 2011 to 2014.  Ajith Kumar is a citizen of the United States and a resident of the State of California.  Ajith Kumar was Vice President of Reimbursement Management at Prime.  Prime owns and operates 45 acute care hospitals,

1  including 15 in California.

2  16.  Relators Marcia Stein and Rodolfo Bone filed an action alleging violations of the FCA on

3  behalf of themselves and the United States Government pursuant to the *qui tam* provisions of the FCA

4  on May 16, 2016, and filed an amended complaint on November 3, 2016.  Marcia Stein is a citizen of

5  the United States and a resident of the State of California.  From 1987 to 2011, Marcia Stein worked for

6  Kaiser Foundation Hospitals as a Regional Health Information Manager.  In that role, she trained

7  physicians and other medical professionals on correct coding and documentation practices.  Rodolfo

8  Bone is a citizen of the United States and a resident of the State of California.  Rodolfo Bone is a

9  medical graduate who worked as a part-time coder for Kaiser Foundation Hospitals.

10  17.  Relators Gloryanne Bryant and Victoria Hernandez filed an action alleging violations of

11  the FCA on behalf of themselves and the United States Government pursuant to the *qui tam* provisions

12  of the FCA on March 1, 2018.  Gloryanne Bryant is a citizen of the United States and a resident of the

13  State of California.  Prior to her retirement in 2017, Gloryanne Bryant was the National Director of the

14  Coding Quality Group for Defendant Kaiser Foundation Health Plan.  Victoria Hernandez is a citizen

15  the United States and a resident of the State of California.  Victoria Hernandez worked for Defendant

16  The Permanente Medical Group, Inc. from 1995 to 2015 and held various positions, including Regional

17  Director for Auditing and Coding.

18  18.  Relator Michael Bicocca, M.D. filed an action alleging violations of the FCA on behalf

19  of himself and the United States Government pursuant to the *qui tam* provisions of the FCA on February

20  10, 2020 in the Eastern District of California.  His action was transferred to the Northern District of

21  California on April 28, 2021.  Dr. Bicocca is a citizen of the United States and a resident of the State of

22  California.  Prior to his retirement in December 2019, Dr. Bicocca was the Chief of Pain Management

23  for three Kaiser hospitals in California and a practicing physician at Defendant The Permanente Medical

24  Group's office in South Sacramento, California.

25  **B.  Defendants**

26  19.  The Defendants are part of Kaiser Permanente, an integrated health-care consortium

27  comprised of three components: health plans ("Health Plans"); physician medical group practices

28  (referred to as "Permanente Medical Groups"); and hospitals.  This Complaint concerns Kaiser's Health

Plans and Permanente Medical Groups in Northern California, Southern California, and Colorado.

### 1.    Kaiser Health Plans

20.    Defendants Kaiser Foundation Health Plan, Inc. ("the Health Plan") and its wholly owned subsidiary, Kaiser Foundation Health Plan of Colorado ("the Colorado Health Plan"), are Kaiser Health Plans that have executed contracts with CMS to be MA Organizations and provide MA plans.

21.    Defendant the Health Plan is headquartered in Oakland, California.  The Health Plan has contracted with CMS to provide MA plans in California, covering Kaiser's Northern California and Southern California regions.

22.    Defendant the Colorado Health Plan is also headquartered in Oakland, California.  The Colorado Health Plan has contracted with CMS to provide MA plans in Colorado, covering Kaiser's Colorado region.

### 2.    Permanente Medical Groups

23.    Defendants The Permanente Medical Group, Inc. ("N. California Medical Group"), Southern California Permanente Medical Group, a California partnership ("S. California Medical Group"), and Colorado Permanente Medical Group, P.C. ("Colorado Medical Group") are regional Permanente Medical Groups that contract exclusively with the Health Plan (or the Colorado Health Plan in the case of the Colorado Medical Group) to provide medical services to patients who enroll in Kaiser healthcare plans, including patients who enroll in Kaiser's MA plans.  Collectively, the N. California Medical Group, the S. California Medical Group, and the Colorado Medical Group provide medical services to over one million MA beneficiaries in California and Colorado.

24.    Defendant the N. California Medical Group is headquartered in Oakland, California and employs approximately 9,500 physicians.  The N. California Medical Group provides medical services for Kaiser's Northern California region.

25.    Defendant the S. California Medical Group is headquartered in Pasadena, California, and employs approximately 7,800 physicians.  The S. California Medical Group provides medical services for Kaiser's Southern California region.

26.    Defendant the Colorado Medical Group is headquartered in Denver, Colorado, and employs approximately 1,100 physicians.  The Colorado Medical Group provides medical services for

Kaiser's Colorado region.

27.    Kaiser's Permanente Medical Groups, including the N. California Medical Group, the S. California Medical Group, and the Colorado Medical Group, have a national leadership and consulting organization, the Permanente Federation LLC ("Permanente Federation").  The Permanente Federation is run by the leadership of the Permanente Medical Groups.

### 3.    Kaiser's integrated and collaborative risk-adjustment operations

28.    Kaiser's Health Plans, Permanente Medical Groups, and hospitals publicly hold themselves out and do business collectively as an integrated healthcare provider called "Kaiser Permanente."  Kaiser Permanente publicly declares that its Health Plans, Permanente Medical Groups, and hospitals are "under one roof," and that "[t]he interconnectedness and interdependence of the hospitals, health plan, and medical groups that make up Kaiser Permanente have advanced our efforts to operate seamlessly as an enterprise."

29.    Kaiser's Health Plans and Permanente Medical Groups use an integrated system for storing patient electronic medical records, KP HealthConnect.  Both the Kaiser Health Plans and the Permanente Medical Groups directly access patient medical records through KP HealthConnect.

30.    The coordination touted by Kaiser extended to its efforts to increase risk-adjustment revenue from the MA Program.  Kaiser's internal Medicare Risk Adjustment Manual highlighted that "[c]ollaboration is the key to the success of the Medicare Risk Adjustment program at Kaiser Permanente."  Many offices and individuals from the Kaiser Health Plans and the Permanente Medical Groups were collectively involved in Kaiser's submission of risk-adjustment claims to CMS.

31.    Internal Kaiser documents and training materials discussed how "[w]e at KP have a strategic advantage to be successful under Medicare risk adjustment compared to other health plans because of our integrated structure, our partnership with the Permanente Medical Groups, and our electronic medical record, KP HealthConnect.  We are better poised to know about and to manage chronic conditions better than anyone else."

32.    According to Kaiser's internal Risk Adjustment Manual, Medicare risk-adjustment work at Kaiser is "governed by several groups and has many stakeholders."  The "governing parties" include the "National Medicare Leadership Team," the "National Medicare Finance Advisory Council," the

Chief Financial Officer, and the Executive Director of the Permanente Federation.  "[D]ue to the importance of this work to financial performance and compliance," the many "stakeholders" include: "Sales and Marketing, Regional and National Controllers, the CFOs, Permanente Medical Groups, Pricing and Actuarial, Revenue Cycle, Compliance, Government Relations, and Regional Presidents."

33.     By way of example, in 2009, the "Executive Sponsors" of the "National KP Risk Adjustment Initiative" were Kathy Lancaster (Executive Vice President and Chief Financial Officer of the Health Plan) and Jack Cochran (Executive Director of the Permanente Federation).  The National Leads were Diane Morissette (National Director for Medicare Risk Adjustment, National Medicare Finance for the Health Plan) and Dr. Simon Cohn (Associate Executive Director of the Permanente Federation).

34.     Kaiser's National Medicare Finance department is housed within the Health Plan and employs dozens of individuals with expertise in cost reimbursement, risk management, finance and accounting, and systems and project management.  There is also a special Risk Adjustment Team, whose analysts help interpret Medicare risk-adjustment trends and data and also perform risk-score forecasting. A dedicated part of the team focuses on "coordinating efforts across the regions, sharing successful practices among the regions, distilling information, and communicating results to leadership."

35.     The Medicare Risk Adjustment Regional Reporting Group ("Medicare Regional Reporting Group") is a "community" that coordinates how both the Kaiser Health Plans and the Permanente Medical Groups implement Medicare risk-adjustment initiatives, and includes coders, physicians, programmers, analysts, legal and compliance advisors, project managers, statisticians, forecasters, accountants, strategists, government-relations influencers, and business-line leaders from both the Kaiser Health Plans and the Permanente Medical Groups.  The Medicare Regional Reporting Group is co-led by the National Director for Risk Adjustment in Kaiser's National Medicare Finance department and the Associate Executive Director of the Permanente Federation.

36.     Kaiser's National Medicare Finance department supports the semi-annual Medicare Regional Reporting Group conference that brings together Health Plan employees and Permanente Medical Group physicians from multiple regions to "increase their knowledge of Medicare risk adjustment, share best practices, and improve consistency and coordination."

37.     Kaiser's National Compliance, Ethics & Integrity Office ("National Compliance Office") is also housed within the Health Plan.  Kaiser's National Compliance Office is led by the senior vice president and Chief Compliance Officer of the Health Plan.  The Chief Compliance Officer reports directly to the Chief Executive Officer and the Board of Directors of Kaiser.  While it is housed within the Health Plan, the National Compliance Office provided training to coders and physicians in the Permanente Medical Groups.  It also conducts audits of the Permanente Medical Groups, including audits of the Permanente Medical Groups' coding of patient diagnoses.

38.     Each Kaiser region's Health Plan (e.g., Colorado) also has a Regional Compliance Officer and a regional Compliance Committee.  These regional Compliance Committees oversee compliance activities, including with respect to Medicare Advantage.

39.     The following diagram from an internal Kaiser training depicts the integrated nature of Kaiser's operations:



40.     Because of the interconnected and interdependent nature of Kaiser, each of the Defendants—the Health Plan, the Colorado Health Plan, the N. California Medical Group, the S. California Medical Group, and the Colorado Medical Group—collaborated on their mutual Medicare risk-adjustment efforts.

III.    JURISDICTION AND VENUE

41.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject-matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a)-(b).

42.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in this District.  Moreover, all of the Defendants have extensive contacts with California.  *See also* Fed. R. Civ. P. 4(k)(1)(C) (providing that serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant "when authorized by federal statute").

43.    Venue also lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or all of the Defendants are subject to the Court's personal jurisdiction under the FCA.

44.    Intradistrict assignment to the San Francisco or Oakland Division is proper under Civil L.R. 3-2(c) because Defendants the Health Plan, the Colorado Health Plan, and the N. California Medical Group are all headquartered in Oakland and a substantial part of the events or omissions that give rise to the claims occurred therein.

IV.    THE FALSE CLAIMS ACT

45.    The FCA is the primary civil remedial statute designed to deter fraud upon the United States and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), 1986 U.S.C.C.A.N. 5266.

46.    A defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for money.  *Id.* § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

47.    After the 2009 amendments to the FCA by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21 (May 20, 2009), a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent

1    claim." 31 U.S.C. § 3729(a)(1)(B).

2    48.    Conspiracy to violate Sections 3729(a)(1)(A) and (a)(1)(B) is also actionable under the

3    FCA.

4    49.    Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had

5    actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the

6    truth or falsity of its claims for payment or its false records or statements.  31 U.S.C. § 3729(b)(1)(A).

7    The FCA does not require proof that the defendant had specific intent to defraud the Government.  *Id.*

8    § 3729(b)(1)(B).  The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in

9    this Complaint, have the meaning ascribed to them by the FCA.

10    50.    The term "material," as used in the FCA, "means having a natural tendency to influence,

11    or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

12    51.    The FCA imposes liability of treble damages plus a civil penalty for each false claim in

13    an amount (as pertinent here) not less than $5,500 and not more than $11,000 for claims submitted prior

14    to August 1, 2016; not less than $10,781 and not more than $21,563 for claims submitted between

15    August 1, 2016 and February 3, 2017; and as appropriately statutorily adjusted for inflation each

16    successive year under the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599-

17    601 (2015).  *See* 28 C.F.R. § 85.5 (identifying applicable inflation adjustments on an annual basis);

18    31 U.S.C. § 3729(a)(1).

19    **V.    THE MEDICARE ADVANTAGE PROGRAM AND ITS RISK-ADJUSTMENT PAYMENT SYSTEM**

20

21    **A.    Medicare Part C and risk-adjustment payments to MA Organizations**

22    52.    Medicare is a federally operated health insurance program administered by CMS for

23    individuals 65 and older and the disabled.  *See* 42 U.S.C. §§ 1395c *et seq.*  There are four parts to the

24    Medicare Program: Part A primarily covers inpatient and institutional care; Part B primarily covers

25    outpatient care; Part C is the Medicare Advantage Program at issue in this case; and Part D is

26    prescription drug coverage.

27    53.    A Medicare beneficiary may choose what is commonly referred to as "traditional"

28    Medicare.  Under Medicare Parts A and B, the Government reimburses healthcare providers using a fee-

1   for-service system, in which providers submit claims to CMS for healthcare services actually rendered,

2   such as a provider office visit or hospital stay.  CMS then pays the providers directly for each service

3   based on payment rates predetermined by the Government.

4        54.     Alternatively, under the MA Program, a Medicare beneficiary can opt out of the

5   traditional Medicare Program (Parts A and B) and instead enroll in an MA plan managed by an MA

6   Organization.  *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28.

7        55.     MA Organizations are insurers who contract with CMS to provide healthcare plans called

8   MA plans to people who are eligible for Medicare Part C.  *See* 42 U.S.C. §§ 1395w-21-1395w-28.  MA

9   plans must provide Medicare beneficiaries all the services that they are entitled to receive from the

10   traditional Medicare program, at a minimum, subject to limited exceptions.  Defendants the Health Plan

11   and the Colorado Health Plan are MA Organizations that administer Kaiser's MA plans in California

12   and Colorado.

13        56.     A Medicare beneficiary who enrolls in an MA plan is considered a member of and

14   enrollee in that plan.[1]

15        57.     CMS reimburses MA plans differently than traditional Medicare.  Under Medicare Part

16   C, the Government pays each MA Organization a predetermined base monthly amount for each enrollee

17   in their MA plans.  This monthly payment is known as a "per-member, per-month" payment and varies

18   for each MA plan depending on various factors.  *See* 42 U.S.C. § 1395w-23 (Payments to

19   Medicare+Choice Organizations[2]); *see also* 42 C.F.R. Part 422 Subpart F (Submission of Bids,

20   Premiums, and Related Information and Plan Approval); 42 C.F.R. Part 422 Subpart G (Payments to

21   Medicare Advantage Organizations).

22        58.     Additionally, since 2000, Congress has required that CMS adjust the "per-member, per-

23   month" base payment for each MA plan beneficiary to account for: (1) demographic factors such as age

24

25        [1] In this Complaint, the terms beneficiaries, members, enrollees, and patients are used

26   interchangeably and mean the same thing, i.e., individuals enrolled in MA plans.

     [2] Medicare+Choice was the predecessor to the Medicare Advantage Program.  Any provisions,

27   such as 42 U.S.C. § 1395w-23, that reference Medicare+Choice are "deemed a reference to 'Medicare Advantage' and 'MA.'"  *See* Medicare Prescription Drug, Improvement, and Modernization Act of

28   2003, Pub. L. 108-73, § 201(b), 117 Stat. 2066, 2176 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395w-21 note).

1    and gender (among others) and (2) health status.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).  This is known

2    as risk adjustment.  Each beneficiary's risk score acts as a multiplier that is applied to the MA plan's

3    base rate to determine the overall monthly payment for the beneficiary.  *See* 42 U.S.C. § 1395w-

4    23(a)(1)(G); *see also* 42 C.F.R. § 422.308(e).

5         59.   HHS has the authority to determine the risk-adjustment methodology.  *See* 42 U.S.C.

6    § 1395w-23(a)(1)(C).  For Medicare Advantage, since 2004, HHS has used a model called the CMS

7    Hierarchical Conditions Category ("CMS-HCC") model, which determines each patient's risk score by

8    accounting for the patient's demographic factors and health status.  *See* 42 C.F.R. § 422.308(c); *see also*

9    42 U.S.C. § 1395w-23(a)(1)(C)(i).

10        60.   The CMS-HCC model is prospective in the sense that it uses diagnoses made in a base

11   year (the "service year"), along with demographic information (such as age and gender, among others),

12   to predict costs for Medicare benefits and adjust payments for the following year (the "payment year").

13   The diagnoses included in the CMS-HCC model are a subset of diagnosis codes from the International

14   Classification of Diseases.  The diagnoses in the CMS-HCC model generally include major, severe,

15   and/or chronic medical conditions.

16        61.   HHS has adopted the ICD and its accompanying ICD Guidelines as the standard for

17   medical record documentation, including the identification of diagnosis codes for health conditions.  *See*

18   45 C.F.R. §§ 162.1002(a)(1), (b)(1), (c)(2), (c)(3) ("The Secretary [of HHS] adopts . . . the official ICD-

19   10-CM Guidelines for coding and reporting").  At all relevant times, CMS regulations have therefore

20   required MA Organizations to "submit data that conform to" the ICD Guidelines.  42 C.F.R.

21   § 422.310(d)(1) (requiring MAOs to submit data in conformity with "all relevant national standards");

22   *see also* CMS, *Medicare Managed Care Manual*, Chapter 7, Exhibit 30 (Rev. 57, Aug. 13, 2004); CMS,

23   *Medicare Managed Care Manual*, Chapter 7 § 40 (Rev. 118, Sept. 19, 2014).

24        62.   ICD diagnosis codes are alphanumeric codes used by healthcare providers, insurance

25   companies, and public health agencies to represent medical conditions; every disease, injury, infection,

26   and symptom has its own code.  The applicable ICD diagnosis codes are set forth in the International

27   Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9") through October 1, 2015,

28   and thereafter in the International Classification of Diseases, Tenth Revision, Clinical Modification

1  ("ICD-10").  *See* 45 C.F.R. § 162.1002 (listing dates for use of Medical data code sets).  The particular

2  ICD Guidelines provisions relevant to the allegations in this Complaint have remained the same.[3]  The

3  Health Insurance Portability and Accountability Act ("HIPAA") and HHS regulations broadly mandate

4  the use of the ICD, including the ICD Guidelines, across the healthcare industry.

5        63.    The CMS-HCC model relies upon the ICD diagnosis codes and the ICD Guidelines.  The

6  ICD diagnosis codes included in the CMS-HCC model are grouped into categories of clinically related

7  medical diagnoses that comprise the HCCs (i.e., the categories).  For example, various cancer diagnosis

8  codes are grouped together (e.g., colorectal and bladder cancers).  The CMS-HCC model organizes

9  related conditions into hierarchies based on disease severity and expected cost.  For example, various

10 cancer HCCs are in the same hierarchy, with the HCC associated with metastatic cancer diagnosis codes

11 as the most severe.  If a patient is diagnosed with conditions (diagnosis codes) that correspond to more

12 than one HCC in a hierarchy, only the most severe HCC is kept and any lower-ranking HCCs are

13 dropped.

14       64.    For a given payment year, an MA plan beneficiary might have zero HCCs or might have

15 one or more HCCs, depending on whether the beneficiary had any diagnoses from the service year that

16 correspond to an HCC.  Some examples of HCC codes are diabetes with chronic complications (HCC

17 18), protein-calorie malnutrition (HCC 21), congestive heart failure (HCC 80), and vascular disease

18 (HCC 108).[4]

19       65.    Each HCC is assigned a coefficient.  CMS calculates a beneficiary's risk score by adding

20 the coefficients associated with each of the beneficiary's applicable demographic characteristics (such as

21 age and gender) and the applicable HCCs, if any, that apply to the beneficiary.[5]  A risk score of 1.0

22 reflects the average expected Medicare-incurred expenses.  A risk score of 0.75 reflects expected costs

23

24        [3] Because the relevant guidelines have remained the same, the Complaint will not reference any

25 particular version of the ICD Guidelines.  All ICD Guidelines for the relevant years are available at https://www.cdc.gov/nchs/icd/icd9cm.htm and https://www.cdc.gov/nchs/icd/icd10cm.htm.

26        [4] CMS has adjusted the CMS-HCC model over time, utilizing different versions.  The numerical examples of HCC codes cited in this paragraph are from the Version 22 model.

27        [5] CMS makes several further adjustments to the risk score before reaching a final calculation.

28 *See* CMS, *Medicare Managed Care Manual*, Chapter 7 § 100 (Rev. 114, June 7, 2013).  These adjustments are not relevant to the allegations in the Complaint.

for a particular beneficiary that are 25% less than the estimated average costs for enrollees in the MA plan, and a risk score of 1.25 reflects expected costs that are 25% greater than the estimated average costs for enrollees in the MA plan.

66.    CMS uses these risk scores to adjust the base monthly payment for each MA plan beneficiary.  As noted, each patient's risk score is based upon diagnosis codes submitted from medical visits in the "service year."  CMS uses those service-year calculations to determine the monthly payments to the MA organizations in the following year (the "payment year").  Each MA plan beneficiary's risk score is calculated each year.

67.    To understand the operation of the CMS-HCC model, imagine a hypothetical patient whose "demographic" characteristics—i.e., age, sex, and institutional and disability statuses—were assigned a coefficient of 0.60.  If this patient had no diagnosed diseases, an MA plan would be paid 60% of its base rate (which is keyed to the average beneficiary) for covering this patient.  If the imagined patient had one diagnosis in the service year that mapped to an HCC, the CMS-HCC model would add the risk-adjustment coefficient for that HCC.  For example, if that HCC had a risk-adjustment coefficient of 0.30, the patient would then have a risk score of 0.90, and the MA plan would be paid 90% of its base rate in the payment year for covering this patient.  If this patient had a second diagnosis that mapped to another HCC, CMS would add the risk adjustment coefficient for that HCC as well.  So if that second HCC had a risk adjustment coefficient of 0.20, the patient would then have a risk score of 1.10, and the MA plan would be paid 110% of its base rate in the payment year for covering this patient. If we assume the base payment amount for the patient was $10,000, the first diagnosis would cause CMS to pay out $3,000 more in risk adjustment payments, and the second diagnosis would cause CMS to pay out an additional $2,000 in risk adjustment payments.[6]

68.    The CMS-HCC model relies upon MA Organizations and authorized physicians to correctly document and submit ICD diagnosis codes for their patients pursuant to the ICD Guidelines. When a Medicare Advantage insurer reports to CMS a relevant diagnosis for a covered patient, that

---

[6] As noted above, CMS makes several technical adjustments to the risk score not relevant to the allegations in the Complaint.  For purposes of this example, all adjustments are incorporated within the hypothetical coefficients.

reported diagnosis directly increases the amount that CMS pays the insurer for providing coverage. A higher risk score translates into higher payments by CMS to the MA Organization. Thus, the risk-adjusting diagnosis codes that correspond to HCCs directly impact how much money CMS pays an MA Organization. The CMS-HCC model does not predict any costs associated with a patient simply having a condition or having been diagnosed with a condition in the past. Rather, as explained above, the CMS-HCC model predicts expected costs based upon particular ICD diagnoses coded in conformance with the ICD Guidelines in the service year.

69.     CMS, through its regulations and guidance, has made clear to MA Organizations and healthcare providers, including physicians, that it relies on the risk-adjusting diagnosis codes to determine and make accurate payments for each patient enrolled in the MA Program. "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record." *See, e.g.*, 42 C.F.R. § 422.504(*l*); CMS, *2013 National Technical Assistance Risk Adjustment 101 Participant Guide* 13 (2013).

70.     During the relevant time period, MA Organizations submitted risk-adjustment data, including diagnosis codes, through two electronic systems administered by CMS: the Risk Adjustment Processing System ("RAPS") and the Encounter Data Processing System ("EDPS"). Up to 2014, CMS calculated risk-adjustment payments based solely on data submitted through RAPS. Starting in 2015, CMS has calculated risk-adjustment payments using a combination of data submitted through RAPS and EDPS.

71.     Each RAPS and EDPS submission by an MA Organization is a claim for payment because the reported diagnosis codes factor directly into CMS's risk-adjustment calculations and into the resulting payments made by CMS to the MA Organization.

72.     MA Organizations can delete or "redact" diagnoses from both the RAPS and EDPS databases to remove erroneous, invalid, unsupported, or otherwise improper diagnosis codes previously submitted to CMS. After a diagnosis is deleted or redacted, CMS's electronic-processing system recalculates the payment.

**B.     Standards governing risk-adjustment payments**

73.     CMS has the authority to issue rules to implement and regulate Medicare Part C. *See*

42 U.S.C. § 1395w-26(b).  CMS has promulgated regulations governing the Medicare Advantage Program, including numerous regulations imposing obligations and responsibilities on MA Organizations.  42 C.F.R. Part 422.

74.     Further, in order to participate in the MA Program, MA Organizations such as Kaiser's Health Plans must enter into and execute a written contract with CMS for the MA plans they operate. 42 U.S.C. § 1395w-27(a); 42 C.F.R. Part 422, Subpart K.  Pursuant to 42 C.F.R. § 422.505, these contracts are renewed annually unless CMS or the MA Organization provides a notice of intention not to renew.  As relevant here, the Health Plan and the Colorado Health Plan executed such contracts with CMS for the MA plans they operated.

75.     These contracts impose numerous obligations.  Among others, the contracts require an MA Organization to operate its MA plans in compliance with the requirements of the contract, applicable federal law and regulations, and CMS's policies, including CMS's Medicare Managed Care Manual.  Furthermore, the MA Organization must certify the accuracy, completeness, and truthfulness of the data it submits to CMS.  42 C.F.R. § 422.504(*l*).

76.     Entities—like physician groups—enter into agreements with MA Organizations to provide health care services to MA plan beneficiaries.  These entities are called first tier and downstream entities.  *See, e.g.*, 42 C.F.R. § 422.500 ("*First tier entity* means any party that enters into an acceptable written arrangement with an MA Organization or contract applicant to provide administrative services or health care services for a Medicare eligible individual."); *id.* ("*Downstream* entity means any party that enters into an acceptable written arrangement below the level of the arrangement between an MA Organization (or contract applicant) and a first tier entity.  These written arrangements continue down to the level of the ultimate provider of both health and administrative services."); *see also, e.g.*, 42 C.F.R. § 422.504(i) (listing some of the obligations).

77.     First tier and downstream entities—such as the Permanent Medical Groups—must, among other things, agree in their contracts with the MA Organization to terms that commit them to comply with the MA Organization's contractual obligations to CMS, 42 C.F.R. § 422.504(i)(3)(iii), and agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id.* § 422.504(i)(4)(v).  Furthermore, if the entity generates data relating to an MA Organization's claims for

1   payment, it must certify the accuracy, completeness, and truthfulness of that data.  *Id.* § 422.504(*l*)(3).

2   The Defendant Permanente Medical Groups have each executed contracts agreeing to these and other

3   obligations related to the MA Program.

4       78.     CMS imposes, and Kaiser Health Plans have contractually agreed to, numerous

5   obligations with respect to diagnosis codes submitted to obtain risk-adjustment payments.  As most

6   relevant to this Complaint:

7       79.     *First*, given the material impact of diagnoses in calculating the Government's payments,

8   MA Organizations must ensure that diagnosis codes submitted for risk-adjustment payments are

9   accurate, complete, and truthful.  MA Organizations must attest to the validity of their risk-adjustment

10  data, including diagnoses, in a Risk Adjustment Attestation submitted to CMS each year.  Specifically,

11  the chief executive officer, chief financial officer, or an individual delegated with authority to sign on

12  behalf of one of these officers and who reports directly to such officer, must certify that the risk-

13  adjustment data that the MA Organization submitted to CMS is accurate, complete, and truthful.  *See*

14  42 C.F.R. § 422.504(*l*); CMS, *Medicare Managed Care Manual*, Chapter 11 § 130 (Rev. 79, Feb. 17,

15  2006).  In its contracts with CMS, Kaiser (like other MA Organizations) agreed that: "[a]s a condition

16  for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G," it

17  must attest to "the accuracy, completeness and truthfulness of the data identified on these attachments."

18  CMS's regulations further specify that the MA Organization's submission of its such attestations

19  regarding "the accuracy, completeness, and truthfulness" of this data is "a condition for receiving a

20  monthly payment" from CMS.  42 C.F.R. § 422.504(*l*).

21      80.     *Second*, diagnosis codes submitted for risk-adjustment payments are valid only if they are

22  documented in the medical record as a result of a face-to-face visit between a patient and physician.[7]

23  *See, e.g.*, CMS, *Medicare Managed Care Manual*, Chapter 7 § 40 (Rev. 118, Sept. 19, 2014) ("All

24  diagnosis codes submitted must be documented in the medical record and must be documented as a

25  result of a face-to-face visit."); CMS, *Medicare Managed Manual*, Chapter 7 § 111.3 (Rev. 57, Aug. 13,

26

27      [7] The Medicare Managed Care Manual provides a table of Acceptable Physician Specialty
    Types.  *See* CMS, *Medicare Managed Care Manual*, Chapter 7 Table 19 (Rev. 118, Sept. 19, 2014).
28  The type of physician is not at issue in this Complaint; this Complaint will therefore refer simply to
    "physician."

2004) ("Physician risk adjustment data is defined as diagnoses that are noted as a result of a face-to-face visit by a patient to a physician (as defined above) for medical services.").

81.     *Third*, diagnosis codes submitted for risk-adjustment payments must be in conformance with the ICD, including the ICD Guidelines.  *See, e.g.*, 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i) (establishing the ICD, including the ICD Guidelines, as the national standard for diagnosis coding); 42 C.F.R. § 422.310(d)(1) ("MA organizations must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards."); CMS, *Medicare Managed Care Manual*, Chapter 7 § 40 (Rev. 118, Sept. 19, 2014) ("The diagnosis must be coded according to *International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting*."); CMS, *Medicare Managed Care Manual*, Chapter 7 § 40 (Rev. 114, June 7, 2013); CMS, *Medicare Managed Manual*, Chapter 7, Exhibit 30 (Rev. 57, Aug. 13, 2004); 42 C.F.R. § 422.504(h)(2) (requiring MA Organizations to comply with HIPAA simplification rules at 45 C.F.R. part 162, which includes the adoption of the ICD and ICD Guidelines as the national standard); ICD Guidelines, Preamble ("These guidelines are a set of rules that have been developed to accompany and complement the official conventions and instructions provided within the ICD-10-CM itself. . . .  Adherence to these guidelines when assigning ICD-10-CM diagnosis codes is required under [HIPAA].").

82.     The ICD Guidelines impose numerous requirements and limitations on what diagnoses may be coded in a particular visit and in a particular setting.  Those Guidelines differ with respect to when diagnoses can be coded for non-outpatient and outpatient visits.  *Compare* ICD Guidelines §§ II, III (non-outpatient guidelines), *with* § IV (outpatient guidelines).  This Complaint concerns outpatient visits, which are covered by Section IV of the ICD Guidelines.

83.     For an outpatient visit (sometimes referred to as an encounter), the ICD Guidelines only permit the coding of documented conditions that both exist at the visit *and* that "require or affect patient care treatment or management."  ICD-10 Guidelines § IV.J; ICD-9 Guidelines § IV.K.[8]  In other words,

---

[8] The ICD Guideline provisions discussed in this Complaint are identical in all relevant editions of the ICD-9 and ICD-10 Guidelines; the subsection letter changed because one subsection not relevant to the Complaint was removed for the ICD-10.

1  it is not enough that a condition merely exists; the condition must have specifically mattered to patient

2  care, treatment, or management.

3      84.     The ICD Guidelines state that "[c]hronic diseases treated on an ongoing basis may be

4  coded and reported as many times as the patient received treatment and care for the condition(s)."  ICD-

5  10 Guidelines § IV.I; ICD-9 Guidelines § IV.J.  As CMS explained in a 2013 Participant Guide: "For a

6  chronic condition to be accepted for risk adjustment, the patient must have a face-to-face visit each year

7  with a provider/physician who assesses and documents that condition."  CMS, *2013 National Technical*

8  *Assistance Risk Adjustment 101 Participant Guide* 17 (2013).

9      85.     For example, even if an MA organization knows that a patient was diagnosed in a prior

10 year with a chronic condition that tends not to go away, the MA organization may not submit the

11 diagnosis for payment for the current year unless the physician has a face-to-face visit with the patient in

12 the current year and the chronic condition required or affected care, management, or treatment during

13 that patient visit.

14     86.     The ICD Guidelines further provide that if a patient does not have a medical condition at

15 the time of a visit, it may not be coded.  Moreover, uncertain conditions—such as probable, suspected,

16 questionable, working diagnoses, etc.—may not be coded.  *See* ICD-10 Guidelines § IV.H; ICD-9

17 Guidelines § IV.I.  Prior conditions may be coded only with special ICD "history codes" if the prior

18 condition has an impact on current care or treatment.  *See* ICD-10 Guidelines § IV.J; ICD-9 Guidelines

19 § IV.K.

20     87.     In sum, the diagnosis codes that MA Organizations submit to CMS for risk-adjustment

21 purposes must be:

22          a.   established by a qualified physician;

23          b.   based on a face-to-face medical visit between the patient and physician;

24          c.   documented in the medical record; and

25          d.   coded in compliance with the ICD Guidelines, including the limitation that the

26              condition must have required or affected patient care, treatment, or management

27              for the visit.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   KAISER KNEW THE CMS STANDARD FOR SUBMISSION OF RISK-ADJUSTMENT DIAGNOSES

88.   Kaiser knew that diagnoses submitted to CMS for risk-adjustment purposes must be: (a) established by a qualified physician; (b) based on a face-to-face medical visit between the patient and physician; (c) documented in the medical record; and (d) coded in compliance with the ICD Guidelines, including the limitation that the condition must have required or affected patient care, treatment, or management for the visit.

89.   As far back as 2008, Kaiser issued a "Program Advisory" (the "2008 Risk Adjustment Program Advisory") to all its regions that was "intended to clarify the minimum amount and type of documentation necessary to support the diagnoses submitted to [CMS] as Medicare Advantage risk adjustment data."  The designated points of contact for the 2008 Risk Adjustment Program Advisory were: Dr. Simon Cohn (Associate Executive Director for the Permanente Federation); Gina Reese (Senior Counsel for Kaiser Foundation Hospitals and Health Plans); and Janet Franklin (at the time, a Practice Leader, Coding Compliance, with the National Compliance Office).

90.   The 2008 Risk Adjustment Program Advisory demonstrates that Kaiser knew the CMS standard for submission of risk-adjustment diagnoses.  Specifically, it stated that:

   a.   "Diagnoses submitted as physician risk adjustment data must be recorded by a 'physician'";

   b.   "[R]isk adjustment data must be obtained as the result of a <u>face-to-face visit</u> by the physician . . . with the patient" (emphasis in original);

   c.   "For the outpatient or physician office visit note, it is acceptable to submit risk adjustment data for diagnoses documented in the history, physical <u>or</u> assessment portion of the medical record that is directly associated with the date of the face-to-face encounter with the patient"; and

   d.   "**<u>Documentation Must Comply with ICD-9-CM Coding Guidelines</u>**" and "[t]here must be an implicit <u>or</u> express indication that the physician **considered**, **addressed** or **evaluated** the coded diagnosis during the patient encounter. . . .  [I]f the physician does not <u>actually</u> consider the condition during the visit, then the

physician should not document the diagnosis in the medical record for that visit and that diagnosis should not be submitted to CMS as risk adjustment data." (Emphasis in original.)

91.     A 2010 Medicare Regional Reporting Group presentation to all Defendants stated that the physician must have considered, addressed, or evaluated the condition during the patient visit.  "Each encounter must be evaluated separately and the condition's impact to care must be evident.  This is in keeping with Coding Clinic and as iterated [sic] by CMS in their participant guide."  The presentation then cited the specific provision in the ICD Guidelines requiring that the condition must require or affect patient care, treatment, or management in order to be coded.

92.     A 2014 Medicare Regional Reporting Group presentation reiterated these requirements: "Documentation must comply with the ICD-9-CM Coding Guidelines."  To be coded, the condition must be "[e]valuat[ed], treat[ed] or affect care," must be the "result of face-to-face encounter" with an acceptable physician, and "must have occurred in the applicable year."

93.     In 2015, Kaiser issued an updated version of the Program Advisory (the "2015 Risk Adjustment Program Advisory"), with similar guidance.  As with the 2008 Risk Adjustment Program Advisory, the 2015 Risk Adjustment Program Advisory was "intended to provide guidance about the documentation necessary to support the diagnoses reported by physicians and diagnoses codes submitted by Kaiser Foundation Health Plans to [CMS] for physician encounter risk adjustment data."  The designated points of contact for the 2015 Risk Adjustment Program Advisory were: Dr. Simon Cohn; Paula Ohliger (Senior Counsel for the Health Plan); and Janet Franklin (at that time, a Compliance Manager for Risk Adjustment with the National Compliance Office).

94.     Specifically, the 2015 Risk Adjustment Program Advisory states that "CMS requires that diagnoses submitted for risk adjustment be" made:

a.   By "a physician deemed acceptable for risk adjustment";

b.    "[A]s a result of a face-to-face encounter";

c.   "[D]ocumented in the medical record"; and

d.   "**Documentation Must Comply with ICD-9-CM Coding Guidelines**. . . .

Generally, physicians should document all conditions that coexist at the time of

the encounter/visit, and require or affect the physician's care, treatment or management of the patient. . . .  [I]f the physician does not actually consider the condition during the encounter or the diagnosis did not impact that encounter then the physician should not document the diagnosis in the medical record for the visit and that diagnosis should not be submitted to CMS as risk adjustment data."  (Emphasis in original.)

95.     Various employees, including those from the National Compliance Office, confirmed Kaiser's awareness of these requirements.  As Janet Franklin testified, "in order to submit a diagnosis that impacted reimbursement, you had to meet the coding rules that showed that it impacted—that there was monitoring, evaluation, assessment, treatment, or some kind of impact to the encounter that day."

96.     Internal Kaiser training documents also stressed the importance of the compliance "Golden Rule" regarding coding for patient diagnoses: "'If it's not documented by the physician, it didn't happen.' . . .  In compliance and in coding, there is no deviation from this principle.  We can't code it if it isn't documented, and we can't bill for it."

## VII.   KAISER KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FRAUDULENT DIAGNOSIS CODES

97.     Despite its obligations to the contrary, Kaiser knowingly submitted or caused to be submitted diagnoses that had no relevance to the patient visit and sometimes did not exist at all and sought risk-adjustment payments based on such fraudulent diagnoses.  Kaiser knew that it could submit only those diagnoses that required or affected care, treatment, or management for a patient visit.  Yet Kaiser knowingly submitted or caused to be submitted thousands upon thousands of diagnoses that it knew had nothing to do with those visits and were not addressed or considered in any way at the patient visits.

98.     Kaiser generated such diagnoses through the use of medical record addenda—changes to the medical record after the patient visit, often months or even a year or more after the visit—to add unrelated diagnoses identified through one of Kaiser's risk-adjustment programs.  Kaiser mined patient records for anything that might support a risk-adjusting diagnosis and then had the physician retrospectively create an addendum to the medical record to make it appear as if the diagnosis was part

of the original patient visit, regardless of whether it actually was.

99.     Defendants all knew that the purpose of these programs was to add diagnoses that the Health Plan and the Colorado Health Plan could submit to CMS to falsely claim entitlement to hundreds of millions of dollars in additional risk-adjustment payments, which the Health Plans then shared with the Permanente Medical Groups.  Indeed, the Defendants routinely tracked these programs in great detail to identify the diagnoses added, money earned, and return on investment.  Meanwhile, Permanente Medical Group physicians often did not tell their patients that they supposedly had the diagnoses for which the Kaiser Health Plans claimed payment.

A.     **Kaiser recognized the importance of Medicare revenue and implemented national initiatives to increase patient risk scores.**

100.     Kaiser recognized and emphasized internally that Medicare Advantage, and in particular risk-adjustment payments from diagnoses, were (and are) critical to Kaiser's business.  Internal Kaiser documents stressed repeatedly how "Medicare is important to KP," how "Medicare is KP's largest single payor," and how Medicare is a "[s]ignificant contributor to operating income."  Kaiser's internal analyses reflected that although Medicare accounted for roughly 10% of Kaiser's members, Medicare accounted for more than 30% of Kaiser's total revenue.  And risk-adjustment payments (i.e., CMS payments based upon risk-adjustment diagnoses) accounted for more than half of all of Kaiser's Medicare revenue.

101.     In his speaker notes for a National Compliance Office summit meeting, Dr. Simon Cohn (Associate Executive Director of the Permanente Federation) explained: "So why are we talking to you about this [Medicare Risk Adjustment] again? … because of KP['']s critical dependencies on Medicare Revenue—risk adjusted revenue—which is almost 1/3 of program revenue and the only thing we are currently making a margin on—the more you know about this the better."

102.     As Diane Morissette (National Director for Medicare Risk Adjustment, National Medicare Finance for the Health Plan) explained to the Medicare Regional Reporting Group, including representatives from all of the Defendants, in 2010: "Why a focus on risk adjustment . . . that's enough to warrant its own 2-day meeting?  Because risk adjustment is by far the biggest lever we have to change our revenue from Medicare.  If we don't do this well, our financial health as a company could be

1  seriously impacted."

2      103.    Revenue from the Medicare Advantage program was shared among the Kaiser entities.

3  As one set of internal Kaiser training materials put it, "Many management consultants will advise people

4  to 'follow the money', so let's do that here.  In Medicare Advantage, Medicare or 'CMS' pays Kaiser

5  Foundation Health Plan to cover Medicare covered benefits for our Medicare Advantage members.  Our

6  Health Plan, in turn, pays the Permanente Medical Groups, Kaiser Foundation Hospitals, and various

7  external providers through claims to care for our members."

8      104.    The same Kaiser internal training depicted the flow of money in the following way:

9

10

11

12

13  

14

15

16

17

18

19

20      105.    Recognizing the importance of risk adjustment as a revenue driver, Kaiser's National

21  Medicare Leadership Team, National KP Risk Adjustment Initiative, National Medicare Finance

22  department, and the Medicare Regional Reporting Group were all key players involved in risk-

23  adjustment activities at Kaiser.  Kaiser's National Medicare Finance department assigned one or more

24  persons from its ranks to lead each region's risk-adjustment efforts.  National Medicare Finance's region

25  leads collaborated with the regional Permanente Medical Groups to ensure coordination, identify and

26  analyze potential opportunities to increase risk-adjustment revenues, and share information across

27  regions.  If particular regions had successful initiatives that increased their risk scores, Kaiser's National

28  Medicare Finance department would work with other regions to duplicate those efforts.  The Medicare

Regional Reporting Group shared information across all Kaiser entities and regions regarding risk adjustment, including so that successful initiatives could be shared and duplicated.

106.    Internally, Kaiser touted that it had a "strategic advantage" in Medicare risk adjustment because of its integrated structure.  This structure enabled Kaiser to coordinate its efforts between each of its entities and across regions.  The National KP Risk Adjustment Initiative and the various working groups it spawned, as well as Kaiser's National Medicare Finance department, ensured this high level of coordination.

107.    Key to Kaiser's ability to coordinate risk-adjustment activities among the Kaiser Health Plans and the Permanente Medical Groups was the fact the Kaiser Health Plans and the Permanente Medical Groups actively monitored and shared risk-adjustment data, including diagnosis documentation.

108.    Kaiser's National Medicare Finance department tracked numerous metrics.  Risk scores were compared across regions, trended over time, tracked against forecasts, and compared to benchmarks.  Volumes of diagnoses were tracked and compared across time, regions, and against expected thresholds.  The number of diagnoses per visit, visits per member, HCCs per member, HCC frequencies, and number of un-refreshed diagnoses were all tracked within Kaiser's National Medicare Finance department.

109.    A variety of reports on all of these metrics were distributed to individuals throughout the Kaiser Health Plans and Permanente Medical Groups involved with Medicare risk adjustment, as well as posted to the internal "KP Medicare Risk Adjustment Website," the purpose of which was to "provide one central location as a resource to staff across the regions who are working on Medicare Risk Adjustment."

110.    In addition to the various risk-adjustment reports, the KP Risk Adjustment Website contained presentations from Medicare Regional Reporting Group conferences, training materials, compliance policies, and National Compliance Office work plans.

111.    As Kaiser's internal Risk Adjustment Manual further explains: "[a]ccuracy and completeness of diagnosis documentation, coding and data submission is tracked monthly by reviewing a full suite of reports that are produced by [Management Information & Analysis], reviewed by National Medicare Finance and the Permanente Federation and consolidated into a monthly summary of reports.

In addition, as soon as new monthly risk score results are available, a Medicare Risk Adjustment flash report is distributed to CFOs, Medicare Risk Adjustment regional leads, National Medicare Finance managers and other key stakeholders."

112.     An additional function of Kaiser's National Medicare Finance department was to work with each region to develop a "risk adjustment improvement plan."  The plans covered seven areas relating to "completeness and accuracy of documentation, coding and data submission."  These plans "are developed early in the year and are evaluated quarterly.  Gaps that are identified are worked through to resolution with the Region and successful practices that are identified are highlighted and shared with other Regions."

113.     In addition to monthly meetings, the Medicare Regional Reporting Group held semi-annual conferences to ensure that key leaders and staff involved in Medicare risk adjustment were updated with the latest information from CMS, reviewed risk score trends and accuracy rates, and learned new tools to allow them to work more efficiently and effectively.  The Medicare Regional Reporting Group conferences were also an important opportunity to share successful practices, such as "[n]ew and promising regional initiatives to improve completeness and/or accuracy of risk adjustment data."

114.     In addition, the "KP Risk Adjustment Data Leads" for all regions and representatives from the national risk-adjustment reporting team meet weekly to "share new risk adjustment information, discuss and resolve data submission issues, and share successful practices."  "Data Leads often adopt each others' initiatives, especially as KP regions move toward common sources for risk adjustment data.  Best practices and lessons learned are discussed, with a focus on moving toward common national practices to the greatest extent possible."

115.     Kaiser made clear that it expected results and would hold employees accountable for achieving them.  In a 2006 Medicare Regional Reporting Group presentation regarding Improving Diagnosis Capture for Medicare Risk-Adjusted Payment, Diane Morissette and Dr. Simon Cohn stated that there was leadership focus on this issue at both the Health Plan and the Permanente Medical Groups, and that leadership in those organizations "holds direct reports accountable for results."

116.     Kaiser identified that the risk score is "one of the primary drivers of overall revenue and

1    is a key driver for organizational performance." Kaiser knew that if it could increase the average risk

2    scores of its patients, even by a small amount, it could receive a significant increase in revenue. As an

3    internal Kaiser training emphasized: "If a risk score increases from, say, 1.10 to 1.11, this is considered

4    a point. It might not sound like much of a change, but that point is worth over $28 Million dollars to a

5    Region like Northern California and over $62 Million dollars if the overall average risk score for the

6    whole KP program increases by a point." Kaiser calculated the value of each point every year. By

7    2015, Kaiser calculated that the value of each point was more than $80 million.

8         117.    A key component of Kaiser's risk-adjustment programs involved setting risk-score

9    targets for the average risk score for all of Kaiser's patients. The Health Plan, through the National

10   Medicare Finance department, set the annual risk-score target for each region, specifically instructing

11   each region what the average risk scores for its members should be. Generally, these targets would take

12   the historical score from the region and add on points for the following year. Each region was expected

13   to work with Kaiser's National Medicare Finance department to develop a plan, including the specific

14   initiatives it would undertake, to meet the risk-score target. These regional initiatives were discussed

15   regularly with Kaiser's National Medicare Finance department, who shared successful initiatives with

16   other regions. Often, regions would present these initiatives at Kaiser's Medicare Regional Reporting

17   Group meetings so that other regions could duplicate their efforts.

18        118.    Kaiser set increasingly higher risk-score targets every year. As previously noted, the

19   average risk score for Medicare beneficiaries under the CMS-HCC model is 1.0. But Kaiser set

20   increasingly higher targets well above this 1.0 average. Kaiser's National Medicare Finance department

21   increased these risk-score targets over time despite concerns from physicians that it created "a culture of

22   'meet the target at any cost.'"

23        119.    Kaiser worked to conceal this financial motive, especially documents that could be

24   disclosed in litigation. For example, in 2011, Karen Graham (Managing Director of the N. California

25   Medical Group's Encounter Information Operations ("EIO") office) wrote to other members of the N.

26   California Medical Group's management that "[i]n the past we've steered away from publicizing the

27   dollar value of diagnoses, particularly in any printed / discoverable format." She reminded them that

28   "[y]ou've heard Dr [David] Bliss put on his 'money grubbing' hat and comment in this fashion."

120.     Kaiser's risk-adjustment program was highly successful with respect to its goal of increasing Medicare revenue and increasing risk scores.  When CMS began using the CMS-HCC model in 2004, most Kaiser regions had average patient risk scores of around 0.90, with some regions slightly above and some slightly below.  Kaiser's 2004 risk score, slightly below 1.0, was consistent with research showing that Medicare Advantage beneficiaries are on average healthier, have lower medical spending, and use fewer medical services than traditional Medicare beneficiaries.[9]  However, by 2014, after spending substantial resources on these risk-adjustment initiatives, Kaiser's average risk score increased to 1.16, with the California and Colorado regions meeting or exceeding this score.  Put differently, Kaiser's risk-score initiatives enabled it to make its patient population appear sicker, allowing Kaiser to achieve a roughly 30% increase in Medicare revenue per patient than it would have received based on its 2004 average risk score.  This risk-score increase translated into billions of dollars of additional Medicare revenue to Kaiser.

**B.     Kaiser mined patient medical records to add lucrative risk-adjustment diagnoses via addenda to achieve risk-score targets.**

121.     In order to meet the ever-increasing risk-score targets set by Kaiser's National Medicare Finance Department, each region was expected to develop and implement initiatives to increase their average patient risk score.  It was not sufficient for Permanente Medical Group physicians to simply have visits with their patients and identify those conditions relevant to the visits.  Instead, the Defendant Kaiser Health Plans and Permanente Medical Groups created and implemented numerous initiatives aimed at raising patient risk scores.

122.     Kaiser made systematic efforts in the California and Colorado regions to increase risk scores by adding lucrative risk-adjustment diagnoses *after* a patient visit, even where the condition had nothing to do with the visit.  Kaiser—through the Kaiser Health Plans and the regional Permanente Medical Groups—used automated algorithms and human reviewers to mine its patients' medical files

---

[9] *See, e.g.*, Kaiser Family Foundation, Do People Who Sign Up for Medicare Advantage Plans Have Lower Medicare Spending? (May 2019), *available at* https://files.kff.org/attachment/Issue-Brief-Do-People-Who-Sign-Up-for-Medicare-Advantage-Plans-Have-Lower-Medicare-Spending (last visited Oct. 25, 2021); Jason Brown et al., How Does Risk Selection Respond to Risk Adjustment? Evidence from the Medicare Advantage Program, 104 *Am. Econ. Rev.* 3335 (2014); *UnitedHealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 876 (D.C. Cir. 2021) (referencing studies finding "that Medicare Advantage insurers in fact have tended to attract healthier-than-average beneficiaries").

1  for potential additional diagnoses.

2       123.    After identifying potential diagnoses, Kaiser then had its physicians retrospectively add

3  these diagnoses to the patients' medical records using addenda, as if the new diagnoses were addressed

4  in some way during the patient visits when, in fact, they were not.

5       124.    An "addendum" is a part of a patient's medical record that is a note drafted by a

6  physician that amends a previous note made by that same physician.  In other words, an addendum is an

7  addition to a patient's medical record made *after* the visit but linked to the record of that visit.

8  Generally, a medical-record addendum is a means by which medical-record entries can be updated,

9  corrected, or supplemented.  An addendum can be used to clarify or correct a medical record that

10  contains conflicting or insufficient information.

11       125.    Under CMS rules and guidance, as well as industry practice, addenda have legitimate

12  uses.  CMS recognizes the use of an addendum where it is related to a service that was provided during

13  the visit.  *See* CMS, *Medicare Program Integrity Manual*, Chapter 3 § 3.3.2.5(A); CMS, *2008 Risk*

14  *Adjustment Data Technical Assistance Participant Guide* § 6.4.2.  An addendum must clearly delineate

15  any amendment, including the date and author of the amendment, from the original content of the

16  medical record, which must be preserved without deletion.  CMS, *Medicare Program Integrity Manual*,

17  Chapter 3 § 3.3.2.5(A).

18       126.    Kaiser, however, did not use addenda simply to timely clarify or correct medical records.

19  Some of the diagnoses that Kaiser added via addenda did not even exist, and many more did not require

20  or affect patient care, treatment, or management at the patient visit as required by the ICD Guidelines.

21  Often, these addenda were added months or even a year or more after the visit so that Kaiser could

22  obtain risk-adjustment payments for the newly added diagnoses.

23       127.    Broadly speaking, Kaiser pushed several types of initiatives to add diagnoses via

24  addenda.  These included "data mining" and "chart review," where Kaiser would utilize automated

25  algorithms and/or human reviewers to identify brand-new diagnoses.  Such never-before-diagnosed

26  conditions should rarely, if ever, result in addenda because these diagnoses were, almost by definition,

27  not relevant to the visit.  Yet Kaiser routinely created addenda to medical records with these diagnoses

28  and submitted them for payment, often without even telling the patient about these brand-new diagnoses.

128.     Kaiser also employed a related data-mining program called "refresh," where Kaiser would mine patient medical files to find old diagnoses that had not been diagnosed in the current service year.  Following a patient visit, if a physician failed to address any of these unrefreshed diagnoses, the physician would receive a list of these "missed-opportunity" diagnoses—i.e., opportunities for risk-adjustment payment.  Because Kaiser had numerous different initiatives, physicians would often receive lengthy lists of both data-mined diagnoses and missed-opportunity diagnoses.

129.     Kaiser typically brought these new mined diagnoses to the physician's attention through a query.  As commonly defined in the healthcare industry, a "query" is any communication tool or process used to clarify documentation in the health record for accurate code assignment.  This would encompass any communication to a physician, after the physician had a visit with a patient, relating to modifying, adding, or deleting any diagnosis in the patient's medical record for the visit.  Queries can take any form; they can be written or oral.

130.     There are standards, discussed in more detail in paragraphs 185-216, guiding and limiting the use of queries, including that a query cannot lead or be presumptive (i.e., cannot direct a provider to a specific diagnosis) and that a query cannot discuss the financial impact of a change to the patient's record.  In general, queries are supposed to be limited to clarifying the medical record, for example to resolve conflicting information in the medical record.  But Kaiser routinely violated the standards that apply to queries, and used queries not to clarify a medical record, but instead to add new diagnoses via addenda that had nothing to do with the record or the original patient visit, so that Kaiser could then seek higher payments from CMS.

131.     As an illustration of how this process worked, consider hypothetical Permanente Medical Group physician Dr. Smith.  Through Kaiser's refresh process, Kaiser identifies diagnoses for each of Dr. Smith's MA patients prior to the visits.  If Dr. Smith were to not re-diagnose all of these diagnoses at the visits for all of her patients, Kaiser would send Dr. Smith queries following those patient visits prompting her to add the remaining "missed opportunity" diagnoses after-the-fact through addenda.  Then, Kaiser would mine the medical records for Dr. Smith's patients MA patients using electronic algorithms or human reviewers to identify potential new diagnoses for conditions that had never previously been identified for Dr. Smith's MA patients.  After these potential new diagnoses were

1   identified, Kaiser would begin sending Dr. Smith queries prompting her to also create addenda to add

2   these new diagnoses for all of her patients.  In this way, Dr. Smith would receive a continual stream of

3   queries throughout the year prompting her to add her "missed-opportunity" and data-mining or chart-

4   review diagnoses, the overwhelming majority of which did not matter to her visits with her patients.

5       132.   As detailed below, each region employed similar although slightly different techniques.

6       **1.   Data mining generates new risk-adjustment diagnoses.**

7       133.   Kaiser's "data mining" programs focused on identifying brand-new diagnoses, that is,

8   diagnoses relating to conditions that no physician had ever diagnosed the patient as having.  The

9   programs identified these diagnoses using various algorithms that mined the patient's electronic medical

10  records for key words, lab results, medications, clinical indicators, and other items that Kaiser believed

11  might be suggestive of potential diagnoses that would increase risk-adjustment payments.

12      134.   As Kaiser made clear in internal training materials, "[d]ata mining is used to improve

13  reimbursement," i.e., to increase payments from CMS.

14      135.   In keeping with that aim, Kaiser focused only on diagnoses that would impact HCCs and

15  increase risk scores.  For example, when two Northern California auditors, Steven Simos and Ellen

16  Lingar, discussed data mining for another medical condition that was associated with development of a

17  cancer with a high mortality rate but that would not have resulted in increased payments to Kaiser, the

18  response from Danielle Sheetenhelm (Clinical Review Manager), was that "our strategy is to only

19  explore data mining suggestions for conditions that are in the CMS MA model or ACA model."[10]

20      136.   Similarly, Kaiser focused only on those patients for whom Kaiser could receive a risk-

21  adjustment payment.  For example, Kaiser provided medical care to some traditional (fee-for-service)

22  Medicare beneficiaries.  Kaiser did not apply its data-mining algorithms to these traditional Medicare

23  patients and instead applied them only to Medicare Advantage patients for whom Kaiser could receive

24  additional payments from CMS.

25      137.   Kaiser organized a large Risk Adjustment Data Mining Workgroup to collect, analyze,

26  and disseminate information throughout Kaiser on data-mining initiatives, including effective algorithms

27

28  _____
    [10] When the Affordable Care Act ("ACA") was implemented in 2014, it provided for additional
    risk-adjustment payments from the Government for ACA patients.

1   and return on investment.  This working group was comprised of representatives from the Kaiser Health

2   Plans, including each regional health plan, as well as representatives from each regional Permanente

3   Medical Group.  Every region was represented, both from the Kaiser Health Plans and the Permanente

4   Medical Groups.  The working group was sponsored by an executive from Kaiser's National Medicare

5   Finance department (Diane Morissette) and the Associate Executive Medical Director from the

6   Permanente Federation (Dr. Simon Cohn).  The chairs included Ken Nelson (the Health Plan's Director

7   of Risk Adjustment Analytics) and Relator Dr. James Taylor (Director of Coding for the Colorado

8   Medical Group).  The working group grew over time to nearly 40 members across Kaiser's regions and

9   entities.

10          138.    Kaiser's National Medicare Finance department also organized a smaller predecessor

11  group called the HCC Data Mining Workgroup. That workgroup had similar information sharing goals,

12  with representatives from each of the regions.

13          139.    The Risk Adjustment Data Mining Workgroup met approximately monthly and ensured

14  that information regarding data mining was widely dispersed across Kaiser.  Each region presented at

15  the meetings regarding its data-mining activities and results.  Topics included data-mining initiatives,

16  tracking initiatives, algorithm-improvement ideas, and addenda to medical records.  The workgroup's

17  activities were further presented to a broader audience within Kaiser, including presentations to the

18  Medicare Regional Reporting Group.

19          140.    Kaiser's data-mining programs covered an extensive range of potential diagnoses.  The

20  Health Plan ran algorithms nationally for all MA patients and distributed the results to each region.  In

21  addition, individual regions developed their own algorithms and initiatives, which they regularly shared

22  at workgroup meetings.  For example, in 2014, the N. California Medical Group developed data-mining

23  algorithms covering over 30 risk-adjusting diagnoses, which it shared with the workgroup so that these

24  algorithms and initiatives could be duplicated in other regions.

25          141.    Many of these diagnosis-specific algorithms coincided with regional initiatives.  For

26  example, the N. California Medical Group created an initiative in 2012 to focus on four "key

27  conditions": protein calorie malnutrition, diabetes with neurological manifestations, aortic

28  atherosclerosis, and chronic kidney disease.  Each of these diagnoses matched up with a data-mining

1   algorithm run in the region.  Kaiser expected each facility in the region to hit a specified prevalence rate

2   for each condition.  And Kaiser instructed the facilities that forty percent of their monetary performance

3   allocation would depend on how well they captured these four conditions (the remaining sixty percent

4   was based on how well they "refreshed" diagnoses, discussed in the next section).  Each facility was

5   required to develop work plans for how it would meet the diagnosis capture rate.  For example, one

6   facility stated that it would make data mining a parameter for physicians when receiving their mid-year

7   and year-end "CMS Performance incentive."

8         142.    Other data-mining algorithms focused on particular patients.  For example, at the urging

9   of Kaiser's National Medicare Finance department, Kaiser encouraged the regions to run algorithms to

10  address and review any MA patients who did not have any diagnoses resulting in a risk-adjustment

11  payment.

12        143.    Another version of data mining, called Natural Language Processing, was developed by

13  the Southern California region and led by Dr. Paul Minardi (the S. California Medical Group's Medical

14  Director of Operations).  Natural Language Processing involved sophisticated algorithms that purported

15  to better read the natural language of medical records to identify potential undiagnosed diagnoses.

16  Kaiser ultimately expanded the use of Natural Language Processing algorithms to every region across

17  the country.

18        144.    Generally, once the algorithm results were released, it was up to each region to determine

19  how to turn those results into risk-adjustment payments.  For the most part, this task fell to the

20  Permanente Medical Groups, but in some cases the Health Plan communicated directly with Permanente

21  Medical Group physicians about potential diagnoses identified via algorithm.

22        145.    In the Colorado region, the Colorado Health Plan and the Colorado Medical Group

23  jointly developed data-mining algorithms to support various risk-adjustment initiatives.  Auditors from

24  the Colorado Health Plan would then use the results to send a template Medicare Query directly to the

25  physicians with the suspected diagnosis to addend the medical record.

26        146.    Initiatives were sometimes sparked by the prospect of reduced revenue from Medicare

27  based on existing diagnoses.  For example, when CMS made changes to the CMS-HCC model related to

28  the diagnosis of hypoxia (a below-normal level of oxygen), the Colorado Health Plan identified patients

1   on oxygen in an effort to generate other diagnoses that would result in risk-adjustment payment.  Health

2   plan auditors queried the patients' physicians to create addenda adding suspected diagnoses of acute

3   and/or chronic respiratory failure and obesity hypoventilation syndrome to patient medical records.  The

4   auditors sent these queries even if the patients already had diagnoses, such as hypoxia, that would serve

5   as a basis for the oxygen.  The query—which was drafted in conjunction with Dr. Teresa Welsh (the

6   Colorado Medical Group Director of Coding)—instructed physicians that hypoxia (and several other

7   common diagnoses for which patients may receive oxygen) was insufficient for reimbursement and

8   identified acute respiratory failure as an appropriate alternative diagnosis.

9       147.    Colorado used this initiative even though Dr. Teresa Welsh acknowledged to the Kaiser

10   Risk Adjustment Data Mining Workgroup that it was not clear that patients with hypoxia could be

11   categorized as having acute respiratory failure.

12       148.    In general, queries to the physicians were generated in two circumstances: (1) when data-

13   mined diagnoses were identified through algorithms run after a patient visit had already occurred; or

14   (2) if the data-mined diagnosis was previously released to the physician but not diagnosed at a visit.  The

15   queries themselves often violated numerous query standards, as further detailed below.

16       149.    In some regions, in particular Northern California, a physician could not simply reject a

17   data-mined diagnosis and end the issue.  Instead, the physician was required to draft a justification for

18   the decision—referred to internally as a "stop prompt" (i.e., a request for the organization to stop

19   prompting the diagnosis)—which was required to be reviewed and approved by other employees in the

20   organization.  These stop prompts are discussed in greater detail later in the complaint.

21       150.    The Kaiser regions developed various tracking mechanisms so that they could monitor

22   the success of their data-mining initiatives.  These tracking mechanisms were regularly discussed and

23   shared across Kaiser regions and entities, including through the Risk Adjustment Data Mining

24   Workgroups.  Some of these tracking mechanisms specifically tracked how many addenda were

25   generated and how much risk-adjustment compensation would be received.  Similarly, details about

26   data-mining programs were reported in the risk-adjustment improvement plans that were provided to the

27   Kaiser Health Plans.  In other cases, for example in Northern California, special computer programs

28   were utilized that routinely notified physicians of their metrics relating to addressing data-mined

diagnoses, and physicians were instructed that they were expected to meet certain targets.  The N. California Medical Group monitored these metrics for physicians and facilities.

### 2.    "Refresh" and "missed-opportunities" are more data-mining programs that generate risk-adjustment diagnoses.

151.    Another category of Kaiser's data-mining efforts focused on capturing diagnoses that had been made in a prior year.  Kaiser referred to this program as "refresh" and to conditions that needed to be captured as "unrefreshed diagnoses."  Kaiser created algorithms that mined patients' electronic medical records for any diagnoses that had been made in any setting during the past several (typically three) years.  As detailed below, Kaiser meticulously monitored and tracked these diagnoses, and if a physician failed to re-diagnose these conditions at a patient visit, Kaiser would systematically pressure the physician to add the diagnoses via addenda, as it did with its other data-mining efforts.

152.    As with the data-mining programs, the refresh program was focused on obtaining risk-adjustment payments.  The program only identified "unrefreshed diagnoses" for which Kaiser could obtain a risk-adjustment payment.  Kaiser excluded any diagnosis that did not correspond to an HCC and would not result in an increased payment.  Similarly, only patients for whom Kaiser could obtain a risk-adjustment payment were included.  In fact, as risk-adjustment payments became available through other programs, such as the Affordable Care Act, Kaiser honed its algorithms to ensure that physicians had to refresh only the specific risk-adjusted diagnoses covered by the patient's specific program (e.g., ACA).

153.    Refresh was a nationwide Kaiser program, with small adaptations in each region.  At a Medicare Regional Reporting Group meeting in October 2006, Dr. Simon Cohn (Associate Executive Director of the Permanente Federation), Sue Gertz (Vice President, Medicare at the Health Plan), and Diane Morissette (National Director for Medicare Risk Adjustment, National Medicare Finance for the Health Plan) jointly presented on improving diagnosis capture for Medicare risk-adjusted payments.  A key aspect of the presentation concerned unrefreshed diagnoses, which the presentation noted Kaiser tracked and was estimated to be a $400 million opportunity for Kaiser in 2006 alone.  Kaiser instructed each region to reduce unrefreshed diagnoses by two-thirds in 2006 and by two-thirds again in 2007.

154.    Kaiser's National Medicare Finance department identified and monitored unrefreshed

1  diagnoses on a regular basis and shared results with each region, some of which also ran their own

2  algorithms to identify and monitor unrefreshed diagnoses.  Each region was required to discuss their

3  refresh program annually with Kaiser's National Medicare Finance department as part of their risk-

4  adjustment improvement plans.  Refresh was also regularly discussed amongst the regions and Kaiser

5  entities as part of the Medicare Regional Reporting Group and the Risk Adjustment Data Mining

6  Workgroup.

7       155.    Much of the refresh program related to capturing diagnoses during the patient visit.

8  Kaiser expended enormous efforts throughout its regions to ensure that a physician could easily find any

9  refreshable diagnosis at the visit.  For example, physicians would generally be given a list of refreshable

10  diagnoses prior to each patient visit either in paper or electronic format.  Further, Kaiser utilized

11  "pushpins" in its electronic health record to flag these diagnoses.  If a physician reviewed a patient's

12  problem list during a visit, the risk-adjusted diagnoses were specifically flagged with a "pushpin."  All a

13  physician had to do was press one button to "slide" any risk-adjusted diagnoses to the medical record for

14  the visit.  In fact, this process was so easy that some within Kaiser expressed concern that physicians

15  were adding old diagnoses that were incorrect or no longer existed.  As one internal Kaiser presentation

16  explained, "pushpins indicate risk-adjusted diagnoses" and those "diagnoses need to land here, in the

17  diagnosis entry field, for risk adjustment":



27       156.    To make things even easier for physicians, Kaiser also developed a tool within the

28  electronic health record called a chronic-disease widget or chronic-disease grid.  This tool automatically

1  populated a patient's medical record for the visit with these conditions, and physicians merely needed to

2  add a status update for the conditions.

3      157.    In short, Kaiser physicians were presented with numerous lists and tools that made it easy

4  for them to identify and add refreshable diagnoses to a visit record at the time of the visit.  These tools

5  also made it all the more inappropriate for Kaiser to query physicians after a visit to add "missed

6  opportunity" diagnoses for which there was no indication in the medical record that the diagnoses had

7  any impact on patient, care, treatment, or management at the visit.

8      158.    In many circumstances, Kaiser physicians did not actually consider or address all of a

9  patient's prior diagnoses at a visit.  For example, if a patient presented with an acute medical condition,

10  the physician might spend the visit addressing that specific acute condition.  Yet, Kaiser engaged in

11  systematic efforts to have physicians add unrefreshed diagnoses via addenda that had nothing to do with

12  the visit so that Kaiser could obtain additional risk-adjustment payments.

13      159.    When a physician did not "refresh" (i.e., re-diagnose) at the patient visit all of the

14  diagnoses identified by Kaiser through the refresh program, Kaiser would begin efforts to have the

15  physician retrospectively add these diagnoses to the medical records for the visit via addenda.  These

16  "missed" refresh diagnoses had different names in different regions.  For example, they were labeled

17  "missed opportunities" in the Northern California region or "not fully refreshed" in the Colorado region.

18  For purposes of this complaint, these diagnoses will be referred to as "missed-opportunity" diagnoses,

19  and the allegations here concern Kaiser's systematic and improper addition of these missed-opportunity

20  diagnoses via addenda when Kaiser knew that these diagnoses were not allowed to be coded under the

21  ICD Guidelines.

22      160.    Similar to data mining, once Kaiser identified a missed-opportunity diagnosis, it began

23  sending the physician queries to add the diagnosis to a visit record.  In most instances, the queries were

24  generated by the Permanente Medical Groups.  As further detailed below, these queries routinely

25  violated national standards.  Often, these queries came in the form of lists (often stretching multiple

26  pages) labeled missed-opportunity reports or sheets, unaddressed diagnosis reports, refresh lists, and

27  not-fully-refreshed reports.  These lists compiled the unrefreshed diagnoses for a physician's patients.

28  Many of these lists came with specific instructions as to how the physician could create an addendum to

1   the record of the visit, including with suggested language to be included in the addendum.  As explained

2   in more detail below, these instructions routinely ignored the ICD Guideline requirement that the

3   diagnoses needed to have mattered to the visit, and instead provided contrary instructions to physicians.

4        161.   If a physician did not address a condition on the list—e.g., by creating an addendum to

5   add the diagnosis to a visit—the physician would continue to receive additional queries for the

6   diagnosis.  Depending on the facility, the physician might receive the list on a weekly to monthly basis.

7   In some cases, these lists also included potential new diagnoses identified from data-mining initiatives.

8   If a physician did not respond to the queries, the physician would often receive follow-ups from

9   Permanente Medical Group employees, either in person or by email.

10        162.   In some instances, physicians had to obtain permission in order to delete a diagnosis on a

11   refresh list, similar to the process for data mining.  For example, the Northern California region created a

12   process whereby a physician who believed that a diagnosis identified through the refresh program was

13   invalid had to submit a stop-prompt request in order to not assign the diagnosis.  Other Kaiser

14   employees would then review the request to determine if the stop was appropriate before it could be

15   removed.

16        163.   Kaiser closely tracked these missed-opportunity diagnoses and expected physicians and

17   facilities to meet targets for refreshing diagnoses.  For example, as part of its mandatory risk-adjustment

18   improvement plan (shared with Kaiser's National Medicare Finance department), the N. California

19   Medical Group set a goal that its physicians would "refresh" 99% of diagnoses identified by Kaiser.  In

20   fact, by 2012, the Northern California region had achieved a 99.2% "refresh" rate of all diagnoses

21   identified through the program.  The region relied so heavily on the refresh program that Karen Graham

22   (Managing Director for EIO) described it to colleagues as the region's "bread & butter."  Other regions

23   had similar results.

24        164.   These increasingly high targets caused physicians to improperly addend diagnoses to

25   meet Kaiser's metric expectations.  Kaiser provided recognition and awards, such as bottles of

26   champagne, to high achievers.  That included physicians who were able to "refresh" 100% of diagnoses

27   for all patients, an achievement that would seem virtually impossible if the ICD Guidelines were being

28   properly followed.

165.    All of Kaiser's efforts, including those described in more detail below, created pressure on physicians to refresh missed-opportunity diagnoses contrary to ICD Guidelines.  These efforts accelerated toward the end of each year when physicians were expected to meet their year-end targets, and when the Kaiser regions were focused on meeting their increasingly high risk-score targets for the year.  Missed-opportunity diagnoses were routinely added to visits that happened much earlier in the year without regard to whether the diagnoses had any relevance to the visit or were properly coded under the ICD Guidelines.  This end-of-year rush in activity was referred to by some Kaiser employees as the "dash for cash."

### 3.    Chart review is another program to generate risk-adjustment diagnoses.

166.    The Colorado region created another program, the "chart review" program, to generate more Medicare revenue.  As one Colorado training slide explained, "Medicare Queries: Why Now?," and provided the answer, because "Diagnoses = Revenue."

167.    Similar to data mining, the chart-review program focused on identifying brand-new diagnoses after a patient visit occurred to increase Medicare risk-adjustment payments to Kaiser.  After a visit, physicians received a "Medicare Query" to add new diagnoses to the medical record for the visit, even though the diagnoses played no role in the visit.  Indeed, "the goal [of the program] is to identify diagnoses that have never yet been made by a physician . . . ."  Such a goal was inconsistent with the ICD Guidelines, which permit coding of only those diagnoses that require or affect patient care, treatment, or management for a visit.  Instead, Kaiser submitted thousands of improper diagnoses added via addenda for tens of millions of dollars in risk-adjustment payments.

168.    The Colorado Medicare Group and the Colorado Health Plan jointly ran and funded this chart review program.  Key players included: Dr. Teresa Welsh (the Colorado Medical Group Director of Coding); Jeremy Walsleben (the Colorado Health Plan's Senior Manager of Risk Adjustment); and Maegen Leake (the Colorado Health Plan's Senior Risk Adjustment Operations Consultant).  In addition, auditors from the Colorado Health Plan sent Medicare Queries to physicians for various HCC conditions.

169.    With funding from the Colorado Health Plan, the Colorado Medical Group paid chart-review physicians to review the medical records of Colorado Health Plan beneficiaries for conditions on

1  "the **Review Grid** to find <u>additional</u> diagnoses that you will query for."  (Emphasis in original.)  In

2  2014, the "review grid" covered more than 50 risk-adjusting diagnoses.

3      170.    The reviewers were instructed to identify only potential new diagnoses.  The reviewers

4  were further instructed that if they identified a new diagnosis that was in the same category (i.e., that

5  corresponded to the same HCC) as another diagnosis that was already made, the reviewers should not

6  send a query to the physician.  Under the CMS-HCC model, an MA Organization can only receive a

7  risk-adjustment payment once per HCC, so if a patient has two conditions that correspond to the same

8  HCC, the HCC risk factor is counted only once.  Accordingly, because this potential new diagnosis

9  would not yield additional revenue to Kaiser, the chart reviewers were told not to send a query.

10      171.    All of the conditions on the Review Grid were lined up with Medicare HCCs, even listing

11  the HCC number.  When CMS changed the CMS-HCC model, the Colorado chart-review program

12  updated its Review Grid to remove conditions that no longer corresponded to HCCs and to add new

13  conditions that corresponded to new HCCs.

14      172.    As Dr. Teresa Welsh (who led the program) explained, it was necessary to pay chart-

15  review physicians to conduct the chart review because most physicians found it too time consuming or

16  technologically demanding.

17      173.    The chart reviews were conducted after patient visits.  Even though the chart reviewers

18  were identifying conditions that had never been previously diagnosed, and the physicians were unaware

19  of them during their patient visits, chart reviewers were instructed to send "Medicare Queries" to

20  physicians every time they identified a potential new diagnosis.

21      174.    A typical example would involve a patient whose visit was entirely unrelated to the

22  queried condition.  Following the visit, the physician would be queried to add a suspected diagnosis,

23  such atherosclerosis of the aorta (hardening of the walls of the aorta), based on a historical radiology

24  report from years prior.  The medical record would contain no indication that the physician was aware of

25  this historical report at the patient visit, let alone that the physician considered or addressed the

26  condition at the patient visit.  Often, the addendum would just include the diagnosis or would copy

27  portions of the query into the medical record.  The medical record would likewise contain no indication

28  that the physician even contacted the patient about the brand-new diagnosis.

175.     The chart review program violated the ICD Guidelines because it involved the systematic creation of addenda for conditions that were entirely unrelated to the visit.  Because the explicit purpose of the program was to identify "new" diagnoses that had never been made by a physician, a physician queried to add a chart-review diagnosis could not have been previously aware of the condition, and certainly could not have considered, evaluated, or treated the condition at the visit.  The ICD Guidelines therefore prohibited the coding of such conditions, yet Kaiser submitted thousands of such diagnoses for tens of millions of dollars in risk-adjustment payments.

176.     Money was the clear driver of the program.  Kaiser did not conduct these chart reviews for patients for whom they could not receive risk-adjustment payments, nor for conditions for which they could not receive such payment.  Moreover, physicians were told not to spend any significant time addressing the suspected new diagnoses.  Dr. Teresa Welsh wrote to clinician supervisors that physicians should not "spend more than 1 minute a query" because responding to queries was "like doing a refill request" and that she could do "two a minute."  When discussing the Medicare Queries, Kaiser physicians repeatedly discussed that each added diagnosis was worth approximately $3,000 to Kaiser.

177.     Physicians at the Colorado Medical Group were required to respond to queries.  The Colorado Medical Group and the Colorado Health Plan tracked which physicians had open queries.  When physicians had significant open queries, their clinical chiefs would be asked to address the problem with the physicians.  If a physician was deleting too many queries (i.e., not adding the suspected diagnoses to the medical record), Dr. Teresa Welsh might address the issue with the physician.  If that did not work, sometimes Dr. Welsh would have a meeting with them.  Dr. Welsh even suggested that physicians with open queries could be placed on a performance improvement plan.

178.     To further pressure physicians to respond to queries, the Colorado Medical Group and the Colorado Health Plan created a physician incentive program, to pay physicians to respond to queries.  Jeremy Walsleben managed the program and determined which Colorado Medical Group physicians would be eligible for the incentive and the amount of the payment.  As one of the Colorado Medical Group's chief clinicians, Dr. Jennifer Ziouras, stated in support of the incentive payment: "we are just trying to get paid for the work that we are doing, esp[ecially] when we have to go back and addend

1  things [because] they were not on our radar (atherosclerosis of the aorta, obesity equivalent, etc)."

2      179.    The Colorado Medical Group and the Colorado Health Plan meticulously tracked the

3  results of the chart-review and query program.  The reviewer instructions stated that Kaiser would track

4  both queries and addenda to identify which diagnoses were captured.  In fact, Kaiser tracked all chart

5  reviewers, all physicians, and all Kaiser facilities to determine the results of the chart reviews.

6      180.    Through a regularly updated dashboard, the Colorado Medical Group and the Colorado

7  Health Plan tracked every physician and facility for how many diagnoses they added via addenda and

8  how much revenue they generated through those addenda.  The Colorado Health Plan generated

9  spreadsheets that were shared with the Colorado Medical Group tracking any open Medicare queries and

10  which queries led to addenda.

11      181.    The Colorado Medical Group and the Colorado Health Plan likewise tracked the overall

12  number of queries, addenda, revenue generated, and return on investment for the program.  For example,

13  the Colorado Health Plan calculated as part of an internal financial analysis that, in 2014, the chart-

14  review program generated 10,900 queries, leading to 9,432 addenda and $17.4 million in risk-

15  adjustment revenue.  Similarly, in 2013, the Colorado Health Plan calculated that the chart-review

16  program resulted in 11,388 HCCs added through addenda, generating $24.9 million in risk-adjustment

17  revenue.  Calculations for other query programs involving data mining showed that they generated

18  thousands of queries and addenda, resulting in millions of dollars in risk-adjustment revenue.  These

19  reports were widely circulated, including to Kaiser's National Medicare Finance department.

20      182.    The Colorado Medical Group and the Colorado Health Plan even tracked all chart

21  reviewers to identify which reviewers were generating sufficient revenue.  Reviewers were placed in

22  quadrants based on speed and effectiveness at getting diagnoses added to medical records.

23      183.    The Colorado Health Plan provided weekly reports to Dr. Teresa Welsh to monitor the

24  progress of the program.  At times, if she thought the number of queries generated was too small, Dr.

25  Welsh suggested placing more resources into querying physicians to ensure that the Colorado Health

26  Plan and the Colorado Medical Group would hit the risk score targets set by the National Medicare

27  Finance department.

28

**C.      Kaiser pressured physicians to add diagnoses via addenda.**

184.    After refresh, data-mining, or chart-review processes identified potential diagnoses, the next step in Kaiser's scheme was to pressure physicians to generate addenda to add these diagnoses retrospectively to the records of their past visits with their patients.  As described below, Kaiser applied this pressure even when the diagnosis in question did not require or affect patient care, treatment, or management at the patient visit being amended.

**1.      Inappropriate queries pressured physicians to create addenda.**

185.    One mechanism through which Kaiser applied pressure to physicians was through inappropriate queries to physicians.

186.    Kaiser's queries came in various forms.  Sometimes, an auditor or other Kaiser employee would send a direct "staff message" (essentially an email within Kaiser's electronic health record) to a physician, requesting that the physician review and add a specific diagnosis from one of Kaiser's risk-adjustment initiatives to a patient visit.  Other times, the queries came in the form of lists of multiple diagnoses for various patients.  These lists often compiled unaddressed diagnoses from various risk-adjustment initiatives, routinely listing CMS as the payor so that it was clear to the physician why they were being asked to consider the addendum.  Depending on the facility, physicians would generally receive such lists on a weekly to monthly basis.  If the physician did not address the diagnoses on the list, the list would keep growing.

187.    As these programs became more sophisticated, some Kaiser regions developed electronic tools so that physicians could access these lists via computer.  For example, the N. California Medical Group instructed physicians to use a particular electronic report that was available on their desktop "as your default page [to] look for addendum and capture opportunities after the visit (**Missed Dxs** [diagnoses])." (Emphasis in original.)

188.    Still other times, the queries came orally.  For example, data-quality trainers or other similar Kaiser employees would meet with physicians in person to work on their lists of diagnoses.

189.    Several regions, including both California regions, would have group coding sessions where data-quality trainers, and other similar Kaiser employees, would meet with physicians while the physicians coded their refresh lists.  At these sessions, physicians would be expected to sit together,

1  perhaps at lunch or after work with food and beverages provided by Kaiser, and work through their lists

2  of specified diagnoses to add to patient visits.  These sessions were sometimes called "coding parties" or

3  "refresh parties."

4      190.  Kaiser's various query practices violated national standards relating to queries.

5      191.  The American Health Information Management Association ("AHIMA") is an

6  organization that sets national coding standards and provides standards for proper query language.

7  Kaiser has incorporated the AHIMA standards into its own policy documents and training materials.

8      192.  As far back as 2006, Kaiser issued a Program Advisory (the "Addenda Program

9  Advisory") to all its regions that was "intended to clarify under what circumstances addenda to the

10  medical record will be considered acceptable as support for risk adjustment data submitted to [CMS]."

11  The designated points of contact for the Addenda Program Advisory were: Dr. Simon Cohn (Associate

12  Executive Director for the Permanente Federation); Gina Reese (Senior Counsel for Kaiser Foundation

13  Hospitals and Health Plans); and Janet Franklin (at the time, a Practice Leader, Coding Compliance,

14  with the National Compliance Office).

15      193.  There are some specific rules for queries set forth in the AHIMA standards and Kaiser's

16  Program Advisory.  *First*, the standards set by AHIMA and adopted by Kaiser make clear that queries

17  cannot be leading; in other words, they cannot suggest a particular diagnosis.  In general, queries should

18  be written as open-ended or multiple-choice questions, so that they do not sound presumptive, directing,

19  or prodding to the physician.

20      194.  AHIMA's 2008 practice brief, "Managing an Effective Query Process," provides that

21  "Queries that appear to lead the provider to document a particular response could result in allegations of

22  inappropriate upcoding.  The query format should not sound presumptive, directing, prodding, probing,

23  or as though the provider is being led to make an assumption."  AHIMA's 2013 practice brief,

24  "Guidelines for Achieving a Compliant Query Practice," which replaced the 2008 practice brief,

25  provides that "[a] leading query is one that is not supported by the clinical elements in the health record

26  and/or directs a provider to a specific diagnosis or procedure."

27      195.  Kaiser's Addenda Program Advisory specifically cited the 2001 AHIMA practice brief

28  (which was superseded by the 2008 version) for the requirement that queries be "open-ended" and avoid

1   "leading" physicians to a particular diagnosis.  As the Addenda Program Advisory explained, "physician

2   queries must be carefully drafted such that undue pressure is not placed on the physician to code the

3   diagnoses in the manner indicated on the query and/or otherwise interfere with physician decision-

4   making."  It further stated that "[q]ueries that appear to lead the physician to provide a particular

5   response could lead to allegations of inappropriate upcoding."  It also stated that queries such as

6   "'Please enter the following diagnoses in the record' (followed by a list of diagnoses and codes[])" were

7   not appropriate.  Similarly, relying on the 2008 AHIMA practice brief, a 2011 Northern California

8   training instructed that "[t]he query format should not sound presumptive, directing, prodding, probing,

9   or as though the provider is being led to make an assumption."

10          196.   *Second*, queries cannot mention money; they are not allowed to include any discussion of

11   the financial impact of altering a patient's medical record.

12          197.   AHIMA's 2008 practice brief states that "the query should never indicate that a particular

13   response would favorably or unfavorably affect reimbursement or quality reporting."  And AHIMA's

14   2013 practice brief states simply that a query "should not indicate the impact on reimbursement."

15   Kaiser's Addenda Program Advisory similarly stated that queries "should not indicate the financial

16   impact of the response . . . ."  And a 2014 training given by Nancy Andersen (then a Senior Compliance

17   Manager with Kaiser's National Compliance Office) provided the same guidance.

18          198.   *Third*, because a query is intended merely to clarify the medical record, queries cannot

19   introduce new information not previously documented in the medical record.

20          199.   AHIMA's 2008 practice brief states that "[t]he introduction of new information not

21   previously documented in the medical record is inappropriate in a provider query."  The 2008 practice

22   brief then gives an example of an inappropriate query where a physician is given information about a

23   diagnosis and clinical information from an emergency room record from the prior week.  The practice

24   brief states that this is inappropriate to query the physician because the diagnosis and information (from

25   the emergency room) was not documented by the physician in the medical record of the current visit.  In

26   compliance trainings, Kaiser similarly repeatedly instructed that a query "should not introduce new

27   information not otherwise contained in the medical record."  These trainings emphasized that a query is

28   permissible only "to the extent it provides clarification" of the medical record.

200.    In practice, however, the queries Kaiser sent to physicians frequently ran afoul of the standards set by AHIMA and Kaiser's Addenda Program Advisory.

201.    For example, a 2012 query sent by Priscilla Schor (an auditor in Southern California) was leading.  It told the physician, Dr. Grace Jean Fu, regarding her patient: "You saw this patient on 7/3/12.  Based on a chest x-ray dated 7/3/12 this patient has Atherosclerosis of Aorta.  Please create an addendum to ADD the diagnosis to your 'diagnosis order entry' box."  Dr. Fu created an addendum to her patient's medical record to add the diagnosis of aortic atherosclerosis after receiving the query.

202.    A query sent by Data Quality Trainer Shannon Henson in Northern California in 2013 was also leading.  It informed the physician, Dr. Sri Madhavi Cholleti, regarding her patient, that "[a]fter review it was found that the diagnosis, AORTIC ATHEROSCLEROSIS, is supported by Imaging Report dated 10/15/12.  Please addend your visit note dated 01/04/13 to include this diagnosis.  If you do not agree, please provide me with your reason so I may forward to Dr Awsare for review."  Dr. Cholleti created an addendum to her patient's medical record add the diagnosis of aortic atherosclerosis after receiving the query.

203.    A query sent in 2014 in Northern California by Dr. Amy Hung was similarly direct about the desired outcome.  It told the physician, Dr. Luu Phuc Nguyen, regarding his patient, simply: "Could you please addendum 'thrombocytopenia' to your visit …?"  Dr. Nguyen created an addendum to his patient's medical record add the diagnosis of thrombocytopenia after receiving the query.

204.    A 2012 query in Southern California from Compliance Auditor Rey D. Creencia inappropriately mentioned money.  It asked that the physician, Dr. Gallit Slonimsky Luftman, add a new diagnosis, aortic atherosclerosis, to her patient's last visit, explaining that "[t]he Medicare Unrefreshed Risk project requires that we report a diagnosis at least once a year to be reimbursed for treatment for the patient for the entire year."  Dr. Luftman created an addendum to her patient's medical record add the diagnosis of aortic atherosclerosis after receiving the query.

205.    Queries often were both leading and mentioned money.  For example, a 2013 query in Northern California from Data Quality Trainer Shahida Dossa to a physician, Dr. George T. Chuang, regarding his patient, stated "[f]or reimbursement of risk adjusted diagnoses all chronic dxs [diagnoses] must be captured at face to face visit. … Please amend DOS: 9/10/13 with Major Depression in full

remission."

206.    Often these queries, including many of the examples above, introduced new information and diagnoses not documented in the medical record and instead mined from elsewhere.

207.    If physicians did not immediately respond to queries, they often received the query multiple times or from multiple people.  For example, N. California Medical Group physician Dr. Irene Soojung O'Farrell, saw a patient in September 2012.  During that visit, she chose a specific diagnosis for that patient of "failure to thrive."  On November 11, 2012 (about two months after the visit), Dr. O'Farrell received a query from Data Quality Trainer Kerri Guerrero that stated: "Please review your note listed above and consider if it would be appropriate to report a label for cachexia.  Thank you . . . ." Cachexia is a complex metabolic syndrome associated with physical wasting, weight loss and muscle atrophy.

208.    Just one week later, Dr. O'Farrell had not responded to the query.  On November 19, 2012, the Data Quality Trainer forwarded the initial query to Dr. Steven Olson (Regional Physician Director, Clinical Documentation and Coding) with the message "For your review.  No response as of 11/19/12."  On November 21, 2012, Dr. Olson sent Dr. O'Farrell a *second* query regarding adding cachexia for M.D.: "Hi Irene, Would you feel comfortable addending your note of 9/18/2012 and adding a dx of cachexia?  We get significant additional resources to care for our members disease burden from appropriately coding that diagnosis.  You had mentioned that she was losing weight-failure to thrive. She has indeed been losing weight so undoubtedly meets the criteria for cachexia.  Please contact me if you would like to discuss or need help.  I would ask you to addend your last visit note, and add the encounter dx [diagnosis] of cachexia if you feel that is appropriate.  Also, adding it to the problem list will make it easier to code in the future.  Thanks, Steve O."  Two days later, Dr. O'Farrell created an addendum to add the diagnosis of cachexia.

209.    Internal communications reveal that the rationale for using this type of language in queries, contrary to AHIMA guidance and Kaiser policy and training, was that if Kaiser did not "'tell' the physicians directly to capture a diagnosis (i.e., not use leading language) then the refresh rates will go down as result.  Presumably because the physicians will . . . not feel like it is required to add the diagnosis."

210.   As discussed above, in Colorado, Kaiser had previously data-mined and queried physicians to add hypoxia for patients receiving oxygen, specifically flagging the increased reimbursement potential.  However, CMS later removed hypoxia as a condition from the CMS-HCC model.  In response, the Colorado Health Plan and the Colorado Medical Group queried physicians to addend medical records for different diagnoses (acute and/or chronic respiratory failure and obesity hypoventilation syndrome) that would generate more revenue for Kaiser: "Please note that the following common diagnoses are insufficient for appropriate reimbursement for patients who need oxygen: hypoxia, sleep apnea, obesity, COPD.  Please continue to use these if clinically appropriate in addition to adding one or more of the above suspected diagnoses [acute and/or chronic respiratory failure and obesity hypoventilation syndrome]."

211.   These Medicare queries led to numerous false claims, with physicians simply adding the diagnoses Kaiser instructed them to add.  In at least one instance, after receiving a query like the one described above from Medicare Risk Auditor Denice Hogan, Colorado Medical Group physician Dr. Patrick Martin created an addendum to add the diagnosis of obesity hypoventilation syndrome—a breathing disorder found in some *obese* individuals—to a patient who was clearly *not* obese (she was 5'9" and weighed 108 pounds).

212.   In October 2013, Nancy Andersen (then a Senior Compliance Manager with the National Compliance Office) specifically warned Dr. Teresa Welsh (the Colorado Medical Group Director of Coding) that the Medicare Query template that the Colorado region was using might be viewed as leading by CMS.  Nancy Andersen even provided a copy of the standards and requirements that must be followed for compliant queries.  Her warnings were ignored, and the Colorado Medical Group and the Colorado Health Plan continued to use the improper queries to generate thousands upon thousands of addenda.

213.   Kaiser's queries to physicians also often omitted any reminder to the physician that the diagnosis in question must have been considered, evaluated, or treated at the prior patient visit in order to be included in addenda.  Instead, the language in Kaiser's queries often indicated that physicians could add a condition to a prior visit record *regardless* of whether the diagnosis was based on or evaluated at that visit, so long as they could confirm *after the fact* at the time they completed the

addenda that "the patient has the listed condition."

214.    For example, in queries called "GSAA Data Mining Reports," which contained lists of conditions (identified through data mining) that went to many physicians, the form instructions directed the physician to "determine whether or not the patient has the listed condition," and if so "addend the chart note and add the [diagnosis]."

215.    Below is an example of the first page of a two-page 2014 "Medicine MCCOMBO Report" report that went to N. California Medical Group physician Dr. Arnold Berman.  The "Provider Instructions" tell Dr. Berman to "Create Addendum" and provided the language he should use: "After reviewing my visit note, I recall this visit encounter.  The visit note reflects that I evaluated the patient who has the diagnosis . . . ."  The report has a "Due Date" and instructs that when the physician completes it, it should be "return[ed] to Medicare Box."  This page of the report asks Dr. Berman to add six different diagnoses for three different patients.  Dr. Berman added all six diagnoses:



216.    For queries where physicians were being asked to addend older visits—often a year or

1 more after the visit—Kaiser included misleading language in many queries to assure physicians that the

2 addenda were allowed: "Medicare allows physicians to clarify the medical record by making an

3 addendum without any time limitations.  Diagnoses that were present at the time of the visit may be

4 clarified by entering the diagnosis in an addendum."  This information was false and misleading,

5 because it omitted the requirement, included in the ICD Guidelines and Kaiser's own policies, that only

6 diagnoses that required or affected patient care treatment or management at the patient visit could be

7 added to the patient's medical record.

      **2.**    **Kaiser used "SmartPhrases" to make it easy for physicians to create addenda even when the condition did not require or affect patient care, treatment, or management.**

10       217.    Another mechanism Kaiser employed to ensure that physicians could easily add

11 diagnoses via addenda was the use of "SmartPhrases."  SmartPhrases are a tool within Kaiser's

12 electronic-health-record system that, upon entry of a single phrase, automatically imported pre-

13 formatted language into a patient's medical record.

14       218.    Kaiser created multiple SmartPhrases that physicians were trained to use when creating

15 addenda.  The input language varied over time and across regions, but the following examples are

16 representative.

17       219.    Entry of ".DXOMITTED" would generate the following language in the patient record:

18 "After review of my note for this visit encounter, I recall this encounter and am addending this note to

19 state that this patient has diagnosis of . . . ."

20       220.    Entry of ".FOL" would generate the following language in the patient record: "I have

21 confirmed with the patient and/or the medical record the presence of the above diagnoses, and the

22 diagnoses are followed or will be followed by his or her PCP or appropriate specialist."

23       221.    Entry of ".STABLE" would generate the following language in the patient record:

24 "Diagnoses recorded for this visit were addressed and are stable, unless otherwise indicated in this

25 note."

26       222.    The queries physicians received would often instruct the physician to use a specific

27 SmartPhrase when they created the addendum.

28       223.    For example, a 2012 Missed Opportunity Report for a physician, Dr. Stewart Wong,

1    instructed him for his patient to "Please consider to capture [sic] Aortic Atherosclerosis based on CXR

2    on 08/0[sic]/11: Aortic atherosclerosis," with a "reminder" to "include .fol in your encounter."

3        224.    A 2015 query to a physician, Dr. Jan Kwong, regarding her patient, stated: "Capture AA

4    on visit dated 6/16/15; LINK: XR which showed evidence of condition ordered on this date; If agree,

5    addend with smartphrase .DXADDITIONAL and address dx.  Add to PL as well."

6        225.    Another 2015 query to a physician, Dr. Wendy Yang, regarding her patient, stated:

7    "Capture SEVERE OBESITY WITH BMI OF on visit dated 4/27/15;  LINK: BMI listed as 36.21 and

8    DM2 comorobidty [sic].  If agree, addend with smartphrase .DXOMITTED and address DX."

9            **3.    Kaiser pressured physicians by requiring them to justify refusals to add
                diagnoses.**

10

11       226.    In addition to drafting queries and creating SmartPhrases in a manner that maximized

12   positive responses, Kaiser forced physicians who declined to add diagnoses to justify their decision in

     burdensome ways.

13

14       227.    As previously noted, in the Northern California region, the N. California Medical Group

15   implemented the "stop prompt" process.  The following diagram from an internal Kaiser training depicts

     how the stop prompt process generally worked:

16

17



18

19

20

21

22

23

24

25

26

27

28

228.    After receiving a query to add a data-mining diagnosis, the easiest route a physician could take was to add the data-mining diagnosis to the patient's record (using an addendum).

229.    If the physician disagreed, the physician had to initiate a "stop prompt" and justify their decision in writing, often through multiple review levels, including to a supervising physician known as the "CMS Lead."

230.    Internal communications show that this process was onerous.  Dr. Pearl Wu, the Documentation and Coding Lead for Redwood City, noted that a refusal by a physician to add a diagnosis went through "stringent" review, starting with collecting all of the stop prompts, having those stop prompts undergo a "second pass" by the "Trainer," "and then final review by me as Physician Lead of all stop prompts to ensure accuracy."

231.    Beginning around 2012, stop prompts received *even more* review in Northern California; the Clinical Review Team within N. California Medical Group's EIO office provided a second-level review after the physician-lead review.

232.    In other words, through the stop-prompt process, if a physician added a diagnosis, the process ended; if a physician refused to add a diagnosis for a patient, the physician had to justify their decision to other Kaiser employees, none of whom had actually seen the patient.

233.    As Karen Graham (Managing Director for EIO) explained when one facility wanted to cease reviewing all prompts: "The concern is that if physicians know the stops are not being reviewed, they are less likely to go to the trouble to capture the dx [diagnosis]."  Kaiser wanted to make it easy for physicians to add diagnoses and hard to say no.

### 4.    Kaiser used financial incentives and other metrics to pressure Permanente Medical Group physicians to create addenda.

234.    As previously discussed, consistent with the financial focus of the risk-score goals, Kaiser placed both positive and negative financial pressures on physicians (and the facilities where they worked) to add addenda to patient-visit records.

235.    One form of pressure involved calling out facilities with low "refresh rates" and emphasizing that the failure to add diagnoses would cost money for Kaiser, the facilities, and the physicians themselves.

236.     For example, in November 2010, when a facility in Northern California was in the "bottom third . . . of refresh performance," Mike Geranio (the Medical Office Controller) noted that the facility had not yet "received a call for a meeting nor any pressure," and then requested that Dr. Robert Klein (a N. California Medical Group Associate Executive Director) call their physician lead, Dr. Paul Rose, to say that they had a "*$4 million* and 2,000 diagnos[es] at risk.  Please send me your action plan every Friday or let[']s meet for 15 minutes until the end of the year."  (Emphasis added.)

237.     In June 2012, when a Kaiser facility in Northern California was not sufficiently "address[ing]" a specific initiative to create addenda, Joel Weiner (the Director of the Business Intelligence Team for the N. California Medical Group) spoke with their CMS Project Manager, Jeremy Lawrence, and discussed that creating the addenda was "so important, easy to do and *worth about $800K*."  (Emphasis added.)  Karen Graham responded, "excellent – referencing money seems to speak to some of the [CMS Project Managers]."

238.     In January 2014, Dr. Teresa Welsh (the Medical Director of Coding for the Colorado Medical Group) cited "a few physicians who apparently didn't work their refresh lists to completion. . . . *Each of these diagnoses adds about $2500 to our bottom line*."  (Emphasis added.)  Reflective of how focused Kaiser was on getting this money, she offered to "drive around and sit with people personally if that is what it takes, usually it just takes the chief telling them to do it.  In past years, I recall doctors were placed on a work improvement plan if they didn't complete this work.  I will let you operations guys decide if that is what it takes."

239.     In addition to calling out "underperforming" physicians and facilities, Kaiser explicitly linked physician bonuses and financial incentives to responses to data-mining diagnoses.  For example, in one facility, Kaiser offered a "Bonus/Premium when addressing >90% of datamining diagnoses" as well as a "Bonus worth 30% of annual payout at 98% performance" with an "Additional premium of 2.5% for each 0.5% above 98%."

240.     As noted above, as part of its mandatory risk-adjustment improvement plan (shared with Kaiser's National Medicare Finance department), the N. California Medical Group set a goal that its physicians would "refresh" 99% of diagnoses identified by Kaiser.  Each physician's and facility's progress in reaching this goal was monitored and tracked throughout each year.

241.    The Colorado Medical Group paid physicians a stipend in 2013 to respond to all pending queries by the end of the year.  The Colorado Medical Group noted that its spending of $350,000 on paying reviewers and stipends to doctors resulted in $24 million to Kaiser over just five months.

242.    The Colorado Medical Group considered the program so successful that it sought to pay thousands of dollars more in stipends to doctors in 2014.  "We will post a table with the anticipated pay out by doc on the website and the average pay out so they understand the dollars being much more than last year."

243.    Along these same lines, managers were required to hold documentation and "coding parties" (where physicians were expected to work on their "missed opportunity" and data-mining lists), which were described as supporting "healthy competition" and providing "performance tracking by provider and department."

### D.    How Kaiser targeted the diagnosis aortic atherosclerosis to increase risk-adjustment payments: "$40M is no chump change."

244.    Beginning around 2010 or 2011, one diagnosis targeted throughout all of Kaiser's regions was atherosclerosis of the aorta ("AA"), which was emphasized to have a "high rate of reimbursement." Atherosclerosis is the hardening of the artery walls, in this case of the aorta.

245.    The N. California Medical Group pursued a multi-pronged strategy to code AA for "revenue capture" purposes.  The process involved three basic steps: *First*, radiologists were instructed to document the presence of any calcium in the aorta in a radiology impression, regardless of significance, and describe it as AA.  Kaiser tracked how well each radiologist performed and compared their performance.  Radiologists were also informed that the purpose was financial.  *Second*, the data-mining team would mine patient medical records by searching for the key words the radiologists had been instructed to document in the radiology reports.  *Third*, based on that data mining, physicians would then be queried to diagnose AA, often by creating addenda to the medical records of prior patient visits.  Physicians (and their facilities) were tracked in their performance for coding AA and received incentives and awards for coding AA.

246.    The N. California Medical Group identified AA as one of four key conditions and instructed facilities that beginning in 2012, 40% of their monetary performance allocation would be

based on how well they coded these conditions, with the remaining 60% based upon their refresh performance.  Facilities were told what prevalence rates they were expected to hit for AA and the other key conditions and were required to develop work plans to meet these rates.  A 2012 internal training described this financial allocation:



247.    The reason for this initiative was money.  In response to MA plans receiving substantially more money per beneficiary than the costs for a traditional Medicare beneficiary, Congress amended the Medicare Advantage statute, and CMS altered the CMS-HCC model in an attempt to bring MA reimbursement in line with traditional Medicare.  In light of these changes, Kaiser was intent on making much of this revenue back by increasing its coding of lucrative conditions such as AA.  As that same 2012 internal training explained: "[G]iven the changing CMS climate regarding Medicare legislation and potential changes to the reimbursement models, it is no longer viable for us to continue to focus only on the Maintaining Diagnoses goal."  Hence, the new focus on coding the four key lucrative conditions.

248.    Northern California repeatedly stressed the financial benefit of coding AA.  For example, one presentation by Dr. Robert Klein (a N. California Medical Group Associate Executive Director) and Dr. David Bliss (the N. California Medical Group Regional Director of Documentation and Coding) to each facility's Documentation and Coding Lead highlighted that each AA diagnosis was worth an

1   additional $2,800 to Kaiser, and that one medical center earned an additional $150,000 in revenue for

2   one month by focusing on coding AA.

3       249.    Following up on that presentation, on August 19, 2011, Dr. David Bliss sent an email to

4   the N. California Medical Group Coding Leads.  Dr. Bliss wrote that "With the Natural Language

5   Processor, we have identified patients over the past two years with evidence of Aortic Atherosclerosis in

6   the Radiology Report. . . . These have been pre-screened and are being sent to you to consider capturing

7   the diagnosis of [AA]."

8       250.    The N. California Medical Group physicians responded with concerns about diagnosing

9   more patients with AA.  At the time, every patient diagnosed with AA was entered into Kaiser's PHASE

10  program.  "PHASE," which stands for "Preventing Heart Attacks and Strokes Everyday," required

11  physicians to perform additional monitoring of patients diagnosed with cardiovascular disease.

12      251.    Given the large volume of patients Kaiser was directing be diagnosed with AA (and thus

13  enrolled in PHASE), physicians were worried that this initiative would require the physicians to do more

14  follow-up with these patients.  As Karen Graham (the Managing Director for EIO) testified, "[t]here was

15  concern about adding it [AA] to the PHASE program because it would create significant increase in

16  workload of follow-up with the patients."

17      252.    In response, Dr. David Bliss and Dr. Robert Klein offered a solution that addressed

18  workload concerns without sacrificing Kaiser's bottom line: in mid-September 2011, they eliminated the

19  requirement that patients diagnosed with AA automatically be enrolled in PHASE.  This allowed Kaiser

20  to capture the revenue associated with additional AA diagnoses (which at the time was estimated at $40

21  million for the Northern California Region alone) without requiring physicians to provide care,

22  treatment, or management associated with the condition.

23      253.    Following this change, the N. California Medical Group continued to pressure physicians

24  to capture more AA diagnoses.  As Dr. James Chang (another Associate Executive Director at the N.

25  California Medical Group) wrote in late September 2011 to the Northern California Chiefs of

26  Radiology, copying Dr. David Bliss and Anne Cadwell (the Managing Director of the N. California

27  Medical Group): "We are missing a $40M opportunity.  In the current reality of contracting revenue

28  stream, this would become devastating to us."  Referring to physicians who had captured fewer AA

diagnoses, Dr. Chang wrote, "What are our steps to improve?  How can we tweak the environment or create habits to take us to 100%?  Can we find out from the bright spots on how they do it?  How do we rally the herd?"  Dr. Chang concluded, "Everybody join in the discussion.  $40M is no chump change."

254.    Many physicians were concerned that for many patients AA was clinically irrelevant. One physician, Dr. Matthew James Sena, observed that "Aortic atherosclerosis is nearly ubiquitous in patients this age.  It is not a clinically relevant diagnosis and doesn't require treatment.  Isolated CXR [chest x-ray] interpretations are not grounds for clinical diagnosis in this case. . . .  [I]t's clinically inconsequential in almost all cases."

255.    Yet another Kaiser physician, Dr. Jill Dunton (a CMS Lead Physician), noted the disconnect between Kaiser's pressure on physicians to code the diagnosis and the clinical basis for doing so, noting that a Kaiser cardiologist said: "When people are seeing fraud cases reported in the paper, people want very much to feel that they are not putting themselves at risk.  *Presenting requests to code AA when there is there may not be [sic] a clinical implication or action needed that are clearly dictated by region is causing increasing discomfort*."  (Emphasis added.)  Dr. Dunton made her report to: Anne Cadwell, Dr. Donald Dyson (an Associate Executive Director for the N. California Medical Group), and Dr. David Bliss.

256.    Another Kaiser employee tasked with pushing the AA initiative, Lisa Woll (a N. California Medical Group Area Chief of Coding and Documentation), went so far as to say that "[n]o one believes it is a real diagnosis" and bemoaned that since "it is non-compliant to tell people to code for money, we need to really sort out a way to package this."  Her complaint was forwarded to Anne Cadwell, Karen Graham, Joel Weiner (the Director of the Business Intelligence Team for the N. California Medical Group), and Dr. David Bliss.

257.    Notwithstanding these and other physician complaints, Kaiser continued to press physicians to add AA.

258.    In 2013, the N. California Medical Group, including through its Revenue Cycle office, instructed physicians in an internal training that AA was an "always code" condition and that physicians must "NOT put AA as [an] incidental finding or state [AA] is 'not clinically significant.'"  Both instructions contradicted the ICD Guidelines.  For outpatient encounters, as explained previously, the

ICD Guidelines only permit coding those conditions that require or affect patient care, treatment, or management at a patient visit. There is no such thing as a condition that is always coded. Accordingly, incidental findings or diagnoses that are not clinically significant may not be coded.

259. The results of this Northern California initiative were dramatic. In 2009 and 2010, before the initiative, Northern California physicians added AA via addenda 44 and 67 times, respectively. Once the initiative was fully implemented, Northern California physicians added AA via addenda approximately 10,500 times in 2012 and 11,500 times in each of 2013 and 2014.

260. Based on the addenda data produced by Kaiser, AA diagnoses accounted for 22% of all diagnoses added by Kaiser physicians via addenda in Northern California, Southern California, and Colorado. In some years in Northern California and Southern California, AA accounted for as much as 30-40% of all addenda diagnoses. Each AA diagnosis was generally worth roughly between $2,500 and $3,000 per patient in additional risk-adjustment payment. As a result of this high rate of reimbursement, AA accounted for an even higher percentage of the risk-adjustment revenue generated from addenda.

261. As described above, Kaiser knew, as set out in its Program Advisories, that a condition must have required or affected patient care, treatment, or management at a patient visit to be coded and submitted to CMS, and that if the physician did not *actually* consider the condition during the visit, the diagnosis could not be submitted to CMS.

262. Janet Franklin (at the time, a Compliance Manager with Kaiser's National Compliance Office) acknowledged internally that aortic atherosclerosis could "be reported only if that treating physician documents that it is more than just an incidental finding and it is relevant to the face-to-face encounter that he or she had with the patient." And in an internal policy memorandum titled "Coding Aortic Atherosclerosis," Nancy Andersen (then the Regional Director of Hospital Coding) wrote that, absent evidence of AA being treated or evaluated at the visit, AA "is considered an incidental finding and the physician should **not** be queried about it **nor should it be coded**." (Emphasis in original.)

263. Among the Physician Documentation and Coding Group, a group of physician coding leaders throughout Kaiser regions, there was complete agreement that adding AA without a physician's having addressed the condition at the patient visit was improper. According to a written summary of the meeting by Dr. Teresa Welsh (the Medical Director of Coding for the Colorado Medical Group),

"[n]obody was in support of having the doctor add a diagnosis such as atherosclerosis of the aorta . . . in an addendum unless they had specifically addressed it within the visit note at the time of service -or- unless the doctor specifically indicates that they recall that they addressed it at the time of the visit."

264.   Nevertheless, the N. California Medical Group used queries to pressure physicians to add AA diagnoses in addenda and made no mention of these requirements when sending queries to its physicians.  Rather, Kaiser's queries indicated an AA diagnosis could be added to a visit record based *only* on the appearance of the condition in a radiology report—while at the same time it was pressuring radiologists to note the condition in as many reports as possible.

265.   Kaiser compliance officials stated that the AA diagnoses that Kaiser was pressuring physicians to add frequently did not comply with coding requirements.  Janet Franklin characterized the N. California Medical Group's practice of adding AA diagnoses as "coding for dollars" and confirmed that AA diagnosis codes should not be submitted to CMS unless AA was related to the reason that the patient was having the diagnosis test and AA's clinical significance or relevance to the patient visit was documented.

266.   The AA diagnoses that Kaiser was pressuring physicians to add via addenda to medical records of prior patient visits frequently had not required or affected patient care, treatment, or management at those visits, as required by ICD guidelines.

267.   The success of Kaiser's pressure campaign is reflected in the skyrocketing usage of the AA diagnosis in California.  Prior to Kaiser's initiative, Kaiser physicians diagnosed around 2% of their MA patients in California with AA.  This was approximately equivalent to the rate of AA diagnoses found in the traditional Medicare patient population in California.  By 2018, Kaiser physicians diagnosed over 40% of their Medicare Advantage patients in California with AA, a more than 1000% increase.  These additional AA diagnoses resulted in Kaiser receiving more than $500 million in increased Medicare Advantage revenue in California alone.  The following chart depicts the percent of Kaiser's MA patients in California with AA compared to the traditional Medicare population:



268.    As discussed further below, a targeted addenda audit conducted by the N. California Medical Group revealed that, of AA diagnoses added through addenda, only 21% were "accurate," meaning that there was a close to 80% error rate for the AA diagnosis.

**E.    Kaiser knew that its practices resulted in the addition of improper diagnoses to patient medical records.**

269.    Throughout the time period in question, Kaiser received (and ignored) numerous warnings and red flags that its practices surrounding addenda were leading to diagnoses that ran afoul of CMS rules.

**1.    Kaiser knew that its use of addenda to add risk-adjustment diagnoses did not comply with CMS rules for submission of diagnoses for risk-adjustment payment.**

270.    Kaiser knew that when it requested that physicians add conditions to the record of a prior patient visit, it needed to follow the ICD Guidelines, including the requirement that the condition must have required or affected patient care, treatment, or management at the visit.

271.    For example, Kaiser's Addenda Program Advisory, which was "intended to clarify under what circumstances addenda to the medical record will be considered acceptable as support for risk adjustment data submitted to [CMS]," provides that that "the practitioner must clearly indicate that the information contained in the addendum *related to the evaluation and/or treatment rendered during the*

*previous patient encounter*."  (Emphasis added).  It further states that addenda are acceptable where the diagnosis was "actually made, considered, evaluated, and/or treated during [the] encounter," but the physician "failed to document that information in the note."  Relatedly, it provides that addenda are *not* acceptable when "there is no documentation in the previous note that indicates that the diagnosis in the addendum was actually considered/treated/evaluated during the prior visit," or when "the information documented in the note does not pertain to the previous patient encounter but, instead, is new information obtained at a later date or as the result of a later visit[.]"  In such cases, as Kaiser recognized in its Addenda Program Advisory, "any diagnoses documented in the addenda may not be submitted to CMS as risk adjustment data."

272.     Kaiser recognized in its Addenda Program Advisory that "<u>since these addenda will be used as support for the submission of risk adjustment data where the practitioner did not clearly document the diagnoses in the original documentation, it is essential that this use of addenda be closely monitored and audited for appropriateness</u>" and that "[i]naccurate or false information submitted in support of claims for payment to federal health care programs may result in liability under the Federal False Claims or False Statement statutes."  (Emphasis in original.)

273.     Kaiser's training was consistent with its Addenda Program Advisory.  For example, a 2011 Northern California training highlighted that in order to include a diagnosis in the record of a patient visit, "[t]here must be evidence that the diagnosis(es) may exist *in the documentation of the original encounter*."  (Emphasis in original.)  The same training instructed that an addendum may *not* be used "[w]hen the original encounter note *does not* indicate that the diagnosis was considered, treated, or evaluated."  (Emphasis in original.)  Similarly, a 2015 Northern California training instructed that a reason to perform an addendum was when "[y]ou have documentation to support that you considered, evaluated, and/or treated a diagnosis, but failed to capture it …."

274.     In the 2015 Risk Adjustment Program Advisory, Kaiser included an Attachment that is about "Addenda to the Medical Record," and provides that an addendum may be appropriate if "the physician recalls the encounter and agrees that he or she did consider, evaluate, and/or treat the diagnosis during the encounter."

275.     A 2016 training on the Fundamentals of Clinical Documentation and Reporting instructed

that an addendum could be done "[t]o clearly document that the provider considered, evaluated or treated each listed diagnosis."

### 2. Kaiser pushed for addenda regardless of how much time had passed since the patient visit, especially at the end of the year.

276. Despite recognizing that a physician's memory of a specific patient visit was likely to fade over time, Kaiser pushed for addenda regardless of how much time had passed since the actual patient visit. This became most apparent at year-end when Kaiser had to get diagnoses submitted in order to get paid by CMS.

277. In the Addenda Program Advisory, Kaiser recognized that "in general, practitioners are less likely to accurately recall specific details regarding patient encounters the more that has passed since the encounter." In the addendum attachment to the 2015 Risk Adjustment Program Advisory, Kaiser reiterated this concept, noting that whether an addendum was reasonable would depend in part on the "time between the applicable encounter and the drafting of the addendum," and "[a]s this time increases, the reasonableness and appropriateness of the addendum to serve as support for a diagnosis submitted as risk adjustment data decreases." The addendum attachment to the 2015 Risk Adjustment Program Advisory continues to give "under 90 days" as an example of what CMS has stated about what a "timely" addendum would be.

278. Kaiser employees shared this understanding. For example, Nancy Andersen (a Senior Compliance Manager with the National Compliance Office) testified that she could not identify "any situations" in which it would be appropriate to add a diagnosis "more than sixty days after an encounter."

279. Similarly, Janet Franklin (a Compliance Manager with the National Compliance Office) testified that only on "rare" occasions would it be appropriate to add a diagnosis "greater than 30 to 60 days after the original patient encounter."

280. In practice, however, Kaiser ignored these requirements and sought to ensure that physicians added lucrative risk-adjusting conditions to the records of their patient visits—oftentimes many months after the original visit, and regardless of whether these conditions were actually considered or addressed by the physician during the patient visits in question.

281.    The extent of Kaiser's push to add diagnoses even months after the fact is borne out through addenda data produced by Kaiser.

282.    These data show a significant number of addenda done a very long time after the visit. For example, from service years 2009 to 2018, Kaiser added over 150,000 diagnoses via addenda more than 90 days after a patient visit in California and Colorado, accounting for over 30% of diagnoses added via addenda.  Over 12% of diagnoses added via addenda were more than 180 days after the patient visit.  More than 6,000 diagnoses were added over a year after the patient visit.

283.    These data also show that the time lag between patient visits and the creation of addenda was particularly pronounced at the end of each year, when Kaiser sought to meet annual financial targets.  Kaiser physicians added far more diagnoses via addenda at the end of the year than at the beginning of the year, especially with respect to addenda created more than 90 days after the visit.

284.    For example, for service years 2009 to 2018, Kaiser physicians added nearly three times as many diagnoses via addenda during the month of December than they did during the month of January.  But the differences are even more pronounced when looking at diagnoses made through addenda more than 90 days after the visit.  In January, only 13% of addenda diagnoses were more than 90 days after the visit; by December, that number jumped to over 50%.  Put differently, Kaiser physicians added roughly eleven times as many diagnoses through addenda more than 90 days after the visit in December than they did in January.

285.    Conversely, Kaiser's data show that, for service years 2009 to 2018, Kaiser physicians added more than five times as many diagnoses through addenda to medical visits that took place in January than they did to medical visits that took place in December.  This pattern is even more pronounced for diagnoses made through addenda more than 90 days after the visit: Kaiser physicians added nearly thirteen times as many of these diagnoses through addenda to January medical visits than they did through addenda to December medical visits.

286.    Similar patterns exist across each of the three Kaiser regions at issue (Northern California, Southern California, and Colorado) and across time periods.  Likewise, similar patterns exist when comparing Kaiser addenda activity in the first quarter of the year versus the last quarter of the year.

287.    This was not happenstance.  Kaiser physicians were not especially forgetful during their January medical visits, nor did their memories suddenly improve in December.  Rather, this was the result of Kaiser's end-of-year activities, sometimes referred to as the "dash for cash."  Year-end pressure from Kaiser for physicians to meet metrics so that Kaiser could achieve risk score targets for the given service year caused physicians to add diagnoses to medical records for older visits from earlier in the year, routinely without regard for the ICD Guidelines and CMS requirements or whether the newly added diagnoses actually required or affected care, treatment, or management during those visits.  Kaiser knew this was occurring, knew it was improper, yet still submitted these diagnoses for payment.

288.    Kaiser would not have been able to submit the thousands upon thousands of risk-adjusting diagnosis codes that it added through addenda for payment by CMS if it had complied with ICD Guidelines and other CMS requirements.  Instead, Kaiser systematically disregarded these requirements to boost its bottom line and used addenda to add diagnoses retrospectively to past patient visits, because, as Dr. Teresa Welsh (the Colorado Medical Group Director of Coding) explained, she could do "two a minute."  As Dr. Welsh similarly discussed in January 2014—when by definition it was impossible for physicians to have visits with their patients for the 2013 service year any longer—in her view physicians "can still make addendums on 2013 dates of service for 2 more months if needed. . . . *Each of these diagnoses adds about $2500 to our bottom line*.  I can drive around and sit with people personally if that is what it takes, usually it just takes the chief telling them to do it."  (Emphasis added.)

### 3.    Kaiser physicians put Kaiser on further notice of fraudulent diagnoses.

289.    Physicians provided further notice that Kaiser's addenda practice was leading to fraudulent diagnoses.

290.    For example, in 2011 Relator Randi Osinek (a Kaiser certified medical coder) reported to several executives, including Karen Graham (the Managing Director for EIO), that "over 50% of the physicians tell me they feel that they are being 'forced' to add diagnoses that they did not considered, evaluated, and/or treat.  Especially since they feel their bonuses are being impacted."  (Emphasis in original.)

291.    Pushback regarding AA diagnoses was particularly forceful.  A Documentation and Coding Project Manager, Kathleen DePuydt, reported to Dr. David Bliss (the Regional Director of

Documentation and Coding for the N. California Medical Group): "One physician told me that all people over 90 have this condition but he is not necessarily treating it.  He wants to know if [he] has to code this on all patients over this age?  The [Family Medical Services] physicians are really pushing back with this condition and DO NOT want to code it."

292.   Along the same lines, Dr. David Conant (a Chief of Medicine) noted "While we are making efforts to *capture the coding to support our bottom line*, I am hearing considerable concern about how we should be handling these patients."  (Emphasis added.)

293.   Similar pushback occurred when Kaiser pressured physicians to diagnose patients with cachexia.

294.   As part of a 2009 training, the N. California Medical Group identified cachexia as one of a few diagnoses that would help them "Find $100 million dollars in NCal."  And in 2012, cachexia was identified as one of "4 Key Conditions" for revenue purposes.

295.   As part of its focus on cachexia, the N. California Medical Group created a data-mining algorithm to identify potential cachexia diagnoses.  The Northern California region created an initiative around cachexia because cachexia is based on clinical judgment rather than clinical indicators, and they wanted physicians to diagnose cachexia in patients that did not meet clinical indicators for malnutrition. In March 2011, the results of the data-mining algorithm were sent to physicians with queries for them to addend their patient medical records to add cachexia diagnoses.

296.   As previously noted, cachexia is not simply low body weight, yet physicians were routinely being sent queries that prompted them to add the cachexia diagnoses for patients who were merely thin.

297.   After noting that physicians were protesting that naturally thin patients did not have cachexia, Dr. Inna Ravkin (an internal medicine physician in Northern California) warned Karen Graham and Dr. David Bliss in 2011 that the prompting would result in "inappropriate assignment of this diagnosis."

298.   Also in 2011, Dr. Patrick Kan (a CMS Lead) reported to Dr. David Bliss and Karen Graham that "they [the treating physicians] do not see any physical signs of cachexia."

299.   And in 2013, Norma Gonzalez (a Senior Consultant for CMS matters) wrote to Danielle

1  Sheetenhelm (Clinical Review Manager) that because she had "a couple of thousand datamining

2  diagnoses in my area," it would be "impossible" to review them all.  She further stated that the feedback

3  from the physicians was that the queries were "garbage."

4       300.    The cachexia initiative demonstrates the extreme distorting effect from these programs:

5  physicians in Northern California added cachexia via addenda over *120 times* more than physicians in

6  Southern California and Colorado, regions that did not have a cachexia initiative.  Moreover, as

7  described below, it became clear from audits that many of these diagnoses were invalid, because the

8  patient did not even have cachexia, let alone that the physician considered or addressed the condition at

9  the visit.

10       301.    And in February 2015, following a meeting of the Physician Documentation and Coding

11  Group, Dr. Teresa Welsh reported back to her colleagues at the Colorado Medical Group and the

12  Colorado Health Plan her concerns that "most of our addendums would not be considered acceptable,"

13  because they would not meet the requirement that "diagnoses should only be added as an addendum if

14  they were actually evaluated, treated, or considered at the time of the visit."

15           **4.**    **Kaiser's internal audits put Kaiser on further notice of fraudulent diagnoses.**

16       302.    CMS regulations require MA Organizations to "[a]dopt and implement an effective

17  compliance program, which must include measures that prevent, detect, and correct non-compliance

18  with CMS's program requirements as well as measures that prevent, detect, and correct fraud, waste,

19  and abuse."  42 C.F.R. § 422.503(b)(4)(vi).  The regulations specify that this compliance program

20  "must, at a minimum, include [certain] core requirements," including: (1) to establish and implement

21  "an effective system for routine monitoring and identification of compliance risks," which "should

22  include internal monitoring and audits and, as appropriate, external audits," to evaluate the MA

23  Organization's "compliance with CMS requirements and the overall effectiveness of the compliance

24  program"; and (2) to establish and implement "procedures and a system for promptly responding to

25  compliance issues as they are raised, investigating potential compliance problems as identified in the

26  course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the

27  potential for recurrence, and ensuring ongoing compliance with CMS requirements."  *Id.*

28  § 422.503(b)(4)(vi)(E)-(G).

303.    In the event that an MA Organization uncovers "evidence of misconduct related to payment," the regulations require the MA Organization to "conduct a timely, reasonable inquiry into that conduct" and to undertake "appropriate corrective action," including "repayment of overpayments" and "disciplinary actions" in response.  *Id.* § 422.503(b)(4)(vi)(G).  The regulations also provide that the MA Organization "should have procedures to voluntarily self-report potential fraud or misconduct related to the MA program to CMS or its designee." *Id.*

304.    A variety of internal audits provided further notice that Kaiser's addenda and query practices were resulting in false claims to CMS.

305.    Two teams within the National Compliance Office were directly involved in audit functions.  The Government Audit & Reimbursement Team "[e]nsures timely, accurate and consistent responses to federal regulator inquiries and audits by providing operational support to national departments and functions."  It also "[e]nsures organizational compliance with rules and requirements associated with payments and reimbursement from government entities."  The National Compliance and Audit Team "[p]erforms compliance audits on high-risk areas and coordinates with governance, internal audit, and investigative functions to ensure that compliance validation is performed."

306.    The Government Audit & Reimbursement Team conducted annual audits of each region, called "probe" audits.  These audits were "documentation and coding review[s]" done "in order to determine the validity of each targeted hierarchical categorical condition category (HCC) under Part C." They were designed to "[e]nsure accurate risk adjustment data submission and payment integrity."

307.    In the Northern California region specifically, the service year 2012 probe audit conducted by Kaiser's National Compliance Office identified a "trend" of "inappropriate use of addendums where the original documentation received by [the National Compliance Office] did not support the use of addenda."

308.    The report further noted that "in each case, there was no documentation in the original note to support the use of the addenda process as required by coding and documentation guidelines and as noted" in the Program Advisory.

309.    The report was submitted by Janet Franklin (at the time, a Compliance Manager with the National Compliance Office), and distributed to the Health Plan and the N. California Medical Group.

310.     The service year 2013 probe audit conducted by Kaiser's National Compliance Office of the Northern California region specifically identified an "issue" with the coding of AA.

311.     Janet Franklin again submitted the report, and it was distributed to the Health Plan and the N. California Medical Group.

312.     As a result of this National Compliance Office audit, EIO conducted a targeted addenda audit in 2015.  The scope of this audit was large: over 27,000 records where various diagnoses, including AA, had been captured by an addendum.  During the audit, the reviewers were tasked with determining whether each addendum was compliant.

313.     Over 17,000 of the addendum diagnoses in the audit were AA.  Of the AA diagnoses, only 21% were "accurate," meaning that there was a close to 80% error rate for the AA diagnoses.  And across all diagnoses, there was approximately a 75% error rate.

314.     And the audit went further; it identified the reasons for the errors, including ones it described as "not eligible for remediation."  For AA, nearly half of the errors, or approximately 6,700 addenda, were ones the audit determined could not be fixed.  These included the following errors: "addenda doc not compliant, but AA Smart Phrase used"; "Addendum made greater than 1 month later"; "Dx not addressed"; "Dx not in encounter"; and "No link in encounter."

315.     The Health Plan, including the National Compliance Office, knew the results of the 2015 EIO addendum audit.  Because AA was identified as a "program-wide" issue, in 2017 the National Compliance Office ultimately created a corrective action plan for AA that covered all regions nationwide.

316.     In the Southern California region specifically, the service year 2011 probe audit conducted by the National Compliance Office identified an "addendum issue" as one of the classification of errors, and described the errors as there being "no justification in [the] original note to support an addendum."

317.     Janet Franklin again submitted the report, and it was distributed to the Health Plan and the S. California Medical Group.

318.     In response to the National Compliance Office probe audits alleged above, the Health Plan redacted the specific diagnoses that were identified in those audits as errors.  But Kaiser knew that

it made thousands upon thousands of similar improper diagnoses via addenda that it submitted for payment, but it did not redact or delete those diagnoses, and indeed continued to submit them year after year.

319.    As part of the discussion that took place between the S. California Medical Group and the National Compliance Office, in July 2012, Janet Franklin wrote to Pat Lontka (the Managing Director of Business Systems of the S. California Medical Group) and others about one addendum for AA—added more than five months after the patient visit despite "no documentation in the original note to support [it]."  In calling that delay into question, Janet Franklin quoted portions of Kaiser's own policies that suggested reliance on memory to such a degree is unreliable and inappropriate.

320.    But Pat Lontka "strongly objected" and criticized the National Compliance Office's conclusion as "troubling."  And Dr. Paul Minardi (S. California Medical Group Medical Director of Operations) bristled at the notion that "they ([National Compliance Office]) are second guessing the credibility/judgment of the treating physician."  He also dismissed the criticism as seeking "perfection not progress," and complained that S. California Medical Group physicians should not be subject to the "whims of an [National Compliance Office] auditor."

321.    Another example of an internal audit that put Kaiser on notice of its problematic addenda practice arises in the context of the cachexia program.  As part of the audit, the Clinical Review Team (within EIO) found that over 90% of the time a physician added the cachexia diagnosis based on a Kaiser query, the documentation is "either lacking or contradict[s] the definition of Cachexia."  In other words, when the physicians were creating addenda based on the query, those addenda were not accurate.

322.    Despite this knowledge, the N. California Medical Group did not modify its cachexia data-mining algorithm or stop-prompt program for several years.

323.    The Health Plan, including Kaiser's National Medicare Finance department and the National Compliance Office, knew about the N. California Medical Group's cachexia data-mining algorithm and stop-prompt analysis.

324.    In the Colorado region specifically, the National Compliance Office had concerns about the leading queries being used by the Colorado Medical Group beginning in 2013.

325.    In 2013, Dr. Teresa Welsh (the Colorado Medical Group Director of Coding) presented

Colorado's chart review and query program to other Kaiser regions at a semi-annual meeting of the Medicare Regional Reporting Group.

326.     After seeing the presentation, Nancy Andersen (then a Senior Compliance Manager with the National Compliance Office) told Dr. Teresa Welsh, "I do have a couple of concerns regarding the query language used and how it may be viewed by CMS and the OIG [the HHS Office of Inspector General]."  She continued that the language "'this patient has a suspected diagnosis' introduces a diagnosis or suspected diagnosis not previously mentioned by the provider and from a compliance perspective may be interpreted as 'leading.'"  She further attached information on how to craft a compliant query, with suggestions how to alter the query.

327.     The Colorado Medical Group did not change its query language at that time.  In the service year 2013 probe audit conducted by the National Compliance Office, the findings noted that "[t]he audit process surfaced questions about the use of queries.  The questions will be further analyzed outside of this report."

328.     Kaiser ultimately determined that it had to redact all diagnoses associated with the Colorado region's chart review and leading query program, deleting over 10,000 addenda diagnoses that it had previously submitted to CMS for payment.

329.     One example of such a diagnosis is with Patient #11.  Dr. Janisse Rears (a Colorado Medical Group physician) saw Patient #11 on October 17, 2013, for a physical examination.

     a.  The visit note identifies a number of active diagnoses, including hypercholesterolemia, hypertension, diabetes, arthritis of the right knee, and severe obesity, as well as number of other diagnoses listed on the problem list.

     b.  The visit note makes no mention of emphysema.

     c.  On October 23, 2013, Dr. Rears received a query from Dr. Jennifer Hronkin, as part of the Colorado chart review program described in paragraphs 166-83.  As explained earlier, the chart review program involved physician reviewers going through patient files after a visit to "identify diagnoses that have never yet been made by a physician."

     d.  The query states in relevant part: "Suspected diagnosis= 'Emphysema'

Supporting data= CT thorax 10/24/08 shows 'There is minimal emphysema.'

If you agree that this data indicates a diagnosis that should be documented, please:

1. Double click above to open the chart as an addendum.

2. Add the diagnosis to the diagnosis entry field.

3. Slide all chronic diagnoses over to the problem list.

4. Add supporting data or other documentation into the progress note. . . ."

e. On the same day she received the query, Dr. Rears created an addendum, copying language from the query: "emphysema Supporting data= CT thorax 10/24/08 shows 'There is minimal emphysema.'"

f. The CT scan referenced in the query was five years old.  There was no indication in the visit note that Dr. Rears was aware of, let alone considered, this CT scan or the requested diagnosis of emphysema.

g. There in nothing in the medical record that indicates that Dr. Rears communicated the diagnosis of emphysema to Patient #11 after creating the addendum.

h. The Colorado Health Plan submitted an ICD diagnosis code for emphysema for Patient #11 for service year 2013 and received a risk-adjustment payment of $2,813.76 for payment year 2014 based upon this submission.

i. The Colorado Health Plan was not entitled to this risk-adjustment payment because emphysema did not require or affect patient care, treatment, or management during the visit.  The diagnosis of emphysema was merely added to Patient #11's medical record after Dr. Rears was prompted by a query to add the diagnosis based on five-year-old CT scan.

330.    After receiving the risk-adjustment payment, the Colorado Health Plan redacted (i.e., deleted) the diagnosis on April 29, 2015, as part of its redaction of diagnoses associated with the Colorado region's unlawful chart-review and leading-query program.  These redactions reflected that Kaiser was aware that its improper query and addenda issues were material to CMS and that it was not lawfully allowed to submit these improper diagnoses to CMS for payment.  Based on these redactions, CMS collected back the payments for these diagnoses through reconciliation.  However, when Kaiser

redacted this information, it failed to furnish the Government—either CMS, HHS-OIG, or the Department of Justice—with any information regarding its fraudulent diagnosis submissions, including its improper use of addenda and queries.

331.    Patient #11 is similar in all relevant respects to thousands upon thousands of other patients, including the specific additional ten patient examples in the allegations below.  Yet Kaiser did not take steps to remediate the hundreds of thousands of improper diagnoses that Kaiser submitted for payment for these similar patients in Colorado, Northern California, or Southern California.  The small number of diagnoses that Kaiser redacted were a miniscule fraction of the improper addenda diagnoses that Kaiser submitted to CMS and for which Kaiser received payment from CMS.  Had Kaiser fully disclosed that its unlawful addenda practices had resulted in other fraudulent diagnoses, CMS would have taken appropriate actions to ensure that Kaiser did not receive or retain risk-adjustment payments to which it was not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

## VIII.   KAISER RECEIVED MONEY FROM MEDICARE BASED ON THE PRESENTATION OF FALSE CLAIMS.

332.    For service years 2009 to 2018, the Defendant Kaiser Health Plans submitted and received payment from CMS for nearly 500,000 diagnoses that were added to patient medical records using addenda.  Approximately 100,000 of these diagnoses were for AA.  The Defendant Kaiser Health Plans received in the range of $1 billion from CMS as a result of these addenda.

333.    For service years 2009 to 2018, over 12,500 physicians employed by the Defendant Permanente Medical Groups created addenda to patient medical records to add diagnoses for which the Defendant Kaiser Health Plans received payment from CMS.  There are over 1,600 physicians that added more than 100 diagnoses via addenda during this time period.  And over two dozen physicians each added over 500 diagnoses via addenda during this time period.

334.    Kaiser's consistent pressure on physicians to add conditions to patient-visit records led to numerous diagnoses that were not based on the original visit and did not require or affect patient care, treatment, or management.

335.    During the period at issue, Kaiser knowingly submitted false and/or fraudulent diagnosis

codes for tens of thousands of Medicare Advantage beneficiaries using the risk-adjustment data reporting systems provided by CMS.  These false claims inflated CMS's reimbursements to the Kaiser Health Plans by hundreds of millions of dollars.

336.    The specific examples, described below, are of Kaiser patients that had diagnoses added to their medical records by Defendant Permanente Medical Group physicians, often many months after the visit.  As is clear from the medical record from the visit, those diagnoses did not require or affect patient care, treatment, or management for the visit, yet the Defendant Kaiser Health Plans submitted them to CMS, and received and retained a risk-adjustment payment from CMS as a result.  In these and thousands of other instances, Kaiser's misconduct had a direct and foreseeable impact on CMS.  Specifically, Kaiser's misconduct not only enabled it to obtain and retain higher risk-adjustment payments from CMS, it also adversely affected the integrity and accuracy of CMS's risk adjustment payment system.

A.    **Patient #1**

337.    The Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #1.

    a.    Dr. Sangita Shah (a N. California Medical Group physician) saw Patient #1 on March 28, 2012, for rib pain during coughing.  Dr. Shah ordered a chest x-ray at the visit.  There was no mention of AA in the medical record for the visit.

    b.    On March 28, 2012 (the same day of the visit), Dr. Shah sent Patient #1 a message after reviewing the radiologist's report of the chest x-ray: "Your xrays of the rib and lung area all looked normal.  The bones are normal and show no evidence of 'lytic' or destructive lesions.  I believe the pain is a neuralgia as we discussed today."  Patient #1 responded thanking Dr. Shah for the assuring note.

    c.    Although the radiology report notes the presence of AA as an incidental finding, Dr. Sangita Shah did not mention or communicate anything about AA to Patient #1 in her message.

    d.    On June 21, 2012 (almost three months after the visit), Dr. Shah received a data-mining query from Data Quality Trainer Ellie Kamkar that stated: "Hello Please

review imaging impression notes on 03/28/2012 and consider diagnosis of
ATHEROSCLEROSIS AORTA.  If agreed, please add the diagnosis of AORTIC
ATHEROSCLEROSIS & amend the visit note for the DOS  03/28/12 Thank
you."

e.   Two weeks after receiving the query, Dr. Shah created an addendum to add the
diagnosis of AA.

f.   The addendum is nothing more than a listing of the diagnosis.

g.   There is nothing in the medical record that indicates that Dr. Shah communicated
to Patient #1 the diagnosis of AA after creating the addendum.

h.   The Health Plan submitted an ICD diagnosis code for AA for Patient #1 for
service 2012 and received a risk-adjustment payment of $2,780.16 for payment
year 2013 based on that submission.

i.   The Health Plan was not entitled to this risk-adjustment payment for AA for
Patient #1 because AA did not require or affect patient care, treatment, or
management during the visit.  The diagnosis of AA was merely added to Patient
#1's medical record—three months after Patient #1's visit—after Dr. Shah was
prompted by a Kaiser data-mining query to add the diagnosis.

**B.   Patient #2**

338.   The Health Plan submitted a false claim and received money from CMS based on a
diagnosis added in an addendum for Patient #2.

a.   Dr. Silvester Rocque Lim (a S. California Medical Group physician) saw Patient
#2 on May 30, 2012, for a blood pressure check and to review lab results.  Dr.
Lim's sole diagnosis for Patient #2 in the brief visit note was hypertension (high
blood pressure).  The note also included a discussion that the recent labs showed
that Patient #2's creatine had improved with increased water intake.

b.   No radiology exam was ordered at the visit.

c.   On November 29, 2012 (approximately six months after the visit), Dr. Lim
received a query from William Wang, of the "Coding Flying Squad," that stated:

"Hi Dr. Lim, I was working on your list of uncoded patients, and this patient was seen earlier this year.  He has several uncoded diagnoses the region thinks should be picked up:

ATHEROSCLEROSIS AORTA (seen on CT 12/21/05)

EMPHYSEMA (seen on CT 12/21/05)-hasn't been clinically diagnosed yet though.

PROSTATE CANCER . . . ."

d. The CT scan referred to in the query for AA and emphysema was seven years old.  There was no indication in the visit note that Dr. Lim was aware of, let alone considered, this CT scan or the requested diagnoses.  There was no mention of AA or emphysema, which the query noted had never been clinically diagnosed.  The medical record from the original visit further stated that Patient #2 had a *history of* prostate cancer (identified with a different ICD history code) and did not have active prostate cancer.

e. The same day he received the query, Dr. Lim created an addendum to add the diagnoses of AA, emphysema, and prostate cancer.

f. There is nothing in the record that indicates that Dr. Lim communicated to Patient #2 that he had AA or emphysema, or that his prior prostate cancer had returned.

g. The Health Plan submitted an ICD diagnosis code for AA, emphysema, and active prostate cancer for Patient #2 for service year 2012 and received a risk-adjustment payment of $7,282.68 for payment year 2013 based upon these submissions.

h. The Health Plan was not entitled to this risk-adjustment payment for Patient #2 because these conditions did not require or affect patient care, treatment, or management during the visit.  The diagnoses were merely added to Patient #2's medical record—six months after Patient #2's visit—after Dr. Lim was prompted by a data-mining query to add the diagnoses.

C.    **Patient #3**

339.    The Health Plan submitted a false claim and received money from CMS based on

1  diagnoses added in addenda for Patient #3.

2      a.  Dr. Chitra Chandran (a N. California Medical Group physician) saw Patient #3 on

3          January 17, 2013, for shortness of breath and diagnosed Patient #3 with

4          exacerbation of chronic obstructive pulmonary disease ("COPD").  Dr. Chandran

5          prescribed prednisone (a steroid) and doxycycline (an antibiotic).  Dr. Chandran

6          ordered a chest x-ray to rule out pneumonia.  When the results of the x-ray came

7          back, Dr. Chandran told Patient #3 that the "x-ray did not show pneumonia," and

8          that "he should take the antibiotics and prednisone like we discussed."  There is

9          no indication in the original visit note that Dr. Chandran considered, evaluated, or

10          treated any other condition at this visit.

11      b.  There is no mention of AA in the visit note.

12      c.  On September 16, 2013 (eight months later), Dr. Chandran received a query from

13          Data Quality Trainer Shahida Dossa, which stated: "Dear Dr. Chandran, On

14          1/17/13 you stated: A/P: ACUTE EXACERBATION OF COPD (primary

15          encounter diagnosis) Note: will get CXR to r/o PNA, . . . XR CHEST, PA AND

16          LATERAL.. Subsequently the imaging you ordered showed Positive Aortic

17          Atherosclerosis.  Therefore we would like you to amend the note for DOS:

18          1/17/13, and capture AA.  A smart phrase you may want to use is DOT

19          AORTICATHEROSCLEROSIS.  Pls add AA to Problem List."

20      d.  The SmartPhrase ".AORTICATHEROSCLEROSIS" was created by the N.

21          California Medical Group.  Entry of this SmartPhrase would generate the

22          following language in the patient record: "Aortic Atherosclerosis noted on review

23          of the radiology exam associate with chart review and this visit.  Will follow

24          longitudinally as an independent risk factor for CVD and CVA, with management

25          per standard risk factor controls over time by PCP or appropriate specialist."

26      e.  One day after receiving the query, Dr. Chandran created an addendum to add the

27          diagnosis of AA using the SmartPhrase as instructed.

28      f.  The addendum states: "After review of my note for this visit encounter, I recall

this encounter and am addending this note to state that this patient has diagnosis of: ATHEROSCLEROSIS AORTA.  Note: Aortic Atherosclerosis noted on review of the radiology exam associated with this visit.  Will follow longitudinally as an independent risk factor for CVD and CVA, with management per standard risk factor controls over time."

g.  There is nothing in the medical record that indicates that Dr. Chandran communicated to Patient #3 the diagnosis of AA after creating the addendum.

h.  Dr. Chandran then later created two additional addenda, eight months and nine months after the visit, to add twelve more diagnoses to Patient #3's medical record.  There is no indication in the original note or addenda that any of these 12 additional conditions required or affected patient care, treatment or management at the visit.  This is confirmed by Dr. Chandran's addenda note which states: "I have confirmed with the patient and/or the medical record the presence of the above diagnoses, and the diagnoses are followed or will be followed by his or her PCP or appropriate specialist."

i.  One of these diagnoses added via addendum was for severe obesity equivalent. The medical record states that Patient #3's BMI was 31 at the visit, which contradicts a diagnosis of severe obesity equivalent, which requires a BMI of at least 35.

j.  The Health Plan submitted an ICD diagnosis code for AA, morbid (severe) obesity, diabetes with other specified manifestations, and colostomy status for Patient #3 for service year 2013 and received a risk-adjustment payment of $13,925.28 for payment year 2014 based upon these submissions.

k.  The Health Plan was not entitled to this risk-adjustment payment for Patient #3 because the four diagnoses did not require or affect patient care, treatment, or management during the visit.  The diagnosis of AA was merely added to Patient #3's medical record—eight months after Patient #3's visit—after Dr. Chandran was prompted by a leading query to add the diagnosis based on an incidental

1    finding noted in a radiology report.  The remaining diagnoses likewise did not

2    require or affect patient care, treatment, or management during the visit.  And the

3    condition of severe obesity equivalent did not exist at the time of the visit, as

4    indicated by the medical record.

5    **D.    Patient #4**

6    340.    The Health Plan submitted a false claim and received money from CMS based on a

7    diagnosis added in an addendum for Patient #4.

8       a. Dr. Natalia Volkova (a N. California Medical Group physician) saw Patient #4 on

9          July 17, 2013, for an ear problem.  Dr. Volkova diagnosed Patient #4 with

10         cellulitis on the ear lobe (bacterial skin infection).

11      b. The visit note makes no mention of any prior cardiac history or any past

12         myocardial infarction ("MI").

13      c. On July 2, 2014 (almost one year later), Dr. Volkova received a query from

14         Clinical Documentation Consultant Danilo Camacho that stated: "Dear Dr.

15         NATALIA B VOLKOVA MD, This message is sent on behalf of the Regional

16         Clinical Review Team.  [Patient #4] has been prescreened for possible Hx of MI.

17         Please review the following clinical information: Pt was diagnosed with 'Old MI'

18         in several office visits.  The last one was on 10/27/08.  Cardio office visit

19         11/10/08 stated 'prior h/o MI and subsequent 2 vessel CABG in 92'.  Please

20         consider evaluating and documenting Hx of MI at the next Visit if appropriate

21         Please consider to add [sic] it to problem list as a reminder.  This makes the

22         diagnosis explicit to other clinicians and ensures quality of care.  Thank you for

23         considering this diagnosis and please respond with the action taken."

24      d. The same day of the query, Dr. Volkova created an addendum to add the

25         diagnosis of history of myocardial infarction.

26      e. The entire addendum states: "HX OF MI.  Status: Stable/Unchanged."

27      f. The Health Plan submitted an ICD diagnosis code for history of myocardial

28         infarction for Patient #4 for service year 2013 and received a risk-adjustment

1      payment of $328.79 for payment year 2014 based on this submission.

2      g.   The Health Plan was not entitled to this risk-adjustment payment for Patient #4

3      because history of myocardial infarction did not require or affect patient care,

4      treatment, or management during the visit.  The diagnosis of history of

5      myocardial infarction was merely added to Patient #4's medical record—one year

6      after Patient #4's visit—after Dr. Volkova was prompted by a query regarding the

7      diagnosis based on a different visit that took place five years prior.  The added

8      diagnosis code was completely unrelated to the visit that actually occurred for a

9      skin infection on the ear lobe.

10    **E.**   **Patient #5**

11    341.   The Health Plan submitted a false claim and received money from CMS based on a

12 diagnosis added in an addendum for Patient #5.

13      a.   Dr. Jennifer Win-Yun Lam (a S. California Medical Group physician) saw Patient

14      #5 on January 21, 2014, because of a right eye problem.  Dr. Lam diagnosed

15      Patient #5 with a stye on her right eyelids and prescribed an antibiotic.

16      b.   The visit note makes no mention of any skin issues and states "skin is warm."

17      c.   On May 15, 2014 (about four months later), Dr. Lam received a query from

18      Compliance Auditor Belinda Covington that stated:

19      "Subject: Action Required: Coding Clarification Request

20      Dear Provider, The following diagnoses are on the 2014 Seen Not Coded

21      Diagnosis List.  WHAT SHOULD I DO WITH THESE DIAGNOSES?  Please

22      review your progress note.  If appropriate, you may complete an addendum in

23      Health Connect to add the diagnosis and reason for the addendum. -  Or - If the

24      diagnosis is Not Active, please indicate if the diagnosis is Resolved or is Incorrect

25      on the Problem list in KP Health Connect as per instructions on the In-basket

26      Addendum Process handout.

27      Diagnosis: 287.2 - Purpura Nos

28      Dx Source:  CLIN

Dx. Date: 11/08/2013"

d. On September 13, 2014 (approximately eight months after the visit), Dr. Lam responded: "Addendum done."

e. On the same day, Dr. Lam created an addendum that states: "Upon further review, pt has 287.2 SENILE PURPURA -stable."

f. The Health Plan submitted an ICD diagnosis code for purpura, not otherwise specified for Patient #5 for service year 2014 and received a risk-adjustment of $679.08 for payment year 2015 based upon this submission.

g. The Health Plan was not entitled to this risk-adjustment payment for Patient #5 because purpura (skin bruising) did not require or affect patient care, treatment, or management during the visit.  The diagnosis was merely added to Patient #5's medical record—eight months after Patient #5's visit—after Dr. Lam was prompted by a query regarding a historical diagnosis.  The added diagnosis code was unrelated to the visit that actually occurred for a stye on the right eyelid.

## F.   Patient #6

342.   The Colorado Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #6.

a. Dr. Timothy Holcomb (a Colorado Medical Group physician) saw Patient #6 on May 1, 2014, for a hospital follow up.  There was no mention of depression in the visit note.

b. On or around October 14, 2014 (five months after the visit), Dr. Holcomb received a "missed opportunity" query in the form of a report titled "Risk Adjustment Refresh – Patients seen by PCP and not all Chronic Diagnoses Addressed."  Patient #6 was among dozens of patients on Dr. Holcomb's report, which listed "Major Depression, Recurrent" as the diagnosis for Patient #6.

c. Two days after receiving the query, Dr. Holcomb created an addendum to add the diagnosis of major depression, recurrent.

d. The addendum states "Major depression – stable at this time."

e.  The Colorado Health Plan submitted an ICD diagnosis code for major depression, recurrent for Patient #6 for service year 2014 and received a risk-adjustment payment of $3,018.96 for payment year 2015 based upon this submission.

f.  The Colorado Health Plan was not entitled to this risk-adjustment payment for Patient #6 because major depression did not require or affect patient care, treatment, or management during the visit.  The diagnosis of major depression was merely added to Patient #6's medical record—five months after Patient #6's visit—after Dr. Holcomb was prompted by a "missed opportunity" query to add the diagnosis.

## G.  Patient #7

343.  The Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #7.

a.  Dr. Amitabh Joglekar (a N. California Medical Group physician) saw Patient #7 on August 4, 2014, for a cough.  Dr. Joglekar diagnosed Patient #7 with gastroesophageal reflux disease at the visit.

b.  There was no mention of AA in the medical record from the original visit, and no radiology exam ordered at the visit.

c.  On or around December 18, 2014 (four months after the visit), Dr. Joglekar received a data-mining query that stated: "Please review PA & LATERAL CHEST imaging impression notes on 12/10/2014 and consider diagnosis of ATHEROSCLEROSIS AORTA, if appropriate."  Notably, the radiology exam referred to in the query was ordered *after* Patient #7's visit with Dr. Joglekar by a *different* physician, Dr. Ted Young.

d.  Nevertheless, approximately four days after receiving the query, Dr. Joglekar created an addendum to add the diagnosis of AA and did so based on the radiology exam that occurred four months after the patient visit, and that was ordered by a different physician, Dr. Young.

e.  The addendum states: "Reason new information.  After review of my note for this

visit, I recall this encounter and am addending this note to state that this patient has a diagnosis of Aortic atherosclerosis - seen on 12/10/14 CXR. Goal Met, continue with current plan. He is on ARB, beta blocker. Did not tolerant statins. BP controlled."

f.   There is nothing in the medical record that indicates that Dr. Joglekar communicated the diagnosis of AA to Patient #7 after creating the addendum.

g.   The Health Plan submitted an ICD diagnosis code for AA for Patient #7 for service year 2014 and received a risk-adjustment payment of $2,920.20 for payment year 2015 based upon this submission.

h.   The Health Plan was not entitled to this risk-adjustment payment for Patient #7 because AA did not require or affect patient care, treatment, or management during the visit as the purported basis for the diagnosis did not even exist at the time.  The diagnosis of AA was merely added to Patient #7's medical record— four months after Patient #7's visit—after Dr. Joglekar was prompted by a query to add the diagnosis based on an incidental finding noted in a radiology report for an x-ray that was ordered by different physician after the visit.

## H.   Patient #8

344.   The Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #8.

a.   Dr. John Pakula (a N. California Medical Group physician) saw Patient #8 on August 11, 2014, for edema.  There was no mention of AA in the visit note and no radiology exam ordered at the visit.

b.   On or around October 11, 2014 (two months after the visit), Dr. Pakula received a data-mining query that stated: "Please review NONCONTRAST CARDIAC CT imaging impression notes on 10/01/2014 and consider diagnosis of ATHEROSCLEROSIS AORTA, if appropriate."  Notably, the CT exam referred to in the query was ordered *after* the visit by a *different* physician, Dr. Terry Anderson.

c.  Nevertheless, approximately one month after receiving the query, and three months after the visit, Dr. Pakula created an addendum to add the diagnosis of AA and did so based on the radiology exam that occurred two months *after* the patient visit, and that was ordered by a different physician, Dr. Anderson.

d.  The addendum states: "After reviewing my visit note, I recall this visit encounter. The visit note an[sic]/or labs reflect that I evaluated the patient who has the diagnosis of: ATHEROSCLEROSIS OF AORTA.  Note: Aortic Atherosclerosis noted on review of the radiology exam (CT for calcium score, 10/1/14 by cardiologist Dr. Anderson) subsequent to this visit. Pt on BB, statin, and ACE-i. Will follow longitudinally as an independent risk factor for CVD and CVA, with management per standard risk factor controls over time."

e.  There is nothing in the medical record that indicates that Dr. Pakula communicated the diagnosis of AA to Patient #8 after creating the addendum.

f.  The Health Plan submitted an ICD diagnosis code for AA for Patient #8 for service year 2014 and received a risk-adjustment payment of $2,785.80 for payment year 2015 based upon this submission.

g.  The Health Plan was not entitled to this risk-adjustment payment for Patient #8 because AA did not require or affect patient care, treatment, or management during the visit as the purported basis for the diagnosis did not even exist at the time.  The diagnosis of AA was merely added to Patient #8's medical record—three months after Patient #8's visit—after Dr. Pakula was prompted by a query to add the diagnosis based on an incidental finding noted in a radiology report for an CT scan that was ordered by different physician after the visit.

I.  **Patient #9**

345.  The Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #9.

a.  Dr. Christina Le (a N. California Medical Group physician) saw Patient #9 on August 22, 2014, for a hospital follow-up.

b.   The visit note makes no mention of hypogammaglobulinemia.

c.   On February 3, 2015 (almost six months later), Dr. Le received a query from Clinical Documentation Consultant Dani Castillo that stated: "Dear Doctor CHRISTINA ANH LOAN LE MD: This message is sent on behalf of the Regional Code Review Team and Dr. Alphana Shekhar (Documentation and Coding Lead).  [Patient #9] has been prescreened for possible Hypogammaglobulinemia, either primary or secondary. . . .  Action requested for Data Mining effort: If appropriate, please consider dx of Hypogammaglobulinemia.  Please consider to add [sic] diagnosis to the problem list as you deem appropriate.  This helps make the diagnosis explicitly apparent to other physicians and ensures quality of care.  Thank you for considering this diagnosis, and please respond with the action taken."

d.   The same day of the query, Dr. Le created an addendum to add the diagnosis of hypogammaglobinemia and responded to the query: "Addended.  Thanks, cle."

e.   The addendum states: "After review of my note for this visit encounter, I recall this encounter and am addending this note to state that this patient has diagnosis of: HYPOGAMMAGLOBULIN.  Note: fu per heme/ofnc."

f.   The Health Plan submitted an ICD diagnosis code for hypogammaglobinemia for Patient #9 for service year 2014 and received a risk-adjustment payment of $9,917.64 for payment year 2015 based upon this submission.

g.   The Health Plan was not entitled to this risk-adjustment payment for Patient #9 because hypogammaglobinemia did not require or affect patient care, treatment, or management during the visit.  The diagnosis of hypogammaglobulinemia was merely added to Patient #9's medical record—six months after Patient #9's visit—after Dr. Le was prompted by a query to add the diagnosis.

**J.     Patient #10**

346.   The Health Plan submitted a false claim and received money from CMS based on a diagnosis added in an addendum for Patient #10.

a.  Dr. Shih-Chin Thomas Wang (a N. California Medical Group physician) saw Patient #10 on October 23, 2014, for the flu.

b.  The visit note makes no mention of cachexia or of Patient #10's nutritional status.

c.  On November 6, 2014 (about two weeks later), Dr. Wang received a query from Clinical Documentation Consultant Albina Dvorkis that stated that Patient #10 "has been prescreened for possible Cachexia.  Patient has met criteria: BMI <18.5 plus diagnosed with following comorbidities: HIV/AIDS, Active CA, COPD, rheumatoid Arthritis, Heart Failure, End Stage Liver Disease, End Stage Renal Disease, Chronic Kidney Disease, Tuberculosis, Alzheimer and Dementia.  Please review the following clinical information: 73 yo female w/Bipolar, CKD st3. Wt loss 7.41% last 5 mon and 17.31% last 3 years. Last BMI -18.44.  Please consider to evaluate for Cachexia next visit and add to diagnosis list if appropriate based on your clinical judgment.  Please remember to update the problem list I would appreciate if you will respond with the action taken. Thank you."

d.  Approximately two weeks later, Dr. Wang created an addendum to add the diagnosis of cachexia.

e.  The addendum states "Cachexia.  Note: patient has no general debility.  But lost some lbs of weight.  Will continue to follow."

f.  By stating "no general debility," the addendum contradicts a diagnosis of cachexia.  The medical record further indicates that the patient is "well appearing" and that the weight loss is associated with the flu.

g.  The Health Plan submitted an ICD diagnosis code for cachexia for Patient #10 for service year 2014 and received a risk-adjustment of $6,363.48 for payment year 2015 based upon this submission.

h.  The Health Plan was not entitled to this risk-adjustment payment for Patient #10 because cachexia did not exist and did not require or affect patient care, treatment, or management during the visit.  In fact, the addendum that was created to add that diagnosis to the medical record contradicts the representation that the patient

had cachexia.  The diagnosis of cachexia was merely added to Patient #10's

medical record—one month after Patient #10's visit—after Dr. Wang was

prompted by a query regarding the diagnosis.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### False Claims Act: Presenting or Causing to be Presented False Claims
### 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))

347.    The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 346 above as though they are fully set forth herein.

348.    Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to CMS, resulting in their receiving inflated Medicare payments from CMS to which they were not entitled.

349.    Specifically, Defendants presented or caused to be presented false claims for risk-adjustment payments in the form of improper diagnosis codes for Defendants' Medicare patients, in violation of CMS regulations and policies, which Defendants agreed to and were obligated to comply with.

350.    If CMS had known that Defendants had presented or caused to be presented false claims based on these improper codes, CMS would have refused to make risk-adjustment payments based on the improper coding and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions, and CMS has now done so via this suit that it has authorized.

351.    By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### SECOND CLAIM FOR RELIEF
### False Claims Act: Making or Using False Records or Statements
### 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))

352.    The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 351 above as though they are fully set forth herein.

353.    Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records or statements material to false or fraudulent claims resulting in their receiving inflated Medicare payments from CMS to which they were not entitled.

354.    If CMS had known that Defendants had made, used, and caused to be made or used, false records or statements material to false claims based on these improper codes, CMS would have refused to make risk-adjustment payments based on the improper coding and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions, and CMS has now done so via this suit that it has authorized.

355.    By reason of the false records and statements that Defendants knowingly made, used, and caused to made or used, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**THIRD CLAIM FOR RELIEF**
**Conspiracy to Violate the False Claims Act**
**31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))**

356.    The United States repeats and realleges the allegations contained in ¶¶ 1 to 355 above as though they are fully set forth herein.

357.    Defendants Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Health Plan of Colorado knowingly conspired with the Permanente Medical Group, Inc., the Southern California Permanente Medical Group, and the Colorado Permanente Medical Group, P.C. to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B) to submit and cause the submission of false claims and to make, use, and cause to make or use, false records and statements material to false or fraudulent claims to the United States and use false records and statements material to false or fraudulent claims.

358.    By reason of Defendants' conspiracy, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**FOURTH CLAIM FOR RELIEF**
**Payment by Mistake**

359.    The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 358 above as

though they are fully set forth herein.

360.    As a consequence of Defendants' misconduct and the acts set forth above, Defendants received monies from the United States as a result of a mistaken understanding.  Specifically, the United States reimbursed the Health Plan and the Colorado Health Plan, which in turn reimbursed the N. California Medical Group, the S. California Medical Group, and the Colorado Medical Group, under the mistaken understanding of the United States that such claims were based on valid risk-adjustment diagnosis submissions.  Had the United States known the truth, it would not have paid such claims and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled.  Payment was therefore by mistake.

361.    As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**

362.    The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 361 above as though they are fully set forth herein.

363.    As a consequence of Defendants' conduct and the acts set forth above, Defendants were unjustly enriched at the expense of the United States.  In equity and good conscience such money belongs to the United States.

364.    The United States is entitled to recover such money based on Defendants' unjust enrichment in an amount to be determined at trial.

**X.    PRAYER FOR RELIEF**

WHEREFORE, the United States requests that judgment be entered in its favor and against Defendants as follows:

On Claims I, II, and III (False Claims Act), against all Defendants jointly and severally, for: (i) the amount of the United States' damages, trebled as required by law; (ii) the maximum civil penalties allowed by law, (iii) the costs of this action, plus interest as provided by law, and (iv) any other relief that this Court deems appropriate.

As to Claim IV (Payment by Mistake), for: (i) an amount equal to the money paid by the United

States through the Medicare Advantage program as a result of Defendants' false submissions, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

As to Claim V (Unjust Enrichment), for: (i) an amount equal to how much Defendants were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

## XI.    DEMAND FOR JURY TRIAL

The United States of America hereby demands a trial by jury.

DATED: October 25, 2021                            Respectfully submitted,

                                                   SARAH E. HARRINGTON
                                                   Deputy Assistant Attorney General

                                                   STEPHANIE M. HINDS
                                                   Acting United States Attorney

                                                   *s/Shiwon Choe*
                                                   SHIWON CHOE
                                                   BENJAMIN WOLINSKY
                                                   Assistant United States Attorneys

                                                   JAMIE ANN YAVELBERG
                                                   PATRICIA L. HANOWER
                                                   ARTHUR S. DI DIO
                                                   GARY R. DYAL
                                                   LAURIE A. OBEREMBT
                                                   United States Department of Justice
                                                   Civil Division
                                                   Commercial Litigation Branch

                                                   Attorneys for the United States of America