Roger A. Lewis (pro hac vice)
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000
roger.lewis@goldbergkohn.com

Peter Rukin (Cal. Bar No. 178336)
RUKIN HYLAND & RIGGIN LLP
1939 Harrison Street, Ste. 290
Oakland, California  94612
(415) 421-1800
prukin@rukinhyland.com

Brian M. Melber (pro hac vice to be submitted)
PERSONIUS MELBER LLP
2100 Main Place Tower
350 Main Street
Buffalo, New York  14202
(716) 855-1050
bmm@personiusmelberg.com

*Counsel for Plaintiffs-Relators Gloryanne Bryant and Victoria Hernandez*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RONDA OSINEK,<br><br>Plaintiffs,<br><br>v.<br><br>KAISER PERMANENTE, et al.,<br><br>Defendants. | Case No. 3:13-c-v-03891-EMC (Consolidated) |
| UNITED STATES OF AMERICA, *ex rel.* GLORYANNE BRYANT and VICTORIA M. HERNANDEZ,<br><br>Plaintiffs-Relators,<br><br>v. | Case No. 3:18-cv-01347-EMC |

1

| | |
|---|---|
| 1   KAISER FOUNDATION HEALTH PLAN,<br>    INC., KAISER FOUNDATION<br>2   HOSPITALS, THE PERMANENTE<br>    MEDICAL GROUP, INC., SOUTHERN<br>3   CALIFORNIA PERMANENTE MEDICAL<br>    GROUP, COLORADO PERMANENTE<br>4   MEDICAL GROUP, P.C., THE<br>    SOUTHEAST PERMANENTE MEDICAL<br>5   GROUP, INC., HAWAII PERMANENTE<br>    MEDICAL GROUP, INC., MID-ATLANTIC<br>6   PERMANENTE MEDICAL GROUP, P.C.,<br>    NORTHWEST PERMANENTE, P.C.,<br>7   WASHINGTON PERMANENTE MEDICAL<br>    GROUP, P.C., KAISER FOUNDATION<br>8   HEALTH PLAN OF COLORADO, KAISER<br>    FOUNDATION HEALTH PLAN OF<br>9   GEORGIA, INC., KAISER FOUNDATION<br>    HEALTH PLAN OF THE MID-ATLANTIC<br>10   STATES, INC., KAISER FOUNDATION<br>    HEALTH PLAN OF THE NORTHWEST,<br>11   and KAISER FOUNDATION HEALTH<br>    PLAN OF WASHINGTON,<br>12<br>              Defendants.<br>13 | AMENDED COMPLAINT BY<br>RELATORS GLORYANNE<br>BRYANT AND VICTORIA M.<br>HERNANDEZ FOR VIOLATIONS<br>OF FEDERAL FALSE CLAIMS<br>ACT<br><br>DEMAND FOR JURY TRIAL |

14       COMES NOW, Plaintiffs and *Qui Tam* Relators Gloryanne Bryant ("Ms. Bryant") and

15   Victoria M. Hernandez ("Ms. Hernandez," and together with Ms. Bryant, "Relators"), individually

16   and on behalf of the United States of America, to recover treble damages and civil penalties under

17   the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, for monies unlawfully obtained

18   and/or retained from the federal Medicare Program by Defendant Kaiser Foundation Health Plan,

19   Inc. and various of its direct and indirect subsidiaries and affiliates (together, "Kaiser" or the "Kaiser

20   Defendants"), and allege as follows:

21                                   **<u>INTRODUCTION</u>**

22       The Kaiser Defendants are now and have been, in some cases since at least 2009,

23   engaged in a widespread scheme to knowingly submit, or cause to be submitted, false claims for

24   payment to the United States by submitting false "risk adjustment" information to the Centers for

25   Medicare & Medicaid Services ("CMS") in order to improperly increase the amounts CMS pays

26   them. Likewise, the Kaiser Defendants have knowingly retained overpayments received from CMS

27   as a result of their false risk adjustment submissions.

28

1.  Millions of elderly and disabled individuals throughout the United States receive their Medicare benefits through the Medicare Advantage Program (also referred to as "Medicare Part C"). A central, distinguishing feature of the Medicare Advantage Program is the provision of Medicare benefits by private healthcare insurance organizations. Medicare beneficiaries enroll in managed healthcare insurance plans called Medicare Advantage Plans ("MA Plans") that are owned and operated by these private organizations, called Medicare Advantage Organizations ("MA Organizations"). This case involves, in large part, conduct by Kaiser — which operates one of the nation's largest MA Organizations — to improperly obtain or avoid returning payments under the Medicare Advantage Program that it was not entitled to receive.

2.  The Government pays each MA Organization a fixed monthly payment for each Medicare beneficiary enrolled in its plans. The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the health status of each enrollee. The adjustments are intended to ensure that MA Organizations are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

3.  To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their MA Plans. These diagnosis codes are from the beneficiaries' medical encounters (*e.g.*, office and hospital visits). Using these diagnosis codes, the Government calculates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the following year. In general, the more numerous the conditions diagnosed, and the more severe the conditions, the higher the risk score for a beneficiary and, thus, the greater the risk-adjusted payments made to the MA Organization for that beneficiary.

4.  This payment model creates powerful incentives for MA Organizations to over-report diagnosis codes in order to exaggerate the expected healthcare costs for their enrollees. In order to combat these incentives and protect the Government from making erroneous payments to MA Organizations, the Government requires that submitted diagnoses be supported and validated

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

by the beneficiaries' medical records. It is a well-established requirement that all diagnosis codes submitted to the Medicare Program for risk adjustment payments must be unambiguously supported by clinical documentation included in the beneficiaries' medical records.  Kaiser knew that these medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments, and for each individual member's medical history and clinical profile.

5. In addition, each MA Organization must expressly certify in "Risk Adjustment Attestations" submitted to CMS that the diagnosis codes it has provided are accurate and truthful. 42 C.F.R. § 422.504(1)(2). Each MA Organization must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

6. In excess of one million elderly and disabled Medicare beneficiaries are currently enrolled in MA Plans that are owned and operated by Kaiser throughout the United States, and that number is growing. In 2011, approximately one million Medicare beneficiaries in the United States were enrolled in Kaiser's MA Plans. In 2015, Kaiser's MA Plans had grown to 1.3 million beneficiaries, in 2016 to 1.4 million, and in 2021 to 1.7 million.

7. The United States also contributes to premiums paid by individuals to private health insurance companies, including Kaiser, under the Affordable Care Act (sometimes referred to as the "ACA").  The Affordable Care Act authorizes the Department of Health and Human Services (HHS) to utilize criteria and methods similar to those utilized under the Medicare Advantage program to implement risk adjustment, and requires similar attestations/certifications from health insurance companies as to the accuracy and documentation of their risk adjustment data. The HHS risk adjustment methodology developed by and on behalf of the Centers for Medicare & Medicaid Services ("CMS") is based on the premise that premiums should reflect the differences in plan benefits, quality, and efficiency, and not the health status of the enrolled population. Accordingly, as under the Medicare Advantage program, the ACA risk adjustment model creates powerful incentives for private health insurance companies like Kaiser to over-report diagnosis

codes in order to exaggerate the expected healthcare costs for their enrollees; the more codes that are reported, the higher premiums the companies are permitted to charge, and the higher contributions will be made to such premiums by the United States.

8.      The United States pays billions of taxpayer dollars each year to Kaiser for the Medicare beneficiaries enrolled in its MA Plans and ACA Plans. Risk adjustment payments account for a substantial amount of these dollars. The diagnoses submitted by Kaiser drive a large percentage of the payments it receives from the Medicare Program. It is not surprising then that Kaiser is not a passive conduit of diagnoses from healthcare providers to the Medicare Program. Rather, for many years, Kaiser has conducted programs and engaged in other activities to increase the amount of risk adjustment payments from Medicare. This includes programs and other efforts to directly influence and capture both the number of diagnoses and the severity of the medical conditions reported by providers and coded by Kaiser staff.

9.      Ms. Bryant, until her retirement on October 3, 2017, was National Director for Kaiser's national coding quality group, and, prior to that, was  Managing Director of Kaiser's Health Information Management program ("HIM") for the Kaiser Foundation Health Plan in Kaiser's Northern California ("NCAL") region.   Ms. Hernandez was employed by the Kaiser Defendants in various positions from June 1995 through October 2015, and as a Kaiser contract employee through May 2016, in functions that included Regional Director of auditing and coding services for The Permanente Medical Group in Kaiser's NCAL region.

10.      In these positions, Relators discovered that the Kaiser Defendants were and are engaged in fraudulent schemes pursuant to which they routinely and systematically overcharge the following government programs in the following ways:

a.      <u>Medicare Advantage</u>

(i)      Defendants "upcode" risk adjustment claims by manipulating the documentation and submitting claims and codes to the Medicare Advantage program for diagnoses that the member does not have or for which the member was not treated in the relevant year, or by claiming that a member was treated for a more serious condition than

the member actually has, or by documenting and submitting a diagnosis that was labeled significant when it was not, or by training, educating, and programming its personnel and systems to support these fraudulent activities; and

(ii)     Defendants refuse to implement and ignore processes to correct (and refuse to reimburse Medicare for) previously submitted risk adjustment claims when the Defendants discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false, and subvert and ignore Kaiser's internal compliance function and pressure it to cooperate; and

(iii)     Defendants manipulate and falsify risk-adjustment data in a deliberate scheme to over-charge the Medicare Advantage program.

b.     <u>Affordable Care Act</u>

Similarly, Defendants overdocument and upcode risk adjustment claims relevant to individuals covered by the ACA in the same manner and pursuant to the same schemes as relevant to the Medicare Advantage program, and similarly refuse to correct or reimburse Medicare for overpayments caused by this conduct, in a deliberate scheme to over-charge the Medicare program.

c.     Through this fraudulent scheme, the Kaiser Defendants have defrauded the United States of hundreds of millions—and likely billions—of dollars for more than nine years.

11.     Defendants' conduct alleged herein violates the federal False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or

1   Government inaction, and to encourage the private bar to commit legal resources to prosecuting

2   fraud on the Government's behalf.

3          12.     The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be

4   presented) to the federal government a false or fraudulent claim for payment or approval; (b)

5   knowingly making or using, or causing to be made or used, a false or fraudulent record or statement

6   material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used,

7   a false record or statement material to an obligation to pay or transmit money or property to the

8   Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an

9   obligation to pay or transmit money or property to the Government; and (d) conspiring to violate

10  any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person who

11  violates the FCA is liable for a civil penalty of up to $21,916 for each violation, plus three times the

12  amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

13         13.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i)

14  has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth

15  or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

16  information." 31 U.S.C. §3729(b)(1). The FCA does not require proof that the defendants

17  specifically intended to commit fraud. Id.  Unless otherwise indicated, whenever the words "know,"

18  "learn," discover" or similar words indicating knowledge are used in this Complaint, they mean

19  knowledge as defined in the FCA.

20         14.     Each claim for risk adjustment payments that defendants have submitted or

21  caused to be submitted to CMS, where the patient was not treated by a qualified provider for that

22  condition in the year in question, and/or the treatment and condition are not properly documented

23  in the medical record is a false and/or fraudulent claim within the meaning of the FCA, so long as

24  defendant knew that the claim was false when it was submitted, or the defendant later discovered its

25  falsity and refused to correct the claim.

26         15.     The FCA allows any person having information about an FCA violation to

27  bring an action on behalf of the United States, and to share in any recovery. The FCA requires that

28

1   the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during

2   that time) to allow the government time to conduct its own investigation and to determine whether

3   to join the suit.

4          16.     Based on the foregoing laws, Relators Gloryanne Bryant and Victoria M.

5   Hernandez seek, through this action, to recover damages and civil penalties arising from the false

6   or fraudulent records, statements and/or claims that the Defendants made or caused to be made in

7   connection with false and/or fraudulent claims for Medicare Advantage risk adjustment payments,

8   and Affordable Care Act insurance premiums.

9                              **JURISDICTION**

10         17.     This Court has jurisdiction over the subject matter of this action pursuant to

11  28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for

12  actions brought under 31 U.S.C. § 3730.

13         18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

14  § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in,

15  or has committed the alleged acts in the Northern District of California.

16                   **VENUE AND INTRADISTRICT ASSIGNMENT**

17         19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

18  substantial part of the events or omissions giving rise to the claims occurred in San Francisco County

19  and Alameda County, and within the Division and Courthouse in which this action has been

20  commenced.

21                                 **PARTIES**

22  **I.     PLAINTIFFS**

23         20.     Plaintiff-Relator Gloryanne Bryant is an individual who, currently and during

24  all times relevant to this action, resides in this judicial district.  After her distinguished career in

25  senior coding compliance positions with other California-based health care companies, Kaiser hired

26  Ms. Bryant in May 2009 into a senior leadership position as Managing Director HIM for the Kaiser

27  Foundation Health Plan, Northern California Revenue Cycle. Ms. Bryant remained at Kaiser until

28

8

her retirement, effective as of October 3, 2017.  In September 2013, Ms. Bryant was promoted to National Director Coding Quality, Education, Systems and Support for Kaiser's National Revenue Cycle Program Office, a position which she held until her retirement.  Ms. Bryant is a nationally recognized expert and educator in coding, clinical documentation improvement, and physician querying, and speaks and teaches regularly to state, regional, and national audiences.  She holds professional designations of RHIA, RHIT, CCS, CDIP, and CCDS, and is an AHIMA-Approved ICD-10-CM/PCS Trainer.

21.     Plaintiff-Relator Victoria M. Hernandez is an individual who, currently and during all times relevant to this action, resides in this judicial district.  Ms. Hernandez is a coding professional with over 25 years of experience in the healthcare field.  She was employed by the Kaiser Defendants in various coding leadership positions from January 2000 through October 2015, including:  (i) Regional Director of Auditing & Coding Services for TPMG from October 2014 through October 2015; (ii) Regional Director of Hospital Coding Audit & Education for Kaiser Foundation Health Plan from April 2012 through October 2014; and (iii) Regional Coding Review Manager for Kaiser Foundation Health Plan's Revenue Cycle HIM from February 2010 through April 2012.  She holds professional designations of RHIA, CDIP, CCS, CCS-P and is an AHIMA-Approved ICD-10-CM/PCS Trainer.

22.     The United States, on whose behalf Relator brings this suit, is the real party in interest. The United States has ongoing contracts with Defendants through CMS, in accordance with Defendants' participation in the Medicare and Medicaid programs.

## II.     THE DEFENDANTS

23.     Kaiser Foundation Health Plan, Inc. is part of Kaiser Permanente, an integrated healthcare consortium, that operates one of the nation's largest health plans, serving over 12 million members.  Kaiser employs doctors and other medical professionals and provides medical services through its Permanente Medical Groups, a for-profit set of regional affiliates that includes The Permanente Medical Group ("TPMG") in Northern California, Southern California Permanente Medical Group ("SCPMG") in Southern California, and five other regional areas including Hawaii,

the Pacific Northwest, Colorado, Georgia and the Mid-Atlantic States. Kaiser owns and operates acute care hospitals in four regions (Northern California, Southern California, Northwest and Hawaii), and provides care in other settings through its non-profit Kaiser Foundation Hospitals ("KFH").

24. Kaiser's private health insurance plan covers the majority of its patient population. Kaiser Foundation Health Plan, Inc. and its subsidiary health plans also operate, however, various MA Plans, including Medicare Advantage HMO plans called "Senior Advantage," serving approximately 1.7 million members in 2021, and 1.4 million members in 2016, in approximately seven states and one district. As of 2016, Kaiser's Medicare Advantage Program served approximately 10% of Kaiser's overall patient population (10.7 million total as of 2016), but generated approximately 30% of Kaiser's overall profits.

25. Kaiser reported overall operating revenue of $88.7 billion in 2020, compared to $64.6 billion in 2016 and $60.7 billion in 2015. Kaiser reported net income of $6.4 billion in 2020, compared to $3.1 billion in 2016 and $1.9 billion in 2015.

### Kaiser Permanente Total Health Plan Membership, by Region (as of early 2017)

| | |
|---|---|
| **Northern California:** | 4,134,194 |
| **Southern California:** | 4,390,653 |
| **Colorado:** | 671,500 |
| **Georgia:** | 306,806 |
| **Hawaii:** | 250,221 |
| **Mid-Atlantic States (Va., Md., D.C.):** | 702,516 |
| **Northwest (Ore./Wash.):** | 575,688 |
| **Washington:** | 677,050 |

Source:  https://share.kaiserpermanente.org/article/fast-facts-about-kaiser-permanente/

26.     Pursuant to inter-company agreements, the Kaiser Foundation Health Plan, Inc. and its subsidiaries share moneys received from federal and state governments with Kaiser's various Permanente Medical Groups and Kaiser Foundation Hospitals.  Accordingly, all of the named Kaiser Defendants possess financial interests in maximizing the amounts claimed to and paid by the governments, and each Kaiser Defendant has participated in various aspects of the fraudulent practices, as described further herein.

27.     Defendant Kaiser Foundation Health Plan, Inc. is a California corporation with its principal place of business in Oakland, California within this judicial district.

28.     Defendant Kaiser Foundation Hospitals is a California corporation with its principal place of business in Oakland, California within this judicial district.

29.     Defendant The Permanente Medical Group, Inc. ("TPMG") is a California corporation with its principal place of business in Oakland, California within this judicial district. TPMG operates all Kaiser medical group operations in the Northern California region ("NCAL region").

30.     Defendant Southern California Permanente Medical Group ("Southern California PMG" or "SCPMG") is a California corporation with its principal place of business in Pasadena, California.  SCPMG operates all Kaiser medical group operations in the Southern California region ("SCAL region").

31.     Defendant Colorado Permanente Medical Group, P.C. ("Colorado PMG") is a Colorado corporation with its principal place of business in Denver, Colorado.  The Colorado PMG operates all Kaiser medical group operations in the Colorado region.

32.     Defendant The Southeast Permanente Medical Group, Inc. ("Southeast PMG") is a Georgia corporation with its principal place of business in Atlanta, Georgia.  The Southeast PMG operates all Kaiser medical group operations in the Southeast region.

33.     Defendant Hawaii Permanente Medical Group, Inc. ("Hawaii PMG") is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  The Hawaii PMG operates all Kaiser medical group operations in the Hawaii region.

34.     Defendant Mid-Atlantic Permanente Medical Group, PC ("Mid-Atlantic PMG") is a Maryland corporation with its principal place of business in Rockville, Maryland.  The Mid-Atlantic PMG operates all Kaiser medical group operations in the Mid-Atlantic region, including Georgia.

35.     Defendant Northwest Permanente, P.C. ("Northwest PMG") is an Oregon corporation with its principal place of business in Portland, Oregon. The Northwest PMG operates all Kaiser medical group operations in the Northwest region, including Oregon.

36.     Defendant Washington Permanente Medical Group, P.C. ("Washington PMG") is a Washington corporation with its principal place of business in Seattle, Washington.  The Washington PMG operates all Kaiser medical group operations in the Washington region.

37.     TPMG, Southern California PMG, Colorado PMG, Southeast PMG, Hawaii PMG, Mid-Atlantic PMG, Northwest PMG, and Washington PMG are referred to collectively herein as "The Permanente Medical Groups" or "PMGs".  The PMGs have a national leadership and consulting organization, the Permanente Federation, which is run by the leadership of the PMGs. Unless stated otherwise, references to Kaiser actions or conduct taking place in a particular Kaiser region refers to the actions or conduct of the specific Permanente Medical Group that operates in that region.

38.     Defendants Kaiser Foundation Health Plan of Colorado, Kaiser Foundation Health Plan of Georgia, Inc., Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., Kaiser Foundation Health Plan of the Northwest, and Kaiser Foundation Health Plan of Washington are corporations organized under the laws of, and with their principle places of businesses in, Colorado, Georgia, Maryland, Oregon and Washington, respectively, and are subsidiaries of Kaiser Foundation Health Plan, Inc.

# THE LAW

### A.      Medicare Advantage (Medicare Part C)

39.      Under Medicare Part C, the Medicare Program pays each MA Organization a predetermined monthly amount for each Medicare beneficiary in the plan. This monthly payment is known as a "per-member, per-month" payment (or "PMPM"). This capitated payment for each plan varies depending on various factors, including amounts set forth in the plan's bid submitted to CMS. Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on demographic factors (*e.g.*, gender, age) and health status. By risk adjusting for health status, Congress required that more be paid for beneficiaries with higher risk scores than be paid for beneficiaries with lower risk scores.  CMS currently employs a health-based risk adjustment model — known as the Hierarchical Conditions Category ("HCC") model — that takes into account diagnoses from inpatient hospital stays, emergency and outpatient surgery encounters, and physician office visits.

40.      The HCC model is prospective, meaning that it relies on diagnoses for certain medical conditions assigned to beneficiaries by their physicians in a one calendar year timeframe (referred to by CMS as the "data collection" year but also generally known as the "date of service" or "DOS" year) to set the payment for each beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses.  *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe/acute, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. Between 2004 and 2013, the CMS-HCC model included 70 HCCs.  Starting in 2014, the CMS-HCC model included 79 HCCs.

41.      The Government assigns a relative numerical value/weight to each HCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It determines the relative values based on the amounts that it paid to fee-for-service providers to treat these major, severe, and chronic medical conditions under Parts A

and B of the Medicare Program. Higher relative values/weights are assigned to HCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

42.     As previously stated, the HCC risk adjustment model is prospective and a beneficiary's risk score for a particular payment year is determined by his or her medical conditions during the previous year (*i.e.*, the date of service year).  These medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor, physician's assistant, etc. as defined by the CMS MA program) in the beneficiary's medical record during the previous year.

43.     Each beneficiary's risk score is calculated anew for each payment year. For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during face-to-face medical encounters during date of service year 2011.

44.     MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans. Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.

45.     MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS"). Each RAPS submission must include the following information: the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter; the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter. Medical encounters include physician office visits, hospital outpatient visits, and hospital inpatient stays.

46.     MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS only if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider  documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation. In addition, codes should

be based on documented conditions that require or affect patient care treatment or management. *See* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

47.    Risk adjustment claims are true, and the resulting risk adjustment payments are valid, only to the extent that the diagnosis codes submitted by the MA Organizations are valid. The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9- CM" & "ICD-10-CM") and documented with sufficient clinical specificity. All diagnosis codes submitted by MA Organizations must be supported by medical record documentation. If the medical record is ambiguous, it cannot be relied on for diagnosis information for risk adjustment payments. *See* 2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

48.    MAOs have a statutory obligation to report and return any overpayment received from the Government, 42 U.S.C. § 1320a-7k(d).  Further, federal regulations are clear that MAOs like Kaiser are required to report and return both overpayments that they have identified and overpayments that they "should have determined through the exercise of reasonable diligence" were made by CMS.  42 C.F.R. 422.326(c).  The law is clear that any overpayment retained after the statutory deadline of 60 days is an "obligation" for purposes of 31 U.S.C. § 3729.  42 U.S.C. § 1320a-7k(d)(4)(B) (defining overpayments); 42 C.F.R. 422.326(e).

**B.    Affordable Care Act ("ACA")**

49.    The Affordable Care Act sets up a program of risk adjustment in individual and group markets to lessen or eliminate the influence of risk selection on the premiums that plans charge.  In the risk adjustment model utilized under the ACA, which is named the HHS-Hierarchical Condition Categories ("HHS-HCC") risk adjustment model, HHS utilizes criteria and methods similar to those utilized under the Medicare Advantage program, and adapts Medicare Advantage HCCs for use in the HHS-HCC model.  The chief goal in the design of the HHS-HCC model is to assure that premiums reflect differences in benefits and plan efficiency.  The HHS-HCC model uses

current year diagnoses and demographics to predict the current year's spending, as distinguished from the Medicare Advantage program, which uses the risk adjustment model to predict next year's spending.  But in the end, the effect of risk adjustment on ACA premiums is similar to the impact of risk adjustment on capitated payments made under the Medicare Advantage program.  Insurers like Kaiser receive more ACA premiums the more documented and coded conditions are submitted for their insureds.

50.     Pursuant to the ACA, the United States contributes, through tax credits, to premiums paid by low-income individuals to private health insurance companies, including Kaiser, based upon a sliding scale calibrated to the poverty line.   Accordingly, when premiums are artificially high due to documentation and coding fraud, both enrollees and the United States are harmed by the overcharges.

## THE FACTS

## I. KAISER AND ITS RELATED COMPANIES OVERDOCUMENT AND OVERCODE/UPCODE "HIGH-VALUE" HIERARCHICAL CONDITION CODES ("HCCS")

51.     Ms. Bryant and Ms. Hernandez have witnessed Kaiser and its related companies engage in systematic fraud on the Medicare Advantage program, and other government programs including the ACA, for many years through teaching and implementing "HCC maximization techniques" to physicians and coding staff, resulting in systematic over-documenting, over-coding and upcoding of certain high value HCCs, as detailed below.  The HCCs directly impact risk adjustment scores, meaning that the Government overpays Kaiser for its patient population which is not as sick as Kaiser reports.

52.     Kaiser submitted a Risk Adjustment Attestation to the Medicare Program each year after the final risk adjustment submission deadline and knew that it was required to submit a truthful Risk Adjustment Attestation. Despite its obligations under Medicare law, Kaiser's documentation, coding and Risk Adjustment Attestations have been false.

### A.     Aortic Atherosclerosis ("AA")

### (i)     Clinical significance, documentation and coding convention

---

16

53.     AA is sometimes referred to as "hardening of the arteries."  It describes a thickening and loss of elasticity in the arterial wall.  This condition is often an incidental finding in radiology and imaging reports and neither treated nor managed after being identified.  It often has no impact on patient care or outcomes.   Unless AA is related to signs, symptoms or conditions/diagnoses that necessitated the performance of the radiology and imaging test, treatment and management is actually directed toward the AA, or a follow-up office visit is ordered for treatment, it should <u>not</u> be reported/coded to Medicare.

54.     For example, the American Hospital Association's ("AHA") Coding Clinic, the official clearing house for ICD-9-CM and ICD-10-CM/PCS coding guidance, publishes the following guidance for outpatient encounters, including emergency room visits:  "It is inappropriate to report an incidental finding found on a radiology report when the finding is unrelated to the sign, symptom, or condition that necessitated the performance of the test for a patient being seen in the emergency department (ED).  The ED physician would need to clarify that the finding was clinically significant and related to the visit in order for it be coded."  *See* <u>Exhibit 1</u>.

55.     Official Coding and Reporting Guidelines applicable to inpatient encounters further confirm the standard:

encounters for diagnostic tests that have been interpreted by a provider.

When it is coded, AA is currently assigned ICD-10-CM code I70.0 (Atherosclerosis of Aorta). Under ICD-9-CM, AA was assigned ICD-9-CM code 440.0 (Atherosclerosis of Aorta). The AA diagnosis is assigned to HCC 108; in 2016, Kaiser received approximately $2,260 for each HCC 108 code.

**(ii)     Kaiser's scheme**

56.     Labeled an "area of significant missed opportunity" by Kaiser's Medicare Finance Group and Kaiser's Permanente Medical Groups, Kaiser implemented an HCC initiative in 2011 to review and capture AA diagnoses in all clinic, emergency, outpatient surgery, and inpatient encounters, even when incidental to the encounter.  In Kaiser's NCAL region, Kaiser subsidiary

TPMG trained its physicians to choose a diagnosis from Kaiser's proprietary, electronic diagnosis "pick list" to capture AA, even when it was merely an incidental finding.

57.     Kaiser's TPMG senior clinician leaders took the position that AA is a "chronic, systemic condition" that is a permanent risk factor once diagnosed, and thus is properly codeable regardless of its actual significance or treatment.  This interpretation, if accurate, would result in the AA diagnosis meeting the Official Coding and Reporting Guideline for the coding of a systemic condition without coding staff questioning it. Kaiser's NCAL TPMG region directed Regional Health Information Management ("Regional HIM") coding leaders to instruct and train to "always code" AA on the basis that it was supposedly a systemic condition and should always be coded. This direction and instruction ignored coding conventions and guidance, and internal feedback from Kaiser NCAL's Regional HIM, including Ms. Bryant and Ms. Hernandez who questioned whether this condition was truly systemic.  This improper TPMG direction was eventually migrated to Kaiser's other regions as a "best practice."

58.     Kaiser's NCAL Regional HIM, led by Ms. Bryant, remained uncomfortable with the TPMG instruction on AA.  Ms. Bryant had numerous conversations with individuals within TPMG and others within Kaiser regarding her and her colleagues' concerns, and submitted a written inquiry to AHA Coding Clinic as to whether the diagnosis of AA is properly considered a chronic, systemic condition (similar to hypertension and diabetes mellitus) that is codeable on a routine basis even in the absence of treatment, management, and/or monitoring.  The guidance received from AHA Coding Clinic subsequently rejected NCAL TPMG's clinical determination.  But TPMG management exerted intimidation, pressure and other undermining techniques to silence Ms. Bryant and her Regional HIM staff.

59.     To provide "documentation" that would constitute evidence of the clinical significance of AA and meet the Official Coding and Reporting Guidelines, Kaiser's NCAL TPMG region developed a "SMARTPHRASE" to automatically populate the medical record when AA was observed and/or diagnosed in radiology and imaging reports that would routinely, automatically, and falsely state that the diagnosis was significant, not incidental, and would require clinical follow-

18

up, often through the use of "addenda" added to the medical record long after the medical visit.  This process was implemented so that the hospital coding staff would assign the ICD-9-CM code for AA, and the HCC for AA would be captured.

60.     Ms. Bryant continued to bring her concerns to Kaiser's National Compliance Ethics & Integrity Office ("National Compliance Office" or "NCO") and finally, in August 2015, Kaiser NCO announced that a Kaiser Permanente ("KP") clinical review overruled NCAL TPMG's clinical determination that AA is a chronic, systemic condition that should always be coded.  But three years had passed and hundreds of thousands of inaccurate, false codes entered before that belated direction was issued.  There was no discussion of or action plan developed to address the inaccuracies of the past with the AA diagnosis and HCC capture.

61.     Kaiser coded data reports from 2010-2016 shows that the increased AA diagnosis-capture scheme worked – AA diagnoses and coding increased four- and five-fold across all Kaiser regions over that period and spread to all patient populations and payers.

**(iii)     Chronology and evidence**

62.     In late 2011, members of Kaiser's National Compliance Office and NCAL Revenue Cycle teams for The Kaiser Foundation Health Plan and Hospitals ("NCAL KFHP") focused attention on the accurate coding of AA as a result of internal inquiries and requests for guidance.  After an exchange of emails, members of these teams, including Ms. Bryant and Ms. Hernandez, drafted and published a memo to all Regional HIM Directors and hospital Coding Staff in March 2012 outlining the <u>correct</u> coding convention for AA.  *See* Exhibit 2.  The memo correctly stated that AA should not be coded except under certain limited conditions (see above).

63.     TPMG Director Anne Cadwell, NCAL Revenue Cycle VP David Nyburg, and TPMG Physician Liaison Dr. David Bliss reacted unfavorably to this memo immediately.  In calls with Ms. Bryant, they took the position that AA "is always significant and a risk factor so thus they will teach the MDs to document that so it will be coded." *See* Exhibit 3**.**  Ms. Bryant noted that she was "troubled" by this approach in an email to Janet Franklin, Kaiser's Senior Compliance Practice Leader in its National Compliance Office.  *Id.*  Ms. Hernandez and other HIM coding

1   leaders shared Ms. Bryant's concern. No definitive guidance was provided nor action taken by

2   Kaiser's National Compliance Office.

3         64.   In 2012, TPMG trained its doctors to document AA as if it were always

4   significant, and KFH hospital coding staff to always code AA, as directed by Dr. Bliss and other

5   TPMG Directors (*e.g.*, Anne Cadwell, Karen Graham, and Erica Eastham).  In a December 3, 2012

6   email, TPMG's Ms. Cadwell wrote to Ms. Bryant and Ms. Hernandez that she was concerned that

7   Kaiser Hospital coding staff was not getting the communication about AA:  "We need to get

8   everyone on the same page that AA is **not** an incidental finding from a clinical perspective." *See*

9   Exhibit 4 (emphasis in original).  Ms. Bryant and Ms. Hernandez felt that they were being strongly

10  pressured to violate coding guidelines and to participate in manipulating documentation and codes.

11        65.   During a December 12, 2012 WebEx/call with TPMG, TPMG Director Ms.

12  Cadwell told NCAL HIM Leadership that the NCAL region would develop and implement a

13  "SMARTPHRASE" for its doctors to add to, or "addend," the patients' electronic files (*e.g.*, in their

14  EPIC electronic health records, called "KP Health Connect") whenever AA was found on a

15  radiology report in order to indicate its significance, even months after the encounter. It was

16  requested that NCAL HIM leadership approve this documentation so that AA would be "always

17  coded." *See* Exhibit 5 (WebEx meeting invitation).

18        66.   The "SMARTPHRASE" developed by TPMG in Kaiser's NCAL region

19  stated as follows:  "Aortic Atherosclerosis noted on review of the radiology exam associated with

20  chart review and this visit.  Will follow longitudinally as an independent risk factor for CVD and

21  CVA, with management per standard risk factor controls over time by PCP or appropriate

22  specialist." *See* Exhibit 6 at REL0000061.  This phrasing was developed in an attempt to satisfy the

23  numerous concerns raised by NCAL HIM Leadership (*i.e.*, Ms. Bryant and Ms. Hernandez) that

24  documentation of AA was required, including language of clinical significance, to pass audit and/or

25  coding compliance testing.  But it was clinically false and misleading.  AA can be clinically

26  insignificant and incidental and should not always be coded, but Kaiser was training its physicians

27  to always document the clinical significance of the findings so as to cause coders to always code it

28

without question.  In December 2012, NCAL HIM was still waiting for Kaiser's National Compliance Office to provide definitive guidance.  In the meantime, Ms. Bryant and Ms. Hernandez made repeated but futile attempts to help TPMG leadership understand the compliant and appropriate documentation for the coding of AA.

67.    By January 2013, Dr. Bliss, TPMG Director Ms. Cadwell and other senior management had fully overridden the coding memo issued in March 2012 by NCAL HIM Leadership.  Summarizing Kaiser NCAL's new directive for coding AA in the hospital setting, Ms. Bryant emailed Kaiser's National Compliance personnel, including Ms. Franklin, as follows (copying Ms. Hernandez) to alert NCO as to the new direction in the NCAL region:  "TPMG takes the position that once AA is present it never goes away and is then a lifelong risk factor ....  We (NCAL) do believe that AA meets the criteria to be reportable and does impact care and decision making.  To go further with this discussion I believe needs individual with greater clinical knowledge like physicians and would invite TPMG *i.e.* Dr. David Bliss) [sic] to discuss this further." *See* Exhibit 7.  Kaiser's National Compliance Office did nothing to stop this new direction.

68.    In fact, Ms. Bryant was required to be "supportive," "collaborative," and a "partner" with TPMG's direction for capturing the AA HCC by putting together an educational power point presentation with Dr. Bliss titled "Documentation and Coding Aortic Atherosclerosis Clarification," which they presented during a January 2013 WebEx conference call for NCAL Regional hospital coding staff and Clinical Documentation Integrity Staff (CDI).  *See* Exhibit 8**.** The presentation identified AA as an "Area of significant missed opportunity."[1] *Id.* at REL0000069. The presentation adopted TPMG's and Dr. Bliss' position that AA is a "systemic disease" that should always be diagnosed, documented, and coded when identified in a radiology report, and should be added to Kaiser's "Always Code" List (which is a Kaiser National Compliance Office document).

---

[1]  Two years earlier, in a September 2011 power point presentation entitled "Documentation and Coding Leads Meeting," TPMG used the same phrase for capturing AA – "Area of significant missed opportunity" – establishing that capturing the diagnosis had been a long-term focus in the Kaiser NCAL region.  *See* Exhibit 9 at REL0000107.

69.     Similar presentations were made throughout 2013, 2014 and 2015 to various Kaiser regional leadership audiences.  TPMG's AA directive and smartphrase were migrated to Kaiser's other regions and adopted by Kaiser's other Permanente Medical Groups.  For example, at Kaiser's Regional Reporting Group ("RRG") meetings, Kaiser regional leaders overseeing its Medicare Advantage programs presented on opportunities and techniques to capture high-yield HCCs, including AA, emulating NCAL TPMG.  *See* Exhibit 10 at REL0000137.  Similarly, Kaiser NCAL's Revenue Cycle Clinical Documentation Integrity/Improvement ("CDI") included vascular disease (including AA) as an HCC target, and an opportunity to query physicians based on radiology and imaging findings.  *See* Exhibit 11 at REL0000179-80.

70.     On behalf of NCAL HIM Regional Leadership, Ms. Bryant remained deeply concerned and continued to pursue direction and guidance from Janet Franklin of Kaiser's National Compliance Office, but received none.   Moreover, Ms. Bryant and NCAL HIM Regional Leadership, including Ms. Hernandez, continued to question the new direction taken by TPMG leadership regarding AA diagnosis and coding.  Due to her continued concern, Ms. Bryant went so far as to submit a question to AHA Coding Clinic, the recognized authority on ICD-9 and ICD-10 coding, on the issue in December 2012.  *See* Exhibit 12.

71.     Kaiser drafted queries to Coding Clinic at least two other times regarding the proper coding of AA (*see* Exhibit 13):  In May 2013, Kaiser queried Coding Clinic regarding the status of AA as "a chronic systemic condition."  *Id.* at REL0000189.  In its May 16, 2013 response, Coding Clinic stated that if the impact of AA were unclear, the physician should be queried.  *Id.* Over a year later, in approximately November 2014, Kaiser NCO's Janet D. Franklin, with the assistance of Ms. Bryant, drafted a detailed follow-up question to AHA Coding Clinic:  Would AA "be considered a systemic condition that can be coded even in the absence of active intervention in the same way that other systemic diagnoses noted in Coding Clinic (*e.g.* COPD, CHF, Diabetes, Parkinson's Disease, hypertension) may be coded without additional documentation of evaluation, treatment, consideration, etc."?  *Id.* at REL0000186-87.  Ms. Franklin noted in the attached exhibit that her draft was subject to review by Dr. Simon Cohn, Kaiser's physician lead for The Medical

22

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M. HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

Group Federation and RRG, and other Kaiser staff.  Ms. Bryant was later told by Nancy Anderson of Kaiser's NCO group that the question was never submitted to AHA Coding Clinic based upon a decision by Kaiser leadership, yet another Kaiser decision that caused Ms. Bryant and Ms. Hernandez significant concern.

72.     In the meantime, while the Permanente Medical Groups in Kaiser's other regions were following TPMG's practice to always document and code AA, Kaiser's National Compliance Office was taking its time deciding whether that direction was proper.  On July 23, 2014, TPMG approached Ms. Bryant and Ms. Hernandez to meet to discuss viewpoints regarding AA capture for Kaiser's National Compliance office.  *See* Exhibit 14 (calling the long-delayed meeting "a high priority and time critical").

73.     On July 31, 2014, a presentation was given to Kaiser's Coding Governance Group (CGG), which represents all Kaiser Regions, on the topic of AA capture for coding, taking the position that AA should be added to Kaiser's "Always Code List" as a chronic, systemic condition.  *See* Exhibit 15 at REL0000220.

74.     In 2015, Dr. Simon Cohn, the physician lead for Kaiser's Medical Group Foundation and RRG, requested that Ms. Bryant meet with him face-to-face, but did not provide the topic of the discussion in advance.  During the meeting in Dr. Cohn's office, Dr. Cohn asked Ms. Bryant to summarize the events surrounding AA HCC capture at Kaiser, including the TPMG guidance and direction of Dr. Bliss and others, which she did. Dr. Cohn told Ms. Bryant that this issue was being further reviewed by the medical groups. Ms. Bryant told Dr. Cohn that it was not her place to question the clinical and medical interpretations of Dr. Bliss, so she accepted his direction but felt compelled to go to NCO for further and final advice. In the meantime, the improper coding of AA continued throughout Kaiser, with Kaiser physicians being instructed, trained, and prompted to add the HCC diagnosis during or even months after patient encounters through addenda to the medical records.

75.     *Finally*, on August 4, 2015, Kaiser's National Compliance Office and Medical Group Federation completed its "clinical review" of TPMG's AA directive, requiring that

1  it be changed back to the way that Ms. Bryant, Ms. Hernandez and their colleagues in NCAL HIM

2  stated it in 2011 and early 2012: "After having gone through clinical review, AA is not considered

3  a systemic condition and will not appear on the final list of examples of systemic conditions. The

4  clinician must do more than just list this condition. There must be documentation to show how it

5  impacted the current encounter. It will be up to the region to decide if they want to query the

6  provider about this condition when it is only listed. Without a query and additional documentation

7  from the provider to show how it impacted the encounter, it cannot be coded." *See* <u>Exhibit 16</u> at

8  REL0000224. This information from NCO was shared with Kaiser Coding Leaders as well so that

9  they would be informed and comply with the directive.

10          **(iv)**    **Impact of Kaiser's HCC AA "missed opportunity" directive**

11      76.     Kaiser's internal data establishes that its efforts to mine for AA succeeded in

12  capturing and submitting an enormous increase of AA codes to Medicare and other payers,

13  beginning with fewer than 600,000 AA codes captured and submitted in 2010 and culminating in

14  over three million submitted in 2015. AA Dx ("Diagnosis") Frequency Report 2010-2016 (Source:

15  Kaiser internal data aggregated by Ms. Bryant) *see* <u>Exhibit 17</u> at REL0000226. Medicare claims

16  for HCC 108 (Vascular Disease), the classification that includes AA diagnoses, were among the

17  highest in number and revenue for Kaiser during 2014-2016. *See* <u>Exhibit 18</u> at REL0000254. (Over

18  350,000 HCC 108 cases in 2014 submitted for almost $800 million in revenue).

19      77.     In early 2016, Ms. Bryant discovered in the course of ICD-10-CM/PCS

20  national coding quality monitoring and coding validation that Kaiser was still coding AA based

21  upon it being a systemic condition, notwithstanding the August 2015 conclusion of Kaiser NCO

22  rejecting AA as a "chronic, systemic condition." Ms. Bryant, who was at that time working in

23  Kaiser's National Revenue Cycle group, shared this finding with Ms. Hernandez, who was also

24  working for this group at the time. Both Ms. Bryant and Ms. Hernandez were disturbed and

25  troubled. Ms. Bryant brought the AA findings to the attention of Janet D. Franklin and Nancy

26  Anderson of Kaiser NCO. Ms. Bryant requested that the appropriate coding guidance be posted in

27  the National Coding Bulletin Board for all Kaiser Regions to see. She also provided the appropriate

28   

24

coding advice on AA to regional HIM leaders during leadership forum meetings and requested that each region disseminate the guidance to all appropriate staff and stakeholders, including Kaiser's medical groups.

78.     In 2016, after Kaiser had started to pull back the directive, there were still almost two million AA codes submitted across payers. Exhibit 17.  In just the first four months of 2016, Kaiser reported to Medicare Advantage over 300,000 cases of vascular disease (HCC 108), which includes the AA diagnosis codes, accounting for almost $700 million. Exhibit 18.  Many Kaiser members now have the diagnosis of AA assigned to their clinical profiles incorrectly, potentially impacting patients' future insurance coverage and profile.

79.     Ms. Bryant's and Ms. Hernandez believe and therefore allege that Kaiser has never gone back to validate the accuracy of AA documentation and coding for years prior to 2016, and has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding AA.  Moreover, they believe and therefore allege that there has been no specific AA validation of documentation and coding or discussion regarding rebilling or resubmission of corrected claims or data.  Indeed, shortly before her retirement from Kaiser in October 2017, Ms. Bryant was asked by NCO's Nancy Andersen to join a coding workgroup to look at AA, as the Kaiser Medical Groups wanted to revisit the issue, *yet again*, of whether the condition is "systemic."  Thus, Kaiser continues its efforts to avoid "missed opportunities" with this false documentation and coding.

**B.     Mechanical Ventilation Dependence Status ("Vent Dependence")**

**(i)     Clinical significance, documentation and coding convention**

80.     The HCC for "dependence on respirator status" is HCC 82 (linked with ICD-9-CM code V46.11 (Dependence on respirator, status) and ICD-10-CM code Z99.11 (Dependence on respiratory ventilator status)).  Dependence on respirator (or ventilator) status is a "status code" that is used when a patient requires long-term, continued ventilator support to breathe beyond the acute care phase.  The status code is/was reported for both Medicare Advantage HCCs and HHS

HCCs (*e.g.*, Medicaid under the Affordable Care Act).  In 2016, Kaiser received approximately $11,497 for each HCC 82.

81.    On February 7, 2014, Coding Clinic stated in a specific response to Kaiser's inquiry – an inquiry initiated by Ms. Bryant with Ms. Hernandez's input – that "this code should be reported when the patient requires continued ventilator support for an unexpected period of time and not for the short-term acute phase of a condition."  Coding Clinic further stated that "there is no time frame set on what constitutes ventilator dependency."  *See* Exhibit 19.

82.    In short, the HCC for vent dependence status should <u>never</u> be coded, and "respirator dependence," "ventilator dependence," "vent status," or similar terminology should <u>never</u> be documented in the medical record, if a patient is weaned from a ventilator during or at the end of an acute short-term stay in the hospital (of whatever length) and discharged home or to a post-acute-care facility without clinically requiring vent support.  That does not constitute "vent dependence status."  Rather, a patient is vent dependent only if the patient relies on the ventilation to live on a long-term basis *and not for the short-term acute phase of a condition.*

**(ii)    Kaiser's scheme**

83.    Kaiser's directives on vent dependence documentation and coding differ region by region, but were all similarly invalid, with regions establishing a "time frame"-based criteria for documenting vent dependence status after which the specific code assignment is permitted.  For example, TPMG, the medical group in Kaiser's NCAL region, initially defined the time period as 12 hours or more but later changed it to 30 days or more on a ventilator before the status condition should be documented and then coded irrespective of discharge status or disposition. Kaiser's Southern California PMG only required 21 days as its time-frame criteria for documenting and coding this status.

84.    These directives contravened AHA Coding Clinic's caution that there is no "set time frame" and that vent dependence should not be reported for the short-term acute phase of a condition.  Kaiser, especially its Permanente Medical Groups, consciously ignores Coding Clinic's response, instead criticizing and rejecting Ms. Bryant's professional coding decision to seek input

from Coding Clinic in the first place, which led to Ms. Bryant being excluded from further coding discussions on this topic and others. By elevating set time periods over actual long-term dependence, Kaiser manipulated the system to over-document and over-code for vent dependence status.  <u>Any</u> patient that is on a ventilator for a set period of time is assigned the status code by Kaiser, even if the patient's reliance is neither long-term nor continuous but instead arises from the acute phase of a condition or following a procedure.

85.     Moreover, Kaiser ignored its own improper directives by coding for vent dependence status even when patients are on vents for just a few days, then discharged without the vent.  Kaiser data shows high volumes of patients being coded for vent dependence status even after being discharged from the acute care hospital without a ventilator, and even for lengths of stay as short as one or two days across four hospital regions, and in the outpatient physician office/clinic setting after discharge.

**(iii)     Chronology and evidence**

**(A)     October/November 2013**

86.     Ms. Hernandez and Ms. Bryant were first made aware of Kaiser's vent dependence status documentation and coding practices in the context of newborns that are placed on ventilators temporarily in the hospital before being discharged home.  This came about due to the patient population impacting the Affordable Care Act, and questions were raised internally by Regional NCAL HIM leadership (Ms. Bryant, Ms. Hernandez and Dawna Toews) about whether V46.11 (vent dependence status) was appropriate in this circumstance.  Ms. Bryant, Ms. Hernandez and Ms. Toews were extremely concerned with the direction that TPMG wanted to take with the V46.11 status code.  The three of them discussed the situation and agreed that the status code should be infrequently assigned and coded; given the high number of such codes at Kaiser, it thus appeared that TPMG was focusing on capturing this status code inappropriately.

87.     In a series of meetings and emails, chronicled contemporaneously by Ms. Hernandez (*see* <u>Exhibit 20</u>), Ms. Hernandez and Ms. Bryant investigated Kaiser's existing documentation and coding practices, researched the proper coding convention, reached out to

external clinical and coding experts and, on November 21, 2013, submitted email queries to AHA's

Nelly Leon-Chisen, Director and Editor of Coding Clinic, and a separate email to Sue Bowman,

American Health Information Management Association ("AHIMA") Senior Director of Coding

Policy and Compliance.  ("AHIMA," like AHA's Coding Clinic, is a neutral organization that can

be queried for guidance by coding professionals.)

88.    On November 22, 2013, AHIMA's Ms. Bowman responded by email as

follows:  "V46.11 is intended for 'dependence' on a ventilator – meaning long-term dependence

(such as patients with spinal cord injuries or progressive neuromuscular diseases such as multiple

sclerosis) – not for short-term use of a ventilator during an acute illness, following surgery, etc.  So

it seems unlikely that a newborn would be declared ventilator-dependent".  *Id.* at REL0000262.

89.    On November 25, 2013, Kaiser's NCAL HIM's Regional Coding Review

Managers met onsite.  All agreed that the vent dependence status code would not be appropriate for

newborn initial clinic visits, follow-up clinic visits, or hospital short-term acute care visits, nor if

the newborn was weaned and discharged home without ventilation.  They concluded and insisted

that Kaiser's hospital coding staff should follow and be compliant with official coding guidelines

for the assignment of a respiratory/vent status code.

**(B)    December 2013**

90.    During a follow-up phone conference on December 3, 2013 attended by Ms.

Hernandez and members of TPMG's Encounter Information Operations group ("EIO," a TPMG

group that specifically focuses on the Medicare Advantage program and was led at the time by

Director Anne Cadwell), the above coding guidance conclusion was rejected over Ms. Hernandez's

objection and notwithstanding the references provided, including that Ms. Bryant had submitted an

inquiry to AHA Coding Clinic. TPMG stated that it would move forward with capturing vent

dependence status if a hospital newborn was placed on ventilation for at least 12 continuous hours,

even if the newborn was successfully weaned from the respirator/ventilator and discharged without a respirator/ventilator.

91.     The December 3 directive was followed by a call to Ms. Hernandez on December 4, 2013 from TPMG Director Ms. Cadwell and Dr. Bliss, who focused not on Kaiser's invalid coding of vent dependence or references provided, but on why Coding Clinic was queried by Ms. Bryant in the first place.  Ms. Hernandez was required to provide Ms. Bryant's cell phone number so that the TPMG EIO Directors could immediately contact Ms. Bryant once they learned that she was the one who submitted the Coding Clinic query.  Dr. Bliss and Ms. Cadwell called Ms. Bryant to rebuke and chastise her for submitting a query to Coding Clinic without notifying TPMG.  Both Ms. Hernandez and Ms. Bryant were in Dr. Bliss' "line of fire," and were very distressed.  *See* Exhibit 21.

92.     Ms. Hernandez and Ms. Bryant were told not to inquire outside Kaiser anymore on such issues without input and approval from Kaiser's Coding Governance Group (CGG).  They were warned that outside inquiry would create risk for Kaiser.  Once again, pressure and criticism were directed at Ms. Bryant and Ms. Hernandez for not agreeing to TPMG's approach to capturing this diagnosis.

93.     On December 8, 2013, Ms. Hernandez was further instructed by TPMG Clinical Documentation Improvement ("CDI") Physician Director Dr. Shirley Cachola, to "use 'respirator dependence' for patients with tracheal intubation until the specifics are clarified by the coding clinic ….  Not sure this meets compliance since it is not defined but this is how med. group wishes to proceed for now."  Exhibit 22 at REL0000273.  Ms. Bryant and Ms. Hernandez believed this instruction to be clear error and unethical, a sentiment echoed by their colleague in the Regional HIM group, Dawna Toews, who questioned how the company could proceed "when it is clearly out of compliance….  I am not inclined to continue working for a company that blatantly ignores guidelines I have promised to follow, and that put me in jeopardy of losing my professional licensing."  *Id.* at REL0000269.

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

94.     Ms. Bryant was directed by TPMG to quickly follow-up on the pending response from Coding Clinic on the newborn-specific issue of vent dependence coding.   On December 6, 2013, Coding Clinic's Senior Coding Consultant Anita Rapier wrote via email to Ms. Bryant that "code V46.11 (respirator dependence status) is used to describe patients who have been dependent on mechanical ventilation over a period of time.  It is not used for newborns who are placed on a vent for a short period."  Exhibit 20 at REL0000267.

95.     Ms. Bryant sent a follow-up email to Anita Rapier as follows:  "Thus if a newborn was placed on a vent for 12 or even 20 hours and then at discharge is NO longer on the vent, we would not assign the V46.11 status code to that discharge/stay."  AHA Coding Clinic's Senior Coding Consultant Ms. Rapier responded immediately:  "Yes, that is my interpretation." *Id.* at REL0000266.  Thus, Coding Clinic corroborated AHIMA's response and Ms. Bryant's and Ms. Hernandez's original conclusion.  Coding Clinic's more formal February 7, 2014 response letter to Ms. Bryant, quoted above, confirmed its guidance. *See* Exhibit 19.

96.     Contemporaneously, Ms. Bryant and Ms. Hernandez continued to have deep concern and investigated Kaiser's coding practices for vent dependence status both inside and outside of the newborn care context, including for patients in the Medicare Advantage program. They quickly confirmed that they were similar.  TPMG in Kaiser's NCAL region required its CDI Physician Director Dr. Cachola, CDI Managers, Susan Ingerbretsen and Donna McIvor (under Dr. Bliss' leadership) to create an acceptable timeline for the capture of vent status code.  In Diagnostic Guidelines published in November 2013, TPMG CDI established a "greater than 30 day" rule for vent dependence status:  that is, if a patient is receiving respiratory support through intubation for more than 30 days, then vent dependence status should be documented and the code should be assigned, even if the patient is successfully weaned and discharged without a ventilator.  Exhibit 23 (TPMG Neonatal Intensive Care Unit Diagnostic Guidelines), at REL0001005.

97.     Similarly, in Kaiser's SCAL region, SCPMG's regional CDI program established a 21-day duration of care to constitute vent dependence.  Exhibit 24 (HIX Neonatology Documentation and Coding 2014), at REL0001040.

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M. HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

98.     The RRG meetings that Ms. Bryant attended often included the capture of specific HCCs, and ventilation status was included on numerous occasions.  Kaiser promoted the documentation and capture of the respirator/ventilator dependence code (HCC 82) in education sessions and materials to Kaiser physicians throughout the Kaiser regions. In this way, Kaiser's improper practice for coding the ventilation status code was migrated systemically throughout the Kaiser regions and adopted by all of Kaiser's Permanente Medical Groups, notwithstanding the coding guidance from Coding Clinic and AHIMA.

(iv)     **Impact of Kaiser's vent dependence practices**

99.     Kaiser data compiled by Ms. Bryant through her national coding quality monitoring work establishes that the Vent Dependence status code is or was being captured frequently by Kaiser.  Medicare Advantage and HHS-HCC payer data specifically indicated a high volume of these codes, particularly in Kaiser's NCAL and SCAL regions.  *See* Exhibit 25 and Exhibit 18.

100.     The coding data includes a high volume of cases in which patients were successfully weaned from ventilation and routinely discharged home or to self-care, including after just a day or two in the hospital.  *See id.*; Exhibit 26 (showing NCAL vent dependence cases).  In a December 2013 validation audit, Ms. Hernandez and her NCAL audit team concluded that 100% of a sample of TPMG vent dependence cases were invalid.  See Exhibit 27.

101.     Data from all Kaiser Regions confirms that the vent dependence coding volume skyrocketed across Kaiser.  *See* Exhibit 28 (Kaiser data gathered by Ms. Bryant).  *See also* Exhibit 18 (includes vent dependence (HCC 82) data submitted by Kaiser to the Medicare Advantage program from January, 2014 through April, 2016).

102.     Kaiser cannot articulate or produce any clinical research, standards or evidence-based medical justification for coding vent dependence status once a patient has been ventilated and removed after a set number of days; for coding vent dependence status even when ventilation is used for far fewer days than the purported thresholds; or for setting different policies for determining ventilation dependence status within the various Kaiser regions.

103.    Ms. Bryant and Ms. Hernandez further believe and therefore allege that Kaiser's proprietary, diagnoses electronic "pick list" was being utilized by Kaiser to easily and falsely capture this inaccurate status code in all clinical settings.   Moreover, they believe and therefore allege that Kaiser has never gone back to validate the coding to identify incorrect codes, and has never repaid, restated, or otherwise reimbursed amounts falsely obtained during this period from over-diagnosing and over-coding vent dependence status.  To their knowledge, there has been no validation or discussion for rebilling or resubmission of corrected claims or data.

## II.    "THE KAISER WAY" IGNORES ESTABLISHED PROCEDURE, INCENTIVIZES GREED, AND CULTIVATES FRAUD

104.    At every level and across regions, Kaiser is driven by a corporate culture that demands and rewards financial success from its employees.  Kaiser's senior management pushes relentlessly to increase Kaiser's revenue from risk adjustment.   The risk adjustment practices described in this Complaint are attributable in large part to these demands and rewards.  Ms. Bryant and Ms. Hernandez have witnessed Kaiser's profit-seeking and financial-gaming culture corrode its compliance function over many years, leading to the frauds described herein on the government and its Medicare and Medicaid programs.

### A.    Kaiser's policies and procedures

105.    Kaiser consistently publishes and enforces internal company policies and procedures that contravene coding and diagnostic principles that are widely accepted and enforced within the broader coding community.  To avoid detection, Kaiser sometimes labels its instructional documents as "Program Advisories" rather than "policies" in order to circumvent the implications of imposing an improper requirement.  But these Advisories are not optional and are enforced like any other policy and procedure within Kaiser.

106.    Many of Kaiser's proprietary policies regarding diagnosing and coding are intentionally constructed to be less restrictive than the norm in furtherance of the company's emphasis on profit over compliance.  These departures from accepted policy and procedure lead directly to improper documentation, coding and overbilling.  Kaiser's Permanente Medical Groups

and Kaiser's Medicare Finance Department initiate and lead this corporate culture, focusing on capturing higher reimbursement without any contravening focus on the avoidance of overbilling.

107.    Kaiser's National Compliance Office is ineffective, apprehensive, and slow in investigating and responding to documentation and coding compliance issues.  In addition, NCO coding leadership has openly admitted to Ms. Hernandez that the Permanente Medical Groups have significant control over chart audit selection, accuracy rates, documentation guidance, coding policy and practices, all to manipulate the capture of more HCC codes and to increase government payer reimbursement.  Instead of turning to NCO, the Permanente Medical Groups asked "Medical Group Regional Compliance" staff for advice about who can be manipulated easily within the region to get the desired result (*e.g.*, more HCC target capture).  When NCO completes an internal audit that shows inaccurate or misleading documentation or coding, NCO is pressured and intimidated by the relevant Regional PMG to change the audit's accuracy results.

108.    On a system-wide basis, Kaiser has been reluctant to perform historical code correction and billing submission when a problem or issue has been identified that should be rebilled.  The culture at Kaiser perpetuates a superiority, manipulation, and intimidation by physician medical group leaders and medical group management, resulting in an inability to challenge or present a different perspective, even when backed by express, unambiguous coding guidelines, standards or HIM coding expertise, without being chastised, threatened and ridiculed.

**(i)    Query templates**

109.    Coding professionals are permitted under AHIMA's Standards of Ethical Coding to query physicians/providers for clarification and additional documentation prior to code assignment when there is conflicting, incomplete, or ambiguous information in the health record regarding a significant reportable condition or procedure or other reportable data element dependent on health record documentation.  Querying physicians/providers is also permitted after billing (*e.g.*, retrospectively) if performed in a timely manner.

110.    But these Standards, as well as AHIMA's Guidelines for Achieving a Compliant Query Practice and AHIMA's Managing an Effective Query Process Practice Brief,

forbid coding professionals and others (e.g., clinical staff, physicians, nursing staff, etc.) who query from "leading" providers to select a particular diagnosis.  *See* <u>Exhibit 29</u>.

111.  According to AHIMA's Managing an Effective Query Practice Brief, "Queries that appear to lead the provider to document a particular response could result in allegations of inappropriate upcoding. The query format should not sound presumptive, directing, prodding, probing, or as though the provider is being led to make an assumption." <u>Exhibit 30</u> at REL0000511.

112.  In *Health Information Management Compliance: A Model Program for Healthcare Organizations,* AHIMA's Sue Bowman writes that "Communication tools between coding personnel and physicians, such as coding summary sheets, attestation forms, or coding clarification forms (*e.g.*, physician query forms), should never be used as a substitute for appropriate physician documentation in the health record."

113.  Nevertheless, some of the Kaiser regions developed sets of query "templates" for clinical documentation improvement (CDI) staff for specific HCC diagnoses to use in concurrent querying of providers that do just that.  These improper query templates were used in at least Kaiser's NCAL hospital CDI and Northwest CDI, and perhaps others.  There is a cultural reluctance within NCO to give direction and/or require the Kaiser Regions to utilize the Kaiser standard query form language for coding and CDI.

114.  The hospital coding staff also utilizes templated physician queries, but these query templates are reviewed and constructed to ensure non-leading language for a variety of diagnoses, regardless of payer type or reimbursement impact.  Most of the query reviews of language utilized were under the oversight of Ms. Bryant and guidance of Ms. Hernandez, always utilizing, communicating, and applying the AHIMA direction, guidance and practice briefs.

115.  KP NCAL and Northwest CDI query templates developed by TPMG and the Northwest PMG, respectively, many of which involve diagnoses directly linked to HCCs under the Medicare Advantage program and HHS-HCCs under the Affordable Care Act, are designed to be, and are in fact, leading.  Through the queries, CDI staff introduce clinical indicators for specific HCC diagnoses to the providers, who in turn routinely follow the suggestion to add a reimbursable

1  diagnosis where none existed and should not have been added.  In Kaiser's NCAL Region, the CDI

2  queries are not made an official permanent part of the record while HIM coding queries are, thus

3  obscuring the role of CDI and improper querying from review.

4  116.  Although the role of CDI staff is to seek clarification from providers for

5  documentation for specific clinical indicators, there has been inconsistent application of the Practice

6  Brief Guidance at Kaiser.  These queries are always, or almost always, directed toward an HCC

7  diagnosis for maximizing reimbursement capture and not for overall quality documentation for all

8  clinical situations, all payers, and all patients.  In fact, Ms. Bryant recalls on several occasions a

9  stated reluctance from Kaiser's Revenue Cycle leaders to look at documentation and coding both

10  ways – *e.g.*, for both over- and under coding – on the basis that it is too costly and time consuming.

11  Moreover, Kaiser's CDI program is not a "payer agnostic" approach.  TPMG in Kaiser's NCAL

12  Region, for example, limits its CDI focus to HCCs only and never expanded to examine severity of

13  illness (SOI) and risk of mortality (ROM) to all patients and to all payers, notwithstanding Ms.

14  Bryant's strong recommendations,

15  117.  Examples of the leading query templates include Kaiser's templates for:

16  obesity/extreme or morbid obesity; protein calorie malnutrition (mild/moderate/severe); pressure

17  ulcer; neoplasm (history versus current); emphysema; depression; adrenal mass; aortic

18  atherosclerosis; diabetes manifestations; neutropenia; sepsis/SIRS with organ dysfunction, and

19  others.  *See* Exhibit 31 (improper query templates from Kaiser's Northwest region, operated by the

20  Northwest PMG); Exhibit 32 (TPMG CDI Tip Sheet).

21  118.  Moreover, certain query templates in Kaiser's Northwest Region developed

22  by the Northwest PMG include leading language introducing a diagnosis to the physician, and not

23  including options of "unknown," "other," "clinically undetermined" or "unspecified."  They

24  contravene AHIMA's guidance on Achieving a Compliant Query Process, which states that

25  "*Multiple choice query formats should include clinically significant and reasonable options as*

26  *supported by clinical indicators in the health record, recognizing that there may be only one*

27  *reasonable option….Multiple choice query formats should also include additional options such as*

28

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

*'clinically undetermined' and 'other' that would allow the provider to add free text.  Additional options such as 'not clinically significant' and 'integral to' may be included on the query form if appropriate."*

### (ii)    Inquiries to AHA Coding Clinic

119.    As discussed above in the Vent Dependence Status section, Kaiser chastised and reprimanded Ms. Bryant, Ms. Hernandez and other HIM coding professionals for submitting coding questions directly to the American Hospital Association Central Office for Coding Clinic, a routine and standard of practice for coding professionals across the country.   Ultimately, Kaiser instituted and mandated requirements for all AHA Coding Clinic questions, routing them through a rigorous review committee comprised primarily of non-coding professionals and many layers of approval process before submission.

120.    Ms. Bryant was directed that any and all coding questions must go through Kaiser's own Coding Governance Group ("CGG"), a group that was and is composed of a majority of physicians and representatives from Kaiser's Permanente Medical Groups rather than coding professionals.  In December 2013, Ms. Bryant was told by Kaiser TPMG's senior physician lead Dr. Bliss that she was "putting the organization at risk" by submitting questions directly to Coding Clinic, a sentiment echoed by TPMG Director Anne Cadwell on a call that also included many regional physicians and Revenue Cycle leaders.  Ms. Bryant's expertise, professional knowledge and career-long practice of submitting questions to Coding Clinic were thus called into question. Ms. Bryant commented to the group that it was her duty and responsibility as a coding professional, and a standard of practice, to submit questions for coding clarification to AHA Coding Clinic without a committee review.

121.    Ms. Bryant expressed concern on the December 2013 call that this internal group lacked coding expertise, and inserted a layer of bureaucracy in an area where Kaiser's National Coding group (led by Ms. Bryant) should have independence and the ability to send unattributed questions to Coding Clinic.  Her protests and professional rationale were ignored.

122.     Ms. Bryant reported back to Kaiser's NCAL HIM leadership, including Ms. Hernandez and Dawna Toews, regarding this new directive.  Her staff was appalled with the outcome of the meeting and felt that their credentials were at risk due to being prohibited from following ethical coding practices to seek and comply with official coding guidelines. *See* Exhibit 22. Under extreme pressure, Ms. Bryant reluctantly complied with the CGG request and worked with NCO's Nancy Andersen to develop a coding questions workflow over the coming years (started in 2014 and finalized in 2015, currently still under revision in 2017).

123.     The internal coding question workflow for submitting coding questions to Coding Clinic was discussed during a March/April 2015 conference call/meeting involving NCO's Diana Medal, Nancy Andersen, Ms. Bryant and Ms. Hernandez.  The group specifically discussed the restrictive and controlling nature of the CGG directive and how the physician members of the CGG were extremely apprehensive of Ms. Bryant sending questions to Coding Clinic due to their concern that Coding Clinic's response might force Kaiser to change its HCC documentation and HCC capture practices.

124.     NCO's Nancy Andersen mentioned that the CGG physician leader, Dr. Annette Guido, was behind the restriction that had been imposed and that she (Ms. Andersen) did not entirely agree with it, but that the physicians' directive had to be followed.  Ms. Bryant stated her concerns with the CGG being composed mostly of physicians and not coding experts, a point with which Ms. Andersen agreed.  On the same call, Ms. Hernandez discussed her concern that TPMG had been focusing on HCCs and had restricted her in the past from collaborating outside TPMG EIO (*i.e.*, with Ms. Bryant, Ms. Anderson and NCO), much less submit a question to Coding Clinic, and felt that TPMG feared that the Coding Clinic response or guidance would derail its capture efforts of HCC diagnoses.  Ms. Andersen stated that she understood but "we have no choice." She stated that it was difficult to get the medical groups and CGG to understand the need to query AHA Coding Clinic directly and freely.

125.     When Ms. Hernandez requested a copy of the recording of the conference call several days later, Ms. Medal stated via email that it had been deleted per the instructions of

Ms. Andersen.  Ms. Bryant and Ms. Hernandez believe that the recording was deleted due to the fact that many comments were made during the call, including by NCO leadership, that were highly critical of CGG's and TPMG's leadership and practices.

**B.     Kaiser's emphasis on financial outcomes**

126.    At every level of the company, Kaiser emphasizes financial results over compliance and accuracy, bending the rules and utilizing gaming strategies to falsely engineer profits.

**(i)     CDI program and related activities.**

127.    In late 2009, Kaiser NCAL Revenue Cycle developed its "Clinical Documentation Improvement" program, which it called "Clinical Documentation Integrity" or "CDI," to ostensibly improve its clinical documentation of hospital inpatient medical encounters. This effort was followed by the SCAL and Northwest Regions in the hospital setting.  In actuality, Kaiser's CDI programs strive only to improve clinical documentation insofar as it increases HCC capture and Medicare and HHS reimbursement.

128.    AHIMA's guidance on CDI programs provides that they are required to address all payers, not just Medicare.  In addition, CDI programs should not focus solely on reimbursement.  In furtherance of this guidance, the original NCAL CDI program initially developed by Ms. Bryant in 2009 was designed to achieve a payer-agnostic focus by the end of a three-year plan.  But Kaiser's CDI program, in practice, has diverged from Ms. Bryant's expertise and design and is definitively not "payer agnostic."  It focuses almost exclusively on risk-adjusted payers, such as HHS under the ACA program and CMS under the Medicare Advantage program, and only on documentation impacting HCCs.

129.    Ms. Bryant made several requests to expand Kaiser's CDI program to other payers and not to focus solely on HCC reimbursement, but was not successful.  In approximately late 2010, Kaiser NCAL Revenue Cycle Vice President Dave Nyburg moved the CDI Program from Ms. Bryant's oversight to his direct oversight.  Ms. Bryant believes that this move was made due to

1  ongoing TPMG discomfort with the direction she wanted to move the program and the pressure and

2  resistance to Ms. Bryant's advice and guidance.

3        130.   Moreover, in the past, Kaiser's CDI program conducted its concurrent

4  documentation reviews by going into prior or old encounters and pulling diagnostic and clinical

5  information to query physicians for the current encounter for HCC diagnosis capture.  Again, this

6  contravenes coding guidelines and AHIMA Standards of Ethical Coding under section 4.5: Coding

7  professionals shall not "*Utilize health record documentation from or in other encounters to generate*

8  *a provider query*."  *See* <u>Exhibit 29</u>.

9        131.   For example, Ms. Hernandez received multiple inquiries from CDI leadership

10  and CDI nursing staff as to whether they may use old lab values, clinical indicators and

11  documentation from previous encounters and apply these to send a query about a different, current

12  encounter.  Ms. Hernandez has repeatedly told CDI leadership staff that this is not appropriate.  But

13  the repeated nature of the inquiries gave rise to Ms. Hernandez's belief that the CDI program was

14  routinely looking backwards; it was highly unlikely that the CDI leadership was getting to every

15  instance and every CDI employee to provide Ms. Hernandez's guidance.

16        132.   For many years, Kaiser's CDI program, especially in the NCAL region, has

17  consistently expressed the value of its work in terms of additional dollars captured, not in improved

18  quality of care, patient safety, severity of illness, improved mortality scores, compliant

19  documentation, or outcomes.

20        133.   For example, in a July 2010 NCAL presentation "CDI Prioritization for Roll

21  Out," Kaiser's NCAL CDI group analyzed the results of an internal audit of inpatient "HCC

22  underpayment."   The presentation quantified the impact of the HCC codes that had been

23  "recaptured" in the audit in terms of how much additional revenue that meant for the company.  The

24  presentation did not mention compliance or identify any HCC overpayment. *See* <u>Exhibit 33</u>.

25        134.   In a Kaiser NCAL "CDI Program:  Update" presentation in December 2011,

26  the company emphasized in its Key Findings that the program had generated year-to-date 2011

27  revenue  of "$27.80 million."  *See* <u>Exhibit 11</u>.  The presentation even quantified the "Top CDI

28

Queries" by HCC in terms of the "Revenue Impact" to the company.  CDI Program Updates have followed the same format and included these same metrics for many years.

          **(ii)**     **Kaiser's RRG meetings and Regional Competitions for Revenue/HCC Capture.**

135.   In approximately 2008-2009, Kaiser formed Regional Reporting Group ("RRG"), comprised of senior personnel from the Health Plan, Permanente Medical Groups and Revenue Cycle of each region with the focus of Medicare Advantage Finance Risk Adjustment. The RRG meetings were initially led by Dr. Simon Cohn until his retirement in 2015, after which the RRG was led by Dr. Annette Guido of Kaiser's Northwest Region, along with Hovannes Daniels, Kaiser's Medicare Finance VP under Kaiser's Health Plan.

136.   The RRG meets regularly to share regional "best practices" on how to capture more HCC conditions, diagnoses, and codes, and thus to increase Kaiser revenue.  This was and is the top focus of these high-level meetings.  Other topics discussed are risk scores and Risk-Adjustment Data Validation (RADV) audits, regulatory changes, comparing regions to each other, and reviewing financial and HCC targets.

137.   "Best practices" often contain improper and inaccurate querying, documentation, and coding practices.  Certain HCC conditions and diagnoses are specifically targeted at the RRG meetings for their financial impact and discussed and compared with the other regions.  Ms. Bryant recalls a RRG meeting where a regional physician leader made a presentation which contained inaccurate documentation and coding information.  Ms. Bryant took her concerns about the presentation to Janet D. Franklin of Kaiser's NCO.  Ms. Franklin agreed that Ms. Bryant was correct but said that that they could not say anything here at the RRG meeting in front of the Permanente Medical Groups.  Ms. Bryant told Janet Franklin that she was concerned with that approach in that there was a large audience in many regions who would think that the presentation had correct information.  Ms. Franklin agreed, but said that there was nothing that could be done.

138.   Kaiser's various regions, including especially its NCAL (TPMG) and Southern California regions (SCPMG), compete with each other on which region manages to

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

capture the highest number of HCCs and improved risk scores.  Monthly or Bi-monthly WebEx meetings and report outs are generated showing the results of the risk-adjustment metrics, as well as goals and targets for regional HCC capture over the next period.  In addition, the regions compete in the third and fourth fiscal quarters each year as to their metrics on capturing chronic conditions and HCCs, and improving scores and revenue, metrics which are also discussed and presented at RGG meetings.

### (iii)     Employee and management bonuses.

139.    Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser's NCAL region, including TPMG, gives bonuses to employees and leadership near year-end that are tied to the overall financial goals and success of the Kaiser region.  They therefore believe and allege from their experience working in TPMG that bonuses are related, directly or indirectly, to HCC and revenue capture.

### (iv)     Kaiser's regional medical groups dominate over Kaiser's compliance function.

140.    In June 2013, Nancy Andersen, Kaiser's National Compliance manager, told Ms. Hernandez that the regional Permanente Medical Groups choose what and how to be audited. She told Ms. Hernandez that "she knows where the bodies are buried," but that the National Compliance Office has no power over the Permanente Medical Groups.  This is exactly the opposite of how the compliance function should operate in a compliant organization.  In 2016, Ms. Andersen confirmed to Ms. Bryant that Kaiser's Permanente Medical Groups continue to be "rabid for HCCs" and that Kaiser's NCO group has no power to focus the organization on compliance.

### C.     Kaiser improperly employs technology to further its HCC and revenue capture.

### (i)     Data mining.

141.    In 2014-2015, Kaiser's TPMG EIO's "data mining" team, comprised largely of out-of-country doctors, used "algorithms" in the NCAL region to identify and capture possible missed HCCs to create "add files," referred to as "missed opportunities" by TPMG.  Ms. Hernandez believes and therefore alleges that this practice had been going on for many years.

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

142.    Also in 2014-2015, Ms. Hernandez witnessed TPMG utilizing foreign doctors, who were not licensed as physicians in the United States and may not have had current foreign licenses, to access the clinic encounters.  The foreign doctors would send "Dear Doctor" notes via KP Health Connect to the primary care physician asking them to add to (addend) the medical records with HCC diagnoses based on their reviews and using their algorithms, often several months after the encounter.

143.    This process was improper and led to HCC payment errors.  For example, as part of an NCO audit in 2015, Ms. Hernandez found documentation of sepsis added onto a clinic encounter four months after the patient was seen, with no supporting documentation as to how the HCC diagnosis was determined (*e.g.*, no lab values, signs/symptoms, treatment, clinical indicators, etc.).  When Ms. Hernandez shared with her director, Anne Cadwell (TPMG EIO Director), that Ms. Hernandez agreed with NCO's finding that sepsis was improperly coded, Ms. Hernandez was told by Ms. Cadwell "never to agree" with an NCO audit, and if the topic came up, to just say "thank you." Ms. Hernandez asked what to enter in the audit response, given that she agreed with the finding.  Ms. Cadwell instructed Ms. Hernandez not to talk at the audit exit call and to only speak when Ms. Cadwell asked Ms. Hernandez to say something.

**(ii)    Improper Carry-Over From Prior Years.**

144.    In 2014-2015, Ms. Hernandez discovered that in Kaiser's NCAL TPMG region, Kaiser's "Business Intelligence Team" ("BIT") generated questionable "block" files and "add" files for resubmission to CMS based on algorithms.  The addenda process they used may have improperly carried over HCCs from previous years to the current year without physician validation or a face-to-face encounter.

145.    Ms. Hernandez was part of the TPMG EIO Director email distribution list where medical record diagnoses files were emailed to the directors asking for approval for "add" or "block" files, which Ms. Hernandez never approved.  To Ms. Hernandez' knowledge, "add" (or "addenda") files were created based on algorithms run by the BIT team (*e.g.*, diabetes with manifestations, etc.), and automatically carried from the previous year to the current year's problem

list even where patients were not seen face-to-face as required under the Medicare Advantage program.

### (iii)    Computer Assisted Coding

146.    Computer Assisted Coding (CAC) is a natural language processing technology utilized as a tool to assist the coding professional to confirm and select ICD and CPT codes based on words and language used in the medical record.  CAC identifies wording and/or full sentences within the electronic health record which contains signs, symptoms, diagnoses and procedures for which a code may possibly be assigned once confirmed and validated by the coding professional. CAC was identified and implemented by Kaiser as a valuable tool and asset to increase coding productivity, coding accuracy, and HCC capture.

147.    In approximately 2013, during the pilot phase of CAC implementation in Kaiser's NCAL region, Ms. Hernandez conducted auditing and validation of the resulting diagnoses and codes, along with Ms. Sheryl Roy (Regional NCAL HIM employee at the time).  Ms. Hernandez and Ms. Roy determined that CAC was capturing and overcoding diagnoses with an overall poor accuracy rate (60% or less).  They shared their findings with Ms. Bryant, who agreed with their concerns.

148.    During a CAC quality assurance meeting, which was held via recorded webex, Ms. Bryant, Ms. Hernandez and Ms. Roy reported their audit findings and concerns to NCAL Revenue Cycle Charge Capture Manager, Gina Sandler, and Revenue Cycle Integrity Director, Diane Ott, who were members of Kaiser's CAC implementation team. Ms. Sandler typed meeting minutes during the call.  Ms. Hernandez and Ms. Roy later discovered that the audit results and their concerns had been excluded from the meeting minutes. Moreover, they discovered that Ms. Sandler and Ms. Ott had manipulated the actual audit results to indicate a higher accuracy rate. Ms. Hernandez and Ms. Bryant believe and therefore allege that the audit results were manipulated and their concerns were ignored so as to avoid identification of any problems with CAC which might delay its full implementation at Kaiser.  Ms. Bryant and Ms. Hernandez voiced their concerns to

NCAL Revenue Cycle Leadership and to Kaiser's NCO leadership (Ms. Anderson), but were ignored.

149.     Ultimately, Kaiser's CAC implementation moved forward in 2014 on outpatient and inpatient encounters.  After 18 months to two years of constant problems with CAC, the hospital coding and auditing staff expressed outrage with the continued inaccuracy and their mistrust of the CAC tool.  These complaints resulted in NCAL Revenue Cycle Leadership finally discontinuing CAC in hospital outpatient encounters in 2016.

150.     Ms. Bryant and Ms. Hernandez believe and therefore allege that Kaiser never went back to correct the many inaccurate codes generated by the Kaiser's flawed CAC processes.

**D.     The Kaiser Defendants Acted With Intent.**

151.     The Kaiser Defendants acted with intent in over-charging the United States and retaining and failing to return such overpayments.  Kaiser's entire corporate culture is built around "mining for", "gaming" and "capturing" codes even when they are not validly supported or documented, training its physicians to over-diagnose and falsely document diagnoses, elevating its profits over its compliance function, and motivating employees through the setting of metrics and, upon information and belief, utilizing bonuses for successful code and revenue capture.  The specific schemes described above engineered by Kaiser regarding aortic atherosclerosis, vent dependent status, and others evidence Kaiser's intentional, systematic efforts to circumvent proper documentation and coding practices and Medicare law.  Moreover, although Kaiser has a National Compliance Office with hundreds of staff, there are huge holes and gaps in the effectiveness of its compliance program, which is subverted to the profit goals of Kaiser's medical groups.

**E.     Kaiser's Fraud Was and Is Material to the Government's Payment Decision**

152.     The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, has paid money that it otherwise would not have paid.  For example, CMS would have refused to make risk adjustment payments, in whole or in part, to the Kaiser Defendants if it had known that the Kaiser Defendants were falsifying documentation and coding as alleged in this

Complaint.  The fraudulent diagnostic data and coding submitted by the Kaiser Defendants constituted a substantial portion of all of the diagnostic data and coding submitted by the Kaiser Defendants to the government.  Given that diagnostic data and coding is the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status, the government's payment decision necessarily would have been different had the government known that the data and coding were false.

153.   Moreover, CMS makes reconciliation payments to the Kaiser Defendants based on the diagnostic data submitted.  Those payments are adjusted to account for invalid diagnoses codes that providers such as Kaiser submit.  If the Kaiser Defendants had complied with their obligation to delete invalid diagnoses from RAPS, Medicare would have processed the corrected data, recalculated the risk score for the beneficiaries, and the risk adjustment reconciliation payment system would have made the corresponding payment adjustment.  But when the Kaiser Defendants did not delete invalid diagnoses from RAPS, Medicare paid for the invalid diagnoses as part of its final reconciliation payment to the Kaiser Defendants.  If the Kaiser Defendants had corrected their invalid diagnoses, CMS would have processed the corrected data to produce accurate risk scores for beneficiaries, which necessarily would have changed the risk adjustment payments for those beneficiaries.

154.   The risk adjustment attestations submitted by the Kaiser Defendants each year are a reminder to the Kaiser Defendants of their obligation to submit valid data and to promptly correct invalid data.  They also have a direct impact on the government's risk adjustment payments.  For example, if CMS knew that the Kaiser Defendants' attestations were false, CMS's risk adjustment payments would have changed in that CMS would have refused to make risk adjustment payments to the Kaiser Defendants, in whole or in part.

155.   The materiality of the Kaiser Defendants' fraud is further established by the fact that the United States has filed suit against Kaiser in this case and against other managed care organizations over similar documentation and coding fraud as alleged herein.

**FIRST CLAIM FOR RELIEF**

**False Claims Act: Presentation of False or Fraudulent Claims**

**U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

156.    The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 208 above as though they are fully set forth herein.

157.    Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the United States in order to receive and retain risk adjustment payments from the Medicare Program.

158.    Defendants violated former 31 U.S.C. § 3729(a)(1) as follows: Defendants knowingly presented, or caused to be presented, to the United States a false or fraudulent claim for payment or approval. Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the United States in order to receive and retain risk adjustment payments from the Medicare Program.

159.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

160.    By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

**SECOND CLAIM FOR RELIEF**

**False Claims Act: Making or Using False Records or Statements**

**U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

161.    The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 213 above as though they are fully set forth herein.

162.     Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

163.     Defendants violated former 31 U.S.C. § 3729(a)(2) as follows: Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

164.     The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

165.     By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

**THIRD CLAIM FOR RELIEF**

**False Claims Act: Conspiracy**

**U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))**

166.     The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 218 above as though they are fully set forth herein.

167.     Defendants violated 31 U.S.C. § 3729(a)(1)(C) as follows: Defendants conspired with one another to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B), and/or (G), as those violations are specifically alleged in Claims I, II, and IV of this Complaint.

168.     Defendants violated former 31 U.S.C. § 3729(a)(3) as follows: Defendants conspired with one another to defraud the United States by getting a false or fraudulent claim allowed or paid. Specifically, Defendants conspired with one another to defraud the United States

47

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

by getting risk adjustment payments from the Medicare Program based on a false or fraudulent claim for risk adjustment payments and/or a false or fraudulent Risk Adjustment Attestation.

169.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

170.    By virtue of the said conspiracy, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims

### U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

171.    The Relators repeat and re-allege the allegations contained in Paragraphs 1 – 223 above as though they are fully set forth herein.

172.    Defendants violated 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

173.    Defendants also violated 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly concealed or improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

174.    Defendants violated former 31 U.S.C. § 3729(a)(7) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit

money or property to the United States. Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

175.   The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

176.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### False Claims Act: Relief From Retaliatory Actions Against Defendant TPMG

### U.S.C. § 3730(h)

177.   Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 246 above as though they are fully set forth herein.

(a)   31 U.S.C. § 3730(h), Relief From Retaliatory Actions, provides:

(i)   In general.— Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(ii)   Relief.— Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs

1  and reasonable attorneys' fees. An action under this subsection may be brought in the

2  appropriate district court of the United States for the relief provided in this subsection.

3  178.  Ms. Hernandez was employed by the Kaiser Defendants from June 1995

4  through October 2015.  From January 2000 forward, Ms. Hernandez's was employed in various

5  coding leadership positions.

6  179.  Ms. Hernandez received stellar employment reviews throughout her career

7  with Kaiser until she was hired into Kaiser's TPMG organization.  In her last year of Kaiser

8  employment (October 2014 through October 2015), the only year that she worked at Kaiser's TPMG

9  subsidiary, Ms. Hernandez was criticized for purported lack of communication and, at the same

10  time, also reprimanded for communicating her concerns about TPMG's coding and auditing

11  functions.

12  180.  This review came after, and was the direct result of, Ms. Hernandez observing

13  and reporting internally several of the coding errors and systemic fraud detailed herein committed

14  at and by Kaiser and its affiliates, including TPMG.

15  181.  The poor review was improper retribution for Ms. Hernandez's efforts to

16  bring to the attention of leadership the deceptive and fraudulent practices within Kaiser.  She was

17  set up to be terminated for reporting what she observed even though she had been asked by TPMG

18  leadership to stop looking for another job.  Ms. Hernandez felt harassed, disrespected, and bullied.

19  She was subjected to threats and intimidation by TPMG leadership.

20  182.  In October 2015, in anticipation of being terminated, and due to Kaiser

21  TPMG's intimidation and harassment, she resigned her position with Kaiser.

22  183.  Ms. Hernandez engaged in protected activity by, among other things,

23  reporting to multiple Kaiser supervisors her concerns that Kaiser was submitting illegal, unlawful

24  and/or false claims to the Government in an effort to stop Kaiser from presenting or causing to be

25  presented to the Government false or fraudulent claims for payment or approval, and from making,

26  using or causing to be made or used, a false record or statement material to a false or fraudulent

27  claim.

28

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)

184.     Kaiser TPMG knew that Ms. Hernandez engaged in the above described protected activity.

185.     Kaiser TPMG discharged, demoted, threatened, harassed, and otherwise discriminated against Ms. Hernandez as a result of her protected activities.

186.     As a result of Kaiser's unlawful actions, Ms. Hernandez has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages, including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of esteem, and loss of enjoyment of life.

## SIXTH CLAIM FOR RELIEF

### Violation of Cal. Lab. Code § 1102.5, *et seq.* Against Defendant TPMG

187.     Relator Victoria M. Hernandez repeats and re-alleges the allegations contained in Paragraphs 1 – 256 above as though they are fully set forth herein.

188.     In violation of Cal. Lab. Code § 1102.5, Defendant TPMG, by and through its principals, agents and employees, retaliated against Ms. Hernandez for having opposed, resisted, and complained of the acts alleged herein.

189.     Defendant TPMG retaliated against Ms. Hernandez for opposing and refusing to participate in Defendant's violations of state and federal statutes and/or rules and regulations.  In contesting Defendant's violations, Ms. Hernandez was engaged in protected activity.  Under Cal. Lab. Code § 1102.5, Defendant TPMG is prohibited from retaliation against Ms. Hernandez for opposing any practices forbidden or made unlawful under Cal. Lab. Code § 1102.5.

190.     In taking the actions alleged herein, Defendant TPMG acted with malice, fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award of punitive damages.

191.     As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages,

1  including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of

2  esteem, and loss of enjoyment of life.

3  **SEVENTH CLAIM FOR RELIEF**

4  **Violation of Cal. Lab. Code § 98.6 Against Defendant TPMG**

5  192.    Relator Victoria M. Hernandez repeats and re-alleges the allegations

6  contained in Paragraphs 1 – 261 above as though they are fully set forth herein.

7  193.    In violation of Cal. Lab. Code § 98.6, Defendant TPMG, by and through its

8  principals, agents and employees, retaliated against Ms. Hernandez for having opposed, resisted,

9  and complained of the acts alleged herein.

10  194.    After Ms. Hernandez complained about and objected to Kaiser's practices

11  detailed herein and in response to such complaints and objections, Defendant TPMG subjected her

12  to ongoing retaliation, including but not limited to ostracism and the threat of termination.

13  195.    In taking the actions alleged herein, Defendant TPMG acted with malice,

14  fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award

15  of punitive damages.

16  196.    As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has

17  suffered a loss of employment opportunities and earnings and a loss of future earnings and earning

18  capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages,

19  including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of

20  esteem, and loss of enjoyment of life.

21  **EIGHTH CLAIM FOR RELIEF**

22  **Violation of Fair Labor Standards Act Against Defendant TPMG**

23  **29 U.S.C. § 215**

24  197.    Relator Victoria M. Hernandez repeats and re-alleges the allegations

25  contained in Paragraphs 1 – 266 above as though they are fully set forth herein.

26  198.    In violation of the Fair Labor and Standards Act of 1939 ("FLSA"),

27  Defendant TPMG, by and through its principals, agents and employees, retaliated against Ms.

28

52

1   Hernandez in constructively discharging her for having opposed, resisted, and complained of the

2   acts alleged herein, including numerous violations of federal law and rules and regulations.

3          199.    In making the above-described internal complaints, Ms. Hernandez was

4   engaged in a protected activity under the FLSA.  Defendant TPMG willfully continued to mask its

5   violations after Ms. Hernandez apprised Defendant of the extent of Defendant's non-compliant

6   practices.  Ms. Hernandez subsequently suffered an adverse employment action when she was

7   constructively discharged from her employment by Defendant in retaliation for making said

8   complaints and refusing to accede to Defendant's masking of its unlawful practices.

9          200.    In taking the actions alleged herein, Defendant TPMG acted with malice,

10  fraud and oppression, and in reckless disregard of Ms. Hernandez's rights, entitling her to an award

11  of punitive damages.

12         201.    As a result of Defendant TPMG's unlawful actions, Ms. Hernandez has

13  suffered a loss of employment opportunities and earnings and a loss of future earnings and earning

14  capacity, and Ms. Hernandez has suffered, and continues to suffer, non-monetary damages,

15  including, but not limited to, emotional and physical distress, humiliation, embarrassment, loss of

16  esteem, and loss of enjoyment of life.

17                                      **PRAYER**

18         **WHEREFORE**, *qui tam* plaintiffs Gloryanne Bryant and Victoria M. Hernandez

19  pray for judgment against Defendants as follows:

20         On Claims I, II, III, and IV (False Claims Act), against all Defendants jointly and

21  severally:

22  •   for the amount of the United States' damages, trebled as required by law, together with the

23      maximum civil penalties allowed by law, costs, post-judgment interest, and such other and

24      further relief as the Court may deem appropriate;

25  •   for Relators to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d)

26      of the Federal False Claims Act;

27  •   for Relators to be awarded all costs of this action, including attorneys' fees and expenses;

28

1 • and for the United States and Relators to receive all such other relief as the Court deems just
2   and proper.
3       Further, on Claims V, VI, VII, and VIII, Plaintiff-Relator Ms. Hernandez, on her own
4 behalf, demands that judgment be entered in her favor and against Defendant The Permanente
5 Medical Group, Inc. granting the following relief:
6 • An award of back pay with prejudgment interest;
7 • An award of front pay in lieu of reinstatement;
8 • An award of general damages to compensate Ms. Hernandez for the mental and
9   emotional distress caused by Defendant TPMG's misconduct;
10 • An award of punitive damages to deter and punish Defendant TPMG;
11 • An award of double, treble, exemplary, and/or punitive damages pursuant to 31
12   U.S.C. § 3730(h)(2), the California Labor Code, and the FLSA;
13 • An award of attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h)(2), the
14   California Labor Code, and the FLSA; and
15 • An award of such other and further relief as this Court deems just and proper.

16                               **<u>DEMAND FOR JURY TRIAL</u>**
17       Relators hereby demand a trial by jury as to all issues.

Dated:  November 15, 2021

Respectfully submitted,

GLORYANNE BRYANT and
VICTORIA M. HERNANDEZ

By ____/s/ Roger A. Lewis_____

Roger A. Lewis (pro hac vice)
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000
roger.lewis@goldbergkohn.com

Peter Rukin (Cal. Bar No. 178336)
RUKIN HYLAND RIGGIN LLP
1939 Harrison Street, Ste. 290
Oakland, California  94612
(415) 421-1800
prukin@rukinhyland.com

Brian M. Melber (pro hac vice to be submitted)
PERSONIUS MELBER LLP
2100 Main Place Tower
350 Main Street
Buffalo, New York  14202
(716) 855-1050
bmm@personiusmelberg.com

*Counsel for Plaintiffs-Relators*

AMENDED COMPLAINT BY RELATORS GLORYANNE BRYANT AND VICTORIA M.
HERNANDEZ FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT
No. 3:18-cv-01347-EMC (consolidated into No. 3:13-cv-03891)