CONSTANTINE CANNON LLP
Michael J. Ronickher (CABN 261335)
Edward Baker *(Pro Hac Vice)*
Max Voldman *(Pro Hac Vice)*
Ronny Valdes (CABN 309195)
  1001 Pennsylvania Ave, NW
  Suite 1300N
  Washington, DC 20004
  Telephone: (202) 204-4523
  Facsimile:  (202) 204-3501
  mronickher@constantinecannon.com
  ebaker@contantinecannon.com
  mvoldman@constantinecannon.com

Mary Inman (CABN 176059)
  150 California Street
  Suite 1600
  San Francisco, CA 94111
  Telephone: (415) 639-4001
  Facsimile:  (415) 639-4002
  minman@constantinecannon.com

*Attorneys for Relator James M. Taylor*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RONDA OSINEK,<br><br>                Plaintiffs,<br><br>    v.<br><br>KAISER PERMANENTE, FOUNDATION HEALTH PLAN, INC., and THE PERMANENTE MEDICAL GROUP, INC.,<br><br>                Defendants. | Consolidated Case No. 3:13-cv-03891-EMC<br><br>SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D., FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT<br><br>**JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA, *ex rel.* JAMES M. TAYLOR, M.D.,<br><br>                Plaintiffs,<br><br>    v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HEALTH PLAN OF COLORADO, COLORADO PERMANENTE MEDICAL GROUP, P.C., THE PERMANENTE MEDICAL GROUP, INC., and SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP,<br><br>                Defendants. | (Original N.D. Cal. Case No. 3:21-cv-03894-EMC)<br><br>SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D., FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

PARTIES ............................................................................................................................... 4

JURISDICTION AND VENUE ............................................................................................... 7

THE FALSE CLAIMS ACT ................................................................................................... 7

MEDICARE PARTS C AND D ............................................................................................. 10

    I.   Risk Adjustment and Claims Submission ................................................................. 11

    II.  MAO Requirements and Certifications .................................................................... 14

KAISER VIOLATED THE FALSE CLAIMS ACT ................................................................ 21

    I.   Kaiser's Aggressive Push for MA Revenue ............................................................ 23

    II.  Kaiser Knew the CMS Standard for Submission of RA Diagnoses ........................... 24

    III.  Kaiser's Claim Submission Process ........................................................................ 25

    IV.  Kaiser Conducted Impermissible One-Way Look Chart Reviews of Colorado External
    Providers .................................................................................................................. 26

        A.   Kaiser Knew Many of Its Colorado External Provider Codes Were False .................. 26

        B.   Kaiser's Retrospective, One-Way Look Chart Review Program .................................. 29

    V.   Kaiser Ignored and Failed to Correct Widespread False Coding by Internal Providers ..... 33

        A.   Kaiser Ignored Numerous Red Flags That Gave It Knowledge of False Claims from
        Internal Providers ................................................................................................... 33

        B.   Despite Its Knowledge of Falsity, Kaiser Submitted False Claims for Payments Based
        on Internal Provider Coding ................................................................................... 46

CLAIMS FOR RELIEF ......................................................................................................... 55

PRAYER ............................................................................................................................... 57

JURY DEMAND ................................................................................................................... 59

1    On October 22, 2014, James M. Taylor, M.D., filed a sealed *qui tam* complaint as Relator

2  on behalf of the United States of America against various Kaiser entities[1], alleging violations of

3  the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.  By his complaint, Relator alleged that the

4  Kaiser entities engaged in fraud on the Medicare program, both nationally and within Colorado,

5  by their intentional submission of inaccurate and unsupported diagnosis codes that inflated

6  Kaiser's reimbursements from Medicare Part C, known as the Medicare Advantage Program.

7  On November 3, 2014, Relator filed a First Amended Complaint with substantially the same

8  allegations.

9    On July 29, 2021, the Government filed a notice of election to intervene in part and

10  decline in part in Relator's and five other cases, and Relator's complaint was subsequently

11  unsealed.[2]  On October 25, 2021, the United States filed its Complaint-in-Intervention against

12  Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Colorado, The

13  Permanente Medical Group, P.C., Southern California Permanente Medical Group, and Colorado

14  Permanente Medical Group, P.C., alleging FCA violations based on a coordinated scheme to

15  unlawfully obtain payments from the Medicare Advantage Program by systematically altering

16  patient medical records to retrospectively add diagnoses, via addendum, that either did not exist

17  or were unrelated to the patient's visit with a Kaiser physician.

18    The United States did not intervene with regard to Relator's allegations of FCA

19  violations relating to Kaiser's improper one-way look chart reviews of non-Kaiser hospitals in

20  Colorado, or its failure to correct codes and return overpayments based on unsupported

21  diagnoses discovered during audits of Kaiser physicians or external providers more generally.

---

[1] Defendants named in Relator Taylor's initial complaint were Kaiser Permanente, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Colorado, Kaiser Foundation Health Plan of Georgia, and Kaiser Foundation Health Plan of the Northwest.

[2] Specifically, in its Notice of Election to Intervene in Part and to Decline to Intervene in Part, the United States intervened on the allegations that Kaiser "submitted, or caused to be submitted, false claims for risk-adjustment payments based on diagnoses improperly added via addenda under Medicare Part C from the years 2009 until present."  (Dkt. 65).

Nor did the United States intervene as to any allegations prior to 2009.  Therefore, through this Second Amended Complaint, Relator—upon knowledge with respect to his own acts and those he personally witnessed, and upon information and belief with respect to all other matters— maintains his allegations on behalf of the United States, including as to those non-intervened claims, as follows:

## PRELIMINARY STATEMENT

1.      This *qui tam* case is brought against Defendants for knowingly defrauding the federal Government in connection with the Medicare program in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

2.      Since at least 2004 to present, Defendants and/or their agents and employees have perpetrated a systematic fraud on the Medicare Advantage ("MA") program and Medicare Part D.  They routinely submit false claims to the Centers for Medicare & Medicaid Services ("CMS") when they know, or in the exercise of reasonable care should know, that their beneficiaries' medical records do not support the diagnoses for which a risk adjustment claim was submitted.

3.      Defendants have also knowingly retained overpayments when they refused to correct (and refused to reimburse Medicare for) previously submitted risk adjustment claims when they discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false.

4.      Kaiser had extensive knowledge of its false claims.  Relator and others, as well as various national, regional, and diagnosis-specific audits, regularly identified red flags in Kaiser's coding: categories of claims that had extremely high rates of falsity.  Yet Kaiser willfully disregarded this falsity, taking few steps to review its claims and shutting down the few successful controls that Relator and others were able to put in place, in order to pursue ever higher revenue.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

5.      This disregard contrasts starkly with Kaiser's considerable efforts and substantial commitment of resources to audit current and past claims in search of additional revenue, by identifying new diagnoses that it could use to submit additional risk adjustment claims.

6.      These opposite approaches are starkly apparent in Kaiser's handling of diagnosis coding by certain non-Kaiser hospitals in Colorado that provide care to Kaiser beneficiaries. Relator and repeated audits made Kaiser well-aware that these external healthcare providers had egregiously high error rates in their coding.  Yet Kaiser passed their codes along to CMS for payment without reviewing them, willfully disregarding its obligations to claim only accurate payments.

7.      Kaiser created a program to review records from certain non-Kaiser hospitals, which should have improved the accuracy in its coding.  But instead Kaiser only looked at the upside of that review: it added legitimate codes that the hospitals had missed, while deliberately ignoring the results that would have shown all the unsupported codes for which it was seeking, or had already sought, payment.

8.      On its internal coding, Kaiser took only limited steps to filter certain diagnoses, which further confirmed that physicians often upcoded those diagnoses, leading (absent intervention) to the submission of false claims.  Despite this knowledge, Kaiser chose not to apply these filters to its prior years' submissions to identify and correct these false diagnoses.  It also shut down these remedial measures, over Relator's objections.

9.      Kaiser's refusal to take reasonable steps to prevent the submission of false claims, and to make a reasonable inquiry into previously submitted false claims, constitutes reckless disregard as to, and/or deliberate ignorance of, the falsity of those claims.

10.      In certain instances, Kaiser had actual knowledge that specific claims it previously submitted to CMS were false.  Kaiser's refusal to delete those claims and refund the resulting overpayments to the United States also constitutes a violation of the False Claims Act.

11.     Through this scheme, Kaiser has defrauded the United States of millions of dollars.

12.     Based on the foregoing laws, *Qui Tam* Plaintiff-Relator Dr. James M. Taylor, seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that Defendants made or caused to be made in connection with false and/or fraudulent claims for inflated Medicare Advantage payments.

## PARTIES

13.     Relator Dr. James M. Taylor ("Relator") is a resident of Colorado and an employee of Colorado Permanente Medical Group ("CPMG").  Dr. Taylor joined Kaiser's Colorado branch in 1995 as a clinician, following eight years in private practice in rural Ohio.  In the early 2000s, Dr. Taylor became heavily involved with Kaiser's national Electronic Medical Record ("EMR") and physician coding practices.  He is a certified professional coder and AHIMA approved ICD-10 trainer.

14.     Dr. Taylor was elected to the Board of Directors of CPMG and served as chair for two years.  He was Kaiser's national co-chair of the Compliance Committee for ICD-10; a member of Kaiser's national Coding Governance Group (the only delegate representing all physicians for the regions outside of California); and CPMG's Medical Director of Revenue Cycle/Claims.  From 2002 to 2007, he served as CPMG's Physician Director of Coding.  He is the only physician to have received Kaiser's National Revenue Cycle "Distinguished Leadership" award.

15.     Relator has extensive experience in risk adjustment payments, processes, audits, and compliance.  He is a nationally recognized speaker on topics such as EMR documentation, coding, and compliance.  He has written articles, created webinars, and presented at national conventions for the American Health Information Association, National Health Care Anti-Fraud Association, Health Care Compliance Association, National Health Care Auditors and Educators Association, and American Association of Professional Coders.

4

16.     Relator not only was a key figure involved in all facets of risk adjustment in Kaiser, but he consistently interfaced with Kaiser personnel at the national level on risk adjustment audits and initiatives.  Relator was directly involved in the Colorado probe audit process, routinely identified issues and errors with external providers, worked with the region on corrective action plans, attended various group meetings to discuss Colorado risk adjustment initiatives and presented on a regular basis at national Regional Reporting Group ("RRG") meetings.

17.     Kaiser Permanente is a "nonprofit integrated health care provider" headquartered in Oakland, California that includes three main groups: (1) the Kaiser Foundation Health Plan, Inc. and its subsidiaries; (2) the Kaiser Foundation Hospitals and their subsidiaries; and (3) the Permanente Medical Groups.  Together, they operate publicly as "Kaiser Permanente."  In its annual report, Kaiser Permanente proclaims that the "interconnectedness and interdependence of the hospitals, health plan, and medical groups that make up Kaiser Permanente have advanced our efforts to operate seamlessly as an enterprise."

18.     Kaiser is one of the largest managed care organizations in the United States. Opened to public enrollment in 1945, it now boasts millions of members throughout various states, including California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, Washington, and the District of Columbia.

19.     Kaiser has over 210,000 employees (including over 20,000 physicians).  In 2020, Kaiser reported more than $80 billion in operating revenue.

20.     Kaiser offers Medicare HMO plans, called "Kaiser Permanente Senior Advantage Plans," in California, Colorado, Georgia, Hawaii, Oregon, and Washington.

21.     Some regions, such as California, operate using almost exclusively Kaiser affiliated medical providers.  In these regions, Kaiser owns or controls the hospitals and physician offices that provide services to members of Kaiser's insurance plans.  In other regions, such as Colorado, Kaiser maintains more limited provider resources.  For example, in Colorado,

5

Kaiser's members are seen by physicians in CPMG, a Kaiser affiliate.  But because Kaiser does not operate hospitals in Colorado, when members require inpatient or outpatient care, they are seen by non-Kaiser hospitals with whom Kaiser has contracted to provide care to its members. Throughout this document, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Health Plan of Colorado, and Colorado Permanente Medical Group P.C., are referred to as "Kaiser" or "Defendants."

22.     Defendant Kaiser Foundation Health Plan, Inc. ("the Health Plan") is a non-profit health maintenance organization ("HMO") headquartered in Oakland, California.

23.     Defendant Kaiser Foundation Health Plan of Colorado ("the Colorado Health Plan") is a non-profit HMO headquartered in Oakland, California.

24.     Colorado Permanente Medical Group P.C. ("Colorado Medical Group") is a multi-specialty physician group of over 1,000 physicians that contracts with Defendant Kaiser Foundation Health Plan of Colorado to provide medical care to its members.

25.     Throughout this complaint, Defendants Kaiser Foundation Health Plan of Colorado and Colorado Permanente Medical Group P.C. are referred to jointly as "Kaiser Colorado."

26.     Defendant The Permanente Medical Group, Inc. ("N. California Medical Group") is headquartered in Oakland, California and employs approximately 9,500 physicians.  It provides medical services for Kaiser's Northern California region.

27.     Defendant the Southern California Permanente Medical Group, a California partnership ("S. California Medical Group") is headquartered in Pasadena, California, and employs approximately 7,800 physicians.  The Southern California Medical Group provides medical services for Kaiser's Southern California region.

**JURISDICTION AND VENUE**

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

29.     Under 31 U.S.C. § 3730(e) there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Even if there had been any such public disclosure, Relator is the original source of the allegations herein because he has direct, independent, and material knowledge of the information that forms the basis of this Complaint, and voluntarily disclosed that information to the Government before filing.

30.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Northern District of California.

31.     Venue is proper, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, and/or transact business in the Northern District of California, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

**THE FALSE CLAIMS ACT**

32.     The FCA was enacted in 1863, over a century before Medicare.  From the outset, and through several amendments enacted over the past twenty-five years to increase the scope and reach of the statute, both Congress and the Supreme Court have repeatedly highlighted that (1) the FCA is to be applied broadly and flexibly to reach all types of fraud that cause financial loss to the Government, and (2) private parties (relators) should be strongly encouraged to bring actions under the statute to supplement the Government's limited resources to combat fraud.

33.     When evaluating claims under the FCA, the Supreme Court has repeatedly acknowledged and deferred to these twin goals of the statute and "consistently refused to accept a rigid, restrictive reading."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  Instead, it has applied the law recognizing that "Congress wrote [it] expansively, meaning to

reach all types of fraud, without qualification, that might result in financial loss to the Federal Government." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (internal quotation marks omitted). *See also Rainwater v. United States*, 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government . . . ."); *Neifert-White*, 390 U.S. at 233 (the FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money.").

34.    Likewise, "[e]ach time Congress has weighed in on the purpose and power of the False Claims Act, it has endorsed a reading of that statute as a robust remedial measure aimed at combatting fraud against the federal government as firmly as possible." *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 391 (S.D.N.Y. 2015).  The FCA together with its amendments "reflect Congress's more than 150-year commitment to deterring fraud against the federal government and ensuring that Government losses due to fraud are recouped in a timely fashion." *Id*.

35.    A defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G).

36.    After the 2009 amendments to the FCA by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.  L. 111-21 (May 20, 2009), a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  Prior to FERA, a defendant violated this

provision of the FCA when it "knowingly [made], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

37.     In May 2009, Congress amended the "reverse false claims act" provision of the FCA to provide that a defendant violates the FCA when it "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).  Prior to FERA, this provision of the FCA provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  After FERA, a defendant violates this provision of the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

38.     The terms "knowing" and "knowingly" include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information" and "require no proof of specific intent to defraud."  *Id.* § 3729(b)(1)(A), (B).  The FCA permits but does not require proof that the defendants specifically intended to commit fraud.  *Id.*  Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government.

39.     A defendant violates the FCA when it "knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Even if an overpayment arises out

9

of an innocent billing error or through a mistake of the contractor, the obligation to return the overpayment still attaches.

40.     The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

41.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.

**MEDICARE PARTS C AND D**

42.     Medicare is a federally funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.  Medicare was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. § 1395 *et seq.*).  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").  *See, e.g.*, 42 U.S.C. §§ 1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r and 1395u.

43.     The Medicare program has four parts.  Under Parts A and B ("traditional Medicare"), the Government reimburses healthcare providers using a fee-for-service system, in which providers submit claims to CMS for healthcare services actually rendered, such as a provider office visit or hospital stay.  CMS then pays the providers directly for each service based on payment rates predetermined by the Government.

44.     In 1997, Congress created Part C, which provides similar benefits to Medicare members, but does so using a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays private managed care organizations (later named "Medicare Advantage Organizations" or "MAOs") a capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

10

45.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, creating Medicare Part D, which provides prescription drug coverage.  These managed care model plans are provided under both Part D prescription drug plans, which offer only prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with the Part C health care coverage.[3]

46.     MAOs' obligations to the MA Program and the requirements for them to participate in the Program are set forth in federal regulations and, each year, the MAOs must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the MA Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MAOs must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides,[4] and Medicare Advantage operating instructions.

**I.  Risk Adjustment and Claims Submission**

47.     Through the MA program, CMS allows private health insurers to set up managed care plans to cover Medicare beneficiaries.  CMS pays a monthly capitation rate for each beneficiary enrolled as a member of an MA plan, known as a "per-member, per-month" payment.  This predetermined base payment varies for each MA Plan depending on various factors, including amounts set forth in the MA Plan's bid submitted to the Government, the scope of medical services covered by the Plan's benefit package, and the amount of premiums,

---

[3] This Complaint refers, collectively, to MAOs with and without Part D coverage as "MAOs."

[4] For the early years of the program, CMS put out a periodic "Participant Guide" with detailed guidance on required compliance.  The names varied somewhat each year—for example, the Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide; the Risk Adjustment Data Basic Training for MAOs Participant Guide; Risk Adjustment Technical Assistance for MAOs Participant Guide; etc.—but will be referred to throughout as the "Participant Guide," with the year of issue.

deductibles, and co-pays for which an enrollee in the Plan is responsible. *See* 242 U.S.C. § 1395w-23(a)(1)(C).

48.     MA plans must then use that money to pay hospitals, physicians, and other health care providers for the services the plan members receive and to cover the plans' administrative expenses. MA plans with Part D coverage are also given money to pay for the plan members' prescription drugs.

49.     Under both types of plans, CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age and gender), geographic location, and health status. *See* 42 U.S.C. § 1395w-23 (a)(1)(C).

50.     The adjustment for each member's health status is a significant component of the capitation rate. Individuals with multiple and/or serious health conditions account for more health care costs than healthy members. Accordingly, CMS pays a substantially higher capitation rate for members who have been recently treated for one or more serious, expensive diseases or conditions. *See* 42 U.S.C. § 1395w-23(a)(1)(C). These increased payments are known as "risk adjustment" payments.

51.     The purpose of risk adjustment is to "allow[] CMS to pay plans for the risk of the beneficiaries they enroll" and to "make appropriate and accurate payments for enrollees with differences in expected costs." Medicare Managed Care Manual, Ch. 7, § 20 (rev. 118, Sept. 19, 2014).

52.     Since 2004, the Secretary has employed the Hierarchical Conditions Category ("HCC") model to carry out risk adjustment. With respect to health status, the model takes into account diagnoses from physician office visits and hospital outpatient encounters as well as hospital inpatient stays. The medical conditions included in the model are grouped into HCCs, which are categories of clinically related medical diagnoses. *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment.

Between 2004 and 2013, the CMS-HCC model included 70 HCCs.  Starting in 2014, the CMS-HCC model included 79 HCCs.

53.     To obtain payments based on adjustments for health status, MAOs submit diagnosis codes to the Government for the beneficiaries in their Plans.  These diagnosis codes are from the beneficiaries' medical encounters with healthcare providers (*e.g.,* physician office visits and hospital stays) during the year prior to the actual payment year (often referred to as the "data collection" year or the "date of service" year).  Payments are based on diagnoses from the prior year, which are used to predict the expected healthcare needs of a beneficiary for the payment year.

54.     Under Medicare Part D, payments to PD or MAPD Plans for prescription drug benefits are also risk-adjusted based on health status.  As with Part C, Part D employs a health-based risk adjustment model known as the Rx Hierarchical Condition Categories ("RxHCC") model.  Like HCCs, RxHCCs are also groups of clinically-related medical diagnoses that are ranked by disease severity and the cost associated with the pharmaceutical drugs used to treat them.

55.     The Government assigns a relative numerical value to each HCC and RxHCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category.  It currently determines the relative values based on an analysis of the amounts that it paid on average for the treatment of these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program.  Higher relative values are assigned to HCCs and RxHCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.  Generally, the more HCCs or RxHCCs a beneficiary has assigned to them, the higher the monthly payment from CMS to the beneficiary's MAO will be.

56.     In sum, using the diagnosis codes submitted by or on behalf of MAOs, the Government calculates a risk score for each beneficiary, which is used to calculate monthly

payments to the MAO for that beneficiary for the payment year.  In general, the more numerous and severe the conditions identified by the diagnosis codes, the higher the risk score for a beneficiary and, thus, the greater the risk adjustment payments made to the MAO for that beneficiary for the payment year.  On average, CMS pays MA plans close to $3,000 per year for each unique condition coded for a member that results in a risk adjustment payment.

**II.  MAO Requirements and Certifications**

57.     The Medicare Advantage payment model creates clear incentives for MAOs like Kaiser to exaggerate the expected healthcare costs for the beneficiaries in their Plans by submitting invalid diagnosis codes or failing to comply with their obligation to retract invalid diagnoses.  To combat these incentives and protect the Government from fraud, CMS requires that submitted diagnoses be supported and, thus, validated by the beneficiaries' medical records for medical encounters during the relevant data collection year.  It is a well-established requirement that all diagnosis codes submitted to the Government for risk adjustment payments must be unambiguously supported by information included in the beneficiaries' medical records. As the D.C. Circuit recently recognized, "Neither Congress nor CMS has ever treated an unsupported diagnosis for a beneficiary as valid grounds for payment to a Medicare Advantage insurer."  *UnitedHealthCare Ins. Co. v. Becerra,* No. 18-5326, 9 F.4th 868, 868 (D.C. Cir. Aug. 13, 2021).  Hence, a beneficiary's medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments.

58.     The medical records that must support the diagnosis codes are not provided to the Government as part of the payment process.  Instead, the Government requires that each MAO expressly certify that the diagnosis codes it has submitted for risk adjustment payments are accurate and truthful.  42 C.F.R. § 422.504(l)(2).  Each MAO must exercise due diligence prior to this express certification and "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's]

14

program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi).

59.     As explained by the Ninth Circuit, CMS made clear in 2000 that

> Medicare Advantage organizations have always had "an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the [medical] encounter data" [*i.e.*, diagnoses] and "an obligation to undertake 'due diligence' to ensure the accuracy, completeness, and truthfulness of encounter data submitted to [CMS]." . . . CMS made perfectly clear that Medicare Advantage organizations would be "held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."

*United States ex rel. Swoben v. UnitedHealthcare Insurance Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting 65 Fed. Reg. 40,170 at 40,268 (June 29, 2000)).  The Ninth Circuit further explained that the requirement that MAOs take affirmative steps to address errors in their data is further demonstrated by "§ 422.503, which since 2005 has required Medicare Advantage organizations to have effective compliance programs in place, including '[p]rocedures for internal monitoring and auditing' and 'for ensuring prompt response to detected offenses'." *Id*. (quoting 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)).

60.     To participate in the MA Program, Defendant MAOs were required to agree in writing to comply with the Part C and D regulations and any other terms and conditions CMS deemed appropriate.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  Each year during the relevant time period, one or more executives of one or more of the Defendants or their predecessors executed these written agreements or renewals of these written agreements between the Defendant MAOs and CMS.

61.     Certain entities—like the Permanente Medical Groups—enter into agreements with MAOs to provide health care services to MA plan beneficiaries.  These entities are called first tier and downstream entities.  *See*, e.g., 42 C.F.R. § 422.500 ("First tier entity means any party that enters into an acceptable written arrangement with an MAO or contract applicant to provide administrative services or health care services for a Medicare eligible individual."); *id*.

("Downstream entity means any party that enters into an acceptable written arrangement below the level of the arrangement between an MAO and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services."); *see also, e.g.,* 42 C.F.R. § 422.504(i) (listing some of the obligations).

62.    The Permanente Medical Groups must, among other things, agree in their contracts with the MAO to terms that commit them to comply with the MAO's contractual obligations to CMS, 42 C.F.R. § 422.504(i)(3)(iii), and agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id*. § 422.504(i)(4)(v).  Furthermore, if the entity generates data relating to an MAO's claims for payment, it must certify the accuracy, completeness, and truthfulness of that data.  *Id*. § 422.504(l)(3).

63.    In addition to the contracts, since 2003, MAOs and entities that submit risk adjustment data on their behalf also have been required to execute Electronic Data Interchange ("EDI") agreements prior to submitting risk adjustment date.  These EDI agreements are considered contracts by which the MAOs attest to the accuracy of the data submitted.  Even if another entity submits the data, the MAOs are still responsible for the content of the submissions.  *See* 2003 Participant Guide § 6.1; 2004 Participant Guide § 4.1; 2005 Participant Guide § 4.1; 2006 Participant Guide § 4.1; 2007 Participant Guide § 4.1; 2008 Participant Guide § 4.1; Risk Adjustment 101 Participant Guide § 2.1 (2013).  *See also* Medicare Managed Care Manual, Ch. 7, § 111.6.1 (rev. 57, Aug. 13, 2004); *id*. § 120.2.1 (Rev. 114, 06-07-13).  By executing these EDI forms, the MAOs agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) *they will research and correct risk adjustment data discrepancies*; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MAO and the right of access to the beneficiaries' medical records to conduct such audits.

---

16

64.     The International Classification of Diseases ("ICD") codes set forth the standards used by CMS and the healthcare industry for the identification of patient diagnoses by their physicians.  *See* 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i); 42 C.F.R. § 422.310(d)(1); Medicare Managed Care Manual, Ch. 7, Ex. 30 (rev. 57, Aug. 13, 2004).  The ICD system assigns each diagnosis a specific code, which is "used to describe the clinical reason for a patient's treatment."  2005 Participant Guide § 5.2.

65.     The applicable standards for these ICD diagnosis codes are set forth in the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9") through October 1, 2015, and thereafter the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10").  *See* Medicare Managed Care Manual, Ch. 7, Ex. 30 (Aug. 13, 2004).  To ensure accuracy, the patient diagnoses must result from a face-to-face encounter between the physician and patient during the relevant year and must be appropriately documented in the patient's medical record at the time of the encounter.  *See Silingo*, 904 F.3d at 673 ("Every diagnosis code submitted to CMS must be based on a 'face-to-face' visit that is documented in the medical record.").

66.     In addition, codes should be based on documented conditions that require or affect patient care, treatment, or management.  *See* Medicare Managed Care Manual, Ch. 7, § 111.8 (rev. 47, Feb. 20, 2004); 2008 Participant Guide § 7.1.5.  Codes cannot be submitted for diagnoses that are only probable or suspected, for diagnoses that are questionable, or for a condition that the provider is trying to rule out.  *See* Medicare Managed Care Manual, Ch. 7, Ex. 30 (Aug. 13, 2004).

67.     The requirement that all diagnosis codes submitted by MAOs must be supported by medical record documentation is well established.  The 2004 Medicare Managed Care Manual stated that "M+C organizations [now known as MAOs] must submit risk adjustment data that are substantiated by the physician or provider's full medical record."  Medicare Managed Care Manual, Ch. 7, § 111.8 (Aug. 13, 2004).  The 2013 Medicare Managed Care Manual (the first

revision since 2004) similarly states that MAOs "must . . . [e]nsure the accuracy and integrity of risk adjustment data to CMS.  All diagnosis codes submitted must be documented in the medical record . . . ."  Medicare Managed Care Manual, Ch. 7, § 40 (June 2013).  Also similarly, the 2003 Participant Guide stated that MAOs "must submit risk adjustment data that are substantiated by the patient's medical record."  2003 Participant Guide § 4.1.[5]

68.     In connection with the requirement that the patient's medical record support the diagnosis(es) reported for him or her, the 2004 Medicare Managed Care Manual also provided that "M+C organizations must maintain sufficient information to trace the submitted diagnosis back to the hospital or physician that originally reported the diagnosis.  Since M+C organizations may submit summary level transactions without a link to a specific encounter or claim, establishing an appropriate audit trail to the original source of the data requires diligent information management on the part of the M+C."  Medicare Managed Care Manual, Ch. 7, § 111.8 (Aug. 13, 2004).  Again, in the 2005 Participant Guide § 8.7.3, CMS advised that "MA organizations should take steps to ensure that they have, or have access to, the proper medical documentation to support diagnoses being submitted for risk adjustment.  MA organizations are responsible for the accuracy of the data they submit to CMS.  Where necessary, they should obtain the proper documentation to support diagnoses and maintain an efficient system for tracking diagnoses back to medical records."[6]

---

[5] This requirement was reiterated in the following CMS training guides and materials since 2003: 2003 Participant Guide §§ 12.3, 12.6; 2004 Participant Guide §§ 5.1, 5.5, 6.1.3; 2005 Participant Guide §§ 4.1, 5, 5.1, 5.5, 8.7.3, 9.1, 9.2; 2006 Participant Guide §§ 5.1, 5.4, 5.5, 7.7.3, 8.1, 8.2; 2007 Participant Guide §§ 6.1, 6.4, 7.1, 7.2, 8.7.3; 2008 Participant Guide §§ 5.6, 6, 6.1, 6.4, 6.5, 7.1, 7.2; 2012 Participant Guide § 2.2; Risk Adjustment 101 Participant Guide §§ 3.2.4; 4.3 (2013); Risk Adjustment Webinar at 48 (July 1, 2014).  Furthermore, CMS from the outset of the program has advised MAOs to "[t]ake steps to ensure that medical documentation supports submitted diagnoses."  2003 Regional Risk Adjustment Training for Medicare+Choice Organizations at 8-19.

[6] This requirement was reiterated in the following CMS training guides: 2003 Participant Guide § 12.2; 2004 Participant Guide § 6.1.3; 2004 Medicare+Choice Organizations Resource Guide at 20; 2005 Participant Guide §§ 5.1, 9.1.3; 2006 Participant Guide §§ 5.1, 7.7.3, 8.7.3; 2007

18

69.     Because CMS recognizes that risk adjusting based on health status creates a strong incentive for MAOs to report invalid diagnoses, CMS engages in a variety of program integrity activities, including training MAOs about their obligations to submit valid data and withdraw invalid data.  For example, in a 2003 Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers document, CMS stated all information that is submitted must be correct.  If a plan identifies incorrect or invalid information that has been submitted, it must delete that information."  Likewise, in an August 9, 2005 Regional Training presentation made jointly by CMS and its contractor, Aspen Systems Corporation, called "Risk Adjustment Data Basic Training", MAOs were told that they "must . . . Delete a diagnosis when any data in that cluster are in error."

70.     CMS cannot feasibly audit all risk adjustment data submitted by MAOs, and must therefore rely, when making risk adjustment payments, on MAOs to exercise due diligence to ensure that provider-reported diagnoses are supported by beneficiaries' medical records and are otherwise accurate and truthful.  Thus insurance companies that want to participate in the MA Program must agree, through their Part C and D agreements and their EDI agreements, to provide valid diagnostic data and investigate and delete invalid data.  Moreover, this is why insurance companies that want to participate in the MA Program must (i) establish and implement effective compliance programs to ensure the integrity of their payment data, 42 C.F.R. § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R. § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the accuracy and truthfulness of the diagnosis data that they submit for risk adjustment payments, 42 C.F.R. § 422.504(l) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False

Participant Guide §§ 6.1, 7.1.4, 8.7.3; 2008 Participant Guide §§ 5.6.3, 6.1; 2012 Participant Guide § 2.2.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

Claims Act (31 USC §§ 3729 et seq.)."  42 C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

71.     The implementation of an effective compliance program is a prerequisite to an MAO obtaining and retaining payments under both Parts C and D of the Medicare Program.  *Id.* §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D).  One purpose of requiring a compliance program is to ensure that MAOs submit accurate and truthful information to CMS.  65 Fed. Reg. 40170-01 at 40264 (June 29, 2000).

72.     Specifically, each MAO must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS's program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R. § 423.504(b)(4)(vi) (Part D).  The compliance program "must, at a minimum, include [certain] core requirements."

73.     Finally, to ensure the accuracy of submitted diagnoses, MAOs must attest to the validity of their risk-adjustment data in a Risk Adjustment Attestation submitted to CMS annually.  Specifically, the chief executive officer, chief financial officer, or an individual delegated with authority to sign on behalf of one of these officers and who reports directly to such officer, must certify that the risk-adjustment data that the MAO submitted to CMS is accurate, complete, and truthful.  *See* 42 C.F.R. § 422.504(l); Medicare Managed Care Manual, Ch. 11, § 130 (rev. 79, Feb. 17, 2006).

74.     In its contracts with CMS, Kaiser (like all MAOs) agreed that: "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G," it must attest to "the accuracy, completeness and truthfulness of the data identified on these attachments."  CMS's regulations further specify that the MAO's submission of attestations regarding "the accuracy, completeness, and truthfulness" of this data is "a condition for receiving a monthly payment" from CMS.  42 C.F.R. § 422.504(l).

75.     During Relator's time at Kaiser, Rick Newsome, then the vice president of finance and the chief financial officer for the Colorado region, was involved in the Colorado region's attestations, and Kathy Lancaster, the executive vice president and chief financial officer for Kaiser Foundation Health Plan, Inc., was involved in these attestations at the national level.

## KAISER VIOLATED THE FALSE CLAIMS ACT

76.     Defendants have engaged in a deliberate scheme to defraud the United States by submitting thousands of false claims for risk adjustment payments to CMS.  Kaiser has submitted and caused the submission of these claims for risk adjustment payments even though it knew, or in the exercise of reasonable care should have known, that the Medicare patients upon whom the claims were based did not have the claimed diagnoses, had not been treated for those diagnoses in the prior year in a face-to-face visit with an appropriate provider type, or that the claims were unsupported by appropriate medical records or otherwise ineligible for risk adjustment payments under CMS rules.

77.     In their constant search for additional revenue, Defendants deliberately ignored red flags about their coding practices, willfully disregarding their obligation to submit only accurate diagnosis codes to Medicare, and their obligation to delete diagnosis codes determined to be incorrect from Medicare's systems.

78.     In Colorado, Kaiser reviewed every inpatient medical record entry from several of their non-Kaiser hospital contractors, yet it acted only on the data that would add codes and thus get them more revenue.  Defendants knowingly disregarded all the findings of false codes that would have identified overpayments that they were obligated to return.

79.     With respect to diagnosis codes generated by Kaiser-owned hospitals, provider groups, and facilities, Kaiser repeatedly saw red flags, many raised by Relator, that gave it knowledge it was required to act upon to prevent future false codes and correct prior false

submissions.  Instead, Kaiser deliberately turned a blind eye, retained overpayments from false codes, and continued their revenue-generating practices.

80.     Relator tried over the course of his employment at Kaiser to convince Kaiser to address the issues set forth in this Complaint.  As described in greater detail below, as he discovered issues with the submission of false risk adjustment claims associated with specific provider types, diagnoses, or other issues, he repeatedly proposed solutions.  At times, Kaiser appeared to be implementing his suggestions or taking other steps to address the problems.  Unfortunately, Relator later learned that Kaiser either did not take the steps it had claimed it was taking or began implementing corrective actions only to stop them later, undoing the improvement.

81.     Although many of the representative examples detailed below are for Kaiser's Colorado region, Relator is aware, based on reports he reviewed showing audit results for other regions and Kaiser nationally, his attendance at Regional Reporting Group ("RRG") Meetings, and work with employees in other Kaiser regions, that some or all of Kaiser's other regions knowingly submitted false risk adjustment claims for similar reasons and for similar diagnosis codes as Kaiser Colorado.  The Regional Reporting Groups are comprised of representatives from each Kaiser region who are responsible for conducting audits and other initiatives related to risk adjustment.  Relator regularly attended the twice-annual RRG meetings held to discuss risk adjustment issues faced by the various regions.  Therefore, Relator has knowledge about the risk adjustment practices and audit results of every Kaiser region.

82.     On the basis of reviewing the audit results for other regions and Kaiser nationally, his attendance at RRG Meetings and work with employees in other Kaiser regions, Relator alleges that at all times material to this action, *i.e.,* from at least 2004 to present, the fraudulent risk adjustment practices identified herein regarding Colorado were typical of Kaiser at some or all of its other regions, including without limitation, California, Georgia, Hawaii, Oregon, and Washington.

83.     In addition, although many of the representative examples detailed below cover HCCs rather than RxHCCs, to the extent that Kaiser's audits also covered RxHCCs (which many of them did), they identified similar patterns of knowing submission of false claims for RxHCCs.

84.     On this basis, Relator alleges that Kaiser has submitted, and fraudulently refused to delete and repay CMS for, tens of thousands of risk adjustment claims that it knows, within the meaning of the False Claims Act, are false and/or fraudulent.

I.     **Kaiser's Aggressive Push for MA Revenue**

85.     Kaiser's Medicare business focused on revenue first and foremost.

86.     Annually, Colorado Health Plan leadership, including Chris Tholen, the former Executive Director of National Medicare Finance for Kaiser Permanente Health Plan, Tom Rennell, the former Executive Director of Finance at KFHP Colorado, and Rick Newsome, the former CFO and VP of Finance at KFHP Colorado, prioritized revenue and increased risk scores by setting revenue generation goals that had no connection to coding accuracy.

87.     Kaiser Colorado set up various groups in pursuit of these goals.  For example, as early as 2009, Relator Taylor and Tholen, amongst other Kaiser employees, were both on a group called the "MA governance group."  The goal of the group was to ensure a maximum return of investment within the MA business and identification of revenue opportunities, with no regard for compliance or accuracy.

88.     Kaiser Colorado also had a report called "filling the tank," on which Tholen commonly presented during his time at Kaiser.  The goal of the report was to track expected average risk score (and hence expected revenue) basis point by basis point to capture as much revenue as possible.  These reports were presented at various meetings that included Kaiser executives and quantified the amount of expected revenue from various initiatives, including the review of all inpatient medical charts discussed below.

89.     Kaiser's risk score goals were driven by revenue generation, and demands for revenue were often driven from the top.  For example, in a 2011 meeting regarding Kaiser

23

Colorado's Medicare business, Tholen reported that Newsome was looking for an increase of 2.5 to 3 "points" (a point is used to describe an additional .01 in average risk score).  Relator was in attendance at this meeting and urged caution, believing that the data the company had at the time was not complete enough to be confident in hitting that goal while maintaining accuracy.

90.     Kaiser Colorado ran a serious of revenue-boosting projects, several of which are described in detail below.  These included the review of all inpatient diagnoses from certain external provider hospitals, the use of data mining to find suspected diagnosis and then pursue them, and encouraging physicians to re-diagnose patients who had been diagnosed with chronic conditions in previous years without regard to that condition being treated or evaluated in a subsequent service year.  Kaiser Colorado did not expend anything like the resources behind these projects towards any compliance goals.

## II.     Kaiser Knew the CMS Standard for Submission of RA Diagnoses

91.     Despite Kaiser's emphasis on revenue generation, it was well aware of its obligations under the MA program to submit accurate diagnosis data supported by the beneficiaries' medical records.

92.     For instance, in a review of 2004/2005 data, a period of time prior to the risk adjustment system being fully implemented, Kaiser conducted a "pre close" audit ahead of an annual deadline to submit data to CMS.  The audit noted the importance of accuracy and the fact that each submitted diagnosis must be supported by an appropriate medical record.  Diane Morrissette, the then Executive Director of National Medicare Finance for Kaiser, was the key executor of this audit.

93.     Kaiser regions, including Colorado, Southern California, Northern California, Georgia, the Northwest, and Hawaii also conducted annual "probe" audits, which generally mimic "Risk Adjustment Data Validation" or "RADV" audits that CMS on occasion performs.  A national probe audit was conducted annually as well.  Those audits repeatedly noted the

importance of medical record documentation and verified diagnosis codes in accordance with the ICD, as required by CMS.  These audits had mixed results, as discussed below.

94.     In addition to audits, Kaiser also, on occasion, actually deleted diagnosis codes after determining that they were not accurate.  For instance, in 2007, Kaiser audited a subset of cancer diagnosis codes and, after concluding that several of the diagnoses ought to have been coded as history of cancer, made roughly $6 million worth of deletes.

95.     Relator also repeatedly presented on issues of compliance internally to both executives higher in the corporate structure than him and to physicians employed by Kaiser, stressing the importance of accurate coding and compliance with CMS rules and guidance.

**III.     Kaiser's Claim Submission Process**

96.     Given his position, Relator was intimately familiar with Kaiser's coding review and claims submissions processes.

97.     Diagnosis codes that Kaiser MAOs submitted to CMS for payment were derived from several sources.  One source was the codes that Kaiser-employed physicians entered into Kaiser Colorado's Electronic Medical Record system, HealthConnect.  Those codes were later submitted to a Kaiser claims database.

98.     Additional sources of diagnosis codes, including those from external providers and those from Kaiser's review of medical records described in detail below, flow directly into the same Kaiser claims database.

99.     This claims database then flowed through Kaiser's National Medicare Finance pre-submission processing and de-duplication processes, which prepared the diagnoses for submission and formatted the data in accordance with CMS requirements.

100.    From there the filtered, de-duplicated, and reformatted information flowed into another database, Kaiser's Risk Adjustment Tracking System or "RATS," which is the Kaiser database that interfaced with CMS's Risk Adjustment databases.  Kaiser submitted the codes from RATS to CMS for risk adjustment payments.

25

101.    Although Relator did not often work directly with the RATS system, he knows the system architecture, and he reviewed reports of Kaiser's coding, its accuracy, and the resulting revenue impacts that together confirm that the diagnosis codes that he discusses herein were in fact submitted to CMS as the basis for claims for payment by Kaiser.

**IV.    Kaiser Conducted Impermissible One-Way Look Chart Reviews of Colorado External Providers**

102.    In Kaiser's Colorado region, the most dramatic example of Kaiser's push for revenue overriding its concerns with CMS rules involves a program to capture additional codes from certain non-Kaiser healthcare providers, while ignoring the rampant false coding that it knew to be present.

103.    Several of Kaiser's regions rely heavily on providers at hospitals or other facilities that are not owned by Kaiser, known as external providers, to furnish inpatient care to Kaiser's HMO members.  These regions included Colorado and Hawaii.  These external providers submit claims to Kaiser for services provided to Kaiser members.  Kaiser then uses the diagnoses coded on these claims as the basis for risk adjustment claims Kaiser submits to CMS.

104.    Kaiser Colorado heavily relies on diagnoses submitted by external providers, particularly hospitals.  The largest external hospitals contracting with Kaiser in Colorado were run by Exempla.  On average, codes from external providers yield roughly 13% of the region's risk adjustment claims, yielding tens of millions of dollars in annual payments from CMS.

**A. Kaiser Knew Many of Its Colorado External Provider Codes Were False**

105.    Kaiser's probe and other audits have identified significant error rates in risk adjustment claims Kaiser submitted to CMS based on diagnoses provided by external providers.

106.    For example, for the Colorado region, the error rates for internal providers were as follows:

| Year | Internal HCCs Audited | Errors | Error Rate |
|------|----------------------|--------|------------|
| 2007 | 156 | 14 | 9% |

| | | | |
|---|---|---|---|
| 2008 | 119 | 11 | 9% |
| 2009 | 277 | 29 | 10% |
| 2010 | 371 | 47 | 13% |
| 2011 | 341 | 28 | 8% |
| 2012 | 370 | 18 | 5% |
| 2013 | 227 | 14 | 6% |

107.   The error rates for Colorado's external providers have been up to **ten times higher**:

| Year | External HCCs Audited | Errors | Error Rate |
|---|---|---|---|
| 2007 | 51 | 11 | 22% |
| 2008 | 12 | 8 | 67% |
| 2009 | 53 | 9 | 17% |
| 2010 | 57 | 23 | 40% |
| 2011 | 54 | 27 | 50% |
| 2012 | 28 | 11 | 39% |
| 2013 | 11 | 7 | 64% |

108.   The error rates for codes Kaiser submits from certain large hospitals are striking. For example, in the 2010 Probe Audit, the hospital Exempla Good Samaritan had an error rate of 40% (4 of 10 HCCs), Exempla St. Joseph had an error rate of 53% (9 of 17 HCCs), and Swedish Medical Center had an error rate of 40% (2 of 5 HCCs).[7]

109.   The 2011 Probe Audit found that:

a.      Exempla Good Samaritan Medical Center had an error rate of 93% (13 of 14 HCCs reviewed were erroneous);

b.      Exempla Lutheran Medical Center had an error rate of 100% (4 of 4 HCCs reviewed were erroneous);

c.      Exempla St. Joseph Hospital had an error rate of 67% (24 of 36 HCCs reviewed were erroneous);

d.      Pueblo Clinic had an error rate of 92% (11 of 12 HCCs reviewed were erroneous); and

---

[7] Although some of these sample sizes are small, it is telling that these and other audits consistently show high error rates.

1

e.      Swedish Medical Center had an error rate of 73% (8 of 11 HCCs reviewed

2

were erroneous).

3      110.    In the 2012 Probe Audit, Exempla[8] St. Joseph again showed a high error rate of

4      42% (5 of 12 HCCs were wrong).

5      111.    The Exempla chain hospitals are the primary providers of inpatient care for Kaiser

6      patients in Colorado, making their consistently elevated error rates of particular concern.

7      112.    Inaccurate coding by external providers is not limited to the Colorado region.

8      Diagnoses submitted by external providers are known to be a significant source of errors across

9      the Kaiser regions.

10     113.    Kaiser was aware of this deficiency.  In 2009, a review of external provider codes

11     headed by Diane Morrissette, then the Executive Director of National Medicare Finance for

12     Kaiser, concluded that external provider codes were less well monitored than those of Kaiser

13     internal physicians and were likely to have higher error rates.

14     114.    Unlike Colorado, most Kaiser regions subject diagnoses submitted solely by

15     external providers to enhanced scrutiny.  The Northern California, Hawaii, and Northwest

16     regions review all (or nearly all) HCCs that are supported only by a diagnosis from an external

17     provider.  The Georgia and Southern California regions conduct targeted samples of some claims

18     provided by certain high volume external providers.

19     115.    Kaiser Colorado's executives are aware that this is a continuing issue.  For

20     example, the Kaiser CFO, CPMG Associate Medical Director (Vice President), CPMG CFO, and

21     Executive Director of Revenue Cycle have all been present at meetings where the results of

22     annual probe audits were discussed.  In Fall 2010, Relator presented at the RRG meeting on

23     hospital discharge review in Colorado, where he discussed problems with external providers.

24     116.    Moreover, around late 2011, Treska Francis, the leader of the Kaiser Colorado

25     coder group, personally performed an audit of about 100 diagnoses received from Exempla St.

---

[8] Exempla has since been acquired by Sisters of Charity Leavenworth.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

Joseph's Hospital and Exempla Good Samaritan Medical Center.  She found a 40% to 60% error rate.  She reported this to her boss, Rusalyn Maitlen, the Manager of Medicare Risk Business, who ignored the report.  Francis then reported the problem to her boss' boss, Tom Rennell, Executive Director of Revenue Cycle for Kaiser Colorado.  Mr. Rennell told her to "leave it alone."

117.    Because of Relator's concerns with these consistently high errors, in or around 2009, he pushed Kaiser Colorado to perform another audit of external hospitals.  The audit was supposed to cover three southern Colorado hospitals.  One hospital refused to participate.  The initial results from the other two hospitals were described in the Kaiser Colorado Medicare Initiative Meeting as "unsettling" and "disturbingly high."  Specifically, 18% of the 357 diagnoses audited at St. Thomas More Hospital were invalid, and 20% of the 678 diagnoses at Memorial Hospital were invalid.  Relator does not know if the audit was ever completed, and the final results were never released.

118.    The prevalence of external providers in Colorado, and their high error rates, should have led Kaiser to closer scrutiny of external diagnoses, as Relator encouraged.  Instead of taking affirmative steps to ensure the accuracy and integrity of its coding data, as required by CMS rules and guidance, Kaiser instead thrust its head further in the sand.  Each year it selected fewer and fewer diagnoses from external providers to analyze in probe audits.  When diagnosis codes from external providers were isolated and analyzed as part of a probe audit, they sometimes led to corrective action plans that Relator tried to help implement, but on which Kaiser rarely followed through.  Eventually Kaiser's probe audits ceased isolating diagnosis codes from external providers.

**B.  Kaiser's Retrospective, One-Way Look Chart Review Program**

119.    While the external providers were consistently demonstrating high rates of false coding, Kaiser launched a program to milk more revenue from CMS, while turning a blind eye to the rampant false coding of which it was well aware.

29

120.     Beginning in 2010, Kaiser Colorado has conducted a retrospective chart review project on external hospital claims.  That project, which involves a coder reviewing records from every Exempla hospital stay at an external provider to look for any diagnoses supported by the chart, gives Kaiser complete knowledge of the proper coding for all of its Colorado external provider records, which it knew were otherwise riddled with false codes.

121.     Yet contrary to its legal obligation to ensure the accuracy, completeness, and truthfulness of coding data, Kaiser treated the results differently depending on whether they would generate revenue.  Kaiser captured and passed through to CMS any codes that had not previously been coded by the treating physician, yielding additional payments to Kaiser.  Yet at the same time, despite having all the necessary information to see whether codes previously submitted by the external providers were accurate, Kaiser did nothing.  It simply passed them through to CMS for payment or, if they had already been submitted, did not delete them.  Many of the diagnoses codes at issue were exactly the same diagnoses codes that multiple Kaiser audits found to have consistently high error rates.  *See supra* ¶¶ 105-118.

122.     Such a program, known as a one-way look chart review, is a violation of the False Claims Act.  *See United States ex rel. Poehling v. UnitedHealth Group, Inc.*, No. CV-16-08697-MWF, 2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) (denying Defendant's Motion to Dismiss against similar allegations); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010 (N.D. Cal. 2020) (same).

123.     To run its program, Kaiser collected all medical charts generated by the Exempla providers for Kaiser's beneficiaries and proceeded to send each chart through an additional level of review.

124.     The coder reviewing the chart did not know which diagnoses the claim previously generated, a common process in the industry known as "blind" review.  The coder would review the record and find any supported diagnosis codes.  Kaiser would capture these diagnoses and submit the resulting additional risk-adjusting diagnoses codes for CMS for increased payment.

125.    However, when the results of a chart review revealed that a previously submitted diagnosis code was not supported by the medical record, Kaiser did not delete that code from CMS databases, as required by CMS, which would have resulted in lower payments.

126.    As an example of how this process worked, say a hypothetical Kaiser beneficiary, "A," was admitted to an Exempla hospital for cancer treatment and the hospital also coded A (erroneously) as diabetic.  Kaiser would have submitted two risk-adjusting diagnoses from that encounter: cancer and diabetes.  That chart then would undergo an additional round of coding at Kaiser, where the Kaiser coder confirmed the cancer diagnosis and also found that the medical record supported the risk-adjusting diagnosis of chronic kidney disease ("CKD") but found no evidence of diabetes.  Kaiser would then submit the diagnoses of CKD to CMS, but it would not remove the diagnosis of diabetes for which its own coder found no support.

127.    The program was born out of Kaiser's knowledge that physician coding was highly inaccurate, which was repeatedly demonstrated through various audits that Kaiser performed.  Kaiser's reaction to this fact was to correct provider coding only in ways that were beneficial to its bottom line, while ignoring inaccuracies that would cost it money.  It thus improperly retained millions of dollars in payments from diagnoses it submitted to CMS that were not supported by the medical records.

128.    The program was launched in summer 2010 with Treska Francis, the leader of the Kaiser Colorado coder group, in charge and Kaiser employees including Rusalyn Maitlen, Stephanie White, Denise Campbell, Becky Bowlen, Beth Cox, Peggy O'Neil, and Donna Rohde on the project team.  The first phase of the project included only two hospitals, Exempla Good Samaritan and Exempla St. Joseph's, and only analyzed six months of hospital discharges, the first half of 2010.  It generated over $10 million in revenue.

129.    At all times during the chart review program's existence, Kaiser had the ability to compare which diagnoses its coders found with the diagnoses that providers submitted.  It chose

to ignore the data in violation of its affirmative legal obligation to ensure the accuracy, completeness, and truthfulness of its coding data, opting to retain ill-gotten revenue instead.

130.    Because of Relator's knowledge of Kaiser's systems and the reports of the revenue from CMS, Relator knows that Kaiser submitted new and unique codes from this one-way look chart review to CMS to claim increased risk adjustment payments.  He also knows that Kaiser did not submit deletes to remove its previously submitted codes that this review demonstrated were erroneous.

131.    The program continued to grow, generating approximately $30 million in revenue based on an analysis of 2014 discharges, and it was still expanding at the time Relator left Kaiser.

132.    In addition to the program giving Kaiser information that previously submitted diagnosis codes were false, the program also rendered Kaiser's annual risk adjustment attestations false.  The knowledge that Kaiser gained through these audits regarding the falsity of its codes also meant that Kaiser's affirmation that its data was truthful, accurate, and complete was not true.

133.    Relator repeatedly raised concerns regarding this program.  As early as 2011, Relator made internal presentations regarding the inaccurate diagnosis coding on Exempla claims and recommended auditing those claims.

134.    For years, Relator has requested that a filter be created to tag high-risk codes from external providers for review.  Instead, Kaiser Colorado created a filter to review codes received from internal providers.

135.    Moreover, despite Kaiser Colorado's consistent problems with data from external providers, it has not performed larger audits or instituted a pre-submission review.  In fact, Kaiser Colorado's only action appears to have been to attempt to stop reporting error rates associated with data from external providers separately from error rates associated with data from internal providers, so as not to call attention to the problem.  The initial version of the 2013

Probe Audit did not identify whether errors were from internal or external providers. Relator insisted that the audit be reopened and amended to add this information.

136.    As a result of Kaiser's deliberate and knowing refusal to delete codes it knew were false, codes that external providers had previously submitted to Kaiser, Kaiser passed onto CMS for payment, and later determined to be incorrect are violations of the False Claims Act and caused millions of dollars of harms to the United States. Because Kaiser, through this program, knew that its data was not accurate, complete, and truthful, the annual attestations Kaiser submitted to CMS are also in violation of the False Claims Act.

## V.    Kaiser Ignored and Failed to Correct Widespread False Coding by Internal Providers

137.    Kaiser knows that it is routinely submitting false diagnosis codes from its internal providers, as well. Relator oversaw and encouraged numerous regional audits, and he helped review the results of Kaiser's nationwide audits—all of which demonstrated a pervasive problem at Kaiser with false coding.

### A.    Kaiser Ignored Numerous Red Flags That Gave It Knowledge of False Claims from Internal Providers

138.    Every year, Kaiser's National Compliance Office ("NCO") conducts a nationwide "probe" audit to test the accuracy of risk adjustment claims submitted the prior year. The NCO chooses the patients and/or diagnoses to be audited but each region conducts the audit work. Kaiser deliberately designs these audits so that the sample size is too small for the results to be used for statistically significant extrapolation with respect to the error rates for individual HCCs. Instead, it is intended to provide an overall accuracy rate, by region, and to serve as a "flag" or "tripwire" to identify potential problems with individual HCCs.

139.    In addition to the annual probe audits, Kaiser conducted nationwide audits in anticipation of CMS's Risk Adjustment Data Validation ("RADV") audits. These pre-RADV audits routinely identified similar problems as the probe audits.

1

### 1.  Kaiser's Audits Were a Red Flag About Its False Coding

2       140.    In addition to the high rates of falsity from its Colorado external providers

3  discussed above, these probe and other audits have put Kaiser on notice that it has submitted and

4  continues to submit a substantial number of other false risk adjustment claims each year.

5       141.    For the Colorado region, the annual probe audits identified the following error

6  rates (including both HCCs and RxHCCs) between 2007 and 2013:

| Year | Total HCCs Audited | Errors | Error Rate |
|------|--------------------|--------|------------|
| 2007 | 207                | 25     | 12%        |
| 2008 | 131                | 19     | 15%        |
| 2009 | 330                | 38     | 12%        |
| 2010 | 428                | 70     | 16%        |
| 2011 | 395                | 55     | 14%        |
| 2012 | 398                | 29     | 7%         |
| 2013 | 238                | 21     | 9%         |

7       142.    Kaiser's audits of other regions, and of national error rates, showed similar

8  results.  For example, in both 2006 and 2007, Kaiser conducted pre-RADV audits.  Kaiser's

9  audits found an error rate of between 14% and 16% (depending on how strictly certain rules were

10 applied).

11      143.    These probe, pre-RADV, and other ad hoc audits show consistent errors in certain

12 types of risk adjustment claims across the Kaiser system.  For example, many of the errors in the

13 2006 and 2007 national RADV audits were for issues or diagnoses that repeatedly show up as

14 upcoded in subsequent probe audits in Colorado and elsewhere, such as coding historical

15 conditions as active, improperly coding based on probable, suspected, or ruled out diagnoses,

16 and coding for specific diagnoses such as cancer, arrhythmia, stroke, vascular disease, ulcers,

17 vertebral fractures, major depression, and diabetes with complications.  Relator repeatedly asked

18 for all regions' probe audits results to be combined, so Colorado could learn from other regions'

19 errors.

20      144.    In 2010, Kaiser's Northern California region audited data in its claims systems for

21 care provided to patients in 2009.  Of the "Top Ten Failed HCCs by Volume" were several that

34

the Colorado region also found to be routinely problematic, including HCCs for cancer, stroke, arrhythmia, and vascular disease.  This audit will be discussed in greater detail below.

145.    Examples of risk adjustment claims that the Kaiser audits have identified as routinely false include: (a) false claims submitted based on diagnoses from external providers, (b) high rates of diagnosis specific false claims identified during the probe audits; (c) false claims submitted due to other process-based coding violations; and (d) diagnoses that Kaiser identified as upcoded through the use of its "high risk" filter program.  These examples (described below) are illustrative of the types of false claims of which Kaiser had knowledge but they do not include each and every false claim.

146.    As described below, despite its knowledge that the categories of risk adjustment claims described below are false a significant percentage of the time, Kaiser routinely fails to take reasonable steps to identify which of these claims are false (*i.e.*, Kaiser does not extend its review beyond the discrete audit sample and into previous years' claims submissions), and then to prevent their submission in the first place or to delete them after submission.  Instead, Kaiser's reaction to this knowledge on a national and regional level has been (except in isolated instances) to avoid conducting retrospective audits to correct previously submitted false data.  Additionally, once Kaiser learned of false submissions within its data, its annual attestations claiming that submitted data was accurate, true, and complete, were rendered false.

## 2. Kaiser Knew Certain of Its Diagnosis Codes Were Frequently False

147.    The following are examples of diagnoses and HCCs identified as frequently upcoded during Kaiser's probe audits.  Although Relator has the most knowledge about the probe audit results from the Colorado region, he also knows, from his attendance at RRG meetings and work with other Kaiser regions, that these HCCs often were found to be upcoded in other regions as well.  Moreover, these are not all of the problematic HCCs that were identified for either the Colorado region or for other regions; instead, they are representative examples of

some of the top problems Relator identified and are illustrative of the types of false claims that,

during the times relevant to this action (i.e., from 2004 to present), Kaiser submitted to CMS.

148.   **Cancer**: Kaiser's probe audits have consistently identified cancer (HCCs 7 – 10)

as the most upcoded condition.  Improper claims for diagnoses of active cancer have shown up in

every single probe audit from 2006 to 2013.

149.   The most significant and consistent error is that Kaiser providers submit diagnosis

codes representing active, current treatment of cancer when in fact, the patient's cancer is cured,

in remission, or otherwise irrelevant to the services provided to the patient.

150.   A diagnosis of cancer is permissible under the ICD-9 coding guidelines when

there is evidence of active disease.  Where a diagnosis of active cancer appears, one would

expect to see evidence of treatment (chemotherapy, radiation, surgery, or palliative care) in the

patient's medical chart as well.

151.   Once there is no evidence of an existing malignancy, the proper diagnosis code is

for "history of cancer."  "History of cancer" diagnoses fall within the v10 category of HCC

codes and do not risk adjust.

152.   Colorado is not the only Kaiser region to have significant problems with the

submission of false risk adjustment claims for cancer.  At RRG meetings attended by Relator, all

other Kaiser regions have noted that they also consistently find high error rates in their risk

adjustment claims where a patient has a history of cancer improperly coded as active cancer.

This is consistently the biggest issue in the annual probe audits across the Kaiser organization.

153.   The source of these errors is in part historical.  Kaiser's physician groups, since

2004, have used an EMR system called HealthConnect.  When Kaiser first launched

HealthConnect, physicians could not easily enter a diagnosis of "history of cancer"—it simply

was not an option in the drop-down menu of diagnoses.  Instead, physicians would code a

diagnosis of active cancer and note "history of" in the comments field.  Although Kaiser has long

known this is a problem, when the data from these charts is filtered for submission to CMS, only

the diagnosis code of active cancer is submitted and the notation of "history of" is ignored for purposes of data submission to CMS.

154.    Although HealthConnect (Kaiser's EMR) now has "history of" codes available, physicians are still accustomed to documenting "history of cancer" in this way (*i.e.*, coding active cancer and noting "history of cancer" in the comments field).

155.    In an attempt to identify how big a problem this was, in 2007 Dr. Taylor conducted an audit of over 6,000 risk adjustment claims for breast or prostate cancer submitted by CPMG physicians in 2006 and 2007.  The audit showed an error rate of 78% for breast cancer and 52% for prostate cancer, resulting in more than $6 million dollars in false claims.  Kaiser deleted the false claims identified in this audit and, accordingly, refunded the overpayments to CMS.

156.    Based on these findings, Relator convinced Kaiser Colorado to make changes to its EMR system to try to "prompt" physicians to change their coding behavior.  HealthConnect, Kaiser's EMR, was modified so that every time a CPMG physician entered a diagnosis of cancer an alert would pop up, offering a brief explanation of when a diagnosis of active cancer is appropriate and ensuring that was the intended diagnosis as opposed to history of cancer.  For example, the breast cancer pop-up said:

> "DISEASE MANAGEMENT REMINDER: To use this diagnosis, you must have documented in your note that the cancer is active or exists and/or the current treatment for the cancer.
>
> ACTION: IF NOT ACTIVE, use History of Breast Cancer – enter Hx Breast in the Encounter Diagnosis field to select."

157.    The use of this pop-up alert reduced the error rate substantially, improving coding to an accuracy rate of 96% for breast cancer and 93% for prostate cancer.

---

37

158.    Unfortunately, the improvement was short-lived.  In 2010, Kaiser turned off the alert and replaced it with a limited, far less useful internal filter.  This "filter" program is discussed in greater detail below.

159.    With the manual review associated with the filter, the error rate in Kaiser Colorado for improper cancer diagnoses remained below the error rates seen before the alert was implemented.  However, in late 2011 or early 2012, Kaiser Colorado decided to turn off the filter to save money and coding resources.  As shown by the probe audits since, the error rate for cancer diagnoses has rebounded.  Despite the fact that the alert and filter were obviously preventing the submission of false claims, Kaiser has not turned either back on.  Doing so would cost it revenue—revenue that it has no basis to claim.

160.    Moreover, despite the substantial volume of cancer HCC submissions, and increased error rates since the filter was turned off, Kaiser Colorado has not conducted another broad cancer audit such as the one performed in 2007.  Instead, Kaiser has responded to the renewed evidence of high cancer error rates with only limited and prospective fixes.

161.    For example, Kaiser Colorado's corrective action plan ("CAP") developed after the 2011 Probe Audit called for targeted retrospective audits of diagnoses of active cancer. However, to Relator's knowledge, no such audits were ever performed.  The CAP similarly called for Relator and Dr. Teresa Welsh, the CPMG Physician Director of Coding, to visit the CPMG oncologists and discuss the coding accuracy of their cancer diagnoses.  Dr. Welsh conducted some follow-up training, but reported back to Relator that, to be effective, such training would have to be done annually given the high turnover rate for oncologists.  Kaiser does not conduct this training annually.

162.    For years, Relator has recommended a broad retrospective audit of diagnosis codes known to be problematic, including cancer.  In 2011, Kaiser Colorado hired an external vendor to conduct such an audit.  This was known as the "Peak" project.  Relator believes that part of this project was to review past cancer diagnoses submitted for risk adjustment to CMS.

Any findings of the Peak audit have been withheld from Relator.  However, he was told by Treska Francis, the leader of the Kaiser Colorado coder group, shortly after the audit began that the findings were "not looking good," *i.e.*, that the error rates were substantial.

163.    **Stroke**: Kaiser identified problems with claims submitted for HCC 96, Ischemic or Unspecified Stroke, in probe audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, and 2011.

164.    As with cancer, Kaiser knew stroke was commonly coded as an active event, when in fact, the patient should have been classified as having a history of stroke.  A diagnosis of a cerebrovascular accident (CVA)/stroke (ICD-9 codes 430-437) is appropriate for the initial acute stroke episode.

165.    During RRG meetings, Relator learned that CVA/stroke is a diagnosis for which all Kaiser regions show high error rates, especially Kaiser's Northwest region (Oregon and Washington).

166.    Given the clinical profile of acute stroke, it would be particularly easy for Kaiser to audit past claims submissions and/or filter current claims to address this issue before submission.  In almost all cases, when a patient is having a stroke, she is treated in a hospital.  A patient typically is not allowed to leave the hospital until after the stroke is over.  Once the acute incident is over, the patient should be diagnosed as either having a history of stroke, or receiving treatment for the late effects of the prior stroke.  Thus, in almost all cases, if a physician submits a diagnosis for acute stroke for a patient treated in the physician's office (or any setting other than a hospital), that diagnosis is likely erroneous.

167.    Applying this principle, Relator convinced Kaiser to fund a pilot project to have a physician review all of the acute stroke diagnoses made in CPMG physician offices in 2010.  Dr. Christina Marchioni, the CPMG physician who performed the review determined that Kaiser had submitted to CMS approximately $3.1 million in false acute stroke claims during the audit period.  In fact, she determined that all but two of these claims were false.  She also determined

39

that Kaiser could have submitted replacement claims for treatment of the aftereffects of stroke for these patients, worth approximately $1.2 million per year.

168.    Despite these results, Kaiser did not delete these erroneous codes (and correspondingly repay CMS), or conduct a similar audit for prior years.  Instead, Kaiser simply had the reviewing physician correct the problem list in the patient's chart to reflect that the patient had a "history of stroke" or the "late effects" of stroke to minimize the chance that the error would be repeated in future years.

169.    This project temporarily reduced the error rate for risk adjustment claims submitted for stroke in the following year.  However, in 2011 Relator's funding for this project was cut and the work stopped.  Since then, the error rate for stroke diagnoses has increased again.

170.    Relator has recently begun a new program whereby all claims for an acute stroke diagnosis submitted based on an office visit by an internal provider are flagged for further review by Kaiser Colorado coders.  If the coders identify errors, they reach out to the internal provider that submitted the diagnosis and ask her to correct the error.  Unfortunately, the coders are not authorized to correct the errors themselves to prevent the false claims from being submitted, or to compel the internal providers to correct their errors.  Thus, approximately 25% to 30% of the errors the coders identify are ultimately submitted to CMS as risk adjustment claims because the internal provider that submitted the diagnosis ignores the coders' efforts to correct the code.

171.    **Vertebral Fractures**: In probe audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, and 2011, Kaiser identified problems with claims submitted for HCC 157, Vertebral Fractures without Spinal Cord Injury.  This is another diagnosis where Kaiser found that it often submitted false risk adjustment claims to CMS because physicians improperly coded the condition as active when in fact, the patient only had a "history of" the condition.

---

40

172.   **Vascular Disease**: In probe audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCCs 104, Vascular Disease with Complications, and/or 105, Vascular Disease.

173.   The audit documents and additional research by Kaiser identified at least two causes for these errors.  First, some claims erroneously claimed the patient had current vascular disease, when in fact, they had only a history of the condition.

174.   This was particularly true for cases where the patient had a history of pulmonary embolism, a condition when one or more pulmonary arteries in the patient's lungs become blocked.  In most cases, pulmonary embolism is caused by blood clots that travel to the lungs from the legs.  Patients who have one or more pulmonary emboli are often treated with anti-coagulants to prevent the development of additional emboli.  Until a recent rule change, it was improper to classify patients being treated with anti-coagulants to prevent emboli as being treated for pulmonary embolism; they were properly coded as having only a history of pulmonary embolism.  Kaiser knew that physicians routinely misapplied this rule, coding patients on anti-coagulants as having pulmonary embolism, thus causing the submission of false claims for HCC 104.

175.   Second, certain claims were false because of a "mismapping" problem with HealthConnect, Kaiser's EMR.  HealthConnect, used throughout all of its regions, allows physicians to choose a descriptive diagnosis (as opposed to a specific ICD-9 code) when entering clinical information.  HealthConnect then "maps" this descriptive diagnosis to a specific ICD-9 diagnosis code, which is then inserted into the medical record documentation.  For certain diagnoses, however, this "diagnosis" file in the past has linked a descriptive term to the wrong ICD-9 diagnosis code.

176.   For example, pain in the legs associated with physical activity may be a result of a lack of blood supply to the legs (vascular claudication) or nerve root compression (neurogenic claudication).  Relator discovered that when a physician attempted to diagnose a patient with the

41

neurologic condition, it incorrectly mapped to the ICD-9 code for the vascular disorder.  For this reason, false claims were submitted for a vascular condition (HCC 104 or 105) when the physician attempted to diagnose a patient with nerve compression (a condition that does not risk adjust).

177.  **Chronic Bronchitis**: In probe audits conducted in 2007 (the "2006 Wrap-up Report"), 2009, 2010, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCC 108, Chronic Obstructive Pulmonary Disease ("COPD").

178.  The probe audits regularly found COPD claims erroneous based on lack of documentation in the record, or because the doctor failed to document the patient's condition with sufficient specificity to determine if the patient actually had COPD.

179.  In addition, Kaiser's problematic diagnosis file also affected claims for HCC 108. Because of mismapping, when a physician attempted to diagnose a patient with bronchitis (a diagnosis that does not risk adjust), it was incorrectly mapped to an ICD-9 code for chronic bronchitis, and thus classified as HCC 108 (which does risk adjust).  The 2010 Probe Audit specifically flagged this problem, even though it did not affect any risk adjustment claims audited that year.

180.  Kaiser's EMR also pressured physicians to use the diagnosis code for chronic bronchitis (which risk adjusts) rather than acute bronchitis (which does not risk adjust).  If a physician chose acute bronchitis as a diagnosis, HealthConnect (Kaiser's EMR) warned them that this could affect their score on certain quality measures.  HealthConnect also informed them that if they selected simple bronchitis or chronic bronchitis instead, the quality measure at issue would not be negatively affected.

181.  **Metastatic Cancer**: In probe audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, 2011, and 2012, Kaiser identified problems with claims submitted for HCC 7, Metastatic Cancer and Acute Leukemia.

182.    While some of these errors were caused by improper use of codes for active cancer, when the patient actually had a "history of" cancer, there was at least one other cause. Again, errors in Kaiser's diagnosis file led to the insertion of an incorrect diagnosis code in the file, indicating metastasis in circumstances where the physician selected a non-metastatic descriptive diagnosis.  Metastatic cancer is a condition where cancer spreads from one organ to another and results in significant additional risk adjustment payments.

183.    **Myocardial Infarction and Old Myocardial Infarction**: In probe audits conducted in 2006 (2007 audit of 2005 data), 2010, and 2011, Kaiser identified problems with claims submitted for HCCs 81, Acute Myocardial Infarction ("MI"), and/or 83, Angina Pectoris/Old Myocardial Infarction ("old MI").

184.    An MI is a heart attack.  Kaiser's probe audits identified multiple issues with the claims submitted for HCCs 81 and 83.  In some cases, a claim was submitted for an acute MI, when the proper claims should have been for old MI.  In other cases, the only support for an old MI diagnosis was a radiology report or other test result, rather than a diagnosis documented by an appropriate provider in a face-to-face visit.  In other cases, Kaiser simply concluded that the medical record documentation did not support the diagnosis of an MI or old MI at all.

185.    **Malnutrition**: In probe audits conducted in 2009 and 2011, Kaiser identified problems with claims submitted for HCC 21, Protein-Calorie Malnutrition.

186.    Kaiser identified several causes for these problems.  In some cases, the condition was diagnosed as current when the patient actually only had a "history of" the condition.

187.    In other cases, the false claim resulted from Kaiser coders and/or computer systems adding a malnutrition diagnosis where the treating physician had not.  This often happened when a physician used the term "cachexia" in his or her treatment note.  Cachexia can be used as a specific diagnosis, indicating that patient has chronic malnutrition or a specific wasting disease.  Alternatively, physicians sometimes use variations of the term cachexia as an adjective to indicate that a patient appears malnourished, even where the patient has not been

diagnosed with the disease cachexia (*e.g.*, the patient "looks cachetic").  In the latter case, it is inappropriate for a coder to decide that a patient has cachexia, because only a physician (or other appropriate provider) can determine that a patient has a given condition.

188.    **Decubitus Ulcers**: In probe audits conducted in 2009 and 2011, Kaiser identified problems with claims submitted for HCC 148, Decubitus Ulcer of Skin.

189.    There are two primary ulcer types: (1) decubitus ulcers, due to pressure; and (2) venous stasis ulcers, where the skin breaks down because of prolonged swelling in the extremities due to poor circulation.  When properly coded, decubitus ulcers support a risk adjustment claim for HCC 148; venous stasis ulcers do not risk adjust.  One reason Kaiser was submitting false claims for HCC 148 is that physician documentation often failed to sufficiently identify the cause of a patient's ulcer.  For example, the audit notes for the 2011 Probe Audit report that one claim was found to be false because "record supported skin breakdown due to maceration rather than an ulcer due to pressure."

190.    Decubitus ulcers were also improperly claimed when no ulcer was present.  For example, another claim from the 2011 Probe Audit invalidated a diagnosis of decubitus ulcer noting that "NCO [Kaiser's National Compliance Office] could find no documentation to support that the patient [had] an ulcer.  The physician documented that the SNF nursing staff reported no skin problems."

191.    **Sick Sinus Syndrome**: In probe audits conducted in 2006 (2007 audit of 2005 data), 2009, 2010, 2011, 2012, and 2013, Kaiser identified problems with claims submitted for HCC 92, Specified Heart Arrhythmias.

192.    Sick sinus syndrome ("SSS") is the name for a group of heart rhythm problems (arrhythmias) in which the sinus node—the heart's natural pacemaker—does not work properly.  A person with SSS may have heart rhythms that are too fast, too slow, punctuated by long pauses, or a combination of these rhythm problems.  SSS is often treated with the implantation of a pacemaker.

---

44

193.    Under established coding guidelines, once a patient has received a pacemaker to treat her SSS, it is no longer appropriate to code her condition as acute SSS (assuming the pacemaker is effectively treating the SSS).  Instead, her condition should be coded to reflect the presence of the pacemaker.

194.    One reason for the number of false claims submitted for HCC 92 is that, as Kaiser knows, physicians routinely submit a diagnosis code for SSS when they only should be submitting the code for the presence of the pacemaker.  As Kaiser noted in one record for the 2011 Probe Audit: "The record documents that the patient is on a pacemaker for SSS, and per Coding Clinic guidelines in the situation the SSS may only be coded if . . . the SSS is addressed or there is a problem with the pacemaker."

195.    Kaiser could easily prevent the submission of false claims for Sick Sinus Syndrome by setting up a process in its claims and billing software to flag situations where a claim includes a diagnosis of SSS and the presence of a pacemaker, and delete the diagnosis for SSS.  It is notable that Kaiser has chosen not to use such a claims processing rule to fix this problem because Kaiser uses such rules to add new diagnoses if such a change will allow Kaiser to submit additional risk adjustment claims to CMS.  For example, in cases where a patient is being treated with a type of drug that typically indicates major depression (a diagnosis that risk adjusts) but the patient has only been diagnosed with standard depression (a diagnosis that does not risk adjust), these claims are flagged for review to potentially code major depression.

196.    In a similar way, Kaiser could easily conduct a retrospective audit of previously submitted claims based on a diagnosis of SSS by selecting any such claims that also had a diagnosis code for presence of a pacemaker.  Nonetheless, Kaiser has not done so.

197.    **Renal Insufficiency**: In probe audits conducted in 2009, 2011, and 2013, Kaiser identified problems with claims submitted for HCC 131, Renal Failure.

198.    Chronic kidney disease ("CKD") is a condition that is often miscoded, and can have significant impact on risk adjustment scores.  Although CKD is classified as Levels I to V,

1   depending on the seriousness of the disease, all five levels of CKD map to the same HCC—HCC

2   131.

3          199.    Kaiser knew that patients were often incorrectly diagnosed with low level CKD

4   (Levels I and II), but failed to conduct any targeted audits to test these claims.  Such audits

5   would have been particularly straightforward because the diagnosis of CKD Levels I and II is

6   largely driven by two lab test values: (a) the patient's glomerular filtration rate ("GFR") rate; and

7   (b) the presence of protein in the patient's urine.

8          200.    Kaiser often fails to delete the claims or otherwise repay Medicare for diagnoses

9   identified as false in these audits, including for the 2010 stroke pilot project.  When it does delete

10  previously submitted false codes, it often later re-submits those same claims, thus seeking (and

11  receiving) payment for the diagnoses that it knows to be false.  Kaiser Colorado and Kaiser

12  Hawaii do this because of a problem in their claims processing systems.  When codes are deleted

13  after an audit, the system for Colorado and Hawaii does not have a flag or other mechanism to

14  indicate that the audit found these diagnoses to be invalid.  Nor are the diagnoses removed from

15  the patient's medical record.  Thus, when Kaiser conducts "resweeps"—a process designed to re-

16  examine the EMR system to capture diagnoses that were added to patients' medical records after

17  the initial submission of data to Kaiser's risk adjustment claims system—the system picks up the

18  previously deleted diagnoses.  Thereafter, Kaiser submits new risk adjustment claims for these

19  diagnoses that Kaiser already determined to be invalid.  Kaiser is aware that the flaw in Colorado

20  and Hawaii's claims processing systems has this effect.

21          **B.  Despite Its Knowledge of Falsity, Kaiser Submitted False Claims for Payments**
22              **Based on Internal Provider Coding**

23          201.    Despite knowing of the consistent errors in diagnoses codes appearing in claims

24  data that Kaiser uses as a basis for its risk adjustment to as basis for payment to CMS, Kaiser

25  refused to take corrective action.  Worse, it shut down corrective efforts that Relator and others

26  put in place to make sure its submissions accurately reflect what was supported by its

beneficiaries' medical records.  Additionally, once Kaiser learned of false submissions within its data, its annual attestations claiming that submitted data was accurate, true, and complete, were rendered false.

### 1.  Kaiser Submitted False Claims for Certain "High Risk" Diagnoses

202.    As detailed above, Kaiser had knowledge that it routinely submitted false claims for certain diagnoses, yet it willfully disregarded the falsity of those claims when it shut down a high risk filter Relator had participated in the creation of that Kaiser knew prevented them.

203.    From approximately 2010 through early 2012, Kaiser's Colorado region used a "filter" program to review certain "high risk" diagnoses, including many of those discussed above, submitted by Kaiser providers before those diagnoses were submitted to CMS for risk adjustment payments.  The filter tagged specified diagnoses for manual review by one of Kaiser Colorado's coders, every time one of the "high risk" diagnoses was received from a Kaiser physician.  If the Kaiser coders determined that the diagnosis was invalid, it would be flagged to prevent Kaiser from submitting that diagnosis to CMS.

204.    The filter was successful in reducing the error rate for many of the diagnoses it targeted.  However, for other diagnoses, the filter showed that Kaiser continued to have a high error rate.

205.    The audits conducted in connection with the filter identified not only specific HCCs that had high error rates, but also the individual diagnosis codes that were prone to error.

206.    For example, as of July 2011, the filter program reviewed the following HCCs and found the following error rates:

| HCC | Description | HCCs Reviewed | Invalid HCCs | Error Rate |
|---|---|---|---|---|
| 8 | Lung, Upper Digestive Tract, & Other Severe Cancers | 472 | 67 | 14% |
| 9 | Lymph, Head & Neck, Brain, & Other Major Cancers | 364 | 45 | 12% |

| 10 | Breast, Prostate, Colorect & Other Cancers & Tumors | 3,013 | 509 | 17% |
|---|---|---|---|---|
| 32 | Pancreatic Disease | 361 | 51 | 14% |
| 44 | Severe Hematological Disorders | 5 | 5 | 100% |
| 92 | Specified Heart Arrhythmias | 7,113 | 1,084 | 15% |
| 96 | Ischemic or Unspecified Stroke | 460 | 215 | 47% |
| 104 | Vascular Disease with Complications | 582 | 172 | 30% |
| 157 | Vertebral Fractures without Spinal Cord Injury | 320 | 115 | 36% |
| 158 | Hip Fracture/Dislocation | 530 | 153 | 29% |
| 164 | Major Complications of Medical Care and Trauma | 52 | 19 | 37% |

207.     Much to Relator's frustration, though, the filter did not address the category of claims with the highest error rate—external providers.  Of course, Kaiser had its own, upside-only audit, for those claims.

208.     In approximately early 2012, Kaiser ended the filter program itself, even though the audits conducted pursuant to the program continued to show high error rates in the coding for these "high risk" diagnoses, which the filter could help reduce.

209.     Ironically, Kaiser eliminated the filter precisely because of its success.  By blocking unsupported diagnoses, the program was becoming too harmful to revenue.  With its removal, Kaiser restored the bump to its revenue from submitting the false codes.  Additionally, once Kaiser learned of false submissions within its data, its annual attestations claiming that submitted data was accurate, true, and complete, were rendered false.

210.     In contrast, Kaiser took a very different approach when it knew or suspected a certain condition was often missed by providers and caused forego revenue.  Kaiser regularly invests substantial resources in audits to find additional diagnosis codes representing these conditions.  When Kaiser finds additional diagnosis codes through these reviews, it always submits risk adjustment codes for those conditions.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

211.   For example, in 2006, Kaiser's Colorado region conducted "Reimbursement Recovery Audits" ("RRA") looking for new diagnosis codes to submit for at least 19 different clinical pathways or diagnoses.  None of these audits targeted claims with high error rates, even though Kaiser knew that some of the same conditions (*e.g.*, MI) were often false.  In 2007, Kaiser Colorado conducted at least 22 such targeted clinical audits.

212.   In 2010, Kaiser's Colorado region conducted more than 30 such RRA audits to find additional diagnosis codes.  Again, several of the audits targeted diagnoses that Kaiser knew were also routinely false (*e.g.*, breast cancer, prostate cancer, arrhythmia, chronic kidney disease, COPD, MI), yet these audits only looked for additional diagnosis codes to submit.

213.   This pattern was not unique to Kaiser's Colorado region.  In 2010, Kaiser's Northern California region did take some steps to attempt to remedy falsely coded conditions.  It audited data in its claims systems for 2009 Dates of Service.  This audit appears to have been conducted before these diagnoses were used to submit risk adjustment claims.  When the audit found false diagnoses, Kaiser, correctly, blocked them so that they would not be used as the basis for future risk adjustment claims.  Of the 4,566 diagnoses audited, 1,781 (39%) "did not have supporting documentation."  Kaiser "blocked" these diagnoses so that no risk adjustment diagnoses codes were submitted for them.  Notably, Kaiser also found an additional 475 diagnoses that should have been included in the claims data.

214.   This is exactly the type of due diligence that Kaiser should have been performing across all regions and for all plan years to identify problems with its medical record documentation before those errors led to the submission of false claims.  Instead, it was a short-lived anomaly.  At a September 16, 2008 RRG meeting, Dr. Robert Klein presented the results of Kaiser's Northern California region's 2008 targeted clinical audits for missed claims.  The region audited at least 12 different clinical pathways.  As with the Colorado region's RRA audits, several of these audits targeted the same diagnoses (*e.g.*, MI, Chronic Kidney Disease) that Kaiser knew were often false.  No audits were performed to find false claims for these diagnoses.

49

Moreover, Dr. Klein proposed the addition of further retrospective reviews designed to find examples where, *inter alia*, metastatic cancer (HCCs 7 and 10), was not coded.  No similar proposal was made to find examples of false cancer codes.

### 2. Kaiser Submitted False Claims Due to Systematized Violations of Coding Rules

215.    The Colorado and national probe audits also revealed that Kaiser consistently misapplied basic risk adjustment coding rules, leading to false claims.  These process-oriented problems could have been addressed easily using Kaiser's Natural Language Process program (discussed in greater detail below), if Kaiser had chosen to do so.

216.    In its probe audits, Kaiser found that false claims were routinely submitted to CMS where the diagnosis was listed in medical documentation of a physician or hospital outpatient visit as probable, ruled out, or suspected.  CMS rules prohibit the use of such a diagnosis for a risk adjustment claim.  2008 Participant Guide § 6.4.2.

217.    For example, in the 2011 Colorado Probe Audit, a stroke HCC was deemed invalid because the suspected stroke had been "ruled out by time of discharge but coded as if present."  Another claim, for a diagnosis of vascular disease (based on a reported pulmonary embolism), was invalidated because the record specifically stated "P[ulmonary] E[mbolism] ruled out."

218.    Again, in the 2013 Colorado Probe Audit, the audit identified a claim submitted for deep vein thrombosis (DVT) where the diagnosis had been "ruled out by work-up."

219.    The probe audits also found that Kaiser routinely submitted claims where a non-chronic diagnosis was listed on a problem list or elsewhere in the medical record without any notation or other evidence that the diagnosis was treated or affected the treatment provided.  CMS rules prohibit the submission of claims based on such diagnoses.

220.     For example, in the 2010 Probe Audit, 7% of all errors were based on a submitted diagnosis for a non-systemic condition where there "was no documentation to support that the condition had been addressed, evaluated, treated, or considered."

221.     The probe audits also found that Kaiser routinely submitted claims where the only documentation to support the diagnosis was a radiologic or lab test, or other non-face-to- face service.  CMS rules prohibit the submission of claims based on such diagnoses.

222.     For example, in the 2010 Probe Audit, two of the invalidated HCCs were found to be invalid because they were based on diagnostic radiology reports.

223.     Kaiser had knowledge that its coding approach produced these consistent types of false claims, yet it continued to submit them.  Additionally, once Kaiser learned of false submissions within its data, its annual attestations claiming that submitted data was accurate, true, and complete, were rendered false.

### 3.   Kaiser's Natural Language Processing Audit Program Caused the Submission of False Claims

224.     Beginning in approximately 2009, Kaiser developed a Natural Language Processing ("NLP") audit program to try to find new diagnosis codes to submit.  Broadly speaking, the NLP program uses an algorithm to search EMRs to find words that, individually or in combination, indicate that a patient has certain diagnoses.  If done properly, NLP analysis can be an effective tool to find diagnoses that were properly documented in the physician treatment notes but not submitted in the claims data.

225.     For that matter, a good NLP program can also identify situations where a diagnosis was submitted with the claims data but is not documented in the medical record. Several existing NLP programs on the market provide such functionality.  They have a user interface that would permit the user to view all previously reported diagnoses as well as ones added by the software and confirmed by the coders.  Further, clicking on any diagnosis would take the reviewer to the corresponding portion of the note.

226.    In fact, Kaiser uses such programs (sold by 3M and Optum) to conduct NLP analysis of its hospital radiology and Emergency Department claims for health plans other than its Medicare Advantage plans, *e.g.*, its commercial plans.

227.    Some of the problems identified in Kaiser's probe audits that, as discussed above, are not necessarily easy to target in a diagnosis-specific audit (*e.g.*, non-chronic conditions that were listed in the record without documentation of treatment; use of radiological test results as the basis for a claim; coding diagnoses that were listed as possible, probable or rule-out) could readily be targeted through a NLP audit and later corrected/deleted.

228.    Rather than use an established NLP program, Kaiser built its own—even though Kaiser uses established NLP products from 3M and Optum for other purposes.  Notably, Kaiser's NLP program was built without any function to allow it to audit the validity of previously submitted claims.

229.    All face-to-face visits to a physician or hospital by members of Kaiser's MA plans are run through the NLP software to identify new diagnoses that might be appropriate to use for the submission of additional risk adjustment claims.  The results are grouped into four categories: (a) True Positive: diagnoses that have been confirmed by two Kaiser coders; (b) More Information Needed: diagnoses that may be present, but further analysis is required to confirm; (c) Problem List Only:  diagnoses that show up only on the member's problem list with no documentation of treatment; and (d) False Positives or Found Elsewhere.

230.    Kaiser allows the various regions to decide how to use this information.  For example, a PowerPoint presented at the Fall 2010 RRG Meeting outlined the results of the "NLP HCC Data Mining Pilot."  Three regions had participated in the pilot: (a) Georgia, (b) Hawaii, and (c) Northwest.  The Northwest region appears to have simply passed along all of its "True Positive" diagnoses to its risk adjustment claims submission system (which submits the claims to CMS) without further review.  The Georgia region passed along most (278 of 294) of the

diagnoses to its risk adjustment claims submission system, which submits the claims to CMS.  It is unclear from the presentation why some diagnoses were not passed along.

231.    The Hawaii region, on the other hand, audited all of the "True Positives" before passing them on.  Remarkably it found a 29% error rate in these claims that had supposedly been confirmed by two Kaiser coders.  It now continues to audit all "True Positives."  Relator spoke with Terri Keliinoi, Kaiser Hawaii's manager of risk coding, on October 14, 2014.  The manager reported that as of the review of the 2014 file, they are still finding a 20% error rate in the "True Positives."

232.    This is consistent with Relator's own experience.  He personally reviewed over 100 of the supposedly "True Positive" claims for the Colorado region and found a 10% error rate.  In particular, he noted that it appears that the NLP software picks up, and the reviewing coders have validated, diagnoses that appear in problem lists but which lack additional notation of treatment.  As described above, a diagnosis may not be submitted for risk adjustment purposes if it just appears in a problem list.  There must be further indication that the physician considered or treated the diagnosis.

233.    Notwithstanding this high error rate, Kaiser continues to allow its regions to determine whether they will conduct any additional review of the True Positives before submission to CMS.  The Colorado region passes the True Positive diagnoses to its claims submission system with no further review, even though Kaiser knows that many of these claims are likely false.  Likewise, the Northwest region passes through all True Positive diagnoses with the exception of diagnoses of cachexia (which are known to have very high error rates).  The Hawaii region, on the other hand, has both a coder and a physician audit 100% of the "True Positives."

234.    By failing to take corrective action to prevent the submission of false diagnosis data, knowing that in the absence of action such data would be submitted, Kaiser knowingly submitted false claims to CMS for risk adjustment payments.  Additionally, once Kaiser learned

1   of false submissions within its data, its annual attestations claiming that submitted data was

2   accurate, true, and complete, were rendered false.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

## FIRST CLAIM FOR RELIEF

### False Claims Act: Presenting or Causing to be Presented False Claims
### 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))

235.  Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 234 of this Complaint.

236.  Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to CMS, resulting in their receiving inflated Medicare payments from CMS to which they were not entitled.

237.  Specifically, Defendants presented or caused to be presented false claims for risk-adjustment payments in the form of false diagnosis codes for Defendants' Medicare beneficiaries, as well as in the form of false risk adjustment attestations certifying the completeness, accuracy, and truthfulness of Defendants' risk adjustment data, in violation of CMS regulations and policies, which Defendants agreed to and were obligated to comply with.

238.  If CMS had known that Defendants had presented or caused to be presented false claims based on these improper codes, CMS would have refused to make risk-adjustment payments based on the improper coding and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

239.  By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## SECOND CLAIM FOR RELIEF

### False Claims Act: Making or Using False Records or Statements
### 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))

240.  Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 234 of this Complaint.

241. Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records or statements material to false or fraudulent claims resulting in their receiving inflated Medicare payments from CMS to which they were not entitled.

242. If CMS had known that Defendants had presented or caused to be presented false claims based on these improper codes, CMS would have refused to make risk-adjustment payments based on the improper coding and/or taken other appropriate actions to ensure that Defendants did not receive or retain risk-adjustment payments to which they were not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

243. By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### THIRD CLAIM FOR RELIEF

**False Claims Act: Reverse False Claims**
**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)))**

244. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 234 of this Complaint.

245. Defendants violated 31 U.S.C. § 3729(a)(1)(G) by knowingly concealing and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States. Specifically, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from CMS.

246. If CMS had known that Defendants had presented or caused to be presented false claims based on these improper codes, CMS would have refused to make risk-adjustment payments based on the improper coding and/or taken other appropriate actions to ensure that

Defendants did not receive or retain risk-adjustment payments to which they were not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

247.    By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER

WHEREFORE, Relator, on behalf of himself and the United States, requests that judgment be entered in his favor and against Defendants as follows:

(a) That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

(b) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500-$11,000, for conduct occurring prior to November 2, 2015 and a civil fine of between $10,957 and $21,916, for conduct occurring after November 2, 2015, for each violation of 31 U.S.C. § 3729, plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990;

(c) That Relator be awarded a "relator's share" in an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States, and/or third parties;

(d) That Relator be granted a trial by jury;

(e) That Relator and the United States be awarded pre-judgment interest;

(f) That Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and 3730(h);

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

1
2
3
4
5
6
7

(g) That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

(h) That Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

(i) That the Government and Relator obtain such other relief as the Court deems just and proper.

SECOND AMENDED COMPLAINT BY RELATOR JAMES M. TAYLOR, M.D.,
FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
Consolidated Case No. 3:13-cv-03891-EMC (Original Case No. 3:21-cv-03894-EMC)

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.


DATED: November 15, 2021                    Respectfully submitted,


By:     s/*Michael J. Ronickher*
MICHAEL J. RONICKHER
EDWARD A. BAKER
MAX VOLDMAN
RONNY VALDES
**Constantine Cannon LLP**
1001 Pennsylvania Ave, NW,
Suite 1300N
Washington, DC 20004
Telephone: (202) 204-3053
Facsimile:  (202) 204-3501
mronickher@constantinecannon.com
ebaker@constantinecannon.com
mvoldman@constantinecannon.com
rvaldes@constantinecannon.com


By:     s/*Mary A. Inman*
MARY ALICE INMAN
**Constantine Cannon LLP**
150 California Street
Suite 1600
San Francisco, CA 94111
Telephone: (415) 639-4001
Facsimile:  (415) 639-4002
minman@constantinecannon.com


*Attorneys for Relator James Taylor*