1   DAVID DEATON (S.B. # 205713)      K. LEE BLALACK, II (admitted *pro hac vice*)
    ddeaton@omm.com     lblalack@omm.com
2   STEPHEN M. SULLIVAN (S.B. # 245314)     DAVID J. LEVISS (admitted *pro hac vice*)
    ssullivan@omm.com     dleviss@omm.com
3   CAITLIN M. BAIR (S.B. # 256994)     O'MELVENY & MYERS LLP
    cbair@omm.com     1625 Eye Street, N.W.
4   DIMITRI D. PORTNOI (S.B. # 282871)     Washington, D.C. 20006
    dportnoi@omm.com     Telephone:    (202) 383-5300
5   O'MELVENY & MYERS LLP     Facsimile:    (202) 383-5414
    Two Embarcadero Center
6   San Francisco, California 94111
    Telephone:    (415) 984-8700
7   Facsimile:    (415) 984-8701

8   *Attorneys for Defendants*

9

10

11                    **UNITED STATES DISTRICT COURT**

12   **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13

14

15   UNITED STATES OF AMERICA ex rel.      Case No. 3:13-cv-03891-EMC
    RONDA OSINEK,
16       **NOTICE OF MOTION AND MOTION TO**
            Plaintiff,     **DISMISS PURSUANT TO FALSE CLAIMS**
17       **ACT'S FIRST-TO-FILE BAR;**
      v.     **MEMORANDUM OF POINTS AND**
18       **AUTHORITIES**
    KAISER PERMANENTE, et al.,
19       Hearing Date:    March 31, 2022
            Defendants.     Time:    1:30 PM
20       Judge:    Hon. Edward M. Chen
    Courtroom:    5, 17th Floor
21

22

23

24

25

26

27                    (CAPTION CONTINUED)

28

| | | |
|---|---|---|
| 1 | UNITED STATES OF AMERICA ex rel. NASER AREFI, AJITH KUMAR and PRIME HEALTHCARE SERVICES, INC., | Case No. 3:16-cv-01558-EMC |
| 2 | | **NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FALSE CLAIMS ACT'S FIRST-TO-FILE BAR; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 3 | Plaintiff, | |
| 4 | v. | |
| 5 | KAISER FOUNDATION HEALTH PLAN, INC., et al., | Hearing Date:   March 31, 2022 |
| 6 | | Time:            1:30 PM |
| 7 | Defendants. | Judge:           Hon. Edward M. Chen |
| | | Courtroom:       5, 17th Floor |

| | | |
|---|---|---|
| 8 | | |
| 9 | | |
| 10 | UNITED STATES OF AMERICA ex rel. MARCIA STEIN and RODOLFO BONE, | Case No. 3:16-cv-05337-EMC |
| 11 | Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FALSE CLAIMS ACT'S FIRST-TO-FILE BAR; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 12 | v. | |
| 13 | KAISER FOUNDATION HEALTH PLAN, INC., et al., | |
| 14 | Defendants. | Hearing Date:   March 31, 2022 |
| 15 | | Time:            1:30 PM |
| 16 | | Judge:           Hon. Edward M. Chen |
| | | Courtroom:       5, 17th Floor |
| 17 | | |

| | | |
|---|---|---|
| 18 | UNITED STATES OF AMERICA ex rel. GLORYANNE BRYANT and VICTORIA HERNANDEZ, | Case No. 3:18-cv-01347-EMC |
| 19 | | **NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FALSE CLAIMS ACT'S FIRST-TO-FILE BAR; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 20 | Plaintiff, | |
| 21 | v. | |
| 22 | KAISER PERMANENTE, et al., | |
| 23 | Defendants. | Hearing Date:   March 31, 2022 |
| 24 | | Time:            1:30 PM |
| | | Judge:           Hon. Edward M. Chen |
| 25 | | Courtroom:       5, 17th Floor |
| 26 | | |
| 27 | | (CAPTION CONTINUED) |
| 28 | | |

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. MICHAEL BICOCCA,<br><br>Plaintiffs,<br><br>v.<br><br>PERMANENTE MEDICAL GROUP, INC., et al.,<br><br>Defendants. | Case No. 3:21-cv-03124-EMC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FALSE CLAIMS ACT'S FIRST-TO-FILE BAR; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:  March 31, 2022<br>Time:           1:30 PM<br>Judge:          Hon. Edward M. Chen<br>Courtroom:   5, 17th Floor |
| UNITED STATES OF AMERICA ex rel. JAMES M. TAYLOR,<br><br>Plaintiff,<br><br>v.<br><br>KAISER PERMANENTE, et al.,<br><br>Defendants. | Case No. 3:21-cv-03894-EMC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FALSE CLAIMS ACT'S FIRST-TO-FILE BAR; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:  March 31, 2022<br>Time:           1:30 PM<br>Judge:          Hon. Edward M. Chen<br>Courtroom:   5, 17th Floor |

1

## NOTICE OF MOTION AND MOTION

2

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on March 31, 2022, at 1:30 p.m., or as soon thereafter as

4

counsel may be heard, in the courtroom of the Honorable Edward M. Chen (Courtroom 5) of the

5

above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102,

6

Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Health Plan of Colorado; The

7

Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Colorado

8

Permanente Medical Group, P.C.; Kaiser Foundation Hospitals; Kaiser Foundation Health Plan of

9

Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States; Kaiser Foundation

10

Health Plan of the Northwest; Kaiser Foundation Health Plan of Washington; The Southeast

11

Permanente Medical Group; Hawaii Permanente Medical Group; Mid-Atlantic Permanente

12

Medical Group; Group Health Permanente (n/k/a Washington Permanente Medical Group, P.C.);

13

Northwest Permanente, P.C.; and The Permanente Federation, LLC (collectively, "Defendants")

14

will and hereby do move this Court to dismiss all or portions of the following complaints under

15

Federal Rule of Civil Procedure 12(b)(1):

16

- *United States ex rel. Taylor v. Kaiser Permanente*, Case No. 3:21-cv-03894-EMC

17

  (N.D. Cal.);

18

- *United States ex rel. Arefi v. Kaiser Foundation Health Plan, Inc.*, Case No. 3:16-cv-

19

  01558-EMC (N.D. Cal.);

20

- *United States ex rel. Stein v. Kaiser Foundation Health Plan, Inc.*, Case No. 3:16-cv-

21

  05337-EMC (N.D. Cal.);

22

- Counts 1 through 4, *United Sates ex rel. Bryant v. Kaiser Permanente*, Case No. 3:18-

23

  cv-01347-EMC (N.D. Cal.); and

24

- Counts 1 and 2, *United States ex rel. Bicocca v. Permanente Medical Group, Inc.*,

25

  Case No. 3:21-cv-03124-EMC (N.D. Cal.).

26

Defendants bring this Motion on the grounds that the above-listed complaints and causes

27

of action are barred under the False Claims Act's first-to-file bar, 31 U.S.C. § 3730(b)(5).  The

28

first-to-file bar is jurisdictional and provides that once a relator brings a *qui tam* action, "no

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1    person other than the Government may intervene or bring a related action based on the facts

2    underlying the pending action."  31 U.S.C. § 3730(b)(5); *United States ex rel. Lujan v. Hughes*

3    *Aircraft Co.*, 243 F.3d 1181, 1186-87 (9th Cir. 2001).  Each of the above-captioned *qui tam*

4    complaints alleges virtually the same fraudulent scheme—that Defendants (or some combination

5    of Defendants) knowingly submitted or caused to be submitted false diagnosis codes to the U.S.

6    Centers for Medicare and Medicaid Services ("CMS") for purposes of obtaining higher

7    reimbursement relating to health insurance coverage that certain Defendants offered their

8    Medicare Advantage members.  Because the fraudulent scheme alleged in all five complaints is

9    related to the same fraudulent scheme alleged in Ronda Osinek's earlier-filed *qui tam* complaint,

10   the first-to-file bar precludes the later-filed actions.  Defendants therefore respectfully request that

11   the Court dismiss the above-listed causes of action and *qui tam* complaints.

12        The Motion is based on this Notice of Motion, the accompanying Memorandum of Points

13   and Authorities, the Request for Judicial Notice, the Declaration of David Deaton in support of

14   the Request for Judicial Notice, any reply memorandum, and such other written and oral

15   argument as may be presented to the Court.

16

17   Dated:  January 18, 2022                    Respectfully submitted,

18

19                                        By:    /s/ *K. Lee Blalack, II*

20                                                K. LEE BLALACK, II
                                                  DAVID DEATON

21                                                DAVID J. LEVISS
                                                  STEPHEN M. SULLIVAN

22                                                CAITLIN M. BAIR
                                                  DIMITRI D. PORTNOI

23
                                                  *Attorneys for Defendants*
24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 3

     A.     The Medicare Advantage Program .......................................................... 3

     B.     The First-Filed *Osinek* Complaint .......................................................... 5

     C.     The Later-Filed Complaints .................................................................... 8

           1.     *Taylor* (2014) .............................................................................. 8

           2.     *Arefi* (2015) .............................................................................. 10

           3.     *Stein* (2016) .............................................................................. 10

           4.     *Bryant* (2018) ............................................................................ 12

           5.     *Bicocca* (2020) .......................................................................... 13

     D.     *Qui Tam* Consolidation and Intervention by United States ................. 14

III.    ARGUMENT .................................................................................................... 15

     A.     The FCA's First-to-File Bar Prohibits Additional *Qui Tam* Actions Alleging the Same Material Elements of Fraud as an Earlier-Filed *Qui Tam* ...... 15

     B.     The First-to-File Bar Requires Dismissal of All or Portions of the Later-Filed Complaints ................................................................................... 18

           1.     *Taylor* ........................................................................................ 19

           2.     *Arefi* .......................................................................................... 21

           3.     *Stein* .......................................................................................... 21

           4.     *Bryant* (Counts 1–4) ................................................................. 22

           5.     *Bicocca* (Counts 1 & 2) ............................................................ 24

IV.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Campbell v. Redding Med. Ctr.*,
   421 F.3d 817 (9th Cir. 2005)..................................................................... 2

*Grynberg v. Koch Gateway Pipeline Co.*,
   390 F.3d 1276 (10th Cir. 2004)................................................................ 18

*In re Nat. Gas Royalties Qui Tam Litig.*,
   566 F.3d 959 (10th Cir. 2009).................................................................. 17

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*,
   858 F.2d 1376 (9th Cir. 1988).................................................................. 17

*United States ex rel. Batiste v. SLM Corp.*,
   659 F.3d 1204 (D.C. Cir. 2011) ........................................................ passim

*United States ex rel. Branch Consultants v. Allstate Ins. Co.*,
   560 F.3d 371 (5th Cir. 2009).................................................................... 16

*United States ex rel. Carter v. Halliburton Co.*,
   144 F. Supp. 3d 869 (E.D. Va. 2015)....................................................... 17

*United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*,
   318 F.3d 214 (D.C. Cir. 2003) ...................................................... 17, 18, 20

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
   792 F.3d 1121 (9th Cir. 2015)................................................................... 16

*United States ex rel. Lujan v. Hughes Aircraft Co.*,
   243 F.3d 1181 (9th Cir. 2001)............................................................ 16, 17

*United States ex rel. Marion v. Heald Coll., LLC*,
   2015 WL 4512843 (N.D. Cal. July 24, 2015)................................ 16, 17, 21

*United States ex rel. Silingo v. WellPoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018)................................................................. 3, 4

*United States ex rel. Taylor v. Kaiser Permanente*,
   Case No. 3:21-cv-03894-EMC (N.D. Cal.) .............................................. 1

*UnitedHealthcare Ins. Co. v. Becerra*,
   16 F.4th 867 (D.C. Cir. 2021)................................................................ 3, 4

## STATUTES

31 U.S.C. § 3730(b)(5)....................................................................... passim

42 U.S.C. § 1395w-23(a)(1)(C)(i)................................................................ 4

42 U.S.C. § 1395w-23(a)(3).......................................................................... 4

1

**TABLE OF AUTHORITIES**
(continued)

2

3                                                                                                          **Page**

**OTHER AUTHORITIES**

4

Moore et al., *Moore's Federal Practice* § 15.14[3] (3d ed. 1999) ................................................ 18

5

**REGULATIONS**

6

42 C.F.R. § 422.308(c)(2) ............................................................................................................. 4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

Eight years ago, Ronda Osinek filed a *qui tam* action under the False Claims Act ("FCA"),

4 alleging that Kaiser Permanente[1] knowingly presented false claims for payment to the Medicare

5 Advantage program.  Specifically, she contends that Kaiser Permanente engaged in an unlawful

6 "upcoding" scheme in which it reported diagnosis codes for Medicare Advantage members[2] to

7 the U.S. Centers for Medicare and Medicaid Services ("CMS") that Kaiser Permanente knew did

8 not comply with CMS coding and documentation requirements and that these diagnosis codes

9 resulted in overpayments from the Medicare Advantage program.  Alerted to an allegedly

10 fraudulent, enterprise-wide scheme, the U.S. Department of Justice ("DOJ") commenced an

11 investigation of Osinek's allegations in 2013.  In the subsequent seven years, a stampede of other

12 individuals seeking to cash in on the FCA's bounty system filed *qui tam* complaints of their own

13 against various healthcare organizations operating under the Kaiser Permanente trade name, all

14 alleging a similar "upcoding" scheme to defraud the Medicare Advantage program.  Despite the

15 first-filed *Osinek* complaint having already given the United States notice of the alleged fraud on

16 the Medicare Advantage program, ***five more*** FCA suits (the "Later-Filed Complaints") now plead

17 duplicative theories based on the same essential facts.  The FCA's first-to-file bar compels the

18 Court to dismiss all or portions of these five subsequent *qui tam* complaints.[3]

19

20 [1] Kaiser Permanente is not a legal entity, *see* Request for Judicial Notice ("RJN"), Ex. F, but rather a trade name that refers to the nationwide collaboration among nonprofit health plans, nonprofit hospitals, and provider-directed medical groups to render healthcare services to their

21 members, including millions of Medicare Advantage members, *see United States ex rel. Taylor v. Kaiser Permanente*, Case No. 3:21-cv-03894-EMC (N.D. Cal.), Dkt. No. 1 ¶¶ 16–17.

22

[2] "Members" refers to the individual Medicare beneficiaries who are enrolled in the Medicare

23 Advantage program and receive their healthcare coverage through a private insurer known as a Medicare Advantage Organization ("MAO").  Members become patients when they receive

24 medical care covered by the Medicare Advantage program.  Thus, for purposes of this Motion, the terms "members," "beneficiaries," and "patients" are synonymous unless otherwise stated.

25

[3] This Motion seeks dismissal of the Later-Filed Complaints—*Taylor*, *Arefi*, *Stein*, *Bryant*, and

26 *Bicocca*—in their entirety except for the retaliation causes of action in the operative *Bryant*

27 complaint (Counts 5 through 8) and the California False Claims Act causes of action in the operative *Bicocca* complaint (Counts 3 and 4), as those claims are not subject to dismissal under

28 the FCA's first-to-file bar.

The FCA incentivizes private individuals, called "relators," to alert the United States to potential fraud by bringing a *qui tam* complaint.  But Congress understood that only a single complaint is needed to serve this purpose—where two suits raise "essentially the same claims, permitting the second suit to go forward [i]s not necessary to alert the government to the underlying facts of a fraudulent scheme."  *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 821 (9th Cir. 2005).  Congress sought to preclude duplicative *qui tam* suits when it amended the FCA in 1986 to add the so-called "first-to-file bar."  This jurisdictional bar provides that after a relator brings a *qui tam* action, "no person other than the Government may intervene or bring a related action **based on the facts underlying the pending action**."  31 U.S.C. § 3730(b)(5) (emphasis added).  The first-to-file bar not only eliminates repetitive lawsuits that needlessly drain judicial and party resources, but also creates a virtuous race to the courthouse with incentives for would-be whistleblowers to quickly file their complaints.

This case is an extreme illustration of why Congress enacted the first-to-file bar.  It features not just one repetitive suit alleging the same fraudulent scheme as the original complaint—but *six separate qui tam actions brought by ten relators* alleging the same essential elements of fraud on the Medicare Advantage program.  As originally pleaded, Relators' complaints total over 300 pages, not to mention amendments and exhibits.[4]  But all six complaints allege essentially the same wrongdoing: that Defendants knowingly upcoded diagnosis codes for Medicare Advantage members and that improper practice caused CMS to remit overpayments to health plans sponsored by some of the Defendants.[5]

---

[4] "Relators" are (i) Ronda Osinek (complaint filed in 2013); (ii) James Taylor (complaint filed in 2014); (iii) Naser Arefi, Ajith Kumar, and Prime Healthcare Services, Inc. (complaint filed in 2015); (iv) Marcia Stein and Rodolfo Bone (complaint filed in 2016); (v) Gloryanne Bryant and Victoria Hernandez (complaint filed in 2018); and (vi) Michael Bicocca (complaint filed in 2020).

[5] "Defendants" are Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Health Plan of Colorado; The Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Colorado Permanente Medical Group, P.C.; Kaiser Foundation Hospitals; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States; Kaiser Foundation Health Plan of the Northwest; Kaiser Foundation Health Plan of Washington; The Southeast Permanente Medical Group; Hawaii Permanente Medical Group; Mid-Atlantic

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1    The first-filed *Osinek* complaint alleged an enterprise-wide fraud that put the United

2    States on notice of the Medicare Advantage upcoding schemes subsequently alleged in the Later-

3    Filed Complaints, and DOJ actively investigated those allegations for years.  The upcoding

4    schemes alleged in the Later-Filed Complaints do nothing to serve the policy goals of the FCA, as

5    the *Osinek* complaint put the United States on notice of the alleged fraud in 2013.  Allowing these

6    duplicative allegations to continue would only further complicate this litigation, burden the

7    Court's docket unnecessarily, and waste the parties' resources.  This Court should therefore

8    dismiss all or portions of the Later-Filed Complaints under the FCA's first-to-file bar.[6]

9    **II.    BACKGROUND**

10           **A.    The Medicare Advantage Program**

11           Medicare is a federal health insurance program for older adults and individuals with

12   disabilities.  *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).  CMS, an

13   agency within the U.S. Department of Health and Human Services, administers the Medicare

14   program.  *Id.*  The traditional Medicare program consists of Medicare Part A, which covers

15   inpatient hospital care, and Medicare Part B, which covers outpatient medical care.  *Id.*  CMS also

16   administers Medicare Part C, which is known as Medicare Advantage, through which Medicare

17   Advantage beneficiaries receive healthcare coverage from private insurers known as MAOs.  *Id.*

18   All of the *qui tam* complaints at issue in this Motion allege a scheme to defraud the Medicare

19   Advantage program.

20           Under the traditional Medicare program, CMS compensates healthcare providers directly

21   for all services rendered to Medicare beneficiaries.  *United States ex rel. Silingo v. WellPoint,*

22   *Inc.*, 904 F.3d 667, 672 (9th Cir. 2018).  Under the Medicare Advantage program, however,

23   _____

24   Permanente Medical Group; Group Health Permanente (n/k/a Washington Permanente Medical
     Group, P.C.); Northwest Permanente, P.C.; and The Permanente Federation, LLC.  Because the
25   various complaints do not name all of the same defendants, "Defendants" or "Kaiser" refers to the
     defendants named in the complaint(s) referenced in the relevant portion of the Motion, unless
26   otherwise indicated.  Although Kaiser Permanente is not a legal entity, *supra* note 1,
     "Defendants" and "Kaiser" include Kaiser Permanente where named in the complaint at issue.

27   [6] To assist the Court in its evaluation of this Motion, Appendix A includes a chart comparing the
28   allegations of the *qui tam* complaints.

private health insurance plans "provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program—regardless of actual healthcare usage." *Becerra*, 16 F.4th at 872. CMS determines this flat monthly rate through an annual bidding process, and then CMS applies a risk-adjustment payment model, which adjusts the payment rate based on various demographic and health factors that can affect healthcare expenses, including age, gender, and medical diagnoses. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i), (a)(3); 42 C.F.R. § 422.308(c)(2).

Healthcare providers typically record member diagnoses after member visits using "diagnosis codes" and send those codes to the members' Medicare Advantage plans. *Silingo*, 904 F.3d at 672; *see also* 42 U.S.C. § 1395w-23(a)(1)(C)(i). The plans then report the codes to CMS, which uses them to calculate payment rates for each Medicare Advantage member. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i). CMS compensates Medicare Advantage plans based on only those medical conditions diagnosed in the previous payment year. *Silingo*, 904 F.3d at 672.

CMS's risk-adjustment payment model groups diagnosis codes into Hierarchical Condition Categories ("HCCs"). *Id.* Each HCC is assigned a different "relative factor," which corresponds to that HCC's relative effect on the payment amount to the Medicare Advantage plan. *Becerra*, 16 F.4th at 874–75. During the period at issue, CMS determined the relative factors for each HCC through its statistical analysis of the average costs of treating members with those reported conditions in traditional Medicare. *Id.* Because the relative factors differ among HCCs, some HCCs have a larger effect on the payment amount to Medicare Advantage plans. *Id.* CMS uses the relative factors associated with each HCC applicable to a given Medicare Advantage member to calculate what it calls a "risk score," and this risk score is then used to compute the risk adjustment to the flat monthly payment for that member. *Id.*

The D.C. Circuit recently offered this example of how the HCC payment model works: "a 72-year-old woman living . . . with diabetes without complications (relative factor 0.118), and multiple sclerosis (relative factor 0.556)" has a particular risk score keyed to her age, gender, other demographic factors, and medical diagnoses. *Id.* at 875. Both medical conditions raised her risk score by a "relative factor," but multiple sclerosis resulted in a higher increase in that score because CMS had previously determined that treating that condition costs the traditional

1    Medicare program more than treating ordinary diabetes without complications.  *See id.*  In other

2    words, under the HCC-payment model, some medical conditions will result in higher risk scores

3    and, in turn, higher CMS payments to Medicare Advantage plans because those conditions are

4    associated with comparatively higher average medical costs than other conditions.

5              **B.      The First-Filed *Osinek* Complaint**

6              Ronda Osinek filed the first of the *qui tam* complaints on August 22, 2013.  Osinek was a

7    medical coder employed by The Permanente Medical Group, which operates in Northern

8    California.  Dkt. No. 1 ¶¶ 5, 23.[7]  Osinek's original complaint names a single defendant, Kaiser

9    Permanente.  She distinguishes Kaiser Permanente from regional entities operating within Kaiser

10   Permanente and alleges that it directed these entities to engage in various documentation and

11   diagnosis coding practices.  *See, e.g.*, *id.* ¶¶ 5–6, 23, 37–38 (alleging that Kaiser exerted

12   "competitive pressure" "between regions").

13             The crux of Osinek's complaint is that Kaiser "defrauded the United States through a

14   sophisticated scheme to upcode diagnoses to ensure Medicare [Advantage] payments for

15   reimbursable, high-value [medical] conditions."  *Id.* ¶ 2.  She defines "upcoding" as using

16   diagnosis codes to make Medicare Advantage members "appear less healthy than they actually

17   are."  *Id.* ¶ 25.  The alleged fraud implicates a range of Kaiser's purported business practices—

18   referred to below as Data Mining/Algorithms, Refresh, Addenda, Boilerplate Phrases, Pressure to

19   Diagnose Risk-Adjusting Medical Conditions, and Guidance & Policies—which subsequent

20   Relators also cited in their *qui tam* complaints.

21             ***Data Mining/Algorithms.***  Osinek alleges that around 2007, Kaiser began a process called

22   "data mining."  *Id.* ¶¶ 24–25.  Through data mining, Kaiser allegedly identified "higher value

23   HCCs and then determined the diagnoses its [healthcare providers] would need to make to

---

24   [7] Unless otherwise indicated, docket references are to the docket in *United States ex rel. Osinek v.*

25   *Kaiser Permanente*, Case No. 3:13-cv-03891-EMC (N.D. Cal.), under which the Later-Filed
     Complaints have been consolidated.  References to dockets in the other consolidated cases are

26   indicated by case name.  Defendants dispute the factual allegations and legal assertions in all of
     the *qui tam* complaints.  The characterization of the complaints in this Motion is for the sole

27   purpose of explaining that the complaints allege the same fraudulent scheme—a scheme that
     Defendants deny.  Nothing herein constitutes an admission of any allegation in those complaints.

28

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1   support the HCCs Kaiser wanted to submit for Medicare reimbursement." *Id.*  Then Kaiser

2   allegedly used "algorithms to identify . . . [medical] conditions for data mining" in members'

3   medical records to ensure that it did not fail to report potentially reimbursable medical conditions

4   to CMS.  *See id.*  Indeed, Osinek contends that Kaiser employed data mining to eliminate

5   instances where a healthcare provider could have recorded a diagnosis for a member but did not,

6   omissions that Kaiser allegedly called "missed opportunities."  *See id.*  After Kaiser identified

7   "missed opportunities," it allegedly prompted healthcare providers to add the identified medical

8   conditions to member medical records.  *Id.* ¶ 33.  According to Osinek, the purpose of data

9   mining is to submit diagnosis codes to CMS for "high value [medical] conditions for which

10  Kaiser can maximize its reimbursement from Medicare and increase its revenue."  *Id.* ¶ 25.  She

11  alleges that Kaiser would target specific medical conditions for data mining medical records,

12  including chronic kidney disease, congestive heart failure, depression, chronic respiratory failure,

13  cachexia/protein calorie malnutrition, and obesity.  *See id.*

14       **Refresh.**  Because CMS compensates Medicare Advantage plans based on only those

15  medical conditions diagnosed in the previous payment year, *see supra* at 4, plans must record and

16  report chronic medical conditions for members each year.  According to Osinek, Kaiser uses the

17  term "refresh" to describe its efforts to re-diagnose chronic conditions each year.  *See id.* ¶ 37.

18  She contends that Kaiser implemented organized efforts to refresh members' "chronic [medical]

19  conditions" year over year to eliminate "missed opportunities."  *Id.* ¶¶ 33, 37.  She further alleges

20  that Kaiser used data mining and this refresh initiative to improperly increase Kaiser's "billings

21  for high value . . . HCCs."  *Id.* ¶ 24.  According to Osinek, Kaiser directly tied compensation to

22  affiliated medical facilities to "refresh and data mining rates" in order to incentivize healthcare

23  providers to submit more diagnosis codes for reimbursable medical conditions.  *Id.* ¶¶ 39–40.

24       **Addenda.**  Osinek alleges that Kaiser violated CMS guidance about when a healthcare

25  provider can modify or amend a medical record following a member visit.  According to Osinek,

26  a provider typically enters relevant information about a member "into a medical record at the time

27  of service."  *Id.* ¶ 20.  But sometimes a provider will amend a medical record with additional

28  information, including additional medical diagnoses, after the face-to-face visit with the member.

1   *See id.*  These post-encounter amendments to the medical record are called "addenda."  *See id.*

2   ¶¶ 20, 28.  Osinek asserts that, under CMS guidelines about addenda, healthcare providers "must

3   verify that they considered a diagnosis or treated a diagnosis during the [patient] encounter, which

4   means a [provider] must address what was contemporaneously considered if he or she addends a

5   diagnosis."  *Id.* ¶ 28.  She contends, however, that Kaiser's healthcare providers addended

6   medical records "with supporting statements or documentation [for medical conditions] that were

7   not addressed at the time of an encounter."  *Id.*  After a member visit, Kaiser allegedly instructed

8   healthcare providers "to go back to see what [the] member's previous test results showed to make

9   diagnoses," and "prompted" healthcare providers to addend records with specific diagnoses based

10  on, for example, laboratory tests.  *Id.* ¶¶ 29–30.  She broadly asserts that Kaiser "also addended

11  and submitted diagnostic codes for complex [medical] conditions without proper support (i.e., not

12  a true causal connection)."  *Id.* ¶ 31.

13       ***Boilerplate Phrases***.  Osinek alleges that Kaiser created "boilerplate phrases" for use in

14  documenting a member encounter in the medical record and that these "boilerplate phrases"

15  helped healthcare providers "justify" additions to the medical record.  *Id.* ¶ 32.  She contends that

16  these phrases allow healthcare providers to "systematically addend [members'] records

17  retroactively—often many months after visits—with cloned or boilerplate language to make the []

18  record appear to comply with CMS instructions."  *Id.* ¶ 28.  She further explains that healthcare

19  providers "are expected to use these phrases rather than their own language and discretion based

20  on what they recall from [member] visits."  *Id.* ¶ 32.

21       ***Pressure to Diagnose Risk-Adjusting Medical Conditions.***  Osinek also alleges that

22  Kaiser "pressures" healthcare providers "to addend diagnoses and capture the high value HCCs"

23  to eliminate "missed opportunities."  *Id.* ¶ 33.  As part of this pressure, Kaiser allegedly uses

24  "data mining prompts," which are requests sent to healthcare providers to add diagnoses to

25  medical records when Kaiser discovers "missed opportunities."  *Id.*  Osinek contends there is an

26  "escalation process" for those healthcare providers who disagree with the prompts and that this

27  escalation process requires healthcare providers to "explain their refusal" to diagnose the

28  prompted medical conditions.  *Id.*  She also alleges that Kaiser ties healthcare providers'

7

1  compensation directly to their performance on data-mining and refresh efforts. *Id.* ¶ 34. And she

2  asserts that Kaiser sponsored so-called "coding parties," created competitions, and awarded cash

3  prizes to encourage healthcare providers to participate in upcoding of diagnosis codes. *Id.* ¶¶ 35–

4  37. As one example, she cites documents that she alleges demonstrate a competition between

5  Kaiser's regional organizations to pressure healthcare providers to increase the number of risk-

6  adjusting diagnoses reported from member visits. *Id.* ¶ 37.

7        ***Guidance & Policies.*** Finally, Osinek alleges that Kaiser instituted policies and guidance

8  meant to target high-value HCCs. *Id.* ¶¶ 26–30. She insists that, as a general matter, Kaiser

9  instructs its affiliated-healthcare providers "to change diagnoses to upcode to higher value and

10  more complicated forms of diseases" rather than medical conditions that members' symptoms

11  actually reflect. *Id.* ¶ 30. She also alleges that Kaiser's policies caused healthcare providers to

12  "take into consideration HCCs and the Medicare [Advantage] payment system when coding and

13  recording [member] encounters." *Id.* ¶ 26. And she asserts that "when CMS announces that

14  HCCs are eliminated (and no longer reimbursable by Medicare), Kaiser tells its [healthcare

15  providers] to change coding practices to reflect new reimbursable [HCCs]." *Id.* ¶ 27.

16      **C.**    **The Later-Filed Complaints**

17        Like *Osinek*, each of the Later-Filed Complaints alleges that Defendants relied on

18  "upcoding" techniques to identify and report to CMS "higher value" HCCs for the purposes of

19  defrauding the Medicare Advantage program. And all five of the Later-Filed Complaints

20  describe the same techniques that allegedly facilitated the scheme that Osinek first described in

21  her initial complaint.

22      **1.**    ***Taylor* (2014)**

23        James Taylor is a physician and former employee of Defendant Colorado Permanente

24  Medical Group. *Taylor* Dkt. No. 1 ¶ 12. On October 22, 2014, he filed a *qui tam* complaint

25  against "Kaiser Permanente" as well as national and regional Kaiser-affiliated entities, including

26  Defendants Kaiser Foundation Health Plan, Kaiser Foundation Health Plan of Colorado, Kaiser

27  Foundation Health Plan of Georgia, and Kaiser Foundation Health Plan of the Northwest. *Id.*

28  ¶¶ 18, 21–24. His allegations date back to when Kaiser implemented new Medicare Advantage

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

policies in 2004 following the creation of the risk-adjustment model that is at issue in this litigation. *Id.* ¶ 5.

Like Osinek's complaint the year before, Taylor details a scheme to "upcode" diagnoses submitted to CMS for Medicare Advantage members. *Id.* ¶¶ 61, 101. He alleges that Defendants "submit false claims to CMS when they know, or in the exercise of reasonable care should know, that: (1) the [members] do not have the diagnoses for which a risk adjustment claim was submitted; and/or (2) the diagnosis" did not meet purported CMS requirements—specifically, the diagnosis "a) was neither treated nor affected the treatment provided; b) in a face-to-face visit; c) with an appropriate provider; d) in the year at issue." *Id.* ¶ 5.

Taylor provides examples of allegedly false risk-adjustment data, *id.* ¶ 81, including "examples of diagnoses and HCCs identified as frequently upcoded" in Kaiser's internal audits. *Id.* ¶ 101. He lists many of the same medical conditions that Osinek identifies in her complaint, such as cancer, malnutrition, respiratory conditions, and renal conditions. *Id.* ¶¶ 131, 135, 139, 151. Taylor also alleges that Kaiser engaged in the same types of business practices and techniques that Osinek described in her complaint:

*Data Mining/Algorithms.* Taylor alleges that Kaiser relied on algorithms and "audits" to identify "certain diagnoses" in member medical records to increase the number and value of the HCCs that Kaiser reported to CMS. *Id.* ¶¶ 62, 177, 191, 197. Like Osinek, Taylor focuses on technology, citing one program called "Natural Language Processing," which he states "uses an algorithm to search [medical records] to find words that, individually or in combination, indicate that a [member] has certain diagnoses." *Id.* ¶ 191.

*Refresh.* Like Osinek, Taylor asserts that Kaiser improperly used a "program designed to 'refresh' chronic [medical conditions]." *Id.* ¶ 186. He contends that some medical conditions identified via refresh initiatives and reported to CMS "were likely false." *Id.* ¶¶ 186–88. He also contends that a 2009 "refresh" audit concluded that more "data mining" of specific conditions was needed. *See id.*

*Addenda.* Taylor also contends that, through use of addenda, healthcare providers impermissibly added diagnoses to medical records after face-to-face encounters. *See id.* ¶ 138.

1    He asserts that "Kaiser routinely submitted [diagnosis codes] where the only documentation to

2    support the diagnosis was a radiologic or lab test, or other non-face-to-face service."  *Id.* ¶ 160.

3        ***Pressure to Diagnose Risk-Adjusting Medical Conditions.***  Taylor, like Osinek, also

4    alleges that Kaiser "pressured" healthcare providers to diagnose "higher-value" medical

5    conditions.  *Id.* ¶ 134.  As an example, he explains that Kaiser pressured healthcare providers "to

6    use the diagnosis code for chronic bronchitis (which risk adjusts) rather than acute bronchitis

7    (which does not risk adjust)."  *Id.*  He also describes provider "scores" that allegedly were

8    affected by participation in Kaiser's upcoding initiatives.  *Id.*

9                    **2.    *Arefi* (2015)**

10           On September 4, 2015, three more relators—Naser Arefi, Ajith Kumar, and Prime

11   Healthcare Services, Inc. ("Prime") (collectively, the "*Arefi* Relators")—filed a third *qui tam*

12   complaint against more than ten Kaiser-affiliated entities.  *Arefi* Dkt. No. 1.  Arefi is a former

13   employee of Defendant The Permanente Medical Group, and he and Kumar are current Prime

14   employees.  *Id.* ¶¶ 8–9.  Prime owns and operates 35 acute care hospitals across 11 states and

15   treats Medicare Advantage members, including some Kaiser members, for emergency medical

16   conditions.  *Id.* ¶ 10.  The *Arefi* complaint's allegations date back to 2009.  *See Arefi* Dkt. No. 67;

17   Dkt. No. 64.

18           The *Arefi* Relators follow the familiar pleading pattern evident from the *Osinek* and

19   *Taylor* complaints, alleging that Kaiser perpetrated a "Medicare Advantage diagnosis upcoding

20   scheme" by "reporting false . . . diagnoses to CMS for Medicare Advantage plan enrollees."

21   *Arefi* Dkt. No. 1 ¶¶ 42, 78.  Similar to Osinek, the *Arefi* Relators allege that Kaiser used **addenda**

22   to "add[] or substitut[e]" medical conditions to members' medical records after encounter dates.

23   *Id.* ¶ 47.  The complaint further alleges that Kaiser relied on medical record reviewers to identify

24   and addend HCC-triggering "diagnoses that were not made by the treating [healthcare provider]

25   at the time of the required face-to-face encounter" with the member.  *Id.* ¶ 45.

26                    **3.    *Stein* (2016)**

27           On May 16, 2016, Marcia Stein and Rodolfo Bone (the "*Stein* Relators") brought a fourth

28   *qui tam* action, naming over a dozen national and regional Kaiser-affiliated entities as defendants

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1    along with "Kaiser Permanente."  *Stein* Dkt. No. 1.  Stein is a Registered Health Information

2    Administrator who was previously employed by Defendants Kaiser Foundation Hospitals and

3    Southern California Permanente Medical Group.  *Id.* ¶ 25.  Bone is a coder who was formerly

4    employed by Defendant Kaiser Foundation Hospitals.  *Id.* ¶ 27.  The *Stein* allegations date back

5    to 2010.  *Id.* ¶ 36.

6         Like the previous Relators, the *Stein* Relators allege "a fraudulent scheme to up-code and

7    falsely diagnose" Medicare Advantage members.  *Id.* ¶ 50.  They also point to the same specific

8    techniques first alleged by Osinek and then again by other Relators:

9         ***Data Mining/Algorithms & Refresh.***  In their *qui tam* complaint, the *Stein* Relators

10   describe "an improper program designed to identify 'missing' [] diagnosis codes and have the

11   [healthcare providers] 'refresh' the missing [diagnosis codes]."  *Id.* ¶ 83.  They allege that

12   Defendant Kaiser Foundation Health Plan's "contracted medical groups compil[ed] a 'hit-list' of

13   high value HCC[s] . . . and their related . . . diagnosis codes," and that the list included chronic

14   medical conditions.  *Id.* ¶ 84.  As part of this alleged scheme to refresh previously diagnosed

15   medical conditions, Kaiser would purportedly "data-mine" the members' medical records for

16   medical conditions that correspond to "high value" HCCs to identify members with a history of

17   diagnoses on the "hit-list."  *Id.*

18        ***Addenda.***  The *Stein* Relators also contend that Kaiser used addenda and "improper late

19   medical record entries" to amend medical records "without valid face-to-face encounters"

20   between healthcare providers and members.  *Id.* ¶¶ 80, 87–91.

21        ***Pressure to Diagnose Risk-Adjusting Medical Conditions.***  The *Stein* Relators allege that

22   Kaiser sent prompts or "queries" to healthcare providers to encourage providers to diagnose

23   medical conditions.  They allege that these "leading queries" pressured healthcare providers to

24   "refresh" medical conditions through addenda that would translate into high-value HCCs, and that

25   coders would meet with healthcare providers "to ensure" the conditions were coded for

26   submission to CMS.  *Id.* ¶ 84; *see also id.* ¶¶ 80, 89, 91.  They also allege that Kaiser "tracked . . .

27   the [healthcare providers] who 'refreshed' the HCC diagnoses" and that "coders then met with the

28   [healthcare providers] to ensure that the hit-list HCC diagnoses were refreshed."  *Id.* ¶¶ 83–84.

1    ***Guidance & Policies.***  The *Stein* Relators also allege that Defendants Kaiser Foundation

2    Health Plan, Kaiser Foundation Hospitals, and the Permanente Medical Groups imposed

3    "unwritten policies" that prevented coders from querying healthcare providers for additional

4    support when the providers diagnosed sepsis, a "high-value" medical condition that would

5    "increase CMS's capitation payments" to Kaiser.  *Id.* ¶¶ 50–51, 68–69.  They also allege that

6    Kaiser "instructed" healthcare providers to use inaccurate diagnosis and coding standards that

7    increased Medicare Advantage members' risk scores through over-diagnosing medical conditions

8    that increased CMS's payments to Kaiser.  *Id.* ¶¶ 50, 53–54, 60, 68–69.

9              **4.    *Bryant* (2018)**

10   Gloryanne Bryant and Victoria Hernandez (the "*Bryant* Relators") filed a fifth *qui tam*

11   complaint on March 1, 2018, naming eleven national and regional Kaiser-affiliated entities as

12   well as "Kaiser Permanente."  *Bryant* Dkt. No. 1.  Bryant and Hernandez are coders and former

13   employees of Defendants Kaiser Foundation Health Plan and The Permanente Medical Group,

14   respectively.  *Id.* ¶¶ 10, 22–23.  Their allegations date back to 2009.  *Id.* at 3.

15   Similar to *Osinek* and the other previously filed *qui tam* actions, the *Bryant* complaint

16   alleges that "Defendants 'upcode' risk adjustment [data]" through various techniques, such as

17   "manipulating the documentation and submitting [risk-adjustment data] to the Medicare

18   Advantage program for diagnoses that the member does not have or for which the member was

19   not treated in the relevant year," or claiming that a member was "treated for a more serious

20   [medical] condition" than the member actually has.  *Id.* ¶ 11.  The *Bryant* Relators also cite the

21   "upcoding" of specific medical conditions, many of which Osinek also references in her

22   complaint—such as malnutrition, respiratory conditions, depression, obesity, aortic

23   atherosclerosis, and renal conditions.  *Id.* ¶¶ 59, 89, 111, 130, 137, 144–45, 148.

24   The *Bryant* Relators contend that Kaiser implemented the alleged fraud using the same

25   upcoding practices first alleged by Osinek:

26   ***Data Mining/Algorithms.***  The *Bryant* Relators describe Kaiser's alleged efforts to

27   "mine" medical records for "missed opportunities," which resulted in the "systematic over-

28   documenting, over-coding and upcoding of [diagnosis codes corresponding to] certain high value

12

HCCs." *Id.* ¶¶ 54, 79. The complaint explains that the "'data mining' team . . . used 'algorithms' . . . to identify and capture possible missed [diagnosis codes] . . . referred to as 'missed opportunities.'" *Id.* ¶ 193.

      ***Addenda.*** Similar to Osinek, the *Bryant* Relators also allege that Kaiser sent "leading" prompts to healthcare providers to "add" diagnosis codes to members' medical records through improper addenda. *Id.* ¶¶ 155, 159–63.

      ***Boilerplate Phrases.*** The *Bryant* Relators allege the improper use of the same type of boilerplate phrases that Osinek first described in her 2013 complaint: "To provide 'documentation' that would constitute evidence of the clinical significance of [a diagnosis]," Defendant The Permanente Medical Group "developed a 'SMARTPHRASE' to automatically populate the medical record . . . that would . . . falsely state that the diagnosis was significant[.]" *Id.* ¶¶ 62, 69.

      ***Pressure to Diagnose Risk-Adjusting Medical Conditions.*** The *Bryant* Relators contend that Kaiser employed "leading" queries that encouraged healthcare providers to diagnose medical conditions that corresponded to HCCs in the CMS payment model and would increase Kaiser's reimbursement from CMS. *See id.* ¶¶ 124–25, 134, 137–38, 141–42, 155–59, 161–64, 182–83, 186. The complaint explains that the "queries are always, or almost always, directed toward an HCC diagnosis for maximizing reimbursement capture and not for overall quality documentation . . . ." *Id.* ¶ 162.

      ***Guidance & Policies.*** According to the *Bryant* Relators, "Kaiser consistently publishes and enforces internal company policies and procedures that contravene coding and diagnostic principles that are widely accepted and enforced within the broader coding community." *Id.* ¶ 151. Like Osinek, the *Bryant* Relators allege that Kaiser relied on diagnosis coding and documentation standards that instructed coders and healthcare providers to report medical conditions that increased Kaiser's reimbursement from CMS where it was not appropriate to do so. *Id.* ¶¶ 59–60, 86–87, 111–13, 131, 137.

      **5.**    ***Bicocca* (2020)**

      Michael Bicocca filed the latest *qui tam* action on February 10, 2020, naming Defendants

13

1    The Permanente Medical Group; Southern California Permanente Medical Group; and The

2    Permanente Federation. *Bicocca* Dkt. No. 1 ¶¶ 1–24. Bicocca is an anesthesiologist who

3    formerly worked at "Kaiser Hospitals" in California. *Id.* ¶¶ 15–16. His allegations date back to

4    2015. *Id.* ¶ 91. Bicocca's complaint focuses on the alleged false submission of chronic medical

5    conditions, an alleged practice that Osinek first described in her complaint.

6         **Boilerplate Phrases.** Like other Relators, Bicocca describes in his complaint boilerplate

7    phrases that Kaiser supposedly directed healthcare providers to use in medical records. *Id.* ¶¶ 98,

8    137–45. He contends that these phrases were used to make it appear that CMS guidelines were

9    satisfied when they were not. *Id.* ¶¶ 99–101.

10        **Pressure to Diagnose Risk-Adjusting Medical Conditions.** Bicocca also alleges a fraud

11   scheme based on pressuring healthcare providers. He asserts that Kaiser "pressures" healthcare

12   providers to improperly diagnose chronic medical conditions by certifying that the providers

13   "managed" the member's "chronic [medical] conditions, even though they have not managed the

14   chronic [medical] condition . . . ." *Id.* ¶¶ 2, 142. Like Osinek, he also alleges that Kaiser tracked

15   healthcare provider participation in various diagnosis-coding initiatives. *Id.* ¶ 132. And he

16   alleges that Kaiser encouraged healthcare providers to add diagnosis codes to members' medical

17   records with monetary incentives and disincentives, including a "reduction in bonus" for

18   healthcare providers who did not meet diagnosis-coding requirements. *Id.* ¶ 129.

19        **Guidance & Policies.** Like Osinek, Bicocca alleges that Kaiser instructed healthcare

20   providers to apply diagnosis-coding and documentation standards that were inconsistent with

21   CMS guidance: "Defendants do not require, and effectively discourage [healthcare providers]

22   from complying with CMS regulations." *Id.* ¶ 6. He further alleges that Kaiser created "trainings

23   and policy changes" that "contained inaccurate information" directing healthcare providers to

24   fraudulently diagnose chronic medical conditions. *Id.* ¶¶ 91–96.

25        **D.    *Qui Tam* Consolidation and Intervention by United States**

26        On June 25, 2021, this Court consolidated *Osinek* and the Later-Filed Complaints at the

27   request of the United States, with no opposition from Relators. Dkt. No. 61. The consolidation

28   order cited the overlapping allegations in the complaints and explained: "The six actions each

14

1  allege that Kaiser submitted claims to the Medicare Advantage Program . . . for risk-adjustment

2  payments for diagnoses that [members] did not actually have and/or that were not actually

3  addressed by the treating [healthcare provider] during a [member] encounter as required by

4  Medicare billing rules." *Id.* at 2.

5         On July 27, 2021, after nearly eight years of investigating the allegations that Osinek first

6  asserted in 2013, the United States filed a notice of its intent to intervene ***partially*** in the

7  consolidated *qui tam* actions.  Dkt. No. 64.  The intervention applies only to "allegations that

8  [Defendants][8] submitted, or caused to be submitted, false claims for risk-adjustment payments

9  based on diagnoses improperly added ***via addenda*** under Medicare [Advantage] from the years

10  2009 until present." *Id.* at 1 (emphasis added).

11         On December 30, 2021, the *Arefi* Relators dismissed their claims with prejudice to the

12  extent that the United States did not intervene in their case.  *See Arefi* Dkt. Nos. 67 & 68.  Thus,

13  only their post-2008 allegations pertaining to addenda practices remain for litigation.  All other

14  causes of action in *Osinek* and the other Later-Filed Complaints remain to be litigated.

15  **III.    ARGUMENT**

16         **A.    The FCA's First-to-File Bar Prohibits Additional *Qui Tam* Actions Alleging
17              the Same Material Elements of Fraud as an Earlier-Filed *Qui Tam***

18         The FCA's first-to-file bar encourages private citizens to promptly alert the government to

19  alleged fraud while also prohibiting duplicative suits that benefit neither the public nor DOJ's

20  investigation of the original fraud allegations.  To advance this dual purpose, the first-to-file bar

21  creates a race to the courthouse by permitting only the first *qui tam* action containing related

22  fraud allegations to proceed through litigation.  Once a relator brings a *qui tam* action, "no person

23  other than the Government may intervene or bring a related action based on the facts underlying

24  the pending action." 31 U.S.C. § 3730(b)(5).  The policy reason for this prohibition is simple: the

25  first-filed action gives "the government notice of the essential facts of an alleged fraud, while the

26  _____

27  [8] The United States' intervention applies only to Defendants Kaiser Foundation Health Plan, Inc.;
    Kaiser Foundation Health Plan of Colorado; The Permanente Medical Group, Inc.; Southern
28  California Permanente Medical Group; and Colorado Permanente Medical Group, P.C.

1   first-to-file bar stops repetitive claims." *See United States ex rel. Lujan v. Hughes Aircraft Co.*,

2   243 F.3d 1181, 1186–87 (9th Cir. 2001).  Accordingly, § 3730(b)(5) provides "incentives for

3   whistle-blowing insiders" to file suit early.  *Id.*

4        The first-to-file bar is broad.  It absolutely prohibits *qui tam* suits that allege "the **same**

5   **material elements** of fraud" as an earlier *qui tam* suit, even if the allegations "incorporate

6   somewhat different details."  *Id.* at 1189 (emphasis added).  The focus of the analysis under

7   § 3730(b)(5) is whether the United States "has enough information to discover related frauds"

8   once it "knows the essential facts of a fraudulent scheme."  *Id.* (quotations omitted); *see United*

9   *States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) (first-to-file bar applied

10  where "the allegations of the first complaint [gave] the government grounds to investigate all that

11  is in the second").

12       The Ninth Circuit has rejected a more narrow test under § 3730(b)(5) that asks whether

13  the two actions share "identical facts."  *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,

14  792 F.3d 1121, 1130 (9th Cir. 2015).  Indeed, the statute speaks of "related," not "identical,"

15  actions.  *Lujan*, 243 F.3d at 1189 (citing 31 U.S.C. § 3730(b)(5)).  In *Lujan*, the Ninth Circuit

16  found that a bar only of "identical" actions would "decrease incentives to promptly bring qui tam

17  actions," allow "recovery for the same conduct," and permit FCA claims to proceed that "have no

18  additional benefit for the government" since the first-filed action already gave DOJ grounds to

19  investigate the alleged fraud.  *Id.*

20       Because the first-to-file bar is so broad, "simply adding factual details . . . to the essential

21  or material elements of a fraud claim" will not save a subsequent *qui tam* suit from dismissal.

22  *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009);

23  *see also United States ex rel. Marion v. Heald Coll., LLC*, 2015 WL 4512843, at *3 (N.D. Cal.

24  July 24, 2015).  For example, in *Marion*, the relator was one of several whistleblowers who

25  alleged that a for-profit college had defrauded the U.S. Department of Education.  2015 WL

26  4512843, at *2.  The relator argued that the first-to-file bar should not apply because her

27  complaint, unlike any earlier complaint, detailed a scheme to enroll "phantom students" without

28  their consent and collect financial aid on their behalf.  *Id.* at *3.  Though the relator's allegations

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

on this point were "more detailed" than earlier *qui tam* complaints, this district court held that the first-to-file bar required dismissal of her complaint because an earlier complaint had referenced the defendant's collection of student aid for "improperly enrolled students," and thus the "phantom student" allegation was just a factual variation of the same scheme. *See id.*

Nor will geographic or temporal differences between complaints suffice to overcome the bar. *Batiste*, 659 F.3d at 1209. In *Batiste*, the first relator alleged a company-wide fraud but claimed it stopped at his particular office. *Id.* A subsequent relator alleged an ongoing fraud at a different regional office of the company. *Id.* Such differences were "immaterial," the D.C. Circuit held, because if DOJ had investigated the alleged fraud in the first-filed complaint "on a nationwide basis," it would have discovered continuing fraud at the second relator's office. *Id.*

Relators likewise cannot avoid § 3730(b)(5) by naming "different members of the same corporate family," *In re Nat. Gas Royalties Qui Tam Litig.*, 566 F.3d 959, 962 (10th Cir. 2009), especially where the first-filed complaint alleges a "corporate-wide problem" that would give DOJ grounds to investigate all corporate entities, *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003). In *Hampton*, the first-filed *qui tam* complaint named a single company, while the second-filed *qui tam* complaint named the same company and regional subsidiaries and employees not named or mentioned in the first action. *Id.* Despite these differences in corporate defendants, the second-filed complaint could not avoid dismissal under the first-to-file bar because the first complaint alleged a "corporate-wide problem" and provided only "examples" and "samplings" of how the fraud occurred. *Id.* Given the first-filed complaint's "broad allegations," the second complaint's focus on specific subsidiaries and naming of employees "were merely variations" on the same alleged fraud in the original *qui tam* action. *Id.*

Finally, relators cannot avoid the first-to-file bar through amendment. *United States ex rel. Carter v. Halliburton Co.*, 144 F. Supp. 3d 869, 880 (E.D. Va. 2015) ("[A]n amendment will not cure the first-to-file bar."). The bar is jurisdictional and requires courts to compare original complaints. *See Lujan*, 243 F.3d at 1186. While a relator can amend to show jurisdiction existed at the time of filing, it may not amend to create jurisdiction. *Morongo Band of Mission Indians v.*

1    *Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988) ("In determining federal court

2    jurisdiction, we look to the original, rather than to the amended, complaint.  Subject matter

3    jurisdiction must exist as of the time the action is commenced."); *see also* Moore et al., *Moore's*

4    *Federal Practice* § 15.14[3], at 15–34 (3d ed. 1999) (similar).  Accordingly, here, the Court must

5    determine whether the first-to-file bar requires dismissal of each Later-Filed Complaint by

6    examining the factual allegations as they were alleged "at the time that action was brought."

7    *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004).

8        **B.      The First-to-File Bar Requires Dismissal of All or Portions of the Later-Filed**
9               **Complaints**

10        The first-filed *Osinek* complaint requires dismissal of all or portions of the five subsequent

11   *qui tam* actions.  Osinek alleges a broad, enterprise-wide scheme by "Kaiser Permanente" to

12   defraud the Medicare Advantage program by "upcoding" diagnoses of Medicare Advantage

13   members from at least 2007 to the present.  Dkt. No. 1 ¶¶ 2, 6, 24.  Her complaint describes

14   techniques that Kaiser allegedly used to perpetrate this scheme—including data-mining and

15   refresh initiatives to eliminate "missed opportunities" to increase reimbursement, pressuring

16   healthcare providers to diagnose risk-adjusting medical conditions, amending medical records

17   through addenda without adequate support, using boilerplate phrases in medical records to feign

18   compliance with allegedly applicable CMS guidelines, and setting policies that allegedly

19   contravened CMS requirements.  *Id.* ¶¶ 24–40.

20        Each of the Later-Filed Complaints repeats allegations about the essential facts of the

21   upcoding scheme first alleged in *Osinek*.  That alone triggers the first-to-file bar, as any

22   reasonable DOJ investigation would attempt to identify the various business practices and

23   techniques that produced such "upcoding."  But the Later-Filed Complaints even detail many of

24   the exact same practices and techniques that *Osinek* first alleged.  The time periods alleged in the

25   Later-Filed Complaints also overlap with the time period at issue in *Osinek*.  And while the Later-

26   Filed Complaints name regional and national Kaiser-affiliated entities not named in *Osinek*, those

27   geographic differences are immaterial given *Osinek*'s enterprise-wide allegations about "Kaiser

28   Permanente" as a whole.  *See Hampton*, 318 F.3d at 218; *Batiste*, 659 F.3d at 1206–07.

1    Because *Osinek* and the Later-Filed Complaints allege the same factual scheme to defraud

2    the Medicare Advantage program through the submission of knowingly false risk-adjustment data

3    to CMS, the allegations in the Later-Filed Complaints provide the United States with notice of no

4    new fraud allegations and therefore do not satisfy the purposes of the FCA's *qui tam* provisions.

5    *See Batiste*, 659 F.3d at 1209.

6              **1.    *Taylor***

7         The first-to-file bar requires dismissal of Taylor's complaint in full.  The underlying

8    fraudulent scheme alleged by both Osinek and Taylor is the same: Defendants engaged in a

9    systematic effort to "upcode" the diagnoses of Medicare Advantage members.  *Taylor* Dkt. No. 1

10   ¶¶ 5, 61.  And many of the factual details about how Kaiser allegedly perpetrated the scheme are

11   the same.  Both describe alleged "data mining" algorithms used to identify medical conditions in

12   medical records for upcoding.  *Compare* Dkt. No. 1 ¶ 25 *with Taylor* Dkt. No. 1 ¶ 197.  Both

13   describe "pressure" supposedly exerted on healthcare providers to diagnose medical conditions

14   that would increase Kaiser's reimbursements under the HCC payment model.  *Compare* Dkt. No.

15   1 ¶¶ 33, 35–36, 40 *with Taylor* Dkt. No. 1 ¶ 134.  And both identify many of the same illustrative

16   medical conditions to show how these upcoding schemes allegedly worked: cancer, malnutrition,

17   renal conditions, and respiratory conditions.  *Compare* Dkt. No. 1 ¶¶ 25, 27, 37 *with Taylor* Dkt.

18   No. 1 ¶¶ 131, 135, 139, 151.  By reading *Osinek*, DOJ had all of the information needed to

19   discover and investigate the allegations in *Taylor*.

20        Taylor cannot overcome the first-to-file bar by pointing to immaterial factual differences

21   between his complaint and the prior complaint filed by Osinek.  For example, that Taylor alleges

22   the fraudulent conduct commenced in 2004, while Osinek alleges it began in 2007, does not save

23   his complaint from dismissal.  A mere expansion of an otherwise overlapping date range by the

24   subsequent relator does not overcome the first-to-file bar.  *See Batiste*, 659 F.3d at 1209.  This

25   rule makes sense: Any reasonable investigation by DOJ into the upcoding practices alleged in

26   *Osinek* would have examined earlier time periods to determine when those alleged practices

27   actually commenced.

28        Taylor also cannot avoid dismissal simply because he points to examples of the alleged

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1    scheme that occurred in Kaiser's Colorado region whereas Osinek cites examples from Northern

2    California.  Courts routinely find that differences in geographic focus are not enough to

3    circumvent the first-to-file bar, particularly where, as here, the first-filed complaint suggests a

4    nationwide fraud.  *See, e.g.*, *Hampton*, 318 F.3d at 218; *Batiste*, 659 F.3d at 1206–07.  Osinek

5    names a single alleged national defendant—"Kaiser Permanente."  Dkt. No. 1.  And while she

6    makes clear that the alleged fraud originated with the broader Kaiser Permanente collective, she

7    alleges that Kaiser Permanente encouraged other Kaiser regions to engage in similar upcoding

8    techniques, resulting in an enterprise-wide fraud.  *See, e.g., id.* ¶¶ 23, 37.  She also cites examples

9    of the alleged scheme from outside the Northern California region, including specific examples

10   from Southern California.  *Id.* ¶ 37.  In other words, the United States would have discovered the

11   practices alleged in *Taylor* by reasonably investigating the *Osinek* allegations on a nationwide

12   basis.  And the United States attempted to do just that—issuing subpoenas in 2013, after the filing

13   of *Osinek*, to Kaiser Foundation Health Plan, Kaiser Foundation Hospitals, The Permanente

14   Medical Group, and Southern California Permanente Medical Group that applied to "all . . .

15   subsidiaries, regions, . . . [and] affiliates" of the subpoenaed entities.  RJN, Exs. A–D at 2; *see id.*,

16   Ex. E at 1 (clarifying that the 2013 subpoena encompassed the Colorado region).

17           Nor can Taylor avoid dismissal by pointing to allegations in his Second Amended

18   Complaint that do not appear in his original complaint.  Allegations that are not in Taylor's

19   original complaint cannot be used to cure the jurisdictional deficiencies from the time of filing.

20   *See supra* at 17–18.  Regardless, the added allegations are still just factual variations of Osinek's

21   broader allegation that Kaiser requires healthcare providers to "review and addend records" to

22   capture diagnoses that will generate additional revenue.  *See, e.g.*, Dkt. No. 1 ¶ 33.  Specifically,

23   Taylor alleges that in Colorado, Kaiser conducted a retrospective review of medical records to

24   independently identify which diagnosis codes the records supported, a process known as "chart

25   review."  Dkt. No. 118 ¶ 120.  Taylor contends that this practice resulted in the submission of

26   false diagnosis codes to the Medicare Advantage program and overpayments from CMS.  *Id.*

27   ¶ 127.  But these allegations describe nothing more than a low-tech version of Osinek's data-

28   mining allegations.  While Taylor may add detail about the broader practice, additional detail

                                            20

1  alone does not circumvent the first-to-file bar.  *See Marion*, 2015 WL 4512843, at *3.

2          **2.    *Arefi***

3          The Court also should dismiss the *Arefi* complaint under the first-to-file bar.  Because the

4  *Arefi* Relators have dismissed all claims with prejudice to the extent the United States did not

5  intervene, *Arefi* Dkt. Nos. 67 & 68, the remaining allegations in the complaint concern only an

6  alleged "Medicare Advantage diagnosis upcoding scheme" focused on improper addenda, *Arefi*

7  Dkt. No. 1 ¶¶ 2, 45–47, 78.  But § 3730(b)(5) bars these claims because *Osinek* already alleged an

8  upcoding scheme based, in part, on improper addenda.  *See* Dkt. No. 1 ¶¶ 20, 29–31.

9          **3.    *Stein***

10         The first-to-file bar requires dismissal of *Stein* in its entirety.  The *Stein* Relators allege "a

11 fraudulent scheme to up-code and falsely diagnose" Medicare Advantage members—the same

12 fraudulent scheme first alleged in *Osinek*.  *See Stein* Dkt. No. 1 ¶ 50; *see also id.* ¶ 70.  In

13 discussing the alleged upcoding scheme, the *Stein* Relators assert three causes of action focused

14 on two specific medical conditions—sepsis and malnutrition—and Kaiser's "refresh" practices.

15 *See generally id.*  *Osinek*, too, focuses on an alleged initiative to "refresh" risk-adjusting

16 diagnoses from prior years.  *See* Dkt. No. 1 ¶¶ 34, 37.  And *Osinek*'s broad focus on upcoding put

17 DOJ on notice of the same alleged scheme at issue in *Stein*, which permitted DOJ to investigate

18 allegations about refresh practices and upcoding involving sepsis and malnutrition.

19         While the *Stein* Relators' allegations focus on sepsis and malnutrition coding initiatives,

20 these allegations do not describe unique fraud schemes.  *See Stein* Dkt. No. 1 ¶¶ 50–79.  As noted

21 *supra* at 16-17, the Northern District of California concluded in *Marion* that a relator's "more

22 detailed" explanation of a fraud alleged by a prior relator did not allow her to avoid dismissal

23 under the first-to-file bar.  *See Marion*, 2015 WL 4512843, at *3.  Similarly, in *Batiste*, the D.C.

24 Circuit affirmed dismissal of a relator's complaint under the first-to-file bar because the two

25 complaints alleged variations on the same fraudulent loan scheme.  659 F.3d at 1206–07.  The

26 first-filed complaint "focused on the fabrication of oral forbearance requests," while the later-

27 filed complaint "focused on the offering of forbearances to unqualified borrowers."  *Id.*  While

28 the competing complaints alleged different methods to perpetrate a similar fraud, the differences

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1   were immaterial to the analysis under § 3730(b)(5) because "the allegations of the first complaint

2   [gave] the government grounds to investigate all that is in the second." *Id.*

3          So too here, *Osinek*'s broad allegations gave DOJ enough factual basis to investigate the

4   condition-specific fraud alleged in *Stein*.  The *Stein* Relators purport to explain how Kaiser used

5   incorrect diagnostic standards for both sepsis and malnutrition that improperly increased the rates

6   at which those conditions were reported to CMS.  *See Stein* Dkt. No. 1 ¶¶ 50–79.  While Osinek

7   does not focus on malnutrition or sepsis, she generally alleges that Kaiser submitted diagnosis

8   codes for complex medical conditions without proper support and that healthcare providers took

9   "HCCs and the Medicare payment system" into account when recording diagnoses, which

10   resulted in upcoding.  Dkt. No. 1 ¶¶ 26, 31.  *Stein*'s focus on the alleged use of incorrect

11   diagnostic standards for sepsis and malnutrition does no more than repackage *Osinek*'s broader

12   allegations about diagnosing medical conditions without proper support under applicable CMS

13   guidance.[9]  The allegations in *Osinek* therefore were sufficient to put DOJ on notice of the alleged

14   fraud, and § 3730(b)(5) requires dismissal of *Stein*.  Indeed, the United States' 2013 subpoenas

15   requested documents that encompassed Kaiser's internal diagnostic standards for all medical

16   conditions, demonstrating that *Osinek* gave DOJ the information it needed to investigate Kaiser's

17   diagnosis standards for sepsis and malnutrition.  RJN, Ex. A at 14 (requesting documents about

18   "policies, procedures, guidelines, or professional standards (whether internal or external)" related

19   to "diagnoses or diagnosis codes"), 16 (requesting documents about "systems" used to determine

20   "diagnoses or diagnosis codes").

21                    **4.**    ***Bryant* (Counts 1–4)**

22          The *Bryant* complaint likewise should be dismissed except for Counts 5 through 8 of the

23   operative complaint, in which Relators allege illegal retaliation that is not subject to the first-to-

24   

25   [9] In their operative amended complaint, the *Stein* Relators add allegations that Kaiser instructed
coders to improperly assign the diagnosis code for "aortic atherosclerosis" any time that condition

26   appeared in a medical record.  Dkt. No. 116 ¶¶ 85, 89.  Again, the Court should not consider these
allegations because they were not included in the original complaint.  *See supra* at 17–18.

27   Regardless, they are merely examples of the same upcoding scheme that Osinek already had

28   alleged, and thus do not change the analysis under § 3730(b)(5).

FIRST-TO-FILE MOTION
CASE NO. 3:13-CV-03891-EMC

1    file bar.  Like *Osinek*, *Bryant* describes in the *qui tam* complaint "HCC maximization techniques"

2    that allegedly resulted in "systematic over-documenting, over-coding and **upcoding** of certain

3    high value HCCs."  *Bryant* Dkt. 1 ¶ 54 (emphasis added).  The *Bryant* Relators explain that

4    "Kaiser's . . . 'data mining' team  . . . used 'algorithms' in the [Northern California] region to

5    identify and capture possible missed [diagnosis codes] . . . referred to as 'missed opportunities.'"

6    *Id.* ¶ 193.  This "missed opportunity" allegation mirrors almost exactly the allegations in *Osinek*

7    about "a system to capture 'missed opportunities,' which are brought to the attention of

8    [healthcare providers] to ensure that all possible Medicare [Advantage] billing opportunities are

9    captured."  Dkt. No. 1 ¶ 24.  Also mirroring *Osinek*, the *Bryant* Relators cite the specific

10   "upcoding" of malnutrition, respiratory conditions, obesity, and renal conditions.  *Compare id.*

11   ¶¶ 25, 27, 37 *with Bryant* Dkt. No. 1 ¶¶ 89, 111, 130, 137, 144–45.

12          And though *Bryant* cites additional medical conditions not discussed in *Osinek*—such as

13   upcoding of aortic atherosclerosis and vent dependence—these examples are not enough to

14   change the § 3730(b)(5) analysis because the business practices and motives alleged to target

15   these conditions are the same in both complaints.  *Compare Bryant* Dkt. No. 1 ¶ 87 (alleging that

16   Kaiser issued "directives" to healthcare providers that "contravene" guidance on vent-dependence

17   coding issued by the American Hospital Association's Coding Clinic) *with* Dkt. No. 1 ¶ 29

18   (alleging that Kaiser Permanente "tells" healthcare providers to make diagnoses in a way that is

19   not appropriate under "CMS guidelines" and "best practices").  *Bryant*'s allegations are just

20   factual variations on *Osinek*'s allegation that Kaiser Permanente "used a variety of algorithms to

21   identify [certain medical] conditions for data mining, which leads to upcoding."  *Compare* Dkt.

22   No. 1 ¶ 25 *with Bryant* Dkt. No. 1 ¶ 59 (alleging that Kaiser "implemented an HCC initiative . . .

23   to review and capture [aortic atherosclerosis] diagnoses in all clinic, emergency, outpatient

24   surgery, and inpatient encounters, even when incidental to the encounter").

25          The *Bryant* complaint also identifies a number of purported ways that "Kaiser emphasizes

26   financial results over compliance and accuracy," citing to a clinical documentation integrity

27   program and meetings of a "Regional Reporting Group."  *Bryant* Dkt. No. 1 ¶¶ 178–79, 187–88.

28   The *Osinek* complaint likewise describes a focus on "HCCs and the Medicare payment system

                                                    23

1 when coding and recording [member] encounters" and efforts to share successful coding

2 initiatives across regions, even though she does not name the Regional Reporting Group or the

3 clinical documentation integrity program specifically.  Dkt. No. 1 ¶¶ 26, 37.  Accordingly, for

4 purposes of § 3730(b)(5), *Bryant*'s allegations do not meaningfully differentiate the alleged fraud

5 scheme from the scheme alleged in *Osinek*.

6                 **5.**    ***Bicocca* (Counts 1 & 2)**

7         Finally, the Court also should dismiss *Bicocca*'s FCA claims under the first-to-file bar.

8 The thrust of the *Bicocca* complaint is that Kaiser "pressured" specialist providers, such as pain-

9 management physicians, to diagnose medical conditions that the specialists "may not have the

10 expertise to address."  *Bicocca* Dkt. No. 1 ¶ 105.  Bicocca alleges that Kaiser "directs its

11 [healthcare providers] to check off all chronic [medical] conditions that could conceivably apply

12 to a [member] and place a certifying statement in the [member's] record."  *Id.* ¶ 94.  He also

13 alleges that healthcare providers could receive "a reduction in bonus" if they failed to meet

14 certain coding "threshold[s]."  *Id.* ¶ 128–29.  Osinek likewise alleges that Kaiser pressured

15 healthcare providers to add diagnoses to members' charts and that healthcare providers "often

16 give in and use the diagnoses that management asks for rather than using their own, original

17 judgment in coding diagnoses."  Dkt. No 1 ¶ 33.  And she also focuses on physician incentives,

18 asserting that Kaiser "tracks and rewards [healthcare providers] based on the percentage of

19 chronic conditions they are able to capture and refresh."  *Id.* ¶ 37.

20         Bicocca focuses on upcoding pressure directed at specialists, who he alleges "do not have

21 the expertise to fully advise their patients on the various ailments" that the specialists had to

22 address.  *Bicocca* Dkt. No. 1 ¶¶ 110–19.  While Osinek does not explicitly mention specialists,

23 Bicocca's allegations do not differ materially from Osinek's broader allegations that Kaiser

24 pressured ***all healthcare providers*** to refresh "99%" of chronic medical conditions, Dkt. No. 1

25 ¶ 39, which encompass the subset of specialists at issue in *Bicocca*.

26         In addition, Bicocca's allegations that Kaiser's efforts to diagnose chronic medical

27 conditions without meeting the requirements of a CMS chronic care program are simply a subset

28 of Osinek's allegations that Kaiser violated CMS diagnosis coding and documentation guidelines.

24

1   For example, Bicocca alleges that a "trainer stated that if a [member] states in response to a
2   question that he or she is taking medication for a certain condition, this would satisfy the [chronic
3   care program] requirements" for adding a chronic medical condition to the medical record, but
4   this statement "is in direct contradiction to the foregoing guidelines." *Bicocca* Dkt. No. 1 ¶ 126.
5   Osinek similarly alleges that "Kaiser tells [providers] to go back to see what a member's previous
6   test results showed to make diagnoses, which is not an appropriate data source for coding a
7   diagnosis under CMS guidelines." Dkt. No. 1 ¶ 29.  In sum, both complaints allege that Kaiser
8   instructed healthcare providers to add diagnoses to members' medical records using methods that
9   allegedly violated CMS guidelines.

10  **IV.   CONCLUSION**

11          Allowing the upcoding allegations in the Later-Filed Complaints to proceed would subvert
12  the purpose of the first-to-file bar not once, but five times over.  With the contentions in the
13  *Osinek* complaint, DOJ had sufficient information to investigate the upcoding allegations in the
14  five Later-Filed Complaints.  The Court should therefore grant Defendants' Motion and dismiss
15  the *Taylor*, *Arefi*, and *Stein* complaints in their entirety, as well as Counts 1 through 4 of the
16  operative *Bryant* complaint and Counts 1 and 2 of the operative *Bicocca* complaint.

18  Dated:  January 18, 2022                    Respectfully submitted,

19                                              By:     /s/ *K. Lee Blalack, II*
20                                                      K. LEE BLALACK, II
                                                        DAVID DEATON
21                                                      DAVID J. LEVISS
                                                        STEPHEN M. SULLIVAN
22                                                      CAITLIN M. BAIR
                                                        DIMITRI D. PORTNOI
23
24                                                      *Attorneys for Defendants*

25