1

2

3

4                                 UNITED STATES DISTRICT COURT

5                              NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA ex rel.          Case No. 13-cv-03891-EMC
     RONDA OSINEK,
8                                              **CONSOLIDATED MEMBER CASES**
                    Plaintiff,
9                                              Case No. 16-cv-01558-EMC
            v.                                 Case No. 16-cv-05337-EMC
10                                             Case No. 18-cv-01347-EMC
     PERMANENTE MEDICAL GROUP, INC,            Case No. 21-cv-03124-EMC
11   et al.,                                   Case No. 21-cv-03894-EMC

12                  Defendants.                **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANTS'
13                                             MOTION TO DISMISS TAYLOR'S
                                               SECOND AMENDED COMPLAINT
14                                             WITH LEAVE TO AMEND**

15                                             Docket No. 181

16

17

18          The above-referenced case consists of several consolidated cases that charge Kaiser

19   entities with making false claims for payment to the federal government.  The main claims

20   asserted against the Kaiser entities are violations of the federal False Claims Act ("FCA").

21   Following the Court's order of May 5, 2022, *see* Docket No. 171 (order), the following cases

22   remain:

23               (1) The United States' complaint in intervention (Docket No. 110);

24               (2) The first amended complaint in *Osinek* (Docket No. 87);

25               (3) Parts of the second amended complaint in *Taylor* (Docket No. 118); and

26               (4) Parts of the first amended complaint in *Bryant* (Docket No. 117).[1]

27   _____

28   [1] The Court's order also dismissed the claims in *Bicocca* except to the extent the first amended
     complaint (Docket No. 16 in Case No. C-21-3124 EMC) pled claims under the California False

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    Currently pending before the Court are four motions to dismiss filed by the relevant Kaiser

2    entities.  The motions are targeted at all of the cases that remain.  This memo addresses only the

3    motion to dismiss the operative complaint in *Taylor*.  Having considered the parties' briefs, as well

4    as the oral as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss but

5    gives Dr. Taylor leave to amend.

6    **I.**    <u>**FACTUAL & PROCEDURAL BACKGROUND**</u>

7    A.   <u>Prior Order</u>

8    Previously, the Court issued an order addressing the Kaiser entities' argument that, *inter*

9    *alia*, the *Taylor* case was prohibited by the FCA's first-to-file bar.  *See* Docket No. 171 (order);

10    *see also* 31 U.S.C. § 3730(b)(5) (providing that, "[w]hen a person brings an action under this

11    subsection, no person other than the Government may intervene or *bring a related action based on*

12    *the facts underlying the pending action*") (emphasis in original).  In that order, the Court compared

13    the original complaint in *Taylor* to the complaint in *Osinek* that was operative at the time that

14    *Taylor* was filed.

15    The original complaint in *Taylor* identified three categories of conduct by Kaiser as

16    problematic:

17         (1) Kaiser failed to act even after audits revealed high error rates in risk adjustment

18              claims for certain HCCs (Hierarchical Conditions Categories) or diagnoses (in

19              particular, high-value conditions).

20         (2) Kaiser failed to act even after audits revealed high error rates for diagnoses made

21              by external providers (*e.g.*, outside hospitals who provided care to Kaiser's

22              members); and

23         (3) Kaiser failed to act even after audits revealed high error rates for "True Positive"

24              results associated with Kaiser's Natural Language Processing ("NLP") program.

25    The Court found that categories (2) and (3) were not barred by *Osinek*.  However, part of

26

27    Claims Act.  *See* Docket No. 171 (Order at 46).  However, prior to the Court's order, the plaintiff

       in *Bicocca* had dismissed those state law claims.  *See* Docket No. 159 (notice of voluntary partial

28    dismissal with respect to Counts III and IV of FAC).  Accordingly, there is nothing left in

       *Bicocca*.

2

(1) was barred – specifically, to the extent the failure to act was associated with California.  *See* Docket No. 171 (Order at 34-35) (noting that, "[a]lthough Dr. Taylor is correct that his claim here is about Kaiser ignoring an upcoding problem (as revealed by error rates) rather than actively creating upcoding [which was *Osinek*'s focus], the Court does not see this flip side as creating a material difference with respect to *Osinek*"; "both *Taylor* and *Osinek* are ultimately based on the same 'underlying facts': that the high-level condition that was diagnosed did not have documentation or proper support and/or did not affect patient care").  *Osinek* did not bar claims based on the failure to act outside of California (nationwide).  *See* Docket No. 171 (Order at 29, 32) (noting that the defendants in *Taylor* were essentially nationwide; because *Osinek* was California-centric, "*Taylor* is broader in scope . . . in terms of defendants").

B.      Operative Complaint in *Taylor*

        Although the Court found that *Taylor* was not barred in its entirety, the Court's focus at that point was on the original complaint in *Taylor*.  Now pending before the Court is a motion to dismiss the operative complaint in *Taylor* which is the second amended complaint ("SAC").

        The factual allegations in the *Taylor* SAC are largely the same as those contained in the original *Taylor* complaint.  To wit, as alleged, Defendants engaged in three categories of misconduct:

> (1) **Internal provider theory.**  Defendants' audits put them on notice of high error rates with respect to the coding of certain high-value conditions by internal providers.  *See* Taylor SAC ¶ 140.  Some of the audits also revealed the reason for the errors.  *See, e.g.*, Taylor SAC ¶ 216 ("In its probe audits, Kaiser found that false claims were routinely submitted to CMS where the diagnosis was listed in medical documentation of a physician or hospital outpatient visit as probable, ruled out, or suspected.  CMS rules prohibit the use of such a diagnosis for a risk adjustment claim.").  In spite of knowing about the error rates *and* the fact that there were errors, Defendants "refused to take corrective action."  Taylor SAC ¶ 201; *see also* Taylor SAC ¶ 146.
>
> (2) **External provider theory.**  Through audits, Defendants knew that there were high

3

error rates in risk adjustment claims based on diagnoses provided by external providers. *See* Taylor SAC ¶ 105.  In 2009, Defendants began a project that involved retrospective chart review of external provider diagnoses.  *See* Taylor SAC ¶ 120.  Coders reviewed records from the external providers looking for diagnoses supported by documentation.  *See* Taylor SAC ¶ 120.  Defendants "treated the results differently depending on whether they would generate revenue." Taylor SAC ¶ 121.  They would give to CMS only those "codes that had not previously been coded by the treating physician[s]" because this would "yield[] additional payments to [Defendants]," Taylor SAC ¶ 121; otherwise, Defendants did nothing – *i.e.*, they did not take corrective action with respect to findings that diagnosis codes were not supported by the medical records.  *See* Taylor SAC ¶ 125.

(3) **NLP/True Positive theory.**  A NLP program uses an algorithm to search electronic medical records to find words indicating that a patient has certain diagnoses.  *See* Taylor SAC ¶ 224.  A NLP program can be used "to try to find new diagnosis codes to submit."  Taylor SAC ¶ 224.  "[A] good NLP program can also identify situations where a diagnosis was submitted . . . but is not documented in the medical record."  Taylor SAC ¶ 225.  In 2009, Kaiser built its own NLP program (even though other companies offer such products).  *See* Taylor SAC ¶ 224.  The program grouped results into four categories: "(a) True Positive: diagnoses that have been confirmed by two Kaiser coders; (b) More Information Needed: diagnoses that may be present, but further analysis is required to confirm; (c) Problem List Only: diagnoses that show up only on the member's problem list [in the medical records] with no documentation of treatment; and (d) False Positives or Found Elsewhere."  Taylor SAC ¶ 229.  Although True Positives have diagnoses confirmed by two coders, they actually have high error rates.  *See, e.g.*, Taylor SAC ¶ 232 (alleging that Dr. Taylor "personally reviewed over 100 of the supposedly 'True Positive' claims for the Colorado region and found a 10% error rate[;] [i]n particular, he noted that it appears that the NLP software picks up, and the

4

reviewing coders have validated, diagnoses that appear in problem lists but which lack additional notation of treatment"). In spite of knowing this fact, Defendants still passed on "True Positive diagnoses to [their] claims submission system with no further review" – *i.e.*, even though "many of these claims [were] likely false." Taylor SAC ¶ 233. In addition, once Defendants learned that a True Positive diagnosis was actually erroneous, they should have taken corrective action with CMS but did not. *See* Taylor SAC ¶ 234; *see also* Opp'n at 15 (arguing that "error rates are [not] the sole basis of Defendants' liability[;] Relator alleges that Defendants reviewed their diagnosis coding using NLP that identified both substantiated and unsubstantiated codes," and, "[w]hen Defendants willfully ignored the unsubstantiated codes, they violated the FCA").

Although the factual allegations in the *Taylor* SAC are largely the same as those in the original complaint, the SAC is different from the original complaint in terms of the entities that have been sued. In the original complaint, Dr. Taylor sued Kaiser entities nationwide: Kaiser Permanente; Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia; and Kaiser Foundation Health Plan of the Northwest. All of these entities are health plans, *i.e.*, MA organizations.

In the SAC, Dr. Taylor dropped some of these defendants and added some new defendants as well. Defendants in the case are now:

- Kaiser Foundation Health Plan, Inc. (an original defendant, based in California);
- Kaiser Foundation Health Plan of Colorado (an original defendant, based in Colorado);
- Colorado Permanente Medical Group P.C. (a new defendant, based in Colorado);
- The Permanente Medical Group, Inc. (a new defendant, based in California); and
- Southern California Permanente Medical Group (a new defendant, based in California).

As noted above, the two health plans are MA organizations. As for the three medical groups, they are providers that contract with the MA organizations to provide medical services to the MA

5

1   enrollees.  Defendants maintain that, based on the entities sued in the SAC, Dr. Taylor has

2   effectively limited his case to California and Colorado, notwithstanding the fact that the SAC

3   contains some allegations suggesting that misconduct occurred nationwide.

4         According to Dr. Taylor, Defendants named in the SAC have violated the FCA because

5   they made claims for payment based on (1) false diagnosis codes and (2) "false risk adjustment

6   attestations certifying the completeness, accuracy, and truthfulness of Defendants' risk adjustment

7   data."  SAC ¶ 237.  In their papers, Defendants categorize (1) as clinically inaccurate diagnoses,

8   "*i.e.*, the member did not have or no longer had the condition reported," and (2) as "process-based

9   coding violations[,] *i.e.*, coding medical conditions in alleged violations of coding guidelines."

10  Mot. at 8.

## II.    DISCUSSION

A.    Legal Standard

13        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

14  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

15  complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

16  Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

17  after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic

18  Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must .

19  . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d

20  1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and

21  construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.

22  Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

23  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

24  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

25  effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial

26  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

27  inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

28  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

United States District Court
Northern District of California

1   possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

2   B.   <u>Defendants</u>

3   As noted above, Defendants named in the SAC are as follows:

- Kaiser Foundation Health Plan, Inc. (an original defendant, based in California);

- Kaiser Foundation Health Plan of Colorado (an original defendant, based in Colorado);

- Colorado Permanente Medical Group P.C. (a new defendant, based in Colorado);

- The Permanente Medical Group, Inc. (a new defendant, based in California); and

- Southern California Permanente Medical Group (a new defendant, based in California).

11   Defendants argue that three of the above defendants should be dismissed, specifically,

12   Kaiser Foundation Health Plan, Inc.; The Permanente Medical Group, Inc.; and Southern

13   California Permanente Medical Group.

14   According to Defendants, the last two defendants – the two California medical groups –

15   should be dismissed for two reasons: (1) the external provider theory and the NLP/True Positive

16   theory do not implicate California at all, and (2) based on the Court's prior order on the first-to-file

17   bar, the internal provider theory is viable only outside of California (*i.e.*, *Osinek* covered

18   California). *See* Mot. at 12. Dr. Taylor does not dispute that the two California medical groups

19   should be dismissed. *See* Opp'n at 1 n.1 (stating that claims against these two entities "were

20   dismissed by the Court's First-to-File Order"). Therefore, the Court dismisses both entities.

21   According to Defendants, Kaiser Foundation Health Plan, Inc. ("KFHP") should also be

22   dismissed, and for basically the same reasons as above. Defendants maintain that KFHP did not

23   play a role with respect to any conduct outside of California. (It is a California-based company.)

24   *See, e.g.*, Mot. at 13 (arguing that "KFHP contracts with CMS to operate a Medicare Advantage

25   plan in California, while KFHP-Colorado contracts with CMS to operate a Medicare Advantage

26   plan in Colorado") (emphasis omitted). Defendants also argue that the SAC improperly lumps

27   KFHP together with the Colorado Kaiser entities. The Court agrees KFHP should be dismissed.

28   First, even if KFHP is the parent company of the Colorado health plan (a named

United States District Court
Northern District of California

7

defendant) – as well as the parent of other Kaiser health plans in the country – *see* Opp'n at 10 (stating that "KFHP is the parent of all Kaiser MAOs in the seven states in which the company operates, including KFHP of Colorado"), that fact in and of itself is not a sufficient basis to hold KFHP liable for their conduct, at least in the absence of additional allegations such as alter ego. *See United States v. Bestfood*s, 524 U.S. 51, 61-62 (1998) (stating that "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries"; "[b]ut there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced" in certain circumstances).

Second, although Dr. Taylor suggests that KFHP can be held liable for misconduct that it engaged in nationwide, it is not clear from the SAC what that nationwide misconduct is. Admittedly, in the SAC, Dr. Taylor does make allegations about KFHP employees submitting attestations to CMS and/or doing audits:

- Taylor SAC ¶ 75: "During Relator's time at Kaiser, Rick Newsome, then the vice president of finance and the chief financial officer for the Colorado region, was involved in the Colorado region's attestations, and Kathy Lancaster, the executive vice president and chief financial officer for Kaiser Foundation Health Plan, Inc., was involved in these attestations at the national level."

- Taylor SAC ¶ 92: "[I]n a review of 2004/2005 data, a period of time prior to the risk adjustment system being fully implemented, Kaiser conducted a 'pre close' audit ahead of an annual deadline to submit data to CMS.  The audit noted the importance of accuracy and the fact that each submitted diagnosis must be supported by an appropriate medical record. Diane Morrissette, the then Executive Director of National Medicare Finance for Kaiser, was the key executor of this audit."

- Taylor SAC ¶ 113: "In 2009, a review of external provider codes headed by Diane Morrissette, then the Executive Director of National Medicare Finance for Kaiser, concluded that external provider codes were less well monitored than those of

1    Kaiser internal physicians and were likely to have higher error rates."

2  But it is not illegal conduct to make attestations to CMS and/or to conduct audits.  Dr. Taylor

3  needs to allege more in order for there to be a plausible violation of the FCA by KFHP for conduct

4  outside of California.  While ¶ 113 above does mention error rates revealed through audits, that is

5  not enough to make out a plausible case of liability.  More allegations are still needed.  For

6  example, what external providers were being evaluated?  What were the error rates?  How did

7  those error rates compare to internal providers?  *Compare, e.g.*, Taylor SAC ¶¶ 106-107

8  (comparing the error rates for internal providers in Colorado and external providers in Colorado –

9  between 2007 and 2013, error rates for internal providers ranged from 5-13% between 2007 and

10  2013, and for external providers from 17-67%; in most years, the error rates for external providers

11  exceeded 40%).  Such information is needed to understand how KFHP allegedly engaged in a

12  false claim scheme.

13    Third, although Dr. Taylor asserts that, at the very least, KFHP worked with the Colorado

14  health plan and the Colorado medical group to defraud the government, *see* Opp'n at 10-11, the

15  allegations are similarly deficient.  In ¶¶ 86-90 of the SAC, Dr. Taylor has made allegations about

16  a KFHP employee, Chris Tholen, who was, during the relevant time, the Executive Director of

17  National Medicare Finance.  The allegations related to Mr. Tholen are as follows:

18    • The Colorado Kaiser entities set up a group called the MA governance group, and

19      Mr. Tholen was a member of that group.  "The goal of the group was to ensure a

20      maximum return of investment within the MA business and identification of

21      revenue opportunities, with no regard for compliance or accuracy."  Taylor SAC ¶

22      87.

23    • The Colorado Kaiser entities "had a report called 'filling the tank,' on which

24      Tholen commonly presented . . . .  The goal of the report was to track expected

25      average risk score (and hence expected revenue) basis point by basis point to

26      capture as much revenue as possible."  Taylor SAC ¶ 88.  In a 2011 meeting,

27      "Tholen reported that Newsome [the vice president of finance and the chief

28      financial officer for the Colorado region] was looking for an increase of 2.5 to 3

United States District Court
Northern District of California

1    'points' (a point is used to describe an additional .01 in average risk score)."

2        Taylor SAC ¶ 89.

3    Similar to above, even if the Court were to credit the above allegations, they do little to support

4    Dr. Taylor.  Paragraphs 88-89 above do not plausibly allege any misconduct by KFHP.  Looking

5    for ways to increase revenue is not in and of itself illegal.  The key would be the sanctioning of the

6    kind of wrongful conduct that is the gravamen of the complaint.  As for ¶ 87, there is admittedly a

7    claim that the MA governance group looked to increase revenue without regard for compliance or

8    accuracy.  However, the claim is conclusory.

9        Accordingly, the Court dismisses KFHP.  However, Dr. Taylor has leave to amend his

10   complaint if he can in good faith plead with specificity that KFHP employees played a role in

11   either a nationwide or Colorado-centric fraud.

12   C.    Falsity

13       As noted above, Dr. Taylor has in the SAC laid out three theories as to how Defendants

14   violated the FCA: (1) the internal provider theory; (2) the external provider theory; and (3) the

15   NLP/True Positive theory.  The three theories are similar in that they involve Defendants knowing

16   that there are high error rates and doing nothing in spite of knowing about the error rates and the

17   fact that errors exist.

18       The three theories are also similar in that their general viability is supported by *United

19   States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2015) [hereinafter

20   *Swoben*].  In *Swoben*, the plaintiff alleged that the defendants (health plans and medical providers)

21   violated the FCA because they "performed biased retrospective medical record reviews" –

22   specifically, the reviews were one-sided in that they were designed to identify and report to CMS

23   *under*-reporting errors only, and not *over*-reporting errors.  *Id.* at 1170.  As alleged by the plaintiff,

24   the defendants

25       knowingly designed and performed retrospective reviews to conceal
         and not withdraw previously submitted diagnosis codes that were
26       unsupported by retrospectively reviewed medical records.  [The
         plaintiff] alleges, moreover, that the defendants knew their
27       certifications were false because they (1) helped develop the
         reporting template and knew the template would not capture over-
28       reporting errors identified by retrospective reviews; (2) had [CMS]

1

> RADV audit over-reporting error rates in excess of 20 percent,
> placing them on notice that "a similar percentage of medical charts
> that were retrospectively reviewed should have resulted in
> [diagnosis] codes being withdrawn as unsupported by the medical
> charts"; and (3) designed their retrospective reviews to avoid
> identifying or reporting unsupported diagnosis codes that should
> have been withdrawn.

*Id.* at 1171.  The Ninth Circuit concluded that the plaintiffs had pled a viable FCA claim.  *See, e.g.*, *id.* at 1173 (underscoring the plaintiff's assertion that "the defendants took affirmative steps to generate and report skewed data"); *id.* at 1175 ("hold[ing] that [ ] when, as alleged here, Medicare Advantage organizations design retrospective reviews of enrollees' medical records deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence, they can no longer certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS").

        Defendants acknowledge *Swoben* but argue that Dr. Taylor has still failed to allege a FCA violation for several reasons.  Defendants' first contention is that Dr. Taylor has failed to allege the essential element of falsity for two out of his three theories: the external provider theory and the NLP/True Positive theory.  Defendants note that all three theories are predicated on their alleged knowledge of high error rates and then their failure to act.  However, Defendants point out, Dr. Taylor only explained in the SAC what the errors were for the internal provider theory, and not for the external provider theory or the NLP/True Positive theory.[2]  Defendants assert that, without some specifics about what the errors were underlying the high error rates, the requirements of Federal Rule of Civil Procedure 9(b) have not been met (*i.e.*, an explanation as to *why* something is false).  *See* Mot. at 15 (contending that "saying that something was erroneous, without any context for the purported error, is tantamount to saying something was 'false' – a conclusory assertion of the falsity element that cannot satisfy Rule 9(b)'s particularity

---

[2] For the internal provider theory, the diagnosis codes were erroneous or false because there was a lack of documentation or proper support or the diagnosis coded did not affect patient care.  *See* Docket No. 171 (Order at 34-35) (noting that "both *Taylor* and *Osinek* are ultimately based on the same 'underlying facts': that the high-level condition that was diagnosed did not have documentation or proper support and/or did not affect patient care").

United States District Court
Northern District of California

1    requirement.").  Defendants note that "the error rates could relate to a system malfunction,

2    diagnosis codes that do not adhere to internal guidelines, diagnosis codes that are not clinically

3    supported, or myriad other issues," Mot. at 15; thus, specificity is needed in order for Defendants

4    to be able to defend themselves.

5            Although Defendants' position is not entirely lacking in merit, it is problematic.  The

6    purpose of Rule 9(b) is

7                    to give notice to defendants of the specific fraudulent conduct
                    against which they must defend, [and] "to deter the filing of
8                    complaints as a pretext for the discovery of unknown wrongs, to
                    protect [defendants ] from the harm that comes from being subject to
9                    fraud charges, and to prohibit plaintiffs from unilaterally imposing
                    upon the court, the parties and society enormous social and
10                   economic costs absent some factual basis."

11   *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).  Here, Dr. Taylor has given a

12   reason as to why the claims for payment that Defendants submitted to CMS were false: they were

13   false because Defendants themselves had identified the diagnosis codes as erroneous.  Providing

14   more information about precisely why the diagnosis codes were erroneous is not necessary for

15   Defendants in order to defend themselves at this juncture, as the complaint provides sufficient

16   description of the gravamen of the action.  Moreover, given that Defendants themselves

17   characterized the diagnosis codes as erroneous, there is no danger of, *e.g.*, Dr. Taylor having filed

18   a pretextual complaint merely in the hope of discovering some wrongdoing by Defendants.

19           Defendants assert that, at the very least, there is an additional reason why falsity has not

20   been sufficiently pled with respect to NLP/True Positive theory.  Defendants focus on ¶ 232 of the

21   SAC where Dr. Taylor makes allegations about his personal experience with True Positives:

22                   He personally reviewed over 100 of the supposedly "True Positive"
                    claims for the Colorado region and found a 10% error rate.  In
23                   particular, he noted that it *appears* that the NLP software picks up,
                    and the reviewing coders have validated, diagnoses that appear in
24                   problem lists but which lack additional notation of treatment.  As
                    described above, a diagnosis may not be submitted for risk
25                   adjustment purposes if it just appears in a problem list.  There must
                    be further indication that the physician considered or treated the
26                   diagnosis.

27   Taylor SAC ¶ 232 (emphasis added).  Defendants hone in on the word "appears":

28                   this is not even an allegation that the errors actually involved

                                              12

> improper coding from problem lists, especially given his allegation
> that True Positive Claims are confirmed by two coders and are not
> automatically passed through to CMS based solely on being present
> on problem lists. What is more, Taylor does not allege that the 100
> claims he reviewed were representative of all True Positive
> claims . . . .

Mot. at 16. However, all reasonable inferences are to be made in Dr. Taylor's favor. For purposes

of falsity, Dr. Taylor has alleged enough: that there were high error rates even for True Positives

(*i.e.*, even though confirmed by two coders) and yet Kaiser still did not take any corrective action.

D.   <u>Materiality</u>

Defendants next argue that, even if there is no failure to plead falsity, there is still a failure

to plead materiality – at least to the extent that Dr. Taylor's theory is that diagnosis codes were

false because, even though clinically accurate, they were not in compliance with coding

guidelines. *See also* Mot. at 19 n.7 ("Defendants do not challenge materiality for claims based on

the alleged submission of . . . diagnosis codes [that were clinically inaccurate, *i.e.*, reflected

medical conditions that did not exist] . . . .").

Here, the Court agrees with Defendants' position. Even though (as discussed above), Dr.

Taylor did not have to explain what errors were underlying the error rates for purposes of the

element of falsity, he must provide some details in order to assess whether he has made a plausible

case that the errors would have been material to CMS. Unlike the government, Dr. Taylor has not

expressly limited diagnosis code errors to violations of specific coding guidance such as

requirements that a diagnosis may be made only if there is proper support and the condition is

treated at a patient visit. *Compare* U.S. Compl. ¶ 83 (alleging that, "[f]or an outpatient visit . . . ,

the ICD Guidelines only permit the coding of documented conditions that [1] both exist at the visit

*and* that [2] 'require or affect patient care treatment or management'") (emphasis in original). At

the hearing, Dr. Taylor suggested that ¶ 93 of his SAC should address any concerns the Court has.

Paragraph 93 makes reference to Kaiser audits that are supposed to mimic CMS audits known as

Risk Adjustment Data Validation ("RADV") audits; the paragraph also states that the Kaiser

audits "repeatedly noted the importance of medical record documentation and verified diagnosis

codes in accordance with the ICD." Taylor SAC ¶ 93. The Court is not persuaded that ¶ 93

provides sufficient information so that a materiality assessment can be made.

13

1    The Court, however, gives Dr. Taylor leave to amend his complaint so that he made plead

2  facts regarding the errors underlying the error rates.

3  E.    Statute of Repose/Statute of Limitations

4    Finally, Defendants argue that, even if the FCA claims are adequately pled, they should

5  still be limited due to a time bar.  Defendants note that Dr. Taylor did not sue the three medical

6  groups (one from Colorado, and the other two from California) until he filed his SAC on

7  November 15, 2021.  According to Defendants, based on the statute of repose in the FCA,[3] any

8  claims against the medical groups must be based on conduct that took place on or after November

9  15, 2011 (*i.e.*, ten years earlier).[4]  Defendants acknowledge that Dr. Taylor filed his *original*

10

---

11  [3] The statute of repose is contained in 31 U.S.C. § 3731.  The relevant provisions of § 3731 are as follows:

12  (b)    A civil action under section 3730 [31 U.S.C. § 3730] may not be brought –

13
14  (1)    more than 6 years after the date on which the violation of section 3729 [31 U.S.C. § 3729] is committed, or

15
16  (2)    more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
17
18

19  whichever occurs last.

20  (c)    If the Government elects to intervene and proceed with an action brought under [section] 3730(b) [31 U.S.C. §
21  3730(b)], the Government may file its own complaint or amend the complaint of a person who has brought an action
22  under section 3730(b) [31 U.S.C. § 3730(b)] to clarify or add detail to the claims in which the Government is intervening
23  and to add any additional claims with respect to which the Government contends it is entitled to relief.  For statute of
24  limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person
25  who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or
26  occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

27  31 U.S.C. § 3731(b)-(c).

28  [4] As discussed above, the parties are in agreement that the two *California* medical groups should

14

complaint back in 2014 but assert that he cannot rely on relation back under Federal Rule of Civil Procedure 15(c) to capture earlier conduct – such as from 2004, *see* Taylor SAC ¶¶ 1, 82 (alleging that there has been fraudulent conduct since "at least 2004")) – because that would violate the Rules Enabling Act.  Under the Rules Enabling Act, the Supreme Court has the power to prescribe general rules of practice and procedure for cases in the federal district courts and courts of appeal, but "[s]uch rules shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  According to Defendants, "statutes of repose vest defendants with a substantive right to be free from liability after a legislatively determined period of time," and "[a]llowing a party to use Rule 15(c) to avoid the consequences of a statute of repose" would violate the Rules Enabling Act as well as "impermissibly enlarge the court's jurisdiction."  Mot. at 22.

As an initial matter, the Court takes note that the time-bar issue here is somewhat different than that presented in conjunction with the motion to dismiss the United States' compliant in intervention.  This is because the government could claim relation back based on a provision in the FCA – 31 U.S.C. § 3731(c) – whereas here Dr. Taylor must rely on the relation back provision in Rule 15(c).  Precisely because Rule 15(c) is at issue, Defendants are able to make an argument based on the Rules Enabling Act.

The main case on which Defendants rely in support of their position is *Police & Fire Retirement System v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013).  That Second Circuit decision dealt with a statute of repose in a different statute, *i.e.*, the Securities Act, and considered a different issue, *i.e.*, whether the tolling rule of *American Pipe* (not relation back) would be allowed where there is a statute of repose.[5]  The Second Circuit first held that, if the tolling rule was equitable in nature, then there was a problem for the plaintiff because Supreme Court precedent rejected application of equitable tolling where there is a statute of repose.  *See id.* at 109.  The court then held that, even if the tolling rule was legal in nature, "its extension to the statute of

_____

be dismissed.

[5] In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  *Id.* at 554.

United States District Court
Northern District of California

1    repose in Section 13 [of the Securities Act] would be barred by the Rules Enabling Act." *Id.* This

2    was because

> a statute of repose "*extinguishes* a plaintiff's cause of action after the
> passage of a fixed period of time, usually measured from one of the
> defendant's acts."
>
> Thus, in contrast to statutes of limitations, statutes of repose
> "create[] a *substantive* right in those protected to be free from
> liability after a legislatively-determined period of time."

7    *Id.* at 106 (emphasis in original). "Permitting a plaintiff to file a complaint or intervene after the

8    repose period set forth in Section 13 of the Securities Act has run would therefore necessarily

9    enlarge or modify a substantive right and violate the Rules Enabling Act." *Id.* at 109.

10         Although the Second Circuit in *IndyMac* went on to note – expressly – that it was not

11   deciding "whether Rule 15(c) allows 'relation back' of claims otherwise barred by a statute of

12   repose," *id.* at 110 n.18, some district courts have since relied on *IndyMac* as a basis for holding

13   that, in fact, relation back under Rule 15(c) is not permitted where there is a statute of repose. *See,*

14   *e.g.*, *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 451 (S.D.N.Y. 2017) (stating

15   that "multiple district courts in this Circuit considering precisely this issue have concluded that the

16   statute of repose [in § 13 of the Securities Act] cannot be circumvented by the relation-back

17   doctrine"); *Baldain v. Am. Home Mortg. Servicing, Inc.*, 2010 U.S. Dist. LEXIS 82876, at *20 n.6

18   (E.D. Cal. June 25, 2010) (stating that "TILA provides a three year statute of repose for rescission

19   claims that cannot be extended through tolling, estoppel, relation back, or related doctrines").

20         The Third Circuit, however, has issued a decision that is in some tension with *IndyMac*.

21   *See SEPTA v. Orrstown Fin. Servs.*, 12 F.4th 337 (3d Cir. 2021). *Orrstown* was, like *IndyMac*, a

22   securities case. The Third Circuit acknowledged that both the Securities Act and the Securities

23   Exchange Act contained statutes of repose (three years and five years, respectively) but it rejected

24   the defendants' contention that (1) "relation back under Rule 15(c) is incompatible with the nature

25   and purpose of statutes of repose" and that (2) the Rules Enabling Act prevents relation back. *Id.*

26   at 346.

27         As to the first argument, the Third Circuit noted that relation back is not inconsistent with a

28   statute of repose because it does not change the repose period – that "period stays intact." *Id.* at

United States District Court
Northern District of California

349.  This is in contrast to tolling which extends a statutory period within which a plaintiff may file suit.  *See id.*  However, the court also pointed out that it was being presented with a situation in which the plaintiff was only "seek[ing] to expand its complaint with additional facts"; it was "not bringing any new legal claims or adding new parties."  *Id.* at 350.

> Thus our holding today does not address whether an entirely new claim – one that plaintiffs did not bring before – may relate back to skirt statutes of repose.  Similarly, we do not reach whether a plaintiff may use relation back in this context to add new parties.  We leave those tougher questions for another time.

*Id.*

As for the second argument, the Third Circuit concluded that the Rules Enabling Act did not require a different result.

> [T]he expiration of a repose period creates a vested right to be free from liability *only as against those plaintiffs who do not have a pending action under the statute at that time*.  This is because statutes of repose create a deadline for *filing* actions, rather than *resolving* them.  Thus a defendant does not have a vested right for repose as against a plaintiff who sues before the deadline as long as the plaintiff's action is pending when the deadline expires.

*Id.* at 451 (bold added; italics in original).

In response to the defendants' invocation of *IndyMac*, the Third Circuit noted that *IndyMac* "by its own terms did not consider 'whether Rule 15(c) allows "relation back" of claims otherwise barred by a statute of repose.'  *Id.*  Furthermore, *IndyMac*'s reasoning was not persuasive because, as already noted, "tolling extends the repose period, while relation back keeps the repose period intact."  *Id.*  Finally, the Third Circuit recognized that several district courts had extended *IndyMac* – *i.e.*, holding that relation back is not permitted where there is a statute of repose.  However, the court rejected those decisions since they "rel[ied] on the premise that relation back would violate the defendants' substantive rights."  *Id.* at 352.

In addition to the Third Circuit, a district court in Virginia has also concluded that Rule 15(c) can still apply even where there is a statute of repose.  It noted first that Rule 15(c) "makes no distinction between statutes of limitations and statute of repose."  *United States ex rel. Carter v. Halliburton Co.*, 315 F.R.D. 56, 64 (E.D. Va. 2016).  In addition, "[u]nder Defendants' interpretation, an expired statute of repose would preclude *all* amendments, regardless of the

1    substance of the amendment.  Thus, an amendment that does nothing more than add specificity or

2    clarify a complaint would not relate back." *Id.* (emphasis in original); *see also Orrstown*, 12 F.4th

3    at 346 (noting that Defendants' blanket rule "would present enormous practical difficulties[;] [i]t

4    would mean that a plaintiff could not make *any* changes – no matter how small – to its complaint

5    after expiration of the repose period") (emphasis in original).  Finally, the court held that there was

6    no violation of the Rules Enabling Act because "[t]he effect on Defendants' substantive rights

7    appear incidental here, as Relator does little more than clarify and add specificity to his Original

8    Complaint and the substantive right of repose is fairly critiqued as minimal in this case." *Carter*,

9    315 F.R.D. at 65.

10    Although parts of *Orrstown* and *Carter* are favorable to Dr. Taylor, the cases notably do

11    not involve the situation before the Court here – *i.e.*, where a plaintiff has added a *new defendant*

12    and wants the claims against the new defendant to relate back to the filing of the original

13    complaint.  The reasoning of *Orrstown* and *Carter* suggests that the expansion sought here would

14    not be sanctioned by way of relate back.  Dr. Taylor provides no persuasive authority for

15    expanding *Orrstown* and *Carter* to this context which involved not clarification of a complaint

16    against an existing party, but adding a new party to the litigation.

17    In any event, even if the Court were to assume, in Dr. Taylor's favor, that *Orrstown* and

18    *Carter* support application of relation back in this specific context, he runs into a different

19    problem.  Under Rule 15(c)(1)(c), relation back for a new defendant is permitted under limited

20    circumstances:

21    An amendment to a pleading relates back to the date of the original
       pleading when:

22    
23    . . .

24    (C)    the amendment changes the party or the naming of the party
             against whom a claim is asserted, if Rule 15(c)(1)(B) is
25           satisfied and if, within the period provided by Rule 4(m) for
             serving the summons and complaint, the party to be brought
26           in by amendment:

27         (i)     received such notice of the action that it will not be
                   prejudiced in defending on the merits; and

28         (ii)    knew or should have known that the action would

18

1

have been brought against it, but for a mistake
concerning the proper party's identity.

2      Fed. R. Civ. P. 15(c)(1).

3          Here, Dr. Taylor has made a conclusory argument that the prerequisites of Rule

4      15(c)(1)(C) have been satisfied.  *See* Opp'n at 25 (asserting that "the medical groups at issue were

5      on notice of the existence of the suit and are not prejudiced in any way by Relator's relation back

6      under Rule 15(c)").  This conclusory argument is patently insufficient to establish relation back.

7          Accordingly, the Court concludes that Dr. Taylor has failed to show that relation back is

8      appropriate for the Colorado medical group.  Because Dr. Taylor did not add the Colorado medical

9      group as a defendant until November 15, 2021, the statute of repose in the FCA dictates that any

10     claims against the Colorado medical group that predate November 15, 2011, are barred.

11     ### III.     CONCLUSION

12         For the foregoing reasons, the Court grants Defendants' motion to dismiss.  Dr. Taylor has

13     conceded that the California medical groups should be dismissed based on the Court's first-to-file

14     order.  The SAC as pled also has several failings: (1) Dr. Taylor has not sufficiently alleged

15     misconduct by KFHP specifically; (2) Dr. Taylor has not adequately alleged materiality; and (3)

16     Dr. Taylor has failed to show that relation back applies to his claims against the Colorado medical

17     group (such that the statute of repose bars any claims prior to November 15, 2011).  The claims

18     against the Colorado medical group that predate November 15, 2011, are dismissed with

19     prejudice.

20         Dr. Taylor has leave to file an amended complaint by December 12, 2022.  Defendants

21     shall file a response by January 3, 2023.

22         This order disposes of Docket No. 181.

23

24     **IT IS SO ORDERED**.

25

26     Dated: November 14, 2022

27

28                                         _____
                                           EDWARD M. CHEN
                                           United States District Judge

United States District Court
Northern District of California

19