UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RONDA OSINEK,<br><br>Plaintiff,<br><br>v.<br><br>PERMANENTE MEDICAL GROUP, INC, et al.,<br><br>Defendants. | Case No. 13-cv-03891-EMC<br><br>**CONSOLIDATED MEMBER CASES**<br><br>Case No. 16-cv-01558-EMC<br>Case No. 16-cv-05337-EMC<br>Case No. 18-cv-01347-EMC<br>Case No. 21-cv-03124-EMC<br>Case No. 21-cv-03894-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS RELATORS BRYANT AND HERNANDEZ'S FIRST AMENDED COMPLAINT**<br><br>Docket No. 182 |

The above-referenced case consists of several consolidated cases that charge Kaiser entities with making false claims for payment to the federal government. The main claims asserted against the Kaiser entities are violations of the federal False Claims Act ("FCA"). Following the Court's order of May 5, 2022, *see* Docket No. 171 (order), the following cases remain:

(1) The United States' complaint in intervention (Docket No. 110);

(2) The first amended complaint in *Osinek* (Docket No. 87);

(3) Parts of the second amended complaint in *Taylor* (Docket No. 118); and

(4) Parts of the first amended complaint in *Bryant* (Docket No. 117).[1]

---

[1] The Court's order also dismissed the claims in *Bicocca* except to the extent the first amended complaint (Docket No. 16 in Case No. C-21-3124 EMC) pled claims under the California False

Currently pending before the Court are four motions to dismiss filed by the relevant Kaiser entities. The motions are targeted at all of the cases that remain. This memo addresses only the motion to dismiss the first amended complaint in *Bryant*. Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   First Amended Complaint

Relators are Gloryanne Bryant and Victoria Hernandez. As alleged in the operative first amended complaint ("FAC"), Ms. Bryant worked for Kaiser entities from June 1995 through October 2017, with job responsibilities relating to auditing and coding. *See* Bryant FAC ¶¶ 9, 20. When she retired in October 2017, she was the "Managing Director of Kaiser's Health Information Management program ('HIM') for the Kaiser Foundation Health Plan in Kaiser's Northern California ('NCAL') region." Bryant FAC ¶ 9. Like Ms. Bryant, Ms. Hernandez is a coding professional. She worked for Kaiser entities from January 2000 through October 2015. *See* Bryant FAC ¶ 21. According to Relators, Ms. Hernandez was constructively discharged from her position in October 15. At that time, she had been working as Regional Director of Auditing & Coding Services for the Northern California medical group. *See* Bryant FAC ¶¶ 21, 182.

Relators have sued the following Kaiser entities:

- **Health plans:** Kaiser Foundation Health Plan, Inc. ("KFHP"); Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Washington. (Note that the first entity – KFHP – is a California-based entity and the parent company of the other health plans.)

- **Hospitals:** Kaiser Foundation Hospitals.

---

Claims Act. *See* Docket No. 171 (Order at 46). However, prior to the Court's order, the plaintiff in *Bicocca* had dismissed those state law claims. *See* Docket No. 159 (notice of voluntary partial dismissal with respect to Counts III and IV of FAC). Accordingly, there is nothing left in *Bicocca*.

- **Medical groups/providers:** The Permanente Medical Group, Inc. ("TPMG") (which covers Northern California); Southern California Permanente Medical Group; Colorado Permanente Medical Group, P.C.; The Southeast Permanente Medical Group, Inc.; Hawaii Permanente Medical Group, Inc.; Mid-Atlantic Permanente Medical Group, P.C.; Northwest Permanente, P.C.; and Washington Permanente Medical Group, P.C.

In their FAC, Relators make allegations about two federal programs: the Medicare Advantage ("MA") program and the Affordable Care Act ("ACA") program. With respect to the ACA program, Relators' main allegations are as follows:

> 49. The Affordable Care Act sets up a program of risk adjustment in individual and group markets to lessen or eliminate the influence of risk selection on the premiums that plans charge. In the risk adjustment model utilized under the ACA, which is named the HHS-Hierarchical Condition Categories ("HHS-HCC") risk adjustment model, HHS utilizes criteria and methods similar to those utilized under the Medicare Advantage program, and adapts Medicare Advantage HCCs for use in the HHS-HCC model. The chief goal in the design of the HHS-HCC model is to assure that premiums reflect differences in benefits and plan efficiency. The HHS-HCC model uses current year diagnoses and demographics to predict the current year's spending, as distinguished from the Medicare Advantage program, which uses the risk adjustment model to predict next year's spending. But in the end, the effect of risk adjustment on ACA premiums is similar to the impact of risk adjustment on capitated payments made under the Medicare Advantage program. Insurers like Kaiser receive more ACA premiums the more documented and coded conditions are submitted for their insureds.
>
> 50. Pursuant to the ACA, the United States contributes, through tax credits, to premiums paid by low-income individuals to private health insurance companies, including Kaiser, based upon a sliding scale calibrated to the poverty line. Accordingly, when premiums are artificially high due to documentation and coding fraud, both enrollees and the United States are harmed by the overcharges.

Bryant FAC ¶¶ 49-50.

According to Relators, Defendants have engaged in fraud with respect to both the MA and ACA programs. *See* Bryant FAC ¶ 51. Specifically, in conjunction with these programs, Defendants have made false claims for payment to the government through improper upcoding.

3

1   Such upcoding is accomplished through various business practices, including but not limited to the
2   following:

3   - posing leading queries to physicians and hospitals (*i.e.*, to pressure them to identify
4     more diagnoses), *see* Bryant FAC ¶ 109 *et seq.*;
5   - requiring coding questions to go through an internal Coding Governance Group
6     (*i.e.*, instead of a third party, the American Hospital Association's Coding Clinic),
7     *see* Bryant FAC ¶ 119 *et seq.*;
8   - running a Clinical Documentation Integrity ("CDI") program which was
9     "ostensibly [supposed to] improve . . . clinical documentation of hospital inpatient
10    medical encounters" but was actually used "to improve clinical documentation
11    [only] insofar as it increases HCC capture and Medicare and HHS reimbursement,"
12    Bryant FAC ¶ 127 *et seq.*;
13  - forming a Regional Reporting Group ("RRG") that shared "'best practices' on how
14    to capture more HCC conditions, diagnoses, and codes," Bryant FAC ¶ 136 *et seq.*;
15  - giving bonuses to employees and leadership based on HCC and revenue capture,
16    *see* Bryant FAC ¶ 139;
17  - using data mining to find diagnoses not previously coded, *see* Bryant FAC ¶ 141 *et*
18    *seq.*; and
19  - using Computer Assisted Coding ("CAC"), a natural language processing
20    technology, to find diagnoses not previously coded. *See* Bryant FAC ¶ 146 *et seq.*

21  Relators provide two concrete examples of improper upcoding in their FAC:

22  - **Upcoding of aortic atherosclerosis ("AA").** AA is "a thickening and loss of
23    elasticity in the arterial wall" – essentially, a "'hardening of the arteries.'" Bryant
24    FAC ¶ 53. AA "is often an incidental finding in radiology and imaging reports"
25    and is "neither treated nor managed after being identified." Bryant FAC ¶ 53; *see*
26    *also* Bryant FAC ¶ 66 (alleging that "AA can be clinically insignificant and
27    incidental"). It should not be coded unless it is being treated. *See* Bryant FAC ¶
28    53. In or about 2011, TPMG (the Northern California medical group) started an

initiative to review and capture AA diagnoses "even when incidental to the encounter." Bryant FAC ¶ 56; *see also* Bryant FAC ¶ 62. TPMG "took the position that AA is a 'chronic, systemic condition' that is a permanent risk factor once diagnosed, and thus is properly codeable [sic] regardless of its actual significance or treatment." Bryant FAC ¶ 57. Other Kaiser regions later followed suit. *See* Bryant FAC ¶ 69. In January 2013, Ms. Bryant emailed Kaiser's National Compliance Office ("NCO") expressing concern about TPMG's practice. *See* Bryant FAC ¶ 67. NCO failed to take action until almost two years later; it was not until August 2015 that NCO concluded that AA should not be considered a systemic condition and should be coded only if documented and treated. *See* Bryant FAC ¶ 75.

- **Upcoding of vent dependence.** Vent dependence relates to dependence on a respirator/ventilator. *See* Bryant FAC ¶ 80. In February 2014, a third party, AHA's Coding Clinic, stated in response to an inquiry initiated by Ms. Bryant that (1) the code for vent dependence "'should be reported when the patient requires continued ventilator support for an unexpected period of time and not for the short-term, acute phase of a condition'" and that (2) "'there is no time frame set on what constitutes ventilator dependency.'" Bryant FAC ¶ 81. Thus, it is improper to code vent dependence "if a patient is weaned from a ventilator during or at the end of an acute short-term stay in the hospital (of whatever length) and discharged home to a post-acute-care facility without clinically requiring vent support." Bryant FAC ¶ 82. Defendants had improper vent dependence coding because they "establish[ed] a 'time frame'-based criteria for documenting vent dependence status after which the specific code assignment is permitted." Bryant FAC ¶ 83 (noting, *e.g.*, that TPMG (the Northern California medical group) "initially defined the time period as 12 hours or more but later changed it to 30 days or more on a ventilator" and "irrespective of discharge status or disposition").

1  B.  Prior Order

2  Based on the Court's prior order on the first-to-file bar, Relators' causes of action related

3  to the MA program have been dismissed (*i.e.*, because they were covered by the earlier-filed cases,

4  *Osinek* and *Taylor*). Relators' claims that remain are: (1) false claims for payment with respect to

5  the ACA program, and (2) Ms. Hernandez's retaliation claims (both federal and state law claims).

## II.  DISCUSSION

A.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.  FCA Claims

For the FCA claims, Defendants make several arguments: (1) Relators have failed to adequately allege essential elements of a FCA claim, in particular, falsity and materiality; (2) Relators have failed to adequately allege claims against any Kaiser entity other than TPMG, the

1  Northern California medical group; and (3) Relators have failed to adequately allege the cause of
2  action for conspiracy in violation of the FCA.

      1.    Essential Elements

As noted above, Defendants' first contention is that Relators have failed to adequately plead the essential elements of falsity and materiality.

      a.    Falsity

With respect to falsity, Defendants argue that it is not sufficient for Relators to make an analogy to the MA program because the MA program is distinct from the ACA program. Relators allege that false claims for payment were made under the ACA program because risk adjustment under the ACA operates the same way as risk adjustment under MA (*e.g.*, requires compliance with certain ICD Guidelines), and cite some authority in support.[2] *See, e.g.*, FAC ¶ 49 ("In the risk adjustment model utilized under the ACA, which is named the HHS-Hierarchical Condition Categories ('HHS-HCC') risk adjustment model, HHS utilizes criteria and methods similar to those utilized under the Medicare Advantage program, and adapts Medicare Advantage HCCs for use in the HHS-HCC model."). Defendants have yet to demonstrate there is a material difference in the way risk adjustments are made between the ACA and the MA.

However, Defendants' broader point has validity – *i.e.*, Relators must plead that false claims for payment were in fact made to HHS, which is the relevant government agency with respect to the ACA program (as opposed to CMS, which is the relevant government agency with respect to the MA program). Relators have not clearly done so in the operative pleading.

To the extent Defendants have suggested that there cannot have been a false claim for payment because risk adjustment under the ACA program simply involves the transfer of funds among health plans, *see* Mot. at 5 (arguing that "[t]he purpose of ACA risk adjustment is to transfer funds ***among health plans***, whereas Medicare Advantage risk adjustment calculates

---

[2] The Court acknowledges that, in their opposition brief, Relators cited statutes and regulations in support of their position that they did not cite in their pleading. *See* Opp'n at 4-5 (citing, *e.g.*, 45 C.F.R. § 153.610(a) (providing that "[a]n issuer that offers risk adjustment covered plans must submit or make accessible all required risk adjustment data for those risk adjustment covered plans in accordance with the risk adjustment data collection approach established by the State, or by HHS on behalf of the State") and § 162.1002 (adopting the ICD Guidelines)).

payments that MAOs receive from CMS for providing healthcare coverage to each member") (emphasis in original), the Court need not decide this issue now because it may turn on how Relators will plead that false claims for payment were made to HHS. At this point, the Court simply notes that the FCA defines "claim" for payment as follows: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(1)(A).

Finally, the Court finds Relators' claim of falsity problematic to the extent they assert that the scope of their case extends to upcoding a number of diagnoses made under the ACA program beyond the AA and vent dependence codes described in the complaint. Although it is possible that there was a broad scheme of upcoding covering a number of conditions, Relators have attempted to plead a scheme by pointing to just two conditions that have somewhat unique circumstances. The Court also notes that the circumstances related to AA and those related to vent dependence differ to a certain extent in that the circumstances related to AA seem to implicate legal and factual falsity (*i.e.*, failure to comply with the ICD Guidelines' requirement that a diagnosis be rendered only if treated) whereas the circumstances related to vent dependence seem to implicate factual falsity only (*i.e.*, the diagnosis of vent dependence was not clinically accurate). These differences suggest the need for greater specificity in alleging a systemic scheme.

b. <u>Materiality</u>

The Court also finds some merit to Defendants' position that allegations in support of materiality are lacking. This is largely because Relators have glossed over the fact that they must make out a plausible case that HHS, and not CMS, would have found the false claims material. (The Court recognizes that, for the other related cases, Defendants have not contested materiality where factual falsity is at issue.)

To the extent Relators claim that there is materiality based on 42 U.S.C. § 18033(a)(6)(A) of the ACA, the Court does not agree. That provision in the ACA states as follows:

> Payments made by, through, or in connection with an Exchange are subject to the False Claims Act (31 U.S.C. 3729 et seq.) if those payments include any Federal funds. Compliance with the

8

> requirements of this Act [*i.e.*, the ACA] concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange.

42 U.S.C. § 18033(a)(6)(A). As Defendants point out, materiality in this section is about "eligibility for a health insurance issues to participate in the Exchange." *Id.* That is not at issue in this case. Moreover, in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), the Supreme Court emphasized that "statutory, regulatory, and contractual requirements are not *automatically* material, even if they are labeled conditions of payment." *Id.* at 191 (emphasis added).

Accordingly, based on the deficiencies above for falsity and material, the Court concludes that dismissal of the FCA claims is warranted. However, the Court shall give Relators leave to amend their complaint to correct the deficiencies.

2. <u>Defendants Other Than TPMG</u>

Defendants contend that, in addition to the deficiencies above, there are other problems with Relators' FAC. According to Defendants, based on the allegations in the FAC, viable claims have been pled against only one of the Kaiser entities – specifically, TPMG (the Northern California medical group). Defendants contend that Relators have improperly lumped all of the Kaiser entities, giving short shrift to the fact that they cover different regions, serve different functions (*e.g.*, health plan v. provider), and do not have shared ownership or control. *See* Reply at 10. Defendants also argue that allegations for most entities other than TPMG are conclusory.

Defendants' position has merit. Most notably, some allegations are conclusory in nature – *e.g.*, just because presentations were made or practices promoted by one region to other regions does not thereby mean that the latter regions adopted the recommendations. However, because the Court is already dismissing the FCA claims and giving Relators leave to amend, it makes sense to allow Relators to supplement their allegations as to how entities other than TPMG engaged in misconduct – and with respect to the ACA program specifically. Relators are advised to make clear which allegations apply to which specific defendants in order to avoid another challenge by Defendants that entities have been improperly lumped together.

9

### 3. Conspiracy

Finally, Defendants argue that at least one FCA claim – the third cause of action for conspiracy to violate the FCA, *see* 31 U.S.C. § 3729(a)(1)(C) (providing that a person who "conspires to commit a violation of [*inter alia*] subparagraph (A)," which addresses false claims, "is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages") – should be dismissed because Relators have alleged a conspiracy in conclusory terms only. The Court need not rule on this argument because Relators' amendment – which should include allegations as to each specific defendant – will likely affect the conspiracy claim. At this point, however, the Court does note that Relators should clarify in their amended pleading whether they are claiming one overarching conspiracy involving all Kaiser entities or rather multiple bilateral conspiracies (*i.e.*, between a health plan and its affiliated medical group). The Court is somewhat skeptical as to whether an overarching conspiracy can be plausibly pled – *e.g.*, even if other regions followed what TPMG was doing with coding of AA and vent dependence, that does not mean that those regions entered into an agreement with TPMG to defraud the government. This would be particularly true if each region was financially independent – *i.e.*, what benefited TPMG would not benefit any other region.

### 4. Summary

For the foregoing reasons, the Court dismisses the FCA claims but gives Relators leave to correct the deficiencies above.

## C. Retaliation Claims

Aside from the FCA claims, one of the relators – Ms. Hernandez – has also brought retaliation claims. The retaliation claims are asserted against TPMG only and are based on the following federal and state statutes:

(1) the FCA, *see* 31 U.S.C. § 3730(h) (providing that an employee "shall be entitled to all relief necessary to make that employee . . . whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this

section or other efforts to stop 1 or more violations of this subchapter [31 U.S.C. § 3721 *et seq.*]");

 (2) California Labor Code § 1102.5 (providing, *inter alia*, that an employer "shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties");

 (3) California Labor Code § 98.6 (providing, *inter alia*, that an "employee who is discharged, threatened with discharge, demoted, suspended, retaliated against, subjected to an adverse action, or in any other manner discriminated against in the terms and conditions of his or her employment because the employee engaged in any conduct delineated in this chapter . . . shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer"); and

 (4) the FLSA. *See* 29 U.S.C. § 215 (providing, *inter alia*, that it is unlawful for a person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act").

1. <u>FLSA Retaliation Claim</u>

Defendants argue that the FLSA retaliation claim must be dismissed because, to have such a claim, a plaintiff must allege that the protected activity that led to retaliation must have involved a complaint about unlawful wage-and-hour practices specifically. In the opposition brief, Ms.

11

1   Hernandez agrees to voluntarily dismiss this claim. *See* Opp'n at 21 n.4.

2       2.    FCA Retaliation Claim

The FCA provides for a cause of action for retaliation in 31 U.S.C. § 3730(h). "Congress added [this provision] to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

A retaliation claim under the FCA has the following essential elements: "(1) [the plaintiff] 'engaged in activity protected under the statute'; (2) the employer knew the plaintiff engaged in a protected activity; and (3) the employer discriminated against the plaintiff 'because he . . . engaged in protected activity.'" *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 907 (9th Cir. 2017). "An employee engages in a protected activity by investigating matters which are calculated or reasonably could lead to a viable [False Claims Act] action." *Id.* (internal quotation marks omitted; also noting that "'an employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government'").

Regarding the second element, *i.e.*, knowledge on the part of the employer, it "is not a high bar." *Id.* at 908. However, the Ninth Circuit has acknowledged that, "when an employee is tasked with [monitoring and reporting activities]," courts have stated "it takes more than an employee's knowledge of that activity to show that an employer was on notice of a potential *qui tam* suit." *Id.* Other circuit courts are generally in accord.[3] *See, e.g.*:

- *Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 173 (1st Cir. 2005) (stating

---

[3] These circuit court cases were decided before the FCA retaliation provision was amended in 2009. "The pre-May 2009 version of § 3730(h) codified an entitlement to relief for any employee retaliated against for lawful acts done by that employee on behalf of the employee or others in furtherance of an FCA action." *Jones-McNamara v. Holzer Health Sys.*, No. 2:13-cv-616, 2014 U.S. Dist. LEXIS 58674, at *7 (S.D. Ohio Apr. 28, 2014). "The post-May 2009 version dropped the FCA action language in favor of language protecting 'other efforts' to stop an FCA violation. This effectuated a substantive change in the statute by utilizing broader language, basing the right to relief not only on pursuit or aid of a *qui tam* case, but on any conduct by or on behalf of the employee to stop FCA misconduct." *Id.* at *8.

12

that, "where an employee's job responsibilities involve overseeing government billings or payments, his burden of proving that his employer was on notice that he was engaged in protected conduct should be heightened[;] [y]et such an employee can put his employer on notice by 'any action which . . . [, regardless of his job duties,] would put the employer on notice that [FCA] litigation is a reasonable possibility'");

- *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (stating that "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice [of protected activity]");

- *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003) (stating that "employees charged with investigating potential fraud are not automatically precluded from bringing a Section 3730(h) action," but, "[i]n light of their ordinary responsibilities, . . . such persons must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations");

- *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999) (stating that "an employee tasked with the internal investigation of fraud against the government cannot bring a section 3730(h) action for retaliation unless the employee puts the employer on notice that a *qui tam* suit under section 3730 is a reasonable possibility[;] [s]uch notice can be accomplished by expressly stating an intention to bring a *qui tam* suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility" – *e.g.*, "characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved," as these actions "let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a

13

reasonable possibility");

- *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996) (stating that "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties, and plaintiff took no steps to put defendants on notice that she was acting 'in furtherance of' an FCA action – *e.g.*, that she was furthering or intending to further an FCA action rather than merely warning the defendants of the consequences of their conduct");

- *Robertson v. Bell Helicopter Textron*, 32 F.3d 948, 952 (5th Cir. 1994) (stating that "[plaintiff] never characterized his concerns as involving illegal, unlawful, or false-claims investigations," and so "the record contains no evidence that [plaintiff] expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job").

In *Campie,* the Ninth Circuit found that the "more" requirement had been satisfied:

> [First,] the Second Amended Complaint alleges that "Mr. Campie made clear that he expected Gilead to stop its deceptive practices and threatened to inform the FDA if Gilead continued its fraudulent conduct."  Second, Campie alleges he was "selectively circumvent[ed]" and "exclud[ed]" from the regulatory review process in which he was meant to take part, was told certain regulatory compliance actions, such as issuing a quarantine, were "not in his job description," and had conversations outside of his chain of command regarding his concerns.

*Campie*, 862 F.3d at 908.  Because Mr. Campie made a threat to inform the FDA, he was clearly going beyond his job duties.  That was underscored because Mr. Campie was having conversations out of his chain of command.  *See Williams*, 389 F.3d at 1261 (noting that, "when an employee acts outside his normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity"; here, "[i]nstead of merely reporting his concerns about Teledyne up [the defendant-company's] management chain, [plaintiff] went outside the company and alerted the government – the victim of any FCA violation").  In addition, because Mr. Campie was having conversations out of his chain of command and Gilead was trying to keep Mr. Campie "out of the

14

loop," even where his job duties were implicated, an inference could reasonably be made that Gilead was on notice of a potential FCA suit.

In *United States ex rel. Garrett v. Kootenai Hosp. Dist.*, No. 2:17-cv-00314-CWD, 2020 U.S. Dist. LEXIS 107048 (D. Idaho June 17, 2020), a district court in Idaho also held that the "more" requirement was satisfied.

> While [the plaintiff's] position involved auditing [the defendant] Kootenai Health's practices to ensure compliance with federal regulations, her reports to Kootenai Health making up the claims in this case were not exclusive to mere regulatory violations. Instead, the complaint alleges [the plaintiff] made numerous complaints and reports to Kootenai Health's officers and directors "[i]n an effort to correct the illegal practices." For example, the complaint alleges [the plaintiff] reported issues concerning reimbursements for inpatient admissions and other illegal practices to her supervisors and Kootenai Health's directors to "remediate" the problem. [The plaintiff] further alleges her supervisor acknowledged the "illegality" of Kootenai Health's billing for services by non-physicians using the physician fee scheduled; stating "the illegality of this situation kept her up at night." Importantly, [the plaintiff] alleges Kootenai Health openly resisted her efforts to stop the illegal conduct by telling her to "stop looking for violations" and that she was costing Kootenai Health revenue; harassing [the plaintiff]; and, eventually, demanding that she resign.
>
> Drawing the inferences in favor of the nonmoving party, the allegations plausibly establish Kootenai Health was placed on notice that [the plaintiff] was investigating fraud which could reasonably lead to a viable FCA claim. [The plaintiff']s reports to Kootenai Health, as alleged, were made to correct alleged illegal fraudulent practices, not simply to report regulatory compliance issues in the course of her employment. Kootenai Health responded by openly and actively resisting her efforts. For purposes of this motion, the Court finds the allegations are sufficient with respect to notice. Whether the claim can survive a later substantive motion remains to be seen.

*Id.* at *26-28.

In the instant case, Defendants argue that Ms. Hernandez has failed to allege the second element of a FCA retaliation claim. According to the FAC, Ms. Hernandez was a coding and auditing professional. *See, e.g.*, Bryant FAC ¶ 21 (alleging that Ms. Hernandez's last position was Regional Director of Auditing & Coding Services for TPMG). Therefore, Defendants contend, "investigating and reporting coding errors were part of [her] job," Mot. at 24, and Ms. Hernandez must show that TPMG was on notice of a potential FCA suit based on facts other than its

15

knowledge of her investigating and reporting coding errors (*i.e.*, simply doing her job).

Whether Ms. Hernandez has done so is a close call. But given that reasonable inferences are to be made in her favor at this early stage of the proceedings, she survives Rule 12(b)(6). Ms. Hernandez has alleged, for instance, that she, along with Ms. Bryant, repeatedly advocated for the correct coding of AA after TPMG leadership took the position that AA is always significant and therefore always to be coded. *See* Bryant FAC ¶ 66 ("Ms. Bryant and Ms. Hernandez made repeated but futile attempts to help TPMG leadership understand the compliant and appropriate documentation for the coding of AA."). In this respect, her case bears some similarity to *Garrett* – *i.e.*, Ms. Hernandez was not just reporting a coding problem but trying to remediate it, implicitly raising the point that the coding was not legally permissible.

Ms. Hernandez has also pointed to other allegations in the complaint that lend some support to her position. For instance, Ms. Hernandez alleges that she and Ms. Bryant worked together on the proper coding for vent dependence and that, in conjunction with such, made a query to the AHA's Coding Clinic. *See* Bryant FAC ¶¶ 86-87. After rejecting Ms. Hernandez and Ms. Bryant's conclusions on proper coding, TPMG leadership contacted Ms. Hernandez asking why the AHA's Coding Clinic had been queried in the first place. Because Ms. Bryant was the one who had actually submitted the query to the Coding Clinic, leadership asked Ms. Hernandez for Ms. Bryant's cell phone number so that she could be contacted immediately and Ms. Bryant was chastised for submitting the query. *See* Bryant FAC ¶ 91. "Ms. Hernandez and Ms. Bryant were told not to inquire outside Kaiser anymore on issues without input and approval from Kaiser's Coding Governing Group (CGG). They were warned that outside inquiry would create risk for Kaiser." Bryant FAC ¶ 92. These allegations viewed in Relators' favor, suggests TPMG was on notice that Ms. Hernandez was not simply fulfilling her job duties, but was looking into matters that could reasonably lead to a FCA suit.

3. <u>California Retaliation Claims</u>

For the California retaliation claims, Defendants make the same argument as above – *i.e.*, that Ms. Hernandez has failed to allege that TPMG knew she had engaged in protected activity. Thus, the Court's conclusion above applies equally here. That being said, the Court takes note

16

that, under California Labor Code § 1102.5, an employer "shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency . . . *regardless* of whether disclosing the information is part of the employee's job duties." Cal. Lab. Code § 1102.5(a) (emphasis added). Thus, if anything, an argument could be made that a § 1102.5 retaliation claim is more easily proven than a FCA retaliation claim. In any event, the § 1102.5 claim survives for the reasons stated above.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss the Bryant FAC. The FCA claims based on the ACA are dismissed but with leave to amend. The FLSA retaliation claim is dismissed. All other retaliation claims under the FCA and California Labor Code are permitted to proceed. Relators have leave to amend their complaint to address the deficiencies with the FCA claims. The amended complaint shall be filed by December 12, 2022; Defendants shall file a response thereto by January 3, 2023.

This order disposes of Docket No. 182.

**IT IS SO ORDERED**.

Dated: November 14, 2022

_____
EDWARD M. CHEN
United States District Judge

17