1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9

10

11

12

13

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RONDA OSINEK, | Case No. 13-cv-03891-EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS UNITED STATES' FIRST AMENDED COMPLAINT** |
| KAISER PERMANENTE, et al., | |
| Defendants. | Docket No. 249 |

United States District Court
Northern District of California

14        This litigation covers claims brought against various Kaiser entities pursuant to the False

15    Claims Act ("FCA").  Currently, there are complaints filed by three sets of Plaintiffs: (1) the

16    United States; (2) Dr. James Taylor; and (3) Gloryanne Bryant and Victoria M. Hernandez.  This

17    order addresses a motion to dismiss challenging the United States' operative complaint.  For

18    convenience, the Court refers to the Kaiser entities moving for dismissal as "Kaiser."  The specific

19    Kaiser entities that have been sued by the United States are: (1) the California health plan and two

20    related physician medical groups (Kaiser Foundation Health Plan, Inc.; the Permanente Medical

21    Group; and the Southern California Permanente Medical Group) and (2) the Colorado health plan

22    and the related physician medical group (Kaiser Foundation Health Plan of Colorado and the

23    Colorado Permanente Medical Group, P.C.).

24        Having considered the parties' briefs, as well as the oral argument of counsel, the Court

25    hereby **DENIES** Kaiser's motion to dismiss.

26                    **I.        FACTUAL & PROCEDURAL BACKGROUND**

27        The government's operative complaint is the first amended complaint ("FAC").  Before the

28    government filed the FAC, the Court granted in part and denied in part Kaiser's motion to dismiss

the government's original complaint.  In that order, the Court noted that the gist of the United

States' complaint was as follows: in conjunction with the Medicare Advantage program, "Kaiser

submitted false claims for payment because it 'alter[ed] patient medical records [via addenda] to

add diagnoses that either [1] did not exist or [2] were unrelated to the patient's visit with the

Kaiser physician.'"  Docket No. 223 (Order at 10).  The Court noted that the government's first

theory was predicated on factual falsity: "If a diagnosis of a medical condition was claimed but

that medical condition did not exist (*i.e.*, the diagnosis was 'clinically inaccurate'), then a claim

for payment based on that diagnosis is literally false."  Docket No. 223 (Order at 10).  The second

theory was primarily predicated on legal falsity but also could be construed as being predicated on

factual falsity.  *See* Docket No. 223 (Order at 16-17) (explaining that "[a] legally false claim for

payment involves an assertion (either express or implied) that there is compliance with a statute,

regulation, or contract" and, here, "the government argues that both the CMS/Kaiser contract and

federal regulations required Kaiser to comply with ICD Guidelines"; adding, however, that there

was also factual falsity because "[Kaiser] incorrectly described the valid ICD codes for the patient

visit").

The Court concluded that the factual falsity theory was problematic because the

government was asserting that there was a *broad scheme* "to include nonexistent diagnoses in

patients' medical records."  Docket No. 223 (Order at 13).  However, with one exception, the

allegations were not sufficient to support a broad scheme.  The Court acknowledged that the

government's complaint identified three specific instances of clinically inaccurate diagnoses but

noted that there was nothing to suggest that these three specific instances "were emblematic of a

wider pattern of similar practices."  Docket No. 223 (Order at 13).  The one exception that the

Court identified was with respect to a disease known as cachexia.  For cachexia, there were

sufficient allegations suggesting a scheme to overcode on that specific disease.  *See* Docket No.

223 (Order at 13-14).

Although the Court dismissed the factual falsity theory, it gave the government leave to

amend so that it could plead "a scheme by Kaiser to alter patient medical records by adding

1    clinically inaccurate diagnoses *on a general or systemic basis*."[1]  Docket No. 223 (Order at 31)

2    (emphasis added).  The government has now filed its FAC, and Kaiser challenges that pleading,

3    asserting that the factual falsity theory is still deficient.

## II.    DISCUSSION

5    A.    Legal Standard

6         Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

7    statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

8    complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

9    Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).

10        To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in

11   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),

12   a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a

13   plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  "A claim

14   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

15   reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

16   678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a

17   sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

18   The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in

19   the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*,

20   519 F.3d 1025, 1031 (9th Cir. 2008).

21        In its papers, Kaiser emphasizes that the *Iqbal* Court indicated a claim is not plausible if

22   there is an "'obvious alternative explanation'" for a defendant's conduct.  *Iqbal*, 556 U.S. at 669.

23   But the Ninth Circuit subsequently pointed out that,

24            [i]f there are two alternative explanations, one advanced by
              defendant and the other advanced by plaintiff, both of which are
25            plausible, plaintiff's complaint survives a motion to dismiss under
              Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when
26            defendant's plausible alternative explanation is so convincing that

27   ───────────────

28   [1] The Court allowed the government's causes of action based on a theory of legally false claims
     for payment to proceed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    plaintiff's explanation is *implausible*.

2    *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original); *see also Waln v. Dysart*

3    *Sch. Dist.*, 54 F.4th 1152, 1159-60 (9th Cir. 2022) (articulating the same standard); *Patton v. Ind.*

4    *Univ. Bd. of Trs.*, No. 1:20-cv-00699-TWP-MJD, 2022 U.S. Dist. LEXIS 154900, at *44 (S.D.

5    Ind. Aug. 29, 2022) (finding defendant's "'obvious alternative explanation' argument . . .

6    unsuccessful" because (1) plaintiff "has not alleged 'so fantastic a story that it could be easily

7    debunked by a non-illicit "obvious alternative explanation"'" and (2) "the alleged non-illicit

8    explanations for [defendant's] actions are not so patently obvious as to make Patton's causation

9    allegations implausible").

10           In addition to Rules 8 and 12, Federal Rule of Civil Procedure 9 is also implicated in the

11   instant case because the government is making a claim for fraud.  Under Rule 9(b), a plaintiff who

12   alleges fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P.

13   9(b).  The Ninth Circuit has noted that,

> [t]o state an FCA claim, a relator is not required to identify actual examples
> of submitted false claims; instead, "it is sufficient to allege 'particular details
> of a *scheme* to submit false claims paired with reliable indicia that lead to a
> strong inference that claims were actually submitted.'"  *Ebeid ex rel. U.S. v.*
> *Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) (quoting *U.S. ex rel.*
> *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  A relator is not
> required to identify representative examples of false claims to support every
> allegation, although the use of representative examples is one means of
> meeting the pleading obligation. *Id.* at 998.

19   *Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019)

20   (emphasis added); *see also United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d

21   71, 89 (2d Cir. 2017) (noting that the majority of circuits follow this approach based on the Fifth

22   Circuit's decision in *Grubbs*; citing cases from the Fifth, Tenth, Ninth, Third, D.C., and Seventh

23   Circuits).

24   B.      Elements of False Claim Act

25           "[T]he essential elements of False Claims Act liability are: (1) a false statement or

26   fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the

27   government to pay out money or forfeit moneys due."  *United States ex rel. Campie v. Gilead*

28   *Scis.*, 862 F.3d 890, 902 (9th Cir. 2017).  In the instant case, Kaiser argues that the government's

4

1    factual falsity theory must be dismissed because the government has failed to plead falsity,

2    scienter, and materiality.

3    C.        Falsity

4              1.        "Contradiction"

5              As an initial matter, Kaiser argues that the government has failed to plead falsity because

6    the government no longer alleges that Kaiser diagnosed medical conditions that patients did not

7    actually have – and instead simply alleges that the diagnoses made were "contradicted" by the

8    patients' medical records.  According to Kaiser,

9              [t]hese theories are distinct.  When a member does not have the
              diagnosed medical condition, the associated diagnosis code is false
10            on its face, regardless of what the medical record shows.  Even if the
              diagnosis does not contradict any information in the medical record,
11            it is still false because the member does not have the medical
              condition described by the diagnosis.  Conversely, a contradiction
12            between the diagnosis and information in the medical record does
              not on its own establish falsity.  Where the medical record
13            contradicts the diagnosis, the contradiction could suggest any
              number of innocuous things – for example, there may have been a
14            change of medical circumstances or a simple typographical error in
              the record.  Indeed, contradictory information in the medical record
15            may be the best reason to query a healthcare provider to clarify
              which of the contradictory indicators should be credited for purposes
16            of diagnosis coding.

17   Mot. at 8.  Kaiser contends that the government's position is predicated on "the faulty premise that

18   a diagnosis must necessarily be false when the patient's medical record contains information that

19   conflicts with the diagnosis."  Mot. at 8; *see also* Mot. at 10 (asserting that "it is not reasonable to

20   infer that a 'contradiction' between a diagnosis and information in the medical record necessarily

21   supports the conclusion that the patient does not have the diagnosed condition").

22            The Court rejects Kaiser's position.  First, contrary to what Kaiser suggests, the

23   government makes clear that, by alleging that a condition is contradicted by the medical record, it

24   means that the condition did not actually exist.  *See, e.g.*, FAC ¶ 2 ("Kaiser falsely submitted

25   diagnosis codes for conditions that the patient did not actually have at the time of the visit, as the

26   existence of the conditions was contradicted by the medical record.").  Notably, Kaiser itself

27

28

United States District Court
Northern District of California

5

1    admits that "contradictions in medical records *can* serve as *evidence* of a nonexistent diagnosis."[2]

2    Reply at 4 (emphasis in original).

3          Second, even if, as Kaiser maintains, a contradiction in the medical record does not

4    *necessarily* mean that the diagnosed condition did not exist, the question at 12(b)(6) is whether it

5    is *plausible* that the diagnosed condition did not exist.  If the medical record does not support a

6    condition, then it is reasonable to infer that the condition did not exist.

7          In its reply brief, Kaiser suggests that it is only *possible*, not plausible, that a diagnosis did

8    not exist if there is a contradiction in the medical record.  *See* Reply at 4 (arguing that "the United

9    States fails to articulate why this inference is plausible rather than merely possible"; "[i]n a

10   medical record, 'contradictions' are routine and even expected, such as where a healthcare

11   provider determines a member has a medical condition despite the existence of a clinical indicator

12   that might suggest otherwise, or where the provider concludes that a medical condition that

13   previously receded has returned").  Although Kaiser's position is not baseless, it is not convincing

14   for several reasons.  First, Kaiser is making plausibility a more demanding standard than it

15   actually is.  As noted above, plausible does not mean probable; plausible simply means that there

16   is more than a sheer possibility that a defendant acted unlawfully.  Second, Kaiser's alternative

17   explanation is not so convincing that Plaintiffs' explanation is thereby rendered implausible.  For

18   example, at this juncture, it is not clear that contradictions in medical records are routine and

19   expected, as Kaiser asserts.  Moreover, if as discussed below, there is a sufficient allegation of a

20   widespread pattern of contradictions, that further supports the inference of purposeful falsity.

21         2.    Systemic Scheme to Defraud

22         Kaiser argues that, even if the Court is not persuaded by its arguments above, there is

23   another reason why the Court should reject the government's claim of factual falsity – specifically,

24   because the government has failed to plead facts supporting a "systemic *scheme* by thousands of

25   healthcare providers to falsely diagnose their patients with medical conditions that do not actually

26

27   ─────────────────

[2] Kaiser has also argued a failure to plead materiality based on the government's "mere" pleading
28   of a "contradiction."  Mot. at 20-21.  Because the government has in fact alleged the submission of
     clinically inaccurate diagnoses, Kaiser's materiality argument also lacks merit.

*(left margin, vertical text:)* United States District Court   Northern District of California

1    exist."  Mot. at 10 (emphasis in original).

2            The Court does not agree.  The United States has in its FAC pointed to specific examples

3    of clinically inaccurate diagnoses.  *See, e.g.*, FAC ¶¶ 175-76 (alleging that, as a result of Kaiser's

4    refresh program, two patients were diagnosed via addenda with malnutrition even though, at the

5    time of the visit, they were obese); FAC ¶ 375 (alleging that three patients were diagnosed via

6    addenda with conditions even though their medical records, at the time of the visit, contradicted

7    those diagnoses).

8            In addition, the United States has made allegations indicating that there were more than

9    just isolated instances of clinically inaccurate diagnosing, *i.e.*, that these problems were systemic.

10   *See, e.g.*, FAC ¶ 103 (alleging that, in "hundreds of thousands" of instances, diagnoses were made

11   that "violated the ICD Guidelines requirement that a diagnosis 'require or affect patient care,

12   treatment, or management' at a patient visit[,] [a]nd many times, contradictory information in

13   patient medical records indicated the patient did not even have the condition at the time of the

14   visit"); FAC ¶¶ 334, 337 (alleging that an audit of addenda in 2015 "identified significant

15   evidence that Kaiser physicians were regularly making . . . errors [of diagnosing a condition where

16   the medical record contradicted the existence of the condition], including in particular adding

17   morbid-obesity diagnoses when the patient had a BMI at the time of the visit that was inconsistent

18   with the diagnosis"); FAC ¶ 338 (alleging that an audit of addenda in 2016 "identified hundreds of

19   instances in Northern California alone where Kaiser physicians added diagnoses via addenda

20   where the existence of the condition was contradicted by information in the encounter note"); *see*

21   *also* FAC ¶ 142 (alleging that Kaiser "often generate[d] after-visit queries [to doctors] based on

22   previously run algorithms that relied upon outdated information"; "[i]nternally, Kaiser identified

23   these data lag issues as a threat and weakness of their data-mining and refresh programs"); FAC ¶

24   178 (alleging that "[i]nternal documents indicate that Kaiser was aware that its risk-adjustment

25   initiatives were generating inaccurate diagnoses, including identifying, for example, that refresh

26   reports would ask for a diagnosis to be refreshed even though it was only captured as a history of

27   the condition"); FAC ¶ 323 (alleging that "one internal document identified as a weakness of the

28   program that '[s]ome clinicians refresh the diagnosis without proper and detailed review of the

United States District Court
Northern District of California

7

medical record, and as a result incorrect diagnoses keep being reported'").

Finally, the United States has alleged a plausible reason why there was, in effect, a *practice of clinically inaccurate diagnosing* – one not limited to specific medical conditions. As the government notes in its opposition brief:

> The false claims arose from the design of Kaiser's risk-adjustment programs . . . . These issues were not specific to any particular [medical] condition [e.g., cachexia] but were *programmatic*. By *design*, Kaiser's risk-adjustment programs [*e.g.*, data mining and chart review] generated voluminous queries to physicians after visits, but the programs would often fail to account for what actually occurred at the visit, ignoring both whether [1] the condition had any relevance to the visit and [2] contradictory information in a patient's medical record showing the patient did not have the condition. Consequently, even if the medical record for the visit contradicted the existence of the condition, Kaiser would still regularly query the physician after a visit to create an addendum to add the diagnosis.

Opp'n at 10 (emphasis added).

Kaiser's "refresh" program provides the clearest example of how there was, effectively, a practice of submitting clinically inaccurate diagnoses. Under the refresh program, "Kaiser created algorithms that mined patients' electronic medical records for any diagnoses that had been made in any setting during the past several (typically three) years." FAC ¶ 161. "[I]f a physician failed to re-diagnose these conditions at a patient visit," Kaiser would send a query to the physician about those diagnoses and "systematically pressure the physician to add the diagnoses via addenda." FAC ¶ 162. But this approach disregarded the fact that an old diagnosis – precisely because it was old – might no longer accurate. For example, the medical condition diagnosed several years earlier could have resolved; or at least the medical condition was now a historical condition instead of an active one. *See* FAC ¶ 161. The patient visit therefore could have "clinical indicators . . . contradict[ing] the actual existence of the condition" that was diagnosed years earlier but, even so, Kaiser would still send query the doctor about the old diagnosis and pressure the doctor to add the diagnosis via an addendum. FAC ¶ 161; *see also* FAC ¶ 134 (alleging that "Kaiser generated these lists [of missed opportunities] without accounting for contradictory information in the medical record of the visit"); FAC ¶ 228 (alleging that clinically inaccurate diagnosing was an "inevitable result[] of Kaiser's flawed programs, given the way that the

United States District Court
Northern District of California

1    diagnoses were generated and the pressure on physicians to add them").

2         In its papers, Kaiser argues that the refresh program allegations do not demonstrate falsity

3    because, as alleged, all that Kaiser did was send queries to doctors; it was then up to the doctors to

4    use their independent judgment to determine whether the old diagnoses should be "refreshed."

5    *See* Reply at 6 ("Even if this Court accepts that Defendants sent healthcare providers queries that

6    had incomplete or inaccurate information, to show a widespread scheme based on those

7    purportedly flawed queries, the United States must also allege with specific facts a widespread

8    failure by thousands of healthcare providers to exercise their professional judgment, adequately

9    review members' medical records, or diagnose medical conditions that they knew their patients

10    did not have.").  While Kaiser's position is not entirely without basis, the government has not

11    relied solely on the fact that queries were sent to doctors.  Rather, the government has expressly

12    alleged that doctors were *pressured* to add the old diagnoses.  This pressure took various forms –

13    *e.g.*, doctors were subjected to multiple queries, were required to justify their refusals to add old

14    diagnoses, and were offered financial incentives (both positive and negative) to generate addenda.

15    *See* FAC ¶ 201 *et seq.*  To the extent Kaiser suggests it is implausible that doctors would succumb

16    to such pressure, *cf.* Reply at 8 (arguing that the government has lodged "a serious charge of

17    misconduct against Defendants" and further "call[ed] into question the professional conduct of the

18    thousands of healthcare providers who work for Defendants and who actually recorded these

19    challenged diagnoses in the members' medical records"), there is enough here to give rise to a

20    reasonable and plausible inference that the pressure had effect.  This is especially true given that,

21    under the refresh program, doctors were being asked to diagnose conditions that had, in fact, been

22    previously diagnosed – *i.e.*, this was not a situation in which diagnoses were being made up out of

23    whole cloth; hence, it took less of a stretch to succumb to pressure from Kaiser.

24         To the extent Kaiser relies on the Ninth Circuit's decision in *Integra Med Analytics LLC v.*

25    *Provident Health & Services*, 854 F. App'x 840 (9th Cir. 2021), to support its position, that case is

26    not binding since it is not a published decision.  Furthermore, *Integra* is distinguishable from the

27    case at hand.  In *Integra*, the plaintiff did claim that the defendant, which operated numerous

28    hospitals and clinics across multiple states, gave its doctors leading queries.  *See id.* at 842.  The

United States District Court
Northern District of California

1    plaintiff also claimed that the defendant "incentivized doctors to use language conducive to coding

2    higher-paying . . . diagnoses though [its] documentation tips and queries." *Id.* at 844; *see also id.*

3    at 842 (referring to "'leading queries'").  The Ninth Circuit held that these allegations *on their own*

4    were not enough to support the conclusion that doctors thereby "recorded unsupported medical

5    conditions." *Id.* at 844.  In the instant case, the government has made allegations beyond those

6    made in *Integra* – *e.g.*, alleging that doctors were subjected to significant pressure beyond the

7    mere fact of the queries (*e.g.*, there were positive and negative financial incentives to upcode, and

8    doctors were required to justify their refusals to add diagnoses) and that audits *confirmed* that

9    there was incorrect diagnosing.

10         Furthermore, it appears that, in *Integra*, the plaintiff simply alleged queries "'would

11   *sometimes* result in the creation of contradictory medical records,' such as an initial documentation

12   of 'delirium' with the later addition of 'encephalopathy.'" *Id.* at 842 (emphasis added).  Here, the

13   government has alleged that, based on audits, there was more than just sporadic incorrect

14   diagnosing.

15         Finally, the focus of the Ninth Circuit in *Integra* was the plaintiff's use of statistics to

16   support its claim of falsity.  According to the plaintiff, there must have been the false recording of

17   medical conditions because the defendant "submitted proportionally *more* claims with higher-

18   paying diagnosis codes than comparable institutions." *Id.* at 841 (emphasis added).  But data cited

19   in the complaint actually showed that, over time, other comparable institutions were also coding

20   more for major complications or comorbidities.  "By 2017, [other] entities generally coded claims

21   with encephalopathy, respiratory failure, and severe malnutrition at similar rates to [defendant's]

22   in 2011 to 2012." *Id.* at 843.  Moreover, even if the defendant had at one point submitted

23   proportionally more claims, the Ninth Circuit said that the plaintiff had simply offered a "*possible*

24   explanation – that doctors lied about underlying medical conditions – to explain" the statistics; the

25   "statistical trend [was also] consistent with a plausible alternative (and legal explanation)" – *i.e.*,

26   that the defendant, "one of the largest health care systems in the country, which specifically hired

27   consultants to improve its Medicare billing, would be at the forefront of a national trend toward

28   coding these relevant MCCs at a higher rate." *Id.* at 844 (emphasis in original).  Unlike the

1    plaintiff in *Integra*, the government is not relying on similar statistics to prove falsity; rather, the

2    government is claiming falsity based on, *e.g.*, audits that confirmed more than sporadic incorrect

3    diagnosing.

4         In any event, even if Kaiser's reading of *Integra* is the correct one, the Court also takes

5    note of an additional allegation made by the government with respect to the refresh program.

6    According to the government,

7         Kaiser physicians who were requested to add diagnoses through
         addenda many times would comply with Kaiser's request by
8         creating addenda documenting that the patient [only] had a *history*
         of the condition. . . . However, instead of using *historical* condition
9         codes, as required by the ICD Guidelines, Kaiser would submit an
         *active* condition code with the condition, even though the physicians
10        documented the condition as historical.  This regularly occurred
         with respect to conditions that may be temporary or resolve over
11        time with treatment, such as cancers, stroke, irregular heart rhythms,
         blood disorders, malnutrition, obesity-related conditions, and
12        numerous others.

13   FAC ¶ 177 (emphasis in original and added).  In other words, here, the government is not only

14   alleging that Kaiser successfully pressured doctors to add incorrect diagnoses via addenda.  Here,

15   the government is alleging that in addition to erroneous diagnoses, doctors sometimes added

16   correct diagnoses but, because these diagnoses would not result in risk adjustment (because they

17   were historical conditions and not active ones), Kaiser then *changed* the diagnoses.

18        Accordingly, for the reasons stated above, the Court rejects Kaiser's contention that the

19   government has not adequately pled falsity.

20   D.    Knowledge

21        Kaiser argues that, even if falsity is sufficiently pled, knowledge of falsity is not.  The

22   Court rejects this argument as well.

23        For purposes of the False Claims Act, a person "knowingly" submits false information if

24   he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth

25   or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

26   information." 31 U.S.C. § 3729(b)(1)(A).  *See, e.g.*, *United States v. United Healthcare Ins. Co.*,

27   848 F.3d 1161, 1175-76 (9th Cir. 2016) (addressing "when a Medicare Advantage organization

28   undertakes comprehensive blind coding but then runs a unidirectional comparison with the

United States District Court
Northern District of California

1    previously submitted codes to reveal only *under-reporting* errors"; "where the organization turns a

2    blind eye to the *over-reporting* errors, it exhibits reckless disregard and deliberate ignorance

3    toward the truth or falsity of the data submitted to CMS") (emphasis added).

4          In the case at bar, the government has alleged, at the very least, reckless disregard and

5    deliberate ignorance because audits revealed more than just isolated instances where clinically

6    inaccurate diagnoses were being submitted.  *See, e.g.*, FAC ¶ 347 ("[A] 2015 N. California

7    Medical Group internal analysis of stop prompts identified that Kaiser's programs were prompting

8    physicians to add diagnoses for conditions that patients never had or did not have at the time.");

9    FAC ¶ 345 ("[National Compliance Office] audits consistently showed that Kaiser's California

10   and Colorado regions erroneously submitted active condition diagnosis codes to CMS for payment

11   when the medical records indicated that the patient had only a history of the condition."); FAC ¶

12   337 ("While [a 2015] audit [that focused on addenda] did not expressly categorize diagnoses

13   where the medical record contradicted the existence of the condition, auditors nevertheless

14   identified significant evidence that Kaiser physicians were regularly making such errors, including

15   in particular adding morbid-obesity diagnoses when the patient had a BMI at the time of the visit

16   that was inconsistent with the diagnosis.").  In other words, the audits put Kaiser on notice of

17   systemic problems and, if Kaiser did not do anything thereafter, then, at least plausibly, it acted in

18   reckless disregard on in deliberate indifference.

19         Other allegations in the government's FAC further support plausibility of the claim that

20   Kaiser acted with the requisite state of mind.  For example, the government has alleged that

21   "[i]nternal documents indicate . . . Kaiser was aware that its risk-adjustment initiatives were

22   generating inaccurate diagnoses, including identifying, for example, that refresh reports would ask

23   for a diagnosis to be refreshed even though it was only captured as a history of the condition."

24   FAC ¶ 178; *see also* FAC ¶ 179 (noting that some "internal documents identified this as a key

25   problem area for cancer and stroke in particular"); FAC ¶ 142 (alleging that Kaiser "often

26   generate[d] after-visit queries [to doctors] based on previously run algorithms that relied upon

27   outdated information"; "[i]nternally, Kaiser identified these data lag issues as a threat and

28   weakness of their data-mining and refresh programs"); FAC ¶ 323 (alleging that "one internal

United States District Court
Northern District of California

12

1    document identified as a weakness of the program that '[s]ome clinicians refresh the diagnoses

2    without proper and detailed review of the medical record, and as a result incorrect diagnoses keep

3    being reported'"). Furthermore, the FAC alleges that numerous doctors warned Kaiser that there

4    was a problem with the submission of clinically inaccurate diagnoses. *See* FAC ¶ 307 *et seq.*

5    Finally, as noted above, the government's allegation that Kaiser *pressured* doctors to add further

6    diagnoses implies Kaiser acted with scienter, as pressure could plausibly lead to incorrect

7    diagnosing.

8            Collectively, these allegations substantiate the government's position that Kaiser was, at

9    the very least, acting in reckless disregard or deliberate ignorance of the truth or falsity of the

10    diagnoses, if not knowingly so, through submission of addenda.

11    E.        Conspiracy

12            Kaiser contends that, even if the government has adequately pled the elements of falsity

13    and knowledge, the specific cause of action for conspiracy to violate the False Claims Act should

14    be dismissed – at least to the extent it is based on a factual falsity theory. According to Kaiser, the

15    allegation of conspiracy is pled in too conclusory a fashion – *i.e.*, there are no "specific facts that

16    would support a plausible inference that the health plan Defendants and medical group Defendants

17    had an agreement to submit diagnosis codes to CMS for medical conditions *that did not exist*."

18    Mot. at 21 (emphasis added).

19            To a certain extent, Kaiser's position here is a variant of one of its arguments above:

20    namely, that it is implausible that a doctor would diagnose a condition that did not actually exist.

21    The Court rejected that argument above; likewise, it rejects the argument that Kaiser now makes

22    here.

23            To be sure, Kaiser's position is not entirely lacking in merit. "'The essence of a conspiracy

24    under the [FCA] is an agreement between two or more persons to commit a fraud.'" *United States*

25    *ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2000 U.S. Dist. LEXIS 12081, at *41 (E.D.

26    Pa. Aug. 24, 2000). Thus, "to prove a False Claims Act conspiracy, a relator must show '(1) the

27    existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed

28    or paid by [the Government] and (2) at least one act performed in furtherance of that agreement.'"

United States District Court
Northern District of California

1    *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009); *see*

2    *also United States v. St. Luke's Subacute Hosp. & Nursing Ctr., Inc.*, No. C 00-1976 MHP, 2004

3    U.S. Dist. LEXIS 25380, at *18-19 (N.D. Cal. Dec. 15, 2004) ("[T]o establish a claim for civil

4    conspiracy under the FCA, the United States need only prove (1) that the defendant conspired with

5    one or more persons to get a false or fraudulent claim allowed or paid by the United State and (2)

6    that one or more conspirators performed an act to effect the object of the conspiracy."); *cf. United*

7    *States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999) ("The FCA provides

8    for conspiracy claims, and general civil conspiracy principles apply.").

9         Here, if the government had simply alleged reckless disregard, then arguably, a finder of

10   fact would have to conclude that there was not an *agreement* among the Kaiser entities to submit

11   clinically inaccurate diagnoses.  A California district court made a similar point in *United States ex*

12   *rel. Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSx), 2019

13   U.S. Dist. LEXIS 125352, at *66 (C.D. Cal. July 16, 2019), *overruled on other grounds by*

14   *Integra*, 854 F. App'x at 840:

15            The FCA claims described above provide for liability if the
             defendant acts "knowingly," which is defined as having actual
16            knowledge or acting in deliberate ignorance or with reckless
             disregard.  However, the FCA's reference to conspiracy claims does
17            not have this "knowingly" requirement.  Accordingly, most courts
             have concluded that general civil conspiracy principles apply to the
18            conspiracy provision of the FCA.  Under these principles, Relator
             "must show that the conspiring parties reached a unity of purpose or
19            a common design and understanding, or a meeting of the minds in
             an unlawful agreement."  As the alleged object of this conspiracy
20            was to submit false claims to Medicare, Relator must show that
             Defendants jointly intended to do so.  *For conspiracy, reckless*
21            *disregard is not enough.*

22   *Id.* at *66 (emphasis added).

23        But in the instant case, the government has plausibly pled more than just reckless

24   disregard, or even deliberate ignorance.  Notably, a conspiracy can be based on an express

25   agreement or an implied one.  *Cf. United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir. 1989)

26   (in a criminal matter, noting that, for purposes of a conspiracy, an agreement does not have to be

27   explicit; "'[a]n implicit agreement may be inferred from the facts and circumstances of the case'").

28   Given the collective allegations that Kaiser internally recognized a problem with clinically

United States District Court
Northern District of California

1    inaccurate diagnosing, as supported by, *e.g.*, audits, but continued to pressure doctors to add

2    diagnoses through the addenda process, it is plausible that the Kaiser entities implicitly agreed to

3    submit factually false claims for payment to the United States.  Although arguably a close call –

4    *i.e.*, the evidence more easily supports a finding of reckless disregard – the government has

5    sufficiently alleged enough from which knowledge and agreement may reasonably be inferred, at

6    least for 12(b)(6) purposes.[3]

7    F.    "Lumping" Defendants

8           Finally, Kaiser argues that, at the very least, some of the Kaiser entities sued should be

9    dismissed.  The government has sued the following five entities (two health plans and three

10   physicians groups):

- Kaiser Foundation Health Plan, Inc. ("KFHP"), a health plan that has contracted
  with CMS to provide Medicare Advantage plans in California (both the Northern
  California and Southern California regions), *see* FAC ¶ 23;

- Kaiser Foundation Health Plan of Colorado ("Colorado Health Plan"), a health plan
  that has contracted with CMS to provide Medicare Advantage plans in Colorado,
  *see* FAC ¶ 24;

- The Permanente Medical Group, Inc. ("TPMG"), a physicians group that provides
  medical services for the Northern California region, *see* FAC ¶ 26;

- The Southern California Permanente Medical Group ("SoCal Medical Group"), a
  physicians group that provides medical services for the Southern California region,
  *see* FAC ¶ 27; and

---

[3] At the hearing, the Court asked some questions regarding the scope of the alleged conspiracy –
*i.e.*, did the conspiracy consist of two bilateral conspiracies (*i.e.*, a conspiracy involving the
California entities and a separate conspiracy involving the Colorado entities), or instead a single
overarching conspiracy involving all of the California and Colorado entities.  The government
indicated the latter.  Although that position may be questionable, *cf. United States v. Singh*, 979
F.3d 697, 721-22 (9th Cir. 2020) (stating that "[a] single conspiracy can only be demonstrated by
proof that an overall agreement existed among the conspirators" and "the evidence must show that
each defendant knew, or had reason to know, that his benefits were probably dependent upon the
success of the entire operation"), the Court need not delve into that issue here because Kaiser did
not expressly make a challenge based on the scope of the conspiracy in its motion to dismiss.  *See*
FAC ¶¶ 122, 149, 153 (allegations suggesting a single nationwide conspiracy).

United States District Court
Northern District of California

1            •   The Colorado Permanente Medical Group, P.C. ("Colorado Medical Group"), a

2               physicians group that provides medical services for the Colorado region. *See* FAC

3               ¶ 28.

4   According to Kaiser, the government has improperly lumped Defendants together and, at most,

5   made allegations that support KFHP and TPMG being defendants, but not the remaining Kaiser

6   entities (*i.e.*, the SoCal Medical Group, the Colorado Health Plan, and the Colorado Medical

7   Group). *See generally Karkanen v. Cal.*, No. 17-cv-06967-YGR, 2018 U.S. Dist. LEXIS 135536,

8   at \*18 (N.D. Cal. Aug. 10, 2018) ("Courts consistently conclude that a complaint which 'lump[s]

9   together . . . multiple defendants in one broad allegation fails to satisfy [the] notice requirement of

10   Rule 8(a)(2).'"); *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018)

11   ("To satisfy Rule 9(b), a fraud suit against differently situated defendants must 'identify the role of

12   each defendant in the alleged fraudulent scheme.' In other words, when defendants engage in

13   different wrongful conduct, plaintiffs must likewise 'differentiate their allegations.'").

14       The government has the better position on this issue. First, there is no concern here that

15   Kaiser does not have adequate notice as to the general roles played by the health plans and the

16   physician medical groups with respect to risk adjustment. The FAC provides sufficient details in

17   those regard.

18       Second, as the government points out, the Ninth Circuit has held that

19
20
21
22
> a complaint need not distinguish between defendants that had the exact same role in a fraud. . . . "There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." A good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts.

23   *Id.* Here, the various Kaiser entities have allegedly engaged in the same basic conduct. This is

24   substantiated by allegations that Kaiser's risk adjustment operations were integrated and/or

25   involved collaboration. *See, e.g.*, FAC ¶ 30 *et seq.* (making allegations regarding Kaiser's

26   "integrated and collaborative risk-adjustment operations"); *see also* FAC ¶¶ 164-65 (alleging that

27   the refresh program was "nationwide . . . , with small adaptations in each region" and that

28   "Kaiser's National Medicare Finance department identified and monitored unrefreshed diagnoses

United States District Court
Northern District of California

United States District Court
Northern District of California

1    on a regular basis and shared results with each region").

2           Finally, there are allegations that point to specific wrongdoing by the SoCal Medical

3    Group, the Colorado Health Plan, and the Colorado Medical Group.  For example:

4           • The Colorado Health Plan and the Colorado Medical Group.  In FAC ¶¶ 154-55,

5               the government makes allegations about how the Colorado entities responded when

6               CMS removed the diagnosis of hypoxia (a below-normal level of oxygen) from the

7               CMS-HCC model, and, as a result, "hypoxia (and several other common diagnoses

8               for which patients may receive oxygen)" were no longer sufficient for

9               reimbursement.  FAC ¶¶ 155, 227.  Specifically, in response, "the Colorado Health

10              Plan identified [through data mining or chart review] patients on oxygen in an

11              effort to generate other diagnoses that would result in risk-adjustment payment."

12              FAC ¶ 155.  In particular, the Colorado Health Plan would query a physician about

13              adding diagnoses for (1) acute and/or chronic respiratory failure and (2) obesity

14              hypoventilation syndrome.  *See* FAC ¶ 155.

15          • The SoCal Medical Group.  In FAC ¶¶ 261 and 278, the government alleges that

16              Kaiser targeted the condition of AA for risk adjustment and that, "[i]n some years

17              in Northern California and Southern California, AA accounted for as much as 30-

18              40% of all addenda diagnoses."  FAC ¶¶ 278.  In ¶ 340, the government alleges

19              that, in the Southern California region, a probe audit for the year 2011 "identified

20              an 'addendum issue' as one of the classification of errors, and described the errors

21              as there being 'no justification in [the] original note to support an addendum.'"

22              FAC ¶ 340.

23                                    **III.    CONCLUSION**

24          For the foregoing reasons, Kaiser's motion to dismiss is denied.  The government has

25   sufficiently pled a factual falsity theory, including as part of its conspiracy claim.  In addition, the

26   government has not improperly "lumped" the various Kaiser entities together.

27   ///

28   ///

1    Because the Court is denying Kaiser's motion to dismiss, it orders Kaiser to file an answer

2  to the government's complaint within forty-five (45) days of the date of this order.

3        This order disposes of Docket No. 249.

4

5        **IT IS SO ORDERED**.

6

7  Dated: June 15, 2023

8

9                                    _____

10                                   EDWARD M. CHEN
                                     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California