UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RONDA OSINEK,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>KAISER PERMANENTE, et al.,<br><br>　　　　　Defendants. | Case No. 13-cv-03891-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS TAYLOR'S THIRD AMENDED COMPLAINT**<br><br>Docket No. 250 |

This litigation covers claims brought against various Kaiser entities pursuant to the False Claims Act ("FCA"). Currently, there are complaints filed by three sets of Plaintiffs: (1) the United States; (2) Dr. James Taylor; and (3) Gloryanne Bryant and Victoria M. Hernandez. This order addresses a motion to dismiss challenging Dr. Taylor's operative complaint. For convenience, the Court refers to the Kaiser entities moving for dismissal as "Kaiser." The specific Kaiser entities that have been sued by Dr. Taylor are: (1) Kaiser Foundation Health Plan, Inc.; (2) Kaiser Foundation Health Plan of Colorado; and (3) Colorado Permanente Medical Group P.C.[1]

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

///

///

---

[1] The operative complaint also names two additional defendants: the Permanente Medical Group, Inc. and the Southern California Permanente Medical Group. However, the Court dismissed these two Kaiser entities in a prior order. *See* Docket No. 225 (taking note that "Dr. Taylor does not dispute that the two California medical groups should be dismissed" and thus dismissing both entities).

## I. FACTUAL & PROCEDURAL BACKGROUND

Dr. Taylor's operative complaint is the third amended complaint ("TAC"). Before Dr. Taylor filed the TAC, the Court addressed the viability of Dr. Taylor's second amended complaint ("SAC") when Kaiser challenged that pleading through a motion to dismiss. The Court granted the motion to dismiss the SAC, explaining as follows.

Dr. Taylor had articulated three theories in his SAC: (1) an internal provider theory; (2) an external provider theory; and (3) a NLP/True Positive Theory. The three theories were similar: underlying each theory was Dr. Taylor's charge that Kaiser had conducted audits that revealed high error rates in risk adjustment claims or diagnoses but, in response, Kaiser did nothing to correct those errors; Kaiser's failure to act stood in contrast to its pursuit of reviewing records to find instances where diagnoses could be added (*i.e.*, upcoding). The Court also noted that the general viability of each theory was

> supported by *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2015) [hereinafter *Swoben*]. In *Swoben*, the plaintiff alleged that the defendants (health plans and medical providers) violated the FCA because they "performed biased retrospective medical record reviews" – specifically, the reviews were one-sided in that they were designed to identify and report to CMS *under*-reporting errors only, and not *over*-reporting errors. . . . The Ninth Circuit concluded that the plaintiffs had pled a viable FCA claim. *See, e.g., id.* at 1173 (underscoring the plaintiff's assertion that "the defendants took affirmative steps to generate and report skewed data"); *id.* at 1175 ("hold[ing] that [w]hen, as alleged here, Medicare Advantage organizations design retrospective reviews of enrollees' medical records deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence, they can no longer certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS").

Docket No. 225 (Order at 10) (emphasis in original).

The Court concluded that Dr. Taylor had sufficiently pled falsity for the three theories[2]: "Dr. Taylor has given a reason as to why the claims for payment that Defendants submitted to

---

[2] "[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 902 (9th Cir. 2017).

1  CMS were false: they were false because Defendants themselves had identified the diagnosis
2  codes as erroneous." Docket No. 225 (Order at 12).  However, the Court agreed with Defendants
3  that Dr. Taylor had failed to sufficiently plead materiality.

> Even though (as discussed above), Dr. Taylor did not have to explain what errors were underlying the error rates for purposes of the element of falsity, he must provide some details in order to assess whether he has made a plausible case that the errors would have been material to CMS. *Unlike the government*, Dr. Taylor has not expressly limited diagnosis code errors to violations of specific coding guidance such as requirements that a diagnosis may be made only if there is proper support and the condition is treated at a patient visit.

Docket No. 225 (Order at 13) (emphasis added).

The Court also held that Dr. Taylor had failed to adequately plead a basis for holding one of the named defendants – *i.e.*, KFHP – liable.  For example, "although Dr. Taylor suggests that KFHP can be held liable for misconduct that it engaged in nationwide, it is not clear from the SAC what that nationwide misconduct is."  Docket No. 225 (Order at 8).  "[I]t is not illegal conduct to make attestations to CMS and/or to conduct audits."  Docket No. 225 (Order at 9).  Also, "although Dr. Taylor asserts that, at the very least, KFHP worked with the Colorado health plan and the Colorado medical group to defraud the government, the allegations are similarly deficient."  Docket No. 225 (Order at 9).  "Looking for ways to increase revenue is not in and of itself illegal.  The key would be the sanctioning of the kind of wrongful conduct that is the gravamen of the complaint."  Docket No. 225 (Order at 10).

The Court therefore dismissed Dr. Taylor's SAC but gave him leave to amend.  Dr. Taylor subsequently filed his TAC, and Kaiser now moves to dismiss that pleading in its entirety.

## II.    DISCUSSION

### A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in

3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

B.  <u>Claims Against KFHP</u>

The Court gave Dr. Taylor leave to amend his claims against KFHP "if he can in good faith plead with specificity that KFHP employees played a role in either a nationwide or Colorado-centric fraud." Docket No. 225 (Order at 10). (The federal government and Ms. Osinek (the first to file suit) are already pursuing a claim against KFHP based on its actions in California.) In the pending motion to dismiss, Kaiser argues that, in the operative TAC, Dr. Taylor still fails to state a claim against KFHP specifically.

Although Dr. Taylor continues to name KFHP as a defendant in the TAC, *see* TAC ¶ 22, he has failed in opposition brief to substantively address Kaiser's argument that KFHP should be dismissed. The only mention of KFHP is in footnote 1 of the opposition which states: "Claims against The Permanente Medical Group, the Southern California Permanente, Kaiser Foundation Health Plan, Inc., and claims against Colorado Permanente Medical Group that predate November 15, 2011, were dismissed by the Court's previous orders." Docket No. 254 (Opp'n at 1 n.1.). That being the case, the Court does not parse through the TAC to consider whether Dr. Taylor did state sufficient allegations against KFHP. Dr. Taylor has waived his right to oppose the motion to dismiss KFHP, and KFHP is dismissed with prejudice.

This dismissal makes the case brought by Dr. Taylor simpler: his case is essentially a Colorado-centric case now, with the only defendants remaining the Colorado health plan and the

4

Colorado medical group (*i.e.*, Kaiser Foundation Health Plan of Colorado and Colorado Permanente Medical Group P.C.).  *See* TAC ¶¶ 23-24.

C.  Materiality

Kaiser argues next that Dr. Taylor has failed to plead the materiality element in support of his FCA claims.

As noted above, the Court dismissed the claims against Kaiser, as pled in the SAC, because of a failure to plead that the errors revealed through the audit were material: *"[u]nlike the government*, Dr. Taylor has not expressly limited diagnosis code errors to violations of specific coding guidance such as requirements that a diagnosis may be made only if there is proper support and the condition is treated at a patient visit."  Docket No. 225 (Order at 13) (emphasis added).

In the TAC, there are many allegations indicating that Dr. Taylor is now trying to align his pleading to be, in essence, the same as the government's – *i.e.*, the errors that were picked up in the audits related to either (1) diagnoses that were not supported by the medical record and (2) diagnoses that were not made in compliance with the ICD Guidelines.  *See, e.g.*:

- TAC ¶ 57: "CMS requires that submitted diagnoses meet specific criteria.  They must be supported and, thus, validated by the beneficiaries' medical records for medical encounters during the relevant data collection year from a face-to-face visit with certain provider types (e.g., radiology and labs are excluded).  The documented conditions must also have required or affected patient care, treatment, or management."
- TAC ¶ 66: "To ensure accuracy, the patient diagnoses must result from a face-to-face encounter between an appropriate provider and patient during the relevant year and must be appropriately documented in the patient's medical record at the time of the encounter."
- TAC ¶ 67: "[C]odes must be based on documented conditions that require or affect patient care, treatment or management."
- TAC ¶ 98 (former ¶ 93): "Kaiser regions . . . conducted annual 'probe' audits, which generally mimicked 'Risk Adjustment Data Validation' or 'RADV' audits that CMS on occasion performs to verify the accuracy of Risk Adjustment data submitted to it.  A

5

national probe audit was conducted annually as well. Those audits repeatedly noted the importance of medical record documentation and verified diagnosis codes in accordance with the ICD, as required by CMS."

- TAC ¶ 107: "In Kaiser's Colorado region, the most dramatic example of Kaiser's push for revenue overriding its concerns with CMS rules involves a program to capture additional codes from certain non-Kaiser healthcare providers, while ignoring the rampant false coding in violation of CMS and ICD guidelines that it knew to be present."
- TAC ¶ 110: "Kaiser's Probe and other audits have identified significant error rates in risk adjustment claims Kaiser submitted to CMS based on diagnoses provided by external providers. These error rates reflect the portion of codes submitted by Kaiser that did not comply with CMS and ICD Guidelines."
- TAC ¶ 121: "The underlying reasons errors identified in the Probe Audits from the Colorado region were varied, but all involved failure to comply with material CMS and/or ICD requirements. As explained in the following paragraphs, the Kaiser Colorado internal audits identified the following (non-exhaustive) *categories of materially improper coding*: (a) Diagnoses not properly supported in the medical record; (b) Diagnoses that did not affect patient care or treatment; (c) Diagnoses of conditions that were resolved, such as coding history of cancer (a diagnosis that does not appear in CMS-HCC model) as active cancer (a diagnosis for which risk adjustment payments are made); (d) Diagnoses based off of probabilistic language in the medical record (e.g., a beneficiary 'possibly' having a condition)" (emphasis added).

As Dr. Taylor is essentially aligning his TAC to be along the lines of the government's complaint, the Court finds the materiality element sufficiently pled. *See* Docket No. 223 (Order at 23) (concluding that government's complaint sufficiently pled materiality with respect to its theory of legally false claims for payment). The Court acknowledges that Dr. Taylor's pleading does not have the same breadth of allegations on materiality as does the government's pleading;

6

nevertheless, Dr. Taylor's pleading is still adequate.  For example, materiality is supported by allegations that CMS makes risk-adjustment payments based directly on the diagnosis codes submitted by health plans.  *See* TAC ¶ 49 (alleging that "CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age and gender, geographic location, and health status"); TAC ¶ 50 (alleging that "CMS pays a substantially higher capitation rate for members whose medical records . . . properly support that they have been recently treated for one or more serious, expensive diseases or conditions").  Also, Dr. Taylor has alleged that "Kaiser knew the Government considered these false codes to be material; indeed, *its own audit found that each of those categories of error made the affected diagnosis unacceptable for submission to CMS*."  TAC ¶ 122 (emphasis added); *see also* TAC ¶ 160 (alleging that "CMS would not pay for diagnosis codes that violated any of its binding rules[;] Kaiser itself, when sampling and identifying errors, acknowledged that fact in their own audits").  Dr. Taylor has further alleged that "[t]he magnitude of revenue generated by the program further demonstrates the materiality of the amounts of improper payments caused by Kaiser's false submissions of improper codes."  TAC ¶ 153.

In its papers, Kaiser protests that it is not sufficient for Dr. Taylor to specify categories of coding errors such as:

> (a) Diagnoses not properly supported in the medical record; (b) Diagnoses that did not affect patient care or treatment; (c) Diagnoses of conditions that were resolved, such as coding history of cancer (a diagnosis that does not appear in CMS-HCC model) as active cancer (a diagnosis for which risk adjustment payments are made); (d) Diagnoses based off of probabilistic language in the medical record (e.g., a beneficiary 'possibly' having a condition).

TAC ¶ 121.  Kaiser asserts: "These categories are not themselves errors: They merely parrot alleged legal requirements from CMS manuals and diagnosis coding guidelines without alleging what the supposed errors were and how each type of error would have affected CMS's payment decision."  Reply at 3.  This argument makes little sense.  For example, if an error is a diagnosis not properly supported in the medical record, and Kaiser's own audits deem this kind of error unacceptable for submission to CMS, then it is reasonable to infer that this is because CMS would not pay for a submission that had this kind of error.

7

1	Accordingly, the materiality issue largely weighs in favor of Dr. Taylor. That being said,
2	there is one wrinkle of which the Court takes note. Although not entirely clear, Dr. Taylor seems
3	to claiming errors *beyond* (1) diagnoses that were not supported by the medical record and (2)
4	diagnoses that were not made in compliance with the ICD Guidelines. In ¶ 121 of the TAC, he
5	alleges:

> The underlying reasons [for the] errors identified in the Probe Audits for the Colorado region were varied, but all involved failure to comply with material CMS and/or ICD requirements. As explained in the following paragraphs, the Kaiser Colorado internal audits identified the following (*non-exhaustive*) categories of materially improper coding:
>
> a.  Diagnoses not properly supported in the medical record;
> b.  Diagnoses that did not affect patient care or treatment;
> c.  Diagnoses of conditions that were resolved, such as coding history of cancer (a diagnosis that does not appear in CMS-HCC model) as active cancer (a diagnosis for which risk adjustment payments are made)[;]
> d.  Diagnoses based off of probabilistic language in the medical record (e.g., a beneficiary "possibly" having a condition).

TAC ¶ 121 (emphasis added). In his opposition, Dr. Taylor maintains that he used the term "non-exhaustive" as "simply an acknowledgment that it would be impossible to provide a detailed, fully exhaustive list of the reasons diagnosis codes were false in Kaiser's submissions to CMS." Opp'n at 15. Later in his opposition he states:

> For example, it is clearly material to CMS that MA beneficiaries see licensed practitioners for their healthcare needs, and diagnoses arising from encounters with providers that have no formal training in medicine, have expired medical licenses, or have been excluded from payment in the Medicare system due to fraud convictions . . . . It is not surprising that none appeared in Kaiser's audits, which of course were of limited sample size, but they remain material. When it discovered these errors in its chart review program, Kaiser should have submitted deletes.

Opp'n at 16. The problem for Dr. Taylor is that he has not offered a good faith basis for believing that there was this kind of error in Kaiser's risk adjustment, and the allegations in the TAC all go to failure to "down-code" based on the ICD Guidelines. Dr. Taylor is not permitted to leave his TAC open-ended. If, as the case unfolds, Dr. Taylor believes that there are other categories of materially improper coding, then he may move for leave to amend consistent with Federal Rules of Civil Procedure 15 and 16.

8

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss Dr. Taylor's TAC.  KFHP is dismissed from the case.  Dr. Taylor may proceed with his case as it is essentially aligned with the government's case, but not to the extent he alleges in conclusory terms coding errors not of the type alleged by the government.

Because the Court is allowing Dr. Taylor's case to proceed, it orders Kaiser to file an answer to Dr. Taylor's pleading within forty-five (45) days of the date of this order.

This order disposes of Docket No. 250.

**IT IS SO ORDERED**.

Dated: June 15, 2023

_____
EDWARD M. CHEN
United States District Judge