1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7   UNITED STATES OF AMERICA ex rel.          Case No.  13-cv-03891-EMC
    RONDA OSINEK,
8
                  Plaintiff,
9                                              ORDER GRANTING IN PART AND
          v.                                   DENYING IN PART DEFENDANTS'
10                                             MOTION TO DISMISS BRYANT AND
                                               HERNANDEZ'S SECOND AMENDED
11  KAISER PERMANENTE, et al.,                 COMPLAINT

                  Defendants.                  Docket No. 251
12

13

14        This litigation covers claims brought against various Kaiser entities pursuant to the False

15  Claims Act ("FCA").  Currently, there are complaints filed by three sets of Plaintiffs: (1) the

16  United States; (2) Dr. James Taylor; and (3) Gloryana Bryant and Victoria M. Hernandez.  This

17  order addresses a motion to dismiss challenging Ms. Bryant and Ms. Hernandez's operative

18  complaint.  For convenience, the Court refers to Ms. Bryant and Ms. Hernandez collectively as

19  "Relators."  Relators have sued the following Kaiser entities:

20        •   **Nationwide:** Kaiser Foundation Hospitals.[1]

21        •   **California:** Kaiser Foundation Health Plan, Inc.; The Permanente Medical Group,

22            Inc.; and Southern California Permanent Medical Group.

23        •   **Colorado:** Colorado Permanente Medical Group, P.C.; and Kaiser Foundation

24            Health Plan of Colorado.

25        •   **Georgia:** The Southeast Permanente Medical Group, Inc.; and Kaiser Foundation

26

27  _____
    [1] The pleading is not entirely clear but it appears that Kaiser Foundation Hospitals is nationwide in
    scope.  *See* SAC ¶ 25 ("Kaiser owns and operates acute care hospitals in four regions (Northern
28  California, Southern California, Northwest and Hawaii), and provides care in other settings
    through its non-profit Kaiser Foundation Hospitals ('KFH').").

Health Plan of Georgia.

- **Hawaii:** Hawaii Permanente Medical Group, Inc.

- **Maryland, Virginia, and D.C.:** Mid-Atlantic Permanente Medical Group, P.C.; and Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

- **Oregon and Washington:** Northwest Permanente, P.C.; and Kaiser Foundation Health Plan of the Northwest.

- **Washington:** Washington Permanente Medical Group, P.C.; and Kaiser Foundation Health Plan of Washington.

The Court shall refer to these Kaiser entities collectively as "Kaiser."

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Kaiser's motion to dismiss.

## I. <u>FACTUAL & PROCEDURAL BACKGROUND</u>

Relators' operative complaint is the second amended complaint ("SAC"). Before Relators filed the SAC, the Court addressed Kaiser's challenge to their first amended complaint ("FAC"). In its order addressing the FAC, the Court allowed Ms. Hernandez's retaliation claims to proceed but dismissed Relators' FCA claims based on the Affordable Care Act ("ACA") program.[2] The Court found several deficiencies with Relators' FCA claims based on the ACA program:

- First, Relators failed to plead false claims for payment that were made to "HHS, which is the relevant government agency with respect to the ACA program (as opposed to CMS, which is the relevant government agency with respect to the [Medicare Advantage] program)." Docket No. 226 (Order at 7). To the extent Kaiser argued that there could not "have been a false claim for payment because risk adjustment under the ACA program simply involves the transfer of funds among health plans," the Court did not address the issue "because it may turn on how Relators will plead that false claims for payment were made to HHS." Docket

---

[2] Like the government and other relators, Relators also asserted claims based on the Medicare Advantage program. However, the Court dismissed Relators' claims based on the Medicare Advantage program, thus leaving Relators with claims based on the ACA program alone.

No. 226 (Order at 7-8).

- Second, Relators did not successfully plead falsity to the extent they claimed that "the scope of their case extends to upcoding a number of diagnoses made under the ACA program beyond the AA [aortic atherosclerosis] and vent dependence codes described in the complaint." Docket No. 226 (Order at 8) (emphasis added).

- Third, Relators did not sufficiently plead allegations to support materiality – "largely because Relators . . . glossed over the fact that they must make out a plausible case that HHS, and not CMS, would have found the false claims material." Docket No. 226 (Order at 8).

- Fourth, Relators did not include adequate allegations as to how Kaiser entities other than The Permanente Medical Group ("TPMG") had engaged in misconduct. Relators had largely made conclusory allegations.

- Finally, with respect to the Relators' conspiracy claim, the Court did not rule on Kaiser's contention that the claim was too conclusory because "Relators' amendment – which should include allegations as to each specific defendant – will likely affect the conspiracy claim." Docket No. 226 (Order at 10). The Court noted, however, that Relators should clarify whether they were "claiming one overarching conspiracy involving all Kaiser entities or rather multiple bilateral conspiracies (*i.e.*, between a health plan and its affiliated medical group)." Docket No. 226 (Order at 10). The Court was "somewhat skeptical as to whether an overarching conspiracy can be plausibly pled – *e.g.*, even if other regions followed what TPMG was doing with coding of AA and vent dependence, that does not mean that those regions entered into an agreement with TPMG to defraud the government. This would be particularly true if each region was financially independent – *i.e.*, what benefited TPMG would not benefit any other region." Docket No. 226 (Order at 10).

Subsequently, Relators filed their SAC, geared toward addressing the deficiencies identified above. Some of the new allegations in the pleading provide background on the ACA.

For example:

- Under the ACA, "Exchanges" consisting of private insurers offering health insurance plans are created in the states. *See* SAC ¶ 52*; see also* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces (last visited 5/8/2023) ("The Affordable Care Act helps create a competitive private health insurance market through the creation of Health Insurance Marketplaces [also known as Exchanges]. These State-based, competitive marketplaces provide millions of Americans and small businesses with 'one-stop shopping' for affordable coverage.").

- Notably, private insurers participating in the Exchanges cannot set premiums based on the health status of prospective enrollees. *See* SAC ¶ 51.

- To get private insurers to participate and stay in the Exchanges (*i.e.*, to prevent them from fleeing "due to fears of unhealthy individuals rushing to sign-up, coupled with the general uncertainty of what kind of risk pool would develop when prices did not depend on existing health conditions"), the ACA provides for risk adjustment. SAC ¶ 54. The risk adjustment program "'is intended to provide increased payments to health insurance issuers that attract higher-risk populations (such as those with chronic conditions) and reduce the incentives for issuers to avoid higher-risk enrollees. Under this program, funds are transferred from issuers with lower-risk enrollees to issuers with higher-risk enrollees.'" SAC ¶ 55 (quoting 77 Fed. Reg. 17220, 17221 (Mar. 23, 2012)); *see also* SAC ¶ 59 5 (alleging that the program "balances out the overall risks taken on by insurers in a given market, by shifting funds from insurers with less risky (less expensive, more healthy) patients to insurers with more risky (more expensive, less healthy) patients"); 42 U.S.C. § 18063(a) (providing that "each State shall assess a charge on health plans and health insurance issuers (with respect to health insurance coverage) . . . if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State" and that

4

"each State shall provide a payment to health plans and health insurance issuers (with respect to health insurance coverage) . . . if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State") (emphasis added).

- Specifically, the risk adjustment program "takes patient data provided by insurers, evaluates each insurer's risk in a given market, and shifts money from insurers who ended up with healthier populations to insurers who ended up with sicker populations. After completion of the risk adjustment process for a given benefit year, the Government shifts funds by issuing invoices to those insurers who owe risk adjustment payments (and those insurers then submit the due funds *directly to the Government*), and issues payments *from the Treasury* to those insurers who are due risk adjustment payments." SAC ¶ 56 (emphasis added).

- Another benefit of the ACA is that it makes insurance less expensive for insureds. See SAC ¶ 51. Specifically, "[u]nder the ACA, private insurers offer different tiers of plans; Bronze, Silver, Gold, or Platinum. Consumers select the tier of coverage they want from among the insurers offering plans in their area, and pay the corresponding monthly premium, with the Government providing tax credits to fully or partially offset the monthly premiums for those consumers that qualify." SAC ¶ 53. Thus, in essence, "the Government pays a portion of premiums to insurers offering ACA plans." SAC ¶ 79.

- The amount of a tax credit "depends on two things: the cost of the 'benchmark plan' for an individual, and the individual's expected contribution (based on a percentage of the individual's income). Essentially, the Government, using federal funds, pays those portions of the ACA premiums that exceed an individual's expected contributions to the cost of the benchmark plan in the individual's area." SAC ¶ 80. "The 'benchmark plan' is the 'second lowest cost silver plan . . . offered through the Exchange for the rating area where the taxpayer resides.'" SAC ¶ 81 (quoting 26 C.F.R. § 1.36B-3(f)).

- Insurers set the premiums they charge based in part on "payments that [they] expect[] to either make or receive through the Risk Adjustment Program." SAC ¶ 77.

In the SAC, Relators allege that Kaiser engaged in a fraudulent upcoding scheme with respect to the ACA program, similar to the fraudulent upcoding scheme used for the Medicare Advantage program. *See* SAC ¶ 11(b); *see also* SAC ¶ 65 (alleging that "[t]he ACA utilizes a hierarchical condition category ('HCC') model [which is] modeled after the Medicare risk adjustment model"); SAC ¶ 67 (alleging that the ACA requires that insurers follow the ICD Guidelines). That is, Kaiser upcoded

> by manipulating the documentation and submitting claims and codes . . . for diagnoses that the member does not have or for which the member was not treated in the relevant year, or by claiming that a member was treated for a more serious condition that the member actually has, or by documenting and submitting a diagnosis that was labeled significant when it was not.

SAC ¶ 11(a)(i). Relators assert that Kaiser engaged in a systematic fraud, discussing, in particular, the following medical conditions: aortic atherosclerosis; vent dependence; malnutrition; arrhythmia; and major depression.

According to Relators, Kaiser benefited from the upcoding scheme in two ways:

**First**, because of the upcoding fraud, Kaiser's patients "appear[ed] more risky and expensive to insure than they actually [were]. . . . [S]ince its patient base appears more risky, Kaiser either pays less in risk adjustments than it should have (when HHS determines that it owes money into the risk pool), or it receives more in risk adjustment payments than it should (when HHS determine that it is owed money from the risk pool)." SAC ¶ 206. Relators admit that, "between 2014 and 2021, Kaiser has made, in the aggregate, nearly $6.13 billion in risk adjustment payments into the pool under the ACA." SAC ¶ 208. However, Relators maintain that, if "Kaiser [had] accurately coded its patient encounters, HHS would have determined that Kaiser owed *substantially more money* to the risk pools than Kaiser actually paid." SAC ¶ 209 (emphasis in original).

**Second**, risk adjustment factors into the premiums that Kaiser and other insurers set. *See*

United States District Court
Northern District of California

SAC ¶ 213.  Because Kaiser has paid less into the risk pool than it should have, "it is able to lower [the] premiums [it charges its members]" – *i.e.*, it "uses those 'savings' to charge lower premiums." SAC ¶ 213 (emphasis added).  Kaiser's competitors, in turn, have had to charge higher premiums because they have had to pay more into the risk pool than they should have (as a result of Kaiser's conduct).  *See* SAC ¶ 214.  The government is affected because it covers part of the cost of monthly premiums (for qualifying individuals at least) – specifically, through tax credits.  As noted above, the amount of a tax credit depends in part on the cost of a benchmark plan.  When the cost of Kaiser's plan is lower than the cost of the benchmark plan (*i.e.*, a competitor's plan is the benchmark plan), *see* SAC ¶ 217 (alleging that "Kaiser plans have served as the benchmark plan in California's ratings areas (marketplaces) less than 30 percent of the time since 2014"), that effectively means that the government is contributing more to cover the cost of the monthly premiums than it should.

> As a hypothetical and simplified example, assume that there are three insurers in a particular market. Insurer A charges $140 for a silver plan, Insurer B charges $130, and Kaiser charges $80.  As the second-lowest priced plan, Insurer B's premium of $130 would serve as the benchmark, and all premium tax credits would be tied [to] the $130 price.  For qualifying individuals, the Government would pay up to $130 of the premium cost, using taxpayer dollars.  However, due to Kaiser's upcoding fraud (and the resulting lower share of risk adjustment payments received by Insurers A and B), the premiums charged by Insurers A and B are artificially inflated.  If Kaiser submitted accurate risk adjustment data, Insurers A and B would each charge $15 less (anticipating higher risk adjustment pool payments by Kaiser), and Kaiser would charge $30 more (to recover more from consumers in anticipation of the need to pay more into the pool).  In other words, if Kaiser were behaving lawfully, Insurer A would charge $125, Insurer B would charge $115, and Kaiser would charge $110.  With accurate data, the benchmark in the area would now be $115, instead of $130.  As a result of Kaiser's fraud, the maximum premium tax credit – and amount paid by the Government towards all premium payments in the area by qualified individuals – would be up to $15 higher than it should have been.  Due to Kaiser's over-documentation and upcoding, the Government is overpaying by up to $15 per month for each and every plan purchased in that area due to Kaiser's over-documentation and upcoding fraud.

SAC ¶ 216.

In short, Relators assert that

> Defendants overdocumented and upcoded risk adjustment claims

> relevant to individuals covered by the ACA in the same manner and pursuant to the same schemes as relevant to the Medicare Advantage program, and similarly refused to correct or reimburse HHS for overpayments caused by this conduct, in a deliberate scheme to overcharge the ACA program, receive more in insurance premiums funded through government tax credits, and receive more of, or contribute less into, the ACA insurance pool.

SAC ¶ 11(b); *see also* SAC ¶ 16.

Kaiser now moves to dismiss the ACA-based claims as repled by Relators in the SAC.

## II.      DISCUSSION

A.      Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

B.      False Claims for Payment: Relators' Three Theories

Based on the SAC, Relators have three theories in support of their FCA claims:

> (1) "Kaiser submits false claims when it certifies its risk adjustment data as being accurate when it is not, as that false data is used to determine risk adjustment payments made from or to the Government." SAC ¶ 16; *see also* SAC ¶ 209

1   (alleging that, if "Kaiser accurately coded its patient encounters, HHS would have

2   determined that Kaiser owed substantially *more* money to the risk pools than

3   Kaiser actually paid") (emphasis in original).

4   (2) "Kaiser . . . causes false claims to be submitted via premium tax credits, due to

5   Kaiser's manipulation of the data it presents to the Government with its risk

6   adjustment submissions."  SAC ¶ 16; *see also* SAC ¶ 211 (alleging that "Kaiser's

7   systemic practice of over-documenting and upcoding also has caused the

8   Government to overpay via ACA premium tax credits").

9   (3) "[E]very payment to, from, or through the Government is connection with the ACA

10  is a false claim, because Kaiser should be ineligible to participate in the ACA

11  exchanges due to its manipulation of risk adjustment data."  SAC ¶ 16.

12  C.   Third Theory: Eligibility to Participate

13       As a preliminary matter, the Court notes that Kaiser's papers do not clearly address the

14  third theory described above.  The Court therefore makes no concrete ruling on the third theory,

15  although it does note that this theory seems problematic for several reasons.  First, the theory

16  seems to cover *any* payment under the ACA program, whether or not Kaiser is directly involved

17  (*i.e.*, whether a payment is made to or from Kaiser).  If so, that would cover the entire ACA

18  program.

19       Second, even if Relators intended to plead a narrower theory – limited to Kaiser's direct

20  involvement in a payment, *see* SAC ¶ 218 – there are still serious questions as to whether such a

21  theory would be viable.  Admittedly, the ACA provide that "[c]ompliance with the requirements

22  of this Act concerning eligibility for a health insurance issuer to participate in the Exchange shall

23  be a material condition of an issuer's entitlement to receive payments, including payments of

24  premium tax credits and cost-sharing reductions, through the Exchange." 42 U.S.C. §

25  18033(a)(6)(A).  Based on this provision, there is room for Relators to argue that, if Kaiser

26  certified to HHS that it was eligible to participate in an Exchange, and in fact it was not eligible,

27  then Kaiser would be making a false claim for payment. The question, however, is what is

28  required in order for an insurer to be considered eligible to participate in an Exchange in the first

9

1    place.  Relators have not clearly pointed to authority suggesting that an insurer is not *eligible*

2    to participate in the ACA program simply because *it does not do risk adjustment correctly* (*i.e.*, if the

3    insurer ends up not complying with the ICD Guidelines when it comes to diagnosis coding).

4    Relators have simply noted that participants in the ACA program must comply with 45 CFR part

5    153.  *See* 45 C.F.R § 156.200(b).  Included among the standards in Part 153 are standards related

6    to the risk adjustment program.  *See, e.g.*, 45 C.F.R. § 153.620 (providing that an issuer must

7    comply with data validation requests made by a state or HHS, maintain documents and records

8    "sufficient to enable the evaluation of the issuer's compliance with applicable risk adjustment

9    standards," and submit to audits by HHS).  But these standards do not appear to expressly require

10   as a condition for participation accurate risk adjustments.

11        If the ultimate issue here is whether Kaiser did its risk adjustment correctly, then that is

12   essentially the same theory raised in (1) above.  The Court now turns to that theory.

13   D.    First Theory: Risk Adjustment Payments

14        In the first theory, Relators' basic claim is that Kaiser certified that its risk adjustment data

15   was accurate when, in fact, it was not because diagnoses were not coded in compliance with

16   coding guidelines.  Relators maintain that, if "Kaiser accurately coded its patient encounters, HHS

17   would have determined that Kaiser owed substantially *more* money to the risk pools than Kaiser

18   actually paid."  SAC ¶ 209 (emphasis in original).

19        1.    Claim for Payment

20        Kaiser makes multiple challenges to Relators' fist theory.  First, Kaiser argues that the

21   theory is fundamentally flawed because no *claim* for payment is being made – *i.e.*, a risk

22   adjustment attestation cannot be deemed a claim for payment.  Kaiser points out that, "while the

23   Medicare Advantage program attestation certifies data for the express purpose of requesting

24   payment, the ACA program attestation [simply] confirms that data generated in HHS's report

25   matches data made available separately to HHS."  Mot. at 12.  *Compare, e.g.*, 42 C.F.R. §

26   422.504(l) (for Medicare Advantage program, providing that, "[a]s a condition for receiving a

27   monthly payment . . . , the MA organization agrees that its chief executive officer (CEO), chief

28   financial officer (CFO), or an individual delegated the authority to sign . . . must request payment

10

under the contract on a document that certifies . . . the accuracy, completeness, and truthfulness of relevant data that CMS requests"), *with* 45 C.F.R. § 153.710(d) (for ACA program, providing that "the issuer must, in a format specified by HHS, either: (1) Confirm to HHS that the information in the final report accurately reflects the data to which the 12 issuer has provided access to HHS . . . ; or (2) Describe to HHS any discrepancy it identifies in the final dedicated distributed data environment report").

Kaiser's argument is overly formalistic.  Under the FCA, a "claim" for payment is defined as follows: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(1)(A).  In short, a claim for payment is a request for money presented to the United States.  By participating in the ACA program which involves risk adjustment, an insurer implicitly makes a request for money which is presented to the United States.  This is substantiated by the following allegation in the SAC: "After completion of the risk adjustment process for a given benefit year, the Government shifts funds by issuing invoices to those insurers who owe risk adjustment payments (and those insurers then submit the due funds *directly to the Government*), and issues payments *from the Treasury* to those insurers who are due risk adjustment payments."  SAC ¶ 56 (emphasis added).

Furthermore, the ACA contains the following provision (which was quoted above in part):

> Payments made by, through, or in connection with an Exchange *are subject to the False Claims Act* (31 U.S.C. 3729 et seq.) if those payments include any Federal funds.  Compliance with the requirements of this Act concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange.

42 U.S.C. § 18033(a)(6)(A) (emphasis added).  Here, Relators have alleged in their pleading that "Federal funds" are at issue because payments are made to or from the U.S. Treasury even if the United States does not have some kind of possessory interest in those payments as it ultimately transfers money among insurers through the U.S. Treasury.

Finally, the Court underscores that, in the case at bar, Relators' theory is that Kaiser should

have paid more into the risk pool than it actually did, and therefore, Relators are not really asserting that Kaiser made false claims for payment; rather, Relators are asserting a cause of action for a reverse false claim, a claim within the ambit of the FCA.  *See* 31 U.S.C. § 3729(a)(1)(G) (providing for liability with respect to any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government").  *See, e.g.*, *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) (stating that "'[s]ubsection (a)(1)(G) is referred to as the reverse false claims provision because it covers claims of money *owed* to the government, rather than payments *made* by the government'") (emphasis in original); *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017) (stating that "the reverse-false-claims provision, 31 U.S.C. §3729(a)(1)(G), reverses the typical claim under the False Claims Act: instead of creating liability for wrongfully *obtaining* money from the government, the reverse-false-claims provision creates liability for wrongfully *avoiding* payments that should have been made to the government") (emphasis in original).

      2.    <u>Falsity</u>

          a.    <u>Conclusory</u>

Kaiser contends that, even if a risk adjustment attestation could be deemed a claim for payment, Relators' FCA claim still founders because Relators have failed to adequately plead falsity.  According to Kaiser, Relators have simply offered "threadbare recitals of fraud . . . . For example, even though the relevant ACA regulations require an annual audit by an independent validator and a subsequent HHS audit, 45 C.F.R. § 153.630, Relators say nothing about these audits, what the results were, and whether any actions were taken in response to the audits."  Mot. at 12-13.  This argument is not persuasive.  Even if Relators did not specifically describe these audits and the results thereof, that does not render their falsity claims conclusory.  A claim of falsity can be made without making reference to an audit.

          b.    <u>Identified Medical Conditions</u>

Kaiser asserts that, even if the Court evaluates the specific medical conditions described in the Relators' SAC, Relators have still failed to plead falsity (whether a factually false submission

or a legally false one). Relators' complaint refers to the following medical conditions: aortic atherosclerosis; vent dependence; malnutrition; arrhythmia; and major depression.

i.     <u>Aortic Atherosclerosis</u>

Aortic atherosclerosis ("AA") is the "'hardening of the arteries.' It describes a thickening and loss of elasticity in the arterial wall." SAC ¶ 91. According to Kaiser, Relators are no longer bringing an ACA-based claim predicated on a false claim for payment related to AA. *See* Mot. at 6. In support, Kaiser points to ¶ 93 of the SAC where Relators concede that, while there is an HCC code for AA under the Medicare Advantage program, there is not an HCC code for the disease under the ACA program. *See* SAC ¶ 93 ("The AA diagnosis is assigned to HCC 108; in 2016, Kaiser received approximately $2,260 for each HCC 108 code under Medicare Advantage. There is no corresponding HHS-HCC for AA in the ACA program."); *see also* SAC ¶ 114 ("[Kaiser's] efforts to mine for AA succeeded in capturing and submitting an enormous increase of AA codes to Medicare . . . .").

In their opposition, Relators do not take issue with Kaiser's position. This is true even though there are multiple paragraphs pled in the SAC related to AA. *See* SAC ¶¶ 91-117. Accordingly, the Court concludes that there is no viable ACA-based claim predicated on Kaiser's conduct with respect to coding of AA.[3]

ii.     <u>Vent Dependence</u>

As pled in the SAC, dependence on a respirator (or ventilator) is an appropriate diagnosis "when a patient requires *long-term, continued* ventilator support to breathe beyond the acute care phase." SAC ¶ 118 (emphasis in original). Relators have two theories related to diagnoses of vent dependence. First, Relators allege that, in response to an inquiry from Kaiser (initiated by Ms. Bryant), the American Hospital Association's Coding Clinic – "the official clearing house for [ICD] coding guidance" – stated that "'this code should be reported when the patient requires continued ventilator support for an unexpected period of time and not for the short-term acute

---

[3] Relators may have continued to plead allegations related to AA as a preservation technique – *i.e.*, to preserve the right to appeal the Court's dismissal of their Medicare Advantage-based claims. *See* Docket No. 226 (Order at 6) (noting that Relators' claims based on the Medicare Advantage program were dismissed because they were covered by the earlier-filed cases *Osinek* and *Taylor*).

United States District Court
Northern District of California

1    phase of a condition.' [The] Coding Clinic further stated 'there is *no time frame set* on what

2    constitutes ventilator dependency.'"  SAC ¶¶ 92, 119 (emphasis added).  According to Relators,

3    "Kaiser's directives on vent dependence documentation and coding differ region by region, but

4    were all similarly invalid, with regions establishing a 'time frame'-based criteria for documenting

5    vent dependence status after which the specific code assignment is permitted."  SAC ¶ 121.  For

6    example, in the Northern California region, the time period was 30 days or more. In the Southern

7    California region, the time period was 21 days.  *See* SAC ¶ 121.  "These directives contravened

8    AHA Coding Clinic's caution that there is no 'set time frame' and that vent dependence should not

9    be reported for the short-term acute phase of a condition."  SAC ¶ 122.

10         Second, Relators allege that Kaiser "ignored its own improper directives by coding for

11    vent dependence status even when patients were on vents for just a few days, then discharged

12    without the vent." SAC ¶ 123 (emphasis added).  Relators "were first made aware of Kaiser's vent

13    dependence status documentation and coding practices in the context of newborns that are placed

14    on ventilators temporarily in Kaiser Foundation Hospitals before being discharged home." SAC ¶

15    124. "The coding data includes a high volume of cases in which patients were successfully weaned

16    from ventilation and routinely discharged home or to self-care, including after just a day or two in

17    the hospital.  In a December 2013 validation audit, Ms. Hernandez and her NCAL audit team

18    concluded that 100% of a sample of TPMG vent dependence cases were invalid."  SAC ¶ 138.

19         In its motion, Kaiser challenges the vent dependence allegations on two grounds: (1) the

20    AHA's Coding Clinic is a nongovernmental organization and thus its guidance cannot be binding

21    as a legal matter; and (2) "much of the conduct" identified in the allegations "predate the

22    implementation of the ACA risk-adjustment program, meaning that it could not have resulted in

23    the submission of false diagnosis codes for ACA members." Mot. at 14.

24         Kaiser's first argument has merit.  Relators point out that the AHA's Coding Clinic is the

25    "official clearinghouse for ICD coding guidance."  Opp'n at 15.  But it is not clear what it means

26    for the Coding Clinic to be the official clearing house for ICD coding guidance, and, if the Coding

27    Clinic was simply giving its own interpretation of the ICD coding guidance, that is not legally

28    binding in the absence of evidence to the contrary.  Relators also suggest that what they really

14

meant in their allegations was that Kaiser was violating ICD Guidelines (*i.e.*, by coding vent dependence based on a timeframe).  *See* Opp'n at 15.  However, Relators have not sufficiently explained how the ICD Guidelines were violated just because Kaiser was coding vent dependence based on a timeframe of 30 or 21 days.  In other words, coding on a timeframe of 30 or 21 days is not inherently contradictory to vent dependence involving long-term, continued ventilator support.

Kaiser's second argument, however, lacks merit.  Coding vent dependence based on just a few days of ventilator support (as alleged with the newborns) appears contrary to the notion of long-term, continued ventilator support – at least plausibly so.  Kaiser's timing argument is not persuasive.  There is no dispute that the ACA program was not implemented until 2014.  That being said, just because Relators identified conduct that took place in 2013, see SAC ¶¶ 124-36 (discussing events in November and December 2013); SAC ¶ 138 (referring to a validation audit in December 2013, where "Ms. Hernandez and her NCAL audit team concluded that 100% of a sample of TPMG vent dependence cases were invalid"), does not mean that Kaiser's alleged practice of improper coding of vent dependence (*i.e.*, for a patient who was on a vent for just a few days) did not go beyond that period.  In fact, as Relators point out, Exhibit 28 to the SAC is a chart that suggests vent dependence coding started to increase in 2013 and that pattern continued past that date and through 2016 at least.  *See* SAC, Ex. 28 (chart titled "ALL REGIONS: 2010-2016 Volumes – Vent Dependence Code").

### iii.   Malnutrition

Relators' allegations related to malnutrition – specifically, protein-calorie malnutrition ("PCM") – are not entirely clear.  Relators seem to take the position that Kaiser had a practice of querying doctors about a diagnosis of PCM simply because there was a dietitian comment of PCM in "dietary notes"; in essence, doctors diagnosed PCM only because they were queried in a leading manner.  According to Relators, this was not sufficient documentation to support a diagnosis of PCM.  *See* SAC ¶ 143 ("Kaiser's CDI querying activities improperly led physicians to diagnose protein-calorie malnutrition, including the use of 'SMARTPHRASE' acknowledgments of dietician diagnoses of PCM with a co-signature of dietary notes for all risk-based payers, including both the [Medicare Advantage] program and the ACA program. . . . [T]he co-signature

of a physician on dietary notes is not sufficient documentation for a PCM diagnosis.").

In addition to the above, Relators make allegations about PCM that are specific to the Northwest Region and its coding related to newborns.  According to Relators, Sharon Beausoleil, the HIM Coding Manager for the Northwest Region's medical group, emailed Ms. Bryant in late 2014 "about documentation and coding of protein-calorie malnutrition on HHS-HCC's for newborns.  In particular, she was concerned with the query language being utilized by the CDI staff in the NW Region, which appeared to not be supported by clinical indicators and to be leading."  SAC ¶ 144.  "Ms. Beausoleil provided Ms. Bryant with a short list of inpatient medical record accounts," which Ms. Bryant then had one of her staff review.  SAC ¶ 145.  The staff member concluded that "there was no supporting documentation or clinical indicators for a newborn malnutrition diagnosis for these records," and Ms. Bryant agreed.  *See* SAC ¶ 145.  Later, the Northwest Region's medical director questioned Ms. Bryant's "authority to audit region's medical records, notwithstanding Ms. Bryant's position with Kaiser's National Revenue Cycle group."  SAC ¶ 146.

Kaiser fairly challenges Relators' allegations related to the Northwest Region and its coding related to newborns. A "short list of [deficient] inpatient medical record accounts" is not enough to support there being a practice of improper coding by Kaiser.  SAC ¶ 145.

However, Relators' allegation that Kaiser had a practice of having doctors co-sign dietitians' notes passes muster.  Contrary to what Kaiser argues, Relators are asserting more here than just improper queries to doctors.  *Compare Integra Med Analytics LLC v. Provident Health & Services*, 854 F. App'x 840, 844 (9th Cir. 2021) (indicating that leading queries, by themselves, are not enough to support a conclusion that doctors thereby "recorded unsupported medical conditions").  Relators have alleged that doctors did in fact respond to queries by co-signing dietitians' notes.  The ICD Guidelines require medical documentation for a condition; a dietitian note is not sufficient.  Nor is it sufficient (at least plausibly so) for a doctor just to co-sign a dietitian note.

Kaiser's contention that there is no indication that the diagnoses were for ACA members or were submitted to HHS lacks merit.  All reasonable inferences are to be made in Relators' favor

United States District Court
Northern District of California

1    at this point.  Notably, Relators have alleged that "Kaiser data compiled by Ms. Bryant through

2    her national coding quality monitoring work establishes that malnutrition continued to have a high

3    frequency of being coded in Kaiser's MA and ACA populations."  SAC ¶ 149.  Finally, to the

4    extent Kaiser makes a timing argument again – *i.e.*, that any problems related to PCM predated the

5    implementation of the ACA in 2014 – the Court rejects that argument as well.  *See, e.g.*, SAC ¶

6    147 (alleging that, "[i]n late 2016, Kaiser's TPMG CDI Director Emily Emmons contacted Ms.

7    Bryant about a possible compliance issue regarding PCM diagnosis, documentation, and coding[;]

8    Ms. Emmons was concerned with dietary documentation of PCS wherein physicians appeared to

9    be queried in a leading manner").

10                              iv.    Arrhythmia

11              Relators have also pled upcoding with respect to the medical condition of arrhythmia.

12   According to Relators, "Kaiser's coders would code heart arrhythmia for members even after the

13   members receive pacemakers to correct their arrhythmia for all risk-based payers, including both

14   the MA and the ACA program."  SAC ¶ 150.  Relators further assert that, "[i]n addition to cardiac

15   arrhythmia, diagnoses for ventricular fibrillation and ventricular flutter (HCC 84 and HHS-HCC

16   142) were also overdocumented," presumably based on the same pacemaker issue.  SAC ¶ 150.

17             Kaiser attacks the arrhythmia allegations on various bases.  Most of the attacks are not

18   particularly significant, with the exception of one – *i.e.*, that, because Kaiser submitted both the

19   pacemaker status code and the arrhythmia code, *see* SAC ¶ 150, then there was no fraud because

20   "HHS and the independent validator could readily observe that both diagnoses were submitted."

21   Mot. at 16.  This argument is meritorious.  Furthermore, having a pacemaker does not necessarily

22   mean that the patient does not have the underlying condition.  Notably, Relators have failed to

23   respond to this specific argument in their opposition.

24                               v.    Major Depression

25             Finally, Relators address the medical condition of major depression in their SAC.

26   According to Relators, "Kaiser manipulated its electronic system for picking diagnoses to 'gray

27   out' the diagnosis of 'major depression unspecified,' which is not linked to an HCC, so that Kaiser

28   doctors would not pick that diagnosis but would instead select a major depression diagnosis

United States District Court
Northern District of California

category that is linked to a high-paying HCC.  Ms. Hernandez believes that this practice also took place within TPMG."  SAC ¶ 152.  Although this practice does seem dubious, without more allegations, it is not plausible that the practice would plausibly result in fraud – *i.e.*, a patient not having the kind of major depression identified by the doctor.  Kaiser essentially makes this point in its motion.  *See* Mot. at 16 ("Relators do not allege that a single healthcare provider diagnosed major depression in a member who did not have major depression.  Nor do they allege that any such inaccurate diagnoses were submitted to HHS or falsely confirmed as accurate in any attestation.").  Relators do not do much to address this problem in their opposition.  *See* Opp'n at 16 (simply making a general argument that Kaiser coded for depression when it was not supported by the patient's status and condition).

vi.   <u>Summary</u>

For the reasons stated above, Relators have not pled enough to establish a fraudulent scheme to upcode for all of the medical conditions specifically identified in the SAC.  At best, Relators have pled a fraudulent scheme to upcode for (1) vent dependence and (2) malnutrition – but only to the extent discussed above.

c.   <u>Scheme to Defraud</u>

Although Relators have alleged schemes to defraud for specific medical conditions, they have also suggested that there was a broader scheme to defraud – one not tied to any given medical condition (although perhaps limited to high-value HCCs).  *See, e.g.*, Opp'n at 15 (asserting that "the SAC alleges an upcoding scheme and provides *illustrative* examples including ventilator dependence, malnutrition, arrhythmia, and depression") (emphasis added); SAC ¶ 88 (alleging that there was "over-coding and upcoding of certain high value HCCs").  Based on the allegations in the SAC, the Court does not find such a broad scheme to defraud plausible.

To be sure, the Court did conclude that, with respect to the Medicare Advantage program, the federal government adequately pled a broad scheme to defraud not tied to a specific medical condition.  In particular, the Court took note of allegations related to the refresh program.  However, Relators here have made much more scattershot allegations.  *See, e.g.*, SAC ¶ 167 (alleging that Kaiser used "leading query templates" for a number of conditions – *e.g.*,

"obesity/extreme or morbid obesity; protein calorie malnutrition (mild/moderate/severe); pressure ulcer; neoplasm (history versus current); emphysema; depression; adrenal mass; aortic atherosclerosis; diabetes manifestations; neutropenia; sepsis/SIRS with organ dysfunction, and others"); SAC ¶ 168 (alleging that Kaiser did not include as options for diagnosis "unknown," "other," "clinically undetermined," or "unspecified"); SAC ¶¶ 180-81, 197 (alleging that Kaiser used old encounters to query doctors, with no face-to-face visit); SAC ¶ 191 (alleging that Kaiser used data mining to find "'missed opportunities'" which would be covered through addenda); SAC ¶¶ 198-99 (alleging that Kaiser used a natural language processing tool that had a poor accuracy rate – 60% or less).  And notably, although Relators address the pressure that *they* were subjected to (as coding employees), *see* SAC ¶ 158 (alleging that "[t]he culture at Kaiser perpetuates a superiority, manipulation, and intimidation by physician medical group leaders and medical group  management, resulting in an inability to challenge or present a different perspective, even when backed by express, unambiguous coding guidelines, standards, or HIM coding expertise, without being chastised, threatened and ridiculed"), they largely fail to make allegations about the pressure that *doctors* (the ultimate party responsible for making a diagnosis) were subjected to with respect to upcoding; this stands in contrast to the allegations made by the federal government in its operative complaint.

Accordingly, the Court concludes that Relators have not adequately alleged a broad scheme to defraud, not tied to any specific medical condition, with respect to the ACA program. However, the Court shall give Relators leave to amend, particularly since, as noted above, the government was able to adequately plead a broad scheme to defraud with respect to the Medicare Advantage program.

d.   Summary

For the reasons stated above, the Court concludes that Relators have adequately pled falsity with respect to two identified medical conditions: vent dependence and malnutrition (to the extent recognized above).  Relators have leave to amend to plead a broader scheme to defraud.

3.   Materiality

Kaiser challenges next Relators' allegations on materiality.  The Court agrees with Kaiser

that Relators cannot base materiality on the following provision from the ACA: "[c]ompliance with the requirements of this Act concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange." 42 U.S.C. § 18033(a)(6)(A).  This statute does make clear that an insurer must be eligible to participate in the ACA program in order to get payment and a misrepresentation about eligibility would be material.  However, as discussed above, Relators seem to assert that that an insurer is not eligible to participate in the ACA program simply because it does not do the risk adjustment correctly – and that position is problematic.  The Court also notes that it previously rejected Relators' attempt to claim materiality based on § 18033(a)(6)(A).  *See* Docket No. 226 (Order at 8-9) (noting that Relators claimed materiality based on § 18033(a)(6)(A) but rejecting that position because eligibility to participate in an Exchange "is not at issue in this case").

　　　　That being said, the Court finds that Relators have adequately pled materiality, even if limited to just the medical conditions of vent dependence and malnutrition.  First, consistent with the Court's order addressing the operative complaint in *Taylor*, materiality may be inferred based on allegations that risk adjustment is tied directly to diagnosis codes submitted by health plans.  *See, e.g.*, SAC ¶ 55 ("The ACA's Risk Adjustment Program . . . 'is intended to provide increased payments to health insurance issuers that attract higher-risk populations (such as those with chronic conditions) and reduce the incentives for issuers to avoid higher-risk enrollees.'").  Second, materiality is supported by Relators' allegation that, when an insurer validates the data it submits to the government as part of the risk adjustment process, it submits an attestation, and the attestation form requires an insurer to check a box that states: "I acknowledge that the data submitted to the EDGE server and made available for the permanent risk adjustment program established under Section 1343 of the Affordable Care Act, upon which final risk adjustment transfers are calculated, may be subject to the False Claims Act." SAC ¶¶ 7, 73; *see also* 42 U.S.C. § 18033(a)(6)(A) (providing that "[p]ayments made by, through, or in connection with an Exchange are subject to the False Claims Act (31 U.S.C. 3729 et seq.) if those payments include any Federal funds").  Finally, the size of the alleged fraud – even if limited to fraud with respect to

20

1    vent dependence and malnutrition – likely weighs in favor of materiality.  *See* SAC ¶ 226 (alleging

2    that Kaiser "managed to increase its overall ACA risk score most every year by at least one

3    percent annually, often much more than that[;] [g]iven the amount of premium revenue and the

4    size of the insurance pool, this level of risk adjustment fraud benefited Kaiser's ACA plans by at

5    least tens of million dollars in federal risk pool adjustments each year").

6            4.    Summary

7            For the foregoing reasons, Relators have successfully pled part of their first theory – *i.e.*,

8    that Kaiser had schemes to defraud tied to vent dependence and malnutrition and that Kaiser's

9    fraud was material.  Relators have leave to amend to plead a scheme to defraud not tied to a

10   specific medical condition.

11   E.     Second Theory: Tax Credits

12          The Court now turns to Relators' second theory for relief – *i.e.*, that Kaiser "causes false

13   claims to be submitted via premium tax credits, due to Kaiser's manipulation of the data it

14   presents to the Government with its risk adjustment submissions."  SAC ¶ 16.  As indicated in the

15   factual and procedural background, this is a somewhat complicated theory.  The theory goes as

16   follows.

17          Risk adjustment factors into the premiums that Kaiser and other insurers set.  *See* SAC ¶¶

18   77, 213.  Because Kaiser has paid less into the risk pool than it should have, "it is able to *lower*

19   [the] premiums [it charges its members]" – *i.e.*, it "uses those 'savings' to charge lower

20   premiums."  SAC ¶ 213 (emphasis added).  Kaiser's competitors, in turn, have had to charge

21   *higher* premiums because they have had to pay more into the risk pool than they should have (as a

22   result of Kaiser's conduct).  *See* SAC ¶ 214.  The government is affected because it covers part of

23   the cost of monthly premiums (for qualifying individuals at least) – specifically, through tax

24   credits.  As noted above, the amount of a tax credit depends in part on the cost of a benchmark

25   plan.  When the cost of Kaiser's plan is *lower* than the cost of the benchmark plan (*i.e.*, a

26   competitor's plan is the benchmark plan), *see* SAC ¶ 217 (alleging that "Kaiser plans have served

27   as the benchmark plan in California's ratings areas (marketplaces) less than 30 percent of the time

28   since 2014"), the fact that other insurers have to raise the premiums elevates the benchmark and

hence increases the government's premium subsidy; this effectively requires the government to contribute more to cover the cost of the monthly premiums than it should. To reiterate the illustration alleged in the SAC:

> As a hypothetical and simplified example, assume that there are three insurers in a particular market. Insurer A charges $140 for a silver plan, Insurer B charges $130, and Kaiser charges $80. As the second-lowest priced plan, Insurer B's premium of $130 would serve as the benchmark, and all premium tax credits would be tied [to] the $130 price. For qualifying individuals, the Government would pay up to $130 of the premium cost, using taxpayer dollars. However, due to Kaiser's upcoding fraud (and the resulting lower share of risk adjustment payments received by Insurers A and B), the premiums charged by Insurers A and B are artificially inflated. If Kaiser submitted accurate risk adjustment data, Insurers A and B would each charge $15 less (anticipating higher risk adjustment pool payments by Kaiser), and Kaiser would charge $30 more (to recover more from consumers in anticipation of the need to pay more into the pool). In other words, if Kaiser were behaving lawfully, Insurer A would charge $125, Insurer B would charge $115, and Kaiser would charge $110. With accurate data, the benchmark in the area would now be $115, instead of $130. As a result of Kaiser's fraud, the maximum premium tax credit – and amount paid by the Government towards all premium payments in the area by qualified individuals – would be up to $15 higher than it should have been. Due to Kaiser's over-documentation and upcoding, the Government is overpaying by up to $15 per month for each and every plan purchased in that area due to Kaiser's over-documentation and upcoding fraud.

SAC ¶ 216.

As an initial matter, Kaiser argues that this second theory of relief is beyond the scope of the amendment permitted by the Court. The Court rejects this argument. The Court's prior order recognized that Relators made reference to the federal government contributing to premiums for the ACA program via tax credits. *See, e.g.*, Docket No. 226 (Order at 3).

Kaiser's stronger argument is its main merits argument – *i.e.*, that Relators' theory of relief is too speculative. There is a complicated causal chain being claimed by Relators: (1) Kaiser is claiming that its members are sicker than they are, which means that Kaiser does not have to transfer as much as it should into the risk pool; (2) this enables Kaiser to offer cheaper premiums since it does not have to pay as much as it should into the risk pool; (3) by extension, this leads other insurers to raise their premiums since they are covering more than they should in the risk pool; (4) Kaiser's plans end up costing less than the benchmark plan (which is the second-lowest,

1   silver plan); and (5) since the government contributes to the cost of the benchmark plan through

2   tax credits, the government is paying more than it should.

3          Moreover, even if the chain of causation here were plausible, the injury being claimed by

4   Relators here (*i.e.*, to the government) is derivative in nature. Nothing in the FCA nor its

5   legislative history suggests that the statute was intended to cover derivative harms that are not

6   direct. Case authority in analogous contexts, if anything, suggests the opposite. For example, in

7   *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030 (9th Cir. 2021) (en banc), the Ninth Circuit

8   indicated that, in many common-law based statutes, proximate cause requires a direct relation

9   between the injury asserted and the allegedly injurious conduct. *See id.* at 1035 (citing Supreme

10  Court cases applying a direct relation standard for claims brought under the Lanham Act, RICO,

11  and the Clayton Act). In other words, anything beyond the first step of the causal chain is

12  attenuated. *See id.*; *see also Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017) ("It is

13  a well established principle of [the common] law that in all cases of loss, we are to attribute it to

14  the proximate cause, and not to any remote cause. We assume Congress is familiar with the

15  common-law rule and does not mean to displace it sub silentio in federal causes of action.")

16  (internal quotation marks omitted). In *Oakland*, the City of Oakland sued Wells Fargo for a

17  violation of the Federal Housing Act, which "prohibits 'lending to minority borrowers on worse

18  terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend

19  refinancing and loan modifications to minority borrowers on fair terms.'" *Id.* at 1036. The City

20  argued that the bank had discriminatory lending practices that "caused higher default rates, which

21  in turn triggered higher foreclosure rates that drove down the assessed value of properties, and

22  which ultimately resulted in lost property tax revenue and increased municipal expenditures." *Id.*

23  at 1032. The Ninth Circuit held that "[t]hese downstream 'ripples of harm' are too attenuated and

24  travel too 'far beyond' [the bank's] alleged misconduct to establish proximate cause." *Id.* It

25  explained as follows: "[t]he harm that the [FHA] guards against . . . is . . . situated at the first step:

26  the issuance of the discriminatory loan. The harm to the borrower has a clear direct relation to

27  conduct prohibited by the FHA." *Id.* There was "no question that [the City's] theory of harm

28  goes beyond the first step – the harm to minority borrowers who receive predatory loans.

United States District Court
Northern District of California

23

1    Oakland's theory of harm runs far beyond that – to depressed housing values, and ultimately to

2    reduced tax revenue and increased municipal expenditures." *Id.* at 1036. It thus rejected the

3    City's claim for relief.

4        Here, the conduct that the FCA prohibits is the submission of a false claim for payment to

5    the United States. Relators' first theory of relief, discussed above, covers the first step in the

6    causal chain, *i.e.*, the submission of a risk adjustment certification to the United States. Their

7    second theory of relief, however, goes well beyond that first step, looking into, *inter alia*, how risk

8    adjustment affects premiums through a multi-step chain of causation.

9        Accordingly, the Court rejects Relators' second theory for relief. It is futile and, therefore,

10   any claim based on that theory is dismissed with prejudice.

11   F.    Conspiracy

12       Kaiser argues next that Relators' conspiracy claim should be dismissed because it is

13   insufficiently pled. According to Kaiser, the conspiracy allegations are too conclusory in nature.

14       Although a close call, the Court concludes that there are sufficient allegations to support

15   bilateral conspiracies. It is a reasonable inference that, for the scheme to defraud to work, a health

16   plan and an affiliated physician medical group or hospital had to work together – *e.g.*, because the

17   health plan submitted the risk adjustment attestations to HSS, while the physician group or

18   hospital established the coding policies and practices. However, the Court holds that there are not

19   enough allegations to support an overarching conspiracy involving *all* health plans, and *all*

20   physician medical groups or hospitals. Relators point to allegations made about two Kaiser

21   groups: (1) Kaiser's Regional Reporting Group ("RRG") and (2) Kaiser's Coding Governance

22   Group ("CGG"). These groups do appear (as alleged) to be comprised of employees from all of

23   the various Kaiser regions. *See, e.g.*, SAC ¶ 185 ("In approximately 2008-2009, Kaiser formed

24   Regional Reporting Group ('RRG'), comprised of senior personnel from the Health Plan,

25   Permanente Medical Groups and Revenue Cycle of each region with the focus of Medicare

26   Advantage Finance Risk Adjustment, and later risk adjustment under the ACA program as well.");

27   SAC ¶ 170 ("Kaiser's own Coding Governance Group ('CGG') . . . is composed of a majority of

28   physicians and representatives from Kaiser's Permanente Medical Groups rather than coding

24

professionals.").  But the fact that the groups involved employees from all of the various Kaiser regions is not by itself enough to show an overarching agreement and conspiracy to defraud.

Indeed, for the RRG, Relators have simply alleged that risk adjustment best practices were shared.  *See* SAC ¶ 185 ("The RRG met regularly to share regional 'best practices' on how to capture more HCC conditions, diagnoses, and codes, and thus to increase Kaiser revenue."); SAC ¶ 107 ("[A]t Kaiser's Regional Reporting Group ('RRG') meetings, Kaiser regional leaders overseeing its Medicare Advantage programs presented on opportunities and techniques to capture high-yield HCCs, including AA, emulating NCAL TPMG.").  An allegation of sharing may make an overarching conspiracy (agreement to defraud) possible but is not enough to push the claim across the line of plausibility.  *See Twombly*, 550 U.S. at 556-57 (in § 1 conspiracy case, stating that "allegations [must] plausibly suggest[] (not merely [be] consistent with) agreement"; therefore, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action").

The allegations for the CGG are not much better – simply indicating that the CGG was a resource that Kaiser employees were told to use to get guidance on coding.  *See* SAC ¶ 170 ("Ms. Bryant was directed that any and all coding questions must go through Kaiser's own Coding Governance Group ('CGG'), a group that was and is composed of a majority of physicians and representatives from Kaiser's Permanente Medical Groups rather than coding professionals. In December 2013, Ms. Bryant was told by Kaiser TPMG's senior physician lead Dr. Bliss that she was 'putting the organization at risk' by submitting questions directly to [the American Hospital Association's] Coding Clinic, a sentiment echoed by TPMG Director Anne Cadwell on a call that also included many regional physicians and Revenue Cycle leaders.").

Furthermore, it is worth noting that there are allegations in Relators' pleading that weigh against an overarching conspiracy nationwide in scope.  For example, Relators allege that

> Kaiser's National Compliance Office is ineffective, apprehensive, and slow in investigating and responding to documentation and coding compliance issues.  In addition, NCO coding leadership openly admitted to Ms. Hernandez that the Permanente Medical Groups have significant control over chart audit selection, accuracy

United States District Court
Northern District of California

1
2

> rates, documentation guidance, coding policy and practices, all to
> manipulate the capture of more HCC codes and to increase
> government payer reimbursement.

3   SAC ¶ 157; *see also* SAC ¶ 190 (alleging that a statement was made by a Kaiser employee that

4   "the National Compliance Office has no power over the Permanent Medical Groups").  Although

5   the physician medical groups appear to have "a national leadership and consulting organization,

6   the Permanent Federation," SAC ¶ 39, the allegations related to the Federation are sparse.

7           The Court therefore shall allow Relators' conspiracy claim to proceed but only to the

8   extent they have alleged bilateral conspiracies.  The Court's ruling here, however, does not

9   preclude Relators from moving for leave to amend should they find through discovery a good faith

10  basis to allege an overarching conspiracy.

11  G.      "Lumping" Defendants

12          Finally, Kaiser argues that Relators have failed to specify what is the alleged wrongdoing

13  of each Kaiser entity that has been sued (other than TPMG, which is the Northern California

14  medical group) – which is particularly significant given the number of entities that have been sued

15  (in essence, each of the health plans, physician medical groups, and hospitals across the various

16  Kaiser regions).  A similar issue was raised in conjunction with Kaiser's motion to dismiss the

17  United States' first amended complaint.

18          As an initial matter, the Court acknowledges that

19              a complaint need not distinguish between defendants that had the
20              exact same role in a fraud. . . . "There is no flaw in a pleading . . .
                where collective allegations are used to describe the actions of
21              multiple defendants who are alleged to have engaged in precisely
                the same conduct."  A good claim against one defendant did not
22              become inadequate simply because a co-defendant was alleged to
                have committed the same wrongful acts.

23  *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018).

24          That being said, Relators' pleading differs from the government's in that the government's

25  contained at least some allegations about specific wrongdoing by each Kaiser entity sued.  In other

26  words, the government's pleading alleged not only that Kaiser's risk adjustment operations were

27  integrated and/or involved collaboration but also that the Kaiser entities at issue actually went

28  ahead and implemented the risk adjustment approach being challenged.  Here, Relators have made

United States District Court
Northern District of California

specific allegations about only a handful of the Kaiser regions: Southern California, Northwest, and Colorado.  There do not appear to be any specific allegations about, *e.g.*, Southeast, Hawaii, Mid-Atlantic, and Washington.

Moreover, the Court takes note that, to the extent allegations have been made about Southern California, Northwest, and Colorado, some of the allegations may not support a viable claim for reasons discussed above.  For example:

- In ¶¶ 121-22 and 135 of the SAC, Relators make allegations about the Southern California medical group's approach to vent dependence – "requir[ing] 21 days as its time-frame criteria for documenting and coding this status" even though the ACA Coding Clinic has said "there is no 'set time frame' and that vent dependence should not be reported for the short-term acute phase of a condition."  However, as noted above, Relators have not sufficiently explained how the ICD Guidelines were violated just because Kaiser was coding vent dependence based on a timeframe.  In other words, coding on a timeframe of 21 days is not inherently contradictory to vent dependence involving long-term, continued ventilator support.

- In ¶ 144, Relators make allegations about the Northwest medical group's approach to malnutrition: the coding manager for the group had "concerns about documentation and coding of protein-caloric malnutrition on HHS-HCC's for newborns[;] [i]n particular, she was concerned about the query language being utilized by the CDI [clinical documentation integrity] staff in the NW Region, which appeared to not be supported by clinical indicators and to be leading."  However,  as noted above, a "short list of [deficient] inpatient medical record accounts," SAC ¶ 145, is not enough to support there being a practice of improper coding by Kaiser.

- In ¶ 150, Relators make allegations about the Colorado medical group's approach to arrhythmia: the medical group was "instructing doctors to diagnose and document so that Kaiser's coders would code heart arrhythmia for members even after the members receive pacemakers to correct their arrhythmia for all risk-based

United States District Court
Northern District of California

27

United States District Court
Northern District of California

1  payers, including both the MA program and the ACA program").  But, as noted

2  above, because Kaiser submitted both the pacemaker status code and the

3  arrhythmia code, *see* SAC ¶ 150, it is not clear how there was fraud since "HHS

4  and the independent validator could readily observe that both diagnoses were

5  submitted."  Mot. at 16.

6  •  In ¶ 152, Relators make allegations about the Southern California medical group's

7  approach to major depression: the group "manipulated [the] electronic system for

8  picking diagnoses to 'gray out' the diagnosis of 'major depression unspecified,'

9  which is not linked to an HCC, so that Kaiser doctors would not pick that diagnoses

10  but would instead select a major depression category that *is* linked to a high-paying

11  HCC" (emphasis in original).  But, even though this practice does seem

12  questionable, it is not clear that this would thereby result in fraud – *i.e.*, a patient

13  not having the kind of major depression identified by the doctor.

14  The strongest allegation that Relators do make – which could potentially support a viable

15  claim – relate to Northwest.  Relators allege that the Northwest medical group created leading

16  "CDI query templates."  SAC ¶ 165; *see also* SAC ¶¶ 159-60 (alleging that leading queries are

17  forbidden by third party AHIMA's[4] "Standards of Ethical Coding," "Guidelines for Achieving a

18  Compliant Query Practice," and "Managing an Effective Query Process Practice Brief").

19  "Through the queries, CDI staff introduce clinical indicators for specific HCC diagnoses to the

20  providers, who in turn routinely follow the suggestion to add a reimbursable diagnoses where none

21  existed and should not have been added."  SAC ¶ 165.  Examples of leading query templates

22  included the following: "obesity/extreme or morbid obesity; protein calorie malnutrition

23  (mild/moderate/severe); pressure ulcer; neoplasm (history versus current); emphysema;

24  depression; adrenal mass; aortic atherosclerosis; diabetes manifestations; neutropenia; sepsis/SIRS

25  with organ dysfunction, and others."  SAC ¶ 167.  Relators also allege that "certain query

26  templates in Kaiser's Northwest Region developed by the Northwest PMG include leading

27

28  _____

[4] AHIMA is American Health Information Management Association.  According to Relators, it is "a neutral organization that can be queried for guidance by coding professionals."  SAC ¶ 125.

language introducing a diagnosis to the physician, and *not* including options of 'unknown,' 'other,' 'clinically undetermined' or 'unspecified.'" SAC ¶ 168 (emphasis added; also alleging that this practice "contravene[s] AHIMA's guidance).

In summary, at best, Relators have only made allegations about the following regions (other than Northern California): Southern California, Northwest, and Colorado. Of those allegations, many are problematic which would leave only allegations against Northwest. The Court, however, shall give Relators leave to amend here. That is, Relators have leave to amend to identify specific misconduct by Kaiser entities beyond those affiliated with the California and Northwest regions. The Court notes that, as stated above, it is already permitting Relators to amend their pleading if they can, in good faith, allege a broad scheme to defraud, not tied to any specific medical condition, with respect to the ACA program.

### III.     CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to dismiss Relators' SAC. Relators have sufficiently pled a FCA claim, with respect to the ACA program, to the extent predicated on the medical conditions of vent dependence and malnutrition (as limited above). Relators have also sufficiently pled wrongdoing by the Kaiser entities in California and Northwest, but not the other regions. In addition, Relators have sufficiently pled bilateral conspiracies, but not an overarching conspiracy involving all Kaiser entities.

Relators have leave to amend their pleading to the extent that they can, in good faith, allege a broad scheme to defraud not tied to any specific medical condition. Relators also have leave to amend to the extent that they can, in good faith, allege specific wrongdoing by Kaiser entities beyond those in the California and Northwest regions.

At this juncture, Relators do not have leave to amend an overarching conspiracy, but the Court's order here does not preclude them from moving for leave to amend in the future.

The Court dismisses with prejudice Relators' FCA claims to the extent they are based on the theory that the government was derivatively harmed by issuance of tax credits.

///

///

1       Relators have forty-five (45) days to file an amended pleading, consistent with the above.

2   Kaiser shall thereafter have forty-five (45) days to respond to the amended pleading.

3       This order disposes of Docket No. 251.

4

5       **IT IS SO ORDERED**.

6

7   Dated: June 15, 2023

8

9   _____

10      EDWARD M. CHEN
        United States District Judge

United States District Court
Northern District of California