UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONDA OSINEK, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>PERMANENTE MEDICAL GROUP, INC, et al.,<br><br>　　　　Defendants. | Case No. 13-cv-03891-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE**<br><br>Docket No. 312 |

　　The United States has sued the following Kaiser entities in this False Claims Act ("FCA") litigation: (1) Kaiser Foundation Health Plan, Inc. ("KFHP"); (2) Kaiser Foundation Health Plan of Colorado ("KFHP Colorado"); (3) The Permanente Medical Group, Inc. ("TPMG"); (4) Southern California Permanente Medical Group ("SoCal PMG"); and (5) Colorado Permanente Medical Group, P.C. ("Colorado PMG"). KFHP and KFHP Colorado are health plans; the remaining Kaiser entities are physician medical groups. KFHP, TPMG, and SoCal PMG all provide services in California; KFHP Colorado and Colorado PMG provide services in Colorado. Each defendant filed an amended answer in September 2023. *See* Docket Nos. 298-302 (amended answers). The government now challenges certain affirmative defenses raised in those amended pleadings.

　　Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the government's motion to strike.

　　　　**I.　　FACTUAL & PROCEDURAL BACKGROUND**

　　In the operative first amended complaint ("FAC"), the government asserts claims pursuant

to the FCA, as well as a claim for payment by mistake and a claim for unjust enrichment. *See* Docket No. 240 (FAC).

Each of the five Kaiser entities sued has filed amended answers in which they assert affirmative defenses to these claims. KFHP's amended answer is representative with respect to most of the affirmative defenses at issue:

(1) **Excessive fine.** "A person liable under the False Claims Act 'is liable . . . for civil penalties of not less than $5,000 and not more than $10,000 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person. The United States seeks hundreds of millions of dollars in damages, which are subject to trebling if awarded. In addition, the United States contends that each diagnosis code at issue is a claim for payment, such that each allegedly false diagnosis code could result in mandatory civil penalties ranging from $5,000 to $10,000. While the United States has not yet disclosed in discovery all of the diagnosis codes that it may allege are false, Defendant alleges that hundreds of thousands of diagnosis codes may be at issue, Accordingly, upon information and belief, Defendant alleges that the civil penalties and damages that the United States seeks would result in an unconstitutionally excessive fine under the Eighth Amendment . . . because any award would be grossly disproportional to the gravity of Defendant's offense, if any." Docket No. 298 (KFHP Am. Ans. ¶ 397).

(2) **Ratification.** "[T]hrough Risk Adjustment Data validation audits, CMS reviewed and verified the types of diagnosis codes that the United States now alleges are false . . . . Defendant contends that, as early as 2003, CMS also has stated that healthcare provider documentation of a diagnosis in the beneficiary's medical record is acceptable support for submission of diagnosis codes to CMS . . . , even though the United States[] . . . challenges submission of diagnosis codes to CMS where a healthcare provider has documented in the medical record the diagnosis at issue. Accordingly, upon information and belief, Defendant asserts that through its actions and omissions, the United States ratified, or otherwise consented to, transactions and occurrences that are

1    the subject of this action." Docket No. 298 (KFHP Am. Ans. ¶ 398).

2    (3) **Failure to mitigate damages.** "The United States did not take reasonable steps to
3    notify Defendant that the United States disagreed with Defendant's interpretation of
4    Section IV.K of the ICD-9 Guidelines and Section IV.J of the ICD-10 Guidelines (the
5    'Contested Provision') and that the United States believed that Defendant was
6    improperly presenting diagnosis codes to CMS based on that disputed interpretation.
7    Defendant alleges that CMS knew of Defendant's interpretation and application of the
8    Contested Provision through communications between representatives of CMS and
9    representatives of Defendant about its risk-adjustment data submissions and CMC's
10   Risk Adjustment Data Validation ('RADV') audits, through which CMS reviewed and
11   verified diagnoses coded consistent with Defendant's interpretation of the Contested
12   Provision. Defendant alleges that the United States knew that other Medicare
13   Advantage Organizations also held the same interpretation of the Contested Provision
14   as Defendant . . . . Accordingly, even if Defendant's interpretation of the Contested
15   Provision is proven to be incorrect, Defendant is not liable to the extent that the United
16   States failed to take adequate measures to mitigate its damages." Docket No. 298
17   (KFHP Am. Ans. ¶ 399).

18   (4) **Estoppel.** "Even though CMS knew how Defendant and others in the industry
19   interpreted and applied the Contested Provision, and even though CMS received
20   repeated requests to clarify how to interpret and apply the Contested Provision, CMS
21   persistently refused to provide clear guidance to Defendant and other Medicare
22   Advantage Organizations about the correct way to interpret the Contested Provision.
23   Defendant relied on these acts and/or omissions by CMS in conducting its risk-
24   adjustment activities and in interpretating the ICD Guidelines, which the United States
25   now challenges . . . . Accordingly, even if Defendant's interpretation of the Contested
26   Provision is proven to be incorrect, the United States' claims for relief are barred, in
27   whole or in part, by the doctrine of estoppel." Docket No. 298 (KFHP Am. Ans. ¶

400).[1]

KFHP Colorado also asserts one affirmative defense unique to it – one known as "voluntary disclosure" and brought pursuant to the FCA. Specifically, KFHP Colorado alleges as follows:

> In 2015, Defendant conducted an internal review related to diagnosis codes that Defendant submitted to CMS for risk-adjustment purposes. In connection with that review, Defendant discovered that some diagnoses associated with diagnosis codes submitted to CMS may not have been documented for the relevant Medicare Advantage beneficiaries. Defendant voluntarily disclosed this information to CMS within 30 days of obtaining the information, and voluntarily redacted the associated diagnosis codes. At the time of this disclosure, Defendant was not aware of an investigation by the United States into these specific diagnosis codes or a lawsuit by any relator involving these specific diagnosis codes. Because the United States has not yet disclosed all of the claims for payment that it contends are false in this case, Defendant is unable to determine if the voluntary disclosure provision of the FCA, 31 U.S.C. § 3729(a)(2), would apply based on Defendant's voluntary disclosure and redaction of these diagnosis codes. Defendant therefore asserts, upon information and belief and subject to discovery, that to the extent damages are awarded against Defendant relating to any of the diagnosis codes that Defendant voluntarily disclosed to CMS and redacted, they should be reduced pursuant to 31 U.S.C. § 3729(a)(2).

Docket No. 299 (KFHP Colo. Ans. ¶ 397).

## II.   LEGAL DISCUSSION

A.   Legal Standard

> Federal Rule of Civil Procedure 8 requires a defendant to state "in short and plain terms its defenses to each claim asserted against it" and to "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(b)(1)(A), (c). Rule 12(f) provides that "[a] court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Ninth Circuit has thus interpreted Rule 8(c) to require that the responsive pleading give the plaintiff "fair notice of the [affirmative] defense." *Schutte & Koerting, Inc. v. Swett & Crawford*, 298 F. App'x 613, 615 (9th Cir. 2008) (quoting *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979)).

---

[1] There is a fifth affirmative defense (based on the nondelegation doctrine), but the government does not challenge this specific defense at this time. *See* Docket No. 298 (KFHP Am. Ans. 401) ("To the extent that the United States premises its claims for relief on allegations that Defendant violated guidance or an interpretation of guidance issued by a private, non-governmental entity, such as AHIMA or AHA, the United States' claims for relief are barred by the nondelegation doctrine.").

1  *United States v. Acad. Mortg. Corp.*, No. 16-cv-02120-EMC, 2020 U.S. Dist. LEXIS 226154, at
2  *3 (N.D. Cal. Dec. 2, 2020).

3  In *Academy Mortgage* (an FCA case like this one), this Court expressly held that the
4  heightened pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),
5  and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), applies not only to claims asserted in a complaint but
6  also affirmative defenses asserted in an answer. *See id.* That is, "[a] defendant must plead
7  sufficient facts to state a defense 'that is plausible on its face.'" *Acad. Mortg.*, 2020 U.S. Dist.
8  LEXIS 226154, at *4.

9  B.  Prejudice

10  In their papers, the Kaiser Defendants first make a procedural argument in opposition to
11  the motion to strike. Specifically, they argue that the motion to strike should be dismissed because
12  the government has failed to show that it would be prejudiced absent relief. *See, e.g.*, *United*
13  *States ex rel. Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCx), 2020 U.S. Dist. LEXIS
14  46043, *5-6 (C.D. Cal. Jan. 28, 2020) ("In view of [the] disfavor [of motions to strike], courts often
15  require a showing of prejudice by the moving party before granting the requested relief. 'The
16  possibility that issues will be unnecessarily complicated or that superfluous pleadings will cause
17  the trier of fact to draw unwarranted inferences at trial is the type of prejudice that is sufficient to
18  support the granting of a motion to strike.'"); *United States v. Paksn, Inc.*, No. 2:15-cv-09064-SB-
19  AGR, 2022 U.S. Dist. LEXIS 126688, *5-6 (C.D. Cal. Feb. 7, 2022) ("[A]ny benefit [to a motion
20  to strike] is usually outweighed by its cost, potential for needless delay, and the risk of premature
21  adjudication on an undeveloped factual and legal record. As a result, . . . [a motion to strike]
22  should be denied unless the challenged allegations have no possible relation or logical connection
23  to the subject matter of the controversy and may cause some form of significant prejudice to one
24  or more of the parties to the action.'").

25  This argument is not particularly persuasive because, in evaluating prejudice, the Court
26  takes into account the function of a Rule 12(f) motion to strike – *i.e.*, "to avoid the expenditure of
27  time and money that would arise from litigating spurious issues, by dispensing with those issues
28  prior to trial." 2 Moore's Fed. Prac. – Civ. § 12.37[3]; *see also Fantasy, Inc. v. Fogerty*, 984 F.2d

1524, 1527 (9th Cir. 1993) (stating that "'[t]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial'"), *rev'd on other grounds*, 510 U.S. 517 (1994). If the Kaiser Defendants' affirmative defenses are in fact insufficient, then the government would be prejudiced by having to litigate spurious issues.

The Court therefore turns to the merits of the government's motion to strike.

C. Equitable Affirmative Defenses

The government argues first that three of the affirmative defenses asserted – estoppel, ratification, and failure to mitigate damages – should be stricken because they are all equitable in nature, and "[e]quity cannot grant a remedy that Congress has not authorized with respect to public funds." Mot. at 3. The main case that the government cites in support is *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).

In *Richmond*, the plaintiff was a federal employee who ended his employment with the government after his application for disability retirement was approved. *See id.* at 416. Subsequently, the plaintiff did some part-time work that still enabled him to get disability payments. After being offered the chance to expand on that work, he contacted the federal government and asked how much he could earn without affecting his eligibility for the disability payments. A federal employee gave him incorrect information and, as a result, the plaintiff ended up doing the additional work which then led him to lose disability payments for six months. *See id.* at 417-18. The plaintiff argued that his request for disability benefits should not have been denied because the government should have been estopped from finding him ineligible based on the incorrect advice he was given.

On appeal before the Supreme Court, the government asked for adoption of "'a flat rule that estoppel may not in any circumstances run against [it].'" *Id.* at 423. The Supreme Court acknowledged that the government advanced substantial arguments in support of its position but it ultimately declined to

> embrace a rule that no estoppel will lie against the Government in any case in order to decide this case. We leave for another day whether an estoppel claim could ever succeed against the

6

> Government. A narrower ground of decision is sufficient to address the type of suit presented here, a claim for payment of money from the Public Treasury contrary to a statutory appropriation.

*Id.* at 423-424.

The narrower ground was based on the Appropriations Clause of the Constitution. That clause provides as follows:

> "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." For the particular type of claim at issue here, a claim for money from the Federal Treasury, the Clause provides an explicit rule of decision. Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by statute.

*Id.* at 424 (quoting art. I, § 9, cl. 7). Or to state the matter slightly differently, "'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Id.*

The Supreme Court explained that judicial use of estoppel could not override this express provision in the Constitution giving authority over Treasury funds to Congress: "Any exercise of a power granted by the Constitution to one of the other Branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425. The Court pointed out that,

> "[i]f it were otherwise, the executive would possess an unbounded power over the public purse of the nation . . . . The power to control and direct the appropriations[] constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation . . . ."

*Id.* at 427. In other words, the Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good, and not according to the individual favor of Government agents or the individual pleas of litigants." *Id.* at 428; *see also id.* at 429 ("Judicial adoption of estoppel based on agency misinformation would . . . vest authority in these agents that Congress would be powerless to constrain.").

The Supreme Court concluded by stating:

> Whether there are any extreme circumstances that might support estoppel in a case **not** involving payment from the Treasury is a matter we need not address. As for monetary claims, it is enough to say that this Court has never upheld as assertion of estoppel against the Government by a claimant seeking public funds. In this context

7

there can be no estoppel, for **courts cannot estop the Constitution**.

*Id.* at 434 (emphasis added).

As an initial matter, the Court takes note that the Kaiser Defendants do not dispute that estoppel, ratification, and failure to mitigate are nonstatutory, equitable defenses. In addition, the Kaiser Defendants do not fundamentally dispute that *Richmond* can apply to defenses other than estoppel. *See also Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 391 (9th Cir. 2000) (stating that, "[b]ecause the holding in *Richmond* was based on the Appropriations Clause, its scope is not limited to the applicability of estoppel to the federal government"; "[w]e would equally usurp Congress's exclusive power to appropriate money were we to award an unauthorized money claim based on a theory of substantial compliance or notice prejudice").

The Kaiser Defendants, however, do disagree with the government's position that the three affirmative defenses should be stricken. According to the Kaiser Defendants,

> [g]iven the express limits on the *Richmond* holding [*i.e.*, to situations where there is a claim for payment of money from the Treasury contrary to a statutory appropriation], "the Supreme Court has not entirely foreclosed the possibility that a party could successfully mount an equitable defense against the government in statutory enforcement actions." [*United States ex rel. Ling v. City of Los Angeles*, No. CV 11-974-PSG (JCx), 2020 U.S. Dist. LEXIS 46043, at *10-11 (C.D. Cal. Jan. 28, 2020).]

Opp'n at 4. In other words, the Kaiser Defendants suggest that *Richmond* is distinguishable from the case at hand because, in *Richmond*, estoppel was being used to make an affirmative claim for payment, whereas, here, estoppel is being used defensively to prevent collection by the government. That distinction, however, is not material. Whether a person is seeking money from the Treasury or trying to keep money from going back to the Treasury, control over public funds is at issue, and if the affected funds were appropriated by Congress, the rationale of *Richmond* applies. Indeed, the Ninth Circuit has implicitly recognized that *Richmond* can apply to a defensive use of estoppel. *See United States v. Fowler*, 913 F.2d 1382, 1386 (9th Cir. 1990) (stating that the plaintiff-government could not be estopped because, "if we were to permit the [defendant-]Fowlers to estop the United States, we would be permitting them to retain public funds that Congress had not appropriated" and "[w]e have no authority to grant such an

expenditure" under *Richmond*). In a panel decision that was later vacated by an en banc decision (on other grounds), the Fifth Circuit also rejected the argument that *Richmond* has no applicability where estoppel is used defensively. *See United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 683 (5th Cir. 2002) ("find[ing] [*Richmond*'s] logic to be equally applicable in situations like the present case, where the Government seeks to recover funds spent contrary to the will of Congress, as in situations like *Richmond*, where the government sought to prevent payment of a claim that would have been paid in derogation of the will of Congress"), *overruled on other grounds*, 326 F.3d 669 (5th Cir. 2003) (en banc). Finally, at least one district court has rejected the Kaiser Defendants' position. *See United States ex rel. Poehling v. UnitedHealth Grp.*, No. CV 16-8697-MWF (SSx), 2019 U.S. Dist. LEXIS 95393, at *37-38 (C.D. Cal. Mar. 28, 2019) (stating that the Ninth Circuit has not held that "*Richmond* is inapplicable to defensive uses of estoppel"). This Court agrees.

The Kaiser Defendants contend still that the Court should not decide the estoppel issue now but rather should defer the matter until discovery has taken place so that a factual record may be developed. In support, they again cite *Ling*. *See Ling*, 2020 U.S. Dist. LEXIS 46043, at *11-12 ("Although under *Heckler* and *Richmond* the bar may be high for establishing a defense of estoppel against the government, the Court cannot say it is impossible. Such a determination is more appropriate on summary judgment, as demonstrated in *Cahuilla Indians* and *Power Media* [which ruled on the equitable defense of laches at summary judgment]."). But again, *Ling* is not persuasive. Though there may be some instances in which it is appropriate to wait until summary judgment to decide an affirmative defense (*i.e.*, so that the factual record may be developed), here Kaiser has not presented any factual scenario that would alter the fact that the Kaiser Defendants were indisputably paid from the Treasury with respect to the Medicare Advantage program. Under *Richmond*, if funds come from the Treasury as appropriated by Congress, that is the end of the analysis. *See Richmond*, 496 U.S. at 434 ("Whether there are any extreme circumstances that might support estoppel in a case **not** involving payment from the Treasury is a matter we need not address. . . . [T]his Court has never upheld as assertion of estoppel against the Government by a claimant seeking public funds. In this context there can be no estoppel, for **courts cannot estop**

**the Constitution**.") (emphasis added). Several district courts have, in fact, granted motions to strike an affirmative defense of estoppel where an FCA claim is at issue. *See, e.g.*, *Poehling*, 2019 U.S. Dist. LEXIS 95393, at *14, 22, 34-39 (granting motion to strike affirmative defenses such as estoppel, failure to mitigate, and ratification based on *Richmond*; government had asserted claims for violation of the FCA, unjust enrichment, and payment by mistake because defendant had not "delete[d] invalid diagnosis codes submitted to CMS for risk adjusted payments that it knew were unsupported by its beneficiaries' medical records"); *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, No. 02-5702 (JAG), 2009 U.S. Dist. LEXIS 111347, at *4, 20 (D.N.J. Dec. 1, 2009) (where the government sued under the FCA to recover "outlier payments" (*i.e.*, "payments that the Medicare program makes to compensate hospitals for episodes of inpatient care that are extraordinarily costly in relation to average or typical episodes of care"), granting motion to strike estoppel defense under *Richmond*); *United States v. Manhattan-Westchester Med. Servs., P.C.*, No. 06 Civ. 7095 (WHP), 2008 U.S. Dist. LEXIS 5819, at *7-9 (S.D.N.Y. Jan. 28, 2008) (where the government brought claims under the FCA, common law fraud, unjust enrichment, and payment under mistake of fact, holding that defendant's estoppel defense failed as a matter of law under *Richmond* and thus striking it).

To be sure, the Kaiser Defendants do present one argument that has more surface appeal. That is, the Kaiser Defendants point out that, under the FCA, the government can get as a remedy civil penalties and treble damages – *i.e.*, this is not just about "returning" money that was erroneously paid out from the Treasury. *See* 31 U.S.C. § 3729(a)(1) (providing that a person who violates the FCA "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person"). *See, e.g.*, Docket No. 240 (U.S. Am. Compl. ¶ 381) ("By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim"); Docket No. 240 (U.S. Am. Compl., Prayer for Relief) ("On Claims I, II, and III (False Claims Act), against all Defendants jointly and severally, for: (i) the amount of the United States' damages, trebled as

required by law; (ii) the maximum civil penalties allowed by law, (iii) the costs of this action, plus interest as provided by law, and (iv) any other relief that this Court deems appropriate.").

But contrary to what the Kaiser Defendants argue, no court has adopted the position that fines and civil penalties are exempt from the *Richmond* bar. To be sure, in *Paksn*, the court did point out the government's failure to "cite any authority addressing Defendants' argument that *Richmond* does not bar equitable defenses to the United States's claims for punitive damages and penalties because they do not involve requests for payment of money from the federal treasury and therefore do not implicate the Appropriations Clause." *Paksn*, 2022 U.S. Dist. LEXIS 126688, at *6. But the court in *Paksn* ultimately did not decide the issue, stating that it "need not resolve this dispute or address the United States's other merits-based arguments because the United States has not adequately shown prejudice" – *e.g.*, although the government claimed discovery-related burdens, "the United States does not identify any evidence that would be relevant to Defendants' affirmative defenses but which the United States would not otherwise produce." *Id.* at *6-7 (thus, "declin[ing] to determine the merits of Defendants' affirmative defenses at this stage").

The Fifth Circuit panel in *Southland* (later vacated on other grounds by an en banc decision) did address the issue and ruled in favor of the government. *See Southland*, 288 F.3d at 583 ("While we acknowledge that the treble damage provision of the civil FCA produces a harsher result than mere recovery of the expended funds, we note that these damages and other remedies are *authorized by Congress*. In addition, the fact that the unavailability of estoppel permits the government to recover treble damages does not justify departure from the longstanding and widely-accepted principle disfavoring government estoppel.").

The *Southland* panel's decision echoes the government's argument which the Court finds persuasive – to wit, that it is not within the province of a court of equity to "'interfere to mitigate [a] penalty or forfeiture [imposed by statute]'" because that "'would be in contravention of the direct expression of [Congress].'" Reply at 4 (quoting *Clark v. Barnard*, 108 U.S. 436, 457 (1883)); *see also United States v. Dieckerhoff*, 202 U.S. 302, 313 (1906) (stating that "[i]t is not within the province of courts of equity to mitigate the harshness of penalties . . . for such relief would run directly counter to the statutory requirements'"); *Valley Ice & Fuel Co. v. United States*,

11

30 F.3d 635, 640 (5th Cir. 1994) (stating that "equity will not bar the imposition of a statutory penalty"); *United States v. Coastal Refining & Mktg., Inc.*, 911 F.2d 1036, 1043 (5th Cir. 1990) (noting that "there is no inherent power for the judiciary to mitigate congressionally-mandated penalties[;] [a] court in equity may not do that which the law forbids"); *see also Ferris v. Haymore*, 967 F.2d 946, 957 (4th Cir. 1992) (in case involving violation of federal odometer statute, holding the district court erred in reducing plaintiff's judgment against the defendant by the amount that plaintiff received from others in compromise of his federal claim against them; "Congress determined that the treble damages awards are necessary to achieve the degree of deterrence and compensation that it wished to exist, and we are without authority to adjust those levels of deterrence and compensation through application of common law or equitable principles"). At the very least, for Kaiser to get relief here, it would have to show that there was some intent on the part of Congress to allow an equitable defense, such as estoppel, with respect to a claim for penalties/treble damages brought under the FCA. It has not done so. *Cf. In re Neff*, 824 F.3d 1181, 1184 (9th Cir. 2016) ("Although the availability of equitable tolling 'is fundamentally a question of statutory intent,' the Supreme Court presumes that Congress intended that equitable tolling would be available 'if the period in question is a statute of limitations and if tolling is consistent with the statute.'"). As a matter of statutory interpretation, Kaiser has failed to demonstrate equitable defenses such as estoppel are to be recognized under the FCA.

Accordingly, based on *Richmond* and as a matter of statutory interpretation, both the affirmative defenses of estoppel and ratification (which is similar in nature to estoppel) are barred. The reasoning above also applies to failure to mitigate – *i.e.*, equity cannot block the Constitution (specifically, the Appropriations Clause). *See, e.g.*, *Poehling*, 2019 U.S. Dist. LEXIS 95393, at *34-39 (striking various defenses, including failure to mitigate, based on *Richmond*); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 350 (5th Cir. 2008) (noting that, "[i]n general, the duty to mitigate damages is an equitable doctrine").

The Kaiser Defendants suggest that, at the very least, the Court should not bar them from proceeding with the failure-to-mitigate defense. They contend that this specific defense has been permitted against the government, both in (1) FCA cases and (2) common law cases. But the

12

Court sees no material reason why treat the defense of failure to mitigate should be treated differently from the defense of estoppel, at least for *Richmond* purposes, given the facts in this case.

To the extent the Kaiser Defendants point out that this Court did not strike a failure-to-mitigate defense in an FCA case – specifically, *Academy Mortgage Corp.*, 2020 U.S. Dist. LEXIS 226154, at *13 – that is true. But in *Academy Mortgage*, this Court discussed the failure-to-mitigate defense only in the context of *Twombly* and *Iqbal*. The Court was not presented with the argument that, *e.g.*, the defense is not proper under *Richmond* (and the Appropriations Clause) or even that a fraud on the government is not subject to a failure-to-mitigate defense.

As for the contention that the failure-to-mitigate defense still has applicability to common law claims, such as payment by mistake and unjust enrichment which the government has asserted in the case at bar, there is some authority to support the Kaiser Defendants' position. *See, e.g.*, *United States v. Rite Aid Corp.*, No. 2:12-cv-1699-KJM-EFB, 2020 U.S. Dist. LEXIS 7089, at *17 (E.D. Cal. Jan. 14, 2020) (indicating agreement with the statement that "the government does have a duty to mitigate damages with respect to a claim for payment by mistake"); *Jordan*, 2002 U.S. Dist. LEXIS 26622, at *52-54, 56 (declining to dismiss as a matter of law the defense of failure to mitigate with respect to government's claims for payment by mistake and unjust enrichment: "[w]hether that duty arises turns on the facts of each case" and there were "[g]enuine issues of fact . . . regarding Defendant's state of mind"; also declining to dismiss the defense with respect to the claim for common law fraud). That being said, there does not appear to be a clear rationale for these rulings, and thus these decisions have little persuasive value. Furthermore, even though the government's claims are based on the common law here, and not a statute such as the FCA, a statutory appropriation was still the basis for the CMS payments to the Kaiser Defendants (*i.e.*, pursuant to Medicare Advantage), and thus *Richmond* applies. *See United States v. Fowler*, 913 F.2d 1382, 1385-86 (9th Cir. 1990) (where government initiated a collection action against defendants because government erroneously paid defendants pursuant to a government insurance policy for which defendants were not actually eligible, precluding estoppel defense against government and citing *Richmond* in support); *see also Poehling*, 2019 U.S. Dist. LEXIS 95393, at

13

*37 (pointing to *Fowler* as an example where Ninth Circuit "has indeed applied *Richmond* to bar defenses to non-statutory claims asserted by the government").

To be clear, however, although the Court strikes these affirmative defenses, that does not mean that the alleged conduct by the government is irrelevant. For example, the Kaiser Defendants may still assert that, because the government did not act after learning of the alleged fraud, the Kaiser Defendants cannot be said to have had the necessary scienter to defraud the government. *See Long*, 2014 U.S. Dist. LEXIS 185675, at *9 n.4 ("To support its argument that the government cannot recover where it continues to issue contracts after it is aware of alleged noncompliance, GSD&M cites caselaw holding that the government's decision to continue working with a defendant may preclude a finding of liability under the FCA. These cases concerned whether the *materiality or scienter elements* were met where the government was aware of the allegedly false claim, and not whether the government had a duty to mitigate.") (emphasis added). The Court does not prejudge the viability of that defense.

D. <u>Excessive Fines Defense</u>

For the excessive fines defense, the government raises two arguments: (1) it is not a true affirmative defense (*i.e.*, a defense that would defeat the FCA claim entirely) and therefore should be stricken and (2) it is insufficiently pled. For purposes of this decision, the Court does not concern itself with the first argument as, even if the government is correct, that would not bar the Kaiser Defendants from asserting the same as *a* defense in the case (*i.e.*, to limit penalties). Thus, the Court focuses on the second argument – *i.e.*, that the defense is not sufficiently pled. Here, the government notes that a penalty is unconstitutional only if it is grossly disproportional to gravity of defendant's offense, *see United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (stating that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish"; "[a] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense"), and then argues that "Defendants fail to explain how any civil penalty in this matter would meet this framework"; even if a civil penalty can be $5,000-$10,000, each additional diagnosis code "associated with an HCC

14

1 may result in thousands of dollars in additional payments." Mot. at 11.

2 At this juncture, the Kaiser Defendants have pled enough. First, they fairly point out that they cannot make a more specific showing at this early stage of the litigation because "they cannot know what the fines imposed in this case will be, if any. Plaintiff has yet to even identify all of the diagnosis codes it asserts are false – rendering a calculation of even the maximum amount of damages and civil penalties impossible." Opp'n at 14. Second, the Kaiser Defendants make a fair point that, given the government's allegation that they "'improperly obtained and retained hundreds of millions of dollars in risk-adjustment payments from CMS,'" "it is plausible that treble damages and civil penalties could total billions of dollars." Opp'n at 14 n.5; *see also* Docket No. 298 (KFHP Am. Ans. ¶ 397) (making the same point). It is premature to assess Kaiser's legal argument on this point in a factual vacuum.

The Court therefore declines to strike the excessive fines defense.

E.  Voluntary Disclosure: Affirmative Defense Specific to KFHP Colorado

The FCA contains a provision that allows for reduced damages: 31 U.S.C. § 3729(a)(2). Section 3729(a)(2) provides as follows.

> (2) Reduced damages. If the court finds that –
>
> (A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;
>
> (B) such person fully cooperated with any Government investigation of such violation; and
>
> (C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,
>
> the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(2). (As indicated above, a defendant who violates the FCA is ordinarily

15

liable to the government "for a civil penalty of not less than $5,000 and not more than $10,000 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." *Id.* § 3729(a)(1).)

In its answer, KFHP Colorado asserts that it is entitled to the reduction provided for in § 3729(a)(2). Specifically, it alleges:

> In 2015, Defendant conducted an internal review related to diagnosis codes that Defendant submitted to CMS for risk-adjustment purposes. In connection with that review, Defendant discovered that some diagnoses associated with diagnosis codes submitted to CMS may not have been documented for the relevant Medicare Advantage beneficiaries. Defendant voluntarily disclosed this information to CMS within 30 days of obtaining the information, and voluntarily redacted the associated diagnosis codes. At the time of this disclosure, Defendant was not aware of an investigation by the United States into these specific diagnosis codes or a lawsuit by any relator involving these specific diagnosis codes. Because the United States has not yet disclosed all of the claims for payment that it contends are false in this case, Defendant is unable to determine if the voluntary disclosure provision of the FCA, 31 U.S.C. § 3729(a)(2), would apply based on Defendant's voluntary disclosure and redaction of these diagnosis codes. Defendant therefore asserts, upon information and belief and subject to discovery, that to the extent damages are awarded against Defendant relating to any of the diagnosis codes that Defendant voluntarily disclosed to CMS and redacted, they should be reduced pursuant to 31 U.S.C. § 3729(a)(2).

Docket No. 299 (KFHP Colo. Ans. ¶ 397).

The government argues first that the voluntary disclosure defense is not a proper affirmative defense because it "merely reduces damages" and does not entirely dispose of the FCA claim. Mot. at 15. As indicated above in the section on the excessive fines defense, that position seems problematic.

The government further argues that KFHP Colorado has not adequately pled the voluntary disclosure defense for several reasons: (1) with respect to § 3729(a)(2)(A) above, KFHP Colorado has failed to allege that it disclosed "all information" about its FCA violations; (2) also with respect to § 3729(a)(2)(A) above, KFHP Colorado has failed to allege that it provided information to DOJ (or even HHS-OIG) and instead simply claimed that it informed CMS; (3) with respect to § 3729(a)(2)(B) above, KFHP has not alleged that it cooperated with the investigation of the reported violations; and (4) with respect to § 3729(a)(2)(C) above, KFHP Colorado has not alleged

16

that it provided information about its violations before an action had already commenced and/or before it knew of the existence of an investigation.

The Court rejects some of the government's arguments. For example, in (1), the government asserts that KFHP Colorado was required to give "all information" about its FCA violations but its answer simply refers to "*some* diagnoses associated with diagnosis codes submitted to CMS [that] may not have been documented for the relevant Medicare Advantage beneficiaries." Docket No. 299 (KFHP Colo. Ans. ¶ 397) (emphasis added). But at this juncture of the litigation, all reasonable inferences are to be made in KFHP Colorado's favor, and it can fairly be inferred that KFHP Colorado gave all information about the violations it knew about. *See* Reply at 13 ("At a minimum, KFHP-CO must plead that it furnished *all* information about these violations that it knew.") (emphasis in original).

As another example, § 3729(a)(2) requires that FCA violations be reported to "officials of the United States responsible for investigating false claims violations." 31 U.S.C. § 3729(a)(2)(A). Although the FCA provides that it is the responsibility of the Attorney General (and thereby DOJ) to investigate potential FCA violations, *see id.* § 3730(a) (providing that "[t]he Attorney General diligently shall investigate a violation under section 3729"), and KFHP Colorado did not mention reporting the alleged violations to DOJ in their answer, it is not clear whether CMS (the agency to which KFHP Colorado did refer) may have a role in investigating. Therefore, there is arguably a question of fact here. *See* Opp'n at 16 (arguing that the statute itself does not expressly "limit disclosure to DOJ or any specific division or agency" and that the government "has cited nothing to show that CMS has no responsibility for policing fraud on the Medicare Advantage program"). The government protests that, "even if § 3729(a)(2) extended beyond the DOJ, KFHP-CO has not pleaded that the officials to whom it made its purported disclosure were responsible for investigating false claims violations." Reply at 14 n.9. But at this juncture all reasonable inferences are to be made in the Kaiser Defendants' favor; by alleging that they reported to CMS, implicitly, they are alleging that CMS was the appropriate body to whom to report.

The government's best argument is that KFHP Colorado has failed to allege that it

17

provided information about its violations before an action had already commenced and/or before it knew of the existence of an investigation. *See* 31 U.S.C. § 3729(a)(2) (providing that, "at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation"). KFHP Colorado has alleged that it discovered a problem and reported it in 2015. But before that date, two actions had already been initiated against Kaiser entities: (1) *Osinek* (No. C-13-3891 EMC), and (2) *Taylor* (No. C-21-3894 EMC).[2] And notably, the plaintiff in *Taylor* sued KFHP Colorado specifically. KFHP Colorado responds by asserting that the government "does not contend that the *Osinek* and *Taylor qui tam* actions pertain to the [specific] diagnosis codes put at issue by KFHP-CO in its affirmative defense." Opp'n at 16. But this argument elevates form over substance: if these lawsuits put into question the *general* practice of upcoding high-value conditions and the government subsequently investigated, then KFHP Colorado was put on sufficient notice of the overarching problem and cannot in good faith claim that it voluntarily disclosed the problem to the government simply because it identified certain *specific* diagnostic codes. *See* Reply at 15 ("KFHP-CO's only response is to recycle its theory that civil actions and investigations must specifically delineate each false diagnosis code submission.").

There is one possible saving grace for KFHP Colorado. One could argue that it is a question of fact as to whether the specific diagnosis codes KFHP Colorado is referring to are fairly covered by, *e.g.*, *Osinek* and *Taylor*. But KFHP Colorado provides no concrete examples.

The Court therefore strikes the voluntary disclosure defense but gives KFHP Colorado leave to amend the defense if it can do so in good faith.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motion to strike.

- The motion to strike the defenses of estoppel, ratification, and failure to mitigate

---

[2] Although *Taylor* has a 2021 date in this Court, it was first filed in Colorado in 2014 and then transferred to this Court in 2021.

damages is granted.  Amendment is not permitted because it would be futile under *Richmond*.

- The motion to strike the excessive fines defense is denied.
- Finally, the motion to strike the voluntary disclosure defense is granted but with leave to amend.  KFHP Colorado shall file an amended answer within four weeks of the date of this decision.

This order disposes of Docket No. 312.

**IT IS SO ORDERED**.

Dated: December 19, 2023

_____
EDWARD M. CHEN
United States District Judge