UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONDA OSINEK, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>PERMANENTE MEDICAL GROUP, INC, et al.,<br><br>        Defendants. | Case No.  13-cv-03891-EMC   (JCS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL**<br><br>Re: Dkt. No. 359 |

## I.    INTRODUCTION

The United States brings this case under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, alleging that Defendants (collectively, "Kaiser") engaged in illegal conduct with respect to billing the government for services provided to patients under Medicare Part C (also known as Medicare Advantage). Presently before the Court is Kaiser's Motion to Compel Production of Documents Withheld on the Basis of the Deliberative Process Privilege ("Motion"). The Motion has been fully briefed and the United States has lodged sample documents to assist the Court in its evaluation of the government's privilege claims.  A hearing on the Motion was held on November 20, 2024.  The Court's rulings are set forth below.

## II.    BACKGROUND

### A.    The Complaint

This case relates to the practices of Kaiser health plans, which are Medicare Advantage Organizations, with respect to obtaining reimbursement from the Centers for Medicare and Medicaid Services ("CMS") for the care Kaiser provides to Medicare Advantage patients.  *See generally,* Amended Complaint, dkt. no. 240.  According to the United States,

> [a]s  Medicare  Advantage  ("MA")  Organizations,  Kaiser's  Health

Plans were responsible for covering the costs of medical services for the Medicare patients enrolled in Kaiser's MA plans. Kaiser's Health Plans, in return, received monthly payments from CMS for each patient for whom Kaiser provided such coverage. CMS adjusts these payments for various "risk" factors that affect expected healthcare expenditures, to ensure that MA Organizations are paid more for sicker enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs. To make these adjustments, CMS relies on "risk adjustment" data, including medical diagnosis codes, collected from MA Organizations. This payment model creates powerful incentives for MA Organizations like Kaiser's Health Plans to exaggerate the expected healthcare costs for their enrollees by "over-reporting" diagnosis codes.

Amended Complaint ¶ 3.

According to the United States, MA Organizations are permitted to operate as MA plans under written contracts with CMS that require them to operate "in compliance with the requirements of the contract, applicable federal law and regulations, and CMS's policies." *Id.* ¶¶ 76-77 (citing 42 U.S.C. § 1395w-27(a); 42 C.F.R. Part 422, Subpart K). Among other things, the contracts between MA Organizations and CMS impose certain standards and requirements regarding which diagnoses can be submitted for risk-adjustment payment, including compliance with the International Classification of Diseases ("ICD") Official Guidelines for Coding and Reporting (the "ICD Guidelines") and with the policies set forth in CMS's Medicare Managed Care Manual. *Id.* ¶¶ 5, 63, 77. Under the ICD Guidelines, diagnoses may be reported to CMS only if they "both existed at the time of the visit and required or affected patient care, treatment, or management at the visit." *Id.* ¶ 5; *see also* Dkt. No. 179-1 at ECF p. 534 (ICD Guidelines Section IV.J) (instructing MA Organizations to "[c]ode all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care, treatment or management.")[1]

The United States alleges Kaiser was aware of these standards but "nevertheless systematically violated [them] as it pursued various risk-adjustment initiatives that routinely resulted in the creation of addenda to retrospectively add diagnoses to patient medical records." Amended Complaint ¶¶ 6-7. The United States further alleges that "[t]hese risk-adjustment initiatives often failed to properly account for contradictory information contained in a patient's

---

[1] Kaiser refers to this requirement as the "Contested Provision," although that term is not used in the Amended Complaint.

United States District Court
Northern District of California

1    medical file, especially with respect to the medical visit at issue," resulting in "widespread

2    submission of invalid diagnosis codes where the condition did not require or affect patient care,

3    treatment, or management at the visit and, in many instances, where the very existence of the

4    condition at the time of the visit was contradicted by the medical record." *Id.* ¶ 9. The United

5    States alleges that "[f]or service years 2009 to 2018, the Defendant Kaiser Health Plans submitted

6    and received payment from CMS for nearly 500,000 diagnoses that were added to patient medical

7    records using addenda" and "received in the range of $1 billion from CMS as a result of these

8    addenda." *Id.* ¶ 359.

9        Based on these allegations, the United States asserts in its Amended Complaint that Kaiser

10   violated the False Claims Act by: 1) knowingly presenting or causing to be presented, false or

11   fraudulent claims for payment or approval to CMS, resulting in their receiving inflated Medicare

12   payments from CMS to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(1)(A); 2)

13   knowingly making, using, and causing to be made or used, false records or statements material to

14   false or fraudulent claims resulting in their receiving inflated Medicare payments from CMS to

15   which they were not entitled, in violation of 31 U.S.C. § 3729(a)(1)(B); and 3) conspiring to

16   violate the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

17   **B.**    **Assertion of the Deliberative Process Privilege by the United States**

18        On January 26, 2022, Kaiser served its initial requests for production ("RFPs") on the

19   United States.  Amended Declaration of Adam Levine, dkt. no. 363 ("Amended Levine Decl.") ¶

20   2 & Ex. P.  On January 31, 2024, the United States produced a privilege log identifying 2,356

21   unique documents that the government withheld from its production to Kaiser on the grounds of

22   the deliberative process privilege.  Amended Levine Decl. ¶ 3 & Ex. O. In support of its assertions

23   of the deliberative process privilege, the United States provided declarations from personnel at

24   CMS and the Office of Inspector General of the U.S. Department of Health and Human Services

25   ("HHS-OIG"). Amended Levine Decl., Exs. C–F ("Agency Declarations"). As relevant here,[2] the

_____

26

27   [2] In addition to the declarations described below, the United States offered the declaration of
Jennifer Dupee, of CMS, in support of its assertion of privilege as to 306 documents that it has

28   now agreed to produce.  *See* Amended Levine Decl. ¶ 9 & Ex. E.  As the United States no longer

United States District Court
Northern District of California

1    Agency Declarations are as follows:

2        Declaration of Jennifer Shapiro ("Shapiro Decl."):  Shapiro is the Director of the Medicare

3    Plan Payment Group ("MPPG") within the Center for Medicare ("CM") and "asserts privilege

4    over two categories of deliberative documents relating to: (1) the drafting and approval of specific

5    proposed or final regulations issued by CMS; and (2) the drafting and revision of the risk

6    adjustment chapter of CMS's Medicare Managed Care Manual . . . ."  Opposition at 2 (citing

7    Amended Levine Decl., Ex. D (Shapiro Decl.)).

8        The first category of documents is broken down into two sub-categories, the first

9    containing documents relating to the proposed rule HHS published on February 18, 2020, at 85

10   Fed. Reg. 9002 (the "Proposed Rule"),[3] and the other containing documents relating to other CMS

11   rulemaking for which MPPG is responsible (referred to in the Shapiro Declaration as Category 1

12   and Category 3, respectively).  The category containing documents related to the drafting and

13   revision of the risk adjustment chapter of the Medicare Managed Care Manual is referred to in the

14   Shapiro Declaration as Category 2.

15       The key paragraphs in the Shapiro Declaration supporting Shapiro's assertion of the

16   deliberative process privilege for Category 1 documents are as follows:

17          6.  Category 1 contains 1,640 documents relating to the proposed rule
            HHS published on February 18, 2020, at 85 Fed. Reg. 9002 (the
18          "Proposed Rule"). The Proposed Rule includes provisions impacting
            MA and Medicare Part D policy for which MPPG was responsible.
19          As described further below, the documents in Category 1 relate to
            MPPG's role in drafting, revising, and obtaining approval for the
20          Proposed Rule.

21          . . .

22          10.  As part of the process for drafting the Proposed Rule, numerous
            drafts and related communications were exchanged across multiple
23

24   ───────────────────────
     asserts deliberative process privilege over these documents, the Dupee Declaration has no bearing
25   on the resolution of the instant Motion.
     [3] The Proposed Rule includes information about when an MAO can consider MA enrollees to
26   meet the "statutory criterion of having one or more comorbid and medically complex chronic
     conditions that is life threatening or significantly limits the overall health or function of the
27   enrollee." *See* 85 Fed. Reg. 9012. Kaiser contends the United States has "put the coding of chronic
     conditions at issue in this case and has alleged that [Kaiser] violated the Contested Provision by
28   improperly submitting diagnosis codes for medical conditions, including chronic conditions."
     Motion at 20 (citing Amended Complaint ¶¶ 86–87, 227, 309, 366, 369, 373).

United States District Court
Northern District of California

levels: among MPPG personnel, between MPPG and CM managers, then between CM and other CMS components, between CM and the CMS Administrator, and finally among CMS, HHS, and the Office of Management and Budget ("OMB"), an office within the Executive Branch. Comments were received from all levels of reviewers, which resulted in various changes to the Proposed Rule.

11. As part of the deliberation and drafting process, MPPG and other CM components prepared internal options papers, briefing papers, and talking points, which were used to aid decisionmakers in determining the final contents of the Proposed Rule.

12. Prior to publication, the Proposed Rule obtained approval (also known as "clearance") from all levels of CMS management, the HHS Secretary, and OMB.

13. Category 1 of Exhibit A identifies deliberative documents relating to the rulemaking process described above. Documents identified as "briefing documents" are briefing documents that explained the policy changes MPPG was proposing to make through the Proposed Rule and the reasons why they believed those changes should be approved. These documents are pre-decisional because they predate the final agency action (that is, public issuance of the Proposed Rule) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the Proposed Rule. Such briefing documents are an integral part of the give and take deliberative process that is an intrinsic element of policymaking.

14. Documents identified as "drafts of Proposed Rule" are drafts of the Proposed Rule, which include comments and proposed edits to the drafts from various stakeholders. These documents are predecisional because they predate the final agency action (that is, public issuance of the Proposed Rule) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the Proposed Rule.

15. Documents identified as "communications regarding Proposed Rule" are e-mails and other communications regarding the Proposed Rule. These communications provide feedback on drafts of the Proposed Rule and discuss potential changes to its contents. These documents are pre-decisional because they predate the final agency action (that is, public issuance of the Proposed Rule) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the Proposed Rule.

16. The documents identified in Category 1 of Exhibit A reflect the individual perspectives of agency personnel at various levels within CMS regarding the provisions of the Proposed Rule that were under consideration. The rulemaking process depends upon these personnel

to freely voice their views when developing agency regulations. CMS personnel reasonably expect that the substance of their drafts, discussions, internal thoughts, deliberations, and preliminary analyses will be kept confidential, and that expectation ensures a free flow of candid discussion and deliberation within the agency. Based on my years of experience within CMS, and my interactions with individuals throughout the agency and federal government, I believe that the open and candid exchange of ideas and information among agency personnel regarding our regulatory actions as reflected in the documents in Category 1 would be seriously undermined if agency personnel believed that their internal drafts, discussions, analyses, opinions, views, and recommendations would subsequently be disclosed to outside parties, because agency personnel would feel constrained in their drafting and communications.

Amended Levine Decl., Ex. D (Shapiro Decl.) ¶¶ 10-16.

As to the Category 2 documents, Shapiro asserts the deliberative process privilege on the following grounds:

7.    Category 2 contains 238 documents relating to the Medicare Managed Care Manual (the "Manual"), a CMS publication that details the operations of the MA program, including CMS's instructions regarding the obligations imposed on Medicare Advantage Organizations ("MAOs"). CMS's contracts require that MAOs operate their MA plans in accordance with the Manual. MPPG has primary responsibility for the contents of various sections of the manual, including Chapter 7, which covers risk adjustment and specifies the core responsibilities of MAOs with respect to risk-adjustment submissions.

. . .

17. The risk adjustment section currently located in Chapter 7 of the Manual has been revised several times. Prior to publication, each version underwent a deliberation and clearance process within CM similar to the regulatory process described above. Changes were proposed by and discussed among agency personnel and then submitted to management for approval.

18. In addition, in May 2011, CMS published a proposed version of the Manual's risk adjustment chapter for public comment. At the conclusion of the comment period, personnel in MPPG and other parts of CMS assessed the comments and decided which to incorporate into the final published version of the Manual's risk adjustment chapter.

19. Category 2 of Exhibit A identifies deliberative materials relating to the revision process described above. Documents identified as "Manual revision communication" are e-mail communications in which agency personnel discussed potential changes to the Manual's risk adjustment chapter. These e-mails are pre-decisional because they predate the final agency action (that is, public issuance of the proposed or final version of the chapter) to which they relate. They

United States District Court
Northern District of California

are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents of the Manual's risk adjustment chapter. Such communications are an integral part of the give and take deliberative process that is an intrinsic element of policymaking.

20. Documents identified as "Draft of Manual chapter" are draft versions of the Manual's risk adjustment chapter. These documents are pre-decisional because they predate the final agency.

21. Documents identified as "Manual comment spreadsheet" are spreadsheets containing assessments by agency personnel of the public comments regarding the Manual's risk adjustment chapter, including whether comments should result in any changes to the chapter's final contents. These assessments are pre-decisional because they predate the final agency action (that is, public issuance of the proposed or final version of the chapter) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents of the Manual's risk adjustment chapter. Such assessments are an integral part of the give and take deliberative process that is an intrinsic element of policymaking.

22. The documents identified in Category 2 of Exhibit A reflect the individual perspectives of agency personnel at various levels within CMS regarding the contents of the Manual's risk adjustment chapter. CMS depends upon these personnel to freely voice their views when developing agency publications. CMS personnel reasonably expect that the substance of their drafts, discussions, internal thoughts, deliberations, and preliminary analyses will be kept confidential, and that expectation ensures a free flow of candid discussion and deliberation within the agency. Based on my years of experience within CMS, and my interactions with individuals throughout the agency and federal government, I believe that the open and candid exchange of ideas and information among agency personnel regarding the Manual and similar publications would be seriously undermined if agency personnel believed that their internal drafts, discussions, analyses, opinions, views, and recommendations—as reflected in the documents in Category 2—would subsequently be disclosed to outside parties, because agency personnel would feel constrained in their drafting and communications.

*Id.* ¶¶ 17-22.

The key paragraphs of the Shapiro Declaration addressing Category 3 documents are as follows:

8. Category 3 contains 6 documents relating to other rulemakings for which MPPG has responsibility.

. . .

7

23. Category 3 of Exhibit A contains documents relating to additional CMS rulemakings for which MPPG is responsible.

24. Documents 1,879-80 are drafts of the Risk Adjustment Data Validation Final Rule ("RADV Rule"), which was published on February 1, 2023 at 88 Fed. Reg. 6643. Prior to publication, the RADV Rule underwent a deliberation and clearance process like the one described above.

25. Documents 1,881-82 are communications created as part of the deliberative process leading to the publication of the RADV Rule.

26. Document 1,883 is an e-mail describing and assessing potential topics for a 2024 rulemaking.

27. Document 1,884 is a document containing notes describing and assessing potential topics for the 2024 rulemaking described in paragraph 27 (sic).

28. The documents in Category 3 are pre-decisional because they predate the final agency action (that is, public issuance of the rule) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in a publicly issued rule.

29. The documents identified in Category 3 of Exhibit A reflect the individual perspectives of agency personnel at various levels within CMS regarding the contents of the rules under consideration. CMS depends upon these personnel to freely voice their views when developing agency rules. CMS personnel reasonably expect that the substance of their drafts, discussions, internal thoughts, deliberations, and preliminary analyses will be kept confidential, and that expectation ensures a free flow of candid discussion and deliberation within the agency. Based on my years of experience within CMS, and my interactions with individuals throughout the agency and federal government, I believe that the open and candid exchange of ideas and information among agency personnel regarding the rulemaking process reflected in the documents in Category 3 would be seriously undermined if agency personnel believed that their internal drafts, discussions, analyses, opinions, views, and recommendations would subsequently be disclosed to outside parties, because agency personnel would feel constrained in their drafting and communications.

*Id.* ¶¶ 23-29.

Amended and Supplemental Declaration of Christopher G. Bresette ("Amended Bresette Decl."): Bresette is the Director of Medicare Advantage Audits within HHS-OIG's Office of Audit Services ("OAS") and "asserts privilege over documents relating to HHS-OIG's deliberations regarding the standards and processes to apply when auditing risk adjustment diagnosis codes

submitted by MAOs." *Id.* (citing Amended Levine Decl., Ex. F (Amended Bresette Decl.)).

The key paragraphs in the Amended Bresette Declaration supporting Bresette's privilege claims are as follows:

> 8. As part of its oversight of the MA program, OAS periodically selects MA plans for audit to ensure that risk adjustment diagnosis codes the plan submitted to CMS complied with federal requirements.

> 9. To conduct these audits, OAS identifies MA patients for whom the MA plan received increased risk-adjustment payments and asks the plan to provide medical records supporting the risk adjustment diagnosis codes submitted for each patient. An independent medical review contractor retained by OAS reviews those medical records to determine whether or not they support the risk adjustment diagnoses the MA plan submitted for the audited patients.

> 10. After OAS completes an audit, HHS-OIG releases a report describing the audit's findings and recommendations for remediation. These reports are publicly available at https://oig.hhs.gov/reports-and-publications/oas/cms.asp.

> 11. In conducting these audits, OAS aims to apply standards and processes consistent with the standards and processes CMS uses during its risk adjustment data validation ("RADV") audits, which similarly seek to determine whether MA plans' risk adjustment data submissions are supported by underlying medical record documentation.

> 12. Exhibit A identifies deliberative documents relating to the standards and processes OAS applies during its audits of MA plans' risk adjustment diagnosis codes. Documents described as "OAS communications with CMS" are e-mail communications with CMS employees and contractors in which OAS representatives ask questions about how CMS applies certain standards in the context of its RADV audits and CMS responds to those questions. Documents described as "internal OAS communications" are e-mails and other communications internal to OAS regarding the standards and processes OAS applies during its audits, including communications discussing how CMS's responses to OAS questions might impact those standards and processes.

> 13. The documents identified in Exhibit A are pre-decisional because they predate the final agency action (that is, adoption and application of standards and processes for audits of MA plans) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS and HHS-OIG personnel, as well as information from CMS contractors solicited as part of this process, about standards and processes applied during CMS audits of MA plans and how HHS-OIG will adopt and apply those standards and processes during its own MA plan audits.

> 14. The documents identified in Exhibit A reflect the individual

perspectives of agency personnel at various levels of both OAS and CMS regarding audits of MA plans' risk adjustment diagnosis codes. The OAS audit process depends on agency personnel working on those audits to freely express their views and questions regarding standards and processes employed while conducting audits. Agency personnel reasonably expect that the substance of their drafts, discussions, internal thoughts, deliberations, and preliminary analyses regarding audit standards and processes will be kept confidential, and that expectation ensures a free flow of candid discussion and deliberation within the agency. Based on my years of experience within HHS-OIG, and my interactions with individuals throughout the agency and federal government, I believe that the open and candid exchange of ideas and information among agency personnel regarding OAS audits as reflected in the documents in Exhibit A would be seriously undermined if agency personnel believed that their internal drafts, discussions, analyses, opinions, views, and recommendations would be subsequently disclosed to outside parties, because agency personnel would feel constrained in their drafting and communications.

Amended Bresette Decl. ¶¶ 8-14.

<u>Declaration of Joanna Bisgaier ("Bisgeier Decl."):</u>  Bisgeier is Regional Inspector General within HHS-OIG's Office of Evaluation and Inspections ("OEI") and "asserts privilege over deliberative documents relating to three reports OEI published regarding the Medicare Advantage program." *Id.* at 2-3 (citing Amended Levine Decl., Ex. C (Bisgeier Decl.)).

The key paragraphs of the Bisgaier Declaration state as follows:

6. I have reviewed the documents identified in Exhibit A, and I have determined that they relate to topics that fall within my purview as Regional Inspector General within OEI. Specifically, the documents relate to evaluations OEI conducted of the MA program relating to two topics: chart reviews and health risk assessments ("HRAs").

7. Under the MA program, the Centers for Medicare & Medicaid Services ("CMS") makes monthly payments to MA plans according to a system of risk adjustment that depends on the health status of each enrollee. Accordingly, MA plans are paid more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources than to healthier enrollees, who would be expected to require fewer health care resources. To determine the health status of enrollees, CMS relies on MA organizations to collect diagnosis codes from their providers and submit these codes to CMS.

8. Chart reviews are a tool used by some MA plans to either add or remove patient diagnosis codes based on the MA plan's review of patient medical records. When used appropriately, they can improve the accuracy of risk adjustment data submitted to CMS. However, OEI's evaluation of MA plans' use of chart reviews found that MA plans almost always used chart reviews to add rather than delete diagnoses, and that diagnoses added only on chart reviews—and not

United States District Court
Northern District of California

on any service records—resulted in an estimated $6.7 billion in risk-adjusted payments for 2017. These findings raise concerns because chart reviews may provide MA plans with opportunities to circumvent CMS requirements, including the requirement diagnoses submitted for risk adjustment payment result from a face-to-face encounter with the patient.

9. HRAs occur when either a physician or other healthcare professional collects information from a patient in order to diagnose the patient or identify potential gaps in care. HRAs can occur in the context of a patient's annual wellness visit or during some other visit with the patient, including a visit to the patient's home initiated and performed by a company hired by an MA plan to conduct such visits. When used appropriately, HRAs are a potential tool for improving both patient care and the accuracy of risk adjustment diagnoses submitted to CMS. However, OEI's evaluation of MA plans' use of HRAs raised concerns that MA plans used HRAs as a strategy for finding and submitting more diagnoses to increase payments rather than as a means to improve patient care. Through an analysis of 2016 data, OEI found that MA plans reported HRA diagnoses for 3.5 million patients with no other encounter records of visits, procedures, tests, or supplies relating diagnosis reported on the HRA. This resulted in an estimated $2.6 billion in payments for diagnoses reported solely on HRAs.

10. OEI published its findings and recommendations relating to MA plans' use of chart reviews and HRAs in a series of reports released between December 2019 and September 2021. Those reports are publicly available via the HHS-OIG website.

11. Exhibit A to this declaration identifies deliberative documents relating to OEI's investigation and evaluation of MA plans' use of chart reviews and HRAs. Documents identified as "CMS questionnaires" contain OEI questions to CMS regarding MAOs' use of chart reviews and HRAs, the responses to which contributed to the contents of OEI's final reports. Documents identified as "CMS follow-up questions" reflect additional questions OEI posed to CMS regarding CMS's responses to OEI's questionnaires. Documents identified as "draft OEI reports" are drafts or draft summaries of the reports referenced above, in which OEI shared with CMS its preliminary findings and recommendations relating to MA plans' use of chart reviews and HRAs. Documents identified as "CMS comments" contain comments from CMS regarding the design of OEI's evaluations or draft versions of OEI's reports and their findings.

12. The documents identified in Exhibit A are pre-decisional because they predate the final agency action (that is, publication of OEI's findings and recommendations regarding MA plans' use of chart reviews and HRAs) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS and HHS-OIG personnel regarding OEI's evaluation of chart reviews and HRAs and how the agency should address potential issues arising from MA plans' use of these tools.

13. The documents identified in Exhibit A reflect the individual

perspectives of agency personnel at various levels of both HHS-OIG and CMS regarding chart reviews and HRAs. The OEI evaluation process depends on agency personnel freely expressing their views and questions regarding topics under evaluation. Agency personnel reasonably expect that the substance of their drafts, discussions, internal thoughts, deliberations, and preliminary analyses regarding OEI evaluations will be kept confidential, and that expectation ensures a free flow of candid discussion and deliberation within the agency. Based on my years of experience within HHS-OIG, and my interactions with individuals throughout the agency and federal government, I believe that the open and candid exchange of ideas and information among agency personnel regarding OEI evaluations as reflected in the documents in Exhibit A would be seriously undermined if agency personnel believed that their internal drafts, discussions, analyses, opinions, views, and recommendations would be subsequently disclosed to outside parties, because agency personnel would feel constrained in their drafting and communications.

Amended Levine Decl., Ex. C (Bisgeier Decl.) ¶¶ 6-13.

As a result of the parties' meet and confer efforts, their deliberative process privilege disputes were narrowed down to 648 documents, which were the subject of a joint discovery letter filed on July 31, 2024. *See* dkt. no. 344 ("Joint Letter"). In the Joint Letter, the United States identified four categories of withheld documents:

(1) 239 documents relating to the drafting and approval of specific proposed or final regulations issued by CMS;

(2) 237 documents relating to drafting and revising the risk adjustment chapter of CMS's Medicare Managed Care Manual;

(3) 118 documents relating to determining what standards HHS-OIG applies when auditing risk adjustment diagnosis codes submitted by MAOs; and

(4) 54 documents relating to the investigation and drafting of reports published by the HHS-OIG Office of Evaluation and Inspections (OEI).

Joint Letter at 3-4 & Ex. A (listing disputed documents). The Court ordered full briefing on the deliberative process privilege disputes and further ordered Kaiser to select ten sample documents from each of the above categories to be lodged with the Court.

The documents that are in dispute are listed in the Amended Levine Declaration, Ex. B. "Exhibit B includes the information that [the United States] presented in its July 1, 2024 privilege log, with some columns added and others omitted." Amended Levine Decl., Ex. B at 1 n. 1.

1  "Specifically, [Kaiser] added the first column, 'Number,' for the Court's ease of reference, and

2  three additional columns 'Decision,' 'Additional Information,' and 'Produced in *Poehling*,' which

3  incorporate information that Plaintiff's counsel provided during the parties' meet-and-confer

4  process." *Id.* "Exhibit B also excludes columns from Plaintiff's July 1, 2024 privilege log

5  because those columns do not contain information relevant to the issues presented in the Motion."

6  *Id.* "Information in the 'Additional Information' column is quoted from Attachment A to [the

7  United States'] June 18, 2024 letter and Attachment A to Plaintiff's September 9, 2024 email." *Id.*

8  n. 2 (citing Amended Levine Decl. Exs. K, L). "This information did not appear in [the United

9  States'] July 1, 2024 privilege log." *Id.* "Information in the 'Decision' column is quoted from

10  Attachment A to Plaintiff's June 18, 2024 letter and Attachment A to [the United States']

11  September 9, 2024 email." *Id.* n. 3. "This information did not appear in Plaintiff's July 1, 2024

12  privilege log." *Id.* "Plaintiff has informed [Kaiser] that documents categorized as 'Not

13  Responsive' are family members of responsive documents." *Id.* (citing Amended Levine Decl.,

14  Ex. I at 1–2). The United States stipulated at the motion hearing, however, that it will produce any

15  of the documents it claims are nonresponsive if they are found not to be deliberative and

16  predecisional.

17      **C.**    **The *Poehling* Decision**

18      In the Motion, Kaiser relies heavily on a decision rejecting the government's assertion of

19  the deliberative process privilege, *United States ex rel. Poehling v. UnitedHealth Grp., Inc*., 2018

20  WL 8459926 (C.D. Cal. Dec. 14, 2018) ("*Poehling*"). That case, like this one, involved

21  allegations that the defendant ("United"), an MA Organization, was knowingly submitting false

22  diagnosis codes to CMS to increase its reimbursement for Medicare Part C services and

23  specifically focused on the defendant's practice of conducting "one way" chart reviews wherein it

24  reviewed patient charts "to locate diagnoses documented in their . . . charts that a provider failed to

25  code" but "did not look the 'other way' and delete codes previously reported by providers that the

26  chart reviewers did not find." 2018 WL 8459926, at *2 (C.D. Cal. Dec. 14, 2018).

27      In discovery, United requested that the government produce documents "broadly relate[d]

28  to United's contention that because CMS's payment model [under Medicare Advantage] use[d]

United States District Court
Northern District of California

unaudited claims data from the traditional [fee for service] Medicare program that contain numerous unsupported codes, the resulting payment amounts that CMS set[ ] for the MA program already account[ed] for the existence of unsupported codes." *Id.* (internal quotations and citation omitted). "Therefore, United [sought] discovery related to what the government knew about errors in United's data and, more importantly, what the government knew about errors in its own data, because the latter [bore] directly on whether United was overpaid." *Id.* (internal quotations and citation omitted). In response to United's discovery requests, the government asserted that over 20,000 documents were protected from disclosure under the deliberative process privilege. *Id.* at *1.

United brought a motion to compel and the court granted the motion, rejecting the government's assertion of the deliberative process privilege. *Id.* The court agreed with United's assertions that the documents United sought were relevant to its defenses, observing that "documents showing that CMS's interpretations of applicable statutes, regulations, guidance documents and contractual requirements mirrored United's own would bear directly on the objective reasonableness of United's interpretations." *Id.* at *11 (internal quotations and citation omitted). It further found that "[e]vidence showing that CMS knew about one-way reviews but took no action would also support the argument that the failure to delete unsupported codes was not material." *Id.* (citation omitted).

The court found that the government's assertion of privilege was procedurally flawed to the extent it listed documents that were never reviewed by the individuals who actually claimed the privilege, who had personally reviewed only a "miniscule fraction" of the withheld documents. *Id.* at *12-13. It also concluded that the government's privilege log "utterly fail[ed] to establish that the specific documents withheld were predecisional" as "[t]he description field merely state[d] that a given 'document' or 'spreadsheet' (for example) 'reflect[ed] internal agency deliberations regarding' any one of a number of subject areas was withheld." *Id.* at *13. The court explained, "a subject area is not a policy, and the Ninth Circuit has long held that for the privilege to apply, the 'agency must identify a specific decision to which the document is predecisional.' " *Id.* (quoting *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997)).

1    Furthermore, the court found, the privilege log was insufficient because it "fail[ed] to indicate

2    whether these documents lost their predecisional status by being adopted as final policies or by

3    being shared with the public." *Id.* at *14 (quoting *Nat'l Res. Def. Council v. U.S. Dep't of Def.*,

4    388 F. Supp. 2d 1086, 1104 (C.D. Cal. 2005)).

5        Next, the court found that the privilege log fell short because it "fail[ed] to show that the

6    documents reflect[ed] 'deliberation[,]'" that is, that they "disclose[ed] the personal opinions or

7    mental processes of decision-makers" *Id.* (internal quotations and citations omitted). The court

8    noted, "[t]he high-level characterization of the subject matter of a document says nothing about its

9    deliberative nature. Furthermore, because the log entries, apart from discussing emails, generally

10   fail to identify either the author or recipient, it is impossible to tell whether a subordinate is

11   forwarding informed options or concerns upward to a superior, which may be a privileged

12   communication, or whether a superior is instructing a subordinate about a decision that was

13   adopted, which is likely not." *Id.*

14       The court in *Poehling* also was not persuaded "that all of the many thousands of

15   documents on the log [were] even fairly characterized as opinions or materials reflecting the

16   author's mental processes, or that any opinions or mental processes, to the extent they are reflected

17   in the document, cannot be separated from unprotected factual information." *Id.* The court noted,

18   "[a]cceptance of the Government's blanket contention that any factual information is 'intertwined'

19   with deliberative materials would seemingly open the door for agencies to withhold all factual data

20   any time they finalize a decision[,]" a result that was "clearly contrary to the purpose of the

21   deliberative process privilege, which is not intended to withhold factual information." *Id.*

22       After finding that the deliberative process privilege was not properly invoked, the court

23   went on to find that United's need for the documents outweighed the government's interest in non-

24   disclosure. *Id.* at *16. The court reasoned that the documents United sought were "an essential

25   component" of its anticipated defense and pointed to the "serious concerns" of the public and the

26   high stakes for United associated with the outcome of the litigation. *Id.* It also found that "the

27   Government [had] not even attempted to explain why the existing protective order (or a modified

28   version) would be insufficient to protect its interests." *Id.* It concluded that amendment of the

privilege log would be futile and ordered production of all of the documents that had been withheld solely on the grounds of the deliberative process privilege. *Id.*

According to Kaiser, 262 of the documents for which the government is claiming deliberative process privilege in this case were produced in *Poehling*. Motion at 12 (citing Amended Levine Decl., Ex. B). Of these, the *Poehling* court specifically ordered production of 24 documents while the remaining 238 documents were produced without the court ordering the government to do so. *Id.* Of the 238 documents, Kaiser contends, 172 documents were documents that were never listed in any privilege log and over which the government never asserted deliberative process privilege in *Poehling*. Motion at 13 (citing Amended Levine Decl., Ex. N (July 1, 2024 email from counsel for the United States to Kaiser's counsel with chart providing information about documents produced in *Poehling*)). The United States represents that the 238 documents that were not explicitly ordered to be produced "were produced subsequent to [the *Poehling* court's] order and fall into the same categories of documents addressed by the court's opinion, including 212 additional documents concerning the MMCM." Opposition at 14 (citing Amended Levine Decl., Ex. B).

### D.  Contentions of the Parties

#### 1.  Motion

In the Motion, Kaiser addresses the 648 documents that were at issue in the Joint Letter, as well as 40 additional documents that appeared for the first time on the United States' July 1, 2024 privilege log. Motion at 2; Amended Levine Decl., Exs. B (list of all documents that are in dispute) ("Privilege Log") & O (July 1, 2024 Privilege Log).[4]  Kaiser asks the Court to compel the government to produce all 688 documents ("the Withheld Documents") on several grounds. First, it contends the United States has failed to make the necessary showing to support its claims that these documents are protected under the deliberative process privilege, citing *In re McKesson*

---

[4]Although the 40 new documents were identified before the parties filed their Joint Letter, it was not until September 9, 2024, that the United States disclosed information as to their responsiveness to Kaiser's requests for production and whether they had already been produced in *Poehling*. Amended Levine Decl. ¶ 22 & Ex. L. Based on that information, Kaiser moves to compel disclosure of these 40 additional documents on the same grounds set forth in the Joint Letter as to the original 648 documents.

United States District Court
Northern District of California

*Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 601 (N.D. Cal. 2009). Motion at 1, 4-12. In particular, it argues that "[a]mong other defects, [the United States] fails to connect the withheld documents to specific agency decisions, describes in only vague and conclusory terms how the documents contributed to a deliberative process, ignores the need to explain whether factual and deliberative material can be separated from each other in each document, and offers only boilerplate assertions of harm that could result from disclosure without explaining why the two-tiered protective order already in place is insufficient to mitigate any such harm of disclosure." *Id.* at 1, 4-12.

Next, Kaiser asserts that the United States has waived the deliberative process privilege as to the 262 documents that it already produced in *Poehling. Id.* at 1, 12-13. It contends "another federal court presiding over another FCA case involving a different MAO's risk-adjustment practices recently came to the same conclusion with respect to Plaintiff's production of documents in *Poehling*, holding that the United States waived its assertion of [the deliberative process privilege] over those previously produced documents." *Id.* at 12 (citing *United States v. Anthem Inc.*, Case No. 20-CV-2593 (ALC) (S.D.N.Y.), Dkt. No. 190 at 11).

Finally, Kaiser argues that the documents should be produced because the deliberative process privilege is a qualified privilege and does not apply where, as here, a party's need for the documents outweighs the interest in non-disclosure of the party who is asserting the privilege. *Id.* at 1, 13-22. In particular, Kaiser contends the withheld documents are highly relevant to the claims and defenses it asserts in this case and cannot be obtained elsewhere. *Id.* at 13-21. Furthermore, Kaiser asserts, many of these documents are more than a decade old and therefore, the likelihood that their disclosure will have a chilling effect on internal deliberations is minimal. *Id.* at 11, 21 (citing Amended Levine Decl., Ex. B, Shapiro-1734 (dated May 2009), Shapiro-1875 (dated September 2010), and Bresette-115 (dated November 2014)). Kaiser also points to the large amount sought in damages, in the range of hundreds of millions of dollars, along with the potential impact of this case on the entire health care industry, in support of its need to obtain the withheld documents. *Id.* at 22.

United States District Court
Northern District of California

### 2. Opposition

In its Opposition, the United States rejects Kaiser's reliance on *Poehling*, distinguishing it on the grounds that in that case the government withheld over 20,000 documents on the basis of the deliberative process privilege whereas here, the dispute relates to "targeted privilege assertions over fewer than 700 documents, which were all reviewed by agency officials who, based on their roles and responsibilities within the agency, linked each document to an agency decision." Opposition at 6. In any event, the United States argues, the declarations it has supplied in support of its privilege assertions are sufficiently detailed to show that the documents are both predecisional and deliberative. *Id.* at 4-12. If the Court finds otherwise, the United States asks that it be given leave to provide supplemental or amended declarations to address any shortcomings. *Id.* at 4 n. 1.

As to Kaiser's assertion that the United States has not offered sufficient details to show that the factual component of the withheld documents could not have been produced without exposing the deliberative process, the United States claims that "the 'function the documents [at issue] play in the decision-making process' shows they should be protected." *Id.* at 13 (citing *California Native Plant Soc'y v. U.S. E.P.A.,* 251 F.R.D. 408, 413 (N.D. Cal. 2008)). In particular, it contends because "the documents relate to final published regulations and reports that are replete with factual material[,]" production of "privileged drafts contain[ing] additional facts that the agency evaluated and decided to exclude . . . would 'expose the deliberative process' of the agency in determining the contents of its final rules and reports." *Id.* (citing *Sea Shepherd Legal v. Nat'l Oceanic & Atmospheric Admin*., 516 F. Supp. 3d 1217, 1233 (W.D. Wash. 2021)).

The United States rejects Kaiser's assertion that it waived the deliberative process privilege as to the documents it produced in *Poehling*. *Id.* at 14. First, it asserts that prior disclosure by an agency does not give rise to waiver of the deliberative process privilege in the Ninth Circuit. *Id.* (citing *Young v. City & Cty. of Honolulu*, 2008 WL 2676365, at *5 (D. Haw. July 8, 2008) (citing *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1091 (9th Cir. 2002))). Furthermore, it argues, 24 of the documents at issue were produced under a court order and the remainder fell into the same category of documents addressed by the *Poehling* court and therefore, the privilege was not

18

1    waived as to any of these documents.  *Id.*

2        The United States also rejects Kaiser's argument that Kaiser's need for the Withheld

3    Documents outweighs the interest of the United States in protecting the documents from

4    disclosure. *Id.* at 15-22.

5            **3.  Reply**

6        In its Reply, Kaiser asserts that the United States continues to offer only boilerplate

7    reasons for asserting the deliberative process privilege and that those reasons are not sufficient.

8    Reply at 1-9.   Kaiser also argues that the United States should not be given the opportunity to

9    amend its declarations as it has had ample time to amend its declarations since this privilege

10   dispute arose, almost a year ago.  *Id.* at 9-10.

11       On the issue of waiver, Kaiser rejects the United States' reliance on *Young v. City &*

12   *County of Honolulu*, 2008 WL 2676365, at *5 (D. Haw. July 8, 2008) for the proposition that the

13   deliberative process privilege is not waived by disclosure.  *Id.* Kaiser argues that the court in that

14   case did not decide the question of waiver, instead focusing on the past disclosure in that case to

15   "determine whether disclosure would 'expose the decision-making process any more than it has

16   already been disclosed.'" *Id.* (quoting *Young*, 2008 WL 2676365, at *5).  The court found that the

17   documents at issue had not already been produced but had only been referenced by a city council

18   member at a public meeting and therefore, compelling disclosure would have exposed additional

19   privileged information.  *Id.* In contrast, Kaiser asserts, the documents at issue here were already

20   produced in their entirety in *Poehling*.  *Id.* at 10-11.

21       Finally, Kaiser reiterates its argument that its need for the documents outweighs the

22   government's interest in nondisclosure.  *Id.*  at 11-15.

23   **III.    ANALYSIS**

24       **A.    Legal Standards**

25       "The deliberative process privilege permits the government to withhold documents that

26   'reflect[ ] advisory opinions, recommendations and deliberations comprising part of a process by

27   which governmental decisions and polices are formulated.'" *Hongsermeier v. Comm'r*, 621 F.3d

28   890, 904 (9th Cir. 2010) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)

United States District Court
Northern District of California

(quotations omitted)). The underlying premise of the privilege is that agency decision-making would be impaired if discussions within the agency were subject to public review, thereby discouraging "frank discussion of legal or policy matters." *NLRB v. Sears, Roebuck & Co*., 421 U.S. at 150.

A document must be both "predecisional" and "deliberative" to fall under the deliberative process privilege. *Assembly of State of California v. United States Department of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992). "[A] document is predecisional if it was ' "prepared in order to assist an agency decisionmaker in arriving at his decision," ' and deliberative if its release would '"expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." ' " *Hongsermeier*, 621 F.3d at 904 (quoting *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) (quoting *Assembly of State of California v. U.S. Dep't of Commerce*, 968 F.2d at 920)).

To satisfy the "predecisional" requirement, an "agency must identify a specific decision to which the document is predecisional[;]" it is not sufficient to cite "a continuing process of agency self-examination" to show that a document is predecisional. *Maricopa Audubon Soc. v. U.S. Forest Serv*., 108 F.3d 1089, 1094 (9th Cir. 1997). This means the Withheld Documents must have been "prepared in order to assist an agency decisionmaker" in arriving at their decision. *Id.* (quoting *Assembly of the State of California*, 968 F.2d at 920 (internal quotation and citation omitted)). A document may be predecisional, however, even if the circumstances obscure the actual decision that was made. *Id.* For example, in *Maricopa Audubon Society*, the court found that the deliberative process privilege was properly claimed even though "the actual decision that was made" was unclear. *Id.* ("The facts that the Regional Forester took early retirement and that his deputy left his position to work in a different region obscure the actual decision that Thomas reached: these developments may have been the result of action on his part, may have obviated action on his part, or may represent some combination of the two.").

In order for a document to be deliberative, "it should disclose the personal opinions or 'mental processes of decision-makers.' " *California Native Plant Soc'y v. U.S. E.P.A.*, 251 F.R.D.

at 413 (citing *Carter v. U.S. Dep't of Com.*, 307 F.3d at 1090; *Coastal States*, 617 F.2d at 866, 868-69). "A predecisional document is a part of the 'deliberative process,' if 'the disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Carter,* 307 F.3d at 1089 (quoting *Assembly of State of California*, 968 F.2d at 920 (internal citations omitted)).

The deliberative process privilege generally does not protect "facts and evidence." *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citing *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87 (1973)). However, the privilege may cover factual material that "is so interwoven with the deliberative material that it is not severable." *United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000). Furthermore, the fact/opinion distinction should not be applied mechanically. *Assembly of State of California*, 968 F.2d at 921–922.  Rather, courts in the Ninth Circuit "look at what function the documents play in the decision-making process, and whether their disclosure would threaten the deliberative process." *California Native Plant Soc'y v. U.S. E.P.A.*, 251 F.R.D. at 413 (citing *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988)). Thus, "in order to protect a document as 'deliberative' under the deliberative process privilege, an agency must show enough detail so that the court can determine 'how each document fits into the deliberative process.'" *Id.* (quoting *Parke, Davis & Co. v. Califano*, 623 F.2d 1, 6 (6th Cir. 1980)).

Generally, the deliberative process privilege may be invoked only by the agency head after personally reviewing the documents for which the privilege is asserted. See *United States v. Rozet*, 183 F.R.D. 662, 665 (N.D. Cal. 1998) (citing to *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 516–517 (D.Del.1980)). As the court explained in *Coastal Corp.*, "[t]hat requirement was designed to deter governmental units from too freely claiming a privilege that is not to be lightly invoked . . . by assuring that someone in a position of high authority could examine the materials involved from a vantage point involving both expertise and an overview-type perspective." *Id*. at 517. The requirement that the privilege be invoked by the agency head need not be applied absolutely literally. *Id*. at 517–518. However, the duty to invoke the privilege cannot be delegated so far

down the chain of command that purposes of the requirement are undermined. *Id*.

The deliberative process privilege is not absolute. *FTC v. Warner Communications, Inc*., 742 F.2d 1156, 1161 (9th Cir.1984). Even if the deliberative process privilege applies, a litigant may obtain discovery of protected material if the need for the documents outweighs the governmental interest in keeping the decision making process confidential. *Id*.

Finally, the privilege "must be strictly confined within the narrowest possible limits consistent with the logic of its principles." *In re McKesson Governmental Entities Average Wholesale Price Litig*., 264 F.R.D. 595, 601 (N.D. Cal. 2009) (quoting *K.L. v. Edgar*, 964 F.Supp. 1206, 1208 (N.D.Ill.1997) (citations omitted); and citing *United States v. Rozet*, 183 F.R.D. 662, 665 (N.D. Cal. 1998) (stating that deliberative privilege is a "narrow privilege" which should not be "indiscriminately invoked")).

### B. Whether the United States Has Adequately Supported its Claims that the Documents are Predecisional

In the Motion, Kaiser points to three distinct examples in support of its assertion that the United States has not provided sufficient information to show that the Withheld Documents are predecisional: 1) the documents for which Bresette claims privilege on the basis that they reflect "predecisional deliberations within the Office of Inspector General (HHS/OIG) regarding HHS-OIG MAO audit standards" ("Bresette documents"); 2) the documents for which Shapiro claims privilege on the basis that they reflect "predecisional deliberations within CMS regarding [the] Medicare Managed Care Manual[,]" described as "Category 2" in the Shapiro Declaration ("Shapiro Category 2 documents"); and 3)  one document for which Bisgaier claimed privilege (Bisgaier-44) that lists a document date that is later than the publication date of the final report identified as the relevant decision.  In addition, Kaiser argues that the United States has failed to provide sufficient information to show that any of the Withheld Documents are predecisional because none of the declarations address whether the documents "lost their predecisional status by being adopted as final policies or by being shared with the public."  Motion at 6 (citing *Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 616 (N.D. Cal. 2020); *Poehling*, 2018 WL 8459926, at *14).

United States District Court
Northern District of California

### 1.  Bresette Documents

Kaiser contends the government's privilege claim is insufficient as to the Bresette documents because the "final decision" Bresette identifies is a website that contains "*thousands* of reports published from 1991 to 2024."  Motion at 5 (citing Amended Levine Decl., Ex. F (Amended Bresette Decl.) ¶ 10 (citing https://oig.hhs.gov/reports-and-publications/oas/cms.asp) (emphasis in Motion).  The United States notes in its Opposition that the website offers a filter feature that allows for the identification of reports related to Medicare Advantage audits (of which there are, apparently "just 44, most of which identify in their title that they are a 'Medicare Advantage Compliance Audit' of 'Diagnosis Codes.' ")  Opposition at 6 n. 2.  In its Reply, however, Kaiser argues that the ability to filter the reports does not cure the problem because it is still "left to sift through 44 separate reports without any link between specific withheld documents and specific reports." Reply at 3.  Kaiser also points out that "Bresette himself . . . never identified those 44 reports as the relevant decisions at issue[.]"  *Id.* (citing Amended Bresette Decl. ¶ 13).

Although the Court has not found – and the parties have not cited to – any authority that sheds significant light on the degree of detail the government is required to provide in identifying a "specific decision" to support its claim that a document is predecisional, it is well-established that "boilerplate" claims of privilege are insufficient.  Therefore, in identifying a "specific decision" the government must provide information that is sufficiently detailed to allow the requesting party, as well as the Court, to draw a reasonable inference that the document is, in fact, predecisional.  Furthermore, because the privilege is a qualified privilege, the government must provide sufficient details to ensure that the party seeking disclosure is given a meaningful opportunity to address whether the interest of the United States in non-disclosure is outweighed by the requesting party's need for disclosure of the document.  *See California Native Plant Soc'y v. U.S. E.P.A,* 251 F.R.D. 408, 415 (N.D. Cal. 2008) (declining to consider whether the plaintiff's need for the withheld documents outweighed the government's interest in nondisclosure because the information provided in the government's privilege log fell short and deferring consideration of that question until after the government agencies had "submitted more detailed privilege logs," when the plaintiffs and the Court would "be better able to assess whether some or all documents,

even if otherwise privileged, should nonetheless be disclosed.").

The Court finds no authority that suggests that decisions about how to apply each individual standard that is addressed in the Bresette Documents must be identified as a separate "decision" on the privilege log.  Nor would such a requirement seem to be necessary to support a finding that a document is predecisional.  So long as each document contains deliberations about how to apply one or more standards in the course of conducting *a particular audit* or preparing *a particular audit report*, this would appear to be sufficient to identify a "specific decision" for purposes of claiming the deliberative process privilege.  Doing so would, at least, narrow the general topic of the deliberations to the specific subject matter addressed in the report, thus allowing the requesting party to make a determination about the potential relevance of the withheld document.  That said, the Amended Bresette Declaration falls far short of that requirement.  Instead, it refers generally to thousands of audit reports, many of which apparently have nothing to do with MA risk adjustment audits.  And although filters can be used to significantly reduce this number, Bresette himself does not identify any of the 44 reports the United States has now pointed to in support of its claim that the Bresette documents are predecisional.   Furthermore, the subject matter of the particular audit report to which each of these withheld documents relates is likely to provide important information as to the relevance of that particular document and Kaiser's need for its disclosure relative to the government's interest in non-disclosure.

Accordingly, the Court concludes the United States has not sufficiently supported its assertion of the deliberative process privilege as to the documents attached to the Amended Bresette Declaration because it has not identified the specific audit report as to which each of the documents is predecisional.

### 2.  Shapiro Category 2 Documents

Kaiser contends the Shapiro Declaration does not supply sufficient information to establish that the Shapiro Category 2 documents are predecisional because the description of the relevant decision is not specific enough.  Motion at 5-6.  In particular, Kaiser argues that it is not enough to assert that these documents are predecisional because they "predate the publication of Chapter 7 of

24

the Medicare Managed Care Manual" given that that document is "a voluminous document that CMS regularly revises, and Chapter 7 itself is 75 pages in length." *Id.* (citing Amended Levine Decl., Ex. D (Shapiro Decl.) ¶ 7).   The United States counters that the Shapiro Declaration "makes clear that the agency's deliberative process related to the 'revision' of Chapter 7 *as a whole*, including the agency's response to public comments the agency solicited." Opposition at 6 (citing Shapiro Decl. ¶¶ 19–23) (emphasis added).   The Court agrees with the United States.

The Court finds that the United States is not required to identify the specific provision of Chapter 7 to which each withheld document relates to support its claim that the document is predecisional because the Shapiro Declaration indicates that these documents related to deliberations of Chapter 7 as a whole.  Indeed, many of these documents are draft versions of the entire chapter.  *See id.* ¶ 20.  Based on the Court's review of the sample documents (Dyal Decl., Ex. B), it also is not clear that the "specific decisions" that were the subject of deliberation in the Manual Revision Communications and Manual Comment Spreadsheets, *see id.* ¶¶ 19, 21, could be broken down to such a granular, provision-by-provision level as Kaiser suggests.

Accordingly, the Court concludes the United States has sufficiently supported its assertion that the Shapiro Category 2 documents are predecisional.

### 3.  Bisgaier-44

In the Motion, Kaiser concedes that the Bisgaier Declaration links the withheld documents to specific decisions but points to one document that appeared in some of the government's privilege logs to have been created *after* the decision that it was claimed to have predated.  Motion at 6.  In particular, the privilege logs produced on January 31, 2024 and July 1, 2024 listed a document date of August 10, 2021 for Bisgaier-44 while the published report listed as the final decision, OEI-03-17-00471, was issued in September of 2020.  *See* Amended Levine Decl., Exs. C (Bisgaier Decl.) at 3 n. 1, M (January 31, 2024 privilege log) and O (July 1, 2024 privilege log).  However, the log attached as Exhibit B to the Amended Levine Declaration, listing all of the documents in dispute, makes clear that Bisgaier-44 is an attachment to an email and that while the date of the email was August 10, 2021, the attachment was created on April 7, 2020 – before the final report was issued.  This information appears to have been provided to Kaiser in a chart that

the United States sent to Kaiser's counsel on June 18, 2024.  *See* Amended Levine Decl., Ex. K. The United States also explains in its Opposition that while the metadata for the document reflects the later date, the content of the document reflects that it was created before the final report. Opposition at 7.  Although  Kaiser contends the late explanation offered by the United States raises questions about the accuracy of the information it has supplied, it does not appear to challenge the more recently supplied information indicating that the document was created before the decision identified by Bisgaier. Therefore, Kaiser's assertion that this document may not be predecisional appears to be moot.

### 4.    Failure to Indicate Whether Document Was Adopted by the Agency or Publicly Disclosed

Kaiser contends the United States has an "affirmative obligation" to disclose whether the Withheld Documents were ever published or used publicly and because the declarations it has supplied do not address that question, it has failed to show that any of the documents at issue were predecisional.  The United States, on the other hand, contends it is apparent from the declarations that this requirement is met, arguing that "[e]ach declaration points Kaiser to the final rules and publications that were 'adopted' by the agency and 'shared' with the public" and "also make[s] clear that the deliberative drafts and communications they identify are distinct from the agency's published rules and reports."  Opposition at 7 (citing Agency Declarations).   The Court finds the position of the United States to be more persuasive.

"A court may . . . reject a claim of deliberative process privilege where the withholding party 'fails to indicate whether these documents lost their predecisional status by being adopted as final policies or by being shared with the public.' "  *Poehling,* 2018 WL 8459926, at *14 (quoting *Nat'l Res. Defense Council*, 388 F. Supp. 2d at 1103 (citing *Arthur Anderson & Co. v. I.R.S.,* 679 F.2d 254, 258 (D.C. Cir. 1982))).  Thus, in *Poehling*, the court found that the government's assertion of privilege was defective because "[i]t [was] unclear whether the 'predecisional' nature of these documents, if it ever existed, was lost by subsequent government conduct."  *Poehling*., 2018 WL 8459926, at *14. In that case, however, the government asserted privilege over approximately 20,000 documents with only boilerplate and high-level descriptions of the

documents, many of which had never been reviewed by the agency declarants. *See id.*  In contrast, the agency declarants in this case have reviewed all of the withheld documents and they have provided more detailed descriptions of the documents and the deliberative process to which they relate than was provided in *Poehling*.  While the declarations do not expressly address whether the documents were ever adopted or disclosed to the public, the declarations support an inference, at least, that they were not. The Court also notes that in its Reply, Kaiser did not challenge the government's position on this point; nor did it identify any specific documents as to which is has reason to believe the document was adopted or disclosed.  Therefore, the Court declines to order wholesale disclosure of the documents on the government's privilege log on this basis.[5]

### C.    Whether the United States Has Adequately Supported its Claims that the Documents are Deliberative

Kaiser contends all three declarations offered by the United States are too conclusory to show that the Withheld Documents are deliberative.  Motion at 7.  According to Kaiser, the declarations need to provide "details on how the final agency decision process works, how that decision was reached, the positions of agency personnel who worked on the decision, and how the proposed decision moved up the chain of command within an agency to become a final decision." *Id.*  (citing *Scalia*, 336 F.R.D. at 613-14; *Poehling*, 2018 WL 8459926, at *14). It argues that the declarations instead provide only "high-level characterization[s] of the subject matter of [the] document[s] [and] say[ ] nothing about [their] deliberative nature." *Id.* (quoting *Poehling*, 2018 WL 8459926, at *14).

Kaiser challenges the sufficiency of the government's declarations on the following specific grounds:

1. In the Amended Bresette Declaration, Bresette describes one group of documents for which privilege is claimed as "show[ing] responses by CMS to questions about how it applies 'standards and processes' in Risk Adjustment Data Validation ('RADV') audits, and another

---

[5] The Court notes, however, that this issue presents a close call.  Going forward, the United States should support any further assertion of the deliberative process privilege with a declaration that makes clear that the document has not been adopted or disclosed to the public.

United States District Court
Northern District of California

group purportedly show[ing] internal communications about how the agency's responses '*might*
impact those standards and processes' " but does not identify the specific standards and processes
and also "does not explain the role of these communications in deciding any particular 'standard'
or 'process.' "   Motion at 7 (citing Amended Levine Decl., Ex. F (Amended Bresette Decl.) ¶ 12
(emphasis added in Motion)).

       2. The Shapiro Declaration "merely describes the various types of documents at issue—
'briefing document,' 'drafts of Proposed Rule,' 'communications regarding Proposed Rule,'
'Manual comment spreadsheet'—and then adds boilerplate language asserting that the documents
are deliberative because 'they contain or embody the internal thoughts, opinions, and
recommendations of CMS personnel.' " Motion at 7-8 (citing Amended Levine Decl., Ex. D
(Shapiro Decl.) ¶¶ 13–15, 19–21, 28).  According to Kaiser, "[t]hese conclusory statements do not
explain how each individual document relates to an actual deliberative process." *Id.* at 8. As an
example, Kaiser notes that "[t]he declaration does not explain . . . how a decision was reached or
who assisted in making that decision, including how information was elevated within the agency
to reach a final decision." *Id.* (citing *Scalia*, 336 F.R.D. at 613–14).

       3.  The Bisgaier Declaration "categorizes documents as 'questionnaires,' 'questions,' and
'draft [] reports' and contends that the withheld documents are deliberative because they reflect
'the internal thoughts, opinions, and recommendations of CMS and HHS-OIG personnel regarding
HHS-OIG OEI's evaluation of chart reviews and HRAs and how the agency should address
potential issues arising from MA plans' use of these tools" but "does not explain how sharing
these 'thoughts, opinions, and recommendations' assisted HHS-OIG OEI in its decision-making
process when releasing the reports" listed as the final decisions as to which the documents are
deliberative. *Id.* at 8 (citing Amended Levine Decl., Ex. C (Bisgaier Decl.) ¶¶ 11–12).  Kaiser
suggests that "the documents may not be deliberative at all and simply reflect dictates from CMS
or the agency's explanation of existing policies." *Id.*

       As set forth below, the Court finds that as to some categories of documents, the
descriptions provided in the supporting declarations are sufficient to show that they are
deliberative but that as to many others, the descriptions provided in the declarations are

United States District Court
Northern District of California

28

insufficient to meet this requirement.

### 1. Bresette Documents

As discussed above, the United States failed to establish that the documents attached to Bresette's declaration are predecisional. The Court also finds that the description of the documents offered by Bresette is insufficient to show that the documents are deliberative.

The problem with Bresette's claim of privilege is that while the government contends these "documents are deliberative because they were " 'prepared to help [HHS-OIG] formulate its position' regarding the standards and processes it would apply when conducting the audits in question[,]" Bresette's declaration makes clear that all of these communications – whether they are between OAS and CMS or internal to OAS – are aimed at *implementing* HHS-OIG's established policy of emulating CMS's approach to RADV audits by applying CMS's rules and standards, which also appear to be established. *See* Amended Levine Decl., Ex. F (Amended Bresette Decl.) ¶ 11 ("In conducting these audits, OAS aims to apply standards and processes consistent with the standards and processes CMS uses during its risk adjustment data validation ('RADV') audits"). There is nothing in Bresette's declaration suggesting that HHS-OIG was considering whether to deviate from CMS's approach in these communications or that any decision was made on that question.

Generally, " 'straightforward explanations of agency regulations in specific factual situations' do not qualify for the deliberative process privilege." *Safeway, Inc. v. I.R.S.*, No. C 05-3182 SBA, 2006 WL 3041079, at *9 (N.D. Cal. Oct. 24, 2006) (quoting *Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)). Thus, in *Safeway*, the court found that notes and email messages that were described as reflecting "deliberations by IRS employees, including counsel employees, with respect to IRS efforts to properly assess and collect taxes owed by [the] plaintiff" were not deliberative and could not be withheld under the deliberative process privilege. On the other hand, courts have found that communications reflecting application of agency rules and regulations in situations that are not "run-of-the-mill" may be "closer to a process by which governmental decisions and policies are formulated" and therefore may be deliberative. *See Microsoft Corporation v. Internal Revenue* Service, No. C 15-1605 RSM, 2023

1   WL 255831 (W.D. Wash. Jan. 18, 2023).

2          Here, the generic description offered in the Bresette declaration indicates these documents

3   are not deliberative because they are simply aimed at implementing (and duplicating) CMS's

4   policies and practices with respect to audits. The Court's review of the sample documents in this

5   category supports this conclusion.  Therefore, the Court finds that the United States has not

6   provided sufficient information to establish that the Bresette Documents are deliberative.

7                    **2.  Shapiro Documents**

8          The core of Kaiser's argument is that Shapiro does not provide sufficient information to

9   show how the documents in any of the three categories of documents Shapiro identifies fit into the

10  decision-making process, simply describing the type of document and then adding boilerplate

11  language stating that the document is deliberative. But Kaiser ignores the sections of the Shapiro

12  Declaration that describe the relevant decision making process for each category of documents.

13  *See* Amended Levine Decl., Ex. D (Shapiro Decl.) ¶¶ 10-12 (decision making process for

14  Category 1 documents), ¶¶ 17-18 (decision making process for Category 2 documents), ¶ 24

15  (stating that decision making process for Category 3 was the same as for Category 2 documents).

16  Such descriptions have been found sufficient to show that certain types of documents are

17  deliberative.  *See Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 614 (N.D. Cal.

18  2020) (finding that privilege log description in combination with supporting declarations

19  describing decision making process sufficiently established that withheld documents contained

20  deliberative material).  Here, when the descriptions of the documents listed in the privilege log and

21  the Shapiro Declaration are considered in combination with the descriptions of the decision

22  making process in the Shapiro Declaration, there is sufficient information to conclude that these

23  documents are deliberative in nature and that their disclosure would undermine the "open and

24  candid exchange of ideas" in which the agency engages in regard to agency rulemaking and the

25  development of agency publications.  *See* Amended Levine Decl., Ex. D (Shapiro Decl.) ¶¶ 16, 22,

26  29.  The Court addresses each of the subcategories of the Shapiro documents below.

27          "Briefing Documents" (Category 1): Shapiro describes 18 documents in Category 1 as

28  "briefing documents" and states that they "explained the policy changes MPPG was proposing to

United States District Court
Northern District of California

make through the Proposed Rule and the reasons why they believed those changes should be approved."  Amended Levine Decl., Ex. D (Shapiro Decl.) ¶ 13. All 18 documents remain in dispute.  Kaiser selected two of these documents – Shapiro-1 and Shapiro-1516 for *in camera* review. *See* Dyal Decl. ¶ 5 & Ex. A.   The privilege log lists the authors of all of these documents as either Cheri Rice or Michael Treitel.  It does not provide any information about the intended audience.  Nonetheless, the Court finds that Shapiro's description of these documents is sufficient to show that the documents are deliberative because she also discusses the changes MPPG was proposing in the Proposed Rule as well as the role the MPPG played in the decision-making process.  *See* Amended Levine Decl., Ex. D (Shapiro Decl.) ¶¶ 10-12.  Although the United States has not identified the specific recipients of the Briefing Documents, the Court finds that they logically fall within the scope of the deliberations described by Shapiro.  The Court's review of the sample documents supports that conclusion.

"communication regarding Proposed Rule" (Category 1): Shapiro describes 90 documents in Category 1 as "communication regarding Proposed Rule" and states that they are "e-mails and other communications regarding the Proposed Rule" that "provide feedback on drafts of the Proposed Rule and discuss potential changes to its contents." Amended Levine Decl., Ex. D (Shapiro Decl.) ¶ 15.  According to Shapiro, the documents are deliberative because "they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the Proposed Rule."  *Id.* Kaiser selected for *in camera* review the following documents with this description: Shapiro-862, Shapiro-1292, Shapiro-1476, and Shapiro-1634. *See* Dyal Decl. ¶ 5 & Ex. A. The Court finds that the descriptions in the Privilege Log and the Shapiro Declaration provide a sufficient basis for the Court to determine whether they are deliberative.  As discussed above, Shapiro provides some explanation of the decision-making process regarding the adoption of the Proposed Rule and the Court finds this information, along with the information contained in the government's privilege log to be sufficient.

"Manual revision communication" (Category 2): Shapiro describes 59 documents in Category 2 as "Manual revision communication" and states in her declaration that they are "e-mail

communications in which agency personnel discussed potential changes to the Manual's risk adjustment chapter" that are "deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents of the Manual's risk adjustment chapter." Kaiser selected for *in camera* review the following documents in this category: Shapiro-1686 (Dyal Decl., Ex. B.4), Shapiro-1734 (Dyal Decl. Ex. B.5), Shapiro-1791; (Dyal Decl. Ex. B.6), Shapiro-1806 (Dyal Decl. Ex. B.7).

The Court concludes that the description of these documents is sufficient to establish that they are deliberative. In particular, Shapiro provided a description of the decision making process relating to revision of the Medicare Managed Care Manual that shows how these documents fit into the decision making process and supports an inference that they are deliberative. Amended Levine Decl., Ex. D ¶¶ 17-18. Moreover, the documents that the Court reviewed *in camera*, listed above, support the government's assertion that they are deliberative.

"Manual comment spreadsheet (Category 2)": Shapiro describes 16 documents as "Manual comment spreadsheet." She explains that these "are spreadsheets containing assessments by agency personnel of the public comments regarding the Manual's risk adjustment chapter, including whether comments should result in any changes to the chapter's final contents." Amended Levine Decl., Ex. D (Shapiro Decl.) ¶ 21. Shapiro also provided a description of the decision making process relating to revision of the Medicare Managed Care Manual, as discussed above. Amended Levine Decl., Ex. D ¶¶ 17-18. Kaiser selected the following documents for *in camera* review in this category of documents: Shapiro-1657 (Dyal Decl., Ex. B.2), Shapiro-1671 (Dyal Decl., Ex. B.3), and Shapiro-1810 (Dyal Decl., Ex. B.8).

The Court concludes that the description provided in the Shapiro Declaration is sufficient to show that these documents contain deliberative material. Nonetheless, the Court's review of the sample documents in this category indicates that the spreadsheets contain public comments that are easily segregable from the deliberative content of these documents. Therefore, the Court orders the United States to review the documents in this category and produce in redacted format any spreadsheet that contains public comments in addition to internal deliberations that have not

already been produced in redacted form.

"Drafts of Proposed Rule" (Category 1), "drafts of Manual chapter" (Category 2)"drafts of the Risk Adjustment Data Validation Final Rule" (Category 3): The Shapiro Declaration lists three types of drafts documents. Kaiser challenges the government's assertion of the deliberative process privilege over these documents, arguing that " 'merely designating a document a draft' is insufficient without 'articulat[ing] how disclosure would reveal a deliberative process.' " Motion at 8 (quoting *Ecological Rts. Found. v. U.S. EPA*, 607 F. Supp. 3d 979, 992–93 (N.D. Cal. 2022) (internal quotation omitted)). Instead, it contends, the documents must be "evaluated in the context of the administrative process which generated them." *Id.* (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 269 (2021)). Here, however, the United States has not simply relied on the "draft" label. Rather, it has described how these drafts fit into the decision making process. *See* Shapiro Decl. ¶¶ 10-11, 14 (draft of Proposed Rule); ¶¶ 17-18, 20 (draft of Manual chapter); ¶ 24 (drafts of Risk Adjustment Data Validation Final Rule). The Court finds that the information supplied by the United States is sufficient to establish that these documents are deliberative.

Shapiro-1881, Shapiro-1882 (Category 3): Shapiro describes these documents as "communications created as part of the deliberative process leading to the publication of the RADV Rule." Amended Levine Decl., Ex. D (Shapiro Decl.) ¶ 25. These documents were also selected for *in camera* review. The privilege log lists only the author of these communications and does not identify the recipients. Amended Levine Decl., Ex. B (Privilege Log) at 83. Nonetheless, these documents appear to logically fall within the scope of the deliberations related to the issues of the RADV final rule, described in the Shapiro Declaration. The Court therefore concludes that these documents are deliberative.

### 3. Bisgaier Documents

Kaiser argues that the Bisgaier Declaration does not establish that the Withheld Documents are deliberative because the description of these documents is too high-level and does not show how they fit into the deliberative process. Motion at 8. It suggests that the documents Bisgaier claims are deliberative "may not be deliberative at all and simply reflect dictates from CMS or the

United States District Court
Northern District of California

agency's explanation of existing policies."   The Court agrees that the description the United States has offered is inadequate to establish that the Bisgaier Documents are deliberative.

In her declaration, Bisgaier describes how chart reviews and health risk assessments (HRAs) are used by MA organization to add diagnosis codes, sometimes improperly, in connection with seeking risk adjustment payments from CMS, and explains that the Office of Evaluation and Inspects (OEI) (within HHS-OIG) has "published its findings and recommendations relating to MA plans' use of chart reviews and HRAs in a series of reports released between December 2019 and September 2021.  Amended Levine Decl., Ex. C (Bisgaier Decl.) ¶¶ 7-10.  The documents as to which Bisgaier claims deliberative process privilege relate to the preparation of these reports and are described as "CMS questionnaires", "CMS follow-up questions", "draft OEI reports", and "CMS comments."  *Id.*

According to Bisgaier, "documents identified as 'CMS questionnaires' contain OEI questions to CMS regarding MAOs' use of chart reviews and HRAs, the responses to which contributed to the contents of OEI's final reports."  *Id.*  "Documents identified as 'CMS follow-up questions' reflect additional questions OEI posed to CMS regarding CMS's responses to OEI's questionnaires."  *Id.*  Documents identified as 'draft OEI reports' are drafts or draft summaries of the reports referenced above, in which OEI shared with CMS its preliminary findings and recommendations relating to MA plans' use of chart reviews and HRAs."  *Id.*  "Documents identified as 'CMS comments' contain comments from CMS regarding the design of OEI's evaluations or draft versions of OEI's reports and their findings."  *Id.*

Kaiser selected for *in camera* review the following documents: Bisgaier-3 (CMS comments regarding OEI evaluation design), Dyal Decl., Ex. D.1; Bisgaier-6 (CMS questionnaire re: OEI-03-17-00470), Dyal Decl., Ex. D.2; Bisgaier-11 (CMS follow-up questions regarding OEI-03-17-00470), Dyal Decl., Ex. D.3; Bisgaier-17 (CMS follow-up questions regarding OEI-03-17-00470), Dyal Decl., Ex. D.4; Bisgaier-19 (CMS follow-up questions on OEI-03-17-00470), Dyal Decl., Ex. D.5;  Bisgaier-37 (CMS questionnaire re: OEI-03-17-00471), Dyal Decl., Ex. D.6; Bisgaier-44 (CMS comments regarding draft of OEI-03-17-00471), Dyal Decl., Ex. D.7; Bisgaier-45 (CMS comments regarding draft of OEI-03-17-00471), Dyal Decl., Ex. D.8; Bisgaier-47 (Draft

of OEI-03-17-00474), Dyal Decl., Ex. D.9; and Bisgaier-50 (CMS questionnaire re: OEI-03-17-00470), Dyal Decl., Ex. D.10.

The Court's concern as to these documents is that, like the ones that Bresette claims are subject to deliberative process privilege, they appear to relate to OAS's efforts to ensure that their reports accurately reflect CMS rules and practices.  There is no suggestion in the Bisgaier Declaration that OAS was considering *whether* to apply CMS's approach in preparing its reports; rather, the back and forth between OAS and CMS employees were aimed at ensuring that the reports achieved that objective.  Even the draft reports appear to have been supplied to CMS to ensure that they accurately reflected CMS rules and standards.  Thus, these communications appear to be analogous to the ones in the *Safeway* case, discussed above, where IRS employees engaged in discussion (including expressing opinions) about how IRS rules should be applied to the audit of the plaintiff in that case.

The Court's review of the sample documents supports this conclusion. And though the investigative reports in this case might involve application of established standards that is not "run-of-the-mill", the United States has not provided a sufficient record to establish that that is the case.  *See Microsoft Corporation v. Internal Revenue Service*, No. C 15-1605 RSM, 2023 WL 255831 (W.D. Wa. Jan. 18, 2023). Therefore, the Court concludes that the United States has failed to show that the Bisgaier Documents are deliberative.

### D. Whether the United States Has Adequately Supported its Claims that the Factual Material in the Documents is Protected by the Deliberative Process Privilege

Kaiser questions whether the United States has been diligent in producing the factual portions of documents that are segregable and do not disclose internal deliberations, noting that the United States "only recently produced its first set of redacted documents over which it asserts [the deliberative process privilege], even though Defendant initially raised Plaintiff's lack of any redacted documents related to this privilege assertion over six months ago, . . . demonstrating Plaintiff's lack of diligence in redacting and producing all documents containing factual information." Motion at 10 n. 6 (citing Amended Levine Decl., Ex. G (Defs.' February 16, 2024 letter) at 7). Kaiser also points out that the declarants did not address this question and that the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  United States' assurances that all factual material that has not been produced is too intertwined

2  with deliberative material to produce has been conveyed only in communications from counsel.

3  *Id.* The United States contends that, "[a]s explained in the agency's declarations, the documents

4  relate to final published regulations and reports . . . are replete with factual material" and that their

5  disclosure "would reveal the agency's internal deliberations." Opposition at 13. The Court finds

6  the position of the United States to be persuasive.

7  First, the nature of the documents described in the agency declarations supports the

8  conclusion that any factual content is intertwined with deliberative material such that redaction is

9  not feasible. Second, the Court has reviewed 40 sample documents, covering the four general

10  topics addressed by the Withheld Documents, and finds that none of them contains easily

11  segregable factual material such that a redacted version should have been produced. Therefore,

12  the Court declines to order production of any document on this basis.

13  **E.  Waiver**

14  Kaiser contends the United States has waived the deliberative process privilege as to all of

15  the documents it produced in *Poehling,* citing this Court's finding of waiver of the deliberative

16  process privilege based on prior disclosure in *In re McKesson*. Motion at 12 (citing 264 F.R.D. at

17  598–600). Kaiser points out that a district court in the Southern District of New York recently

18  ordered the United States to produce the documents that the government produced in *Poehling* in a

19  similar FCA case in which the United States claimed deliberative process privilege as to those

20  same documents. *Id.* (citing *United States v. Anthem Inc*., Case No. 20-CV-2593 (ALC)

21  (S.D.N.Y.), Dkt. No. 190).

22  The United States counters that " 'the Ninth Circuit does not consider prior disclosure of

23  information to constitute a waiver of the deliberative process privilege.'" Opposition at 14

24  (quoting *Young v. City & Cty. of Honolulu*, 2008 WL 2676365, at *5 (citing *Carter v. U.S. Dep't

25  of Commerce*, 307 F.3d 1084, 1091 (9th Cir. 2002))). Furthermore, it asserts, under traditional

26  waiver law, privilege is not lost when a document is produced pursuant to a court order rather than

27  voluntarily and all of the documents produced in *Poehling* that remain in dispute were either

28  expressly ordered disclosed or were required to be disclosed under the court's order because they

fell into the same categories as the documents specifically identified by the *Poehling* court.  *Id.*

In response, Kaiser observes that the United States did not address the waiver finding by the district court in *United States v. Anthem Inc*., Case No. 20-CV-2593 (ALC) (S.D.N.Y.).  Reply at 1.  It further rejects the United States' argument that the documents produced in *Poehling* were not produced voluntarily, asserting that "the vast majority of these documents never appeared on any privilege log and were not addressed by any order in that case."  *Id.* It also argues that the documents should be produced under the standard applied in *Young* because the documents have already been produced and it is not seeking any disclosure beyond what has already occurred.  *Id.*

Under traditional waiver doctrine, courts look to the following factors, developed in the context of inadvertent disclosure of privileged material, to determine whether privilege has been waived: "(1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the 'overriding issue of fairness.' " *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 599 (N.D. Cal. 2009) (citing *Eureka Financial Corp. v. Hartford Accident and Indemnity Co.*, 136 F.R.D. 179, 184 (E.D. Cal. 1991)).

In *McKesson*, this Court applied this framework in finding that the agency that claimed the deliberative process privilege had waived the privilege by voluntarily producing the documents in a related case without taking reasonable precautions to avoid disclosure.  264 F.R.D. at 598-600.  The court in *United States v. Anthem Inc.* appears to have taken a similar approach in concluding that the United States had waived the deliberative process privilege as to documents produced in *Poehling*.  *See* Case No. 20-CV-2593 (ALC) (S.D.N.Y.), Dkt. No. 190 at 11.  In that case, the court rejected the United States' argument in an FCA case similar to *Poehling* and this case that some of the documents produced in *Poehling* were protected by the deliberative process privilege, reasoning:

> Although the Government has suggested that documents marked attorneys' eyes' only in the *Poehling* litigation may be subject to the deliberative process privilege, the Government waived that privilege by producing them in *Poehling* and not taking efforts, consistent with the protective order in that case, to claw them back as privileged. *See In re Parmalat Securities Litigation*, No. 04-MD-1653 (HBP), 2006 WL 3592936, at *4 (S.D.N.Y. Dec. 1, 2016) ("While voluntary or

1        even inadvertent disclosure of documents may result [in] a waiver of
         privilege, involuntary or compelled disclosure does not give rise to a
2        waiver."); *S.E.C. v. Forma*, 117 F.R.D. 516, 523 (S.D.N.Y.1987).

3    *Id.*

4            However, the Ninth Circuit has cautioned against applying waiver doctrine to the

5    deliberative process privilege, reasoning that "[a]gencies should not be penalized for openness."

6    *Assembly of State of California v. U.S. Dep't of Com.*, 968 F.2d 916, 923 n. 5 (9th Cir. 1992), as

7    amended on denial of reh'g (Sept. 17, 1992).  Instead, the Ninth Circuit "consider[s] prior

8    disclosures only to determine whether the disclosure of [the material at issue] would expose the

9    decision-making process any more than it has already been disclosed."  *Id.*  Thus, for example, in

10   *Assembly of State of California*, the court found that the deliberative process had already been

11   disclosed as to a document relating to a decision by the Department of Commerce where a report

12   describing that process had already been published in the Federal Register.  986 F.2d at 920-923.

13   Consequently, the court held, the government could not claim deliberative process protection as to

14   the document it sought to withhold.  *Id.*  In contrast, in *Young*, the court held that the deliberative

15   process privilege could be claimed as to documents whose contents were mentioned at a public

16   meeting by a city council member but not described in detail, reasoning that "disclosure of the

17   requested documents would expose the Council's decision-making process more than [the council

18   member's] statements did and therefore her statements do not negate the deliberative process

19   privilege."  2008 WL 2676365, at *5.

20           Here, the United States has provided Kaiser with some details about the *Poehling*

21   production, including which documents were listed in the privilege log that was presented to the

22   court in connection with the motion to compel in that case (denoted by a single asterisk in

23   Amended Levine Decl., Ex. B) and which documents were listed in a subsequent privilege log in

24   that case but were nonetheless produced (denoted by a single double asterisk in Amended Levine

25   Decl., Ex. B).  As to the latter category, the United States represents that all of these documents

26   fell into categories that the court had already found were required to be disclosed in its prior order.

27   Exhibit B reflects, however, that many of the documents that the United States claims are

28   protected by the deliberative process privilege in this case were never listed in any privilege log in

United States District Court
Northern District of California

*Poehling* (documents with a "Yes" on the Exhibit B privilege log but no asterisk).

Applying traditional waiver doctrine discussed above, the Court would have no difficulty concluding based on the information provided by the United States that any document that was produced in *Poehling* pursuant to the court's order – whether by virtue of the fact that the document was listed in the original privilege log or because it fell into a category covered by the court's order and was listed on a subsequent privilege log – was not produced voluntarily and therefore, that there was no waiver as to those documents. On the other hand, the Court would reject the United States' belated assertion that documents that were produced in that case were done so pursuant to the court's order where the United States did not make clear, at some point in the course of the *Poehling* litigation, that it believed the document was privileged and was producing it only because it understood that doing so was required under the court's order. Thus, under traditional waiver rules, the Court would order production of all of the documents Kaiser seeks from the *Poehling* production that are not identified with a single or double asterisk on Exhibit B.

As discussed above, however, the Ninth Circuit cautions against applying traditional waiver rules to the deliberative process privilege, instead focusing on the question asked by the Ninth Circuit under *Assembly of State of California* and its progeny, namely, whether the disclosure of the material at issue would expose the decision-making process any more than it has already been disclosed. That inquiry does not focus on whether the prior disclosure was voluntary or involuntary (though the Court has not found a case that addresses how that issue plays into the analysis under the *Assembly of State of California* approach) but simply on whether the scope of the prior disclosure is the same, in which case, the deliberative process privilege cannot be claimed in the first instance. Given that Kaiser seeks disclosure of the same documents that were already produced to the *Poehling* defendant (and apparently the defendant in *United States v. Anthem Inc.* as well), the Ninth Circuit case authority upon which the United States relies supports the conclusion that it may not claim deliberative process protection as to any of the documents produced in *Poehling*, not because of waiver but because the production of these documents would not expose the decision-making process any more than it has already been exposed.

The Court concludes that the *Assembly of State of California* line of cases sets forth the correct approach to this issue and therefore finds that all of the documents produced in *Poehling* that remain in dispute must be produced, subject to appropriate protections.[6]

### F.    Whether Kaiser Has Established that its Need for the Documents Outweighs the Government's Interest in Nondisclosure

As discussed above, even if the deliberative process privilege applies, a litigant may obtain discovery of protected material if their need for the documents outweighs the governmental interest in keeping the decision making process confidential. *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  "Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id*. Courts also consider "5) the interest of the litigant, and ultimately society, in accurate judicial fact finding[;] 6) the seriousness of the litigation and the issues involved[;] 7) the presence of issues concerning alleged governmental misconduct[;] and (8) the federal interest in the enforcement of federal law." *Young v. City & Cnty. of Honolulu*, No. CIV 07-00068 JMS-LEK, 2008 WL 2676365, at *5 (D. Haw. July 8, 2008) (quoting N. *Pacifica, LLC v. City of Pacifica*, 274 F.Supp.2d 1118, 1122 (N.D. Cal. 2003) (citation omitted)).

In support of the United States' contention that disclosure of the Withheld Documents will result in significant harm to the deliberative process, the United States has pointed to statements in the supporting declarations relating to the harm of disclosure.  Opposition at 15-16 (citing Amended Levine Decl., Ex. C (Bisgaier Decl.) ¶ 13; *id.*, Ex. F (Am. Bressette Decl.) ¶ 14; *id.*, Ex. D (Shapiro Decl.) ¶¶ 16, 22, 29). The Court finds, however, that as to certain categories of documents, this harm is outweighed by Kaiser's need for the documents because they appear to be closely related to Kaiser's defense that its practices and application of the Contested Provision of

---

[6]The Court notes that in *In re McKesson*, the parties relied on traditional waiver doctrine in their briefs and neither side cited the Ninth Circuit authority suggesting that it is not appropriate to apply traditional waiver doctrine where the deliberative process privilege has been asserted.  Had they done so, the Court would likely have handled that issue differently.

United States District Court
Northern District of California

1   the ICD Guidelines were consistent with CMS rules, going to the elements of falsity, scienter, and

2   materiality.  *See Poehling*, 2018 WL 8459926, at *16 (holding that United's need for withheld

3   document outweighed government's interest in nondisclosure because the information Kaiser

4   sought was "an essential component of its anticipated defense.") (quoting *Desert Survivors*, 231 F.

5   Supp. 3d at 380)).

6        In particular, the Court finds that the following categories of Withheld Documents are like

7   to be critical to Kaiser's defense:

8        • All of the Bresette Documents that relate to the ICD Guidelines that are at issue in

9          this case.[7]

10       • In the Shapiro Documents, all documents in Category 1 (re the Proposed Rule) that

11         address the *coding* of chronic conditions.

12       • In the Shapiro Documents, all documents in Category 2 (re Chapter 7 of  the

13         Medicare managed Care Manual) and Category 3 (related to other rulemaking) that

14         address, either implicitly or explicitly, the meaning or application of the Contested

15         Provision of the ICD Guidelines.

16       • In the Bisgaier Documents, all of the documents that address the use of queries to

17         providers or contain such queries.

18  With respect to  the last category of documents, the Court finds unpersuasive the government's

19  argument that these documents are not relevant to the misconduct Kaiser is alleged to have

20  committed because they do not involve queries to providers who were employed by the MAO (in

21  contrast to Kaiser's relationship with its providers).  As the government was not able to provide

22  any assurance that such queries were not used to pressure doctors (even though they were not

23  employed by the MAO) to add diagnoses to patients' charts, the Court finds that these documents

24  may be important for Kaiser's defense.

25       The Court further finds that the documents described above cannot be obtained elsewhere

26  and that any harm associated with their disclosure can be mitigated by a strict protective order.

27  _____

28  [7] At the motion hearing, the United States represented that all or nearly all of the Bresette
    Documents fall into this category.

These factors support the Court's conclusion that Kaiser's need for these documents outweighs the interest of the United States in protecting them from disclosure.

## IV.    CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part. The Court ORDERS that the United States produce: 1) all of the Bresette Documents that remain in dispute; 2) All of the Shapiro Documents in Category 1 that remain in dispute that address the coding of chronic conditions; 3) All of the Shapiro Documents in Categories 2 and 3 that address, either implicitly or explicitly, the meaning or application of the Contested Provision of the ICD Guidelines; 4) all of the Bisgaier Documents that remain in dispute; 5) all of the documents that remain in dispute that were produced in *Poehling*.  As to any spreadsheets that have been withheld on the basis of the deliberative process privilege and that contain both public comments and internal agency deliberations, the United States should produce those spreadsheets in redacted form if it has not done so already.

The parties should meet and confer and agree to a schedule for the disclosures ordered herein.  They may also amend the protective order to incorporate additional protections as to the documents to be disclosed under this Order and should submit the amended protective order to the Court for approval prior to production of the documents.

**IT IS SO ORDERED.**

Dated: November 27, 2024

_____
JOSEPH C. SPERO
United States Magistrate Judge