JEREMY L. FRIEDMAN, CA Bar No. 142659
ATTORNEY AT LAW
2801 Sylhowe Road
Oakland, CA 94602
Tel: (510) 530-9060
Fax: (510) 530-9087
Email: jlfried@comcast.net

Warner Mendenhall, OH Bar No. 70165
(*Pro Hac Vice*)
MENDENHALL LAW GROUP
190 North Union Street, Suite 201
Akron, OH 44304
Tel: (330) 535-9160
Fax: (330) 762-9743
Email: warner@warnermendenhall.com

Attorneys for Claimant Jeffrey Mazik

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. RONDA OSINEK, <br><br> Plaintiff, <br><br> v. <br><br> KAISER PERMANENTE, et al., <br><br> Defendants <br> _____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 3:13-cv-03891-EMC

**NOTICE OF MOTION AND MOTION OF CLAIMANT JEFFREY MAZIK FOR A SHARE OF SETTLEMENT PROCEEDS UNDER 31 U.S.C. § 3730(c)(5); MEMORANDUM OF POINTS AND AUTHORITIES**

Date: April 2, 2026
Time: 1:30 pm
Courtroom: 5
Hon. Edward M. Chen

(Caption continued on next page)

1
2
3
4
5
6
7

UNITED STATES OF AMERICA and
STATE OF CALIFORNIA ex rel.
GLORYANNE BRYANT and
VICTORIA M. HERNANDEZ,

     Plaintiff,

v.

KAISER PERMANENTE, et al.,

     Defendants

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:18-cv-01347-EMC

8
9
10
11
12
13
14

UNITED STATES OF AMERICA ex
rel. JAMES M. TAYLOR,

     Plaintiff,

v.

KAISER PERMANENTE, et al.,

     Defendants

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:21-cv-03894-EMC

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION

**TO ALL PARTIES, AND THE ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on April 2, 2026, at 1:30 p.m. in Courtroom 5 on the 17th floor at 450 Golden Gate Avenue, San Francisco, California, claimant Jeffrey Mazik will and hereby does move the Honorable Edward M. Chen for a share of settlement proceeds in this action under the False Claims Act, 31 U.S.C. § 3730(c)(5).

More specifically, claimant seeks an order recognizing Mazik's statutory share of settlement proceeds under the alternate remedy provision of the Act. For his allocation, Mazik requests that the Court award him 8% of the amounts recovered by the United States from the Kaiser defendants under the terms of the January 14, 2026, settlement agreement (Exh. A), said allocation being paid in addition to, and will not diminish, the existing 17% relator's share for relators Osinek and Taylor. To the extent further proceedings are necessary, Mazik renews his request that he gain access to all settlement and share agreements between the parties of this consolidated action.

This motion is grounded on the following:

1. Mazik is the relator and *qui tam* plaintiff in a related action styled United States *ex rel.* Mazik v. Kaiser Foundation Health Plan, *et al.*, pending in the Eastern District of California, Case No. 2:19-cv-00559-DAD.

2. In his *qui tam* action, Mazik alleged, *inter alia*, that Kaiser defendants violated the False Claims Act by submitting false claims to Medicare for capitated payments on its Medicare Advantage enrollees, using inflated risk adjustment factors (RAFs) that were based on false diagnoses codes.

3. This motion was anticipated by Congress when it amended the False Claims Act in 1986 and turned it into the government's primary litigative tool for combating fraud. As the Senior Practice Leader for the Fraud Control Program in Kaiser's National Compliance Office, Mazik exposed an internal sham compliance program, including the deliberate tampering with data analytic tools designed to expose false and inflated diagnoses codes.

When he exposed the fraud and tried to stop it, defendants terminated his employment. Mazik was the first and only relator to allege defendants deliberately tampered with compliance software to ensure Kaiser did not identify and document erroneous diagnoses codes.

4.     After Mazik filed his amended complaint, the United States elected to pursue remedies for injuries to it caused by the submission of false claims for capitated payments in an alternate proceeding. Specifically, it moved here to consolidate six other *qui tam* actions, all **also** involving Kaiser's false claims for capitated payments based on inflated RAFs, and then it filed a complaint-in-intervention.

5.     Although it could have pursued the remedies for those same injuries by intervening in Mazik's action as well, the government chose not to, leaving Mazik to pursue his action on his own under 31 U.S.C. § 3730(c)(3).

6.     On January 14, 2026, the government announced a settlement of this consolidated action, whereby defendants paid the United States $556,000,000, plus interest at a rate of 4.250% per annum from October 15, 2025, until and including the day of payment. The settlement resolved the United States' amended complaint-in-intervention and the remaining *qui tam* claims of relators Osinek and Taylor.[1]

7.     The government and relators Osinek and Taylor reached an agreement on a 17% relator's share out of a potential 25%, resulting in the payment of approximately $95 million to those relators.[2]

---

[1]The settlement agreement, the Department of Justice's press release (Exh. B), and the dismissal requests filed in this action indicate that there were other settlement agreements between defendants and relators in this action. Mazik has not been informed of the terms of those settlements, including whether additional funds were recovered by the United States as a result of the settlements or dismissals.

[2]Mazik has not been informed whether additional relator's shares were recovered by any of the relators in this action.

8.    Because the government recovered remedies for the injuries alleged by Mazik, and because the one-recovery rule precludes Mazik from recovering in his *qui tam* action for the same injury or alleged damages again, Mazik's right to share in the settlement proceeds is respectfully protected by the alternate remedy provision of the False Claims Act, 31 U.S.C. § 3730(c)(5).

9.    Because the government declined to intervene in Mazik's action, Mazik is entitled to recover a statutory minimum of 25% of the settlement proceeds.

10.    The 8% share requested by Mazik from the government is the difference between this statutory floor and the share amounts already agreed upon by the United States and relators Osinek and Taylor. As such, the request made by this motion complies with § 3730(c)(5) while also not diluting the relator's share paid to Osinek and Taylor.

This motion is based on this notice, the attached memorandum of points and authorities, the declaration and exhibits filed concurrently herewith, the pleadings and orders in this action and Mazik's action, and any further evidence and argument submitted on the motion.

Respectfully submitted,

Dated: February 25, 2026          Law Office of Jeremy L. Friedman
                                  Mendenhall Law Group

                          By:    /s/Jeremy L. Friedman
                                  Jeremy L. Friedman

                                  Attorneys for relator Jeffrey Mazik

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  At great risk to his career, Mazik exposed Kaiser's sham fraud detection program
    and pursued his *qui tam* claims over risk adjustment fraud . . . . . . . . . . . . . . . . . . .

    1.  Kaiser knew it had a problem with false diagnoses data . . . . . . . . . . . . . . . 2

    2.  Mazik worked with data analytic tools used for fraud control . . . . . . . . . . 3

    3.  Data analytics showed Kaiser's fraud scheme was nationwide . . . . . . . . . 4

    4.  Mazik discovered that Kaiser accomplished its fraud scheme by tampering
        with data analytic compliance software . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    5.  Kaiser silenced and retaliated against Mr. Mazik, but now OIG uses Mazik-
        style data analytics to combat the same risk adjustment fraud . . . . . . . . . . 7

B.  The United States elected to pursue Mazik's claim and seek remedies for the same
    injuries alleged by Mazik through an alternate proceeding. . . . . . . . . . . . . . . . . . . 10

    1.  The government was informed of Mazik's allegations, declined to intervene
        and elected to pursued this action without joining Mazik . . . . . . . . . . . . . 10

    2.  The government's initial and amended complaints-in-intervention sought
        remedies for the same injuries identified in Mazik's claims. . . . . . . . . . . 12

C.  Following this Court's decision, Judge Drozd denied Kaiser's motion to dismiss,
    finding Mazik's action survived the first-to-file rule. . . . . . . . . . . . . . . . . . . . . . . . 13

E.  Mazik gave notice of his claim and filed this motion . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.  Mazik is entitled to a share under the clear wording of the statute . . . . . . . . . . . 17

II.  No further proceedings are necessary on Mazik's request for an award of 8% of the
    settlement proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.  The Court need not conduct another first-to-file analysis . . . . . . . . . . . . . 22

    B.  Congress set the 25% statutory floor applicable to Mazik's share . . . . . . 23

    C.  An award of 8% does not dilute the settling relators' share . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

<u>Cases</u>

*In Re Pharmaceutical Industry Ave. Wholesale Price*,
     892 F. Supp. 2d 341 (D. Ma. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States ex rel. Allstate Ins. Co. v. Millenium Labs., Inc.*,
     464 F. Supp. 3d 449 (D. Mass. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905 (9th Cir. 1998) . . . . . . . 20

*United States ex rel. Barajas v. United States*, 258 F.3d 1004 (9th Cir. 2001) . . . . . 18-21

*United States ex rel. Bibby*, 369 F. Supp. 3d 1346 (N.D. Ga. 2019) . . . . . . . . . . . . . . . . 23

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*,
     342 F.3d 634 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*,
     501 F.3d 493 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
     792 F.3d 1121 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993) . . . . . . . . . . . . . . . 17

*United States v. Bisig*, 2005 U.S. Dist. LEXIS 38316 (S.D. Ind. Dec. 21, 2005) . . . . . . 20

*United States v. Couch*, 906 F.3d 1223 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Van Dyck*, 866 F.3d 1130 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Statutes</u>

False Claims Act, 31 U.S.C. § 3730(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

False Claims Act, 31 U.S.C. § 3730(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19, 23, 24

False Claims Act, 31 U.S.C. § 3730(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

False Claims Act, 31 U.S.C. § 3730(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Legislative History</u>

S. Rep. No. 345, 99th Cong., 2d Sess. 2 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## MEMORANDUM OF POINTS AND AUTHORITIES

The United States, Kaiser defendants and relators Ronda Osinek and Dr. James M. Taylor have reached a settlement that recovers hundreds of millions of dollars to the federal fisc for injury caused by Kaiser's fraud – the same fraud scheme relator Jeffrey Mazik exposed when he filed his *qui tam* action under seal in the Eastern District of California and made his extensive disclosures to the government.

Mr. Mazik is entitled to a share of these settlement proceeds under the False Claims Act's alternate remedy provision, 31 U.S.C. § 3730(c)(5). That provision exists for precisely this situation: where the government learns of material facts of fraud through the relator's filings and disclosures, elects to pursue its remedy through a separate proceeding rather than intervening in the relator's case, and then settles the dispute to recover a remedy on the same injury identified by the relator. Congress included the alternate remedy provision to prevent the government from depriving a relator of his rightful share of proceeds recovered on claims he brought to the government's attention. Any other outcome would defeat the statutory design, and discourage relators from coming forward to face the risks of prosecuting a declined case only to be left out in the cold when the United States recovers its remedy through alternate means.

Mr. Mazik requests an award of 8% of the proceeds of the settlement, or approximately $44.5 million. This award does not dilute the 17% share of settling relators Osinek and Taylor, while keeping with the 25% statutory minimum for a relator's share in a non-intervened case.

## STATEMENT OF FACTS

**A.    At great risk to his career, Mazik exposed Kaiser's sham fraud detection program and pursued his *qui tam* claims over risk adjustment fraud**

Jeffrey Mazik is the former Senior Practice Leader for Kaiser's National Compliance Office, with over 25 years of experience in fraud control, auditing, and compliance. Second Amended Complaint ("SAC"), Exh. C, at ¶ 11. He was employed by Kaiser from 2008 until Kaiser fired him in 2017, first joining as an Information

Technology Audit Specialist in May 2008 and transitioning to the role of Senior Practice Leader in the Fraud Control Program in March 2012. *Id.* ¶ 12.

In his final role at Kaiser, Mr. Mazik's duties included working closely with regional compliance leadership to implement compliance and fraud control initiatives; leading comprehensive risk assessments, using data analytics to drive compliance, fraud control focus-areas, and fraud mitigation initiatives; investigating cases of potential fraud, waste, and abuse; developing corrective action plans to address root causes of fraud risks; and overseeing board reporting and mandatory regulatory reporting for the fraud control program. *Id.* ¶ 13. His role inside Kaiser provided access to high-level, data-driven analyses of claims submissions – all of which he disclosed to the government. Indeed, his ability to understand data-driven fraud detection software clued him in to the fraudulent scheme at issue in this litigation.

### 1. Kaiser knew it had a problem with false diagnoses data

Participants in the Medicare Advantage program have an inherent "incentive to over-report diagnosis codes in order to raise beneficiary risk scores and, in turn, increase the amount that CMS pays them." *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1020 (N.D. Cal. 2020). Mr. Mazik uniquely gave the government a roadmap showing Kaiser's fraud was necessarily deliberate. After CMS expanded its Recovery Audit program to Medicare Part C following the Affordable Care Act, Kaiser recognized its diagnosis coding would be subject to governmental scrutiny. As part of his extensive disclosures to the Department of Justice, Mr. Mazik provided a 2013 internal report on Reimbursement Compliance, where Kaiser's Audit and Compliance Committee noted "extrapolatable" audits conducted by the government might result in a "take back" of Medicare Advantage capita payments and subject Kaiser to fines and penalties, threatening "gross income for our risk adjustment payments [of] roughly $11 Billion." Friedman Decl., ¶ 5, Exhibit D.

Similarly, Mr. Mazik provided the government with the results of a Hierarchical Condition Category (HCC) audit probe in 2012 using 2011 data. Friedman Decl., ¶ 6,

Exh. E. These results showed a total accuracy rate for Part C at a dismal 89%, with only 2 regions showing accuracy rates at 95% or better, and 3 regions showing accuracy at 85% or below. Kaiser's National Compliance, Ethics & Integrity Office identified "key issues" with respect to false or fraudulent diagnosis data, including two important risks: "coding of historical conditions as acute" and "record submitted in support of condition not documented to be present." *Id*.

Despite these red flags, Kaiser focused its compliance efforts exclusively on "encounters" data – diagnosis coding from care provided by internal Kaiser providers – rather than "claims" data from outside providers. This was done because Kaiser had much greater control over clinical services furnished by network physicians and thus could hide behind its self-audit and self-improvement responsibilities. This deliberate plan allowed Kaiser to intentionally disregard fraud control measures, even though it was obligated to review and adjudicate claims pursuant to CMS standards, and undertake measures to protect the integrity of the diagnosis code data reported to CMS.

**2.    Mazik worked with data analytic tools used for fraud control**

When Mr. Mazik joined Kaiser's compliance office in 2012, he reported to Mia Okinaga, who was then Vice President of the National Compliance Office. SAC ¶ 55. Ms. Okinaga personally recruited Mr. Mazik to join the compliance team and focus on integrating regional and national departments for better monitoring and tracking of fraud control. *Id.* Mr. Mazik worked closely with Ms. Okinaga, who actively pushed initiatives to direct Kaiser and the regional offices to effectively utilize various diagnostic compliance and fraud detection tools. *Id.* ¶ 56. Such tools were developed by vendors such as Verisk Health, McKesson and FICO – data analytics companies that work with clients to identify fraud and abuse in various financial sectors. *Id.* CMS's own Medicare Advantage Fraud Handbook identifies the use of such analytics tools as critical measures that are "especially productive in trying to uncover fraud: scrutiny of beneficiary enrollment data and provider contract information, and surveillance of billing and claims patterns." Friedman Decl., ¶7, Exh F, at p.67.

Mr. Mazik also worked with Jay Loden, Assistant Director of Information Analytics and Compliance Technology, on tools and analytical studies; Judy Sarles, Senior Director, on compliance systems; and Daren Pursche, Director of Government Audit & Reimbursement, on external and internal compliance standards. SAC ¶ 57.

### 3. Data analytics showed Kaiser's fraud scheme was nationwide

In his *qui tam* action, Mr. Mazik revealed that since 2008, Kaiser engaged in a scheme to defraud the United States by providing inflated risk adjustment factors derived from invalid diagnosis coding for Medicare Advantage enrollees. SAC ¶¶ 2, 6-7. Through his own audits, Mr. Mazik discovered that Kaiser was able to conceal its risk adjustment fraud by deploying a sham compliance program.

In September 2016, Mr. Mazik employed the data analytic tools that were at Kaiser's disposal to audit claims data from all regional offices using Kaiser's proprietary Audit Recovery Information System (ARIS) database. *Id.* ¶ 86. The audit covered the period from August 3, 2010 through July 30, 2016. *Id.* Mr. Mazik created Excel pivot tables that summarized the data and found that unsupported diagnosis codes led to over $209 million in Medicare Advantage overpayments. *Id.* Such overpayments not only represented a dramatic failure of the organization to review and adjudicate claims as was required of it. The overpayments were a necessary step in Kaiser's plan to submit monthly claims for billions of dollars in falsely inflated capitated payments.

For example, applied to data from 2010 to 2013, Verisk software identified $11,690,149 in overpayments in Georgia alone. SAC ¶ 92. A snapshot of Kaiser's claims metrics from April 2015 reveals the scope of the problem: Kaiser reported approximately 900,000 Medicare claims and paid out a total of $2.0 billion in claims across all strata. Although 32% of the financials had been audited, **only 1% of paid claims had been audited.** And while several outside vendors recovered high seven-figure dollars in claims overpayments, the two vendors who flagged claims for "fraud and abuse" (CSC and HCI) recovered $0. Friedman Decl., ¶ 8, Exh. G.

Ms. Okinaga's position was eliminated on August 21, 2015, after she prioritized Mr. Mazik's initiatives that uncovered problems with Kaiser's data integrity – problems Kaiser intentionally concealed. *Id.* ¶ 58. Thereafter, Mr. Mazik reported to Marita Janiga, Executive Director of Investigations in Kaiser's National Compliance, Ethics & Integrity Office, for about a year—and then to Lauren Sutcliffe, a Senior Manager in the Special Investigations Unit. *Id.* In effect, Kaiser shut down the audit efforts of Ms. Okinaga and Mr. Mazik.

### 4. Mazik discovered that Kaiser accomplished its fraud scheme by tampering with data analytic compliance software

Through his *qui tam* action, Mr. Mazik brought unique insight to the government into the key component of Kaiser's risk adjustment fraud scheme: to conceal the results of its one-way data-mining effort to find "missing" diagnoses, Kaiser had to deactivate the compliance filters of its data analytics.

Kaiser would contract with data analytics vendors to review claims data for each region. SAC ¶ 47. These vendors – including McKesson, Verisk and FICO – each provided Kaiser with software applications that performed various types of Medicare Advantage billing reviews. *Id.* ¶ 61. Mr. Mazik discovered that Kaiser intentionally failed to use these fraud-detection tools, thus allowing its offensive data-mining practices to move forward unchallenged. Specifically, Kaiser intentionally misused these programs by setting them at minimum capacity and disabling key features to purposely reduce the chances of detecting false diagnoses data errors. *Id.* ¶¶ 48, 49.

Mr. Mazik uncovered this software tampering in late 2015 when he was tasked with conducting a comparative analysis between the functionalities provided by McKesson and Verisk. *Id.* ¶¶ 55, 56, 60.

McKesson's software, ClaimsXten, detects fraudulent billing practices using a robust set of rules. *Id.* ¶ 61. ClaimsXten applies automated rules based on CMS's Correct Coding Initiative, including the detection of invalid, inconsistent and unsupported diagnoses codes. Friedman Decl., ¶ 9; Exh. H. Mr. Mazik learned that Kaiser had

deactivated 25 of the 54 rules in ClaimsXten – **the principal software program Kaiser relied on to detect billing fraud**. SAC ¶ 62.

Kaiser refused to buy or turn on the full set of McKesson or Verisk rules, and it delayed implementation of FICO, an advanced predictive modeling software that Mr. Mazik used to detect anomalous billing patterns in Kaiser's electronic health records and identify providers who used improper coding. SAC ¶ 117.

When Mr. Mazik and his colleagues used a Verisk program to double-check data from the Georgia region produced by the neutered ClaimsXten, the group found $5.3 million in overpayments stemming directly from Kaiser's decision to deactivate nearly half the rules in ClaimsXten. *Id.* ¶ 59, 64. The most obvious solution would have been for Kaiser to simply re-activate these built-in editing features. Instead, in furtherance of its fraud, Kaiser never reactivated the disabled rules nor take steps to audit the consequences. *Id.* ¶¶ 60, 61, 65.

Indeed, when Mr. Mazik, Mr. Kelly, and Mr. Loden presented their findings to Ms. Janiga and Ms. Sarles, neither expressed any interest in correcting this problem. *Id.* ¶ 66. The findings were also brought before Sean Killeen, Executive Director of Payment Integrity in the Claims-Cost Containment Department. *Id.* ¶ 67. Mr. Killeen's response was also indifferent. In short, nothing was ever done at the national or regional level to rectify the easily correctable non-compliance. *Id.*

Mr. Mazik also used a Verisk-based program to run a shadow audit across all other regions, detecting some $209 million in overpayments for Medicare Advantage enrollees due to erroneous coding. *Id*. ¶ 68. He then prepared a Webex presentation to report his findings to Ms. Janiga and Mr. Pursche of the Government Audit & Reimbursement division. *Id.* In this presentation, Mr. Mazik pointed out that, pursuant to applicable regulations, Kaiser was required to review and investigate all identified overpayments within 60 days. *Id*. ¶ 69. The purpose of his analysis was to put his superiors on notice and lay out various options for the necessary corrective action. *Id.*

Kaiser's executives demonstrated a complete lack of interest in this audit. No one at Kaiser – including Ms. Sarles, Mr. Pursche or Ms. Janiga – asked for any follow-up by Mr. Mazik. *Id.* ¶ 71. They made no request for his data, and they did not ask for any root-cause analysis. Instead, Kaiser dismissed, ignored, and hid Mr. Mazik's findings. Not only did his superiors refuse to investigate any further, they took overt steps to prevent Mr. Mazik from investigating any further himself. *Id.* Kaiser never even executed the contract with Verisk to include it from its new "Anti-Fraud Alliance." *Id.* ¶ 99.

Kaiser's one-sided data mining efforts could only have succeeded long term with the compliance software tampering uncovered by Mr. Mazik. If the tools flagged the false diagnoses coding, the compliance officers were legally obligated to delete it. By turning the tools off, Kaiser prevented internal compliance officers from creating a paper trail for the fraud, and it also allowed the false diagnoses codes in the electronic health records to inflate the risk adjustment factors which led to the higher capitated payments.

### 5. Kaiser silenced and retaliated against Mr. Mazik, but now OIG uses Mazik-style data analytics to combat the same risk adjustment fraud

Mr. Mazik not only uncovered the key mechanism by which Kaiser committed the risk adjustment fraud, he witnessed the misrepresentations to the government that hid this fraud. During a phone call with the U.S. Department of Health & Human Services: Office of Inspector General (HHS OIG) on June 30, 2016, Kaiser silenced Mazik and made sure that his information would not be disclosed. SAC ¶ 80.

The call was a kick-off call held by HHS OIG with Kaiser to discuss medical loss ratio reporting and audits, addressing issues surrounding claims accuracy and claims recovered through fraud reduction efforts. *Id.* ¶ 81. During the call, OIG asked Kaiser about its general stance on claims operations, informing Kaiser that part of OIG's initiative was to address potential problems. *Id.* ¶ 82. Ms. Janiga falsely claimed that OIG's questions regarding claims auditing were irrelevant because "claims were not [Kaiser's] business." *Id.* ¶ 83. This statement ignored that Kaiser processed outside medical claims of at least $7 billion annually. *Id.* Kaiser's misrepresentations to OIG were

intended to preclude the OIG from inquiring into Kaiser's claims audit process. *Id*.

Ms. Janiga was concerned that if he spoke during the OIG call, Mr. Mazik might contradict her and correct her misrepresentations. *Id*. ¶ 85. She was also concerned that Mr. Mazik might raise his compliance and audit findings with the OIG. *Id*. To that end, in the middle of the phone call with OIG, Ms. Janiga messaged Mr. Mazik on intercompany messaging and instructed him to "[not] say a word." *Id*. ¶ 86.

The more Mr. Mazik raised concerns regarding Kaiser's suspect coding and overpayments, or steer Kaiser toward full compliance, the more he was sidelined and closed out from data and documents. *Id*. ¶ 96. This was especially true after Mr. Mazik began reporting to Ms. Sutcliffe in or around July 2016. *Id*. ¶ 114.

On October 12, 2016, Mr. Mazik approached Ms. Sutcliffe about an analysis he had performed that uncovered approximately $380,000 in suspected overpayments relating to a single procedure code error. *Id*. ¶¶ 54, 98, 116. Rather than acknowledge Mr. Mazik's efforts, or proceed to correct the systematic overpayments, Ms. Sutcliffe criticized him for performing the analysis without obtaining her prior approval, and she placed him on a Performance Improvement Plan ("PIP"). *Id*. ¶¶ 98, 116.

Mr. Mazik was also denied access to the software tools that were necessary for his job. *Id*. ¶¶ 99, 100, 117. On October 15, 2016, Mr. Mazik was denied access to the Claims Data Warehouse, Kaiser's internal data repository system to collect and analyze claims information. *Id.* ¶ 117(a).

On October 16, 2016, he was denied access to Kaiser Permanente HealthConnect, Kaiser's internal electronic health record (EHR) database system. *Id*. ¶ 117(b). HealthConnect is a massive multi-year EHR database, built at a cost of approximately $4 billion, and considered one of the largest non-governmental health information technology projects in the world. This EHR database combines diagnoses codes from outside providers with codes provided by Kaiser encounters, weaving a unified data stream used by Kaiser to provide CMS to back up its monthly claims for capitated payments.

By denying him access to every data repository necessary to perform his job, Kaiser effectively prevented Mr. Mazik from performing any audit activity. *Id*. ¶¶ 101, 118 119. Ms. Sutcliffe also forbade Mr. Mazik from holding any meetings with anyone at Kaiser that was above her level without her express, prior approval. *Id*. ¶¶ 102, 120. This directive restricted Mr. Mazik's access to communicating with key people at Kaiser, purposefully disincentivized internal complaints and whistleblowing, and directly hindered him from accomplishing the PIP objectives. *Id*. ¶ 120.

On November 3, 2016, Ms. Sutcliffe further forbade Mr. Mazik from communicating with other employees via phone or internal instant messaging. *Id.* ¶¶ 106, 124. Instead, Mr. Mazik was told he could only use email communications, and he was instructed to copy Ms. Sutcliffe on all such outgoing emails. *Id*. On December 13, 2016, Mr. Mazik met with Ms. Janiga, and summarized the retaliatory actions taken against him, but Ms. Janiga ignored his complaints. *Id*. ¶ 127.

On December 23, 2016, Mr. Mazik sought a meeting with Jacqueline Thomas in Human Resources to discuss Kaiser's harassing efforts at stymying his attempt to correct Kaiser's audit problems. *Id*. ¶ 128. No such meeting ever took place.

On January 5, 2017, Mr. Mazik was instead fired. *Id*. ¶ 111, 129. Throughout his prior nine years working for Kaiser, Mr. Mazik's performance reviews were consistently "successful" or "excellent." *Id*. ¶¶ 112, 130. Between 2012 and 2016, he performed exceedingly well. *Id*. ¶ 130. It was not until he first presented his audits findings that he suddenly received his very first, below-level "performance needs improvement" review. *Id*. ¶¶ 112, 130. The Honorable Judge Dale A. Drozd relied on these facts when ruling on February 13, 2024, that Mr. Mazik's action could continue despite the "first-to-file" bar set forth in 31 U.S.C. § 3730(b)(5). Exh. I.

After being silenced during the OIG call, stripped of his responsibilities, denied access to the Kaiser's systems, barred from speaking internally and ultimately fired, Mazik filed his *qui tam* action. Soon thereafter, CMS made a sea change in its auditing of Medicare Advantage Organizations for risk adjustment fraud.

1    By way of background, in the April 2016 report by the Government Accountability

2    Office, GAO-16-76, CMS was criticized for its weak audit selection process, noting that

3    $14.1 billion was improperly paid to Medicare Advantage Organizations in 2013 alone.

4    Between 2019 and 2021, OIG launched and reported on a targeted review series,

5    indicating 20 Medicare Advantage organizations were using chart reviews to

6    disproportionately drive payments. *See* Office of Inspector General Report in Brief

7    (September 2021), OEI-03-17-00474.

8    By 2023, CMS finalized technical details of risk adjustment data validation,

9    whereby CMS would extrapolate audit findings across plan revenue. *See* 2023 Risk

10   Adjustment Data Validation Rule Fact Sheet (CMS-4185-F2). OIG then released a

11   definitive "Toolkit to Help Decrease Improper Payments in Medicare Advantage," which

12   became the industry standard for internal auditing in 2024. This toolkit follows form of

13   the shadow audits that Mr. Mazik performed. New OIG Compliance Guidance, issued in

14   February 2026, now mandates exactly what Mr. Mazik found missing at Kaiser: two-way

15   auditing, NPI-level monitoring and audit finding extrapolation.

16   **B.    The United States elected to pursue Mazik's claim and seek remedies for the same injuries alleged by Mazik through an alternate proceeding**

17   **1.    The government was informed of Mazik's allegations, declined to intervene and elected to pursued this action without joining Mazik**

18

19   On April 1, 2019, Mr. Mazik filed his original complaint under seal, and the sealed

20   complaint and disclosure statement were served on the government. On February 25,

21   2021, Mr. Mazik's counsel provided the government confidentially with a final draft of

22   an amended complaint. Friedman Decl., ¶ 11. An application to file under seal was made

23   on March 31, 2021, and after the application was granted, Mr. Mazik's amended

24   complaint was filed under seal on April 2, 2021. Subsequently, after discussions with the

25   government's attorneys, two supplemental disclosure statements were served, on April

26   19, 2021, and on May 21, 2021. *Id*. At those times, Mr. Mazik and his counsel were

27   unaware of any pending related actions against Kaiser under the False Claims Act. *Id*.

28

1        Through Mr. Mazik's filings and disclosures, the government learned of Mr.

2  Mazik's allegations regarding Kaiser's RAF fraud scheme, and the software tampering

3  that allowed the fraud to exist undetected. Mr. Mazik's disclosures went far beyond the

4  complaint itself. He provided compelling documentary evidence, including: internal

5  presentations showing that use of data analytics tools was supposed to be a key

6  component in Kaiser's compliance risk-mitigation strategy; evidence that Kaiser had at its

7  disposal various data analytics-based fraud detection tools which, if used properly, would

8  have effectively identified the false or invalid diagnoses coding in Kaiser's EHRs;

9  evidence that Kaiser knowingly disabled critical features and functionalities in those

10  software applications; and Mr. Mazik's contemporaneous handwritten notes and

11  calculations from his September 2016 ARIS database analysis revealing $209 million in

12  Medicare Advantage overpayments. *Id.*, ¶ 12.

13        In his supplemental disclosures, Mr. Mazik articulating his legal theories in detail

14  – explaining the precise mechanism of Kaiser's fraudulent scheme: running a sham fraud

15  compliance program over claims, effectively disabling Kaiser's defenses that led to the

16  submission of false data for its members' health status and inflated RAFs. He identified

17  specific categories of documents the government should seek through Civil Investigative

18  Demands, including Kaiser's ARIS database, FICO Insurance Fraud Manager data,

19  McKesson claims review data, and documentation of Kaiser's database architecture. He

20  even suggested methodologies the government could use to analyze data and determine

21  whether false or improper claims diagnosis code data caused Kaiser to receive higher per

22  capita payments. *Id.*, ¶ 13.

23        After receiving the filings and disclosures, the government chose to pursue

24  alternate remedies here for the injuries Mr. Mazik identified – which was its right.

25  Pursuant to the government's motion, the Court ordered consolidation of sealed cases on

26  June 25, 2021 (ECF 61). On July 27, 2021, while the consolidated cases were sealed, the

27  government noticed its intent to intervene (ECF 64). The Court, on July 29, 2021, ordered

28  unsealing of the relators' complaints and the government's notice of election (ECF 65).

1  On October 25, 2021, the government filed a complaint-in-intervention (ECF 110), listing

2  six consolidated actions and 10 relators, but not Mr. Mazik.

3      Subsequently, on December 1, 2021, the government filed a notice declining to

4  intervene in Mazik's amended complaint. In an order issued on December 2, 2021, the

5  Eastern District of California, Hon. John A. Mendez, directed that Mr. Mazik's amended

6  complaint be unsealed and served upon defendants. Friedman Decl., ¶ 14.

      **2.      The government's initial and amended complaints-in-intervention
           sought remedies for the same injuries identified in Mazik's claims.**

8      In its initial complaint-in-intervention, the government elected to pursue the same

9  causes of action alleged by Mr. Mazik, *i.e.,* the submission of monthly claims for

10  capitated payments for Medicare Advantage enrollees using falsely inflated RAFs based

11  on invalid or improper diagnoses codes. ECF 110, ¶¶ 2, 3, 348-351 (First Claim for

12  Relief), 353-355 (Second Claim for Relief), and 360 (Fourth Claim for Relief). The

13  government's complaint-in-intervention alleged the same basis for the inflated risk

14  adjustment factors as that alleged by Mr. Mazik. *See, e.g., id.,* at ¶¶ 137 ("the inevitable

15  result was the widespread submission of invalid diagnosis codes for conditions that did

16  not require or affect patient care treatment or management and whose very existence

17  many times was contradicted by the patient's medical record"), 174 ("Kaiser often failed

18  to alert physicians to information that directly contradicted the existence of the condition,

19  leading to the addition of many inaccurate diagnoses via addenda, and the resulting

20  submission of inaccurate diagnosis codes to CMS for risk-adjustment payments"). In the

21  original complaint-in-intervention, the United States focused on Kaiser's use of addenda

22  to manufacture false records of diagnoses coding – facts that were not part of Mr. Mazik's

23  complaint. But the United States alleged the same core fraudulent scheme that Mr. Mazik

24  alleged: Kaiser knowingly submitted false diagnosis codes to CMS to unlawfully and

25  fraudulently inflate risk adjustment payments on its enrollees.

26      In the original complaint-in-intervention, the government also made multiple

27  allegations that Kaiser engaged in data mining of EHRs to identify and add diagnosis

28

codes only when they resulted in higher payments by CMS. *Id*., ¶¶ 133-150. These facts become material when understood through the lens provided by Mr. Mazik: by turning off the data analytic tools in its compliance software, the consistent effort to insert conditions with higher reimbursement rates internally was one-sided, as the tools would have flagged claims for procedures and lab testing that were inconsistent with that patient's coding, triggering an obligation to delete the claims and audit the patient's records. Kaiser's data mining was only one-way by virtue of its deliberate tampering with the software that would have detected the scheme and precluded Kaiser from engaging in it.

On December 12, 2022, the government filed an amended complaint-in-intervention (ECF 240), maintaining the same claims for relief based upon the same RAF fraud scheme alleged by Mr. Mazik. *See* ¶¶ 378-384. Moreover, the government greatly expanded on the allegations of the widespread submission of inaccurate diagnosis codes that were contradicted by the medical records. In fact, whereas such allegations were sparse in the original pleading, in the amended pleading illuminated by Mr. Mazik's voluminous disclosures the government introduced these concepts in the second paragraph and the last paragraph before the causes of action (¶ 376), and it repeated them some 20 times throughout. Kaiser's tampering with the compliance software as revealed by Mr. Mazik was thus crucial and well understood by the government as necessary for the facilitation of the fraudulent scheme alleged by the government.

**C. Following this Court's decision, Judge Drozd denied Kaiser's motion to dismiss, finding Mazik's action survived the first-to-file rule**

Between the time the original and amended complaints-in-intervention were filed in this action, Kaiser defendants on January 1, 2022, filed a motion to dismiss (ECF 141) pursuant to the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5). In light of the filing of the first-to-file motion here, Kaiser defendants and Mazik on January 28, 2022, agreed to stay briefing in the Eastern District of California action until 30 days after this Court ruled on the motion. Judge Mendez granted the stay on January 31, 2022.

On May 5, 2022, this Court entered an order (ECF 171), granting in part and denying in part defendants' first-to-file motion. Pursuant to the temporary stay order in the Eastern District, after this Court's ruling, the parties then briefed Kaiser defendants' motion to dismiss the *Mazik* action. On July 13, 2022, Kaiser filed a motion to dismiss relator Mazik's action, predicated in part on the first-to-file rule. Mr. Mazik opposed the motion on August 29, 2022, arguing that this Court's ruling on the first-to-file rule provided a "blueprint" for resolution of Defendants' motion to dismiss.

The Eastern District case was then reassigned to Judge Drozd. After briefing, on February 13, 2024, Judge Drozd issued an order granting in part and denying in part Kaiser defendants' motion to dismiss Mazik's complaint. (A copy of that order is included as Exhibit I, and can be found at: *Mazik v. Kaiser Permanente, Inc*., No. 19-cv-00559-DAD-KJN, 2024 U.S. Dist. LEXIS 25397 (E.D. Cal. Feb. 13, 2024)). Relevant for purposes of this motion, the court compared the allegations by Mr. Mazik to the allegations made by relator Taylor. The court concluded that Mr. Mazik's federal False Claims Act claim is "barred by the first-to-file rule except to the extent relator alleges that defendants deliberately tampered with compliance software to ensure that it did not identify erroneous diagnosis codes." Order, at 12:26-28. Because Mazik was the first relator to allege Kaiser had tampered with compliance software to achieve their unlawful ends, "'the nature of the wrongdoing claimed by [relator Mazik] here involves different "material elements" from' the wrongdoing in the Taylor Complaint" (*id*., at 13:16-19) (quoting this Court's ruling, 601 F. Supp 3d at 569). Accordingly, Judge Drozd followed this Court's ruling in the Consolidated action, and it dismissed the Mazik complaint only in part. See Order, at 14:5-16.

Importantly, Judge Drozd recognized that Mr. Mazik's allegations revealed material facts about Kaiser's fraudulent scheme that could not be learned from the relators' in this action. He wrote: "[t]here is nothing in these [Taylor] allegations that would have prompted the government to question the validity of the audits. Relator Mazik's allegations that the audits were themselves compromised would therefore

1   'provide[] [some] additional benefit to the government.'" Order, at 14 (quoting *United*

2   *States ex rel. Hartpence v. Kinetic Concepts, Inc*., 792 F.3d 1121, 1131 (9th Cir. 2015)).

3   Indeed, the conduct uncovered by Mr. Mazik and revealed to the government would have

4   been difficult to uncover but for Mr. Mazik stepping forward, given that no other relator

5   brought forth any claim based on Kaiser's throttling of compliance software – the very

6   software intended to prevent the exact massive fraud perpetrated by Kaiser.[3]

7       Judge Drozd also denied Kaiser defendants' motion under Rules 9(b) and 12(b)(6).

8   He concluded that Mr. Mazik "has sufficiently alleged a fraudulent scheme" in his

9   amended complaint.

10      Relator has alleged the "who" (defendants), the "what" (tampering with
        auditing software), the "when" ("since at least 2008"), the "why" (to
11      decrease the chance of identifying errors in claims), and "how" the alleged
        scheme is fraudulent ("Kaiser repeatedly provided expressly false
12      certifications that its risk adjustment data submissions to CMS were
        'accurate, complete, and truthful,' while knowing that the data were, in fact,
13      plagued with errors, and despite knowing that those errors would cause
        CMS to pay unjustifiably and falsely higher capitation rates."). [Order, at
14      15:14-19.]

15      Judge Drozd also found the conduct alleged by Mr. Mazik potentially "material"

16  under the Act because it could influence the government's payment of money: "Relator

17  has alleged . . . defendants have purposefully disabled features of their compliance

18  software in order to avoid discovering certain errors in diagnosis codes that would reduce

19  the capitation rates they receive." *See id*., at 16:24-17:27.

20  _____

21      [3]Tellingly, of the Kaiser employees deposed by the government in its civil
    investigation, not one was a "Data Quality Trainer" such as Relator Ms. Osinek; they
22  were compliance and IT audit professionals like Mr. Mazik, including: Nancy Andersen,
    Senior Compliance Manager with Kaiser's National Compliance Office (CID Testimony,
23  October 1, 2020); Dr. David Bliss, Regional Director of Documentation and Coding (CID
    Testimony, October 2, 2020); Janet Franklin, Compliance Manager with Kaiser's
24  National Compliance Office (CID Testimony, October 7, 2020); Karen Graham,
    Managing Director for Encounter Information Operations (CID Testimony, October 5,
25  2020); Jeremy Walsleben, Senior Manager of Risk Adjustment (CID Testimony,
26  September 29, 2020); Teresa Welsh, Director of Coding (CID Testimony, October 2,
    2020). See Stipulation and Order Regarding Admissibility of Prior Deposition and
27  Examination Transcripts (ECF 401 at 2-3).
28

Pursuant to Judge Drozd's order, Mr. Mazik filed his second amended complaint (Exh. C) on March 26, 2024. He then proceeded in his *qui tam* action under § 3730(c)(3) ("If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action").

**D.    Under the terms of the January 14, 2026, settlement agreement, the government recovered $556 million and broadly released its claims**

In the settlement announced on January 14, 2026, the government recovered $556 million, plus interest at a rate of 4.250% per annum from October 15, 2025, until and including the day of payment. *See* Exh. A. This is the largest recovery in history to date in a False Claims Act involving Medicare Part C. It results in the release and dismissal of all "covered conduct" claims – as defined by the broad scope of the government's amended complaint-in-intervention. According to the press release, relators Osinek and Taylor shall received approximately $95 million, a 17% share.

**E.    Mazik gave notice of his claim and filed this motion**

On January 15, 2026 – one day after learning of the settlement – Mr. Mazik gave notice to the Court and the parties of his claim to a share of the settlement proceeds under the alternate remedy provision of the Act (ECF 422). On January 30, 2026, Mr. Mazik and the parties filed a joint response confirming their agreement that the settlement remains valid (ECF 429).

Mr. Mazik filed administrative motions seeking an extension of time to file his motion (ECF 430) and for a special conference or an order granting access to the settlement and share agreements (ECF 435). The Court denied without prejudice the request for access to the agreements, directing Mr. Mazik at this juncture to address entitlement to any share (ECF 438).[4] The Court extended the time for filing the motion to February 25, 2025. Mr. Mazik now files this motion seeking an order recognizing his right to a share, and requesting an 8% share of the settlement proceeds.

---

[4]As argued below, the Court may award Mr. Mazik his requested share of the settlement without further proceedings. However, Mr. Mazik will renew his request if the Court desires further briefing, or if any opposition so warrants it.

**ARGUMENT**

**I.      Mazik is entitled to a share under the clear wording of the statute**

"The FCA, which Congress originally enacted in 1863, is the government's 'primary litigative tool for combatting fraud' against the federal government." *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993) (citing Senate Judiciary Committee, False Claims Amendments Act of 1986, S. Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266). Congress queried "why fraud in Government programs is so pervasive yet seldom detected and rarely prosecuted." S. Rep. No. 99-345, at 4. It found "69 percent of those who believed they had direct knowledge of illegalities failed to report the information. Those employees who chose not to report fraud were then asked why they failed to come forward. The most frequently cited reason given (53 percent) was the belief that nothing would be done to correct the activity even if reported. Fear of reprisal was the second most cited reason (37 percent)." *Id.*

Relevant for our purposes, Congress made two changes to overcome this hurdle. First, § 3730(c)(3) now allows a relator to pursue a *qui tam* case even if the government declines to intervene. This provision gave Mr. Mazik reassurance that, even if the Department of Justice declined to do something about the fraud he saw inside Kaiser, he could still move forward. Accordingly, when the government declined to intervene in his action, he persevered, knowing that if he were to recover a remedy for the United States, he would be entitled to a minimum of 25% of the proceeds.

Second, the 1986 amendments added § 3730(c)(5): "Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action **shall have the same rights** in such proceeding as such person would have had if the action had continued under this section" (emphasis supplied). This provision reassured Mr. Mazik that his "same right" to a share would be protected if the government pursued remedies for the same injuries he identified.

1     As the Ninth Circuit stated:

2          the purpose of the statutory scheme is clear. The FCA is designed to help
           fight fraud against the government by encouraging private individuals to
3          come forward with information about fraud that might otherwise remain
           hidden. The encouragement is provided by giving these individuals a
4          relator's share of any recovery obtained using the relator's information in an
           FCA action, or an equivalent share of a recovery obtained using that same
5          information to procure an "alternative remedy." [*United States ex rel.
           Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001).]
6

7     "It is entirely consistent with this purpose to read the "any alternative remedy" language

8     of § 3730(c)(5) to mean what it says." *Id.*

9          The Court in *Barajas* went on:

10         It can be quite difficult for private individuals – particularly for
           "whistleblowers" like Barajas – to come forward with damaging
11         information about their employers. In some instances, the whistleblowers
           have participated in the wrongdoing (as Barajas did), and in some instances,
12         the whistleblowers are fired because of their whistleblowing (as Barajas
           may have been). It would be inconsistent not only with the plain meaning of
13         the broad language employed in the statute, but also with the purpose of the
           statute, to allow the government to obtain from a *qui tam* defendant a
14         remedy that **could have been obtained** in an already-filed FCA action, and
           then to argue that the proceeds of that remedy need not be shared with the
15         whistleblower because the remedy was not an "alternate remedy" within the
           meaning of the FCA. [*Id.* (Emphasis supplied).]
16

17         Application of § 3730(c)(5) to Mr. Mazik's claim is straightforward. Mr. Mazik

18    was always an important insider with knowledge of key essential facts proving the

19    massive RAF fraud that Kaiser committed. While relators Osinek and Taylor also brought

20    important information to the government's attention, and they were first to file with those

21    pieces in place, Mr. Mazik provided material information no other relator (or government

22    investigator) had before he acted. No different than Leocadio Barajas, Mr. Mazik too

23    faced significant personal risks for his whistleblowing efforts. It was the deliberate

24    deactivation of the fraud detection software tools, however, that ultimately allowed

25    Kaiser to hide its fraud, and without Mr. Mazik's filings and disclosures the United States

26    would have been unable to articulate the one-way data mining set forth in its amended

27    complaint-in-intervention.

28

This point is worth expanding upon. Whether or not Mr. Mazik could theoretically continue in the Eastern District with his software tampering claims and use such claims to prove how Kaiser's fraud was perpetuated, that could only lead to the same remedies the United States recovered through the settlement agreement. In other words, the material elements found in both the consolidated cases and in Mr. Mazik's action necessarily only provides the government a single remedy because there are no two Kaiser frauds – only one, even though there were several paths towards proving it: one by way of the consolidated cases and one using Mr. Mazik's fraud roadmap. *See, c.f., United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1131 (9th Cir. 2015) ("[A]llowing claims for related but distinct fraud claims encourages broader investigation and increases the total potential for recovery").

As in *Barajas*, "It would be inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from [Kaiser] a remedy that could have been obtained in [Mr. Mazik's] already-filed [False Claims Act] action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower." 258 F.3d at 1012. Under the clear wording of the Act, the Court should recognize Mr. Mazik's entitlement to a share of the settlement proceeds.[5]

In addition to its plain reading of the statute, *Barajas* is helpful to understand two related underlying doctrines: **claim preclusion** and **damage credit** as applied to this case. Both doctrines – and the alternate remedy provision itself – are grounded in an underlying "**one-remedy" rule**. Mr. Barajas brought two separate *qui tam* actions against Northrop

---

[5] *See also United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 649 (6th Cir. 2003) ("We therefore hold that a settlement pursued by the government in lieu of intervening in a *qui tam* action asserting the same FCA claims constitutes an 'alternate remedy' for purposes of 31 U.S.C. § 3730(c)(5)"); *In Re Pharmaceutical Industry Ave. Wholesale Price*, 892 F. Supp. 2d 341, 344 (D. Ma. 2012) ("The government effectively settled Relators' claims by approving the settlement between Ven-A-Care and Baxter, and such a separate settlement constitutes an 'alternate remedy'").

for injuries caused to the United States. The first, in which the government intervened, sought damages for test falsifications; and after that action ended in settlement, Barajas filed a second action, in which the government did not intervene, alleging defective dampening fluid. Northrop successfully moved to dismiss the second *qui tam* action on the grounds of claims preclusion, arguing that the settlement of the first *qui tam* action, concerning the falsified and incomplete tests foreclosed the second action, concerning the defective damping fluid. In an earlier appeal, the Ninth Circuit affirmed the dismissal, holding that the damping fluid complaint was precluded by claim preclusion because it arose out of the "same transactional nucleus" as the test falsification complaint.

> Application of "same transactional nucleus of fact," is quite clear here. While Barajas is plainly correct that it is one thing to have fluid that gums up in the cold, and another to lie about whether the fluid was tested for gumming up, **both wrongful acts arise out of the same attempt to get paid** for flight data transmitters not up to specifications. **The recovery in a qui tam case is not for each false statement or bad act done to the government; it is for "a false or fraudulent claim for payment or approval."** 31 U.S.C. § 3729(a)(1). [*United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998) (emphasis supplied).]

The same is true here. As in *Barajas*, the transactional nucleus of facts in this case involves claims for capitated payments based on falsely inflated RAFs, which in turn are based on invalid diagnoses codes. Kaiser could therefore successfully argue that the government's settlement in this case for false RAF claim submissions extinguishes Mazik's claims for false RAF claim submissions. Even if causing internal physicians to submit false diagnostic codes through improper addenda is distinct from tampering with the software tools which would have exposed invalid coding, the recovery is for the false claims for capitated payment – which is the same underlying fraud in both the settled actions and in Mr. Mazik's suit. The settlement in this Court thus impairs Mazik's action, entitling him to a share of the proceeds.[6] *See United States v. Bisig*, 2005 U.S. Dist. LEXIS 38316, at *6 (S.D. Ind. Dec. 21, 2005) (government acknowledges that a remedy is an alternate remedy when it "precludes the continuance of a *qui tam* action").

---

[6]For these reasons, relator Taylor also recovered a share and dismissed his claims.

1    With equal force, the *Barajas* decision exemplifies the related basis for share

2    entitlement: the damage credit. There, the Ninth Circuit held that the relator was entitled

3    to a share of the government's recovery of a remedy through a debarment proceeding.

4    Although the Ninth Circuit noted the differences between a False Claims Act action and a

5    suspension or debarment proceeding, it recognized that the government can, and

6    sometimes does, seek a remedy in such proceedings that "effectively takes the place" of a

7    False Claims Act remedy. Because Northrop was entitled to receive an "appropriate credit

8    for funds paid or value received" in any separate civil proceeding – specifically, the

9    relator's *qui tam* action – the relator in that *qui tam* action was entitled to a share.

10   *Barajas*, 258 F.3d at 1011.

11   The government, the Ninth Circuit, and several other courts now recognize this

12   well-founded rule: when the *qui tam* defendant would be entitled to claim a damage credit

13   against the relator's action based upon money paid in an alternate proceeding, the relator

14   is entitled to a share out of that alternate recovery. *See United States v. Van Dyck*, 866

15   F.3d 1130, 1135 n.3 (9th Cir. 2017) (government acknowledges that relator is entitled to

16   claim a share to the extent that *qui tam* defendant "is entitled to a damage credit"); *United

17   States v. Couch*, 906 F.3d 1223, 1228-29 (11th Cir. 2018) (citing *Van Dyck*).

18   In this case, Kaiser's settlement with the government resulted in a broad release of

19   all covered conduct claims, meaning all claims encompassed within the government's

20   expansive amended complaint-in-intervention. Those claims encompass the same remedy

21   sought in Mr. Mazik's *qui tam* action. Whether under the clear terms of the statute, the

22   force of claim preclusion, the defendants' right to a damage credit, or all three bases, the

23   government is only entitled to recover its damages one time – effectively barring Mr.

24   Mazik from pursuing his action in the Eastern District.

25   Even if Mr. Mazik *could* theoretically continue his federal *qui tam* False Claims

26   Act claims against Kaiser, he would have to recover one dollar more than the largest

27   settlement in the history of Part C False Claims Act recoveries before he obtained that

28   one dollar for the federal fisc, and 25 cents for himself. No logical interpretation of the

1
2
3

Act would require either Mr. Mazik or the Eastern District to continue such a futile effort. Under these circumstances, the Court should hold Mr. Mazik is entitled to a share of the government's recovery.

4

**II.    No further proceedings are necessary on Mazik's request for an award of 8% of the settlement proceeds**

5
6
7
8
9
10
11
12
13
14
15
16
17
18

It is no surprise that Kaiser's multi-billion dollar fraud scheme involved complex factual issues where several independent relators brought material information to the government on essential elements of its claims. When multiple relators claim entitlement to an allocation of a share, and when the relators and the government are unable to reach agreement amongst themselves on the amount of the share or its allocation, the statute entrusts those determinations to the courts. In some cases, there has been no first-to-file adjudication, and courts will take up that determination in the first instance in determine shares. In others, multiple relators are first-to-file on some aspect of the recovery, and the Courts must make an allocation determination. And, in still others, the relators' share agreements can impact who is entitled to what among the shares. *See e.g., United States ex rel. Allstate Ins. Co. v. Millenium Labs., Inc*., 464 F. Supp. 3d 449, 453 (D. Mass. 2020) (only one relator was entitled to a share under § 3730(d)(1)); *United States ex rel. Bledsoe v. Community Health Systems, Inc*., 501 F.3d 493 (6th Cir. 2007) (multiple relators were entitled to attorneys' fees in light of their sharing agreements).

19
20

In this case, however, no further proceedings are necessary to determine the amount or the apportionment of a share.

21

**A.    The Court need not conduct another first-to-file analysis**

22
23
24
25
26
27

In extensive proceedings in this Court and the Ninth Circuit, it has already been determined that Ms. Osinek and Dr. Taylor survived the motions to dismiss under the first-to-file bar. Under the law of the case doctrine, that decision may not be revisited. To that end, the settlement agreement with defendants note that only those two relators in this consolidated action will share in the settlement agreements. Moreover, it was reported that, under the side-letter agreement with the government, relators Osinek and

28

Taylor receive a total share of $95 million. Any apportionment between themselves, or with other relators in the action, need not be reviewed by the Court.

As set forth herein, Judge Drozd already determined that Mr. Mazik's federal False Claims Act claims survived the first-to-file bar. That determination was based on this Court's ruling with respect to relator Taylor, and it was predicated on a sound and correct scrutiny of the pleadings. As such, no further proceedings are needed to apply the first-to-file bar in this action.

**B.    Congress set the 25% statutory floor applicable to Mazik's share**

Under the express terms of the alternate remedies provision, Mr. Mazik is entitled to the same rights as if the recovery was made in his *qui tam* action. *See* § 3730(c)(5) (relator "shall have the same rights . . . as such person would have had if the action had continued"). Because the government declined to intervene, the total amount of share recovered in his case has a statutory floor of 25% and a maximum of 30%. *See* § 3730(d)(2) ("The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds"); *United States ex rel. Bibby*, 369 F. Supp. 3d 1346, 1349 (N.D. Ga. 2019) (government concedes that a relator in a non-intervened case has a minimum 25% share authorized under § 3730(d)(2)). Affording Mr. Mazik the "same rights" to which he have if the action had continued, the statutory floor for the relator's share is 25%.

**C.    An award of 8% does not dilute the settling relators' share**

This motion does not require apportionment between Mr. Mazik and relators Osinek and Taylor. Mr. Mazik does not seek to reduce what the settling relators agreed to receive. Mr. Mazik is requesting the differential between that agreement and the statutory floor to which he is entitled to claim. As such, relators Osinek and Taylor may recover their agreed-upon $95 million award with all parties knowing this case has resolved.

Although Mr. Mazik's requested award will come from the government's share of the proceeds, such was the determination of Congress when it set the relative ranges of share recoveries for intervened and non-intervened actions, and when it required that Mr.

1  Mazik receive the "same rights" as he would have in his non-intervened case.

2      Moreover, while Mr. Mazik reserves for his reply any response to what the

3  government has to say in opposition to this motion, he notes here that these circumstances

4  are of its own making. The government had a right to decline intervention into Mr.

5  Mazik's case, and to pursue its remedies on the same RAF fraud scheme in this Court.

6  Even though he had expended considerable time and effort providing the government

7  with detailed pleadings and disclosure statements on key facts, he was left in the dark

8  regarding the government's progress. When Kaiser moved to have Mr. Mazik's action

9  transferred to the Northern District, the government vigorously opposed it, filing a

10  Statement of Interest against the motion. Mr. Mazik was led to believe he would not be

11  left out in the cold by the government but instead he was left to fight the government's

12  battles for it all the while he was kept out of discovery and settlement proceedings. Mr.

13  Mazik did not even learn of the settlement until the press release on January 14. He had to

14  act fast just to put the Court on notice of his claim – which he did the following day. The

15  goverment should not be rewarded for its conduct by shirking the plain language of 31

16  U.S.C. § 3730(c)(5) and adding to the federal fisc at Mr. Mazik's significant detriment.

17                              **CONCLUSION**

18      For the foregoing reasons, Mr. Mazik respectfully requests that the Court

19  recognize his entitlement to a share of the government's settlement proceeds, and he be

20  awarded 8%, in addition to, and not out of, the 17% award agreed upon for the named

21  settling relators.

22                          Respectfully submitted,

23  Dated: February 25, 2026        Law Office of Jeremy L. Friedman
                                    Mendenhall Law Group

24

25                          By:   /s/Jeremy L. Friedman
                                    Jeremy L. Friedman

26                          Attorneys for relator Jeffrey Mazik

27

28