UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONDA OSINEK, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>PERMANENTE MEDICAL GROUP, INC, et al.,<br><br>　　　　　Defendants. | Case No.  13-cv-03891-EMC<br><br>**ORDER DENYING THIRD PARTY MAZIK'S MOTION FOR SHARE OF SETTLEMENT PROCEEDS**<br><br>Docket No. 439 |

United States District Court<br>Northern District of California

Several qui tam suits were brought against Kaiser entities ("Kaiser"), alleging that Kaiser submitted false claims for payment as part of the Medicare Part C program, also known as Medicare Advantage.  Before this Court, six cases were consolidated.  The government intervened in part with respect to the consolidated cases.  In general, the Court shall use the term "*Osinek* matters" to refer to the consolidated cases and the term "*Osinek*" to refer to the portion of the consolidated cases where the government intervened.

Another qui tam suit was brought against Kaiser in the Eastern District of California.  For that suit, filed by Jeffrey Mazik,[1] the government declined to intervene.  Subsequently, Kaiser moved to transfer *Mazik* to this District, but both Mazik and the government (as the real party in interest) opposed transfer.  The Eastern District court agreed with Mazik and the government, concluding that transfer was not appropriate.

/ / /

---

[1] As alleged in his complaint, Mazik is the former Senior Practice Leader for Kaiser's National Compliance Office.  He began working for Kaiser in 2008 as an Information Technology Audit Specialist.  In March 2012, he became the Senior Practice Leader.  In 2017, he was fired.  *See* Mot. at 1-2 (citing allegations in Mazik SAC).

In January 2026, the *Osinek* matters settled. The main settlement agreement was the agreement covering *Osinek* – *i.e.*, the government's complaint-in-intervention. The parties to that settlement agreement were:

- the United States,
- Kaiser,
- Osinek (who filed the first qui tam suit), and
- Taylor (who filed the second qui tam suit).

There was also a second settlement agreement covering the portion of the *Osinek* matters where the government declined to intervene.

In the main settlement agreement covering the government's complaint-in-intervention, the government recovered $556 million plus interest. According to a press release, "[t]he relator share of [that] recovery will be $95 million" – *i.e.*, about 17% of the $556 million. Friedman Decl., Ex. B (press release). As indicated above, it appears this relator share will go to Osinek and Taylor.

Now pending before the Court is a motion filed by Mazik (*i.e.*, the plaintiff in the non-transferred Eastern District case). Mazik contends that he is entitled to a share of the above settlement proceeds recovered in *Osinek*. Specifically, Mazik asks that he be awarded 8% of the total $556 million (*i.e.*, $44.48 million). Mazik maintains that the 8% should be deducted from the government's share; he does not challenge the 17% that will go to Osinek and Taylor. According to Mazik, adding up the 8% and 17% (*i.e.*, 25% total) would mean the government would still get 75%, an allocation consistent with the False Claims Act ("FCA") statute. *See* 31 U.S.C. § 3730(d)(2) (providing that, if the government declines to intervene in a FCA case brought by a qui tam plaintiff, "the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages[;] [t]he amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement"). The government, Osinek, and Taylor all oppose Mazik's motion. Osinek and Taylor's opposition, however, is cursory in nature; thus, ultimately, the substantive opposition is from the government.

/ / /

Having considered the parties' briefs and accompanying submissions, all other evidence of record, and the oral argument of counsel, the Court hereby **DENIES** Mazik's motion for relief.

### I. FACTUAL & PROCEDURAL BACKGROUND

A. *Osinek* Matters

The *Osinek* matters litigated before this Court consist of six cases: *Osinek* (filed in 2013); *Taylor* (filed in 2014); *Arefi* (filed in 2015); *Stein* (filed in 2016), and *Bryant* (filed in 2018).  Each case involved allegations about false claims for payment to the government in conjunction with Medicare Advantage.

As the Court has explained in a prior order, Medicare Advantage is different from traditional Medicare.  With traditional Medicare, the government reimburses health care providers using a fee-for-service system.  In contrast to traditional Medicare, Medicare Advantage uses a capitation payment system:

> Under that system, "private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program – regardless of actual healthcare usage." The fixed monthly fee for an enrollee is set as follows.  First, there is a predetermined base payment for each enrollee in a Medicare Advantage plan.  Second, the base payment is then adjusted "to account for (1) demographic factors such as age and gender (among others) and (2) health status.  This is known as risk adjustment."
>
> Risk adjustment is accomplished by assigning each beneficiary a risk score, which "acts as a multiplier that is applied to the [Medicare Advantage] plan's base rate to determine the overall monthly payment for the beneficiary."  A beneficiary's risk score is determined through a model called the CMS Hierarchical Conditions Category ("CMS-HCC") model, which, as indicated above, is based on the patient's demographic factors and health status.  With respect to health status, the model relies on diagnosis codes from the International Classification of Diseases ("ICD"). "ICD diagnosis codes are alphanumeric codes used by healthcare providers, insurance companies, and public health agencies to represent medical conditions; every disease, injury, infection, and symptom has its own code."

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 601 F. Supp. 3d 536, 542 (N.D. Cal. 2022).[2]

_____

[2] Technically, "[t]he CMS-HCC model is prospective in the sense that it uses diagnoses made in a base year (the service year), along with demographic information (such as age and gender, among

United States District Court
Northern District of California

Generally speaking, because of risk adjustment, if an individual is diagnosed with a serious medical condition, the higher the fixed monthly fee will be under the Medicare Advantage program. Risk adjustment can be fraudulent if a false diagnosis is rendered. In other words, for a given enrollee, if a false diagnosis is issued, then (1) the health status of the enrollee would be deemed more serious than it actually was, and (2) the health insurance organization would get a higher monthly payment from the government for that enrollee.

In the case at bar, all *Osinek* matters asserted false claims for payment in conjunction with Medicare Advantage because of improper risk adjustment. However, the government chose to intervene in the *Osinek* matters only in part: "Specifically, the United States intervenes on the allegations that [Kaiser] submitted, or caused to be submitted, false claims for risk-adjustment payments **based on diagnoses improperly added via addenda** under Medicare Part C from the years 2009 until present. The United States declines to intervene on all other allegations." Docket No. 64 (Not. ¶ 1) (emphasis added). Thus, the government's case was based on a specific factual predicate: false diagnoses were added via addenda – and by Kaiser doctors specifically. *See* Docket No. 240 (U.S. FAC ¶ 1) (alleging that "Kaiser mined Medicare Advantage patient medical files for potential additional diagnoses" and "then pressed *its* physicians to add the diagnoses to medical records retrospectively using an addendum to make it appear as if the conditions had been addressed in some way during the patient visit when in fact they had not") (emphasis added).

While the government made the decision to intervene in part, it did not take any position on how first-to-file rule codified in the FCA applied to each relator in the *Osinek* matters . *See* 31 U.S.C. § 3730(b)(5) (providing that, "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action"); *see also United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001) (noting that the purpose of the first-to-file rule is twofold: (1) "to promote incentives for whistle-blowing insiders" and (2) "[to] prevent opportunistic successive

others), to predict costs for Medicare benefits and adjust payments for the following year (the payment year)." *Osinek*, 601 F. Supp. 3d at 542-43 (internal quotation marks omitted).

United States District Court
Northern District of California

plaintiffs"). The first-to-file bar was an issue litigated among Kaiser and the various relators.

That being said, the Court's first-to-file order, *see* Docket No. 171 (order), did have an impact – at the very least, a practical one – on the government's complaint-in-intervention. Based on the Court's order, only two relators had claims that were not barred by the first-to-file rule **and** that were covered by the government's complaint-in-intervention: (1) Osinek and (2) Taylor.

- Osinek met this criteria because she had filed the very first qui tam suit and because she alleged that Kaiser doctors in California added false diagnoses via addenda.

- Taylor met this criteria because, even though he did not file the first qui tam suit, he was the first relator to allege that Kaiser doctors in other states – including Colorado – added false diagnoses via addenda.

In each case, the addenda was alleged to have been "upcoded" internally by Kaiser doctors – the same position taken by the government in its complaint-in-intervention.

For purposes of the pending motion, it is worth noting that Taylor also had claims that were not barred by the first-to-file rule but where the government did **not** intervene. For example, Taylor alleged that non-Kaiser (*i.e.*, external) doctors also made false diagnoses. In contrast to Taylor, the government focused solely on Kaiser (*i.e.*, internal) doctors. *See, e.g.*, Docket No. 240 (U.S. FAC ¶ 1) (alleging that "Kaiser mined Medicare Advantage patient medical files for potential additional diagnoses" and "then pressed *its* physicians to add the diagnoses to medical records retrospectively using an addendum to make it appear as if the conditions had been addressed in some way during the patient visit when in fact they had not") (emphasis added).

B.   *Mazik*

In his case filed in the Eastern District of California, Mazik also claims Kaiser made false claims for payment because of improper risk adjustment. While *Mazik* and *Osinek* (*i.e.*, the government's complaint-in-intervention) are thus similar in a general sense, there are important differences between the two cases. Most notably:

(1) *Osinek* focused on false diagnoses issued by **Kaiser (*i.e.*, internal) doctors** whereas *Mazik* focused on false diagnoses issued by **non-Kaiser (*i.e.*, external) doctors**. *Compare, e.g.*, Docket No. 240 (U.S. FAC ¶ 1) ("The allegations in this

Amended Complaint concern Kaiser's efforts to increase its Medicare revenue by systematically pressuring **its** physicians to add diagnoses that did not appear in the original visit note" – "retrospectively using an addendum to make it appear as if the conditions had been addressed in some way during the patient visit when in fact they had not.") (emphasis added), *with Mazik* Docket No. 122 (Order at 4) ("According to [Mazik], since 2008 at the latest, defendants have schemed to defraud the federal government by allowing **external**, i.e., 'non-Kaiser,' healthcare providers to submit false diagnosis codes, which defendants in turn submit to CMS in order to inflate their capitation rates.") (emphasis added).

(2) *Osinek* described Kaiser being **alerted** to improper upcoding **when, *e.g.*, audits were conducted but then doing nothing in response**. *See, e.g.*, Docket No. 240 (U.S. FAC ¶ 12) (alleging that "Kaiser ignored numerous red flags and internal warnings that it was violating Medicare rules, including concerns raised by its own physicians that these were false claims and audits by its own compliance office identifying the issue of inappropriate addenda"). In contrast, Mazik alleged that Kaiser contracted with **third-party vendors (such as McKesson and Verisk) to use their software applications** to ensure that the Medicare Advantage billing was correct. *See* Mot. at 5. "Mazik discovered that Kaiser **intentionally failed** to use [the third-party vendors'] fraud-detection tools . . . . Specifically, Kaiser **intentionally misused** these programs by setting them at minimum capacity and disabling key features to purposely reduce the changes of detecting false diagnoses data errors." Mot. at 5 (emphasis added). In other words, *Osinek* proceeded with the assumption that the audits that revealed errors were valid, whereas *Mazik* challenged the validity of the audits themselves.

Significantly, Mazik drew these very distinctions in arguing before Judge Drozd (the presiding judge in *Mazik*) that the first-to-file rule did not bar his case and/or that his case should not be transferred to this District. And these differences in focus led Judge Drozd to conclude that the first-to-file rule did not bar all of Mazik's case/or that *Mazik* should not be transferred to the

Northern District.  However, Mazik now maintains that his case and *Osinek* are similar such that he is entitled to a share of the *Osinek* settlement proceeds.  Mazik claims, for instance, that in both *Osinek* and *Mazik*, the same injury was suffered by the government.  *See* Mot. at 12.  He also suggests that, if Kaiser had not "deliberate[ly] tamper[ed]" with the compliance software (*i.e.*, the subject of *Mazik*), then the software "would have detected the scheme [described in *Osinek*] and precluded Kaiser from engaging in it."  Mot. at 13 (emphasis added).  Mazik further maintains that, without his "filings and disclosures[,] the United States would have been unable to articulate the one-way data mining set forth in its amended complaint-in-intervention."  Mot. at 18.

C.    Timeline

In evaluating whether Mazik is entitled to a share of the settlement proceeds in *Osinek* (the government's complaint-in-intervention), the Court bears in mind the events that have taken place in both *Mazik* and the *Osinek* matters.

- **8/22/2013.**  The qui tam plaintiff in *Osinek* filed her complaint in the Northern District of California.  *See* Docket No. 1 (complaint).  The complaint was filed under seal as required by the FCA.

- **2014-2018.**  Four additional qui tam suits were filed (under seal) against Kaiser: *Taylor* (filed in 2014), *Arefi* (filed in 2015), *Stein* (filed in 2016), and *Bryant* (filed in 2018).  The complaints were either filed in or transferred to the Northern District of California.

- **4/1/2019.**  Mazik filed his case in the Eastern District of California (No. C-19-0559 DAD-JAP).  *See Mazik* Docket No. 1 (complaint).

- **2/10/2020.**  Yet another qui tam suit was filed against Kaiser: *Bicocca*.  The case was filed in the Eastern District of California but was later transferred to the Northern District.

- **7/13/2020.**  The United States declined to intervene in *Mazik*.  *See Mazik* Docket No. 18 (notice).  Judge Mendez unsealed the *Mazik* complaint.  *See Mazik* Docket No. 20 (order).  (Judge Mendez was the judge who presided over *Mazik* before Judge Drozd.)

United States District Court
Northern District of California

United States District Court
Northern District of California

- **4/2/2021.** Mazik filed an amended complaint. *See Mazik* Docket No. 48 (FAC).

- **4/19/2021 and 5/21/2021.** Mazik served on the United States two supplemental disclosure statements which were related to the alleged false claims pled in his FAC. *See* Friedman Decl. ¶ 11; *see also* Friedman Decl. ¶¶ 5-9 (describing documents provided to the government as part of the second supplemental disclosure – *e.g.*, a 2013 internal report on Reimbursement Compliance from the Audit and Compliance Committee, a document of results of the 2012 HCC audit probe using 2011 data showing 89% accuracy rate, the CMS Medicare Advantage Fraud Handbook, a copy of an April 2015 snapshot of Kaiser's claims metrics, a copy of McKesson ClaimsXten documentation comparing McKesson functionality with the functionality of a competitor).

- **6/25/2021.** This Court consolidated the six qui tam suits that were pending in the Northern District of California: *Osinek* (filed in 2013), *Taylor* (filed in 2014), *Arefi* (filed in 2015), *Stein* (filed in 2016), *Bryant* (filed in 2018), and *Bicocca* (filed in 2020). *See* Docket No. 61 (order).

- **7/27/2021.** The government elected to intervene in part with respect to the six consolidated suits in the Northern District (*i.e.*, the *Osinek* matters). "Specifically, the United States intervenes on the allegations that [Kaiser] submitted, or caused to be submitted, false claims for risk-adjustment payments **based on diagnoses improperly added via addenda** under Medicare Part C from the years 2009 until present. The United States declines to intervene on all other allegations." Docket No. 64 (Not. ¶ 1) (emphasis added).

- **7/29/2021.** This Court unsealed the complaints in the six consolidated cases. *See* Docket No. 65 (order).

- **10/25/2021.** The United States filed its complaint-in-intervention in *Osinek*. *See* Docket No. 110 (U.S. Compl.). The complaint-in-intervention focused on Kaiser's health plans and provider medical groups in Northern California, Southern California, and Colorado specifically. *See* Docket No. 110 (U.S. Compl. ¶ 19).

(Osinek's case was California-centric; Taylor's extended more broadly, including Colorado.)  The United States alleged that Kaiser had engaged in "data mining" and "chart review," where it would use "automated algorithms and/or human reviewers to identify new diagnoses for a patient," and then "pressure [its] physicians to improperly add these diagnoses" "via addenda."  Docket No. 110 (U.S. Compl. ¶¶ 7-9); *see also* Docket No. 110 (U.S. Compl. ¶ 11) ("Through these coordinated and systematic efforts to have physicians create retrospective addenda to patient medical records with diagnoses that did not exist or were unrelated to the medical visit, Kaiser improperly submitted thousands upon thousands of diagnoses to CMS as claims for payment.").

- **12/1/2021.**  The United States declined to intervene with respect to Mazik's FAC.  *See* Docket No. 62 (notice).  The following day, Judge Mendez unsealed the *Mazik* FAC.  *See* Docket No. 63 (order).

- **1/3/2022.**  Judge Mendez approved a stipulation submitted by the parties, staying *Mazik* pending this Court's decision on Kaiser's motion to dismiss in the *Osinek* matters based on the first-to-file rule.[3]  *See* Docket No. 69 (stipulation and order).

- **5/5/2022.**  This Court issued its first-to-file order.  *See* Docket No. 171 (order).  The Court's first-to-file order dismissed Arefi and Stein's cases in their entirety.  It also found that most of Taylor's, Bryant/Hernandez's, and Bicocca's cases barred by the first-to-file rule, but not all.  *See* Docket No. 171 (Order at 46).  Bicocca voluntarily dismissed his claims that were not barred.  *See* Docket No. 159 (notice).  Thus, as a practical matter, the parties involved in the *Osinek* matters thereafter were: the United States, Osinek, Taylor, Bryant/Hernandez, and Kaiser.  However, as discussed above, the only two relators that were not subject to the first-to-file bar **and** that had claims covered by the government's complaint-in-intervention were

---

[3] *See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.").

9

(1) Osinek and (2) Taylor.

- **7/13/2022.** Kaiser filed a motion to dismiss in *Mazik*, in part based on the first-to-file rule. *See Mazik* Docket No. 78 (motion).

- **12/12/2022.** The United States filed an amended complaint-in-intervention in *Osinek*. *See* Docket No. 240 (U.S. FAC). This was in response to a Court order granting in part Kaiser's motion to dismiss the original complaint-in-intervention. *See, e.g.*, Docket No. 223 (Order at 14) (holding that the only *systemic* scheme sufficiently pled by the government was with respect to one diagnosis only (cachexia); but giving the government "leave to amend . . . to expand the scope of its allegations on clinically false diagnoses").

- **2/13/2024.** Judge Drozd (to whom the *Mazik* case had been reassigned) granted in part and denied in part the first-to-file motion in *Mazik*. *See Mazik* Docket No. 104 (order). More about the order is discussed *infra*.

- **3/26/2024.** Mazik filed a second amended complaint. *See Mazik* Docket No. 107 (SAC).

- **4/8/2024.** Kaiser moved to transfer *Mazik* to the Northern District of California. *See Mazik* Docket No. 109 (motion). Mazik opposed the motion. *See* Docket No. 114 (opposition by Mr. Mazik). Although the government had declined to intervene in *Mazik*, it still remained the real party in interest and thus filed a statement. Like Mazik, the government also opposed transfer. *See Mazik* Docket No. 111 (statement by United States).

- **6/14/2024.** Judge Drozd denied Kaiser's motion to transfer. *See Mazik* Docket No. 122 (order). More about this order is discussed *infra*. Mazik's case remains pending in the Eastern District of California.

D.    Rulings in *Mazik*

As indicated by the above, Judge Drozd issued two orders of note in *Mazik*: (1) his order finding that part of Mazik's case was subject to the first-to-file rule, *see Mazik* Docket No. 104 (order), and (2) his order denying Kaiser's motion to transfer to the Northern District. *See Mazik*

10

United States District Court
Northern District of California

Docket No. 122 (order).

1.     First-to-File Order

In the first order, Judge Drozd considered whether Mazik's FAC was subject to the first-to-file bar based on *Taylor* (one of the *Osinek* matters).  *See Mazik* Docket No. 104 (Order at 10-11).  As noted above, the government's complaint-in-intervention covered part of *Taylor* – *i.e.*, that part which implicated false diagnoses via addenda made by Kaiser doctors.  However, the government did not intervene with respect to other parts of *Taylor* – *e.g.*, Taylor's claim that non-Kaiser (*i.e.*, external) doctors engaged in improper upcoding.[4]  Although Judge Drozd did not expressly state why he compared *Mazik* to *Taylor*, implicitly, it was because, like *Mazik*, part of *Taylor* focused on improper upcoding by non-Kaiser doctors (whereas *Osinek*, the first qui tam suit, addressed only improper upcoding by Kaiser doctors).  In other words, Judge Drozd was comparing the declined part of *Taylor* (in which the government chose not to intervene) to *Mazik*.

Mazik argued to Judge Drozd that there was no first-to-file bar as a result of the declined part of *Taylor* because, *e.g.*, he was "'the first to put the government on notice about Kaiser's practice of acquiring and utilizing recognized fraud-detecting programs to make it *appear* as though it has a robust compliance operation, but purposefully *configuring* those programs to overlook readily identifiable instances of fraud.'"[5]  *Mazik* Docket No. 104 (Order at 12) (emphasis added).  This basis of fraud – invalidity of the audit – differed from that asserted in the declined part of *Taylor*.  Judge Drozd found this reasoning persuasive.  He held that Mazik's "FCA claim is barred by the first-to-file rule **except** to the extent [he] alleges that defendants deliberately tampered with compliance software to ensure that it did not identify erroneous diagnosis codes."  *Mazik* Docket No. 104 (Order at 12) (emphasis added).  Specifically, Mazik's "federal FCA claim

---

[4] *See* Docket No. 171 (Order at 46) (in this Court's order on the first-to-file rule, comparing *Osinek* and *Taylor* and finding that the first-to-file rule barred all of *Taylor* except, *e.g.*, to the extent Taylor pled "a fraud based on improper coding by external providers").

[5] As indicated above, the programs were provided by third-party vendors such as McKesson and Verisk.  *See Mazik* Docket No. 122 (Order at 4).  As alleged, Kaiser "tampered" with the programs "by disabling key features, in order to reduce the chances of detecting claims errors."  *Mazik* Docket No. 122 (Order at 4-5) (noting as an example that Kaiser allegedly deactivated 25 of the 54 rules used by the McKesson program known as "ClaimsXten").

is barred insofar as it alleges a general fraudulent scheme wherein defendants knowingly requested CMS reimbursements premised on erroneous diagnosis codes." *Mazik* Docket No. 104 (Order at 13). But

> [t]he Taylor Complaint describes various Kaiser entities discovering errors in the diagnosis codes via audits and then failing to act on those discoveries. By contrast, here relator's allegations in his FAC describe defendants' decision to disable compliance software so that the audits would *not* identify erroneous codes and defendants would not discover the errors in the first place.

*Mazik* Docket No. 104 (Order a 13) (emphasis in original). There was "nothing in [*Taylor*] that would have prompted the government to question the validity of the audits." *Mazik* Docket No. 104 (Order at 14). Thus, Judge Drozd allowed this part of *Mazik* to proceed. Significant to the motion at bar, this part of *Mazik* was independent of not only (1) the declined part of *Taylor* but also (2) the government's complaint-in-intervention in the *Osinek* matters (which focused solely on upcoding by Kaiser doctors and which did not include allegations of deliberate tampering with the compliance software).

### 2. Transfer Order

In the second order, Judge Drozd considered Kaiser's motion to transfer what remained in *Mazik* to the Northern District of California.

In his papers, Mazik focuses on the fact that the government opposed transfer. While that is true, Mazik himself also opposed transfer to the Northern District. Notably, Mazik took the position that, from an efficiency/economy standpoint, it did not make sense to transfer *Mazik* so that it could essentially be consolidated with the *Osinek* matters in the Northern District. Mazik argued, *e.g.*, as follows:

- "[T]he factual basis for proving Mazik's claim is not present in the consolidated cases [in the Northern District]. None of the evidence concerning Kaiser's contracts with third-party vendors for fraud detection software, Defendants' determination to turn off certain functionality on that software, or Relator's extensive interactions with Kaiser management regarding its mis- or non-use and resulting overpayment, is material to the *Osinek* actions. Yet, this evidence forms

the basis for Mazik's claims.  And while the United States in *Osinek* will focus on proof that Kaiser providers added false diagnostic codes in addenda after patient encounters, Mazik will focus on a different compliance system and database, to show Kaiser tampered with it to allow fraudulent claims by non-Kaiser providers." *Mazik* Docket No. 114 (Mazik Opp'n at 10).

- "Whether Kaiser is responsible for false claims caused by its tampering with compliance software for detecting fraudulent claims by outside providers would be a determination that is simply unaffected by a different judicial determination that Kaiser physicians did or did not use false diagnosis codes to record patient encounters.  And vice versa." *Mazik* (Docket No. 114) (Opp'n at 11).

In his order, Judge Drozd largely agreed with Mazik.  Judge Drozd noted that there were "some high-level similarities between *Mazik* and the *Osinek* matters" in that "[b]oth involve defendants' alleged violations of the federal FCA via incorrect diagnoses and deficient compliance programs." *Mazik* Docket No. 122 (Order at 17).  But, after Judge Drozd's ruling on the first-to-file issue, "the scope of *Mazik* is different from that of the *Osinek* matters": "[t]he FCA claim in *Mazik* is predicated on defendants' alleged tampering with compliance software, while the FCA claims in the *Osinek* matters is almost entirely predicated on defendants' providers allegedly adding false diagnostic codes in addenda after patient encounters." *Mazik* Docket No. 122 (Order at 16).  Accordingly, Judge Drozd found that "the lack of factual similarity between the actions undercuts defendants' claim that consolidation would promote efficiency in discovery and case management." *Mazik* Docket No. 122 (Order at 17).

Judge Drozd also went on to note that there was potential for delay if there were to be consolidation:

> Consolidating *Mazik* with the *Osinek* matters appears likely to disrupt the laboriously negotiated schedule currently in place in the cases pending before Judge Chen in the Northern District.  Moreover, transfer runs the risk of injecting [Mr. Mazik] into discovery disputes *with little relation to his action given the factual dissimilarity of his federal FCA claim*.  Accordingly, the court concludes that the potential for delay weighs strongly in favor of denying the pending motion.

United States District Court
Northern District of California

*Mazik* Docket No. 122 (Order at 18) (emphasis added).

Ultimately, Kaiser's motion to transfer *Mazik* to the Northern District was denied.

E.      Settlement Agreements in *Osinek*

After Judge Drozd denied Kaiser's motion to transfer, *Mazik* continued to be litigated in the Eastern District while the *Osinek* matters continued to be litigated in the Northern District.  In January 2026, this Court received notice that the *Osinek* matters had settled.

The settlement of the *Osinek* matters technically involves two agreements:

(1) The 1/14/2026 Settlement Agreement addressing the U.S.'s complaint-in-intervention. *See* Friedman Decl., Ex. A (settlement agreement); *see also* Docket No. 421 (stipulation of dismissal entered into by the United States, Osinek, Taylor, and Kaiser). As noted above, this is the main settlement agreement.  The agreement reflects that the only relators who had claims that were not barred by the first-to-file rule **and** that were covered by the government's complaint-in-intervention (focusing on false diagnoses made by Kaiser doctors via addenda) were Osinek and Taylor.

(2) The 1/14/2026 Declined Claims Agreement.  *See* Docket No. 423 (stipulation of dismissal entered into by Bryant/Hernandez, Taylor, and Kaiser).  This secondary agreement reflects that the government did not intervene on all aspects of the *Osinek* matters, including part of *Taylor*.

The main settlement agreement addressing the United States's complaint-in-intervention specifically stated that it released Kaiser from liability only with respect to "Covered Conduct," defined as conduct implicated in the operative complaint-in-intervention filed by the government. *See* Opp'n at 3; Friedman Decl., Ex. A (Sett. Agmt. ¶ I) ("The United States contends that it has certain civil claims against the Defendants for the time period between 2009 and 2018, as specified in the United States' Amended Complaint-in-Intervention.  That conduct is referred to herein as the 'Covered Conduct.'").

/ / /

/ / /

/ / /

## II.    DISCUSSION

A.    Legal Standard

Mazik contends that he is entitled to a share of the main settlement agreement – *i.e.*, the first settlement agreement involving the United States, Osinek, Taylor, and Kaiser.  He argues that his entitlement to a share is required by the FCA statute, specifically 31 U.S.C. § 3730(c)(5).

Before the Court focuses on that provision, it first provides a brief overview of the FCA statute.  Under the FCA, "[a] person may bring a civil action for a violation of section 3729 [addressing false claims for payment to the government] for the person and for the United States Government.  The action shall be brought in the name of the Government." *Id.* § 3730(b)(1). "When a person brings an action under this subsection, **no person** other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5) (emphasis added).  As noted above, this is the first-to-file provision.

The government has two options when a qui tam suit is filed pursuant to the FCA.

- **Intervene.**  "If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action.  Such person shall have the right to continue as a party to the action, subject to [certain] limitations . . . ." *Id.* § 3730(c)(1).  "If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* § 3730(d)(1).

- **Decline intervention.**  "If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action." *Id.* § 3730(c)(3).  "If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages.  The amount shall be not less than 25 percent and not more than 30 percent of the

United States District Court<br>Northern District of California

15

proceeds of the action or settlement and shall be paid out of such proceeds." *Id.* § 3730(d)(2).

Section 3730(c)(5) is the FCA provision on which Mazik relies in support of the pending motion. Section 3730(c)(5) states:

> Notwithstanding subsection (b) [actions by private persons], the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in **another proceeding**, the person initiating the action shall have the same rights in such proceeding as such person would have had **if the action had continued under this section**.

*Id.* § 3730(c)(5) (emphasis added). The Ninth Circuit has explained § 3730(c)(5) as follows: "If the government **declines** to intervene but instead 'pursue[s] its claim through any alternate remedy,' the relator [in the declined suit] remains entitled to the same share of the recovery to which she would have been entitled **had the government pursued its claim by intervening in the relator's qui tam action**." *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1005 (9th Cir. 2001) (emphasis added).

> An alternate remedy under § 3730(c)(5) is a remedy achieved through the government's **pursuit of a claim after it has chosen not to intervene** in a qui tam relator's FCA action. The use of the term "alternate remedy" makes clear that the government must choose one remedy or the other; it cannot choose both. If the government chooses to intervene in a relator's action, and if the government recovers any proceeds in the action, the relator has a right to a share of those proceeds. If the government chooses not to intervene in the relator's action, but, instead, chooses to pursue "any alternate remedy," the relator has a right to recover a share of the proceeds of the "alternate remedy" to the same degree that he or she would have been entitled to a share of the proceeds of an FCA action.

*Id.* at 1010 (emphasis added).

## B.  First-to-File Rule

Mazik invokes § 3730(c)(5) in support of his contention that he is entitled to a share of the *Osinek* settlement proceeds. But before getting to § 3730(c)(5) as applied to Mazik, the Court must take into account the first-to-file rule. *See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."). To the extent part of *Mazik* was based

16

(at one point) on the same factual predicate as that in *Osinek*, Mazik cannot claim a share of the *Osinek* settlement because of the first-to-file bar. *See United States ex rel. Dhillon v. Endo Pharms.*, 617 Fed. Appx. 208, 212 (3d Cir. 2015) ("Only the first-filed Relator is entitled to a Relator's share award from a settlement, and Dhillon is not a first-filed Relator."). Mazik does not make any argument to the contrary.

The Court also takes into consideration that Judge Drozd allowed part of *Mazik* to survive – when comparing *Mazik* to *Taylor* – because part of *Mazik* focused on different conduct. As noted above, while *Taylor* focused on a theory that audits alerted Kaiser to improper coding, *Mazik* focused on the theory that Kaiser tampered with compliance (*i.e.*, auditing) software. To be sure, here, Judge Drozd was comparing *Mazik* to the part of *Taylor* where the government *declined* to intervene (*i.e.*, addressing non-Kaiser doctors). However, that underscores the even greater difference between *Mazik* and the government's complaint-in-intervention; while the former focused on non-Kaiser doctors, the latter focused solely on Kaiser doctors.

C.      Alternate Proceeding for the Same Claim

The Court next considers that, in order for Mazik to get a share of the *Osinek* settlement under § 3730(c)(5), the government would have had to – in effect – pursued and/or settled **Mazik's** FCA claim in *Osinek*. *See United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 650 (6th Cir. 2003) ("We . . . hold that a settlement pursued by the government in lieu of intervening in a qui tam action asserting **the same FCA claims** constitutes an 'alternate remedy' for purposes of 31 U.S.C. § 3730(c)(5).") (emphasis added); *Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373 (8th Cir. 2015) ("[A] relator seeking recovery must establish that 'there exists [an] **overlap** between Relator's allegations and the conduct discussed in the settlement agreement.'") (emphasis added); *United States ex rel. Conyers v. Conyers*, 108 F.4th 351, 354, 358 (5th Cir. 2024) ("Courts applying this provision [§ 3730(c)(5)] permit the relator to recover only insofar as the settled claim '**overlaps**' with the relator's claim.") (emphasis added); *cf. United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47, 58 (D.C. Cir. 2021) ("[F]actual overlap is *necessary* for an alternative proceeding to be an 'alternate remedy' within the meaning of subsection 3730(c)(5).") (emphasis in original).

17

Mazik has failed to cite any authority that interprets § 3730(c)(5) in a different way.  That being the case, his motion for a share of the settlement proceeds in *Osinek* fails.  As indicated above, the claims the government pursued in *Osinek* were materially different from those pursued by Mazik in his case.  First, *Osinek* focused on upcoding by internal (Kaiser) providers (specifically, via addenda) while *Mazik* focused on upcoding by external providers.  Second, *Osinek* focused on the theory that audits revealed improper coding but Kaiser did nothing in response; meanwhile, *Mazik* focused on Kaiser deliberately tampering with compliance (*i.e.*, auditing) software.

At the hearing, Mazik protested that the government did, in fact, settle his FCA claim because:

- The main settlement agreement stated that the United States released Kaiser "from any civil or administrative monetary claim the United States has for the Covered Conduct," Friedman Decl., Ex. A (Sett. Agmt. ¶ 4);

- "Covered Conduct" was defined by reference to the government's operative complaint-in-intervention, *see* Friedman Decl., Ex. A (Sett. Agmt. ¶ I) (stating that "[t]he United States contends that it has certain civil claims against [Kaiser] for the time period between 2009 and 2018, as specified in the United States' Amended Complaint-in-Intervention[;] [t]hat conduct is referred to herein as the 'Covered Conduct'");

- The government's operative complaint-in-intervention broadly alleged, *e.g.*, that Kaiser had "presented or caused to be presented false claims for risk-adjustment payments in the form of improper diagnosis codes for [Kaiser's] Medicare patients," Docket No. 240 (U.S. FAC ¶ 379); and

- Mazik also asserted in his case that there were false diagnosis codes that resulted in improper risk-adjustment payments by the government to Kaiser.

But Mazik's position lacks merit.  The government's complaint-in-intervention focused solely on Kaiser "min[ing] Medicare Advantage patient medical files for potential additional diagnoses" and then "press[ing] its physicians to add the diagnoses to medical records retrospectively using an

United States District Court
Northern District of California

addendum to make it appear as if the conditions had been addressed in some way during the patient visit when in fact they had not." Docket No. 240 (U.S. FAC ¶ 1). As Mazik conceded at the argument herein, there is not a single reference in the government's pleading to upcoding by external non-Kaiser doctors nor is there any allegation that Kaiser misused third party software in effectuating that upcoding. Instead, Mazik's position is predicated on **isolating** a single allegation from the government's operative complaint-in-intervention (¶ 379) that essentially summarizes in a general way the allegations of Kaiser's fraud in upcoding. Mazik ignores (1) an almost-immediately preceding allegation (in ¶ 377) which incorporates by reference all prior allegations in the operative pleading, *see* Docket No. 240 (U.S. FAC ¶ 377) ("The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 376 above as though they are fully set forth herein."), and (2) the allegations contained in those preceding paragraphs which make no reference to the specific kinds of fraudulent conduct alleged in Mazik.[6]

Thus, the claims settled in *Osinek* were different and distinct from the claims asserted by *Mazik*, and hence § 3730(c)(5) is inapplicable.

D.      Other Theories for Sharing in Settlement

In his papers, Mazik suggests there are other theories to support his claim of entitlement to settlement proceeds. He argues, for example, that Kaiser will likely assert as a defense in *his* case (1) claim preclusion[7] and (2) damage credit.[8] *See* Mot. at 19- 21. What Kaiser may or may not

---

[6] At the hearing, Kaiser did not disagree that the government's complaint-in-intervention covered only improper upcoding by Kaiser doctors (not external ones) and did not include any allegations of Kaiser deliberately tampering with the auditing software.

[7] *See, e.g.*, *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998) (where relator was pursuing a claim on which the government had declined to intervene, evaluating whether claim was barred by res judicata in light of settlement between the government and defendant on the claim where the government did intervene; concluding res judicata applied because both claims were based on the same transactional nucleus of fact: "[w]hile Barajas [relator] is plainly correct that it is one thing to have fluid that gums up in the cold, and another to lie about whether the fluid was tested for gumming up, both wrongful acts arise out of the same attempt to get paid for flight data transmitters not up to specifications").

[8] By damage credit, Mazik is referring to a situation "when the qui tam defendant [Kaiser] would be entitled to claim a damage credit against the relator's [Mazik's] action based upon money paid in an alternative proceeding [*Osinek*]." Mot. at 21. *See, e.g.*, *Barajas*, 258 F.3d at 1011 (noting that, through an agreement between the government and Northrop, "the government obtained a remedy from Northrop for the defective damping fluid that substantially replicated the remedy it

United States District Court
Northern District of California

assert as a defense in the *Mazik* case is not clear, particularly given Kaiser's acknowledgement herein that the claims in *Osinek* (*i.e.*, the government's complaint-in-intervention) addressed improper upcoding by Kaiser doctors. Nor will this Court predict how Judge Drozd might rule should Kaiser assert claim preclusion or damage credit as a defense in *Mazik*. But from the perspective of this Court at least (as well as from the government's perspective as articulated at the hearing), Kaiser will have difficulty in arguing in *Mazik* that there is claim preclusion or that it is entitled to a damage credit for what it paid out in *Osinek*, **unless** the same conduct or injury was at issue in both *Mazik* and *Osinek*. But Kaiser did not assert to this Court that the same conduct or injury is at issue in the two cases. Any such argument would have to account for this Court's finding that the conduct or injury at issue in *Mazik* and that in *Osinek* are not the same, particularly because *Osinek* focused on upcoding by internal providers while *Mazik* focused on upcoding by external providers.

The Court acknowledges that Medicare Advantage is different from traditional Medicare: with traditional Medicare, the government reimburses health care providers using a fee-for-service system; in contrast, Medicare Advantage uses a capitation payment system. Nevertheless, the capitation payment system still depends on diagnosis codes that are issued by physicians. Thus, the government could isolate diagnosis codes issued from internal Kaiser providers and focus on risk-adjustment payments based on those diagnosis codes only. While there could be instances in which, *e.g.*, a diagnosis was rendered by an internal provider and then the same diagnosis by an external provider, there is no indication that this occurred and if so, how often. Absent such a coincidence of upcoding of the **same diagnosis** of the **same patient** by two different doctors – one Kaiser and one external – **at the same time**, the fraudulent conduct and damages alleged in *Osinek* and *Mazik* would not overlap. Certainly, Mazik did not convincingly suggest such.

Although not entirely clear, Mazik seems to suggest in his reply brief that he is still entitled to a share of the *Osinek* settlement because, even if his case focuses on different conduct, both the

---

could have obtained if it had intervened in Barajas' second qui tam action"; the agreement also stated Northrop could use the agreement "'in any civil proceeding in which Northrop attempts to obtain appropriate credit for funds paid or value received pursuant to this Agreement'").

20

conduct at issue in *Osinek* and the conduct at issue in his case are part of a "single complex fraud scheme." Reply at 6-7 (arguing that the fact that "multiple relators alleged independent material allegations all in support of a single complex fraud scheme is hardly surprising"; multiple relators may "'each describe pertinent aspects of a broad-reaching fraud'"). This argument, however, is not persuasive because, even if there was a larger overarching scheme, the government was entitled to intervene as to only part of that scheme, that part which involved different conduct and different damages. Notably, the case that Mazik cites, *United States ex rel. Bryant v. Community Health Systems, Inc.*, 24 F.4th 1024 (6th Cir. 2022), is distinguishable because, there, the government intervened in *each* of the relators' actions, *see id.* at 1029, and thus there was a basis for all of the relators to get an allocation of the settlement.

The only other theory that Mazik offers in support of his motion is a causation theory – *i.e.*, because of the deliberate tampering with the compliance software, Kaiser was able to carry out its upcoding scheme and/or, because of Mazik's assistance to the government (providing documents or information), the government was able to file an informed amended complaint-in-intervention. Any such causation theory is subject to the same problem as above; that is, given that *Mazik* focused on external providers and *Osinek* internal ones, there would not seem to be any causation. In this regard, it is worth noting that Mazik fails to provide any real specifics as to how the government's pleading was informed by documents or information he provided.

Furthermore, even if there were a factual basis for the causation claim, at least one court has indicated that a causation theory is not enough to support a claim to a share of settlement proceeds under § 3730(c)(5). *See United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 192 (4th Cir. 1999) ("The Global Settlement did not include Wagner and Dehner's original qui tam action. Instead, the government settled other potential claims, at least some of which arose from discoveries that were made pursuant to Allied's CIA [Corporate Integrity Agreement]. The fact that the CIA was part of the settlement of Wagner and Dehner's original qui tam suit confers on them no entitlement to proceeds resulting from the later findings. There is no ground in the statute for recovery based on such attenuated 'but for' causation. Therefore, nothing in the Global Settlement can be considered an 'alternate remedy' to any part of the original action."). Nothing

21

in the language of the statute suggests otherwise, and Mazik cites no case to the contrary.

Finally, to the extent Mazik suggests (in his reply brief) that he is entitled to a share of settlement proceeds because he is in no different position from Taylor, that argument also lacks merit. According to Mazik, Taylor was not the first to file, yet is still being given a share; Mazik should be treated no differently. *See* Reply at 10. The problem for Mazik is that he and Taylor are positioned differently. The government did not intervene in Mazik's case at all. But the government **did** intervene in part in Taylor's case: specifically, that part which claimed false diagnoses (via addenda) by Kaiser doctors outside of California, in particular, Colorado. (*Osinek*, the first qui tam suit, focused only on false diagnoses (via addenda) by Kaiser doctors in California. Because of this limitation, not all of *Taylor* was subject to the first-to-file rule.) Mazik cannot rely on § 3730(c)(5) to recovery from the settlement fund here.

### III.    CONCLUSION

For the foregoing reasons, the Court denies Mazik's motion for a share of the settlement proceeds.

The Clerk of the Court is directed to close the file in the case. The Clerk is also directed to enter a final judgment with respect to this order so as to trigger the time to appeal. The Court acknowledges that there is no final judgment with respect to the direct litigants in the *Osinek* matters because a settlement was reached.

This order disposes of Docket No. 439.

**IT IS SO ORDERED**.

Dated: April 10, 2026

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

22